Evan R. Chesler (N.Y. Bar No. 1475722) (*pro hac vice*)
echesler@cravath.com
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

David A. Nelson (Ill. Bar No. 6209623) (*pro hac vice*)
davenelson@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN, LLP
500 West Madison St., Suite 2450
Chicago, Illinois 60661
Telephone: (312) 705-7400
Facsimile: (312) 705-7401

Karen P. Hewitt (SBN 145309)
kphewitt@jonesday.com
JONES DAY
4655 Executive Drive, Suite 1500
San Diego, California 92121
Telephone: (858) 314-1200
Facsimile: (858) 345-3178

[*Additional counsel identified on signature page*]

*Attorneys for Defendant and Counterclaim-Plaintiff*
QUALCOMM INCORPORATED

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| APPLE INC., <br><br>          Plaintiff, <br><br>    v. <br><br> QUALCOMM INCORPORATED, <br><br>          Defendant. | No. 17-cv-0108-GPC-MDD <br><br> **REDACTED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF QUALCOMM INCORPORATED'S MOTION FOR ANTI-SUIT INJUNCTION** <br><br> Date:       August 18, 2017 <br> Time:       1:30 p.m. <br> Courtroom:  2D <br> Judge:     Hon. Gonzalo P. Curiel |

QUALCOMM INCORPORATED,

          Counterclaim-Plaintiff,

             v.

APPLE INC.,

          Counterclaim-
          Defendant.

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION ........................................................................................... 1

FACTUAL BACKGROUND ............................................................................ 3

I.       The Parties. ................................................................................................ 3

II.     Qualcomm's Patent Portfolio and Licensing Practices. ................................ 4

      A.    SDOs and the Standardization Process. ............................................. 4

      B.    The FRAND Contractual Commitment. ............................................. 5

      C.    Qualcomm's and Apple's Past Licensing Relationship. .................... 6

III.    The Parties' Global Licensing Dispute. ...................................................... 7

IV.    Apple's Duplicative Lawsuits Against Qualcomm. ...................................... 9

ARGUMENT .................................................................................................11

I.       Applicable Legal Standard. ......................................................................11

II.     The Parties and Issues Are Functionally the Same. ....................................12

      A.    The Parties Are Functionally the Same. ...........................................12

      B.    The Issues Are Functionally the Same. ............................................13

III.    Multiple *Unterweser* Factors Apply. ..........................................................20

      A.    Apple's Foreign Actions Are Vexatious and Oppressive.................21

      B.    Apple's Foreign Actions Prejudice Multiple Equitable Considerations. ................................................................................22

IV.    The Requested Injunction Has No Adverse Impact on Comity. .................24

CONCLUSION ..............................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Albemarle Corp. v. AstraZeneca UK Ltd.*,
   No. Civ. A. 5:08-1085-MBC, 2009 WL 902348 (D.S.C. Mar. 31,
   2009) ...........................................................................................................24

*Apple Inc. v. Samsung Elecs. Co.*,
   No. 11-cv-01846, 2012 WL 1672493 (N.D. Cal. May 14, 2012) ...................16

*Apple, Inc. v. Motorola Mobility, Inc.*,
   886 F. Supp. 2d 1061 (W.D. Wis. 2012) .......................................................6

*Applied Med. Distribution Corp. v. Surgical Co.*,
   587 F.3d 909 (9th Cir. 2009)..............................................................*passim*

*E. & J. Gallo Winery v. Andina Licores S.A.*,
   446 F.3d 984 (9th Cir. 2006)..............................................................*passim*

*Ericsson Inc. v. D-Link Sys., Inc.*,
   No. 6:10-CV-473, 2013 WL 4046225 (E.D. Tex. Aug. 6, 2013),
   *aff'd in part and rev'd in part*, 773 F.3d 1201 (Fed. Cir. 2014)......................6

*Hilton v. Guyot*,
   159 U.S. 113 (1895)...........................................................................25

*Interdigital Tech. Corp. v. Pegatron Corp.*,
   No. 15-CV-02584-LHK, 2015 WL 3958257 (N.D. Cal. June 29,
   2015) ...............................................................................................13, 25

*Kaepa Inc. v. Achilles Corp.*,
   76 F.3d 624 (5th Cir. 1996)...................................................................24

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas
   Bumi Negara*,
   335 F.3d 357 (5th Cir. 2003).................................................................21

*Microsoft Corp. v. Motorola, Inc.*,
   696 F.3d 872 (9th Cir. 2012)..............................................................*passim*

*Microsoft Corp. v. Motorola, Inc.*,
   871 F. Supp. 2d 1089 (W.D. Wash.), *aff'd*, 696 F.3d 872 (9th Cir.
   2012) ....................................................................................... 11, 13, 24

*Microsoft Corp. v. Motorola, Inc.*,
   No. C10-1823JLR, 2013 WL 6000017 (W.D. Wash. Nov. 12,
   2013), *aff'd*, 795 F.3d 1024 (9th Cir. 2015) .......................................15

*Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren,*
    361 F.3d 11 (1st Cir. 2004) ...................................................................12

*Saint Lawrence Commc'ns v. Vodafone,*
    No. 4a O 73/14, Düsseldorf Regional Court (Mar. 31, 2016) ........................16

*Seattle Totems Hockey Club, Inc. v. Nat'l Hockey League,*
    652 F.2d 852 (9th Cir. 1981)..................................................................21, 24

*Strategic Intent, LLC v. Strangford Lough Brewing Co. Ltd.,*
    No. CV-09-309-RHW, ECF No. 101 (E.D. Wash. Sept. 9, 2010) ..................22

*TCL Commc'ns Tech. Holdings Ltd. v. Telefonaktenbologet LM*
    *Ericsson,*
    No. 8:14-cv-00341-JVS-DFM, ECF No. 7340 (C.D. Cal. June 29,
    2015) ....................................................................................................16

*In re Unterweser Reederei, GmbH,*
    428 F.2d 888 (5th Cir. 1970), *rev'd on other grounds sub nom.*
    *The Bremen v. Zapata Offshore Co.*, 407 U.S. 1 (1972) ...........................21, 23

*Unwired Planet Int'l v. Huawei Techs.*
    [2017] EWHC (Pat) 711 .................................................................6, 16, 17

**INTRODUCTION**

Defendant and Counterclaim-Plaintiff Qualcomm Incorporated ("Qualcomm") brings this motion for an anti-suit injunction to prevent Apple Inc. ("Apple") from pursuing vexatious and duplicative lawsuits against Qualcomm around the world during the pendency of this action.

At their core, all of the suits Apple has brought against Qualcomm are part of a single licensing dispute that should be resolved in this Court. Qualcomm owns a vast and global portfolio of standard essential patents ("SEPs"), including cellular SEPs, which a cellular device must practice in order to comply with a cellular standard, such as 3G or 4G. Apple's iPhones and cellular iPads rely on Qualcomm's SEPs to operate. Instead of entering into a direct license agreement with Qualcomm, Apple outsourced the manufacture of its iPhones and iPads to third parties (the "Contract Manufacturers"), relying on those Contract Manufacturers' existing license agreements with Qualcomm. From time to time, Apple and Qualcomm have discussed a direct license. Over the past two years, the parties have engaged in negotiations for Apple to take a direct license to Qualcomm's global portfolio of cellular SEPs, but they have never executed one.

