# Exhibit 1



# Claim Form

In the
**High Court of Justice
Chancery Division
Patents Court**

| Fee Account no. | |
|---|---|
| Help with Fees – Ref. no. (if applicable) | H W F - ☐☐☐ - ☐☐☐ |

You may be able to issue your claim online which may save time and money. Go to www.moneyclaim.gov.uk to find out more.

| For court use only | |
|---|---|
| Claim no. | HC·2017-000186 |
| Issue date | 23·01·2017 |

Claimant(s) name(s) and address(es) including postcode

(1) Apple Retail UK Limited, 5th Floor, 6 St Andrew Street, London, United Kingdom EC4A 3AE
(2) Apple Distribution International, Hollyhill Industrial Estate, Hollyhill, Cork, Republic of Ireland
(3) Apple Operations Europe, Hollyhill Industrial Estate, Hollyhill, Cork, Republic of Ireland
(4) Apple GmbH, Arnulfstr. 19, 80335, Munich, Federal Republic of Germany
(5) Apple Retail Germany B.V. & Co. KG, Eschenheimer Anlage 1, 60316 Frankfurt am Main, Federal Republic of Germany
(6) Apple Inc., One Infinite Loop, Cupertino, CA 95014 United States of America

Defendant(s) name and address(es) including postcode

(1) Qualcomm (UK) Limited, 20-22 Bedford Row, London, United Kingdom WC1R 4JS
(2) Qualcomm Communications UK Limited, 20-22 Bedford Row, London, United Kingdom WC1R 4JS
(3) Qualcomm Technologies International, Ltd., Churchill House, Cambridge Business Park, Cowley Road, Cambridge, Cambridgeshire, United Kingdom CB4 0WZ
(4) Qualcomm Incorporated, 5775 Morehouse Drive, San Diego, CA 92121, United States of America

CHIEF MASTER
MARSH

Not for service out of the jurisdiction.

For further details of the courts www.gov.uk/find-court-tribunal.
When corresponding with the Court, please address forms or letters to the Manager and always quote the claim number.

**N1** Claim form (CPR Part 7) (06.16)
This form is reproduced from http://hmctsformfinder.justice.gov.uk/HMCTS/FormFinder.do and is subject to Crown copyright protection. Contains public sector information licensed under the Open Government Licence v3.0 © Crown Copyright 2016

**EXHIBIT 1
PAGE 1**

Brief details of claim

The Claimants seek:

(1) A declaration that the Defendants are in breach of their obligations under Article 102 of the Treaty on the Functioning of the European Union (the "**TFEU**"), Article 54 of the Agreement on the European Economic Area (the "**EEA**") and/or Section 18 of the Competition Act 1998 (the "**CA98**"), as a consequence of the abuse by the Defendants of their dominant positions on the markets for LTE, CDMA and WCDMA/UMTS chipsets, including but not limited to the Defendants' refusal to license competing chipmakers.

(2) A declaration that the Defendants are in breach of their obligations under Article 102 TFEU, Article 54 EEA and/or Section 18 of the CA98, and/or obligations arising from their contract with, and/or declarations to, the European Telecommunications Standards Institute ("**ETSI**") as a consequence of the abuse by the Defendants of their dominant market position as licensor of actual or purported standard essential patents ("**SEPs**") in connection with chipsets purchased from the Defendants, including but not limited to the Defendants':

    a. failure to offer the Claimants a direct licence to SEPs actually practiced on fair, reasonable and non-discriminatory terms;

    b. charges and demands for excessive royalties from the Claimants for the use of actual or purported SEPs (without any objective and/or sufficient explanation for those royalties); and

    c. charges and demands for excessive licence fees (charged directly or indirectly) from the Claimants for the use of actual or purported SEPs in connection with chipsets purchased from the Defendants.

(3) A declaration that the Claimants have expressed willingness, and are willing, to conclude a direct licence of the SEPs actually practiced on fair, reasonable and non-discriminatory terms, and have operated in accordance with recognised commercial practices in the field and in good faith for the purposes of Article 102 TFEU, Article 54 EEA and/or Section 18 CA98.

(4) A declaration that the making, importing, keeping, disposing, offering to dispose, and any other commercial activity in relation to the Claimants' iPhone and iPad products attributable to, or implemented by or using, the Defendants' chipsets does not infringe any patent of the Defendants in the UK or any other member state of the European Patent Organisation, including by virtue of an implied licence and/or the exhaustion of patents.

(5) Damages to be assessed.

(6) Interest due to the Claimants pursuant to Section 35A of the Senior Courts Act 1981, at such rate and for such period as the Court shall in its discretion determine.

(7) Costs.

(8) Such further or other relief as the Court considers just.

Value

More than £10 million.

As the claim relates to licence offers for patents, we respectfully request that the claim be heard in the Patents Court List, being a specialist list for the hearing of claims such as this, in accordance with CPR Part 63.

You must indicate your preferred County Court Hearing Centre for hearings here *(see notes for guidance)*

**EXHIBIT 1**
**PAGE 2**

| Defendant's name and address for service including postcode | (1) Qualcomm (UK) Limited, 20-22 Bedford Row, London, United Kingdom WC1R 4JS |
|---|---|
| | (2) Qualcomm Communications UK Limited, 20-22 Bedford Row, London, United Kingdom WC1R 4JS, |
| | (3) Qualcomm Technologies International, Ltd, Churchill House, Cambridge Business Park, Cowley Road, Cambridge, Cambridgeshire, United Kingdom CB4 0WZ |
| | (4) Qualcomm Incorporated, 5775 Morehouse Drive, San Diego, CA 92121, United States of America |

| | £ |
|---|---|
| Amount claimed | More than £10 million |
| Court fee | £10,528 |
| Legal representative's costs | To be assessed |
| Total amount | N/A |

| Claim No. | |
|---|---|

Does, or will, your claim include any issues under the Human Rights Act 1998?    [ ] Yes [X] No

Particulars of Claim to follow

---

**Statement of Truth**

*The Claimants believe that the facts stated in these particulars of claim are true.

* I am duly authorised by the claimants to sign this statement

Full name: Noreen Krall

Name of Claimants' legal representative's firm: Boies, Schiller & Flexner (UK) LLP

signed _____  position or office held: <u>Vice President, Chief Litigation Counsel</u>
    *(on behalf of the Claimants)                                    (if signing on behalf of firm or company)

*delete as appropriate

---

Boies, Schiller & Flexner (UK) LLP
25 Old Broad Street
London
EC2N 1HQ
(FAO Natasha Harrison)

nharrison@bsfllp.com

Claimants' or claimants' legal representative's address to which documents or payments should be sent if different from overleaf including (if appropriate) details of DX, fax or e-mail.

**EXHIBIT 1**
**PAGE 3**

# Exhibit 2



# Amended Claim Form
## (amended under CPR 17.1(1))

| | |
|---|---|
| In the | |
| **High Court of Justice** | |
| **Chancery Division** | |
| **Patents Court** | |

| Fee Account no. | |
|---|---|
| Help with Fees – Ref. no. (if applicable) | H W F - ☐☐☐ - ☐☐☐ |

**You may be able to issue your claim online which may save time and money. Go to www.moneyclaim.gov.uk to find out more.**

| | For court use only |
|---|---|
| Claim no. | |
| Issue date | |

Claimant(s) name(s) and address(es) including postcode

(1) Apple Retail UK Limited, 5th Floor, 6 St Andrew Street, London, United Kingdom EC4A 3AE
(2) Apple Distribution International, Hollyhill Industrial Estate, Hollyhill, Cork, Republic of Ireland
(3) Apple Operations Europe, Hollyhill Industrial Estate, Hollyhill, Cork, Republic of Ireland
(4) Apple GmbH, Arnulfstr. 19, 80335, Munich, Federal Republic of Germany
(5) Apple Retail Germany B.V. & Co KG, Frankfurt am Main, Eschenheimer Anlage 1, 60316 Frankfurt am Main, Federal Republic of Germany
(6) Apple Inc., 1 Infinite Loop Cupertino, CA 95014 United States of America

SEAL

Defendant(s) name and address(es) including postcode

(1) Qualcomm (UK) Limited, 20-22 Bedford Row, London, United Kingdom WC1R 4JS
(2) Qualcomm Communications UK Limited, 20-22 Bedford Row, London, United Kingdom WC1R 4JS
(3) Qualcomm Technologies International, Ltd, Churchill House, Cambridge Business Park, Cowley Road, Cambridge, Cambridgeshire, United Kingdom CB4 0WZ
(4) Qualcomm Incorporated, 5775 Morehouse Drive, San Diego, CA 92121, United States of America

**N1** Claim form (CPR Part 7) (06.16)
This form is reproduced from http://hmctsformfinder.justice.gov.uk/HMCTS/FormFinder.do and is subject to Crown copyright protection. Contains public sector information licensed under the Open Government Licence v3.0
© Crown Copyright 2016

**EXHIBIT 2**
**PAGE 4**

Brief details of claim (page 1 of 2)

The Claimants seek, as more fully set out in the Particulars of Claim:

(1) A declaration that the Defendants are in breach of their obligations under Article 102 of the Treaty on the Functioning of the European Union (the "**TFEU**"), Article 54 of the Agreement on the European Economic Area (the "**EEA**") and/or Section 18 of the Competition Act 1998 (the "**CA98**"), as a consequence of the abuse by the Defendants of their dominant positions on the markets for LTE, CDMA and WCDMA/UMTS chipsets, including but not limited to the Defendants' refusal to license competing chipmakers.

(2) A declaration that the Defendants are in breach of their obligations under Article 102 TFEU, Article 54 EEA and/or Section 18 of the CA98, and/or obligations arising from their contract with, and/or declarations to, the European Telecommunications Standards Institute ("**ETSI**") as a consequence of the abuse by the Defendants of their dominant market position as licensor of actual or purported standard essential patents ("**SEPs**") in connection with chipsets purchased from the Defendants, including but not limited to the Defendants':
   a. failure to offer the Claimants a direct licence to SEPs actually practiced on fair, reasonable and non-discriminatory terms;
   b. charges and demand for excessive royalties from the Claimants for the use of actual or purported SEPs (without any objective and/or sufficient explanation for those royalties); and
   c. charges and demands for excessive licence fees (charged directly or indirectly) from the Claimants for the use of actual or purported SEPs in connection with chipsets purchased from the Defendants.

(3) A declaration that the Claimants are entitled to a direct licence of the SEPs actually practiced on fair, reasonable and non-discriminatory terms.