In the midst of these negotiations, Apple filed this action (the "U.S. Action"), alleging (among other things) that Qualcomm breached its contractual obligation to the European Telecommunications Standards Institute ("ETSI") to offer Apple a license to its cellular SEPs on fair, reasonable, and non-discriminatory ("FRAND") terms. The essence of Apple's claim is that Qualcomm's royalties (both in the existing license agreements with the Contract Manufacturers and in Qualcomm's offer to Apple for a direct license) are not FRAND. Qualcomm disputes Apple's claims and intends to prove that its license terms and its offer to Apple are entirely consistent with Qualcomm's FRAND obligations. Qualcomm also filed a counterclaim asking this Court to adjudicate the parties' global licensing dispute. Accordingly, to resolve this action, the Court

will need to determine whether Qualcomm has met its FRAND contractual commitments to ETSI as to Apple and, if not, what the appropriate FRAND terms should be for the global cellular SEP license that Qualcomm has offered to Apple.

Before this Court could even begin to adjudicate these core issues, Apple filed duplicative actions in four foreign jurisdictions—the UK, China, Japan, and Taiwan. In these foreign actions, Apple raises the same issue already before this Court in this case—whether Qualcomm has breached its contractual FRAND commitments to ETSI as to Apple. Apple has tried to maximize its chance of getting a favorable ruling by simultaneously asking courts in five countries to adjudicate the same dispute. But Apple and Qualcomm's FRAND dispute will be resolved as a global matter in the U.S. Action. Qualcomm's global FRAND obligation as to Apple arises from a single contract, so Qualcomm's compliance with that obligation does not depend upon the law of any forum chosen by Apple, including those forums' patent or competition laws. This is a private contract dispute, and the Court's ruling on Qualcomm's FRAND obligation will be dispositive of Qualcomm's obligations as to Apple (and the extent to which they were satisfied) worldwide. Apple has no justification for asking foreign courts to undertake the same analysis of the same contract in a piecemeal fashion.

After filing its duplicative lawsuits and without waiting for any court to rule on its claims, Apple also engaged in self-help—declaring unilaterally that it would stop the Contract Manufacturers from paying royalties to Qualcomm on the sale of iPhones and iPads for the duration of the global litigation. Apple's improper self-help is costing Qualcomm hundreds of millions of dollars in revenue each quarter. The goal of Apple's refusal to pay royalties and its duplicative lawsuits is clear— to maximize pressure on Qualcomm to grant Apple a license at an unfair discount. Apple should not be allowed to pursue this exploitative, holdout strategy.

This motion for an anti-suit injunction is governed by *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872 (9th Cir. 2012), in which the Ninth Circuit affirmed

1    the district court's anti-suit injunction in a global FRAND dispute.  That case is

2    squarely on point.  Two major international companies were engaged in a global

3    licensing dispute.  After failing to reach agreement, the parties resorted to

4    litigation and raised global FRAND issues in the district court.  Nevertheless,

5    Motorola pursued patent litigation in Germany on SEPs at issue in the FRAND

6    license dispute, which threatened to frustrate the district court's ability to resolve

7    the global licensing dispute.  The Ninth Circuit concluded that an anti-suit

8    injunction was the appropriate remedy, allowing the district court to resolve the

9    global FRAND issues raised in the domestic action.

10   So too here.  Unchecked, Apple's foreign actions will impede this Court's

11   ability to resolve the issues before it.  In addition, Apple's foreign actions are

12   likely to delay these proceedings, are certain to lead to a pointless duplication of

13   efforts, and will cause both parties—and courts around the world—to waste

14   resources.  Moreover, Apple's duplicative lawsuits create a serious risk of

15   inconsistent judgments, which would place Qualcomm in the impossible position

16   of trying to satisfy conflicting rulings.  Apple should not be permitted to use its

17   foreign actions—coupled with its vow to stop paying *any royalties* for the use of

18   Qualcomm's intellectual property while the global litigation is pending—to exert

19   improper pressure on Qualcomm to agree to below-FRAND terms.

20   Apple should be enjoined from pursuing its duplicative foreign actions and

21   from initiating other duplicative foreign actions while the U.S. Action is pending.

## FACTUAL BACKGROUND

### I.     The Parties.

24   Qualcomm is an industry leader and innovator in the field of wireless

25   technologies.  Since its founding in 1985, Qualcomm has been designing,

26   developing, and improving cellular communication systems, networks, and

27   products—successfully inventing numerous core technologies that have

28   transformed how the world communicates.  Qualcomm invented fundamental

1  technologies at the heart of 2G, 3G, and 4G cellular communications, is leading

2  the industry to 5G, and has contributed innumerable additional innovations used in

3  virtually every modern cell phone.  Qualcomm's innovation is driven by its more

4  than 24,000 engineers and 33,000 employees, primarily based at Qualcomm's

5  headquarters in San Diego, California.

6      Apple is a corporation based in Cupertino, California, that designs, markets,

7  and sells cellular devices throughout the world.  (ECF No. 83, 1st Am. Compl.

8  ¶ 13.)  Apple is the world's most profitable seller of cellular devices.  In recent

9  years, Apple has captured more than *90 percent of all profits* in the smartphone

10  industry.  With a market capitalization of more than $750 billion, more than a

11  quarter of a trillion dollars in cash reserves, and a global sphere of influence,

12  Apple has more money and influence than many countries.

13  **II.    Qualcomm's Patent Portfolio and Licensing Practices.**

14      Qualcomm's technologies enable the cellular ecosystem that allows

15  smartphones to send and receive vast amounts of data and voice communications

16  at rapid speeds, seamlessly and reliably, from anywhere within reach of a cellular

17  network.  Qualcomm's inventions are necessary for *the entire cellular network* to

18  function.  Rather than keep its core inventions to itself, Qualcomm chose to patent

19  its inventions, contribute them to standards development organizations ("SDOs"),

20  and voluntarily license them to cellular device manufacturers.

21      A.    SDOs and the Standardization Process.

22      SDOs foster technological advancement by bringing together the best

23  engineering resources to develop and identify the optimal solution to enormously

24  complex engineering challenges—in the case of the cellular industry, the need to

25  accommodate ever-increasing traffic on the limited cellular spectrum.  As part of

26  this process, SDOs develop, approve, and promulgate thousands of detailed,

27  complex technical specifications that define each successive generation of cellular

28  standards (such as 2G, 3G, and 4G), thereby enabling cellular communications to

1  function.  *See Microsoft*, 696 F.3d at 875 (discussing the role of SDOs).  In other

2  words, cellular standards ensure that devices manufactured by hundreds of

3  companies can communicate with each other using networks and infrastructure

4  manufactured and deployed by companies and carriers around the world.

5  Inventors like Qualcomm contribute to SDOs by proposing their technological

6  approaches for the next generation of standards.  The engineers participating in the

7  standard-setting process evaluate the technological approaches and develop the

8  standard by choosing those technologies that meet the standard's requirements and

9  will be optimal for the operation and success of the standard as a whole.

10         Qualcomm's patent portfolio includes patents that are "essential" to cellular

11  standards ("cellular SEPs"), patents that are "essential" to other standards, and

12  patents that are not essential to any industry standard ("NEPs") but reflect

13  valuable non-standardized technologies.  In total, Qualcomm's patent portfolio

14  consists of more than 130,000 issued patents and patent applications worldwide.