(4) A declaration that each of the following patents is and at all times has been invalid:

   a. EP (UK) 1,264,506
   b. EP (UK) 1,192,749
   c. EP (UK) 1,791,286
   d. EP (UK) 1,774,822
   e. EP (UK) 2,217,031

(5) An Order that each of the following patents be revoked:

   a. EP (UK) 1,264,506
   b. EP (UK) 1,192,749
   c. EP (UK) 1,791,286
   d. EP (UK) 1,774,822
   e. EP (UK) 2,217,031

(6) A declaration that each of the following patents is not essential to any part of any version of the European Telecommunications Standards Institute standards in relation to which each such patent has been declared essential:

   a. EP (UK) 1,264,506
   b. EP (UK) 1,192,749
   c. EP (UK) 1,791,286
   d. EP (UK) 1,774,822
   e. EP (UK) 2,217,031

(7) A declaration that Qualcomm's rights in respect to all EP(UK)s declared by Qualcomm to be essential to any of the ETSI standards are exhausted in respect of any device which incorporates a chipset supplied directly or indirectly to Apple with Qualcomm's consent.

**EXHIBIT 2**
**PAGE 5**

(8)  Damages to be assessed.

(9)  Interest due to the Claimants pursuant to Section 35A of the Senior Courts Act 1981, at such rate and for such period as the Court shall in its discretion determine.

(10) Costs.

(11) Such further or other relief as the Court considers just.

Value

More than £10 million.

Pursuant to CPR 63.2(2)(a) and CPR PD 7A paragraph 2.4, this Claim must be started in the Patents Court.

**You must indicate your preferred County Court Hearing Centre for hearings here** *(see notes for guidance)*

Defendant's name and address for service including postcode

(1)  Qualcomm (UK) Limited, 20-22 Bedford Row, London, United Kingdom WC1R 4JS

(2)  Qualcomm Communications UK Limited, 20-22 Bedford Row, London, United Kingdom WC1R 4JS,

(3)  Qualcomm Technologies International, Ltd, Churchill House, Cambridge Business Park, Cowley Road, Cambridge, Cambridgeshire, United Kingdom CB4 0WZ

(4)  Qualcomm Incorporated – as set out in Schedule 1

|  | £ |
|---|---|
| Amount claimed | More than £10 million |
| Court fee | £10,528 |
| Legal representative's costs | To be assessed |
| **Total amount** | N/A |

| Claim No. |  |
|---|---|

Does, or will, your claim include any issues under the Human Rights Act 1998?     [ ] Yes [X] No

Particulars of Claim to follow

**EXHIBIT 2**
**PAGE 6**

**Statement of Truth**
*The Claimants believe that the facts stated in these particulars of claim are true.
* I am duly authorised by the claimants to sign this statement

Full name: Noreen Krall

Name of Claimants' legal representative's firm: Boies Schiller Flexner (UK) LLP

signed _____ position or office held: <u>Vice President, Chief Litigation Counsel</u>
      *(on behalf of the Claimants)                              (if signing on behalf of firm or company)

                                                     *delete as appropriate

Boies Schiller & Flexner (UK) LLP
5 New Street Square
London
EC4A 3BF
(FAO Natasha Harrison / Fiona Huntriss)

nharrison@bsfllp.com / fhuntriss@bsfllp.com

Claimants' or claimants' legal representative's address to which documents or payments should be sent if different from overleaf including (if appropriate) details of DX, fax or e-mail.

**EXHIBIT 2**
**PAGE 7**

## Schedule 1

The addresses for service for the Fourth Defendant are as follows:

(i)      In respect of the relief claimed in paragraphs (1) – (3) and (8) – (11) of the Amended Claim Form, c/o The Prentice-Hall Corporation System, Inc, 2711 Centerville Road Suit 400, Wilmington, DE 19808, United States of America.

(ii)     In respect of the relief claimed in paragraphs (4) – (7) and (10) – (11) of the Amended Claim Form in respect of EP(UK) 1,264,506, c/o Venner Shipley LLP, 200 Aldersgate, London EC1A 4HD (ADP Number 08897431001).

(iii)    In respect of the relief claimed in paragraphs (4) – (7) and (10) – (11) of the Amended Claim Form in respect of EP(UK) 1,192,749, c/o Maucher Jenkins, 26 Caxton Street, London SW1H 0RJ (ADP Number 11803202001).

(iv)    In respect of the relief claimed in paragraphs (4) – (7) and (10) – (11) of the Amended Claim Form in respect of EP(UK) 1,791,286, c/o R.G.C Jenkins & Co, 26 Caxton Street, London SW1H 0RJ (ADP Number 09557687001).

(v)     In respect of the relief claimed in paragraphs (4) – (7) and (10) – (11) of the Amended Claim Form in respect of EP(UK) 1,774,822, c/o Reddie & Grose, 16 Theobalds Road, London WC1X 8PL (ADP Number 00000091001).

(vi)    In respect of the relief claimed in paragraphs (4) – (7) and (10) – (11) of the Amended Claim Form in respect of EP(UK) 2,217,031, c/o Reddie & Grose, 16 Theobalds Road, London WC1X 8PL (ADP Number 00000091001).

**EXHIBIT 2**
**PAGE 8**

**EXHIBIT 2**
**PAGE 9**

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**PATENTS COURT**
**BETWEEN:**

(1)     **APPLE RETAIL UK LIMITED**

**(a company incorporated in England and Wales)**

(2)     **APPLE DISTRIBUTION INTERNATIONAL**

**(a company incorporated in the Republic of Ireland)**

(3)     **APPLE OPERATIONS EUROPE**

**(a company incorporated in the Republic of Ireland)**

(4)     **APPLE GMBH**

**(a company incorporated in Germany)**

(5)     **APPLE RETAIL GERMANY B.V. & CO. KG**

**(a company incorporated in Germany)**

(6)     **APPLE INC.**

**(a company incorporated in California)**

<div align="right">

**Claimants**

</div>

**and**

(1)     **QUALCOMM (UK) LIMITED**

**(a company incorporated in England and Wales)**

(2)     **QUALCOMM COMMUNICATIONS UK LIMITED**

**(a company incorporated in England and Wales)**

(3)     **QUALCOMM TECHNOLOGIES INTERNATIONAL, LTD.**

**(a company incorporated in England and Wales)**

(4)     **QUALCOMM INCORPORATED**

**(a company incorporated in Delaware)**

<div align="right">

**Defendants**

</div>

---

**PARTICULARS OF CLAIM**

**(Non-confidential version)**

---

1

**EXHIBIT 2**
**PAGE 10**

1. This is the non-confidential version of the Claimants' Particulars of Claim in these proceedings. Commercially confidential information contained in the confidential version of the Particulars of Claim has been redacted in this version. The confidential version of the Particulars of Claim will be made available to members of the confidentiality club that the Claimants will seek to establish by an appropriate order following the commencement and service of the proceedings.

## A. THE PARTIES

### (i) The Claimants

2. The Claimants are companies within the well-known Apple group of companies. They are involved in the design, manufacture and marketing of innovative and iconic mobile communication and media devices, personal computers and portable music players as well as related software, accessories and content. Apple's products include the well-known iPhone and iPad devices.

3. The First Claimant operates Apple's retail stores (known as 'Apple stores') in the UK and in so doing sells Apple devices including iPhones and iPads to customers in the UK. It is incorporated in England and Wales.

4. The Second Claimant ("Apple Distribution") sells Apple devices including iPhones and iPads to the First and Fifth Claimants and all third party retailers in the EMEA (Europe, Middle East and Africa) region. It also operates the Apple online store in the EU and in so doing sells Apple products to final customers in the EU purchasing the goods online. It is incorporated in the Republic of Ireland.

5. The Third Claimant ("Apple Operations") sells Apple devices including iPhones and iPads to the Second Claimant. It is incorporated in the Republic of Ireland.

6. The Fourth Claimant provides sales support and marketing support to the Second Claimant. It is incorporated in Germany.

2

**EXHIBIT 2**
**PAGE 11**

7. The Fifth Claimant operates Apple stores in Germany and in doing so sells Apple devices including iPhones and iPads to customers in Germany. It is incorporated in Germany.

8. The Sixth Claimant is a company incorporated in California. It is the ultimate parent company of the other Claimants and of the Apple group as a whole.

9. The term 'Apple' where used herein should be taken to refer to the Apple group or to the relevant corporate entity within it, as the case may be.

**(ii)     The Defendants**

10. The Defendants are companies within the Qualcomm group, which is involved in the development and sale of wireless telecommunications products and services and which holds certain IP rights (such as patents) in connection with such products.    In particular, so far as material for present purposes, Qualcomm is involved in the development and sale of baseband processor chipsets and the provision of licenses to third parties in respect of Qualcomm's IP rights. Baseband processor chipsets are sets of microprocessors which enable a mobile device to communicate with a particular wireless network. The term 'chipsets' when used herein is shorthand for baseband processor chipsets. Chipsets are sometimes called 'baseband modems' or 'cellular baseband modems'.

11. The First to Third Defendants are Qualcomm group companies incorporated in England and Wales. The First and Second Defendants share the same registered office address in London. The First Defendant is involved in the development of Qualcomm's technology for the wireless communications market, including chipsets. The Second Defendant is involved in managing Qualcomm's chipset production and providing support operations in relation to the same. The First and Second Defendants also carry out the majority of Qualcomm's commercial operations in the UK.

12. The Third Defendant is based in Cambridge and has its registered office there. It is involved in research and development and holds a number of European Patents designating the UK ("EP(UK)").

3

**EXHIBIT 2**
**PAGE 12**

13. The Fourth Defendant is a corporation incorporated in Delaware, USA. It is the ultimate parent company of the First to Third Defendants and of the Qualcomm group as a whole. It holds a number of EP(UK) patents relevant to the present proceedings.

14. The term 'Qualcomm' where used herein should be taken to refer to the Qualcomm group or to the relevant corporate entity within it, as the case may be. For the avoidance of doubt, the Qualcomm group is a single undertaking within the meaning of Article 102 of the Treaty on the Functioning of the European Union ("TFEU"), Article 54 of the Agreement on the European Economic Area ("EEA") and Section 18 of the Competition Act 1998 ("CA98").

15. Qualcomm's business is primarily conducted through two segments, known as Qualcomm CDMA Technologies ("QCT") and Qualcomm Technologies Licensing ("QTL"). QCT (operated via Qualcomm Technologies Inc., a wholly-owned subsidiary of the Fourth Defendant) primarily engages in development and supply of integrated circuits and system software, including chipsets. QTL (operating via the Fourth Defendant) operates Qualcomm's patent licensing business, granting licences or providing rights to use portions of Qualcomm's intellectual property portfolio.

## B. COMMON STANDARDS IN THE WIRELESS TELE-COMMUNICATIONS SECTOR

16. In order that components manufactured by different mobile device manufacturers can operate with each other and with mobile telecommunications networks, the wireless telecommunications industry has adopted certain common standards. These standards are adopted by the market participants (such as mobile network providers, wireless device manufacturers and baseband chipset manufacturers) through standard setting organisations ("SSOs"). The European Telecommunications Standards Institute ("ETSI") is a leading SSO in the telecommunications industry. Both Apple and Qualcomm are members of ETSI. In particular, the Fourth Claimant and the First Defendant are members of ETSI.