15         B.     The FRAND Contractual Commitment.

16         SDOs—including ETSI, the relevant cellular communications SDO—have

17  attempted to balance the need to encourage innovators to contribute to standards,

18  on the one hand, with the need for implementers of standards to have access to the

19  innovators' intellectual property to make standard-compliant products, on the

20  other hand.  *See Microsoft*, 696 F.3d at 876.  Patent licensing—and the

21  enforcement of patent rights when the patents are not licensed—are critical to this

22  balance.  ETSI seeks to achieve that balance by requesting that SEP holders agree

23  to make licenses available for their SEPs on "fair, reasonable and non-

24  discriminatory", or FRAND, terms and conditions.  A patentee makes a FRAND

25  commitment to ETSI voluntarily, with the understanding that it will be entitled to

26  seek FRAND royalties from licensees of its SEPs in the future.  Indeed, ETSI's

27  Intellectual Property Rights ("IPR") Policy emphasizes that owners of intellectual

28  property rights should be "adequately and fairly rewarded for the use of their IPRs

in the implementation of STANDARDS".[1]

The FRAND commitment creates a contractual obligation on the part of the SEP holder.  *See Apple, Inc. v. Motorola Mobility, Inc.*, 886 F. Supp. 2d 1061, 1085 (W.D. Wis. 2012).  Prospective licensees become third-party beneficiaries of the SEP holder's contractual promise to ETSI to offer to license products "fully conforming to a standard" under the patent holder's SEPs on FRAND terms.  *Id.* To the extent that an implementer seeks a license to SEPs governed by the FRAND commitment, however, the implementer also has an obligation to negotiate fairly and reasonably.  That is, "the implementer must take a FRAND approach to the negotiation".  *Unwired Planet Int'l Ltd. v. Huawei Techs. Co.* [2017] EWHC (Pat) 711, [163] (UK) (Lavely Decl. Ex. 1); *see also Ericsson Inc. v. D-Link Sys., Inc.*, No. 6:10-CV-473, 2013 WL 4046225, at *25 (E.D. Tex. Aug. 6, 2013) (concluding that licensing obligations are a "two-way street"), *aff'd in part and rev'd in part*, 773 F.3d 1201 (Fed. Cir. 2014).  If an implementer does not negotiate fairly and reasonably, it is not a willing licensee and is not entitled to the benefits of the innovator's contractual FRAND commitment.  *See Unwired Planet*, [2017] EWHC (Pat) at [163].  Moreover, the FRAND commitment is global in scope.  A SEP holder's FRAND commitment applies to products fully conforming to a standard of any prospective licensee, operating anywhere in the world.  ETSI IPR Policy ¶ 6.1 (placing no geographic limit on the FRAND undertaking).

C.    Qualcomm's and Apple's Past Licensing Relationship.

Apple does not have a direct license with Qualcomm for the use of its patented technology.  When Apple entered the cellular industry a decade ago, Apple adopted the strategy of outsourcing its manufacturing of iPhones and iPads to certain Contract Manufacturers, relying on those Contract Manufacturers'

---

[1] ETSI Rules of Procedure, Annex 6:  ETSI Intellectual Property Rights Policy (Apr. 5, 2017) [hereinafter ETSI IPR Policy] ¶ 3.2 (Lavely Decl. Ex. 3).

existing license agreements with Qualcomm, instead of signing a direct license with Qualcomm.  The Contract Manufacturers' agreements are generally similar to the license agreements Qualcomm has entered into with hundreds of other cellular device manufacturers.  They are worldwide licenses that grant certain rights to Qualcomm's global portfolio of patents.  The basic terms of such licenses are customary in the cellular industry.  Indeed, virtually every significant cellular device manufacturer in the cellular industry has recognized the value of Qualcomm's technology and entered into a license agreement to practice Qualcomm's global patent portfolio.  (Rogers Decl. ¶ 5.)

### III.   The Parties' Global Licensing Dispute.

Although Apple benefits from the Contract Manufacturers' worldwide license agreements, Qualcomm and Apple have had on-and-off negotiations about a direct license.  In particular, for approximately the past two years, Qualcomm has engaged in negotiations with Apple about granting a direct license to Qualcomm's global cellular SEP portfolio.  The parties' licensing-related communications and meetings all took place in California.  Apple requested a license for cellular SEPs and, more recently, any patents Qualcomm has declared as potentially essential to any cellular standard.  (Rogers Decl. ¶ 6.)  Qualcomm made a complete, written license offer to Apple for Qualcomm's global cellular SEP portfolio on FRAND terms, consistent with terms accepted by over a hundred other licensees.  (Rogers Decl. ¶ 7.)  But Apple has been unwilling to accept an agreement with Qualcomm on FRAND terms.

***Qualcomm's Global License Offer***:  In June and July 2016, Qualcomm provided Apple with a complete, written offer for a global license to Qualcomm's cellular SEPs.  The written offer memorialized oral offers that Qualcomm had made to Apple months earlier.  The terms of Qualcomm's offer are based on the market-established value of Qualcomm's patent portfolio.  (Rogers Decl. ¶ 7.)

***Apple's Global Counteroffer***:  On September 13, 2016, Apple rejected

1   Qualcomm's offer and outlined its global counteroffer, under which Apple would
2   pay a mere fraction of the royalties that Qualcomm currently receives from the
3   Contract Manufacturers for selling Apple products.  Critically, although
4   undervaluing Qualcomm's intellectual property, Apple's counteroffer was *global*
5   in scope and encompasses "all patents and patent applications that are either
6   technically essential or have been declared essential" to any cellular standard,
7   regardless of whether Qualcomm agrees to a FRAND commitment for such
8   patents.  Qualcomm rejected Apple's counteroffer.  (Rogers Decl. ¶ 8.)

9        The parties continued to exchange letters concerning the global licensing
10  dispute.  Qualcomm gave Apple in-person presentations on the breadth,
11  importance, strength, and value of Qualcomm's patent portfolio, both for cellular
12  SEPs and other patents practiced by Apple's products, including detailed
13  information about specific Qualcomm patents and how Qualcomm's patents
14  enhance the value of Apple's products.  (Rogers Decl. ¶ 9.)  Moreover, Qualcomm
15  repeatedly offered to arbitrate any dispute over licensing terms and made clear that
16  it was willing to arbitrate a license for *any* portfolio of patents in which Apple was
17  interested, including the global portfolio of patents for which Apple made a
18  counteroffer in September 2016.  Qualcomm offered to arbitrate under the
19  arbitration procedures endorsed by the U.S. FTC in its 2013 consent order with
20  Google relating to the licensing of cellular SEPs.  Qualcomm has proposed that
21  either side can make any arguments it wants to make to an arbitration panel and
22  that if the parties have a disagreement about procedure, they can work with the
23  arbitration panel to resolve it.  Apple refused every arbitration proposal by
24  Qualcomm.  (Rogers Decl. ¶ 10.)

25       On January 20, 2017, Apple initiated this action.  That same day, Apple sent
26  Qualcomm a draft license agreement, memorializing the general terms of Apple's
27  September 13, 2016 global counteroffer.  Qualcomm again rejected Apple's
28  counteroffer, but in the spirit of good-faith licensing negotiations, Qualcomm

1  provided Apple with its proposed revisions to Apple's draft agreement.  Apple has
2  yet to respond to this proposal.  (Rogers Decl. ¶ 11.)