4

**EXHIBIT 2**
**PAGE 13**

17. ETSI and/or its predecessors produced and ETSI now maintains a number of principal standards in mobile telecommunications technology:

    (a)    The Global Systems for Mobile Communication (GSM) standard, sometimes referred to as a second generation (2G) mobile communications technology. Technology known as Code-Division Multiple Access (CDMA) was originally developed in respect of the (non-ETSI) 2G standard.

    (b)    The Universal Mobile Telecommunications Service (UMTS) standard, sometimes referred to as a third generation (3G) mobile communications technology. The UMTS standard incorporates the Wide-band Code-Division Multiple Access (WCDMA) standard.

    (c)    The Long-Term Evolution (LTE) standard, sometimes referred to (in whole or in part) as a fourth generation (4G) mobile communications technology.

18. Where there is more than one standard available for any particular generation of technology, the standard applicable to the device in question depends on the wireless network on which the device is to be used, as each wireless network specifies the standard on which it is to operate. The prevailing standards vary between different geographical areas of the world and in some places between different wireless network operators in a single country.

19. Mobile devices generally have to simultaneously support standards applicable to more than one 'generation' of technology. Thus, for example, when 3G devices were initially released, unless they continued to support the applicable 2G standard, they would not have been able to communicate with existing 2G base stations. The same position applies (*mutatis mutandis*) in relation to 4G devices. This phenomenon of devices and chipsets that support two or more simultaneous standards is referred to as 'backwards-compatibility'.

20. The adoption of a standard that incorporates particular patented technology has the effect of conferring upon the owner of technology that is essential to the standard – often embodied in 'standard essential patents' or 'SEPs' –

5

**EXHIBIT 2**
**PAGE 14**

significant market power in the market for the licensing of IP rights in such technology. Due to the incorporation of that proprietary technology in the relevant industry standard, it is not possible for downstream operators to adopt alternative technology or to 'work around' the relevant SEPs.

21. For that reason, ETSI requires its members to comply with the provisions of ETSI Directives, which include its Rules of Procedure and Intellectual Property Rights Policy (the "IPR Policy"). The term 'Member' is defined under the IPR Policy (s.15(9)) as including affiliates. Apple will refer to the ETSI Directives for their full terms, true meaning and effect.

22. Amongst other things, the IPR Policy requires ETSI members and their affiliates to declare whether they own any intellectual property rights such as patents that would be incorporated in such standard and, in the event that such patents are declared, to require their owners to undertake to grant a licence on fair, reasonable and non-discriminatory (FRAND) terms to anyone wishing to take such a licence.

23. Clause 4.1 of the IPR Policy provides:

> *"Subject to Clause 4.2 below, each MEMBER shall use its reasonable endeavours, in particular during the development of a STANDARD or TECHNICAL SPECIFICATION where it participates, to inform ETSI of ESSENTIAL IPRs in a timely fashion. In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted"*.

24. Clause 6.1 of the IPR Policy provides:

> *"When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an irrevocable undertaking in writing that it is prepared to grant irrevocable licences on fair, reasonable and non-*

6

**EXHIBIT 2**
**PAGE 15**

*discriminatory ("FRAND") terms and conditions under such IPR to at least the following extent:*

- *MANUFACTURE, including the right to make or have made customized components and sub-systems to the licensee's own design for use in MANUFACTURE;*

- *sell, lease, or otherwise dispose of EQUIPMENT so MANUFACTURED;*

- *repair, use or operate EQUIPMENT; and*

- *use METHODS*

*The above undertaking may be made subject to the condition that those who seek licences agree to reciprocate."*

25. Clause 6bis of the IPR Policy provides that *"MEMBERS shall use one of the ETSI IPR Licensing Declaration forms at the Appendix to this ETSI IPR Policy to make their IPR licensing declarations".* These Licensing Declaration forms contain a "General IPR Licensing Declaration" which includes a declaration that:

> *"In accordance with Clause 6.1 of the IPR Policy, the Declarant and/or its AFFILIATES hereby irrevocably declares the following ... the Declarant and/or its AFFILIATES are ... prepared to grant irrevocable licences on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy...".*

26. Relevant definitions contained in these provisions include:

a. "Affiliate" defined at Clause 15.1 of the IPR Policy: *"AFFILIATE" of a first legal entity means any other legal entity: directly or indirectly owning or controlling the first legal entity; under the same direct or indirect ownership or control as the first legal entity, or directly or indirectly owned or controlled by the first legal entity, for so long as such ownership or control lasts. Ownership or control shall exist*

7

**EXHIBIT 2**
**PAGE 16**

through the direct or indirect: ownership of more than 50% of the nominal value of the issued equity share capital of or more than 50% of the shares entitling the holders to vote for the election of directors or persons performing similar functions; or right by any other means to elect or appoint directors, or persons who collectively can exercise such control...".

b. "Essential IPR" defined at Clause 15.6 of the IPR Policy:

"'ESSENTIAL' as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease or otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR. For the avoidance of doubt in exceptional cases where a STANDARD can only be implemented by technical solutions, all of which are infringements of IPRs, all such IPRs shall be considered ESSENTIAL."

c. "Equipment" is defined at Clause 15.4 of the IPR Policy as follows: "any system, or device fully conforming to a STANDARD" (and includes baseband processor chipsets and components thereof that compatibly implement standards within mobile wireless products made by manufacturers, and equipment within base stations operated by network operators).

d. "Member", which as stated above is defined at Clause 15.9 of the IPR Policy in terms whereby "References to a MEMBER shall wherever the context permits be interpreted as references to that MEMBER and its AFFILIATES".

27. Clause 12 of the IPR Policy provides that "the POLICY shall be governed by the laws of France...". The IPR Policy and this undertaking creates an obligation on ETSI members to licence (or procure a licence for) such patents on FRAND terms, which obligation is actionable under French law by other ETSI members and third parties seeking such a licence, by reason of the

8

**EXHIBIT 2**
**PAGE 17**

contractual relationship between ETSI members *inter se* (the terms of which include the aforesaid IPR Policy), further or alternatively under the French law principle of *stipulation pour autrui* (*Code Civil,* arts. 1205-1209). Any ETSI Declarations made by or on behalf of Members or patent-holding affiliates (whether Members or not) are likewise enforceable in French law, on the same grounds. Likewise, and for the same reasons, as more fully pleaded below, a party holding SEPs is obliged under Article 102 TFEU, Article 54 EEA and Section 18 of CA98 to grant a licence on FRAND terms to anyone wishing to obtain one.

28. Qualcomm has declared to ETSI some 30,000 patents as essential to the 2G, 3G and 4G mobile telecommunications standards. The party who holds the relevant EP(UK) patents declared as essential to the said standards is the Fourth Defendant. The First Defendant is a member of ETSI. Pursuant to this declaration and the undertakings made to ETSI (including Clause 6.1 of the IPR Policy), Qualcomm has agreed to license those patents on FRAND terms.

29. In addition to holding such patents, Qualcomm also develops and sells baseband processor chipsets that support (*inter alia*) the CDMA and LTE standards. For many years, Qualcomm has been the only commercially significant manufacturer of CDMA chipsets (including 3G and 4G chipsets that are backwards-compatible with the CDMA standard), and today is the dominant supplier of LTE chipsets, including the premium, or high-end, LTE chipsets used in Apple's flagship iPhone devices.

## C. RELEVANT SUPPLY ARRANGEMENTS AND THEIR CHRONOLOGICAL DEVELOPMENT

### (i) The earliest devices and Apple's move to using Qualcomm chipsets

30. Apple launched the iPhone in 2007 and the iPad in 2010. Apple outsources the manufacture of its iPhone and iPad devices to third party contract manufacturers ("CMs") located in China and Taiwan. Apple instructs the CMs as to the components to be included in the devices, and the CMs then purchase certain of those components as appropriate from their suppliers (including Qualcomm).

9

**EXHIBIT 2**
**PAGE 18**

31. For the early models of the iPhone, Apple used baseband chipsets supplied by Infineon. From around 2009, however, Apple wished to launch an iPhone that would be compatible with certain networks operating on the CDMA standard, including the Verizon network in the US. The only viable supplier of chipsets that were compatible with the CDMA standard was Qualcomm. Apple was therefore required to source chipsets for incorporation in its CDMA-compatible iPhones from Qualcomm, and did so.

**(ii)      Overview of Qualcomm's licensing and chipset supply practices**

32. Qualcomm requires that purchasers of chipsets from Qualcomm first take a licence to Qualcomm's SEPs on terms involving excessive royalties, as a condition of obtaining chipset supply.

33. Qualcomm also refuses to license its SEPs to competing chipset manufacturers. In certain circumstances, and only where it decides that it is prepared to do so, Qualcomm will enter into patent non-assert or similar agreements with competing chipset manufacturers. This is not equivalent to granting licences to Qualcomm's SEPs (on FRAND terms) to any party, including competing chipset manufacturers, who may wish to obtain such a licence. In particular, it means that Qualcomm insists that customers purchasing chipsets incorporating Qualcomm SEPs from competing manufacturers still have to obtain licences from Qualcomm to its standard-essential IP. This enables Qualcomm to insert itself into the commercial relationships between its competitors and their customers and to exert control over that relationship.

34. The consequence of Qualcomm's requirement that purchasers of its chipsets obtain a licence to its SEPs, and its refusal to license chipset competitors, is that chipset customers must take a licence from Qualcomm (on non-FRAND terms) irrespective of whether those chipsets are purchased from Qualcomm or from a competitor. Together, these practices give Qualcomm the ability and incentive to use these non-FRAND terms to disadvantage competitors, for example (as occurred in Apple's case) by requiring customers to refrain from

10

**EXHIBIT 2**
**PAGE 19**

dealing with Qualcomm's competitors as a condition of obtaining a degree of relief from Qualcomm's non-FRAND royalties.

35. So far as Apple is concerned, Qualcomm has not entered into a direct patent licence with Apple, but rather entered into patent licences with Apple's CMs. This enables Qualcomm to impose even higher patent royalties than it would otherwise be able to do, including because the CMs have relatively little ability or incentive to negotiate the royalty rates down.

36. In order to secure some relief from the very high royalty rates charged by Qualcomm to Apple's CMs, Apple has entered into agreements with Qualcomm that entitle Apple to a rebate on the royalties that it would otherwise have to pay (through the CMs). In a number of these agreements, Qualcomm required Apple, as a condition of obtaining such royalty relief, to agree to grant Qualcomm exclusivity over Apple's chipset supply requirements and not to use competing technology standards. Under these arrangements, Apple would lose a disproportionate share of its entitlement to royalty rebates in the event of transferring even a small proportion of its purchases of chipsets to competitors.