3       ***Apple's Interference with the Contract Manufacturers' Licenses***:  For Q1
4  2017, Apple refused to pay the Contract Manufacturers for *any* Qualcomm
5  royalties and directed the Contract Manufacturers not to pay *any* royalties to
6  Qualcomm for Apple products, resulting in the Contract Manufacturers
7  withholding from Qualcomm hundreds of millions of dollars in royalties for sales
8  during Q1 2017 alone.  Apple also declared that it will continue to withhold
9  Qualcomm royalties for the indefinite future—contrary to nearly a decade of past
10  practice—until Apple's litigation against Qualcomm ends.  (Rogers Decl. ¶ 12.)

11  **IV.    Apple's Duplicative Lawsuits Against Qualcomm.**

12       On January 20, 2017, Apple filed this action.  (ECF No. 1.)  Apple's First
13  Amended Complaint ("Complaint" or "FAC") challenges, among other things,
14  Qualcomm's licensing practices and seeks monetary, injunctive, and declaratory
15  relief.  Apple alleges that Qualcomm "broke its promise and has breached its
16  FRAND commitments", that Qualcomm's "licensing practices violate its FRAND
17  promise", and that Qualcomm has "breach[ed] its FRAND commitments for its
18  SEPs".  (FAC ¶¶ 8, 159, 623.)  Apple seeks an injunction preventing Qualcomm
19  from "imposing or enforcing any unlawful and/or non-FRAND terms and
20  conditions relating to Apple's iPhones and iPads" and the disgorgement of "non-
21  FRAND royalties" that Qualcomm has allegedly received from Apple indirectly,
22  through the Contract Manufacturers' licenses.  (FAC Prayers S, M.)  In Apple's
23  own words, "the dispute over the royalties to which Qualcomm is entitled . . . has
24  been placed directly at issue by Apple's claims against Qualcomm".  (FAC ¶ 199.)

25       Apple's Complaint includes (i) claims relating to 18 Qualcomm patents;
26  (ii) claims based on the doctrine of patent exhaustion; and (iii) antitrust and unfair
27  competition claims—all of which are allegedly tied to Qualcomm's purported
28  "non-FRAND licensing scheme".  (FAC ¶ 624.)  For example, Apple alleges that

"Qualcomm's illegal practices" include "past and ongoing non-FRAND royalties for patents exhausted through the sales of Qualcomm chipsets", that Qualcomm has made "non-FRAND royalty demands" to Apple, that "Qualcomm's breach of its FRAND commitments . . . is a foundation of its scheme to acquire and abuse monopoly power in the cellular industry", and that "Qualcomm's anticompetitive conduct is based on the breach of its FRAND commitments for its SEPs". (FAC p. 2, ¶¶ 11, 52, 623.)

After initiating this Action, Apple filed duplicative lawsuits against Qualcomm in the UK (January 23, 2017), China (January 23, 2017, two actions), Japan (February 16, 2017, four actions), and Taiwan (April 11, 2017). Apple has not completed service of process in any of the foreign jurisdictions, and in most actions, Qualcomm has not filed responsive pleadings.[2] (Prevezer Decl. ¶¶ 3, 7-8; Li Decl. ¶¶ 3, 8, 10; Shibata Decl. ¶¶ 3, 6, 10, 14, 18-19; Chen Decl. ¶¶ 3, 4-8.)

Just as in its Complaint before this Court, Apple makes repeated allegations in each of its foreign actions that Qualcomm breached its FRAND commitments to ETSI as to Apple. In all four foreign jurisdictions, Apple alleges that Qualcomm's licensing practices violate FRAND. For example, in the first China complaint, the primary relief Apple seeks from the court is an order requiring Qualcomm to "███████████████████████████" in "███████████████████████████████████████████". (Li Decl. Ex. 1, 1st China Compl., Claim 1; *see also* Li Decl. Ex. 2, 2nd China Compl. 3-4; Prevezer Decl. Ex. 2, UK Compl., Claim 2; Shibata Decl. Ex. 1, Japan Compl. 8, 21-22, 23; Shibata Decl. Exs. 2-4, Japan Patent Compls. 4; Chen Decl. Ex. 1, Taiwan Compl., Claim V.)

---

[2] Qualcomm's motion for an anti-suit injunction is without prejudice to any defenses it may have in the foreign actions and/or any challenges to service of process or to the jurisdiction of the foreign courts. Qualcomm's counsel are providing copies of the foreign action complaints to this Court only for purposes of this motion. The Qualcomm entities named in the foreign actions reserve all rights.

1   And in all four jurisdictions, Apple asserts foreign competition law claims based

2   in substantial part (like the antitrust claim in the U.S. Action) on Qualcomm's

3   alleged breach of its FRAND obligations as to Apple.  For example, in the second

4   China complaint, Apple asserts that Qualcomm's license offer to Apple was "█

5   ████████████████████████████".  (Li Decl. Ex. 2, 2d China Compl. 8; *see*

6   *also* Prevezer Decl. Ex. 2, UK Compl. ¶ 96; Shibata Ex. 1, Japan Compl. 15; Chen

7   Ex. 1, Taiwan Compl. 8.)  Finally, in some foreign venues, Apple brings claims

8   related to foreign counterparts to the patents-in-suit in the U.S. Action, including

9   claims alleging that Qualcomm's licenses as to these patents are not FRAND.

10  (*See, e.g.*, Prevezer Decl. Ex. 2, UK Compl.; Shibata Decl. Exs. 2-4, Japan Patent

11  Compls.)

12                                   **ARGUMENT**

13  **I.    Applicable Legal Standard.**

14          A district court with jurisdiction over a party has the power to enjoin it from

15  proceeding with an action in the courts of a foreign country.  *Microsoft*, 696 F.3d

16  at 880-81.  "Courts derive the ability to enter an anti-suit injunction from their

17  equitable powers.  Such injunctions allow the court to restrain a party subject to its

18  jurisdiction from proceeding in a foreign court in circumstances that are unjust."

19  *E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 989 (9th Cir. 2006).

20          Although the power to issue an anti-suit injunction should be used

21  "sparingly", *id.* at 989, an anti-suit injunction is appropriate when a party's foreign

22  actions "frustrate[] this court's ability to adjudicate issues properly before it" or

23  when "[w]ithout the issuance of an anti-suit injunction, the integrity of the action

24  before this court will be lessened."  *Microsoft Corp. v. Motorola, Inc.*, 871

25  F. Supp. 2d 1089, 1100 (W.D. Wash. 2012), *aff'd*, 696 F.3d 872 (9th Cir. 2012).

26  The Ninth Circuit has emphasized that district courts have "a duty to protect" their

27  "legitimately conferred jurisdiction to the extent necessary to provide full justice

28  to litigants".  *Gallo*, 446 F.3d at 995.  For instance, the Ninth Circuit affirmed a

1   district court's issuance of an anti-suit injunction to protect its ability to resolve a

2   global FRAND licensing dispute.  The court there enjoined a patent holder from

3   pursuing claims in a foreign jurisdiction in an attempt to "pressure" the

4   prospective licensee to enter an unfair license "before the [domestic] litigation is

5   complete".  *Microsoft*, 696 F.3d at 886.

6        The Ninth Circuit, which follows a "liberal approach" to granting anti-suit

7   injunction motions,[3] applies a three-part inquiry to such motions:

8        "First, we determine 'whether or not the parties and the issues are the
     same' in both the domestic and foreign actions, 'and whether or not

9        the first action is dispositive of the action to be enjoined.'  Second, we
     determine whether at least one of the so-called '*Unterweser* factors'

10       applies.  Finally, we assess whether the injunction's 'impact on

11       comity is tolerable'."