37. Such exclusivity agreements have further limited the emergence of competition for chipsets by foreclosing the share of the market corresponding to Apple's purchases of chipsets to competitors (or potential competitors) of Qualcomm for substantial periods of time. Apple is a significant purchaser on the market for chipsets and represents a significant share of such market, and in particular of the relevant market for premium LTE chipsets. These agreements also meant that potential competitors were deprived of the developmental benefits (in terms of economies of scale, scope, learning and commercial validation) that would have been provided by a relationship with Apple.

38. Apple had no commercial alternative but to agree to the exclusivity conditions imposed by Qualcomm because:

(a)     as pleaded above, Apple required CDMA-compatible chipsets, of which Qualcomm was then the only commercially viable supplier;

11

**EXHIBIT 2**
**PAGE 20**

(b) the grant of exclusivity was the only way for Apple to secure some relief from the high royalty rates charged by Qualcomm to Apple's CMs; and

(c) Qualcomm refused to extend meaningful supply assurances to Apple, meaning that Apple was exposed to the risk of interruption or reduction of supplies if it refused to agree to the terms required by Qualcomm.

39. The practices referred to above are mutually reinforcing. By requiring that customers take a licence on non-FRAND terms as a condition of obtaining supply, and by refusing to license those patents to competitors, Qualcomm obtains the ability to charge above-FRAND royalties to all chipset purchasers. By charging high headline royalty rates, Qualcomm is able to force customers to agree to exclusionary terms as the sole means by which they can secure some relief against such royalties, thereby impeding the development or emergence of competition. By excluding chipset competition, Qualcomm enhances its ability to extract non-FRAND royalties as a condition of obtaining chipset supply (since customers cannot secure supplies elsewhere), further reinforcing its ability to exclude chipset competitors.

40. By these means, Qualcomm has enabled itself to charge royalties for its SEPs for the wireless communications standards referred to above that are far in excess of what would be FRAND and has thereby sought to avoid its obligations under the ETSI Rules and applicable competition laws, as pleaded further below.

**(iii)    Relevant arrangements between Apple and Qualcomm**

41. Apple has entered into a number of agreements directly with Qualcomm concerned with matters such as royalty rebates and the supply of Qualcomm chipsets, as follows.

42. As pleaded above, when Apple first launched the iPhone in 2007, it used chipsets supplied by Infineon. However, Apple still had to pay Qualcomm royalties for the purchase of those chipsets, pursuant to the pre-existing

12

**EXHIBIT 2**
**PAGE 21**

licences of its CMs, under which the CMs' obligation to pay royalties to Qualcomm was not limited to chipsets supplied by Qualcomm but extended also to chipsets supplied by others, which made use of Qualcomm's IP (SEPs). These licences which were on non-FRAND terms and exposed Apple to exorbitant royalty overcharges. Since Apple wanted to use the CMs and had no good alternatives to doing so, it had no choice but to pay the non-FRAND royalties Qualcomm had extracted from the CMs, and thereafter to seek ways to reduce the royalty burden, if it could.

43. On 8 January 2007 Apple entered into an agreement entitled 'Marketing Incentive Agreement' (the "MIA") with Qualcomm. Apple will refer to the MIA for its full terms, true meaning and effect. The MIA applied to all Apple phones practising certain 3G technologies for which Qualcomm claimed to have SEPs. Under the MIA Apple was entitled to a rebate from Qualcomm such that the per unit patent licensing royalty paid to Qualcomm for each Apple phone to which the agreement applied (i.e. UMTS-compatible phones) would be reduced to ███████, subject to compliance by Apple with the terms and conditions of the MIA. Those terms and conditions included that Apple would not sell phones incorporating WiMax technology (a competing wireless communications technology at this time). The MIA also provided that it could be terminated by Qualcomm if Apple initiated any claim for intellectual property infringement against Qualcomm.

44. As pleaded above, from around 2009, Apple wished to launch a CDMA-compatible iPhone and had therefore to begin sourcing chipsets from Qualcomm. On 16 December 2009, Apple and Qualcomm entered into a 'Strategic Terms Agreement' (the "STA") governing the terms upon which Qualcomm would supply Qualcomm chipsets to the CMs used by Apple, based on forecasts of anticipated supply requirements provided by Apple. Apple will refer to the STA for its full terms, true meaning and effect. Those terms included limitations on Apple's ability to cancel orders for Qualcomm chipsets, and a cap on Qualcomm's liability for a failure to supply chipsets. The STA could be terminated at Qualcomm's convenience. Similar to the

13

EXHIBIT 2
PAGE 22

MIA, the STA was expressed to be terminable in the event that Apple asserted any of its patents against Qualcomm.

45. The STA was superseded by an 'Amended and Restated Strategic Terms Agreement' effective as of 28 February 2013 (the "ASTA"). Apple will refer to the ASTA for its full terms, true meaning and effect.

46. With effect from 11 February 2011, Apple and Qualcomm entered into a 'Transition Agreement' (the "TA"). Apple will refer to the TA for its full terms, true meaning and effect. Under the TA, Qualcomm agreed to make various payments to Apple, of the order of ███████████████████████, conditional upon Apple exclusively selling devices incorporating Qualcomm chipsets (save for pre-existing Apple models already on the market). Clause 1.5 of the TA provided:



47. The effect of the TA was (as pleaded above) to enable Apple to obtain a partial rebate in respect of the royalties it was paying (via the CMs) to Qualcomm. In order to secure those partial rebates, however, Apple was required to agree to grant Qualcomm exclusivity across all wireless standards

14

**EXHIBIT 2**
**PAGE 23**

(CDMA, UMTS and LTE). The last model of iPhone launched prior to the TA in 2011 was the iPhone 4, which was therefore the last model of iPhone to use non-Qualcomm chipsets prior to the period of exclusivity resulting from the agreements pleaded herein. For the avoidance of doubt, supplies of chipsets by Qualcomm to Apple did not fall within the MIA pleaded above.

48. The last device launched by Apple containing a non-LTE chipset was the iPhone 4S, launched in 2011. Since that date, all models of new iPhones and cellular-compatible iPads sold by Apple have incorporated LTE chipsets.

49. The MIA expired on 31 December 2012. With effect from 1 January 2013, Apple and Qualcomm entered into a 'Business Co-operation and Patent Agreement' (the "BCPA"). Apple will refer to the BCPA for its full terms, true meaning and effect. Under the BCPA, Qualcomm agreed to make a payment to Apple (described as a Business Cooperation and Patent Payment or BCP Payment) which reduced (by way of rebate) the amount of royalties paid to Qualcomm to ████ per iPhone or ████ per iPad. Clause 10.2 of the BCPA provided, however, as follows—

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████

50. The sums potentially due to Apple by way of BCP payments under the BCPA each quarter were very large, in the order of ████████████████████.

15

**EXHIBIT 2**
**PAGE 24**

Under Clause 2 of the BCPA, that agreement was to expire on 31 December 2016 (and has now expired).

51. With effect from 1 January 2013, and alongside the BCPA, Apple and Qualcomm entered into an agreement entitled 'First Amendment to Transition Agreement' (the "FATA"). Apple will refer to the FATA for its full terms, true meaning and effect. Under the FATA, Qualcomm agreed to make certain additional payments to Apple (i.e. additional to those for which the TA provided), again dependent upon all new models of Apple devices exclusively incorporating Qualcomm chipsets. These payments included, in particular, a payment described as a '[REDACTED], equivalent to [REDACTED] per iPhone sold at a price of [REDACTED] or more, or [REDACTED] for every iPhone sold at a price of [REDACTED] or more – in other words, in combination with the BCPA, reducing total Apple net payments to the [REDACTED] level that Apple had effectively previously paid under the MIA. Under the FATA, in the event that Apple sold iPhones incorporating a competitor's chipset, Qualcomm was entitled to "claw-back" past 'Marketing Fund' payments. In particular, Clause 1.3A(c) stated:

[REDACTED]



52. Whilst Clause 1.3A(c) applies to payments described as a ██████████,
equivalent repayment provisions were included in respect of further payments
for which the FATA provided, including a payment of up to ███████████
described as an '████████████████████████. These clawback
provisions ceased to apply as at the end of calendar year 2015.

53. By an STA Assignment Agreement (the "STAAA") effective 7 December
2015, Qualcomm Incorporated, QTI and Apple agreed that Qualcomm
Incorporated was to have the right to assign the STA to QTI. Apple will refer
to the STAAA for its full terms, true meaning and effect. Clause 4.1 of the
STAAA provided for a limited supply commitment from Qualcomm, but only
in return for significant restrictions on Apple, such as at Clause 4.4:

17

**EXHIBIT 2**
**PAGE 26**



**(iv)**    **Relevant supply chains**

54. So far as concerns Apple devices for sale in Europe, such devices are sold by the CMs to Apple Operations pursuant to contracts known as 'original equipment manufacturing agreements' ("OEMAs"). The royalty fees paid by the CMs to Qualcomm are charged by the CMs to the Sixth Claimant, Apple Inc., reflecting the royalty rebate arrangements between Apple Inc. and Qualcomm pleaded above. So far as concerns Apple devices for sale in Europe, following the application of any applicable rebates, the royalty costs are passed on by Apple Inc. to Apple Operations in proportion to the sales of

18

**EXHIBIT 2**
**PAGE 27**

royalty-bearing devices sold in the territories for which Apple Operations is responsible (rather than the territories for which Apple Inc is responsible). Save as aforesaid, under the OEMAs the CMs pass on their costs to Apple Operations, including the price of the chipsets incorporated within the devices.

55. As explained above, Apple Operations then on-sells the devices to Apple Distribution. Apple Distribution then further on-sells the devices as follows:

(a) for Apple devices to be sold in Apple stores in the UK, to the First Claimant, which then sells them on to end users;

(b) for Apple devices to be sold in Apple stores in Germany, to the Fifth Claimant, which then sells them on to end users;

(c) directly to end-users who purchase such devices online in the EU; and

(d) to third party retailers in the EMEA region for on-sale by them to end-users.

(v) **Apple's request for a direct patent licence**

56. Apple does not hold, and has at no stage held, a direct patent licence with Qualcomm. This situation is highly unusual. So far as concerns other cellular telecommunications patent holders (such as ███████████████████ ████████), Apple is or has been a direct licensee of the patent holder.