12  *Microsoft*, 696 F.3d at 881 (quoting *Gallo*, 446 F.3d at 991).  If the injunction is

13  granted, it "operates in personam:  the American court enjoins the claimant, not

14  the foreign court."  *Gallo*, 446 F.3d at 989.

15  **II.   The Parties and Issues Are Functionally the Same.**

16       Under the first part of the test, the parties and issues in the domestic and

17  foreign suits need only be functionally the same, not literally identical.  *Applied*

18  *Med. Distribution Corp. v. Surgical Co.*, 587 F.3d 909, 914 (9th Cir. 2009).

19       A.    <u>The Parties Are Functionally the Same.</u>

20       Because Apple's various actions involve Apple or its affiliates suing

21  Qualcomm or its affiliates, the parties are the same for purposes of an anti-suit

22  injunction.  Again, "[p]erfect identity of parties is not required . . . .  Rather, it

23  suffices that the parties be affiliated in such a way that their interests coincide."

24  *Microsoft*, 871 F. Supp. 2d at 1098 (finding that the parties were the same where

25  Microsoft or its affiliates were adverse to Motorola or its affiliates in both

26  actions).  Here, it is undisputed that (i) Apple Inc. is the plaintiff in this action and,

27       [3] *See Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*, 361 F.3d

28  11, 17 (1st Cir. 2004) (the Fifth and Ninth Circuits follow the "liberal approach").

along with certain subsidiaries or affiliates, in each of its foreign actions, and (ii) Qualcomm Incorporated is a defendant in this action and, along with certain subsidiaries or affiliates, in each of Apple's foreign actions. (*See* Prevezer Decl. Ex. 2, UK Compl., ¶¶ 2-15; Li Decl. Ex. 1, 1st China Compl. 2-3; Shibata Decl. Ex. 1, Japan Compl. 9-11; Shibata Decl. Exs. 2-4, Japan Patent Compls. 5; Chen Decl. Ex. 1, Taiwan Compl. 3-4.)  Accordingly, the parties are the same for purposes of an anti-suit injunction. *See Microsoft,* 871 F. Supp. 2d at 1098.

### B.   The Issues Are Functionally the Same.

Whether Qualcomm has complied with its contractual FRAND obligations as to Apple is squarely before this Court and is raised repeatedly throughout Apple's foreign complaints.  As a result, the issues are the same for purposes of an anti-suit injunction.  Under Ninth Circuit law, the issues in the foreign and local suits need only be functionally the same, not literally identical.  *Applied Med.*, 587 F.3d at 914-15 (treating a Belgian statutory claim as functionally the same as a breach of contract claim); *Interdigital Tech. Corp. v. Pegatron Corp.*, No. 15-CV-02584-LHK, 2015 WL 3958257, at *5 (N.D. Cal. June 29, 2015) (finding that the alleged violations of Taiwanese antitrust laws "arise out of the parties' obligations pursuant to the [Agreement]").  It is unnecessary that the claims or elements asserted in the actions be identical because "requiring issues to be precisely and verbally identical would lead to counterproductive, and perhaps unintended, results".  *Applied Med.*, 587 F.3d at 914-16.  If perfect identity were required, the standard would be impossible to meet, because claims in different jurisdictions under different laws "will inevitably differ".  *Microsoft*, 696 F.3d at 882-83.

This Court will determine whether Qualcomm has satisfied its *global* FRAND commitment as to Apple under the ETSI contract and whether Apple has forfeited its right to a FRAND offer through its bad-faith, holdout tactics, including unlawful interference with Qualcomm's long-standing license agreements with the third-party Contract Manufacturers.  Apple has put this same

FRAND question before courts in the UK, China, Japan, and Taiwan.  Each of the foreign actions includes broad challenges to Qualcomm's licensing practices and repeated allegations that Qualcomm has breached its FRAND commitment as to Apple.[4]  (*See, e.g.,* Prevezer Decl. Ex. 2, UK Compl. ¶ 59; Li Decl. Ex. 1, 1st China Compl. Claim 2; Shibata Decl. Ex. 1, Japan Compl. 8, 14-17, 19, 21-22, 23; Chen Decl. Ex. 1, Taiwan Compl. 8, 12, 14-18.)

Apple has admitted that its foreign actions are duplicative of the U.S. Action, telling the UK court, for example, that "Apple Inc. . . . has brought proceedings against Qualcomm Incorporated . . . in other jurisdictions pursuing similar complaints under applicable laws to those pursued herein under applicable UK and European laws".  (*See* Prevezer Decl. Ex. 2, UK Compl. ¶ 129(a).)  Accordingly, adjudication of the global FRAND issues in the U.S. Action—and resolution of the parties' global licensing dispute—requires this Court to address issues that are functionally the same as those in the foreign actions.

      1.    *The Parties' Licensing Dispute Involves a Global License, and Apple's Complaint Raises Global FRAND Issues.*

Apple's worldwide litigation arises out of the parties' most recent attempt to negotiate a *global* license so that Apple would no longer rely on the Contract Manufacturers' licenses (also global).  Apple recognizes as much in its Complaint, alleging that Apple, since 2006, has "attempted to negotiate a lower royalty rate in the form of a worldwide FRAND license directly from Qualcomm".  (FAC ¶ 94.)  Both Apple and Qualcomm approached these licensing negotiations by reference to Qualcomm's worldwide patent portfolio.  There is no debate that both parties seek a single, global portfolio license.

In its Complaint, Apple puts the global FRAND question at issue in broad

---

[4] Although there are additional claims at issue in this action (*e.g.*, breach of contract claims unrelated to FRAND), what matters under the *Gallo* test is whether the domestic action will dispose of the core issues in the foreign actions.

strokes, for example by including FRAND allegations in its antitrust and patent claims.  And Apple acknowledges that "the dispute over the royalties to which Qualcomm is entitled . . . has been placed directly at issue by Apple's claims against Qualcomm".  (FAC ¶ 199.)  In response, Qualcomm has asked this Court to declare that Qualcomm has satisfied and discharged its FRAND commitments as to Apple or, in the alternative, to declare the FRAND royalty terms for Qualcomm's global portfolio of cellular SEPs that it has offered to Apple.  (Qualcomm Am. Countercls. ¶ 345, Prayer for Relief (i); *see also* Count II (declaration as to the Contract Manufacturers' license agreements).)  Thus, to resolve Apple's claims as well as Qualcomm's counterclaims, this Court will need to determine whether Qualcomm has met its global FRAND contractual obligations as to Apple (or whether Apple has forfeited its right to a FRAND offer because of its bad faith), and, if not, set binding FRAND terms for Apple's requested license to Qualcomm's global portfolio of cellular SEPs.  This global determination will resolve the FRAND issues between Apple and Qualcomm in Apple's foreign lawsuits.  *See Microsoft Corp. v. Motorola, Inc.*, No. C10-1823JLR, 2013 WL 6000017, at *4 (W.D. Wash. Nov. 12, 2013) ("The RAND royalty issue is central to the parties' dispute, such that resolution of this issue could very well make it unnecessary to address some of the remaining claims."), *aff'd*, 795 F.3d 1024 (9th Cir. 2015).