57. For a number of years Apple has been seeking a direct worldwide patent licence from Qualcomm in respect of its cellular patents that have been declared essential to the relevant wireless telecommunications standards on FRAND terms. Whilst Qualcomm has recently made an offer to enter into a direct licence with Apple, this offer was on non-FRAND terms. In fact, on 15 July 2016, when Qualcomm sent Apple a draft licence for its patents declared essential to 3G and 4G standards (other than in China, such patents being the subject matter of a separate draft licence), the proposed royalties sought by Qualcomm amounted to a very substantial increase as compared with the royalty rates Apple has paid to Qualcomm over the last several years, which are themselves excessive (as pleaded further below).

19

**EXHIBIT 2**
**PAGE 28**

58. Apple has offered to enter into direct licence with Qualcomm on what Apple considers (and alleges herein) to be FRAND terms, including as set out in its letters dated 13 September 2016, 22 December 2016 and 20 January 2017. The FRAND terms proposed by Apple were that Qualcomm would grant Apple a seven-year licence for Qualcomm's cellular SEPs in return for an annual (or annualised) fee of ████████████. Qualcomm has not responded substantively to Apple's said offer. The terms of this offer represent Apple's current best quantification of an appropriate FRAND royalty fee for Qualcomm's SEPs comprised in the relevant 3G and 4G mobile telecommunications standards.

59. It therefore remains the position that there is no direct patent licence between Qualcomm and Apple, because Qualcomm has not been willing to enter into such a licence on FRAND terms.

60. Further particulars of Apple's requests that Qualcomm grant Apple a direct patent licence will be provided, so far as relevant, by way of witness statement evidence in due course.

**(vi)    The current position**

61. The clawback provisions of the FATA expired at the end of calendar year 2015. Following such expiry, in the course of 2016, Apple began purchasing some of its requirement for chipsets (i.e. LTE chipsets) from Intel. The BCPA also expired at the end of 2016, as pleaded above.   Apple is currently challenging Qualcomm's fees and practices in connection with the sale of chipsets and licensing of associated SEPs through competition law challenges in multiple jurisdictions   Ultimately, the terms of the licence between the parties will have to be determined, whether through litigation or negotiation.

62. Subject to the effect of applicable competition or antitrust laws, Qualcomm's refusal to engage further in realistic negotiations regarding a patent licence agreement leave Apple at risk of patent infringement proceedings by Qualcomm or other retaliatory behaviour by Qualcomm.   Qualcomm has commenced proceedings in order to assert patents, for example against Meizu Technology Co., Ltd. ("**Meizu**").   As pleaded below, some of the patents

20

**EXHIBIT 2**
**PAGE 29**

which form the basis of challenges in these proceedings are counterparts of Chinese patents asserted by Qualcomm against Meizu in ongoing proceedings.

## D. QUALCOMM'S PATENTS

63. As pleaded above, Qualcomm (and, in particular, the Fourth Defendant) is the registered proprietor of some 30,000 patents declared to ETSI as essential to the 2G, 3G and 4G mobile telecommunications standards.

64. Amongst other patents, the Fourth Defendant is the registered proprietor of the following European Patents designating the United Kingdom:

    a.  EP (UK) 1,264,506 ("EP '506");

    b.  EP (UK) 1,192,749 ("EP '749");

    c.  EP (UK) 1,791,286 ("EP '286");

    d.  EP (UK) 1,774,822 ("EP '822"); and

    e.  EP (UK) 2,217,031 ("EP '031"),

(together, the "**Specified Patents**"),

each of which are counterparts of patents either asserted by Qualcomm in proceedings against Meizu, or otherwise listed by Qualcomm in information and allegations provided to Apple during licensing negotiations between the parties.

65. The Specified Patents and each of them are in force.

66. By declarations made by the Fourth Defendant to ETSI, the Fourth Defendant has averred that the Specified Patents and each of them are essential to the performance of the following specified standards maintained by ETSI (each a "Relevant ETSI Standard" and together the "Relevant ETSI Standards"):

    a.  EP'506 declared standard essential:

        i.  by declaration ISLD-200201-001, disclosure numbers 207-208, in relation to:

            (i)    UMTS TS 33.102

        ii.  by declaration ISLD-201412-012, disclosure number 17, in relation to:

21

**EXHIBIT 2**
**PAGE 30**

       (i)      TD-SCDMA TS 33.102

b. EP'749 declared standard essential:

    i. by declaration ISLD-200610-009, disclosure number 1, in relation to:

        (i)      UMTS (no standard specified)

        (ii)     3GPP (no standard specified)

    ii. by declaration ISLD-201004-005, disclosure number 55, in relation to:

        (i)      UMTS TS 125 211

        (ii)     UMTS TS 125 212

        (iii)    UMTS TS 125 214

        (iv)    UMTS TS 25.211

        (v)     UMTS TS 25.212

        (vi)    UMTS TS 25.214

    iii. by declaration ISLD-201611-007, disclosure number 50, in relation to:

        (i)      3GPP-Release-6 TS 25.321

c. EP'286 declared standard essential:

    i. by declaration ISLD-200610-009, disclosure number 1, in relation to:

        (i)      UMTS (no standard specified)

        (ii)     3GPP (no standard specified)

    ii. by declaration ISLD-201004-005, disclosure number 55, in relation to:

        (i)      UMTS TS 125 211

        (ii)     UMTS TS 125 212

        (iii)    UMTS TS 125 214

        (iv)    UMTS TS 25.211

        (v)     UMTS TS 25.212

        (vi)    UMTS TS 25.214

    iii. by declaration ISLD-201611-007, disclosure number 50, in relation to:

        (i)      3GPP-Release-6 TS 25.321

d. EP'822 declared standard essential:

22

**EXHIBIT 2**
**PAGE 31**

i. by declaration ISLD-200809-004, disclosure number 1, in relation to:

  (i)   LTE - TS 36.300

  (ii)  LTE - TS 32.321

ii. by declaration ISLD-201611-007, disclosure number 33, in relation to:

  (i)   3GPP-Release-8 - TS 36.213

  (ii)  3GPP-Release-8 - TS 36.214

e.  EP'031 declared standard essential:

i. by declaration ISLD-200809-004, disclosure number 1, in relation to:

  (i)   LTE - TS 36.300

  (ii)  LTE - TS 32.321

ii. by declaration ISLD-201611-007, disclosure number 33, in relation to:

  (i)   3GPP-Release-8 - TS 36.213

  (ii)  3GPP-Release-8 - TS 36.214

67. However, performance of the Relevant ETSI Standards or any of them does not require performance of the invention of any valid claim of the Specified Patents or any of them.

68. In the premises of the disputed essentiality set out immediately herein above, and in the premises of the disputed position on patent exhaustion set out immediately herein below, there is a commercial dispute between Apple and Qualcomm as to whether Apple requires a licence from Qualcomm in order to implement devices complying with the Relevant ETSI Standards or any of them.

69. Further and in any event, Qualcomm's right to assert its EP(UK)s declared to be essential  or any of them has been exhausted in respect of any device which incorporates a chipset supplied directly or indirectly to Apple with the consent of Qualcomm:

23

**EXHIBIT 2**
**PAGE 32**

a. As pleaded above, Qualcomm supplies chipsets to the CMs, for inclusion in Apple's devices which are on-sold by the CMs to Apple;

b. Qualcomm consents to this supply arrangement by reason of its knowledge of the CMs' dealings with Apple and its contractual relationships with Apple in respect of those dealings, as pleaded above;

c. Supply of the chipset by Qualcomm implies authorisation for the use of and a licence for the relevant patents;

d. Whilst Apple has not had sight of the relevant contractual terms between Qualcomm and the CMs, to the extent that these contain any purported express term to limit the authorisation for the use of and licence for the relevant patents, this express term is invalid; and

e. Any attempts by Qualcomm to evade this authorisation and licence for its patents by supplying chipsets through one corporate entity and licences through another are invalid and ineffective.

70. In respect of each of Qualcomm's declared essential EP(UK)s, pursuant to CPR 63.14 Apple is entitled without permission of the Court to serve at any corresponding UK address for service such a claim for a declaration of exhaustion of rights. However, Qualcomm (as it is entitled to do) has not provided a single harmonised address for service for each of its EP(UK)s. By way of example, the registered particulars for the address for service for the 5 Specified Patents between them appoint 4 different agents (as listed in Schedule 1 to the Amended Claim Form).

71. In the premises, and absent any particularised averment by Qualcomm that the position on exhaustion differs (or might differ) materially across the scope of its portfolio of EP(UK)s, and given that Apple herein serves Qualcomm with the exhaustion claim in respect of the 5 Specified Patents at each of the corresponding registered addresses for service, Apple avers that it is unnecessary and would be disproportionate to specifically issue and serve the exhaustion claim against any of Qualcomm's EP(UK)s beyond the Specified Patents, but reserves the right to do so if and insofar as Qualcomm avers that

the Court cannot or should not make the general form of declaration of exhaustion set out in the Prayer herein without Apple issuing and serving the claim specifically particularising each declared essential EP(UK).

72. If and to the extent any claim of any of the Specified Patents is held to be essential to the Relevant ETSI Standards or any of them, and the corresponding rights therein have not been exhausted (in each case as pleaded herein above), Apple will contend that each such Specified Patent is, and at all times has been, invalid for the reasons set out in the Grounds of Invalidity served herewith.

73. Apple pleads further to the aforesaid pleas of invalidity and ineffectiveness at Section G(vi) below.

## E. RELEVANT MARKETS

74. Apple's case as pleaded below as to both relevant markets and dominance represent the best case it is currently in a position to plead. Apple reserves the right further to particularise or refine its case as to these issues by way of reports of expert economists in due course.

75. So far as Qualcomm is concerned, this case involves both relevant 'upstream' and 'downstream' markets. The relevant 'upstream' markets are the markets for licensing of the relevant patent rights. The relevant 'downstream' markets are the markets for the chipsets that implement each such standard.

76. The relevant upstream markets in this case are the markets for the provision of the licences for patents declared essential to the relevant standards. In the premises, there are separate markets for each such standard (GSM, CDMA, UMTS, LTE, etc.). Alternative technologies are not substitutable for these standards, since only chipsets and devices incorporating those chipsets that implement each specific standard will be capable of communicating with networks and other devices operating on those standards.

25

**EXHIBIT 2**
**PAGE 34**

77. For the same reasons, there are separate downstream markets for chipsets operating each such standard.

78. In particular, the most cutting-edge technologies are incorporated into the flagship devices of OEMs selling on a global basis, such as Apple. For these devices, older technologies are not reasonable substitutes for high-end LTE chipsets, incorporating the most cutting-edge LTE technology.

79. The geographic market for the relevant products identified above is worldwide (save, potentially, where a particular standard operates in only part of the world (although, in any event, customers often prefer devices which are compatible with all major global standards to allow voice and data communications wherever they may travel in the world) - this topic will be addressed further by way of expert evidence in due course, if necessary).