> 2.  *This Court Should Resolve the Global FRAND Issues Between Apple and Qualcomm.*

Courts around the world have recognized the propriety of resolving contractual FRAND issues between two parties at the global level.  In the United States, in *Microsoft v. Motorola*, the Ninth Circuit affirmed the district court's grant of an anti-suit injunction.  The Ninth Circuit concluded that resolving whether Motorola's offer of a worldwide license was FRAND would, in turn, resolve a foreign patent infringement claim because the foreign patent was

1    included in the global license offer.  *Microsoft*, 696 F.3d at 883.  In *TCL*

2    *Comm'ns Tech. Holdings Ltd. v. Telefonaktenbologet LM Ericsson*, No. 8:14-cv-

3    00341-JVS-DFM, ECF No. No. 279-1 (C.D. Cal. June 29, 2015), another FRAND

4    licensing dispute, the court granted an anti-suit injunction to prevent either party

5    from pursuing foreign patent claims on the SEPs that were the subject of the

6    court's global FRAND determination because "the [domestic] FRAND action

7    should resolve [the parties'] global licensing dispute".  *Id.* at 5.  Similarly, the UK

8    High Court of Justice, after recognizing that global cellular SEP licenses are

9    common in the industry and have economic efficiencies, found that a global

10   cellular SEP license is FRAND.  *Unwired Planet*, [2017] EWHC (Pat) at [543-

11   44].  The court explained that in the context of large portfolios of cellular SEPs—

12   such as that owned by Qualcomm—"a licensor and licensee acting reasonably and

13   on a willing basis would agree on a worldwide license.  They would regard

14   country by country licensing as madness." *Id*.  In March 2016, a German court

15   found that where the plaintiff-patentee had "consistently offered a worldwide

16   portfolio license", such licensing was FRAND, as it "corresponds to a well-

17   established licensing practice".  *Saint Lawrence Comm'ns v. Vodafone*, No. 4a O

18   73/14, at 14, 19, Düsseldorf Regional Court (Mar. 31, 2016) (Lavely Decl. Ex. 2).

19   Likewise, consistent with the parties' negotiations for a global license to

20   Qualcomm's worldwide cellular SEP portfolio and the claims at issue here, this

21   Court should resolve on a *global* basis what the FRAND contract requires between

22   these two parties.

23        Moreover, there should be only one court adjudicating the core FRAND

24   dispute between Apple and Qualcomm because those FRAND questions involve

25   interpreting a single contract and a single course of negotiation.  The FRAND

26   dispute is a contract dispute, which by the terms of the ETSI IPR Policy is

27   governed by French law.  *See Apple Inc. v. Samsung Elecs. Co.*, No. 11-cv-01846,

28   2012 WL 1672493, at *10 (N.D. Cal. May 14, 2012).  In other words, despite

Apple's decision to file suit in various countries around the world, the underlying contract issues are the same and the applicable law is the same. Moreover, the relevant facts are the same. Apple's FRAND claims are not specific to the jurisdiction in which Apple brought its claim, but rather attack Qualcomm's *global* FRAND commitments and the parties' negotiations concerning a *global* license. It is irrelevant, in this context, that this global license would cover foreign patents. *See Unwired Planet*, [2017] EWHC (Pat) at [543] (finding that a global license is the only license that makes sense given that both parties conduct business worldwide). All told, the core questions of whether Qualcomm breached its contractual FRAND obligations as to Apple, or whether Apple breached its obligations to negotiate in good faith, are the same no matter which court adjudicates the questions. Once one court answers the core FRAND questions at the heart of Apple's and Qualcomm's global licensing dispute, the FRAND claims will necessarily be resolved in each of Apple's actions.

This Court is best positioned to answer those questions. The dispute is between two California companies; the U.S. Action will result in a global resolution; and Apple filed the U.S. Action first. Apple should not be allowed to present the same question to five courts, creating a serious risk of inconsistent judgments and depriving this Court of its ability to adjudicate the global dispute.

3. *Apple's Other Claims Overlap with the Key FRAND Issues.*

In addition to the central FRAND claims, Apple's foreign actions also include claims that are intertwined with the same FRAND questions. For instance, Apple asserts claims related to the validity, infringement, or essentiality of specific patents; claims related to the doctrine of patent exhaustion; and competition law claims. Apple should be enjoined from pursuing its duplicative actions in their entirety during the pendency of this action because Apple's other claims are tied to Qualcomm's FRAND obligations.

For example, Apple has challenged aspects of Qualcomm's patents declared

1    as potentially essential.  (*See, e.g.*, Prevezer Decl. Ex. 2, UK Compl. Claims 4-7.)

2    The Ninth Circuit has made clear that an anti-suit injunction is appropriate when a

3    domestic court's FRAND determination will moot foreign patent claims by

4    resolving a global licensing dispute.  In *Microsoft*, 696 F.3d 872, Microsoft sought

5    to enjoin Motorola from enforcing an injunction (based on European patents) that

6    Motorola had obtained against Microsoft in Germany.  The district court granted

7    the anti-suit injunction.  The Ninth Circuit affirmed, holding that the pending U.S.

8    contract action—adjudicating whether Motorola had breached its global FRAND

9    licensing obligation—would dispose of the foreign patent claims "because the

10   European Patents at issue in the German Action were included in Motorola's

11   [global SEP license offer]" that was the subject of the domestic action.  Critically,

12   the Ninth Circuit reasoned that "when [the FRAND contract] is enforced by a U.S.

13   court, the U.S. court is not enforcing German patent law but, rather, the private

14   law of the contract between the parties."  *Id.* at 883-84.

15        In its foreign patent complaints, Apple asks the courts to set FRAND

16   royalty terms for certain foreign patents if the courts determine that the patents are

17   cellular SEPs.  Because the parties have asked this Court to determine whether

18   Qualcomm has satisfied its FRAND obligations as to Apple for *all* of Qualcomm's

19   cellular SEPs—and, if not, set binding terms for a license to Qualcomm's global

20   portfolio of cellular SEPs—this action will dispose of Apple's foreign patent

21   actions.

22        Similarly, Apple's patent exhaustion and competition law claims depend

23   heavily on the core allegation that Qualcomm has breached its FRAND

24   obligations by collecting excessive royalties from the Contract Manufacturers and

25   demanding excessive royalties from Apple.[5]  The China Complaints are

26

27        [5] Apple asserts that Qualcomm's alleged FRAND violations are violations of

28   the antitrust laws.  Qualcomm disputes this proposition on the facts and the law.

illustrative.  In Apple's First China Complaint, Apple raises patent exhaustion as a basis for claiming that Qualcomm's license terms are not FRAND.  (Li Decl. Ex. 1, 1st China Compl. 9-10.)  In Apple's Second China Complaint, Apple alleges that Qualcomm "████████████████████████████████████

███████████████████████", claiming that Qualcomm "████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████".  (Li Decl. Ex. 2, 2d China Compl. 4.)  Resolution of both types of claims depends on the determination of the core FRAND questions as between Apple and Qualcomm, which are properly before this Court and therefore justify the issuance of an anti-suit injunction.