80. So far as the Claimants are concerned, the relevant markets upon which they operate are the markets for mobile devices. Such markets are further 'downstream' from the markets upon which Qualcomm operates, as pleaded above. Qualcomm does not itself operate on the markets for mobile devices, although those markets are affected by Qualcomm's conduct as pleaded herein.

## F. DOMINANCE

### (i) Upstream markets

81. Qualcomm holds a dominant position on the market for the licensing of its SEPs in relation to such of the relevant wireless telecommunications standards:

(a) Qualcomm holds or has declared that it holds many SEPs which are practised by any device implementing such standard;

(b) Qualcomm requires any downstream operator to obtain a licence to use Qualcomm's proprietary technology in order to operate such standard on its devices (or secure the right to practice Qualcomm's patents in

26

**EXHIBIT 2**
**PAGE 35**

another way, such as by purchasing the relevant device or component from a supplier which is so licensed); and

(c)     Qualcomm is therefore an unavoidable trading partner for downstream operators in relation to those standards.

82. By definition, Qualcomm's market share is 100% on the market for its own patented technology where, by reason of (and following) its incorporation in an industry standard, it is not substitutable for alternative technology for any devices implementing such standard.

**(ii)     Downstream markets**

83. Qualcomm also holds a dominant position on the downstream market for LTE chipsets, and, in particular, the high-end LTE chipset segment. Qualcomm's FRAND undertaking to ETSI has not operated to constrain that dominance (if it were able to do so) by reason of Qualcomm's abusive and non-FRAND behaviour in requiring that purchasers of chipsets first take a licence to Qualcomm's SEPs (on non-FRAND terms).

84. Following the emergence of LTE technology in around 2011, Qualcomm's market share (by value) in this market (as best as Apple can currently particularise it) was over 90% in 2012-2013. It was over 80% in 2014 and over 65% in 2015. Qualcomm therefore continued to be dominant in the LTE sector as a whole in 2015. Qualcomm continues to hold a market share of 80% or more on the high-end LTE market or segment. Qualcomm's only competitor on that market or segment is Intel (and Intel only emerged as a competitor in 2016).

85. In addition, Qualcomm entered into agreements with Apple that had the effect for multiple years of foreclosing the market to competing suppliers by imposing exclusivity upon Apple. Prior to the expiry of those arrangements in 2015, Apple would have faced the loss of rebates worth hundreds of millions of dollars in the event of transferring even a small proportion of its custom for chipsets to alternative chipset manufacturers. This made it impossible or excessively difficult in practice for any alternative chipset manufacturer to

27

**EXHIBIT 2**
**PAGE 36**

compete for Apple's business, irrespective of the price or quality of product on offer from such competitors. Thus, as pleaded above, between 2011 and 2015, Apple used Qualcomm chipsets exclusively in its new iPhone and iPad models. By preventing Apple from purchasing chipsets from Qualcomm's competitors, Qualcomm was able to deprive those rivals of the significant economies of scale, scope, education and commercial validation that would come from dealing with Apple (thereby enforcing a further barrier to the market for these competitors).

86. Apple will furthermore rely upon the agreements pleaded above as evidence of Qualcomm's dominance. In particular, Apple will rely upon the inclusion in those agreements of highly unusual and onerous terms, including terms (for example) preventing Apple from challenging the royalties charged on the basis that they are not FRAND, or requiring Apple to make payments to Qualcomm as if its patents had not been exhausted, even if a Court were to hold that they were.

87. Apple had no alternative but to agree to such terms. As pleaded above, from around 2009, Apple wished to launch an iPhone that was compatible with the CDMA standard, and Qualcomm was the only commercially viable supplier of CDMA-compatible chipsets. Apple therefore had no choice but to pay the royalties demanded by Qualcomm. In order to seek to reduce the royalty burden upon it, Apple entered into agreements with Qualcomm under which Qualcomm would make payments to Apple providing Apple with (in effect) a partial rebate in respect of the royalties it had paid to Qualcomm (via the CMs). In order to secure those rebates, however, Apple had to, amongst other things, agree to grant Qualcomm exclusivity, as it did in the agreements pleaded above.

88. There are very substantial barriers to entry in the LTE chipset market, including the very substantial research and development and other costs needed to set up in business as a manufacturer of chipsets. Further, over the period since 2011 a number of undertakings have exited the market, including ST-Ericsson, Broadcom, and Texas Instruments.

28

**EXHIBIT 2**
**PAGE 37**

89. By reason of the facts and matters pleaded above, Qualcomm is able to act independently of its competitors, customers and consumers on the market for LTE chipsets.

## G. ABUSE

90. By reason of holding a dominant position on the market or markets pleaded above:

    (a)   Qualcomm is subject to a special responsibility to conduct itself so as to ensure, so far as possible, that competition is not further impeded or hindered on any relevant market; further and in particular

    (b)   by reason of holding one or more SEPs in relation to the standards pleaded above, Qualcomm is subject to an obligation to offer to enter into a patent licence for its SEPs on FRAND terms with anyone wishing to take such a licence, and to enter into such licence if such offer is accepted; and

    (c)   for the purposes of (ii) above, Qualcomm is further obliged to provide such information as is necessary for parties wishing to take such a licence to determine which of Qualcomm's patents are in fact essential for the applications for which the technology is required and to evaluate whether the terms being offered by Qualcomm are in fact FRAND.

91. Qualcomm has abused its dominant position on the market or markets pleaded above in the following ways.

**(i)      Imposition of non-FRAND royalty terms**

92. Qualcomm has abused its dominant position by demanding and charging royalties for its SEPs that are excessively high and indeed exorbitant, even after taking into account rebates on royalties and (if relevant) other direct payments by Qualcomm that Apple has recovered or to which it is entitled under the agreements pleaded above. In particular:

29

**EXHIBIT 2**
**PAGE 38**

(a) Qualcomm requires its licensees to take a licence to its whole portfolio of declared-essential patents irrespective of whether those patents are in fact either valid or essential to the relevant standard. (The draft licence sent by Qualcomm to Apple on 15 July 2016 adopted such an approach, and Apple assumes that the same applies to Qualcomm's current licences with Apple's CMs, although as pleaded above Apple has not seen those licences.) Such an approach is abusive, particularly in circumstances in which the portfolio contains patents which are invalid, non-essential or both. Apple repeats Section D above. The Specified Patents addressed in Section D above are corresponding EP(UK)s from the families of patents selected without demur by Qualcomm as the objects of representative co-pending litigation between Apple and Qualcomm in the USA. In the premises, Apple does not expect, and avers that it would be inconsistent for, Qualcomm to demur that the Specified Patents are representative of Qualcomm's declared-essential patent portfolio for the purpose of these proceedings.

(b) For the period 2010 – 2016, the effective royalties paid by Apple to Qualcomm alone were, on average, ▇▇▇▇▇ per iPhone and ▇▇▇▇▇ per iPad, which sum is charged on top of the cost of the chipsets themselves. This is so even though Qualcomm holds less than a quarter of the total number of declared SEPs for the LTE standard, and only a slightly higher proportion for the GSM, UMTS, and LTE standards combined. This approach assumes, however, that Qualcomm is entitled to insist on licensing on a portfolio-basis without establishing that the patents contained in the said portfolio are either valid or essential (which is denied as aforesaid) and that the patents declared by Qualcomm are in fact valid, essential and infringed—see however the matters pleaded at Section D above in relation to a representative sample of the said patents.

(c) By way of comparison, and for the same period, Apple paid an average of ▇▇▇▇ (on a weighted average basis) per iPhone and iPad for

30

**EXHIBIT 2**
**PAGE 39**

licenses covering (but in some cases not limited to) cellular SEPs from the next largest four other holders of such SEPs (collectively holding over one-third of all declared 4G cellular SEPs) combined.

(d) By setting its headline royalties (for example, in the CM agreements, insofar as Apple understands them, as well as in Qualcomm's licence proposals to Apple) at a percentage of the sale value of the device, Qualcomm can and does levy a tax or charge upon products and innovation developed by others, including Apple itself. If calculated on an *ad valorem* basis at all, Qualcomm's royalty ought to have been expressed as a percentage of the value of no more than the chipsets themselves (being an economically tradeable product), not on the value of the devices into which the chipsets happen to be incorporated.

(e) Further, the level of such royalty should reflect the intrinsic value of the patented technology, leaving aside the additional value conferred upon that technology by virtue of having been incorporated into a relevant standard (since the value generated by virtue of having been incorporated into a relevant standard was not created by Qualcomm).

(f) The level of any royalty due to Qualcomm should also take into account the proportion of SEPs in the relevant standard held by Qualcomm as compared with other licensors of cellular SEPs.

(g) Apple had no alternative but to agree to pay the royalties demanded by Qualcomm, as pleaded above.

93. The royalties charged by Qualcomm are furthermore discriminatory:

(a) As pleaded above, Qualcomm's headline royalties are set by reference to the final sale price of the device in question. This means that the royalty payable can vary between two different Apple phones which use precisely the same Qualcomm chipsets and precisely the same standardised technology.

31

**EXHIBIT 2**
**PAGE 40**

(b)     Likewise, phones produced by third party originators that have only basic functionality (for example, those used primarily for making telephone calls rather than for the additional functionality provided by smart phones) may use precisely the same Qualcomm technology as Apple's phones, but will be subject to different royalties due to the difference in price.

(c)     Qualcomm's agreements with Apple included patent non-assert provisions in respect of all of Apple's patent rights, for no separate consideration. The value of such non-assert provisions varies widely between customers depending on the extent to which such customers own valuable IP rights which Qualcomm would otherwise be at risk of infringing. In Apple's case, the rights are very valuable.

94. Qualcomm's discriminatory behaviour has had the effect of preventing, restricting or distorting competition by preventing or hindering the emergence of competition for its chipsets and enabling Qualcomm to strengthen its market position to the detriment of its potential competitors.

95. As pleaded above, on Apple's current best valuation including taking into account Apple's other licences, the FRAND rate for a licence for Apple to practise Qualcomm's cellular SEPs would an annual fee of ███████████ ████████████████████████████. On an assumed annual volume of ████████████████, Apple's proposed royalty is equivalent to approximately ███████ per unit. The actual average royalty paid by Apple to Qualcomm over the period 2010-2016 for both iPhones and iPads has been over ███ per unit and therefore over ███ times as high on a per-unit basis than Apple's calculation of a fair and reasonable royalty, which it has offered to pay Qualcomm.