The Ninth Circuit has held that anti-suit injunctions are appropriate where the claims at issue in the foreign action are based on the contract at issue in the domestic action—even where the foreign action includes claims asserted under foreign statutes.  For example, in *Applied Medical*, the Ninth Circuit held that the "proper question . . . was whether the issues in the Belgian suit were the same as the issues before the district court in the *functional* sense."  587 F.3d at 916 (emphasis added).  The Ninth Circuit emphasized that "differences between foreign and domestic law do not necessarily make the 'issues' different. . . .  [T]he issues are not different here merely because Surgical framed its Belgian action in terms of the Belgian Act."  *Id.* at 918.  The Ninth Circuit concluded that the issues in both actions were *functionally* the same because the domestic contract action would effectively dispose of the core issues raised in the foreign court, despite the statutory nature of the claims in the foreign action.  *Id.* at 916-17.  The crucial fact was the identity of the underlying issues that the domestic and foreign courts would resolve.[6]

---

[6] The court's reasoning in *Applied Medical* is applicable, even though the FRAND contract does not contain a forum-selection clause.  *See Microsoft*, 696

Here, for the foreign courts to resolve Apple's patent exhaustion and competition law claims, under Apple's theory of the case, those courts must address Apple's assertion that Qualcomm has demanded supposedly above-FRAND royalties.  Whether Qualcomm's licensing practices violate its FRAND commitment will be resolved by this Court in this action.  Accordingly, these foreign claims are functionally the same as those in the U.S. Action.

In sum, the conduct that Apple attacks in each of its foreign actions is the *same* conduct that Apple attacks in this action.  The resolution of the parties' global dispute requires the adjudication of whether Qualcomm has satisfied its FRAND obligations with respect to Apple (and whether Apple has acted in bad faith), and, if needed, determination of FRAND terms for a license for Apple to Qualcomm's global portfolio of cellular SEPs.  Those core issues are squarely before this Court.  Given that this Court will make a binding, global FRAND determination as to the obligations owed between Apple and Qualcomm and the extent to which they were fulfilled, which will resolve issues at the core of the foreign actions, Apple's claims in the foreign actions and in the U.S. Action are functionally the same.

## III.   Multiple *Unterweser* Factors Apply.

The Court should grant Qualcomm's motion for an anti-suit injunction because multiple *Unterweser* factors apply.  These factors include whether the foreign litigation "(1) would frustrate a policy of the forum issuing the injunction; (2) be vexatious or oppressive; (3) threaten the issuing court's *in rem* or *quasi in rem* jurisdiction; or (4) . . . prejudice other equitable considerations."  *Microsoft*,

---

F.3d at 882 ("Although the contract at issue in this case does not contain a forum-selection clause, we are nevertheless informed by *Applied Medical*'s emphasis on the functional character of the threshold similarity-of-issues inquiry.").

696 F.3d at 882 (citing *Gallo*, 446 F.3d at 990).[7]  In addition, other factors the Court may consider include whether "separate adjudications could result in inconsistent rulings or even a race to judgment", and whether "adjudicating the issue in two separate actions is likely to result in unnecessary delay and substantial inconvenience and expense to the parties and witnesses."  *Seattle Totems Hockey Club, Inc. v. Nat'l Hockey League*, 652 F.2d 852, 856 (9th Cir. 1981).  "'[A]ny of [these] factors' may justify a foreign anti-suit injunction."  *Microsoft*, 696 F.3d at 882 n.9 (quoting *Gallo*, 446 F.3d at 991).

Apple's filing of duplicative foreign litigation regarding Qualcomm's FRAND obligations, despite the pendency of the comprehensive U.S. Action, implicates at least two *Unterweser* factors.  Apple's foreign actions (1) are vexatious and oppressive and (2) prejudice multiple equitable considerations.

A.    Apple's Foreign Actions Are Vexatious and Oppressive.

The Ninth Circuit has defined "vexatious" to mean "without reasonable or probable cause or excuse; harassing; annoying."  *Microsoft*, 696 F.3d at 886; *see also Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 366 (5th Cir. 2003).  Apple filed its duplicative lawsuits to harass Qualcomm and to gain leverage in licensing negotiations.  Apple is hedging its litigation bets, knowing that it may lose in this action and hoping to secure "do-overs", should it need them, in foreign jurisdictions.  Apple's use of the threat of such "do-overs" to pressure Qualcomm into entering a license on below-FRAND terms points to the vexatious nature of Apple's foreign actions.  *See Microsoft*, 696 F.3d at 886 (finding that "the timing of the filing of the German Action [after the U.S. action] raises concerns of forum shopping and duplicative and vexatious litigation"); *see also Strategic Intent, LLC v. Strangford Lough Brewing Co.*,

---

[7] These factors are derived from *In re Unterweser Reederei, GmbH*, 428 F.2d 888, 890 (5th Cir. 1970), *aff'd on reh'g en banc*, 446 F.2d 907, *vacated on other grounds sub nom. The Bremen v. Zapata Offshore Co.*, 407 U.S. 1 (1972).

No. CV-09-309-RHW, ECF No. 101 at *6-7 (E.D. Wash. Sept. 9, 2010).  In addition, the number of overlapping suits Apple has brought points to their vexatious nature.  The *Microsoft* court found that a single action seeking injunctive relief in Germany could be vexatious, *even if it was meritorious*.  696 F.3d at 886; *see also Gallo*, 446 F.3d at 993 (holding that a single foreign suit in Ecuador "may well be vexatious and oppressive").  Here, the eight additional foreign actions Apple has brought raising functionally the same issues can only be described as vexatious.

**B.    Apple's Foreign Actions Prejudice Multiple Equitable Considerations.**

**1.    *Apple's Foreign Lawsuits Are a Pretext for Withholding Royalties To Gain Leverage in Licensing Negotiations.***

Apple has told Qualcomm that it plans to withhold from the Contract Manufacturers payments for all royalties—hundreds of millions of dollars each calendar quarter—until the global litigation has been resolved.  Meanwhile, during the pendency of this litigation, which could last years, Apple continues to sell iPhones and iPads that make use of Qualcomm's technology—collecting billions of dollars in revenue.  With its virtually limitless resources (hundreds of billions of dollars in cash on hand), Apple could continue filing lawsuits like the duplicative foreign actions it has already filed, indefinitely, while continuing to withhold royalty payments owed to Qualcomm.  Apple's strategy is clear.  It is attempting to inflict severe, immediate, and permanent harm on Qualcomm through harassing and duplicative litigation while demanding that the Contract Manufacturers not pay royalties, so that Qualcomm will be forced to agree to Apple's unreasonable, below-FRAND licensing demands.  This was precisely the concern the Ninth Circuit raised in *Microsoft*, a concern that justified the issuance of an anti-suit injunction:  Apple has "interfered with 'equitable considerations' by compromising the court's ability to reach a just result in the case before it free of external pressure on [Qualcomm] to enter into a 'holdup' settlement before the

1    litigation is complete." *Microsoft*, 696 F.3d at 886.

2              2.      *Apple's Foreign Lawsuits Threaten To Delay a Speedy and*
                       *Efficient Resolution of the FRAND Issues.*
3

4            By pursuing duplicative actions in various jurisdictions, Apple will

5    necessarily prolong the dispute and delay any final resolution.  Given Apple's

6    refusal to advance royalties during the pendency of *any* action and its interference

     with the Contract Manufacturers' license agreements, the more protracted the
7
     resolution of the final action appears, the greater the pressure will be placed on
8
     Qualcomm to enter into a license agreement on below-FRAND terms.  The
9
     potential for unnecessary delay as a result of duplicative foreign actions supports
10
     the issuance of an anti-suit injunction.  *See, e.g.*, *Unterweser*, 428 F.2d at 896
11
     (holding that "allowing simultaneous prosecution of the same action in a foreign
12
     forum thousands of miles away would result in 'inequitable hardship' and 'tend to
13
     frustrate and delay the speedy and efficient determination of the cause'").
14

15             3.      *Apple's Foreign Lawsuits Will Cause Substantial*
                       *Inconvenience, Unnecessary Expense, and a Duplication of*
16                     *Efforts.*

17           Both Qualcomm and Apple are based in California.  The licensing

18   negotiations at issue have occurred in California.  The parties' resources and

19   personnel are primarily located in California.  If the foreign actions are allowed to

20   proceed simultaneously around the world, it would lead to substantial

21   inconvenience, unnecessary expense, and an absurd duplication of effort.  The

22   parties would be forced to shuttle witnesses back and forth across the globe for

23   duplicative testimony and file duplicative motions—slowing the pace of each

24   proceeding.  And Apple's strategy does not merely tax the parties' resources.