96. For the avoidance of doubt, the royalty rates of ███████ for CDMA devices and ███████ for LTE-only devices demanded by Qualcomm in mid-2016 are not FRAND, but are on the contrary manifestly excessive. Indeed, these rates would represent a significant increase in the royalties Apple has historically been paying to Qualcomm. Thus, the least expensive 32GB

32

**EXHIBIT 2**
**PAGE 41**

version of the iPhone 7 costs US$649. For CDMA-enabled phones this pricing would correspond to a Qualcomm royalty of ██████, which is more than ██ as much as the average iPhone royalty over the period 2010-2016, as pleaded above. Any use of the device price or other arbitrary device-based amount (even if capped) imposes a tax on Apple's innovation and arbitrarily makes the royalty paid to Qualcomm dependent on features that it has not contributed. In the premises, Qualcomm has further abused its dominant position by refusing to enter into a direct patent licence with Apple for its SEPs on FRAND terms.

**(ii)      Exclusivity / fidelity rebates**

97. Qualcomm has further abused its dominant position by granting rebates to its customers that are in the nature of fidelity rebates in that they are conditional upon exclusivity or are otherwise designed to prevent competitors or potential competitors from competing for all or part of customers' trade in a way that does not correspond to competition on the merits (in that it is not, for example, simply a volume discount). Thus:

    (a)    As pleaded above, under the MIA, Apple's entitlement to royalty rebates (referred to in the MIA as a '██████████') was conditional upon Apple not selling phones using the emerging and potentially competitive WiMax technology.

    (b)    Under the TA (and the FATA), Apple's entitlement to certain rebates was conditional upon Apple not selling new models of products incorporating non-Qualcomm cellular baseband modems (chipsets). The economic effect of such payments was that Apple received back part of the sum it had paid (via the CMs) to Qualcomm (including such sums as were paid by way of royalties).

98. Since Apple began purchasing Qualcomm chipsets, and to this day, Qualcomm has been an essential supplier for Apple in relation to a substantial proportion of Apple's chipset requirements, as there was no other supplier who could actually or potentially replace all of the chipsets supplied by Qualcomm. However, absent the exclusivity arrangements/fidelity rebates

33

**EXHIBIT 2**
**PAGE 42**

pleaded above (and, so far as relevant, the other abusive practices pleaded herein), Apple could and would have sourced a part of its chipset requirements from a competing supplier at a substantially earlier stage, and could and would have sourced a larger part of those requirements from a competing supplier. By reason of the royalty rebate structure pleaded above, however, Qualcomm made it economically unviable for Apple to transfer any part of its chipset requirement to an alternative supplier for the vast majority of the duration of the agreements pleaded above. Qualcomm thereby leveraged its position as an unavoidable supplier for a portion of Apple's chipset requirements to ensure that no competitor could compete for any part of such requirement. Such rebate structure amounts to a classic exclusionary abuse of dominance. Apple will rely for the averments pleaded herein upon the fact that, following the expiry of the said exclusivity arrangements, Apple has sourced a proportion of its requirement for high-end LTE chipsets from Intel.

99. For the avoidance of doubt whilst, in the circumstances, it was economically rational for Apple to enter into the said rebate agreements, that was so only because the structure of the market was already affected by Qualcomm's licensing and supply practices as pleaded above. In the relevant counterfactual in which Qualcomm had not imposed exclusivity as a condition for royalty rebates, Apple's economic interest would have lain in seeking to support potential alternative manufacturers (and competitors to Qualcomm) such as Intel at a much earlier stage than it did.

**(iii)    Other unusual and anti-competitive terms**

100.    Qualcomm has further abused its dominant position by granting rebates to Apple conditional upon Apple not pursuing claims in litigation or complaints to governmental authorities to the effect that the royalties imposed by Qualcomm are not FRAND. The obligation imposed on holders of SEPs to grant licences on FRAND terms is a matter of public interest and can help protect the integrity of the competitive process. It is abusive for the holder of one or more SEPs to seek to escape its obligation to license on FRAND terms by imposing supra-FRAND licence royalties upon its customers and then granting partial rebates upon such supra-FRAND royalties conditional upon

34

**EXHIBIT 2**
**PAGE 43**

such customers not bringing litigation or making complaints to the competition authorities in order to enforce their right to a licence on FRAND terms.

101.    Apple will rely on the existence of the aforementioned term for its case that the royalties Qualcomm charges are not FRAND but are rather abusive. Had Qualcomm believed that the royalties that it charges for its SEPs were FRAND, it would have no need to seek to prevent its customers from challenging those royalties through litigation or complaint to the competition authorities by exposing them to penalties potentially of hundreds of millions of dollars in the event that they exercise their undoubted and inalienable legal right to enforce applicable competition laws, which laws exist for the protection of the public interest. The term in question is not only an abuse of Qualcomm's dominance, but is plainly contrary to public policy.

102.    Qualcomm has further abused its dominant position by imposing on Apple contractual terms that require Apple to pay the same royalties to Qualcomm as would be due if particular Qualcomm patents had not been exhausted, even if such patents are found to have been exhausted. Such provisions in effect enable Qualcomm to charge royalties to customers upon a 'bundle' of patent rights determined by Qualcomm, including patents to which such customers may not require licences, including by depriving customers of any incentive to bring a claim asserting that the patent or patents in question have been exhausted. Such provisions represent a further attempt by Qualcomm to escape from its obligation to license its SEPs to willing purchasers for a consideration that is FRAND in return for the right to practise those SEPs.

**(iv)    Refusal to license**

103.    Qualcomm has further abused its dominant position by refusing to license its competitors (either on FRAND terms or at all) to manufacture chipsets incorporating Qualcomm's SEPs. Such refusal:

(a)    enables Qualcomm to abuse its dominant position on the downstream markets in the other ways pleaded herein, including by imposing

35

**EXHIBIT 2**
**PAGE 44**

exclusivity/fidelity rebates and other unfair terms, by ensuring that all chipsets purchasers must take a licence from Qualcomm on non-FRAND terms, regardless of the supplier of those chipsets; and

(b)     enables the abuses alleged herein, by giving Qualcomm the ability and incentive to charge exorbitant and non-FRAND royalties to the customers of its competitors, and to insist – as it did repeatedly with Apple – on chipset exclusivity as a condition of granting relief from such royalties.

### (v)     Terms of chipset supply

104.     Qualcomm's abuses as pleaded herein have strengthened its dominant position and damaged competition on the downstream chipset markets. These abuses have thereby enabled Qualcomm to limit price competition for chipsets and to charge excessive prices for the chipsets themselves. Qualcomm's actions in charging excessive prices for chipsets is a separate abuse, alternatively is an aspect of Qualcomm's other abuses as pleaded herein.

### (vi)     Patent exhaustion

105.     Qualcomm has further abused its dominant position by arranging its corporate structure and contractual affairs in such a way as to seek to avoid the application of patent exhaustion and instead to charge through one corporate entity within the single Qualcomm undertaking licence fees for goods incorporating patented technology freely put on the market by another corporate entity within the same undertaking. When carried out by a dominant undertaking, such conduct is abusive in and of itself, or in any event where it is entered into with a view to charging supra-FRAND royalties or engaging in the other abusive conduct pleaded above. To the extent that such practices are enshrined in the applicable contracts, the relevant provisions thereof are void and unenforceable on the ground that they are themselves abusive or are the means through which the abuses pleaded herein have been committed.

**EXHIBIT 2**
**PAGE 45**

(vii)    **Regulatory investigations into Qualcomm's conduct**

106.    Qualcomm's conduct in relation to the licensing of its SEPs or claimed
SEPs for the CDMA, UMTS and LTE standards has been and continues to be
the subject of numerous regulatory investigations by competition authorities
around the world, In particular:

(a)    On 9 February 2015 the National Development and Reform
Commission of the People's Republic of China ("NDRC") imposed a
fine of CNY6.08 billion (approximately US$975 million at then
prevailing exchange rates) upon Qualcomm for abusive patent
licensing practices in relation to its SEPs for wireless communication
standards.

(b)    In July 2015, the European Commission commenced two formal
investigations into Qualcomm, on the basis of alleged infringements of
Article 102 TFEU.  One of those investigations is concerned with the
abuse pleaded above in relation to the imposition of exclusivity/grant
of fidelity rebates to Apple.  A Statement of Objections containing the
Commission's preliminary conclusion that such conduct was an abuse
by Qualcomm of its dominant position was issued to Qualcomm in
December 2015.

(c)    In December 2016, the KFTC imposed a fine of KRW 1 trillion 30
billion (over US$850 million) on the basis of Qualcomm's
monopolistic conduct on the chipset market, including through abusive
use of the standardisation process (and declaration of patents as
essential to those standards). Apple reserves the right to refer to the
KFTC Decision in full, as may be necessary or appropriate.

(d)    On 17 January 2017, and further to the opening of an investigation in
September 2014, the US Federal Trade Commission commenced
proceedings against Qualcomm, charging it with monopolisation of the
CMDA and premium-LTE chipset market and a cycle of
anticompetitive conduct (including a refusal to licence competitors, a
refusal to sell chipsets without a licence, and its imposition of

37

**EXHIBIT 2**
**PAGE 46**

exclusivity in exchange for royalty rebates). The Taiwanese Fair Trade Commission also has an ongoing investigation into Qualcomm's behaviour.

## H. RELEVANT LEGAL PROVISIONS, JURISDICTION, APPLICABLE LAW AND EFFECT ON TRADE

107.    In abusing its dominant position in the ways particularised above (and/or any one or more of them, together or in combination), Qualcomm is in breach of:

(a)    Article 102 TFEU;

(b)    Article 54 EEA; and

(c)    Section 18 of the CA98.

108.    In the premises, Qualcomm has committed a breach of its statutory duties and is liable to Apple in tort accordingly.

109.    Insofar as necessary so to plead, the abuses pleaded above were implemented in the EU/EEA, further and in the alternative have had direct, foreseeable and significant effects in the EU/EEA, as follows.

110.    As pleaded above, so far as concerns Apple devices for sale in the EU/EEA, Apple Operations purchases such devices directly from the CMs. The abusive excessive royalties charged by Qualcomm were suffered by Apple Operations, since the amount of the royalties paid on devices for sale in the EU/EEA is charged by the CMs to Apple Inc. and by Apple Inc. to Apple Operations.

111.    As pleaded above, had Qualcomm entered into a direct patent licence with Apple, the beneficiaries of such a patent licence would have included all of the Claimants (including, therefore, the First to Fifth Claimants, which are EU companies), and the licensors would have included the Fourth Defendant. Apple will rely for this assertion upon the terms of the draft FRAND patent licence sent by Apple to Qualcomm on 20 January 2007, the parties to which

38

**EXHIBIT 2**
**PAGE 47**

were Qualcomm "*including its Affiliates*" and Apple "*including its Affiliates (for clarity, including Apple Operations Europe and Apple South Asia Pte. Ltd.)*". Qualcomm's refusal to license was therefore a refusal in relation to (*inter alia*) patent rights under EP(UK) patents.