25   Apple's duplicative suits will waste judicial resources, as Apple uses courts

26   around the world as sounding boards for its position on the same issue.  Courts

27   routinely find that such inconvenience, expense, and duplication support the

28   issuance of an anti-suit injunction.  *See Seattle Totems*, 652 F.2d at 856

("Adjudicating this issue in two separate actions is likely to result in unnecessary delay and substantial inconvenience and expense to the parties and witnesses."); *Kaepa Inc. v. Achilles Corp.*, 76 F.3d 624, 627-28 (5th Cir. 1996). Apple should not be allowed to undermine this Court's jurisdiction over the FRAND issues—which Apple first filed in this Court—through its multi-front litigation strategy.[8]

> 4. *Apple's Foreign Lawsuits Could Result in Inconsistent Rulings or a Race to Judgment.*

Apple's duplicative lawsuits create a serious risk of inconsistent judgments, which further supports issuance of an anti-suit injunction. *See Microsoft*, 871 F. Supp. 2d at 1100. For example, this Court and a foreign court could issue inconsistent decisions on the same global FRAND questions, placing Qualcomm "in an impossible position of attempting to alter its behavior in an attempt to satisfy conflicting rulings". *Albemarle Corp. v. AstraZeneca UK Ltd.*, No. Civ. A. 5:08-1085-MBC, 2009 WL 902348, at *7 (D.S.C. Mar. 31, 2009). And Apple's duplicative lawsuits raise related concerns that Apple is engaged in an improper "race to judgment". *Seattle Totems*, 652 F.2d at 856. By placing the same global FRAND questions before five different courts, Apple can test the waters in each court and then opportunistically race to judgment in whichever jurisdiction it believes to be most sympathetic to its cause.

## IV. The Requested Injunction Has No Adverse Impact on Comity.

The last step of the anti-suit injunction analysis is a determination of

---

[8] While this motion is pending, Qualcomm may have to file defenses and counterclaims in the foreign actions to avoid waiver. The inevitable similarities between Qualcomm's counterclaims in this action and the counterclaims it may have to file in the foreign actions will only highlight the duplicative nature of Apple's foreign lawsuits. If the Court grants this motion, Qualcomm will subject its own foreign counterclaims to the same order. Actions by either party on patents that are unencumbered by FRAND obligations (*i.e.*, NEPs) should not be affected by such an order. *See TCL Commc'ns Tech.*, ECF No. 279-1, 9 (enjoining foreign SEP actions but declining to enjoin Texas action involving only NEPs).

---

1  whether the injunction's "impact on comity is tolerable". *Gallo*, 446 F.3d at 991.

2  "Comity is 'the recognition which one nation allows within its territory to the

3  legislative, executive or judicial acts of another nation, having due regard both to

4  international duty and convenience.'" *Id.* at 994 (quoting *Hilton v. Guyot*, 159

5  U.S. 113, 164 (1895)).  The Ninth Circuit repeatedly has held that private

6  contractual disputes have little, if any, impact on comity.  *See, e.g.*, *Microsoft*, 696

7  F.3d at 887.  In contrast, the Ninth Circuit has recognized that allowing a private

8  party to proceed with duplicative lawsuits in multiple jurisdictions may itself have

9  an intolerable impact on comity.  *See Applied Med.*, 587 F.3d at 921; *Gallo*, 446

10  F.3d at 994.  The presence of antitrust claims does not change that result.  *See*

11  *Interdigital*, 2015 WL 3958257, at *8.

12          Here, an anti-suit injunction has no impact on comity.  At its core, this is a

13  dispute between two California corporations concerning licensing negotiations

14  that occurred primarily in California.  Although Apple has filed actions across the

15  globe, the inescapable fact is that the key issue in each action is Apple's claim as a

16  third-party beneficiary of Qualcomm's contractual commitment to ETSI to license

17  its SEPs on FRAND terms.  No foreign government is involved.  Comity is not

18  offended by this Court's exercise of jurisdiction over this private contractual

19  dispute.  Ordering one American corporation to stop pursuing duplicative foreign

20  actions concerning the contractual relationship with another American corporation

21  will have no adverse impact on comity.

## **CONCLUSION**

23          For the foregoing reasons, Qualcomm respectfully requests that the Court

24  enjoin Apple from pursuing its foreign actions and from initiating additional

25  duplicative foreign actions against Qualcomm during the pendency of the U.S.

26  Action.

27

28

1    Dated:  July 14, 2017                    Respectfully submitted,

2                                             By:   /s/   Evan R. Chesler

3                                             **CRAVATH, SWAINE & MOORE LLP**

4                                             Evan R. Chesler (*pro hac vice*)

5                                             (N.Y. Bar No. 1475722)
                                              echesler@cravath.com
6                                             Keith R. Hummel (*pro hac vice*)

7                                             (N.Y. Bar No. 2430668)
                                              khummel@cravath.com
8                                             Richard J. Stark (*pro hac vice*)

9                                             (N.Y. Bar No. 2472603)
                                              rstark@cravath.com
10                                            Antony L. Ryan (*pro hac vice*)

11                                            (N.Y. Bar No. 2784817)
                                              aryan@cravath.com
12                                            Gary A. Bornstein (*pro hac vice*)

13                                            (N.Y. Bar No. 2916815)
                                              gbornstein@cravath.com
14                                            J. Wesley Earnhardt (*pro hac vice*)

15                                            (N.Y. Bar No. 4331609)
                                              wearnhardt@cravath.com
16                                            Yonatan Even (*pro hac vice*)

17                                            (N.Y. Bar No. 4339651)
                                              yeven@cravath.com
18                                            Vanessa A. Lavely (*pro hac vice*)

19                                            (N.Y. Bar No. 4867412)
                                              vlavely@cravath.com
20                                            Worldwide Plaza, 825 Eighth Avenue

21                                            New York, New York 10019
                                              Telephone:  (212) 474-1000
22                                            Facsimile:  (212) 474-3700

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

David A. Nelson (*pro hac vice*)
(Ill. Bar No. 6209623)
davenelson@quinnemanuel.com
Stephen Swedlow (*pro hac vice*)
(Ill. Bar No. 6234550)
stephenswedlow@quinnemanuel.com
500 West Madison St., Suite 2450
Chicago, Illinois 60661
Telephone:  (312) 705-7400
Facsimile:  (312) 705-7401

Alexander Rudis (*pro hac vice*)
(N.Y. Bar No. 4232591)
alexanderrudis@quinnemanuel.com
51 Madison Ave., 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Sean S. Pak (SBN 219032)
seanpak@quinnemanuel.com
50 California St., 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

**JONES DAY**

Karen P. Hewitt (SBN 145309)
kphewitt@jonesday.com
4655 Executive Drive, Suite 1500
San Diego, California 92121
Telephone:  (858) 314-1200
Facsimile:  (858) 345-3178

***Attorneys for Defendant and Counterclaim-Plaintiff***
**QUALCOMM INCORPORATED**