112.    Likewise, had Apple refused to agree to the terms and conditions imposed by Qualcomm in the agreements pleaded above, Apple anticipates that Qualcomm would have ceased supplying the CMs with chipsets for incorporation into Apple products or would have brought patent infringement proceedings against Apple. (For the avoidance of doubt, in making this averment Apple should not be taken to be asserting that such action by Qualcomm would have been legal under applicable competition laws.) Such refusal to supply would have deprived the Claimants of the chipsets required to meet UK/EU/EEA demand for Apple products. Further, such patent infringement proceedings would have been brought by, *inter alia*, the Fourth Defendant, upon UK/EP patents (since, as pleaded above, such patents are held by that Defendant), before the Courts of the UK or before Courts elsewhere in the EU/EEA. In other words, the abuses pleaded above have been enabled or brought about by the risk of patent infringement proceedings in the UK (amongst other places) in the event that Apple devices incorporating the standard technology were to be manufactured or sold without the benefit of licences to use Qualcomm's patents. Those abuses have thereby been implemented in the UK.

113.    The conduct pleaded above affected the structure of competition worldwide, including in the EEA, by ensuring there was little or no competition for LTE chipsets worldwide over much of the period covered by this claim. Further, the intended and foreseeable effect of the conduct was that no Apple devices were sold worldwide, including in the EEA, incorporating competitors' chipsets, between 2011 and 2015. Apple's share of the downstream market for handsets/tablets was itself significant in the EEA.

114.    Had Qualcomm not abused its dominant position as pleaded above, Apple is likely to have purchased chipsets from other suppliers, potentially including European suppliers. Qualcomm's abusive conduct prevented this

39

**EXHIBIT 2**
**PAGE 48**

from happening and thereby affected the pattern of trade in Europe. For example, prior to 2013, ████████ had been a potential supplier of competing LTE chipsets. ████████ exited the chipsets market after Apple and Qualcomm entered into the TA that required Apple to source its chipsets exclusively from Qualcomm.

115.     The conduct pleaded above directly affected the markets for handsets/tablets as well as the upstream markets for IP rights/chipsets. Thus, under the TA, Apple's right to the various payments for which that agreement provides is dependent upon Apple not selling in commercial quantities products incorporating non-Qualcomm cellular baseband modems. Such condition therefore related to sales on the market for the devices themselves (including in the EEA). Further and in any event, even if such condition had related to purchases of chipsets by Apple, in the event that Apple could purchase only Qualcomm chipsets for any new models of device it proposed to launch, that would necessarily and directly mean that Apple would be unable to sell devices containing competitors' chipsets in the EEA.

116.     The abuses pleaded above have, in the above-pleaded ways (or in any of those ways individually or in combination) affected trade between the Contracting Parties to the EEA Agreement, the Member States of the EU and within the UK. The said practices affected the supply of Qualcomm chipsets to Apple for sale throughout the world including the EU/EEA.

117.     Such effects have furthermore been substantial. Thus, for example, the sales of the First Claimant alone, that is to say sales by Apple stores in the UK, amount to in excess of ████████ per annum, the vast majority of which relates to sales of iPhones and iPads incorporating Qualcomm chipsets. Such effects were also foreseeable, as Qualcomm knows that a substantial proportion of its chipsets will be incorporated in Apple devices for sale in the EU/EEA. Such effects were also direct in that there is no intervening step such as to render them indirect and no potential Claimant at an earlier stage of the supply chain which is a potential or more appropriate Claimant in respect of EU/EEA losses.

**EXHIBIT 2**
**PAGE 49**

118.　　Insofar as necessary so to plead, the said abuses therefore fall within and are governed by applicable UK, EU and EEA laws as pleaded above, including by virtue of Article 6.3(b) of Regulation 864/2007 (the Rome II Regulation).

## I.　BREACH OF OBLIGATIONS ARISING FROM QUALCOMM'S MEMBERSHIP OF ETSI AND ETSI DECLARATIONS

119.　　As pleaded above, the First Defendant is a member of ETSI. The Fourth Claimant is also a member of ETSI.

120.　　Also as pleaded above, members of ETSI have agreed to accept and be bound by the ETSI Directives including the Rules of Procedure and the IPR Policy. These creates a contract between ETSI and the relevant member, and between the members *inter se*, which is enforceable by members of ETSI and third parties (in addition to ETSI itself). This contract is governed by French law pursuant to Clause 12 of the IPR Policy.

121.　　Clause 6.1 of the IPR Policy requires Members to grant irrevocable licences to relevant patents on FRAND terms and conditions. By reason of the provisions and definitions pleaded in section B above, such obligation applies to patents held either by the Member itself or by its affiliates. In the case of a patent held by an affiliate rather than by the Member itself, the obligation requires the Member to procure the grant of the relevant licence.

122.　　For the reasons pleaded above, the First Defendant has breached Clause 6.1 of the IPR Policy. Such breach is actionable at the suit of the Fourth Claimant as an ETSI Member; further and in the alternative is actionable at the suit of each and all of the Claimants as parties wishing to secure such a licence under the doctrine of *stipulation pour autrui* (above).

123.　　The Fourth Defendant has made, on its behalf and on behalf of its Affiliates (as defined in the IPR Policy) including the First Defendant and the Third Defendant, certain Declarations to ETSI undertaking to grant an irrevocable licence to Qualcomm's SEPs, and otherwise negotiate on a FRAND basis.

41

**EXHIBIT 2**
**PAGE 50**

124.    For the reasons pleaded above, the Fourth Defendant and its Affiliates have breached these undertakings.

125.    These breaches of contract and breaches of undertakings are actionable by the Claimants and each of them as aforesaid.

126.    The matters pleaded in this Section I are subject to French law as pleaded above and (if disputed) will be further particularised in expert evidence of French law in due course.

## J. LOSS, DAMAGE AND INTEREST

127.    By reason of the abuses pleaded above, the Claimants have suffered loss and damage. The Claimants' primary case is that such loss and damage was suffered by Apple Operations (the Third Claimant). However, to the extent that such loss was reflected in the prices charged by Apple Operations to the other Claimants (or, so far as the royalties are concerned, to the extent that it may be held that some part of such loss was retained within the Sixth Claimant rather than being passed on to Apple Operations), such loss was suffered by such other Claimant, as the case may be.

128.    The Claimants are not currently in a position to quantify such loss. The Claimants will particularise their case as to loss and damage in due course by way of expert accountancy evidence.

129.    For the avoidance of doubt:

(a)    Apple Inc. (the Sixth Claimant) has brought proceedings against Qualcomm Incorporated (the Fourth Defendant herein) in other jurisdictions pursuing similar complaints under applicable laws to those pursued herein under applicable UK and European laws;

(b)    To the extent that Apple Inc. recovers sums in the other jurisdictions which would go to reduce the loss suffered on devices sold in the EEA as claimed herein, the Claimants will give credit for all such sums in calculating the losses claimed in the present proceedings;

42

**EXHIBIT 2**
**PAGE 51**

(c) The question whether Qualcomm's conduct is in breach of applicable UK and European laws will not be determined in the other proceedings and those courts may limit recoveries to sales made in that particular jurisdiction.

130. The Claimants will claim interest on all sums found due and owing to them under s.35A of the Supreme Court Act at 3% above base rate for the time being or at such other rate or rates and for such periods as the Court may determine.

AND THE CLAIMANTS CLAIM

(1) A declaration that each of the following patents is and at all times has been invalid:

    a. EP (UK) 1,264,506

    b. EP (UK) 1,192,749

    c. EP (UK) 1,791,286

    d. EP (UK) 1,774,822

    e. EP (UK) 2,217,031

(2) An Order that each of the following patents be revoked:

    a. EP (UK) 1,264,506

    b. EP (UK) 1,192,749

    c. EP (UK) 1,791,286

    d. EP (UK) 1,774,822

    e. EP (UK) 2,217,031

(3) A declaration that each of the following patents is not essential to any part of any version of the European Telecommunications Standards Institute standards in relation to which each such patent has been declared as essential:

    a. EP (UK) 1,264,506

    b. EP (UK) 1,192,749

43

**EXHIBIT 2**
**PAGE 52**

c.  EP (UK) 1,791,286

d.  EP (UK) 1,774,822

e.  EP (UK) 2,217,031

(4) A declaration that Qualcomm's rights in respect to all EP(UK)s declared by Qualcomm to be essential to any of the ETSI standards are exhausted in respect of any device which incorporates a chipset supplied directly or indirectly to Apple with Qualcomm's consent.

(5) A declaration that Qualcomm has abused its dominant position in the ways pleaded above (or any one or more such ways, individually or in combination);

(6) A declaration that Qualcomm is in breach of the ETSI IPR Policy and of the ETSI Declarations it has made;

(7) A declaration that Qualcomm is obliged to offer a patent licence to the Claimants in respect of Apple devices for sale in the EU/EEA in relation to any SEPs for the CDMA and LTE telecommunications standards pleaded above on FRAND terms;

(8) Damages in respect of losses suffered by the Claimants by reason of the said abuses, to be assessed;

(9) Costs;

(10)   Interest;

(11)   Further or other relief.

<div align="right">

MARIE DEMETRIOU QC

COLIN WEST

BRIAN NICHOLSON

CHRISTOPHER HALL

</div>

**EXHIBIT 2**
**PAGE 53**

**Statement of truth**

The Claimants believe that the facts stated in these Particulars of Claim are true. I am duly authorised to sign this Statement of Truth on the Claimants' behalf.

Signed        7. the

Position      Partner, Boies Schiller Flexner (UK) LLP.

Date          19. 5. 17

SERVED this 19th day of May 2017 by Boies Schiller Flexner (UK) LLP, solicitors for the Claimants, of 5 New Street Square, London, EC4A 3BF.

45

**EXHIBIT 2**
**PAGE 54**

**IN THE HIGH COURT OF JUSTICE**

**CHANCERY DIVISION**

**PATENTS COURT**

**BETWEEN:**

**(1) APPLE RETAIL UK LIMITED**

**(2) APPLE DISTRIBUTION INTERNATIONAL**

**(3) APPLE OPERATIONS EUROPE**

**(4) APPLE GMBH**

**(5) APPLE RETAIL GERMANY B.V. & CO. KG**

**(6) APPLE INC.**

**Claimants**

**and**

**(1) QUALCOMM (UK) LIMITED**

**(2) QUALCOMM COMMUNICATIONS UK LIMITED**

**(3) QUALCOMM TECHNOLOGIES INTERNATIONAL, LTD.**

**(4) QUALCOMM INCORPORATED**

**Defendants**

---

**PARTICULARS OF CLAIM**

**(Non-confidential version)**

---

Boies Schiller Flexner (UK) LLP

5 New Street Square

London

EC4A 3BF

46

**EXHIBIT 2**
**PAGE 55**