# EXHIBIT 1

**quinn emanuel** trial lawyers | washington, dc

777 Sixth Street NW, 11th Floor, Washington, District of Columbia  20001-3706 | TEL (202) 538-8000 | FAX (202) 538-8100



WRITER'S DIRECT DIAL NO.
**(202) 538-8104**

WRITER'S INTERNET ADDRESS
alexlasher@quinnemanuel.com

July 7, 2017

**VIA HAND DELIVERY**

The Honorable Lisa R. Barton, Secretary
U.S. International Trade Commission
500 E Street, SW – Room 112
Washington, DC 20436

Re:     *Certain Mobile Electronic Devices And Radio Frequency And Processing Components Thereof*

Dear Secretary Barton:

Enclosed for filing, please find documents in support of a request by Qualcomm Incorporated ("Complainant") that the U.S. International Trade Commission institute an investigation pursuant to Section 337 of the Tariff Act of 1930, as amended, concerning certain mobile electronic devices and radio frequency and processing components thereof. Complainant's submission includes the following documents:

1.     One (1) original and eight (8) paper copies of Complainant's Verified Complaint, pursuant to Commission Rule 210.8(a)(1)(i).

2.     One (1) electronic copy of the public exhibits to the Verified Complaint pursuant to Commission Rules 210.8(a)(1)(i) and 210.12(a)(9), including:

    a.     one (1) electronic certified copy of each of United States Patent Nos. 8,633,936 ("the '936 patent"), 8,698,558 ("the '558 patent"), 8,487,658 ("the '658 patent"), 8,838,949 ("the '949 patent"), 9,535,490 ("the '490 patent"), 9,608,675 ("the '675 patent"), copies of which are respectively included as Exhibits 1, 3, 5, 7, 9, and 11 to the Verified Complaint pursuant to Commission Rule 210.12(a)(9)(i); and

**quinn emanuel urquhart & sullivan, llp**

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | HOUSTON | LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS

**MAUSER Exhibit 1**
**Page 1**

  b. one (1) electronic copy of the certified assignment records for each of the '936 patent, '558 patent, '658 patent, '949 patent, '490 patent, and '675 patent, copies of which are respectively included as Exhibits 2, 4, 6, 8, 10, and 12 to the Verified Complaint, pursuant to Commission Rule 210.12(a)(9)(ii).

3. One (1) electronic copy of the confidential exhibits to the Verified Complaint, pursuant to Commission Rules 201.6(c) and 210.8(a)(1)(ii).

4. One (1) additional copy of the Verified Complaint and accompanying electronic copies of the public exhibits, for service upon the Proposed Respondent, pursuant to Commission Rules 201.6(c) and 210.8(a)(1)(iii); and one (1) additional copy of electronic copies of the confidential exhibits to the Verified Complaint for service upon the Proposed Respondent's counsel after it has subscribed to the protective order.

5. Four (4) electronic copies each of the certified prosecution history of the '936 patent, '558 patent, '658 patent, '949 patent, '490 patent, and '675 patent, which are respectively identified as Appendices A, C, E, G, I, and K to the Verified Complaint, pursuant to Commission Rule 210.12(c)(1).

6. Four (4) electronic copies each of each patent and applicable pages of each technical reference mentioned in the prosecution history of the '936 patent, '558 patent, '658 patent, '949 patent, '490 patent, and '675 patent, which are respectively identified as Appendices B, D, F, H, J, and L to the Verified Complaint, pursuant to Commission Rule 210.12(c)(2).

7. One physical sample of a representative imported article that is the subject of the complaint (Physical Exhibit P1 to the Verified Complaint).

8. A letter and certification requesting confidential treatment for the information contained in confidential exhibits 14C and 16C-27C to the Verified Complaint, pursuant to Commission Rules 201.6(b) and 210.5(d).

9. A Statement on the Public Interest regarding the remedial orders sought by Complainants in the Verified Complaint, pursuant to Commission Rule 210.8(b).

Please contact me with any questions regarding this filing.

**MAUSER Exhibit 1**
**Page 2**

Page 3

Dated: July 7, 2017

Respectfully submitted,

S. Alex Lasher
*Counsel for Complainant Qualcomm Incorporated*

Enclosures

3

**quinn emanuel** trial lawyers | washington, dc

777 Sixth Street NW, 11th Floor, Washington, District of Columbia 20001-3706 | TEL (202) 538-8000 | FAX (202) 538-8100

WRITER'S DIRECT DIAL NO.
**(202) 538-8104**

WRITER'S INTERNET ADDRESS
**alexlasher@quinnemanuel.com**

## REQUEST FOR CONFIDENTIAL TREATMENT

July 7, 2017

**VIA HAND DELIVERY**

The Honorable Lisa R. Barton, Secretary
U.S. International Trade Commission
500 E Street, SW – Room 112
Washington, DC 20436

**Re:** *Certain Mobile Electronic Devices And Radio Frequency And Processing Components Thereof*

Dear Secretary Barton:

Pursuant to Commission Rule 201.6, Complainant Qualcomm Incorporated respectfully requests confidential treatment of certain confidential business information contained in confidential exhibits 14C and 16C-27C to the Verified Complaint.

The information in the exhibits for which Complainant seeks confidential treatment consists of proprietary commercial information, including confidential and proprietary licensing information, technical information related to domestic articles protected by Complainant's asserted patents, technical information related to accused products articles obtained from nonpublic teardowns, and financial data regarding Complainant's domestic investments in plant and equipment and labor and capital related to domestic articles protected by Complainant's asserted patents.

The proprietary information described herein qualifies as confidential business information under Commission Rule 201.6 because substantially-identical information is not available to the public, because the disclosure of this information would cause substantial competitive harm to Complainant, and because the disclosure of this information would likely impede the Commission's efforts and ability to obtain similar information in the future.

**quinn emanuel urquhart & sullivan, llp**

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS

Page 2

Thank you for your attention.  Please contact me with any questions regarding this request for confidential treatment.

Dated: July 7, 2017

Respectfully submitted,

S. Alex Lasher
*Counsel for Complainant Qualcomm Incorporated*

Enclosure (Certification)

## UNITED STATES INTERNATIONAL TRADE COMMISSION
## WASHINGTON, D.C.

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN MOBILE ELECTRONIC DEVICES AND RADIO FREQUENCY AND PROCESSING COMPONENTS THEREOF** | Inv. No. 337-TA-____ |

## CERTIFICATION

I, S. Alex Lasher, counsel for Complainant Qualcomm Incorporated, declare as follows:

1. I am duly authorized by Complainant to execute this certification.

2. I have reviewed confidential exhibits 14C and 16C-27C to Complainant's Verified Complaint, for which Complainant seeks confidential treatment.

3. To the best of my knowledge, information, and belief, founded after a reasonable inquiry, substantially-identical information to that contained in the exhibits is not available to the public.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 7th day of July, 2017 in Washington, DC.

S. Alex Lasher

# UNITED STATES INTERNATIONAL TRADE COMMISSION
## WASHINGTON, D.C.

In the Matter of

**CERTAIN MOBILE ELECTRONIC
DEVICES AND RADIO FREQUENCY
AND PROCESSING COMPONENTS
THEREOF**

Investigation No. 337-TA- _____

## COMPLAINANT'S INITIAL STATEMENT ON THE PUBLIC INTEREST

Pursuant to Commission Rule 210.8(b), Complainant Qualcomm Incorporated ("Qualcomm") respectfully submits this Statement on the Public Interest regarding the remedial orders that Qualcomm seeks against Proposed Respondent Apple Inc. ("Apple"). Qualcomm seeks a permanent limited exclusion order excluding from entry into the United States certain mobile electronic devices that do not incorporate a Qualcomm brand baseband processor modem and that infringe or are manufactured by processes that infringe one or more of claims 1, 10-27, 29, 38, 49, 55-60, and 67-68 of U.S. Patent No. 8,633,936 ("the '936 patent"), and/or claims 1, 6-11, and 15-20 of U.S. Patent No. 8,698,558 ("the '558 patent"), and/or claims 9, 10, 12, 14, and 20-22 of U.S. Patent No. 8,487,658 ("the '658 patent"), and/or claims 1–8, 10-14, 16, 20, and 22 of U.S. Patent No. 8,838,949 ("the '949 patent"), and/or claims 1–6, 8, 10, 16–17, and 31 of U.S. Patent No. 9,535,490 ("the '490 patent"), and/or claims 1-3 and 7-14 of U.S. Patent No. 9,608,675 ("the '675 patent"),[1] either literally or under the doctrine of equivalents. Qualcomm also seeks permanent cease and desist orders prohibiting Apple, its subsidiaries, related companies, and agents from conducting any of the following activities in the United States: importing, admitting or withdrawing from a foreign trade zone, marketing, advertising, demonstrating, testing, warehousing inventory of, distributing, offering for sale, selling, licensing, programming, packaging, repackaging, bundling, updating, soliciting U.S. agents or distributors for, or aiding and abetting other entities in the importation, sale for importation, sale after importation, transfer, or distribution of its infringing mobile electronic devices, or of mobile devices manufactured using processes that infringe. The accused mobile electronic devices are the types of products commonly before the Commission and have been the subject of past remedial orders.

---

[1] None of the asserted patents are Standards Essential Patents ("SEPs") and none were declared essential to a standards development body nor are any essential to a promulgated standard.

1

The Commission has made clear that protecting domestic intellectual property rights against infringing imports is of paramount importance, and will only be denied in exceptional circumstances where the harm to the public interest is severe. There is no such harm here. Indeed, Qualcomm's requested remedial orders serve—rather than harm—the public interest. Qualcomm is a global semiconductor and telecommunications company, founded and based in the United States, that has invested billions of dollars in the United States researching and developing innovations which have enabled wireless telecommunications and countless mobile technologies. Qualcomm relies on its intellectual property to support and protect this valuable work. Furthermore, Qualcomm does not seek exclusion of Apple mobile electronic devices that employ a Qualcomm brand baseband processor modem. Apple currently imports and sells mobile electronic devices that use a Qualcomm brand baseband processor modem, which are sufficient (technically and commercially) to fill any void resulting from the exclusion of Apple mobile electronic devices including non-Qualcomm brand baseband processor modems. This investigation does not concern Apple mobile electronic devices employing Qualcomm brand baseband processor modems, which can easily meet the public demand for such devices. Infringement by use of non-Qualcomm brand baseband processor modems is purely a matter of choice on the part of Apple.

Qualcomm's requested remedial orders raise no public interest concerns because: (1) the accused products do not serve any essential public health or welfare objective; (2) any demand for the products that would be subject to the requested remedial orders could be filled by Apple mobile electronic devices that include Qualcomm brand baseband processor modems; and (3) U.S. consumers would not face any potential shortage of like or directly competitive products. Accordingly, this investigation does not present any unique public interest concerns that would require the Commission to deviate from its practice of issuing remedial orders covering infringing mobile electronic devices. *See, e.g., See, e.g., Certain Electronic Digital Media Devices and*

2

*Components Thereof*, Inv. No. 337-TA-796, Comm'n Op. (Sept. 6, 2013); *Certain Electronic Devices, Including Wireless Communication Devices, Portable Music and Data Processing Devices, and Tablet Computers*, Inv. No. 337-TA-794, Comm'n Op. (July 5, 2013); *Certain Personal Data and Mobile Communications Devices and Related Software*, Inv. No. 337-TA-710, Comm'n Op. (Dec. 29, 2011).

## I.    USE OF THE ACCUSED PRODUCTS IN THE UNITED STATES

The accused products are Apple's imported mobile electronic devices that do not incorporate a Qualcomm brand baseband processor modem, including mobile phones and tablet computers that infringe one or more claims of the Asserted Patents.  These products are manufactured abroad and sold to consumers throughout the United States.

## II.   THE ACCUSED PRODUCTS DO NOT PRESENT ANY PUBLIC HEALTH, SAFETY, OR WELFARE CONCERNS RELATING TO THE REQUESTED REMEDIAL ORDERS

There are no public health, safety, or welfare considerations that weigh against remedial relief.  The accused products are common consumer goods, which the Commission has consistently found do not present public health, safety or welfare concerns.  *See, e.g., Electronic Digital Media Devices*, Comm'n Op. at 114-115;  *Electronic Devices*, Comm'n Op. at 109; *Personal Data and Mobile Communications Devices*, Comm'n Op. at 76.  And Apple has echoed this sentiment in previous investigations.  *See Electronic Digital Media Devices*, Apple's Submission on Remedy, Bond, and Public Interest at 19 (June 11, 2013) (mobile electronic devices "do not have any specialized public health, safety, or welfare applications, nor are they the type of products that affect public health and welfare"); *Personal Data and Mobile Communications Devices*, Apple's Public Interest Statement at 2 (Aug. 25, 2011) (mobile electronic devices "do not implicate any particular public health, safety, or welfare concerns").

3

III.   **NUMEROUS LIKE OR DIRECTLY COMPETITIVE ARTICLES ARE AVAILABLE TO SATISFY DEMAND FOR THE EXCLUDED PRODUCTS**

The U.S. mobile electronics market is highly competitive with a diverse field of participants offering products that directly compete with Apple's accused products. Third parties comprise more than 50 percent of the U.S. smartphone market and could easily ramp up production to replace any excluded Apple products. Furthermore, Apple itself sells mobile electronic devices that use a Qualcomm brand baseband processor modem, which could replace any accused products subject to an exclusion order.

Further, remedial orders would not have any negative impact on competitive production in the United States because the accused products and their replacements are manufactured overseas. The Commission has explained that the consideration of the production of like or directly competitive articles does not weigh against issuance of a remedy when substitute products are available and the accused products are manufactured overseas. *See Certain Digital Televisions & Certain Prods. Containing Same & Methods of Using Same*, Inv. No. 337-TA-617, Comm'n Op. at 15 (Apr. 23, 2009).

IV.   **REMEDIAL ORDERS WOULD NOT NEGATIVELY IMPACT U.S. CONSUMERS**

As previously discussed, if the Apple accused products are excluded, U.S. consumers will continue to have numerous available options for mobile electronic devices, including products sold by Apple that include Qualcomm brand baseband processor modems. Thus, there will be no reduction in consumer choice.

V.   **CONCLUSION**

This investigation does not present any special public interest issues. Issuance of the requested remedial relief against Apple's accused products will support the strong public interest in protecting intellectual property rights held by highly innovative companies like Qualcomm. That

4

interest is not outweighed by any hypothetical adverse impact to the U.S. public, especially because of the significant number of manufacturers that can readily satisfy any new demand created by issuance of the requested remedial orders. Accordingly, the Commission should institute this investigation without delegating public interest fact-finding to the Administrative Law Judge.

Dated: July 7, 2017                              Respectfully submitted,

/S. Alex Lasher
QUINN EMANUEL URQUHART & SULLIVAN, LLP
777 6th Street NW, 11th Floor
Washington, DC 20001
Tel.: (202) 538-8000
Fax: (202) 538-8100

David A. Nelson
Stephen Swedlow
QUINN EMANUEL URQUHART & SULLIVAN, LLP
500 West Madison St., Suite 2450
Chicago, Illinois 60661
Telephone: (312) 705-7400
Facsimile: (312) 705-7401

Alexander Rudis
Richard W. Erwine
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Tel.: (212) 849-7000
Fax: (212) 849-7100

Sean S. Pak
QUINN EMANUEL URQUHART & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Tel.: (415) 875-6600
Fax: (415) 875-6700

Tom M. Schaumberg
Deanna Tanner Okun
David H. Hollander, Jr.

5

Daniel F. Smith
ADDUCI, MASTRIANI & SCHAUMBERG, L.L.P.
1133 Connecticut Avenue, N.W., 12th Floor
Washington, DC 20036
Tel.: (202) 467-6300
Fax: (202) 466-2006

Evan R. Chesler
Keith R. Hummel
Richard J. Stark
Gary A. Bornstein
J. Wesley Earnhardt
Yonatan Even
Vanessa A. Lavely
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza, 825 Eighth Avenue
New York, NY 10019
Tel.: (212) 474-1000
Fax: (212) 474-3700

*Counsel for Complainant Qualcomm Incorporated*

6

# UNITED STATES INTERNATIONAL TRADE COMMISSION
## WASHINGTON, D.C.

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN MOBILE ELECTRONIC DEVICES AND RADIO FREQUENCY AND PROCESSING COMPONENTS THEREOF** | Investigation No. 337-TA- \_\_\_\_\_ |

## COMPLAINT UNDER SECTION 337 OF THE TARIFF ACT OF 1930, AS AMENDED

**Complainant**

Qualcomm Incorporated
5775 Morehouse Drive
San Diego, CA 92121
Tel. (858) 587-1121

*Counsel for Complainant Qualcomm Incorporated*

S. Alex Lasher
QUINN EMANUEL URQUHART & SULLIVAN, LLP
777 6th Street NW, 11th Floor
Washington, DC 20001
Tel.: (202) 538-8000
Fax: (202) 538-8100

David A. Nelson
Stephen Swedlow
QUINN EMANUEL URQUHART & SULLIVAN, LLP
500 West Madison St., Suite 2450
Chicago, Illinois 60661
Tel: (312) 705-7400
Fax: (312) 705-7401

**Proposed Respondent**

Apple Inc.
1 Infinite Loop
Cupertino, CA 95014
Tel. (408) 996-1010

Richard W. Erwine
Alexander Rudis
QUINN EMANUEL URQUHART & SULLIVAN,
LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Tel.: (212) 849-7000
Fax: (212) 849-7100

Sean S. Pak
QUINN EMANUEL URQUHART & SULLIVAN,
LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Tel.: (415) 875-6600
Fax: (415) 875-6700

Tom M. Schaumberg
Deanna Tanner Okun
David H. Hollander, Jr.
Daniel F. Smith
ADDUCI, MASTRIANI & SCHAUMBERG,
L.L.P.
1133 Connecticut Avenue, N.W., 12th Floor
Washington, DC 20036
Tel.: (202) 467-6300
Fax: (202) 466-2006

Evan R. Chesler
Keith R. Hummel
Richard J. Stark
Gary A. Bornstein
J. Wesley Earnhardt
Yonatan Even
Vanessa A. Lavely
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza, 825 Eighth Avenue
New York, NY 10019
Tel.: (212) 474-1000
Fax: (212) 474-3700

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     PARTIES .......................................................................................................... 4

        A.     Qualcomm Incorporated ................................................................... 4

        B.     Apple Inc. .......................................................................................... 7

III.    THE TECHNOLOGIES AND PRODUCTS AT ISSUE ................................. 8

        A.     Products At Issue ............................................................................... 8

        B.     Background Of The Technology ....................................................... 8

IV.     THE ASSERTED PATENTS AND NON-TECHNICAL DESCRIPTIONS OF
        THE INVENTIONS ...................................................................................... 13

        A.     The '936 Patent .............................................................................. 13

               1.     Identification and Ownership of the '936 Patent ................... 13

               2.     Foreign Counterparts to the '936 Patent ............................... 13

               3.     Non-Technical Description of the '936 Patent ....................... 14

        B.     The '558 Patent .............................................................................. 14

               1.     Identification and Ownership of the '558 Patent ................... 14

               2.     Foreign Counterparts to the '558 Patent ............................... 15

               3.     Non-Technical Description of the '558 Patent ....................... 15

        C.     The '658 Patent .............................................................................. 15

               1.     Identification and Ownership of the '658 Patent ................... 15

               2.     Foreign Counterparts to the '658 Patent ............................... 16

               3.     Non-Technical Description of the '658 Patent ....................... 16

        D.     The '949 Patent .............................................................................. 17

               1.     Identification and Ownership of the '949 Patent ................... 17

i

**MAUSER Exhibit 1**

**Page 16**

|   | 2. | Foreign Counterparts to the '949 Patent | 17 |
|   | 3. | Non-Technical Description of the '949 Patent | 18 |
| E. | | The '490 Patent | 18 |
|   | 1. | Identification and Ownership of the '490 Patent | 18 |
|   | 2. | Foreign Counterparts to the '490 Patent | 19 |
|   | 3. | Non-Technical Description of the '490 Patent | 19 |
| F. | | The '675 Patent | 19 |
|   | 1. | Identification and Ownership of the '675 Patent | 19 |
|   | 2. | Foreign Counterparts to the '675 Patent | 20 |
|   | 3. | Non-Technical Description of the '675 Patent | 20 |
| G. | | Licensees to the Asserted Patents | 21 |
| V. | APPLE'S INFRINGEMENT OF THE ASSERTED PATENTS | | 21 |
| A. | | Infringement of the '936 Patent | 21 |
| B. | | Infringement of the '558 Patent | 23 |
| C. | | Infringement of the '658 Patent | 24 |
| D. | | Infringement of the '949 Patent | 25 |
| E. | | Infringement of the '490 Patent | 26 |
| F. | | Infringement of the '675 Patent | 28 |
| VI. | SPECIFIC INSTANCES OF UNFAIR IMPORTATION AND SALE | | 28 |
| VII. | HARMONIZED TARIFF SCHEDULE NUMBERS | | 29 |
| VIII. | RELATED LITIGATION | | 29 |
| IX. | THE DOMESTIC INDUSTRY RELATING TO THE ASSERTED PATENTS | | 29 |
| A. | | Technical Prong | 29 |
| B. | | Economic Prong | 31 |
| X. | RELIEF REQUESTED | | 33 |

ii

## EXHIBIT LIST

| Exhibits | Description |
|---|---|
| 1 | Certified Copy of U.S. Patent No. 8,633,936 |
| 2 | Certified Assignment Records for U.S. Patent No. 8,633,936 |
| 3 | Certified Copy of U.S. Patent No. 8,698,558 |
| 4 | Certified Assignment Records for U.S. Patent No. 8,698,558 |
| 5 | Certified Copy of U.S. Patent No. 8,487,658 |
| 6 | Certified Assignment Records for U.S. Patent No. 8,487,658 |
| 7 | Certified Copy of U.S. Patent No. 8,838,949 |
| 8 | Certified Assignment Records for U.S. Patent No. 8,838,949 |
| 9 | Certified Copy of U.S. Patent No. 9,535,490 |
| 10 | Certified Assignment Records for U.S. Patent No. 9,535,490 |
| 11 | Certified Copy of U.S. Patent No. 9,608,675 |
| 12 | Certified Assignment Records for U.S. Patent No. 9,608,675 |
| 13 | List of Foreign Counterparts |
| 14C | Confidential List of Licensees to One or More of the Asserted Patents |
| 15 | Representative Infringement Claim Charts for the '936 Patent |
| 16C | Confidential Representative Infringement Claim Charts for the '558 Patent |
| 17C | Confidential Representative Infringement Claim Charts for the '658 Patent |
| 18C | Confidential Representative Infringement Claim Charts for the '949 Patent |
| 19C | Confidential Representative Infringement Claim Charts for the '490 Patent |
| 20C | Confidential Representative Infringement Claim Charts for the '675 Patent |
| 21C | Confidential Declaration of Tim Durkin Regarding Economic Domestic Industry |
| 22C | Confidential Representative Domestic Industry Claim Charts for the '936 Patent |
| 23C | Confidential Representative Domestic Industry Claim Charts for the '558 Patent |
| 24C | Confidential Representative Domestic Industry Claim Charts for the '658 Patent |
| 25C | Confidential Representative Domestic Industry Claim Charts for the '949 Patent |
| 26C | Confidential Representative Domestic Industry Claim Charts for the '490 Patent |
| 27C | Confidential Representative Domestic Industry Claim Charts for the '675 Patent |
| 28 | October 2016 Earnings Call |
| 29 | September 2014 Launch Event |
| 30 | Importation Declaration |
| 31 | Apple 2016 10K |
| 32 | Certificate of Correction for the '558 Patent |

## PHYSICAL EXHIBIT LIST

| Exhibits | Description |
|---|---|
| P1 | Apple iPhone 7 |

**MAUSER Exhibit 1**

**Page 18**

**APPENDIX LIST**

| Appendices | Description |
|:---:|---|
| A | Certified Prosecution History of U.S. Patent No. 8,633,936 |
| B | Patents and Applicable Pages of Technical References Mentioned in the Prosecution History of U.S. Patent No. 8,633,936 |
| C | Certified Prosecution History of U.S. Patent No. 8,698,558 |
| D | Patents and Applicable Pages of Technical References Mentioned in the Prosecution History of U.S. Patent No. 8,698,558 |
| E | Certified Prosecution History of U.S. Patent No. 8,487,658 |
| F | Patents and Applicable Pages of Technical References Mentioned in the Prosecution History of U.S. Patent No. 8,487,658 |
| G | Certified Prosecution History of U.S. Patent No. 8,838,949 |
| H | Patents and Applicable Pages of Technical References Mentioned in the Prosecution History of U.S. Patent No. 8,838,949 |
| I | Certified Prosecution History of U.S. Patent No. 9,535,490 |
| J | Patents and Applicable Pages of Technical References Mentioned in the Prosecution History of U.S. Patent No. 9,535,490 |
| K | Certified Prosecution History of U.S. Patent No. 9,608,675 |
| L | Patents and Applicable Pages of Technical References Mentioned in the Prosecution History of U.S. Patent No. 9,608,675 |

## I.    INTRODUCTION

1.    Complainant Qualcomm Incorporated ("Qualcomm" or "Complainant") respectfully files this complaint under Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, based on Proposed Respondent Apple Inc.'s ("Apple" or "Respondent") unlawful importation into the United States, sale for importation into the United States, and/or sale within the United States after importation of certain mobile electronic devices, including mobile phones and tablet computers.

2.    This complaint is directed to Apple's imported mobile electronic devices that do not incorporate a Qualcomm brand baseband processor modem,[1] including mobile phones and tablet computers, that infringe, or are manufactured by processes that infringe, one or more of claims 1, 10-27, 29, 38, 49, 55-60, and 67-68 of U.S. Patent No. 8,633,936 ("the '936 patent"), and/or claims 1 and 6-20 of U.S. Patent No. 8,698,558 ("the '558 patent"), and/or claims 9, 10, 12, 14, and 20-22 of U.S. Patent No. 8,487,658 ("the '658 patent"), and/or claims 1–8, 10-14, 16, 20, and 22 of U.S. Patent No. 8,838,949 ("the '949 patent"), and/or claims 1–6, 8, 10, 16–17, and 31 of U.S. Patent No. 9,535,490 ("the '490 patent"), and/or claims 1-3 and 7-14 of U.S. Patent No. 9,608,675 ("the '675 patent") (collectively, the "Asserted Patents"), either literally or under the doctrine of equivalents.  Such products include at least the Apple iPhone 7 that does not incorporate a Qualcomm brand baseband processor modem ("Accused Devices").[2]  The following table provides a summary of the asserted claims of the Asserted Patents (independent claims in bold):

---

[1] Qualcomm brand baseband processor modems are designed, sold, and distributed by Qualcomm and its affiliates.

[2]    The identification of a specific model or type of mobile electronic device is not intended to limit the scope of the investigation.  Discovery may reveal that additional Apple products infringe the asserted patent claims and/or that additional claims are infringed.

**MAUSER Exhibit 1**
**Page 20**

| Patent No. | Asserted Claims |
|---|---|
| 8,633,936 | **1**, **10**, 11-18, **19**, 20-27, **29**, **38**, **49**, **55**, 56-60, **67**, 68 |
| 8,698,558 | **1**, 6, 7, **8**, 9, **10**, 11, **12**, 13, 14, **15**, 16-20 |
| 8,487,658 | **9**, 10, 12, 14, **20**, **21**, **22** |
| 8,838,949 | **1**, 2-8, **10**, 11-14, **16**, **20**, **22** |
| 9,535,490 | **1**, 2-6, 8, 10, **16**, 17, **31** |
| 9,608,675 | **1**, 2-3, 7-14 |

3.      Qualcomm, based in San Diego, California, is a global semiconductor and telecommunications company that designs and markets wireless telecommunications products and services. It is the largest domestic provider of telecommunications chipsets and software. Since its founding in 1985, Qualcomm has invested billions of dollars in the United States researching and developing innovations that have enabled wireless telecommunications and countless mobile technologies. These market-changing innovations have allowed Qualcomm to grow into one of the largest technology companies in the United States, where it now employs over 18,000 people, more than two-thirds of whom are engineers.

4.      Qualcomm helped pioneer advances at the heart of cellular connectivity, enabling not only Apple's mobile electronic devices, but also the entire smartphone revolution. Qualcomm's patented technologies allow Apple's mobile electronic devices to send and receive vast amounts of data at lightning speed. Qualcomm also invented critical technologies improving functions throughout every modern cellular device. Indeed, Qualcomm's inventions make mobile electronic devices desirable to consumers in their daily lives.

5.      Apple is a dominant seller in both the global and domestic markets for mobile electronic devices. While Apple's mobile electronic devices are ubiquitous today, Apple had

nothing to do with creating the technology that forms the backbone of the cellular industry. Instead, Apple rose to dominance relying heavily on Qualcomm's technology that enables numerous important features on the iPhone, including providing better battery life and improved graphics. Further, the iPhone's value to customers is driven by its Qualcomm-enabled ability to connect with and transfer data over networks at rapid speeds. Apple CEO Tim Cook has confirmed on multiple occasions the heavy dependence of the iPhone on high-speed cellular connectivity for its success. (Ex. 28, April/October 2016 statements ("There are enormous investments going on in 4G, and we couldn't be more excited about that because it really takes a great network working with iPhones to produce that great experience for people.").)

6.      Apple's unlicensed and unauthorized use of Qualcomm's technology—including the technology disclosed in the Asserted Patents—to manufacture, import and sell mobile electronic devices in the United States constitutes an unfair act within the meaning of Section 337.

7.      On information and belief, the Accused Devices are manufactured and/or sold for importation into the United States, imported into the United States, and/or sold after importation into the United States by or on behalf of Apple.

8.      A domestic industry as required by 19 U.S.C. § 1337(a)(2) and (3) exists in the United States relating to articles protected by Qualcomm's Asserted Patents. Qualcomm's domestic industry includes significant investments in plant and equipment, significant employment of labor and capital, and substantial investments in the exploitation of the inventions claimed in Qualcomm's Asserted Patents, including through engineering, research, and development.

9.      Qualcomm seeks as relief a permanent limited exclusion order under 19 U.S.C. § 1337(d) barring from entry into the United States infringing mobile electronic devices, or mobile electronic devices that are manufactured using processes that infringe, that are imported into the United States, sold for importation into the United States, and/or sold in the United States after importation by or on behalf of Apple.

10.     Qualcomm further seeks a permanent cease and desist order under 19 U.S.C. § 1337(f) prohibiting Apple from importing, admitting or withdrawing from a foreign trade zone, marketing, advertising, demonstrating, testing, warehousing inventory of, distributing, offering for sale, selling, licensing, programming, packaging, repackaging, bundling, updating, soliciting U.S. agents or distributors for, or aiding and abetting other entities in the importation, sale for importation, sale after importation, transfer, or distribution of its infringing mobile electronic devices, or of mobile devices manufactured using processes that infringe.

11.     Qualcomm further seeks the imposition of a bond upon importation of mobile electronic devices that infringe one or more claims of the Asserted Patents, during the 60-day Presidential review period pursuant to 19 U.S.C. § 1337(j).

## II.     PARTIES

### A.      Qualcomm Incorporated

12.     Qualcomm Incorporated is a publicly-traded corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 5775 Morehouse Drive, San Diego, California 92121.

13.     Qualcomm was founded in 1985 when seven industry visionaries came together to discuss the idea of providing quality wireless communications.  For more than 30 years, Qualcomm has been in the business of researching, designing, developing, and selling

MAUSER Exhibit 1
Page 23

innovative semiconductor and cellular technologies and products for the telecommunications and mobile industries.

14.     Today, Qualcomm is one of the largest technology, semiconductor, and telecommunications companies in the United States, where it has over 18,000 employees, 68 percent of whom are engineers, and occupies more than 92 buildings (totaling over 6.5 million sq. ft.) in seventeen states and the District of Columbia. The majority of Qualcomm's research and development occurs in the United States.

15.     At the core of Qualcomm's business is its industry-leading research and development focused on enabling cellular systems and products. Since its founding, Qualcomm has invested tens of billions of dollars in research and development related to cellular, wireless communications, and mobile processor technology. Qualcomm's massive research and development investments have produced numerous innovations. Because of this ongoing investment, Qualcomm continues to drive the development and commercialization of successive generations of mobile technology and is one of a handful of companies leading the development of the next-generation 5G standard.

16.     From its inception, Qualcomm has specialized in innovations to improve digital, wireless communications systems. Qualcomm is an innovator at the systems level as well as at the chip level. As a result of its unparalleled commitment to research and development, Qualcomm has a diverse patent portfolio. Indeed, Qualcomm now holds over 19,860 U.S. patents, including the Asserted Patents in this investigation. Qualcomm's patent portfolio includes patents that are "essential" to cellular standards, patents that are "essential" to other standards, and patents that are not essential to any industry standard but reflect valuable non-standardized technologies.

17.   A non-standard-essential patent ("NSEP") is not technically necessary to practice any feature of an industry standard, but an NSEP may cover an invention that provides important functionality and value to cellular devices or systems and may be highly desired by consumers, cellular device manufacturers, suppliers, or network operators.   As a result of its decades-long commitment to cellular and other mobile R&D, Qualcomm owns tens of thousands of cellular standard-essential patents ("SEPs") and NSEPs worldwide.

18.   All six Asserted Patents are NSEPs covering Qualcomm's proprietary technology and are not necessary to practice any feature of an industry standard.

19.   Cellular communications are constrained by the radio spectrum over which voice and data travel, as well as by performance requirements such as voice quality, call drop rate, average data rate, maximum data rate, battery life, and coverage.   Additionally, cellular networks are expensive to deploy and operate.   Thus, cellular communications pose multiple fundamental engineering challenges—the design of communication systems and methodologies that allow user equipment and network equipment to share the capacity of any given portion of the radio spectrum while still meeting performance requirements.

20.   Cellular technologies must address specific challenges regarding how cellular devices interact with the network.   These technologies are also aimed at making the most efficient use of the scarce spectrum available while working within the size and power constraints of mobile electronic devices, which need to be small, lightweight, and efficient.   The usefulness of any cellular device depends on these enabling technologies, which are the technologies that Qualcomm has spent 30 years developing.

21.   A substantial portion of Qualcomm's research and development activities also have been directed to its cutting-edge integrated circuit chipsets, which combine multiple

**MAUSER Exhibit 1**
**Page 25**

technologies, including advanced multimode modems, application processors, and graphics engines, as well as the tools to connect these diverse technologies, for use in consumer products such as smartphones, tablets, and other electronic devices.   In addition to 3G and 4G LTE technologies, Qualcomm's chipsets support other wireless and wired connectivity and positional technologies, including Bluetooth, Ethernet, GPS, and GLONASS.   Qualcomm's technology has also evolved into some of the most advanced systems-on-chips integrating multiple technologies, including graphics engines, application processors, and multimode modems onto a single semiconductor chip.

22.     Qualcomm also conducts research, development, and testing through its use of Mobile Test Platforms ("MTPs"), which are manufactured in the United States at Qualcomm's facilities and incorporate Qualcomm's modems, processors, and other chipsets, along with third-party chips into a physical device used for testing and analysis.   For example, Qualcomm works with base station partners to verify the operation and performance of the MTPs. Qualcomm sells these MTPs to its customers and shares schematics and test results with potential and existing customers based on this MTP analysis.

     **B.     Apple Inc.**

23.     Apple Inc. is a California corporation with a principal place of business at 1 Infinite Loop, Cupertino, California, 95014.

24.     On information and belief, Apple designs, develops, tests, imports into the United States, offers for sale, sells for importation into the United States, and sells in the United States after importation infringing, or manufactured by processes that infringe, mobile electronic devices, including devices sold under the tradename Apple iPhone 7.   Apple does not have a license from Qualcomm to the Asserted Patents.

## III.   THE TECHNOLOGIES AND PRODUCTS AT ISSUE

### A.   Products At Issue

25.     Pursuant to Commission Rule 210.12(a)(12), the Accused Devices include, without limitation, certain mobile electronic devices that do not include a Qualcomm brand baseband processor modem, including devices sold under the tradename Apple iPhone 7, that infringe one or more claims of the Asserted Patents.

### B.   Background Of The Technology

26.     The technologies at issue in this investigation generally relate to technologies for use in mobile applications, including the design, structure, and operation of products with envelope tracking technology, voltage shifter circuitry, flashless boot, power management circuitry, enhanced carrier aggregation, and graphics processing units.

27.     Qualcomm has driven the development and commercialization of each successive generation of cellular technology from second-generation (2G) technologies through the upcoming fifth-generation (5G) technologies.  Each new generation of cellular technology has depended on countless inventions from a small number of innovators around the world, none more significant than Qualcomm.

28.     The first commercial cell phone networks were deployed in 1983.  These first generation (1G) networks relied on analog technology, which was fundamentally limited and prohibitively expensive.  Call quality was poor, and signals often crossed into neighboring frequencies, causing interference and dropped calls.

29.     By the mid-to-late 1980s, a digital technology called Time Division Multiple Access ("TDMA") had been developed.  TDMA digitized and compressed callers' voices, divided a given frequency channel into time slices, and then sent "packets" of compressed data associated with multiple conversations in rotation in that same frequency, thus enabling

multiple users and conversations to share the same frequency. By the late 1980s, the European Union determined that its wireless networks would use a TDMA standard known as the Global System for Mobile communications ("GSM").

30. In 1989, Qualcomm publicly announced its groundbreaking Code Division Multiple Access ("CDMA") technology. CDMA offered far better call clarity than TDMA and promised to accommodate roughly ten times as many calls on a single network compared to an analog system. Instead of transmitting data in time slots, CDMA allows a large number of users to communicate at the same time, sharing the same frequency channel. Data associated with different conversations (or data transmissions) are distinguished from one another through the use of codes. Individual calls are encoded, transmitted, identified, and then decoded and reassembled on the receiving end. By the mid-1990s, CDMA technology had been widely accepted.

31. Based in large part on Qualcomm's innovations, the mobile industry was thriving by the late 1990s. As the industry grew, it began working on a 3G solution that could provide improved data transmission, reliability and network efficiency. Ultimately, all new 3G variations that achieved commercial importance were fundamentally based on Qualcomm's CDMA method.

32. Led by Qualcomm's efforts, 3G technology became significantly more advanced in its later years with the releases of major enhancements to Wideband Code Division Multiple Access ("WCDMA") technology. This led to the adoption of "3.5G" and "3.75G" standards, which significantly increased data speeds and were critical to the smartphone revolution.

33. Qualcomm also began researching 4G technologies years before those technologies were standardized, and a decade before their significant commercial rollout. As

MAUSER Exhibit 1
Page 28

various industry players worked on 4G technologies, Qualcomm made fundamental contributions such as the application of Orthogonal Frequency Division Multiplexing ("OFDM"). OFDM became the basis for the 4G standards broadly known as Long-Term Evolution ("LTE"). This innovation once again expanded network space and vastly boosted data rates.

34.     It was the development of 3G and 4G technologies—enabled in large part by Qualcomm—that allows smartphones to send and receive vast amounts of data at lightning speed and propelled smartphones (including the iPhone) to become the fastest-selling consumer electronics devices in history. Qualcomm continues to be a leading contributor to LTE.

35.     Qualcomm also expends considerable effort and resources toward the research and development of various customized integrated circuits known as Application Specific Integrated Circuits ("ASICs") for use in mobile electronic devices. Qualcomm's core chip products for mobile electronic devices are: (1) Baseband Modem chips, which process received voice and data information and prepare the same for transmission; (2) Radio Frequency ("RF") chips, which transmit and receive radio signals using multiple frequencies; (3) Power Management chips, which optimize power consumption across mobile electronic devices; (4) applications processors, which act as the central processing unit of the mobile electronic devices; and (5) chipsets that include a combination of the above products as well as other hardware elements to support the functionality of mobile electronic devices.

36.     As a longstanding worldwide leader in mobile technology innovation, Qualcomm profoundly understands the pressing need of mobile devices capable of high performance computing, effective signal transmission, and powerful graphics processing, all while using minimal power. Today, Qualcomm's massive investments in envelope tracking

**MAUSER Exhibit 1**
**Page 29**

technology, voltage shifter circuitry, flashless boot, power management circuitry, enhanced carrier aggregation, graphics processing technology, LTE technology, and chip product development have facilitated the development of enhanced power consumption in mobile products, better carrier aggregation, 4G in wireless communications, and the proliferation of suppliers offering LTE chipsets. Indeed, Qualcomm was the first to make LTE chips available to device makers and continues to offer the best quality modem and LTE chips with enhanced capabilities. Qualcomm has driven and continues to drive the development of mobile technologies and modems to not only benefit consumers, but to also drive consumer demand for new mobile electronic devices.

37.     The Asserted Patents reflect the breadth of Qualcomm's dedication and investment in research and development relating to wireless technology. Not only did Qualcomm contribute directly to the development of industry standards that form the backbone of modern cellular communications reflected in Qualcomm's SEPs, but Qualcomm also invented numerous proprietary solutions for implementing standards-compliant devices in optimal ways, reflected in Qualcomm's NSEPs such as the ones asserted here.

38.     As mobile electronic devices have become more powerful with greater functionality, device manufacturers have faced numerous problems with power consumption, noise reduction, battery charging, graphics processing and heat dissipation, among others. The technologies of the Asserted Patents solve many of these problems by enhancing chip performance through advanced carrier aggregation, power-efficient envelope tracking, power-efficient boot up and inter-chip communication techniques, area- and power-efficient circuit designs, compact and robust multi-bit voltage level shifter design and layout, and higher performance and more power-efficient graphics processing circuitry and techniques.

39.     For example, Qualcomm pioneered various "envelope tracking" techniques for mobile devices to save power and reduce heat inside a mobile device when transmitting at different signal strength.  Using one of these techniques as set forth in Qualcomm's '558 patent, the RF amplifier power supply is continuously adjusted and dynamically boosted, as necessary, to ensure that the amplifier is operating at peak efficiency for power required during transmission.  Envelope tracking allows for a thinner, lighter mobile electronic device that generates less heat.  Without envelope tracking, power is wasted and battery life is consequently shorter.

40.     As another example, Apple has touted the capability of its newest mobile electronic devices to support "carrier aggregation" technology.  This means that a mobile device can simultaneously transmit RF signals for multiple carriers, which again allows for a more efficient use of power and longer battery life.[3]  Indeed, Apple's Senior Vice President of Worldwide Marketing proclaimed that one of the differentiating features of the iPhone 6 is that its enhanced speed is done "with a technology called carrier aggregation."  (Ex. 29).  Qualcomm has pioneered and patented technologies that allow this carrier aggregation to be utilized more efficiently and with less wasted power, such as set forth in the '675 patent.

41.     As yet another example, Qualcomm's '949 patent provides an innovative design that eliminates the need for a separate flash memory for the modem, which results in lower component costs and power savings for the iPhone.  At the same time, the '949 patent allows the boot up code to be loaded directly into the modem processor's memory.  This minimizes the startup delays that mobile device users often experience when starting up their devices and connecting to the network.

---

[3]   The term "carriers" refers to the frequency bands for transmitting data, and is often called "component carriers."

## IV.   THE ASSERTED PATENTS AND NON-TECHNICAL DESCRIPTIONS OF THE INVENTIONS[4]

### A.   The '936 Patent

#### 1.   Identification and Ownership of the '936 Patent

42.   Qualcomm owns by assignment the right, title, and interest in United States

Patent No. 8,633,936, titled "Programmable Streaming Processor with Mixed Precision

Instruction Execution," which issued on January 21, 2014 and named Yun Du, Chun Yu,

Guofang Jiao, and Stephen Molloy as co-inventors.  The '936 patent issued from U.S. Patent

Application Serial No. 12/106,654, filed on April 21, 2008.

43.   A certified copy of the '936 patent is attached as Exhibit 1.  A certified copy of

the assignment from the named inventors to Qualcomm is attached as Exhibit 2.  A certified

copy of the prosecution history of the '936 patent is included as Appendix A.  Copies of each

patent and applicable pages of each technical reference mentioned in the prosecution history of

the '936 patent are included as Appendix B.

#### 2.   Foreign Counterparts to the '936 Patent

44.   Exhibit 13 lists each foreign patent and each pending foreign patent application

(not already issued as a patent), and each foreign patent application that has been denied,

abandoned or withdrawn, corresponding to the '936 patent, with an indication of the

prosecution status of each such patent application.   No other foreign patents or patent

applications corresponding to the '936 patent have been filed, abandoned, withdrawn, or

rejected.

---

[4]   All non-technical descriptions of the patents herein are presented to give a general
background of those patents.  These statements are not intended to be used nor should they be
used for purposes of patent claim construction.  Qualcomm presents these statements subject to
and without waiver of its right to argue that claim terms should be construed in a particular way
under claim interpretation jurisprudence and the relevant evidence.

### 3. Non-Technical Description of the '936 Patent

45.     The '936 patent relates generally to a graphics processing architecture. The '936 patent discloses novel methods and structures for forming graphics processing circuitry incorporating multiple execution units for processing graphics instructions at different graphics precision levels, and for converting graphics data to the correct precision level prior to processing the associated graphics instruction. As a result of the invention of the '936 patent, graphics processors are able to use lower precision execution units, processing graphics data in a higher performance and more power efficient manner, thereby extending battery life.

### B. The '558 Patent

### 1. Identification and Ownership of the '558 Patent

46.     Qualcomm owns by assignment the right, title, and interest in United States Patent No. 8,698,558, titled "Low-Voltage Power-Efficient Envelope Tracker," which issued on April 15, 2014 and named Lennart K. Mathe, Thomas Domenick Marra, and Todd R. Sutton as co-inventors. The '558 patent issued from U.S. Patent Application Serial No. 13/167,659, filed on June 23, 2011.

47.     A certified copy of the '558 patent is attached as Exhibit 3.[5] A certified copy of the assignment from the named inventors to Qualcomm is attached as Exhibit 4. A certified copy of the prosecution history of the '558 patent is included as Appendix C. Copies of each patent and applicable pages of each technical reference mentioned in the prosecution history of the '558 patent are included as Appendix D.

---

[5]     On June 27, 2017, the United States Patent and Trademark Office issued a certificate of correction with respect to claim 12 of the '558 patent. A copy of the certificate of correction is attached as Exhibit 32.

### 2. Foreign Counterparts to the '558 Patent

48.     Exhibit 13 lists each foreign patent and each pending foreign patent application (not already issued as a patent), and each foreign patent application that has been denied, abandoned or withdrawn, corresponding to the '558 patent, with an indication of the prosecution status of each such patent application.  No other foreign patents or patent applications corresponding to the '558 patent have been filed, abandoned, withdrawn, or rejected.

### 3. Non-Technical Description of the '558 Patent

49.     The '558 patent relates generally to envelope tracking technology, which addresses the efficient use of power by a power amplifier in transmitting an output radio frequency (RF) signal.  In particular, the power amplifier may require varying degrees of power supply voltage depending on the type of RF signal being transmitted.  In the past, the use of a constant power supply voltage did not match the varying power requirements of the power amplifier, and led to unnecessary dissipation of power (and devices that, due to this unnecessary power dissipation, quickly drained the battery).  Envelope tracking adjusts the power supply voltage based on information from the modem to match the needs of the power amplifier.  The '558 patent discloses novel circuitry for efficiently and effectively boosting power supply voltage to continuously match the peak efficiency necessary over the RF envelope.  As a result of the invention of the '558 patent, electronic devices are able to reduce power consumption and extend battery life.

### C. The '658 Patent

### 1. Identification and Ownership of the '658 Patent

50.     Qualcomm owns by assignment the right, title, and interest in United States Patent No. 8,487,658, titled "Compact and Robust Level Shifter Layout Design," which issued

on July 16, 2013 and named Animesh Datta and William James Goodall, III as co-inventors. The '658 patent issued from U.S. Patent Application Serial No. 13/180,598, filed on July 12, 2011.

51.     A certified copy of the '658 patent is attached as Exhibit 5.  A certified copy of the assignment from the named inventors to Qualcomm is attached as Exhibit 6.  A certified copy of the prosecution history of the '658 patent is included as Appendix E.  Copies of each patent and applicable pages of each technical reference mentioned in the prosecution history of the '658 patent are included as Appendix F.

### 2.     Foreign Counterparts to the '658 Patent

52.     Exhibit 13 lists each foreign patent and each pending foreign patent application (not already issued as a patent), and each foreign patent application that has been denied, abandoned or withdrawn, corresponding to the '658 patent, with an indication of the prosecution status of each such patent application.   No other foreign patents or patent applications corresponding to the '658 patent have been filed, abandoned, withdrawn, or rejected.

### 3.     Non-Technical Description of the '658 Patent

53.     The '658 patent relates generally to voltage level shifter circuitry.  Integrated circuit devices incorporating different types of functional circuitry are often required to handle multiple voltage levels.  These devices typically contain a high-voltage circuit driven by a relatively high voltage power supply and a low-voltage circuit driven by a relatively low-voltage power supply.  Reducing the overall operating voltages of the integrated circuit reduces power consumption and increases efficiency of the integrated circuit.  However, some circuits are more amenable to lower operating voltages while others must operate at a higher voltage. For circuits operating at two different voltages to communicate with each other, a level shifter

MAUSER Exhibit 1
Page 35

circuit is required as an interface to shift the signal from one voltage level to another to avoid circuit dysfunction. However, because the level shifter itself operates with two different voltages, it is required to have at least two N-wells, one for each voltage. In addition, constraints placed on the N-wells may require them to be separated by a minimum distance. Therefore, incorporating multiple level shifters into a single chip can consume a significant portion of the available chip area. The '658 patent is directed to a compact and robust multi-bit voltage level shifter design and layout, which may reduce the area of the level shifters.

### D. The '949 Patent

#### 1. Identification and Ownership of the '949 Patent

54. Qualcomm owns by assignment the right, title, and interest in United States Patent No. 8,838,949, titled "Direct Scatter Loading of Executable Software Image From a Primary Processor to One or More Secondary Processor in a Multi-processor System," which issued on September 16, 2014 and named Nitin Gupta, Daniel H. Kim, Igor Malamant, and Steve Haehnichen as co-inventors. The '949 patent issued from U.S. Patent Application Serial No. 13/052,516, filed on March 21, 2011.

55. A certified copy of the '949 patent is attached as Exhibit 7. A certified copy of the assignment from the named inventors to Qualcomm is attached as Exhibit 8. A certified copy of the prosecution history of the '949 patent is included as Appendix G. Copies of each patent and applicable pages of each technical reference mentioned in the prosecution history of the '949 patent are included as Appendix H.

#### 2. Foreign Counterparts to the '949 Patent

56. Exhibit 13 lists each foreign patent and each pending foreign patent application (not already issued as a patent), and each foreign patent application that has been denied, abandoned or withdrawn, corresponding to the '949 patent, with an indication of the

prosecution status of each such patent application.   No other foreign patents or patent applications corresponding to the '949 patent have been filed, abandoned, withdrawn, or rejected.

### 3.   Non-Technical Description of the '949 Patent

57.     The '949 patent relates generally to "flashless boot," *i.e.*, booting up a secondary processor that does not have its own non-volatile memory to store the system image.   The '949 patent discloses novel techniques for implementing flashless boot for secondary processors in multi-processor systems by using a scatter loader to directly transfer the image into memory of the secondary processor.   As a result of the invention of the '949 patent, multi-processor systems—which encompass a device including at least an application processor and a modem processor—can avoid requiring a non-volatile memory for each processor with minimal negative performance impact.

### E.   The '490 Patent

### 1.   Identification and Ownership of the '490 Patent

58.     Qualcomm owns by assignment the right, title, and interest in United States Patent No. 9,535,490, titled "Power Saving Techniques in Computing Devices," which issued on January 3, 2017 and named Vinod Harimohan Kaushik, Uppinder Singh Babbar, Andrei Danaila, Neven Klacar, Muralidhar Coimbatore Krishnamoorthy, Arunn Coimbatore Krishnamurthy, Vaibhav Kumar, Vanitha Aravamudhan Kumar, Shailesh Maheshwari, Alok Mitra, Roshan Thomas Pius, and Hariharan Sukumar, as co-inventors.   The '490 patent issued from U.S. Patent Application Serial No. 14/568,694, filed on December 12, 2014.

59.     A certified copy of the '490 patent is attached as Exhibit 9.   A certified copy of the assignment from the named inventors to Qualcomm is attached as Exhibit 10.   A certified copy of the prosecution history of the '490 patent is included as Appendix I.   Copies of each

patent and applicable pages of each technical reference mentioned in the prosecution history of the '490 patent are included as Appendix J.

### 2. Foreign Counterparts to the '490 Patent

60. Exhibit 13 lists each foreign patent and each pending foreign patent application (not already issued as a patent), and each foreign patent application that has been denied, abandoned or withdrawn, corresponding to the '490 patent, with an indication of the prosecution status of each such patent application. No other foreign patents or patent applications corresponding to the '490 patent have been filed, abandoned, withdrawn, or rejected.

### 3. Non-Technical Description of the '490 Patent

61. The '490 patent relates generally to reducing power consumption in electronic devices. The '490 patent discloses novel techniques for controlling power consumption by disclosing methods to minimize the time during which system buses are in a high power consumption state. As a result of the invention of the '490 patent, computing devices can operate just as efficiently with lower power consumption, which in turn prolongs the battery life of those devices.

### F. The '675 Patent

### 1. Identification and Ownership of the '675 Patent

62. Qualcomm owns by assignment the right, title, and interest in United States Patent No. 9,608,675, titled "Power Tracker for Multiple Transmit Signals Sent Simultaneously," which issued on March 28, 2017 and named Alexander Dorosenco as the sole inventor. The '675 patent issued from U.S. Patent Application Serial No. 13/764,328, filed on February 11, 2013.

MAUSER Exhibit 1
Page 38

63.     A certified copy of the '675 patent is attached as Exhibit 11.  A certified copy of the assignment from the named inventor to Qualcomm is attached as Exhibit 12.  A certified copy of the prosecution history of the '675 patent is included as Appendix K.  Copies of each patent and applicable pages of each technical reference mentioned in the prosecution history of the '675 patent are included as Appendix L.

### 2.     Foreign Counterparts to the '675 Patent

64.     Exhibit 13 lists each foreign patent and each pending foreign patent application (not already issued as a patent), and each foreign patent application that has been denied, abandoned or withdrawn, corresponding to the '675 patent, with an indication of the prosecution status of each such patent application.   No other foreign patents or patent applications corresponding to the '675 patent have been filed, abandoned, withdrawn, or rejected.

### 3.     Non-Technical Description of the '675 Patent

65.     The '675 patent relates generally to techniques for generating a power supply voltage for a power amplifier that processes multiple transmit signals sent simultaneously, such as multiple transmissions sent simultaneously on multiple carriers at different frequencies.  As one example, the '675 patent discloses a power tracker that generates a single power tracking signal based on inputs from a plurality of carrier aggregated transmit signals; a power supply generator for generating a single power supply voltage based on the power tracking signal; and a power amplifier that receives the single power supply voltage and the plurality of carrier aggregated transmit signals to produce a single output RF signal.  As one result of the invention of the '675 patent, electronic devices can more efficiently support and perform carrier aggregation.

G. **Licensees to the Asserted Patents**

66. All licensees to one or more of the Asserted Patents are identified in Confidential Exhibit 14.

V. **APPLE'S INFRINGEMENT OF THE ASSERTED PATENTS**

67. As discussed below, Apple's Accused Devices are certain mobile electronic devices that do not incorporate a Qualcomm brand baseband processor modem, including mobile phones and tablet computers, which infringe the Asserted Patents, or are manufactured by processes that infringe the Asserted Patents, and are manufactured abroad by or for Apple, sold for importation into the United States, and imported into the United States by or for Apple, and/or sold within the United States after importation by or for Apple. The Accused Devices include, but are not limited to, mobile electronic devices sold under the tradename Apple iPhone 7. Apple is not licensed to any of the Asserted Patents.

A. **Infringement of the '936 Patent**

68. Apple infringes, literally and/or under the doctrine of equivalents, at least claims 1, 10-27, 29, 38, 49, 55-60, and 67-68 of the '936 patent. Apple infringes at least these claims by importing, selling for importation, and/or selling after importation into the United States the Accused Devices. The Accused Devices satisfy all claim limitations of claims 10-27, 29, 38, 55-60, and 67-68 at the time of importation into the United States.

69. On information and belief, Apple also knowingly induces and/or contributes to the infringement of at least claims 1 and 49 of the '936 patent by others. On information and belief, Apple has had knowledge of the '936 patent, and its infringement of the '936 patent, since at least July 6, 2017, when Qualcomm filed a parallel action in the Southern District of California. On information and belief, Apple tests, demonstrates, or otherwise operates the Accused Devices in the United States, thereby performing the claimed methods and directly

infringing any asserted claims of the '936 patent requiring such operation. Similarly, Apple's customers and the end users of the Accused Devices test and/or operate the Accused Devices in the United States in accordance with Apple's instructions contained in, for example, its user manuals, thereby also performing the claimed methods and directly infringing the asserted claims of the Asserted Patents requiring such operation.

70.     Apple also contributes to infringement of the '936 patent by selling for importation into the United States, importing into the United States, and/or selling within the United States after importation the Accused Devices and the non-staple constituent parts of those devices, which are not suitable for substantial non-infringing use and which embody a material part of the invention described in the '936 patent. These mobile electronic devices are known by Apple to be especially made or especially adapted for use in the infringement of the '936 patent. Apple also contributes to the infringement of the '936 patent by selling for importation into the United States, importing into the United States, and/or selling within the United States after importation components, such as the chipsets or software containing the infringing functionality, of the Accused Devices, which are not suitable for substantial non-infringing use and which embody a material part of the invention described in the '936 patent. These mobile devices are known by Apple to be especially made or especially adapted for use in the infringement of the '936 patent. Specifically, on information and belief, Apple sells the Accused Devices to resellers, retailers, and end users with knowledge that the devices are used for infringement. End users of those mobile electronic devices directly infringe the '936 patent.

71.     Attached as Exhibit 15 are representative claim charts for the Accused Devices showing infringement of the '936 patent by exemplary Accused Devices.

**B.      Infringement of the '558 Patent**

72.     Apple infringes, literally and/or under the doctrine of equivalents, at least claims 1 and 6-20 of the '558 patent.  Apple infringes at least these claims by importing, selling for importation, and/or selling after importation into the United States the Accused Devices.  The Accused Devices satisfy all claim limitations of claims 1, 6-7, and 10-20 at the time of importation into the United States.

73.     On information and belief, Apple also knowingly induces and/or contributes to the infringement of at least claims 8-9 of the '558 patent by others.  On information and belief, Apple has had knowledge of the '558 patent, and its infringement of the '558 patent, since at least July 6, 2017, when Qualcomm filed a parallel action in the Southern District of California. Additionally, Qualcomm has provided technical assistance and solutions to Apple, including envelope tracking technology, under non-disclosure agreements.  Apple was aware of, and implemented, Qualcomm's technology in certain of its devices without authorization.  On information and belief, Apple tests, demonstrates, or otherwise operates the Accused Devices in the United States, thereby performing the claimed methods and directly infringing any asserted claims of the '558 patent requiring such operation.  Similarly, Apple's customers and the end users of the Accused Devices test and/or operate the Accused Devices in the United States in accordance with Apple's instructions contained in, for example, its user manuals, thereby also performing the claimed methods and directly infringing the asserted claims of the Asserted Patents requiring such operation.

74.     Apple also contributes to infringement of the '558 patent by selling for importation into the United States, importing into the United States, and/or selling within the United States after importation the Accused Devices and the non-staple constituent parts of those devices, which are not suitable for substantial non-infringing use and which embody a

23

material part of the invention described in the '558 patent. These mobile electronic devices are known by Apple to be especially made or especially adapted for use in the infringement of the '558 patent. Apple also contributes to the infringement of the '558 patent by selling for importation into the United States, importing into the United States, and/or selling within the United States after importation components, such as the chipsets or software containing the infringing functionality, of the Accused Devices, which are not suitable for substantial non-infringing use and which embody a material part of the invention described in the '558 patent. These mobile devices are known by Apple to be especially made or especially adapted for use in the infringement of the '558 patent. Specifically, on information and belief, Apple sells the Accused Devices to resellers, retailers, and end users with knowledge that the devices are used for infringement. End users of those mobile electronic devices directly infringe the '558 patent.

75.     Attached as Confidential Exhibit 16 are representative claim charts for the Accused Devices showing infringement of the '558 patent by exemplary Accused Devices.

### C.     Infringement of the '658 Patent

76.     Apple infringes, literally and/or under the doctrine of equivalents, at least claims 9, 10, 12, 14, and 20-22 of the '658 patent. Apple infringes at least claims 9, 10, 12, 14, 21, and 22 by importing, selling for importation, and/or selling after importation into the United States the Accused Devices. The Accused Devices satisfy all claim limitations of claims 9, 10, 12, 14, 21, and 22 at the time of importation into the United States. Apple infringes at least claim 20 by importing, selling for importation, and/or selling after importation into the United States Accused Devices that were manufactured abroad using an infringing process.

77.     Attached as Confidential Exhibit 17 are representative claim charts for the Accused Devices showing infringement of the '658 patent by exemplary Accused Devices.

**D.    Infringement of the '949 Patent**

78.    Apple infringes, literally and/or under the doctrine of equivalents, at least claims 1–8, 10-14, 16, 20, and 22 of the '949 patent.  Apple infringes at least these claims by importing, selling for importation, and/or selling after importation into the United States the Accused Devices.  The Accused Devices satisfy all claim limitations of claims 1-8, 16, and 20 at the time of importation into the United States.

79.    On information and belief, Apple also knowingly induces and/or contributes to the infringement of at least claims 10-14 and 22 of the '949 patent by others.  On information and belief, Apple has had knowledge of the '949 patent, and its infringement of the '949 patent, since at least July 6, 2017, when Qualcomm filed a parallel action in the Southern District of California.  Additionally, Qualcomm has provided technical assistance and solutions to Apple under non-disclosure agreements.  Apple was aware of, and implemented, Qualcomm's technology in certain of its devices without authorization.  On information and belief, Apple tests, demonstrates, or otherwise operates the Accused Devices in the United States, thereby performing the claimed methods and directly infringing any asserted claims of the '949 patent requiring such operation.  Similarly, Apple's customers and the end users of the Accused Devices test and/or operate the Accused Devices in the United States in accordance with Apple's instructions contained in, for example, its user manuals, thereby also performing the claimed methods and directly infringing the asserted claims of the Asserted Patents requiring such operation.

80.    Apple also contributes to infringement of the '949 patent by selling for importation into the United States, importing into the United States, and/or selling within the United States after importation the Accused Devices and the non-staple constituent parts of those devices, which are not suitable for substantial non-infringing use and which embody a

material part of the invention described in the '949 patent. These mobile electronic devices are known by Apple to be especially made or especially adapted for use in the infringement of the '949 patent. Apple also contributes to the infringement of the '949 patent by selling for importation into the United States, importing into the United States, and/or selling within the United States after importation components, such as the chipsets or software containing the infringing functionality, of the Accused Devices, which are not suitable for substantial non-infringing use and which embody a material part of the invention described in the '949 patent. These mobile devices are known by Apple to be especially made or especially adapted for use in the infringement of the '949 patent. Specifically, on information and belief, Apple sells the Accused Devices to resellers, retailers, and end users with knowledge that the devices are used for infringement. End users of those mobile electronic devices directly infringe the '949 patent.

81.     Attached as Confidential Exhibit 18 are representative claim charts for the Accused Devices showing infringement of the '949 patent by exemplary Accused Devices.

### E.     Infringement of the '490 Patent

82.     Apple infringes, literally and/or under the doctrine of equivalents, at least claims 1–6, 8, 10, 16–17, and 31 of the '490 patent. Apple infringes at least these claims by importing, selling for importation, and/or selling after importation into the United States the Accused Devices. The Accused Devices satisfy all claim limitations of claims 1-6, 8, 10, and 31 at the time of importation into the United States.

83.     On information and belief, Apple also knowingly induces and/or contributes to the infringement of at least claims 16-17 of the '490 patent by others. On information and belief, Apple has had knowledge of the '490 patent, and its infringement of the '490 patent, since at least July 6, 2017, when Qualcomm filed a parallel action in the Southern District of California. Additionally, Qualcomm has provided technical assistance and solutions to Apple

MAUSER Exhibit 1
Page 45

under non-disclosure agreements.   Apple was aware of, and implemented, Qualcomm's technology in certain of its devices without authorization.  On information and belief, Apple tests, demonstrates, or otherwise operates the Accused Devices in the United States, thereby performing the claimed methods and directly infringing any asserted claims of the '490 patent requiring such operation.  Similarly, Apple's customers and the end users of the Accused Devices test and/or operate the Accused Devices in the United States in accordance with Apple's instructions contained in, for example, its user manuals, thereby also performing the claimed methods and directly infringing the asserted claims of the Asserted Patents requiring such operation.

84.     Apple also contributes to infringement of the '490 patent by selling for importation into the United States, importing into the United States, and/or selling within the United States after importation the Accused Devices and the non-staple constituent parts of those devices, which are not suitable for substantial non-infringing use and which embody a material part of the invention described in the '490 patent.  These mobile electronic devices are known by Apple to be especially made or especially adapted for use in the infringement of the '490 patent.  Apple also contributes to the infringement of the '490 patent by selling for importation into the United States, importing into the United States, and/or selling within the United States after importation components, such as the chipsets or software containing the infringing functionality, of the Accused Devices, which are not suitable for substantial non-infringing use and which embody a material part of the invention described in the '490 patent. These mobile devices are known by Apple to be especially made or especially adapted for use in the infringement of the '490 patent.  Specifically, on information and belief, Apple sells the

Accused Devices to resellers, retailers, and end users with knowledge that the devices are used for infringement. End users of those mobile electronic devices directly infringe the '490 patent.

85.     Attached as Confidential Exhibit 19 are representative claim charts for the Accused Devices showing infringement of the '490 patent by exemplary Accused Devices.

### F.     Infringement of the '675 Patent

86.     Apple infringes, literally and/or under the doctrine of equivalents, at least claims 1-3 and 7-14 of the '675 patent. Apple infringes at least these claims by importing, selling for importation, and/or selling after importation into the United States the Accused Devices. The Accused Devices satisfy all claim limitations of claims 1-3 and 7-14 at the time of importation into the United States.

87.     Attached as Confidential Exhibit 20 are representative claim charts for the Accused Devices showing infringement of the '675 patent by exemplary Accused Devices.

## VI.   SPECIFIC INSTANCES OF UNFAIR IMPORTATION AND SALE

88.     Apple sells for importation into the United States, imports into the United States, and/or sells after importation into the United States the Accused Devices. Examples of Accused Devices were purchased from a retailer located in the United States. *See* Ex. 30. Specifically, an Apple iPhone 7 was purchased on June 15, 2017 from Apple Georgetown, 1229 Wisconsin Ave., Washington, D.C. 20007. *Id.* The iPhone 7 is labeled as "Assembled in China." *See* Ex. 30; Ex. P1.

89.     Upon information and belief, substantially all of the Accused Devices in the United States are manufactured by Apple's outsourcing partners, which are located primarily in Asia, and sold for importation. *See* Ex. 31.

## VII.   HARMONIZED TARIFF SCHEDULE NUMBERS

90.   The Accused Devices are classified under at least the following subheading of the Harmonized Tariff Schedule of the United States:  8517.12.00 (mobile phones); 8471.30.01, 8471.41.01, or 8471.49.00 (handheld computers).  These classifications are exemplary in nature and not intended to restrict the scope of any exclusion order or other remedy ordered by the Commission.

## VIII.   RELATED LITIGATION

91.   On July 6, 2017, Qualcomm filed a complaint in the U.S. District Court for the Southern District of California alleging infringement of the Asserted Patents against Apple.

92.   Aside from the above-mentioned parallel district court matter, Qualcomm has not previously litigated the Asserted Patents before any other court or agency.

## IX.   THE DOMESTIC INDUSTRY RELATING TO THE ASSERTED PATENTS

93.   An industry as required by Section 337(a)(2) and defined by Section 337(a)(3) exists in the United States.  Qualcomm has made significant investments in plant, equipment, labor and capital, and made substantial investments in engineering and research and development related to products protected by the Asserted Patents.

94.   As described below and in the accompanying declaration at Confidential Exhibit 21, Qualcomm researches, designs, and develops integrated circuit products in the United States (the "Domestic Industry Products") that are protected by at least one claim of each of the Asserted Patents.

### A.   Technical Prong

95.   The chart below sets forth exemplary Domestic Industry Products that are protected by least one claim of each of the Asserted Patents:

| Patent No. | Domestic Industry Product and Components |
|---|---|
| '936 patent | APQ 8064, MSM8960AB, MSM8974, MSM8x30, MSM8x12, MSM8x26, MSM8926, MSM8928, MSM8916, MSM8909, MSM8917, SDM 440, APQ 8084, MSM8994, MSM8992, MSM8936, MSM8952, APQ 8096, MSM8996, MSM8956, MSM8937, MSM 8940, MSM8953, MSM8998, MSM8997, SDM 660, SDM630 |
| '558 patent | MDM6X15, MDM9230, MDM9645, MDM9650, MDM9X25, MDM9X25M, MDM9X30, MDM9X35M, MDM9X40, MSM660, SDM660, MSM8926, MSM8928, MSM8958, MSM8974, MSM8974PRO, MSM8992, MSM8994, MSM8996, MSM8996AU, MSM8996PRO, MSM8996SG, MSM8998, QFE1035, QFE1040, QFE1045, QFE1100, QFE3100, QFE4100, QFE4335, QFE4345, QPA4340, QPA5460, WTR1605, WTR1625, WTR2605, WTR3925, WTR4905, WTR5975, WTR6955, MTP660, MTP8084, MTP845, SDM845, MTP8926, MTP8928, MTP8974, MTP8992, MTP8994, MTP8996, MTP8998, MTP9625, MTP9630, MTP9635, MTP9640, MTP9645, MTP9650, MTP9655, MTP APQ 8084, MTP FUSION4.5 |
| '658 patent | MSM8960, MSM8974, MDM9x25, SDM652, MSM8994, MDM9x30, MDM9x45, MSM8996, MDM9x55, SDM653, SDM660, MSM8998 |
| '949 patent | SDX/SDX20M, MDM9x35, MDM9x45, MDM9x55, MDM9x65, MTP9x35, MTP9x45, MTP9x55, MTP9x65, MTP Fusion 4.5 |
| '490 patent | SDX/SDX20M, MDM9x35, MDM9x45, MDM9x55, MDM9x65, MTP9x35, MTP9x45, MTP9x55, MTP9x65, MTP Fusion 4.5 |
| '675 patent | MDM9X50, QFE4100, WTR5975, WTR6955, MTP9650, MTP9655 |

96.     Claim charts applying a representative claim of each Asserted Patent to a representative Domestic Industry Product are attached as Confidential Exhibits 22-27.[6]

97.     Qualcomm·also sells the Domestic Industry Products to its customers, who then incorporate them into devices (e.g., smartphones) that are sold in the United States.   On

_____

[6]   The Domestic Industry Products are protected by additional claims of the Asserted Patents, and Qualcomm may establish the technical prong of the domestic industry requirement through claims other than those explicitly charted in Confidential Exhibits 22-27.

information and belief, these devices may also practice one or more claims of the Asserted Patents.

### B.    Economic Prong

98.    There is a domestic industry as defined under 19 U.S.C. § 1337(a)(3)(A), (B), and/or (C), comprising continuing significant investments made in the United States by Qualcomm in plant and equipment and employment of labor and capital, and continuing substantial investment in exploitation of the Asserted Patents.  Specific, non-limiting examples of such investments are set forth below and in the Confidential Exhibit 21.

99.    Qualcomm is a global leader in the development of integrated circuit technology and products. Qualcomm is one the United States' largest and most innovative technology companies, with over 18,000 employees in the United States, 68 percent of whom are engineers.

100.    Qualcomm maintains its headquarters in San Diego, California. Qualcomm occupies 92 buildings in the United States totaling over 6.5 million sq. ft. of space. Qualcomm operates facilities in 17 U.S. states and the District of Columbia.

101.    Qualcomm's worldwide R&D expenditures in fiscal 2016, 2015 and 2014 totaled approximately $5.2 billion, $5.5 billion and $5.5 billion, respectively.  Qualcomm continues to expand and enhance its products, services, and related intellectual property portfolios.  These efforts have resulted in a leading intellectual property portfolio related to, among other things, wireless technology and integrated circuit products.

102.    Qualcomm engages in a broad range of qualifying domestic industry activities in the United States directed to articles protected by the Asserted Patents described above.  The Domestic Industry Products are all designed, developed, tested and supported by Qualcomm in the United States.

103.    Qualcomm has made and continues to make significant investments in plant and equipment directed to the Domestic Industry Products in the United States. Those investments in plant and equipment are dedicated to research, design, development, engineering, product support, manufacturing support, testing, and various customer support activities focused on the Domestic Industry Products.

104.    Qualcomm also has made and continues to make significant investments in labor and capital directed to the Domestic Industry Products in the United States. Those investments in labor and capital are dedicated to research, design, development, engineering, product support, manufacturing support, testing, and various customer support activities focused on the Domestic Industry Products.

105.    Qualcomm further engages in exploitation of the Asserted Patents through its substantial domestic investments in research and development and engineering activities in the United States. These activities include, among other things, research and development and engineering and design tied to the claimed technology implemented in the Asserted Patents. These activities have occurred in the past and are ongoing with respect to prior and current versions of the Domestic Industry Products as well as future versions of Qualcomm products under development.

106.    A significant and substantial portion of Qualcomm's technical activities takes place in the United States. Qualcomm's domestic investments and activities are significant and substantial both in absolute terms and relative to Qualcomm's overall operations. Qualcomm's domestic investments and activities are important to the Domestic Industry Products and represent significant added value. These investments are described in more detail in the Declaration of Tim Durkin, attached hereto as Confidential Exhibit 21.

## X.    RELIEF REQUESTED

107.    Qualcomm respectfully requests that the Commission:

(a)    Institute an investigation pursuant to Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, with respect to Apple's violations of that section arising from the importation into the United States, sale for importation, and/or the sale within the United States after importation of mobile electronic devices that infringe one or more claims of the Asserted Patents;

(b)    Schedule and conduct a hearing pursuant to Section 337(c) for the purposes of (i) receiving evidence and hearing argument concerning whether there has been a violation of Section 337, and (ii) following the hearing, determining that there has been a violation of Section 337;

(c)    Issue a permanent limited exclusion order directed to products manufactured by or on behalf of Apple, its subsidiaries, related companies, and agents pursuant to 19 U.S.C. § 1337(d) excluding entry into the United States of mobile electronic devices that do not incorporate a Qualcomm brand baseband processor modem and that infringe one or more claims of the Asserted Patents;

(d)    Issue a permanent cease and desist order pursuant to 19 U.S.C. § 1337(f) prohibiting Apple, its domestic subsidiaries, related companies, and agents from engaging in the importation, sale for importation, marketing and/or advertising, distribution, offering for sale, sale, use after importation, sale after importation, and other transfer within the United States of mobile electronic devices that do not incorporate a Qualcomm brand baseband processor modem and that infringe one or more claims of the Asserted Patents;

(e)     Impose a bond upon importation of mobile electronic devices that infringe one or more claims of the Asserted Patents, during the 60-day Presidential review period pursuant to 19 U.S.C. § 1337(j); and

(f)     Issue such other and further relief as the Commission deems just and proper under the law, based on the facts determined by the investigation and the authority of the Commission.

Dated:  July 7, 2017                     Respectfully submitted,

                                         S. Alex Lasher
                                         QUINN EMANUEL URQUHART & SULLIVAN, LLP
                                         777 6th Street NW, 11th Floor
                                         Washington, DC 20001
                                         Tel.: (202) 538-8000
                                         Fax: (202) 538-8100

                                         David A. Nelson
                                         Stephen Swedlow
                                         QUINN EMANUEL URQUHART & SULLIVAN, LLP
                                         500 West Madison St., Suite 2450
                                         Chicago, Illinois 60661
                                         Telephone:  (312) 705-7400
                                         Facsimile:  (312) 705-7401

                                         Richard W. Erwine
                                         Alexander Rudis
                                         QUINN EMANUEL URQUHART & SULLIVAN, LLP
                                         51 Madison Avenue, 22nd Floor
                                         New York, NY 10010
                                         Tel.: (212) 849-7000
                                         Fax: (212) 849-7100

                                         Sean S. Pak
                                         QUINN EMANUEL URQUHART & SULLIVAN, LLP
                                         50 California Street, 22nd Floor

San Francisco, CA 94111
Tel.: (415) 875-6600
Fax: (415) 875-6700

Tom M. Schaumberg
Deanna Tanner Okun
David H. Hollander, Jr.
Daniel F. Smith
ADDUCI, MASTRIANI & SCHAUMBERG, L.L.P.
1133 Connecticut Avenue, N.W., 12th Floor
Washington, DC 20036
Tel.: (202) 467-6300
Fax: (202) 466-2006

Evan R. Chesler
Keith R. Hummel
Richard J. Stark
Gary A. Bornstein
J. Wesley Earnhardt
Yonatan Even
Vanessa A. Lavely
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza, 825 Eighth Avenue
New York, NY 10019
Tel.: (212) 474-1000
墨耀墨護济(212) 474-3700

*Counsel for Complainant Qualcomm Incorporated*

UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C.

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN MOBILE ELECTRONIC DEVICES AND RADIO FREQUENCY AND PROCESSING COMPONENTS THEREOF** | Investigation No. 337-TA-\_\_\_\_\_ |

## VERIFICATION OF COMPLAINT

I, John Scott, am a Vice President for Qualcomm Incorporated ("Qualcomm") and am duly authorized by Qualcomm to execute this verification of the accompanying Complaint under Section 337 of the Tariff Act of 1930, as Amended, on behalf of Qualcomm. I have read the Complaint and am aware of its contents. To the best of my knowledge, information, and belief and based upon a reasonable inquiry under the circumstances, I hereby certify that:

1.  The allegations contained in the Complaint are well grounded in fact and have evidentiary support, or are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery;

2.  The claims and other legal contentions set forth in the Complaint are warranted by existing laws or by a good faith, non-frivolous argument for extension, modification, or reversal of existing law, or by the establishment of new law; and

3.  The Complaint is not being filed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

Dated: July 7, 2017

John Scott
Vice President
Qualcomm Incorporated

# EXHIBIT 2

– Certified translation from the German, 30 pages –

**Quinn Emanuel – Deutschland**
Mollstrasse 42, 68165 Mannheim – Tel.: +49 621 43298-6000 – Fax.: +49 621 43298-6100

Landgericht Mannheim
Court for Patent Matters
68149 Mannheim

| Our reference | 03536-00006 / 21479791.8 | |
|---|---|---|

Dr. Marcus Grosch, LL.M. (Yale)
marcusgrosch@quinnemanuel.com

Dr. Johannes Bukow, LL.M. (Edinburgh)
johannesbukow@quinnemanuel.com

Dr. Katrin Gerstenberg
Katringerstenberg@quinnemanuel.com

Dr. Lennert Alexy
lennertalexy@quinnemanuel.com

July 17, 2017

**Complaint**

In the lawsuit

**Qualcomm Inc.**, 5775 Morehouse Drive, San Diego, CA 92121, USA, legally represented by its CEO, Steve Mollenkopf, same address,

- Plaintiff -

Counsel: Attorneys of Quinn Emanuel Urquhart & Sullivan, LLP, licensed to practice law in Germany, particularly Dr. Marcus Grosch and Dr. Johannes Bukow, Mollstrasse 42, 68165 Mannheim

**Case No.: new**
2 cert. copies encl.

vs.

1. **Apple Distribution International ULC**, Hollyhill Industrial Estate, Hollyhill, Cork, Ireland, legally represented by its Directors, Cathy Kearney, Michael O'Sullivan, and Gene Daniel Levoff, same address,

- Defendant 1 -

**2. Apple Retail Germany B.V. & Co. KG**, Eschenheimer Anlage 1, 60316 Frankfurt am Main, legally represented by its General Partner, Apple Holding B.V., Leidseplein 29, Amsterdam 1017PS, Netherlands, represented by its Directors, Alexander Niemczyk and Michael Joseph Boyd, same address

- Defendant 2 -

for patent infringement (**EP 2 954 737**)

We represent the Plaintiff, in the name and on the authority of which we file this action, and we request that:

I.      The Defendants are ordered,

1.      on pain of a fine of €250,000 for each infringement to be set by the court – or, in the alternative, imprisonment, or a term of imprisonment of up to six months, in the case of repeated infringement of up to two years, said term to be served by the Defendants' legal representatives, to refrain with respect to:

from offering, putting on the market, using, or importing or owning for these purposes in the Federal Republic of Germany,

apparatuses

comprising the following:

a power tracker configured to determine a single power tracking signal based on a plurality of inphase (I) and quadrature (Q) components of all of a plurality of transmit signals being sent simultaneously; and

a power supply generator configured to generate a single power supply voltage based on the single power tracking signal; and

a power amplifier (PA) configured to receive the single power supply voltage and all of the plurality of transmit signals for generating a single output radio frequency signal, RF signal.

(**EP 2 954 737, claim 1**, direct infringement)

2.      to inform the Plaintiff of the extent to which they committed the actions described in No. I. 1. since July 21, 2017, specifying

a)      the names and addresses of the manufacturers, suppliers and other prior possessors,

Complaint of July 17, 2017
in the matter Qualcomm v. Apple et al.
LG Mannheim, case no. new

**MAUSER Exhibit 2**
**Page 57**

b) the names and addresses of commercial buyers and retail outlets for which the products were intended,

c) the quantities of products produced, delivered, received and ordered as well as the prices paid for the respective products;

wherein copies of the respective purchase and sales documents (namely invoices, alternatively delivery slips) in which details required to be kept confidential may be redacted should be presented to prove the statements made;

3. to provide a structured written account (by calendar quarters) to the Plaintiff detailing the extent to which the Defendants have committed the actions described in No. I.1 since July 21, 2017, specifying:

a) the quantity of goods received or ordered,

b) each of the shipments (listing the brands of the respective products and all other identifying characteristics, such as type designation, item description, product number), broken down by delivery quantities, delivery times, and prices (and type designations, where required) as well as the names and addresses of the buyers including the retail outlets for which the products were intended,

c) each of the offers (listing the brands of the respective products and all other identifying characteristics, such as type designation, item description, product number), broken down by delivery quantities, delivery times, and prices (and type designations, where required) as well as the names and addresses of the recipients of the offers,

d) advertising activities, broken down by advertising medium, circulation, period and area of distribution,

e) each of the cost factors broken down by cost drivers and realized profit,

• wherein copies of the respective documentation (namely delivery slips) in which details required to be kept confidential may be redacted should be presented to prove the statements made with respect to b);

• wherein the Defendants may provide the names and addresses of non-commercial buyers and recipients of offers, instead to the Plaintiff, to a certified accountant to be named by the Plaintiff, said accountant being based in the Federal Republic of Germany and bound to secrecy, if the Defendants pay the associated costs and authorize and obligate said accountant to inform the Plaintiff upon request whether a specific buyer or recipient of an offer is included in the list;

4. to recall from the distribution channels the products described in No. I.1. that were put on the market and are in the possession of third parties,

by making a serious request for this, with notice that the Division found infringement of the disputed patent with this ruling, to the third parties who were given possession of the products by the Defendants or with its consent to return the products to the Defendants and by promising the third parties repayment of any purchase price that may have already been

03536-00006 / 21479791.8                                    3                      Complaint of July 17, 2017
in the matter Qualcomm v. Apple et al.
LG Mannheim, case no. new

**MAUSER Exhibit 2**
**Page 58**

paid and an assumption of the costs of the return if the products are returned by the Defendants reclaiming the successfully recalled products.

5.    to <u>destroy</u> the products described in No. I.1. in direct and/or indirect possession of Defendants at their own expense, or, at their discretion, to hand said products over to a court bailiff to be named by them for destruction at their expense;

II.    It is determined that the Defendants are obligated to compensate the Plaintiff for all damages the Plaintiff incur or will incur as a result of each of the respective actions described in No. I.1. committed since July 21, 2017.

III.    The defendants are ordered to bear the costs of the proceedings.

We request that the amount of security be set separately for each enforceable portion of the judgment.

If written preliminary proceedings should be ordered, we request that the court deliver a default judgment according to Section 331 (3) ZPO [Code of Civil Procedure] in case of default on the part of the Defendants.


## Substantiation

The Plaintiff's action is directed against infringement of the German part of the European patent **EP 2 954 737** (**Patent in Suit**) by the Defendants. The Defendants inter alia offer and distribute mobile telephones in Germany.

Our submission is structured as follows:

    A.    The Parties
    B.    The Patent in Suit
    C.    Contested embodiments and infringing actions
    D.    Infringement subsumption
    E.    Legal assessment
    F.    Miscellaneous

## A.
## The Parties

**1.**    **The Plaintiff**

The Plaintiff is a U.S. company based in San Diego, California. It is one of the world's leading research and development companies in the field of semiconductor and chip production and manufactures respective products, particularly for the communications and computer industries.

03536-00006 / 21479791.8        4        Complaint of July 17, 2017
in the matter Qualcomm v. Apple et al.
LG Mannheim, case no. new

**MAUSER Exhibit 2**
**Page 59**

2. **The Defendants**

a) The Defendants both are subsidiaries of Apple Inc., a U.S. company based in Cupertino, California. Apple Inc. develops and manufactures, among other products, mobile computers and communication devices that are mainly sold and distributed under the brand names of "iPhone" and "iPad."

b) Defendant 1, domiciled in Hollyhill, Cork, Ireland, is responsible for the German Apple Online Store (*http://www.apple.com/de/*) as well as for the mobile Apple Store app and the Apple Contact Center.

c) Defendant 2 operates the physical Apple retail stores in Germany. Its general partner is Apple Holding B.V. based in Amsterdam, Netherlands. A B.V. is a Dutch private company with limited liability. Its limited partner is Apple Retail Europe Holding based in Hollyhill, Ireland.

**B.**
**The Patent in Suit**

**I.**
**Overview**

1. The Patent in Suit is European patent 2 954 737, the German part of which is asserted here. We submit a copy of the Patent in Suit (hereinafter "**PIS**") (in triplicate for the court) as

**- Exhibit K 1 -.**

The notification of the grant of the Patent in Suit was published on June 21, 2017. The Patent in Suit was applied for on January 30, 2014 claiming the priority of February 11, 2013 (US 13/764,328).

2. The German part of the disputed patent being asserted with this legal action is registered with DPMA [German Patent and Trademark Office] under file number DE 60 2014 010 962.4. The German part is in force, as can be learned from the excerpt from the German patent register available to anyone at www.dpma.de.

3. The Plaintiff is the registered holder of the Patent in Suit.

03536-00006 / 21479791.8                    5                    Complaint of July 17, 2017
in the matter Qualcomm v. Apple et al.
LG Mannheim, case no. new

**MAUSER Exhibit 2**
**Page 60**

## II.
## Technical Background and Prior Art

1.   Wireless devices, such as smartphones, send and receive data for a two-way information flow. The wireless devices contain a transmitter for data transmission and a receiver for data reception. For data transmission, the transmitter processes (e.g. encode and modulate) data to generate so-called output samples. The transmitter further conditions (e.g. conversion to analog format, filtering, amplification, and frequency upconversion) the output samples to generate a modulated radio frequency (RF) signal, amplify this to obtain an output RF signal with a suitable transmit power level, and to transmit this signal via an antenna to a base station. For data reception, the receiver obtains a received RF signal via the antenna and amplifies and processes the received RF signal to recover data sent by the base station (PIS, paragraph [0003]).

The transmitter typically includes a power amplifier (PA) to provide high transmit power for the output RF signal. The power amplifier should be able to provide high transmit power and have high power added efficiency (PAE) (see PIS, paragraph [0004]).

2.   The Patent in Suit concerns a device for "envelope tracking". "Envelope tracking" is a technology that contributes to optimizing the power added efficiency of RF power amplifiers. This is achieved by the energy supplied to the RF power amplifier with "envelope tracking" being continuously adjusted to assure that the amplifier works at maximum efficiency in each process in terms of the necessary real-time output power. In this way, for example, the operating time of a battery-powered device can be extended, the signal quality improved, and the heat development reduced.

## III.
## Object and Solution of the Patent in Suit

The Patent in Suit states the object of disclosing techniques for generating a power tracking supply voltage and a circuit (e.g. a power amplifier) in which multiple transmit signals sent simultaneously are processed, also at different frequencies. The Patent in Suit solves this object, among other ways, with the independent apparatus claim 1.

The <u>original English wording</u> of claim 1 can be structured as follows:

1.   *An apparatus comprising:*

03536-00006 / 21479791.8          6          Complaint of July 17, 2017
in the matter Qualcomm v. Apple et al.
LG Mannheim, case no. new

**MAUSER Exhibit 2**
**Page 61**

1.1    a power tracker (582) configured to determine a single power tracking signal based on a plurality of inphase, I, and quadrature, Q, components of all of a plurality of transmit signals being sent simultaneously;

1.2    a power supply generator (586) configured to generate a single power supply voltage based on the single power tracking signal; and

1.3    a power amplifier, PA, (560) configured to receive the single power supply voltage and all of the plurality of transmit signals to produce a single output radio frequency, RF, signal.

[German translation follows.]

We submit the above breakdown of features (in triplicate for the court) as

- Exhibit K 2 -.

## IV.
## Explanation of the Patent in Suit's Teaching

1.    **General**

a)    The Patent in Suit deals with the most efficient power supply for devices, such as wireless communication devices (see PIS, paragraph [0010]). These also include smartphones. These can communicate with base stations through various wireless systems (e.g. WLAN or LTE).

[0011]  FIG. 1 shows a wireless device 110 communicating with a wireless communication system 120. Wireless system 120 may be a Long Term Evolution (LTE) system, a Code Division Multiple Access (CDMA) system, a Global System for Mobile Communications (GSM) system, a wireless local area network (WLAN) system, or some other wireless system. A CDMA system may implement Wideband CDMA (WCDMA), CDMA 1X, Time Division Synchronous CDMA (TD-SCDMA), or some other version of CDMA. For simplicity, FIG. 1 shows wireless system 120 including two base stations 130 and 132 and one system controller 140. In general, a wireless system may include any number of base stations and any set of network entities.
[0012]  Wireless device 110 may also be referred to as a user equipment (UE), a mobile station, a terminal, an access terminal, a subscriber unit, a station, etc. Wireless device 110 may be a cellular phone, a smartphone, a tablet, a wireless modem, a personal digital assistant (PDA), a handheld device, a laptop computer, a smartbook, a netbook, a cordless phone, a wireless local loop (WLL) station, a Bluetooth device, etc. Wireless device 110 may be capable of communicating with wireless system 120. Wireless device 110 may also be capable of receiving signals from broadcast stations (e.g. a broadcast station 134), signals from satellites (e.g., a satellite 150) in one or more global navigation satellite systems (GNSS), etc. Wireless device 110 may support one or more radio technologies for wireless communication such as LTE, WCDMA, CDMA 1X, TD-SCDMA, GSM, 802.11, etc.

b)    Radio frequencies are divided into different bands depending on the frequency, e.g. the three band groups *low-band* (frequencies lower than 1000 megahertz (MHz)), *mid-band* (1000 to 2000 MHz) or *high-band* (higher than 2300 MHz). These band

03536-00006 / 214797918                                          7                              Complaint of July 17, 2017
in the matter Qualcomm v. Apple et al.
LG Mannheim, case no. new

**MAUSER Exhibit 2**
**Page 62**

groups in turn are subdivided into different frequency bands (or simply: "**bands**"). Each band may cover up to 200 MHz and may include one or more carriers. Each carrier may cover up to 20 MHz; for example, in the LTE mobile radio standard. The LTE Release 11 standard supports 35 carriers (see PIS, paragraph [0013]).

[0013]   Wireless device 110 may be able to operate in low-band (LB) covering frequencies lower than 1000 megahertz (MHz), mid-band (MB) covering frequencies from 1000 MHz to 2300 MHz, and/or high-band (HB) covering frequencies higher than 2300 MHz. For example, low-band may cover 698 to 960 MHz, mid-band may cover 1475 to 2170 MHz, and high-band may cover 2300 to 2690 MHz and 3400 to 3800 MHz. Low-band, mid-band, and high-band refer to three groups of bands (or band groups), with each band group including a number of frequency bands (or simply, "bands"). Each band may cover up to 200 MHz and may include one or more carriers. Each carrier may cover up to 20 MHz in LTE. LTE Release 11 supports 35 bands, which are referred to as LTE/UMTS bands and are listed in 3GPP TS 36.101.

c)   Wireless devices may support carrier aggregation, i.e. simultaneous use of multiple carriers. LTE Release 11 says a wireless device can be designed for use of up to five carriers in one or more bands.

[0014]   Wireless device 110 may support carrier aggregation, which is operation on multiple carriers. Carrier aggregation may also be referred to as multi-carrier operation. Wireless device 110 may be configured with up to 5 carriers in one or two bands in LTE Release 11.

d)   In paragraphs [0022] to [0028] in connection with Fig. 3 and paragraphs [0029] to [0034] in connection with Fig. 4, the Patent in Suit describes two devices in which a separate power amplifier is used in each for transmitting different signals (simultaneously). In these devices the I and Q components[1], which are the starting point for each signal, are further processed separately for each signal and also each uses a separate power amplifier.

The technology protected by the Patent in Suit differs from such designs in that **a single envelope signal** is formed on the basis of the I and Q components of different signals, which are transmitted simultaneously, based on which **a single power supply voltage** is generated by **a single power amplifier**. This device correspondingly has a single efficient power amplifier instead of multiple highly linear but less efficient power amplifiers (see Fig. 3), or multiple power amplifiers with an envelope tracking function (see Fig. 4).

The Patent in Suit therefore concerns a device with a particularly efficient "envelope tracking."

---

1   In the English-language literature I is the abbreviation for inphase component as one component and Q for quadrature component as the other component.

03536-00006 / 21479791.8                    8                    Complaint of July 17, 2017
in the matter Qualcomm v. Apple et al.
LG Mannheim, case no. new

MAUSER Exhibit 2
Page 63

e)   In paragraphs [0035] to [0039] in connection with Fig. 5 and in paragraphs [0040] to [0043] in connection with Fig. 6 the Patent in Suit describes two embodiments. The individual features of the Patent in Suit's claim 1 are described below based on the example shown in Fig. 5.

## 2.   Features 1/1.1

*"An apparatus comprising:*

*a power tracker configured to determine a single power tracking signal based on a plurality of inphase (I) and quadrature (Q) components of all of a plurality of transmit signals being sent simultaneously"*

The Fig. 5 depicted below shows an apparatus (reference sign 500) that among other things contains a voltage generator (580). The voltage generator contains a power tracker (582). The I and Q components of the different signals are directed to this power tracker. Each signal consists of a separate pair of I and Q components. The use of $I_1$ to $I_K$ components ($I_1$ samples and $I_K$ samples) and $Q_1$ to $Q_K$ components ($Q_1$ samples and $Q_K$ samples) makes it clear that there are multiple parallel signals present, with the exact number not further defined.



*FIG. 5*

Complaint of July 17, 2017
in the matter Qualcomm v. Apple et al.
LG Mannheim, case no. new

MAUSER Exhibit 2
Page 64

Based on the $I_1$ to $I_K$ components and $Q_1$ to $Q_K$ components in themselves the power tracker then calculates the total power needed for transmitting the signals regardless of the specific modulation[2] method being used for the subsequent transmission of the RF signal. The power tracker's method of operation is described in the Patent in Suit Specification's paragraph [0038].

> **[0038]**   Within voltage generator 580, a power tracker 582 receives $I_1$ to $I_K$ samples and $Q_1$ to $Q_K$ samples for all transmit signals being sent simultaneously. Power tracker 582 computes the overall power of all transmit signals based on the I and Q samples for those transmit signals and provides a digital power tracking signal to a DAC 584. DAC 584

## 3.   Feature 1.2

*"a power supply generator (586) configured to generate a single power supply voltage based on the single power tracking signal"*

After determination and construction of the single power tracking signal by the power tracker, the single power tracking signal is received by the power supply generator (586). Based on it, the power supply generator generates a power supply voltage. This is likewise described in the Patent in Suit's paragraph [0038], whereas the description also refers to a conversion and processing of the envelope signal that is not a subject matter of claim 1.

> on the I and Q samples for these transmit signals and provides a digital power tracking signal to a DAC 584. DAC 584 converts the digital power tracking signal to analog and provides an analog power tracking signal for all transmit signals. Although not shown in FIG. 5, a lowpass filter may receive and filter an output signal from DAC 584 and provide the analog power tracking signal. **A power supply generator 586 receives the analog power tracking signal and generates a power supply voltage for PA 560.**

## 4.   Feature 1.3

*"a power amplifier (PA) (560) configured to receive the single power supply voltage and all of the plurality of transmit signals for generating a single output radio frequency signal, RF signal."*

While Features 1/1.1 and 1.2 describe the generation of a power supply voltage (adapted to the various signals), Feature 1.3 concerns the power amplifier. This generates a single output radio frequency signal or RF signal from the (single) power supply voltage and the (multiple) transmit signals.

---

[2]   In communications engineering, the term modulation describes a process in which a useful signal to be transmitted (such as music, speech, data) changes (modulates) a so-called carrier. This enables high-frequency transmission (e.g. over mobile radio frequencies) of the low-frequency useful signal (e.g. voice). On the receiver side, the message is recovered by a demodulator.

03536-00006 / 21479791.8                                10                                Complaint of July 17, 2017
in the matter Qualcomm v. Apple et al.
LG Mannheim, case no. new

**MAUSER Exhibit 2**
**Page 65**

In the embodiment presented in the Patent in Suit, the plurality $I_1$ to $I_K$ components and $Q_1$ to $Q_K$ components are directed to both the power tracker and a plurality of transmit circuits (540a to 540k, within the transmit circuits the signal is being processed to obtain a RF signal, see paragraph [0035] to [0037]). The different RF signals from the multiple transmit circuits are summed by a summer (552) into a modulated RF signal, see the excerpt below from the Patent in Suit Specification (paragraph [0037]).

[0037]   Each remaining transmit circuit 540 may similarly process I and Q samples for a respective transmit signal and may provide an upconverted RF signal for the transmit signal. Up to K transmit circuits 540a to 540k may provide up to K upconverted RF signals at different RF frequencies for up to K transmit signals being sent simultaneously. A summer 552 receives the upconverted RF signals from transmit circuits 540a to 540k, sums the upconverted RF signals, and provides a modulated RF signal to PA 560.

The power amplifier receives both this RF signal (covering multiple individual signals) and the power supply voltage and from these forms a single output radio frequency, RF, signal.

[0039]   PA 560 amplifies the modulated RF signal from summer 552 using the power supply voltage from supply generator 586. PA 560 provides an output RF signal for all transmit signals being sent simultaneously. The output RF signal is routed through duplexer 570 and transmitted via antenna 590.

## C.
## Contested Embodiments and Infringing Actions

### I.
### Contested embodiments

1.    **Overview**

a)    Among other products, the Defendants offer the following mobile devices in Germany which make use of the technical teaching of the Patent in Suit (hereinafter also referred to as contested embodiments):

- Smartphones of the iPhone family: iPhone 7, iPhone 7 Plus.

The contested embodiments are offered among others on the website of the German Apple online store (freely retrievable at *https://www.apple.com/de/iphone/compare/*):

03536-00006 / 214797791.8                    11                    Complaint of July 17, 2017
in the matter Qualcomm v. Apple et al.
LG Mannheim, case no. new

**MAUSER Exhibit 2**
**Page 66**

iPhone 7 Plus        iPhone 7



*Excerpt from the Internet site https://www.apple.com/de/iphone/compare*

b)    This complaint contests all embodiments whose essential technical aspects, i.e. technical characteristics relevant for subsumption, are of such technical design as we will demonstrate and subsume below based on the functionality and technical features that the exemplary embodiments comprise.

## 2.    Design of the contested embodiments

a)    In addition, the contested embodiments have interfaces for wireless communication, which are specified in greater detail in the product description below on the aforementioned German website of the German Apple online store.

03536-00006 / 21479791.8                    12                    Complaint of July 17, 2017
in the matter Qualcomm v. Apple et al.
LG Mannheim, case no. new

**MAUSER Exhibit 2**
**Page 67**

iPhone 7 Plus        iPhone 7

Wireless technologies

| | |
|---|---|
| GSM/EDGE | GSM/EDGE |
| UMTS/HSPA+ | UMTS/HSPA+ |
| DC-HSDPA | DC-HSDPA |
| CDMA EV-DO Rev. A (some models) | CDMA EV-DO Rev. A (some models) |
| LTE Advanced (up to 450 Mbps)[6] | LTE Advanced (up to 450 Mbps)[6] |
| 802.11a/b/g/n/ac Wi-Fi with MIMO | 802.11a/b/g/n/ac Wi-Fi with MIMO |
| Bluetooth 4.2 | Bluetooth 4.2 |
| GPS and GLONASS | GPS and GLONASS |
| VoLTE | VoLTE |
| NFC | NFC |
| Wi-Fi calling[b] | Wi-Fi calling[b] |

*Excerpt from the Internet site https://www.apple.com/de/iphone/compare*

b)    The contested embodiments contain various chips. The following image from the Teardown report of the company TechInsights (see page 8), an excerpt of which we submit as

- **Exhibit K 3** -

shows the arrangement of the so-called radio block (the elements relevant for the radio connections) in the iPhone 7 Plus, and thus an example of the connections between different relevant hardware components:

03536-00006 / 21479791.8                    13                    Complaint of July 17, 2017
                                                                  in the matter Qualcomm v. Apple et al.
                                                                  LG Mannheim, case no. new

**MAUSER Exhibit 2**
**Page 68**



*Excerpt of Exhibit K 3*

## 3. Relevant functionality of the contested embodiments

As already described, the contested embodiments are able to communicate wirelessly. The contested embodiments use a device that with realization of the Patent in Suit's features enables a particularly efficient design of the "envelope tracking." The contested mobile terminals thus contain a device with efficient "envelope tracking" covered by the Patent in Suit in which an envelope signal, a power supply voltage and a power amplifier with power tracking are used.

## II.
## Infringing Actions

1. Defendant 1 is responsible for the German Apple online store and thus for internet sales of the contested wireless terminals in Germany. The website of the Apple online stores (freely retrievable at *http://www.apple.com/de/contact/*) states:

Offer and sale of articles through the Apple Online Store in Germany occur through Apple Distribution International.

In addition, Defendant 1 is explicitly named under "Contact" on the website (freely retrievable at *http://www.apple.com/de/contact/*):

03536-00006 / 21479791.8                    14                    Complaint of July 17, 2017
                                                                  in the matter Qualcomm v. Apple et al.
                                                                  LG Mannheim, case no. new

**MAUSER Exhibit 2**
**Page 69**

Apple Distribution
International

Last of all, it is expressly confirmed in the general terms and conditions of the Apple Online Store, freely retrievable at *https://www.apple.com/de/shop/open/salespolicies*, that Defendant 1 operates the Apple online store. It says there:

> *"The Apple Online Store, the mobile Apple store app, and the Apple contact center are operated by Apple Distribution International, a company under Irish law based in Hollyhill Industrial Estate, Cork, Ireland, registered in the Irish company register under registration number 470672."*

2. Defendant 2 operates the physical Apple retail stores in Germany and is thus also responsible for the distribution of the contested embodiments. A respective note is given expressly, for example, on the website of the German Apple Online Store (freely retrievable at *https://www.apple.com/de/*):

Offer and sale of articles in Apple Retail Stores in Germany occur through Apple Retail Germany B.V. & Co. KG.

Defendant 2 is also named in the general terms and conditions for the Apple stores, freely retrievable at *https://www.apple.com/legal/sales-support/sales-policies/retail_de.html*. It states there:

> *"The Apple stores do business as Apple Retail Germany B.V. & Co. KG ("Apple"), registered under HRB 88898 in the company register of Frankfurt/Main District Court and can be contacted under the address Apple Retail Germany B.V. & Co. KG, Eschenheimer Anlage 1, 60316 Frankft am Main."*

## D.
### Infringement Subsumption

The contested embodiments realize the independent device claim 1 literally. We will show the infringement of the Patent in Suit below using the iPhone 7 Plus as an example.

03536-00006 / 21479791.8          15          Complaint of July 17, 2017
in the matter Qualcomm v. Apple et al.
LG Mannheim, case no. new

**MAUSER Exhibit 2**
**Page 70**

1.      **Realization of Feature 1/1.1**

*"An apparatus (500, 502) comprising:*

*a power tracker (582) configured to determine a single power tracking signal based on a plurality of inphase (I) and quadrature (Q) components of all of a plurality of transmit signals being sent simultaneously"*

a)      The accused products have a so-called power tracker. The accused product contains the Intel PMB 5750 Multinode RF Transceiver (hereafter "**Intel PMB 5750**"), as shown in the figure below (marked as yellow rectangle).



*Excerpt of Exhibit K 3 (p. 8)*

Below is shown another excerpt from Exhibit K 3 showing now one side of the mainboard of the iPhone 7 Plus with an Intel PMB 5750 Chip (highlighted in red below).

03536-00006 / 21479791.8                    16                    Complaint of July 17, 2017
in the matter Qualcomm v. Apple et al.
LG Mannheim, case no. new

**MAUSER Exhibit 2**
**Page 71**



*Main board of the iPhone 7 Plus, excerpt from Exhibit K 3 (p. 71)*



*Enlargement of the Intel PMB 5750 rotated by 180°*

b)   The Intel PMB 5750 is configured to generate a single power tracking signal. This power tracking signal is based on the respective inphase (I) and quadrature (Q) components of the two transmit signals sent simultaneously. Inphase (I) and quadrature (Q) components are always used in the transmission of signals in the mobile radio range relevant here. The useful signal (e.g. voice or data) is converted to the I and Q components.

The Intel company, which manufactures the Intel PMB 5750, in various publications always assumes that the starting point for transmission of transmit signals and mobile terminals is inphase (I) and quadrature (Q) components.

03536-00006 / 214479791.8                                    17                                    Complaint of July 17, 2017
in the matter Qualcomm v. Apple et al.
LG Mannheim, case no. new

MAUSER Exhibit 2
Page 72

c)   The iPhone 7 Plus also demonstrably supports dual band operation, i.e. it can send transmit signals simultaneously on two different frequencies.

The iPhone 7 Plus thus contains a Broadcom/Avago FEM 8050 power amplifier (hereafter "**Broadcom/Avago FEM 8050**"). Below is shown another excerpt from Exhibit K 3 showing the other side of the main board of the iPhone 7 Plus with the Broadcom/Avago FEM 8050 (highlighted in red below).



*Main board of the iPhone 7 Plus, excerpt from Exhibit K 3 (p. 51)*



*Enlargement of the Broadcom/Avago FEM 8050 rotated by 180°*

03536-00006 / 21479791.8                18                Complaint of July 17, 2017
in the matter Qualcomm v. Apple et al.
LG Mannheim, case no. new

**MAUSER Exhibit 2**
**Page 73**

The Broadcom/Avago FEM 8050 was highlighted (yellow rectangle) in the schematic overview of the components relevant for radio transmissions depicted once again below.



*Excerpt from Exhibit K 3 (p. 8)*

d)   The following representation produces measurements at the output of the Broadcom/Avago FEM 8050 (i.e. the output radio frequency signal) of an iPhone 7. Transmit signals on two different carriers can be seen (marked 1 and 2), which are sent simultaneously adjacent to each other within the same band group. Accordingly, the iPhone 7 can simultaneously send transmit signals on two different frequencies. As the components of an iPhone 7 and those of an iPhone 7 Plus – as far as they are presently concerned – are identical, the measurements equally apply to an iPhone 7 Plus.

Complaint of July 17, 2017
in the matter Qualcomm v. Apple et al.
LG Mannheim, case no. new

MAUSER Exhibit 2
Page 74



*Graphical presentation of measurement of output radio frequency signal*
*at the output of the Broadcom/Avago FEM 8050 of an iPhone 7*

## 2.    Realization of Feature 1.2

*"a power supply generator (586) configured to generate a single power supply voltage based on the single power tracking signal"*

The contested embodiments also have a power supply generator. In the contested embodiments the **Qorvo 81003M** chip is the power supply generator in this sense.

a)    Below is shown another excerpt from Exhibit K 3 in which the Qorvo 81003M has been highlighted. In Exhibit K 3, the Qorvo 81003 M is labeled "#RF8129." However, the enlargement likewise depicted shows that the component was labeled "Qorvo 81003M."

Complaint of July 17, 2017
in the matter Qualcomm v. Apple et al.
LG Mannheim, case no. new

**MAUSER Exhibit 2**
**Page 75**



*Excerpt from Exhibit K 3 (p. 50)*



*Enlargement of the Qorvo 81003M rotated by 180°*

b)    The method of operation of the Qorvo 81003M in the Defendants' iPhone 7 and 7 Plus was investigated in a (further) detailed analysis by TechInsights. The component investigated by TechInsights comes from an iPhone 7 (model A1778). However, there are no differences from the component used in the iPhone 7 Plus. We submit an excerpt from the analysis of the Qorvo 81003M in

- Exhibit K 4 -.

03536-00006 / 21479791.8     21     Complaint of July 17, 2017
in the matter Qualcomm v. Apple et al.
LG Mannheim, case no. new

**MAUSER Exhibit 2
Page 76**

c)     Based on the schematic representation of the Qorvo 81003M on page 28 of the analysis, it can be seen that the component as power supply generator is configured to generate a single power supply voltage (in the overview shown as **EXT_OUT**) based on the single envelope signal – shown in the overview as **RF+** and **RF-**. RF+ and RF- are not different signals but merely inverted versions of the same signal.



*Figure 3.0 of Exhibit K 4 – Schematic representation of the Qorvo 81003M*

As can be seen from the following excerpt 1 of the schematic representation, the single envelope signal is passed to the "Envelope detector" at the RF+ and RF- inputs.

03536-00006 / 21479791.8                22                Complaint of July 17, 2017
in the matter Qualcomm v. Apple et al.
LG Mannheim, case no. new

**MAUSER Exhibit 2**
**Page 77**



*Excerpt 1 from Figure 3.0 of the schematic representation of the Qorvo 81003M*

*Exhibit K 4*

RF+ and RF- are identified in the annex to the descriptions of the individual ports as "*Envelope Tracker RF Input Pad*." RF stands for "radio frequency," i.e. high frequency. An "*Envelope Tracker RF Input Pad*" in the proper German translation is therefore an input pad for the radio frequency envelope tracking or input for a (radio) envelope signal.

As can be seen from the following excerpt 2 of the schematic representation, the "Envelope Detector" (shown on the left) is connected with the "DC-to-DC Converter."

03536-00006 / 21479791.8                    23                    Complaint of July 17, 2017
in the matter Qualcomm v. Apple et al,
LG Mannheim, case no. new

MAUSER Exhibit 2
Page 78



*Excerpt 2 from Figure 3.0 of the schematic representation of the Qorvo 81003M in Exhibit K 4 – connection between Envelope Detector and DC-To-DC Converter*

At the DC-to-DC Converter is the following marked output EXT_OUT.



*Excerpt 3 from Figure 3.0 of the schematic representation of the Qorvo 81003M in Exhibit K 4*

03536-00006 / 21479791.8                                24                            Complaint of July 17, 2017
                                                                                in the matter Qualcomm v. Apple et al.
                                                                                LG Mannheim, case no. new

**MAUSER Exhibit 2**
**Page 79**

In the annex to the descriptions of the individual ports, the EXT_OUT port is defined as "Envelope Tracker Output Pad," i.e. an envelope tracking output pad. A single power supply voltage is supplied to this output. This is based on the single envelope signal going into the RF+ and RF- ports.

d)      Repeat measurements have likewise confirmed that the Qorvo 81003M generates a single power supply voltage that is based on a single envelope signal. Depicted below is a measurement on an iPhone 7 – which again equally applies to an iPhone 7 Plus as well. Shown in brown is the measurement of the electrical voltage at the (single) output of the Broadcom/Avago FEM 8050 power amplifier, i.e. the single output RF signal. Shown in green is the single power supply voltage that was measured at the EXT_OUT port of the Qorvo 81003M.



*Graphic representation of measurement results in a test of the iPhone 7*

It can be seen from the measurement results that the power supply voltage (green) follows the output RF signal (brown). The Qorvo 81003M therefore generates the

03536-00006 / 214479791.8                           25                           Complaint of July 17, 2017
in the matter Qualcomm v. Apple et al.
LG Mannheim, case no. new

**MAUSER Exhibit 2**
**Page 80**

power supply voltage based on the envelope signal generated according to Feature 1/1.1.

3.      **Realization of Feature 1.3**

*"a power amplifier (PA) (560) configured to receive the single power supply voltage and all of the plurality of transmit signals for generating a single output radio frequency signal, RF signal."*

The contested embodiments also have a power amplifier configured to receive the single power supply voltage and all of the plurality of transmit signals for generating a single output radio frequency signal, RF signal.

a)      As shown above, the iPhone 7 Plus has the Broadcom/Avago FEM 8050 chip, which is a power amplifier within the meaning of Feature 1.3.

b)      The test results of measurements of a – with regard to the examined components identical – iPhone 7 displayed once again below illustrate that the Broadcom/Avago FEM 8050 power amplifier receives a single power supply voltage and supports a power amplification for the simultaneous sending of signals over a single output RF signal.

It was thus confirmed in the measurements that the Qorvo 81003M has a single power supply voltage that is applied to the EXT_OUT port shown above and is directed to the Broadcom/Avago FEM 8050 as the power amplifier (shown in green below). The Broadcom/Avago FEM 8050 receives this single power supply voltage and the plurality of transmit signals and from them generates a single output RF signal that it emits at its output. The curve shown in brown below reproduces the single output RF signal at the output of the Broadcom/Avago FEM 8050.

03536-00006 / 214797911.8                        26                        Complaint of July 17, 2017
in the matter Qualcomm v. Apple et al.
LG Mannheim, case no. new

**MAUSER Exhibit 2**
**Page 81**



*Graphic representation of measurement results in a test of the iPhone 7*

c)   It was already demonstrated with respect to Feature 1/1.1 that a plurality of transmit
     signals are processed. Reference is accordingly made once more to the following
     presentation of the measurement of the output RF signal at the output of the
     Broadcom/Avago FEM 8050 of an iPhone 7. Transmit signals on two different
     carriers can be seen (marked 1 and 2), which are sent simultaneously adjacent to each
     other within the same band group.

03536-00006 / 21479791.8                          27                          Complaint of July 17, 2017
                                                                             in the matter Qualcomm v. Apple et al.
                                                                             LG Mannheim, case no. new

**MAUSER Exhibit 2**
**Page 82**



*Graphical presentation of measurement of output RF signal at Broadcom/Avago*
*FEM 8050 output of an iPhone 7*

### E.
### Legal Analysis of the Actions

**1.     Standing to be sued**

Defendant 1, as mentioned above supra C.II.1., operates the Apple Online Store through which the contested embodiments are shipped to Germany; Defendant 2 operates the physical Apple stores in Germany (supra C.II.2.).

**2.     Legal consequences**

The asserted claims for injunctive relief, damages and accounting result legally from Sections 139, 140b of the German Patent Act (PatG) as well as from Section 242 of the German Civil Code (BGB); the recall and destruction claims are derived from Section 140a PatG.

a)     Offering the contested embodiments and putting them on the market is a direct infringement that constitutes a risk of repetition for the injunction claim according to Section 139 (1) in conjunction with Section 9 PatG.

03536-00006 / 21479791.8                                28                          Complaint of July 17, 2017
in the matter Qualcomm v. Apple et al.
LG Mannheim, case no. new

**MAUSER Exhibit 2**
**Page 83**

b)  To be able to quantify the damage incurred in the future, the Plaintiff also has an information and accounting claim resulting from Sections 140b PatG, 242 BGB.

c)  The claim for destruction of the contested embodiments results from Section 140a (1) 1 PatG. In addition to Defendant 2, Defendant 1 is also liable under Section 140a (1) 1 PatG, since it was at least in indirect possession of the contested embodiments it distributed until these were delivered to the buyer. The general terms and conditions of the Apple online store, for which Defendant 1 is responsible as shown by the website of the Apple Online Store (freely retrievable at *https://www.apple.com/de/shop/open/salespolicies*), state with respect to shipment and delivery:

> *"Apple is responsible for delivering the products purchased in the Apple store; the risk of loss and damage for the product(s) passes to the buyer as soon as the product(s) have physically come into the buyer's possession or into the possession of a person buyer has specified."*

d)  The claim for recall and removal from distribution channels with regard to both Defendants results from Section 140a (3) PatG.

e)  Since the Defendants are to blame for negligent behavior with respect to the infringing actions that have occurred, they are also liable for damages under Section 139 (2) PatG. Had the Defendants used due diligence, the Defendants could have realized no later than one month after the mention of the grant of the Patent in Suit was published that the Patent in Suit is infringed by the contested embodiments, since they were obligated to keep themselves informed of the patent situation in the technical field they work in with their products. Since the Plaintiff is currently not in a position to quantify the claims for damages, the request for declaratory judgment under Section 256 ZPO is justified.

## F.
## Miscellaneous

1.  The Mannheim Regional Court is the locally competent court for Defendant 1 since the offers are made throughout Germany, Sections 32 ZPO, 143 (2) (2) PatG, in conjunction with Section 14 of the Court Jurisdiction Ordinance of 11/20/1998.

03536-00006 / 21479791.8                                29                    Complaint of July 17, 2017
in the matter Qualcomm v. Apple et al.
LG Mannheim, case no. new

**MAUSER Exhibit 2**
**Page 84**

2.      The Mannheim Regional Court is also the locally competent court for Defendant 2, since it operates an Apple store in Sindelfingen, Baden Württemberg (cf. Section 14 of the Court Jurisdiction Ordinance).

3.      We are stating an estimated preliminary amount in controversy of EUR 10 Million. We enclose an account-only check to cover the required advance deposit for court fees in the amount of EUR 113,208.00.

4.      A certified translation of the complaint for service will be submitted in due course.


(Dr. Marcus Grosch)
Attorney at Law


Exhibits
K 1 to K 4


*This is to certify that the above text is*
*the complete translation of and in strict*
**conformity with the German original**



Complaint of July 17, 2017
in the matter Qualcomm v. Apple et al.
LG Mannheim, case no. new

**MAUSER Exhibit 2**
**Page 85**

# EXHIBIT 3

*CONVENIENCE TRANSLATION*

Munich I District Court
Patent Litigation Chambers
80316 Munich

| | | |
|---|---|---|
| Our reference | 03536-00006 / 21482897.1<br>MG/JE/DB | Dr. Marcus Grosch, LL.M. (Yale)<br>marcusgrosch@quinnemanuel.com |
| | | Dr. Jan Ebersohl<br>janebersohl@quinnemanuel.com |
| | | Denise Benz<br>denisebenz@quinnemanuel.com |

17 July 2017

**Complaint**

In the dispute

**Qualcomm Inc.**, 5775 Morehouse Drive, San Diego, CA 92121, USA, represented by its CEO Steve Mollenkopf, ibid,

- Plaintiff -

<u>Attorney of record:</u> The attorneys-at-law of Quinn Emanuel Urquhart & Sullivan, LLP, licensed to practice in Germany, in particular Dr. Marcus Grosch and Dr. Jan Ebersohl, Hermann-Sack-Straße 3, 80331 Munich, Germany,

**Case No.: new**
4 certified copies and
2 uncertified copies attached

v e r s u s

**1. Apple Distribution International ULC**, Hollyhill Industrial Estate, Hollyhill, Cork, Ireland, legally represented by its directors Cathy Kearney, Michael O'Sullivan and Gene Daniel Levoff, ibid

- Defendant no. 1 -

**2. Apple Retail Germany B.V. & Co. KG**, Eschenheimer Anlage 1, 60316 Frankfurt am Main, legally represented by its general partner Apple Holding B.V., Leidseplein 29, Amsterdam 1017PS, Netherlands, represented by its

*CONVENIENCE TRANSLATION*

directors Alexander Niemczyk and Michael Joseph Boyd, ibid

- Defendant no. 2 -

for patent infringement (EP 2 724 461)

we represent the Plaintiff, for whom and on behalf of which we are filing a legal action against the Defendants with the following <u>prayers for relief</u>:

I.     That the Defendants be ordered

1.     on penalty of an administrative fine of up to EUR 250,000 to be determined by the court for every case of violation, alternatively imprisonment for contempt of court, or imprisonment for contempt of court of up to six months, in the event of repeated violation of up to a total of two years, whereas imprisonment for contempt of court is to be enforced upon the legal representatives of the Defendants,

<u>to refrain from offering, putting on the market or utilizing, or importing or stocking for the above-named purposes in the Federal Republic of Germany,</u>

apparatuses

comprising:

an inductor operative to receive a switching signal and provide a supply current;

a switcher operative to sense an input current and generate the switching signal to charge and discharge the inductor to provide the supply current, the switcher adding an offset to the input current to generate a larger supply current via the inductor than without the offset;

an envelope amplifier operative to receive an envelope signal and provide a second supply current based on the envelope signal, wherein a total supply current comprises the supply current from the switcher and the second supply current from the envelope amplifier; and

a boost converter operative to receive a first supply voltage and provide a boosted supply voltage having a higher voltage than the first supply voltage, wherein the envelope amplifier selectively operates based on the first supply voltage or the boosted supply voltage.

(claim 1, direct infringement),

especially when

the switcher operates based on a first supply voltage, and wherein the offset is determined based on the first supply voltage

(claim 2, direct infringement),

Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new

**MAUSER Exhibit 3**
**Page 88**

*CONVENIENCE TRANSLATION*

and/or especially when

the switcher comprises:

a summer operative to sum the input current and an offset current and provide a summed current,

a current sense amplifier operative to receive the summed current and provide a sensed signal, and

a driver operative to receive the sensed signal and provide at least one control signal used to generate the switching signal for the inductor

(claim 3, direct infringement),

the latter especially when

the at least one control signal comprises a first control signal and a second control signal, and wherein the switcher further comprises:

a P-channel metal oxide semiconductor (PMOS) transistor having a gate receiving the first control signal, a source receiving a first supply voltage, and a drain providing the switching signal, and

an N-channel metal oxide semiconductor (NMOS) transistor having a gate receiving the second control signal, a drain providing the switching signal, and a source coupled to circuit ground

(claim 4, direct infringement);

and/or especially when

the apparatus further comprises:

a power amplifier operative to receive the supply current from the inductor and to receive and amplify an input radio frequency (RF) signal and provide an output RF signal

(claim 5, direct infringement);

2.   to inform Plaintiff about the extent to which the Defendants committed the acts described under Section I.1. since 9 September 2017, and to specifically detail

  a)   the names and addresses of the manufacturers, suppliers, and other prior possessors,

  b)   the names and addresses of the commercial customers and retail outlets for which the products were intended,

  c)   the quantity of goods manufactured, delivered, received, and ordered and the prices paid for the respective products;

Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new

**MAUSER Exhibit 3**
**Page 89**

*CONVENIENCE TRANSLATION*

with copies of the relevant purchasing and sale documents (namely invoices, in the alternative delivery notes) to be submitted as evidence, whereby confidential details not part of the data to be disclosed may be redacted;

3.   to render accounts to the Plaintiff in writing in an orderly form (subdivided by calendar quarters) as to the scope in which the Defendants have carried out the actions described under Section I.1. since 9 September 2017, and to specifically detail

   a)   the quantities of goods received or ordered,

   b)   the individual deliveries (specifying the brands of the respective products and all identifying characteristics such as model designation, product designation, product serial number), itemized by the quantities delivered, times of delivery, and delivery prices (and model designations where available), as well as the names and addresses of customers including retail outlets for which the products were intended,

   c)   the individual offers (specifying the brands of the respective products and all identifying characteristics such as model designation, product designation, product serial number), itemized by the quantities offered, times of offer, and offer prices (and model designations where available), as well as the names and addresses of the offerees,

   d)   the advertising that was done, broken down by advertising media, their circulation, distribution period, and distribution area,

   e)   the production costs broken down by the individual cost factors and the profit that was obtained,

with copies of the relevant documents (notably delivery notes) to be submitted as evidence of the details of the information provided under b), whereby confidential details not part of the data to be disclosed may be redacted,

whereby the Defendants retain the right to notify a sworn accountant, based in the Federal Republic of Germany and to be designated by the Plaintiff and obliged towards them to confidentiality, of the names and addresses of the non-commercial customers and the offerees, provided that the Defendants bear the associated costs and authorize and obligate him to communicate to the Plaintiff upon specific request whether a particular customer or offeree is contained in the list;

4.   to destroy the goods in their direct and/or indirect possession and/or ownership designated in Section I.1. located in the Federal Republic of Germany at their own expense, or alternatively hand them over to a Bailiff to be appointed or designated by the Plaintiff for the purpose of destruction at the expense of the Defendants;

5.   to recall the products designated under Section I.1. put into the market and in the possession of third parties from the distribution channels,

by making a serious request for this, with notice that the Court found infringement of the Patent in Suit with the local ruling, to the third parties who were given possession of the products by the Defendants or with their consent to return the products to the Defendants and by promising the third parties repayment of any purchase price that may have already

03536-00006/21482897.1                                    4                    Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new

**MAUSER Exhibit 3**
**Page 90**

*CONVENIENCE TRANSLATION*

been paid and an assumption of the costs of the return in the case that the products are returned.

II.     It is found that the Defendants are obliged to compensate the Plaintiff for all damage they incurred and will incur in the future due to the acts of the Defendants cited under Section I.l. since 9 September 2017.

III.    The Defendants shall bear the costs of the litigation.

We ask that the security be separately specified for each enforceable part of the operative provisions of the ruling.

## Grounds:

With the present complaint the Plaintiff defends itself against infringement of the German designation of European Patent EP 2 724 461 (patent in suit) by the Defendants. The Defendants infringe upon the patent in suit by distributing wireless communication devices, particularly smartphones of the type iPhone 7 and iPhone 7 Plus domestically.

We structure our submission as follows:

A.     Regarding the parties

B.     Regarding the patent in suit

C.     Regarding the accused products and acts of infringement

D.     Regarding the subsumption of infringement

E.     Regarding the legal assessment

F.     Miscellaneous

## A.
## Regarding the parties

## I.
## Regarding the Plaintiff

The Plaintiff is an American company based in San Diego, California. It is one of the world's leading research and development companies in the field of semiconductor and chip manufacturing, and produces corresponding products, particularly for the communications and computer industry.

03536-00006/21482897.1                          5                    Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new

*CONVENIENCE TRANSLATION*

## II.
### Regarding the Defendants

1.      The Defendant no. 1 is an Irish subsidiary of the Apple Inc. based in Hollyhill, Cork, Ireland. It is responsible for the German Apple Online Store (accessible for everybody at *http://www.apple.com/de/*), as well as the Apple Contact Center.

2.      The Defendant no. 2 operates the physical Apple retail stores in Germany. Its general partner is the company Apple Holding B.V. based in Amsterdam in the Netherlands. A B.V. is a Dutch limited liability company. The limited partner is the company Apple Retail Europe Holding, based in Hollyhill, Cork, Ireland.

## B.
### Regarding the patent in suit

In the following, we will first discuss the status of the register (**under I**). We will then address the technical background of the teaching of the patent in suit (**under II**). Following this, we will describe the object and solution of the patent in suit (**under III**), and finally we will discuss the subject matter of the claimed teaching (**under IV**).

## I.
### Overview

1.      The patent in suit is the European patent EP 2 724 461, which was filed on 24 June 2012, claiming the priority of 23 June 2011 (US 13/167,659). The European Patent Office declared on 20 April 2017 the intention to grant the patent in suit. We are submitting a copy of the version of the specification of the patent in suit which the European Patent Office intends to grant (in triplicate for the Court) as

**- Exhibit K 1 -**

On 26 June 2017, the plaintiff paid the fee for issuance of the patent in suit and submitted translations of the patent claims into the German and French language to the European Patent Office. On 13 July 2017, the European Patent Office rendered its decision to grant the patent in the version presented as Exhibit K 1; the publication of the grant will take place 9 August 2017.

Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new

**MAUSER Exhibit 3**
**Page 92**

*CONVENIENCE TRANSLATION*

2.    The plaintiff is the applicant of the patent in suit and will be the registered owner of the patent following issuance. Germany is one of the designated member states. The file number, under which the German designation of the patent in suit asserted in this complaint will be registered with the German Patent and Trademark Office, will be submitted in due course.

## II.
### Regarding the technical background:

1.    The patent in suit deals with the provision of a power supply for electrical amplifiers, in particular for the purpose of transmitting electrical signals.

2.    The transmission of information via the air interface typically involves converting the information into a high-frequency signal (also referred to as RF signal, where "RF" stands for the English term "radio frequency") and then transmitting it to a receiver via a communication channel. The RF signal is amplified by a power amplifier (cf. para. [0002] et seq. of the patent in suit specification), which process requires electrical energy. Particularly in the case of mobile devices, which are operated with a (rechargeable) battery, electrical energy is a scarce resource. Since users want long operating times of the mobile device, an efficient use of the available energy is required. The operating time of the device on the one hand and the performance of the device on the other hand – the latter also including the amplification for the transmission of the RF signal – must be reconciled with one another.

3.    Against this background, the patent in suit describes it as desirable for the power amplifier to be able to provide high output power and have high power-added efficiency. This should apply even at a low battery voltage. In this connection, the patent in suit mentions prior art in which combined switched-linear envelope tracking supplies for RF power amplifiers would be known (cf. para. [0003] of the patent in suit specification).

4.    The envelope tracking technology addressed in para. [0003] is a possible means of optimizing the power-added efficiency of high-frequency power amplifiers. Here, the energy supplied to the RF power amplifier is adjusted in a signal-specific manner with regard to the required real-time output power.

a)    The background of this technology is that the energy requirements for the transmission of high-frequency electrical signals are dependent on the signal itself,

Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new

**MAUSER Exhibit 3**
**Page 93**

notably the amplitude of the signal. An envelope depicts the course of the amplitude, as can be seen from the following schematic illustration of such an envelope (red line):



b)   Since the energy requirements for the amplification and transmission of the signal decreases and increases in accordance with the envelope, an envelope-specific amplification can be used to increase the efficiency due to the fact that a power supply can be provided for the power amplifier that is adapted to the actual power requirements. This is particularly relevant when applying more complex modulation schemes in which the amplitude information are part of the modulation, since no energy efficiency can generally be achieved here through compression. This is for instance the case in modern mobile radio communication networks, e.g. using LTE technology.

c)   The effect of the envelope tracking is shown schematically in the figure below. The same signal is amplified once with linear voltage supply (left image) and once on the basis of envelope tracking (right image).

Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new

*CONVENIENCE TRANSLATION*



The surfaces marked in red show the superfluously applied energy that is dissipated as heat. In the linear voltage supply, a value must be chosen that is sufficient even at maximum amplitude. This voltage is also applied when the signal has a lower amplitude, meaning that unnecessary energy is expended. This can be reduced by tracking the envelope, as the right image schematically represents.

### III.
### Regarding the object and solution of the patent in suit

Against this technical background and in view of the cited prior art, the patent in suit teaches an energy-efficient device for providing a power supply.

Independent device claim 1 can be structured as follows in the binding <u>English-language version</u>:

1.      *An apparatus comprising:*

    1.1      *an inductor operative to receive a switching signal and provide a supply current; and*

    1.2      *a switcher operative to sense an input current and generate the switching signal to charge and discharge the inductor to provide the supply current,*

        1.2.1    *the switcher adding an offset to the input current to generate a larger supply current via the inductor than without the offset.*

    1.3      *a boost converter operative to receive a first supply voltage and provide a boosted supply voltage having a higher voltage than the first supply voltage,*

    1.4      *an envelope amplifier operative to receive an envelope signal and provide a second supply current based on the envelope signal,*

Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new

*CONVENIENCE TRANSLATION*

> 1.4.1   *wherein the envelope amplifier selectively operates based on the first supply voltage or the boosted supply voltage.*

> 1.5   *wherein a total supply current comprises the supply current from the switcher and the second supply current from the envelope amplifier.*

Translated into German:

> [*German translation follows*]

Claim 2 can be structured as follows in the binding English-language version:

> 2.   *The apparatus of claim 1, wherein the switcher operates based on the first supply voltage, and wherein the offset is determined based on the first supply voltage.*

Translated into German:

> [*German translation follows*]

Claim 3 can be structured as follows in the binding English-language version:

> 3.   *The apparatus of claim 1 wherein the switcher comprises*

> 3.1   *a summer operative to sum the input current and an offset current and provide a summed current,*

> 3.2   *a current sense amplifier operative to receive the summed current and provide a sensed signal, and*

> 3.3   *a driver operative to receive the sensed signal and provide at least one control signal used to generate the switching signal for the inductor.*

Translated into German:

> [*German translation follows*]

Claim 4 can be structured as follows in the binding English-language version:

> 4.   *The apparatus of claim 3*

> 4.1   *wherein the at least one control signal comprises a first control signal and a second control signal, and*

> 4.2.   *wherein the switcher further comprises*

03536-00006/21482897.1                                    10                            Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new

MAUSER Exhibit 3
Page 96

    4.2.1   *a P-channel metal oxide semiconductor, PMOS, transistor having a gate receiving the first control signal, a source receiving a first supply voltage, and a drain providing the switching signal, and*

    4.2.2.  *an N-channel metal oxide semiconductor, NMOS, transistor having a gate receiving the second control signal, a drain providing the switching signal, and a source coupled to circuit ground.*

Translated into German:

    [*German translation follows*]

Claim 5 can be structured as follows in the binding English-language version:

5.    *The apparatus of claim 1 further comprising: a power amplifier operative to receive the supply current from the inductor and to receive and amplify an input radio frequency, RF, signal and provide an output RF signal.*

Translated into German:

    [*German translation follows*]

We are submitting the above feature analysis (in triplicate for the Court) in bilingual form (English/German) as

          **- Exhibit K 2 -.**

## IV.
## The teaching of the patent in suit

1.    The apparatus according to independent claim 1 of the patent in suit makes possible a particularly efficient provision of energy, e.g. for an RF power amplifier, through its components – in particular an inductor, a switcher, a boost converter and an envelope amplifier – and their potential interaction.

2.    The basic principles of the teaching according to the patent in suit shall first be explained using the example of Figure 1, reproduced below:

03536-00006/21482897.1          11          Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new

**MAUSER Exhibit 3**
**Page 97**

*CONVENIENCE TRANSLATION*



*FIG. 1*

Two supply currents are provided by the claimed apparatus: a switcher (160) provides a first supply current (feature 1.1), and an envelope amplifier (170) provides a second supply current (feature 1.4). The total supply current comprises the first and second supply currents (feature 1.5). This is supplied to a power amplifier (130) in the exemplary embodiment shown in Figure 1.

a)    The envelope amplifier (170) receives an envelope signal from the modulator (112), that is to say a signal which tracks the amplitudes of the signal to be transmitted. This enables the signal-specific and thus energy-efficient provision of the <u>second supply current</u>. The use of a boost converter (180) allows the envelope amplifier to be operated either with a first voltage (in the exemplary embodiment the battery voltage Vbat) or with a boosted voltage (Vboost) that is increased by the converter (feature 1.3). The selective use of a boosted current – especially only when there is actual demand – enables a particularly efficient use of existing energy resources.

b)    The inductor through which the <u>first supply current</u> is being provided may receive a switching signal. This switching signal is provided by the switcher (160), and serves to induce the charging and discharging of the inductor (feature 1.2). The switcher can sense an input current (Isen) (feature 1.2). As indicated in Figure 5, which pertains to an exemplary embodiment of the patent in suit and is reproduced below, the sensed

03536-00006/21482897.1                                    12                        Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new

**MAUSER Exhibit 3**
**Page 98**

*CONVENIENCE TRANSLATION*

current can be, for example, the current (Ienv) output by the envelope amplifier, which is sensed by a sensor (164):



**FIG. 5**

In this manner, the provision of the first supply current through the inductor – which is in turn controlled by the switcher – can be carried out under consideration of the second supply current provided by the envelope amplifier, thus allowing a further efficiency increase of the use of available energy resources.

c)      In summary, the teaching of the patent in suit enables particularly efficient signal amplification by virtue of its components and their interaction. This is achieved in particular by (1) the use of an envelope amplifier which allows a signal-specific and thus energy-efficient amplification (2) the use of a boost converter which allows the envelope amplifier to selectively operate based on a first voltage (e.g. battery voltage) or a boosted voltage, and (3) the use of an inductor and a switcher which provide a further supply current in addition to the envelope amplifier, and are thereby able to operate adaptively and thus energy-efficiently by sensing an input current, e.g. at the output of the envelope amplifier.

3.      There follows a detailed description of selected individual features of independent device claim 1 and their content:

*1.1      an inductor operative to receive a switching signal and provide a supply current;*

03536-00006/21482897.1                                        13                        Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new

**MAUSER Exhibit 3**
**Page 99**

*CONVENIENCE TRANSLATION*

An inductor is a component which can store and dispense current, cf. para. [0019] of the patent in suit specification: "*Inductor 162 stores current from switcher 160 and provides the stored current to node A on alternating cycles.*" According to the claim, this storage or charging and dispensing or discharging takes place based on a switching signal that is generated by a switcher.

1.2    *a switcher operative to sense an input current (Isen) and generate the switching signal to charge and discharge the inductor to provide the supply current,*

1.2.1   *the switcher adding an offset to the input current to generate a larger supply current via the inductor than without the offset;*

The switcher adds an offset to the input current according to feature 1.2.1. According to the claim, this ensures that the supply current generated via the inductor is larger than a supply current without offset.

The use and mode of operation of a <u>switcher</u> in accordance with the claim are described by way of example in para. [0031] of the specification. According to this, the switcher is in the "On" state when a high output current from the envelope amplifier is sensed. As long as the switcher is in the "On" state, the current through the inductor rises. When a low output current from the envelope amplifier is sensed, the switcher is in the "Off" state, and the inductor is discharged and provides the stored energy to the power amplifier.

The embodiment in para. [0041] describes an exemplary implementation of the <u>offset</u> according to the patent in suit, which is added by the switcher. To illustrate, we are reproducing once more Figure 5 of the patent in suit below:

03536-00006/21482897.1                                   14                         Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new

**MAUSER Exhibit 3
Page 100**



*FIG. 5*

The switcher 160b receives the current Isen sensed by the envelope amplifier and adds an offset current in the summer 328. By means of the offset current, the current provided by the summer 328 to the current sensing amplifier 330 is <u>lower</u> than the current sensed by the sensor 164 directly at the envelope amplifier. As described above, a sensed low current from the envelope amplifier causes the switcher to be in the "On" state, whereby the current via the inductor increases and thus the first supply current. Thus, the offset can be used to deliberately cause the switcher to remain in the "On" state longer than without the offset, resulting in an increase in the first supply current provided through the inductor compared to an apparatus without offset (cf. para. [0041] of the patent in suit specification: "*Summer 328 intentionally reduces the Isen current provided to current sense amplifier 330, so that switcher 160 is turned On for a longer time period and can provide a larger Iind current, which is part of the Ipa current provided to power amplifier 130.*"). The patent in suit describes several exemplary criteria for the use of the offset; for instance, a fixed value can be selected or the offset can be selected variably as a function of the battery voltage or the envelope signal. Thus, with the use of the offset a further means for the efficient deployment of energy is provided.

Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new

**MAUSER Exhibit 3**
**Page 101**

*CONVENIENCE TRANSLATION*

**C.**
**Regarding the accused products and acts of infringement**

**I.**
**Regarding the accused products**

1.    In Germany, the Defendants are offering, among others, the following mobile devices that make use of the technical teaching of the Patent in Suit (hereinafter also referred to as: "Accused Products"):

- Smartphones of the iPhone family: iPhone 7 and iPhone 7 Plus;

The Accused Products are offered on, inter alia, the website of the German Apple Online Store (accessible for everybody at https://www.apple.com/de/iphone/compare/):



2.    They include, among others, the Qorvo 81003M chip (also referred to as: "the chip"), which is a so-called "envelope tracking" module. The following photograph from a teardown report of the company TechInsights, titled "Circuit Vision Analysis on the Qorvo 81003M Envelope Tracker", which we submit in excerpts as

**- Exhibit K 3 -,**

shows the implementation of the chip in the smartphone model iPhone 7:

03536-00006/21482897.1                16                Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new

**MAUSER Exhibit 3**
**Page 102**

*CONVENIENCE TRANSLATION*



*Photograph 2.3.7: Close up image highlighting the Qorvo 81003M envelope tracker device*

(*Exhibit K 3, Photograph 2.3.7*)

As per the present report, the chip is integrated in the area of the high-frequency front-end of the iPhone 7:



*Photograph 2.3.6: Image of the iPhone 7 PCB board (back)*

(*Exhibit K 3, Photograph 2.3.6*)

03536-00006/21482897.1                    17                    Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new

**MAUSER Exhibit 3**
**Page 103**

*CONVENIENCE TRANSLATION*

As can further be gathered from the following image from a further teardown report of the company TechInsights, which we present in excerpts as

**- Exhibit K 4 -,**

also the smartphone model iPhone 7 Plus includes the chip of the type Qorvo 81003M:



*(Exhibit K 4, Photograph p. 50, deletions made by us)*

This chip in the form of a semiconductor chip contains an integrated circuit, i.e., an electronic switch.

3.   The legal action is contesting all products that are designed in the relevant technical aspects, that is to say in the technical characteristics relevant for the subsumption, as we will demonstrate and subsume in the following (**sub D**) with reference to the functionality and technical features that the exemplary products comprise.

03536-00006/21482897.1                                    18                        Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new

**MAUSER Exhibit 3**
**Page 104**

*CONVENIENCE TRANSLATION*

## II.
### Regarding the acts of infringement

1.  The Defendant no. 1 is responsible for the German Apple Online Store, and is therefore responsible for Internet sales of the contested wireless terminals in Germany. The following statement is present on the Apple Online Store website (available for everybody at *http://www.apple.com/de/*):

> Angebot und Verkauf von Artikeln über den Apple Online Store in Deutschland erfolgen durch Apple Distribution International.

[The offer and sale of articles via the Apple Online Store in Germany take place through Apple Distribution International.]

In addition, it is explicitly referred to under "Contact" on the website (accessible for everybody at *https://www.apple.com/de/contact/*):

> **Apple Corporate Information**
>
> **Apple Distribution International**
>
> Hollyhill Industrial Estate
> Hollyhill, Cork
> Republic of Ireland
>
> contactus.de@euro.apple.com
>
> Registration number: 470672
> Registered at the Companies
> Registration Office, Ireland

Finally, the general terms and conditions of the Apple Online Store, which are accessible for everybody at https://www.apple.com/de/shop/open/salespolicies, expressly confirm that the Defendant no. 1 operates the Apple Online Store. It says there:

> *"The Apple Online Store, the mobile Apple Store App, and the Apple Contact Center are all operated by Apple Distribution International, a company incorporated under Irish law, with headquarters at Hollyhill Industrial Estate, Hollyhill, Cork, Ireland registered in the Irish company register under number 470672."*

2.  The Defendant no. 2 operates the physical Apple retail stores in Germany, and is therefore also responsible for the distribution of the Accused Products. A corresponding, express statement is present on the website of the German Apple Online Store (accessible for everybody at https://www.apple.com/de/):

> Angebot und Verkauf von Artikeln in Apple Retail Stores in Deutschland erfolgen durch die Apple Retail Germany B.V. & Co. KG.

Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new

**MAUSER Exhibit 3**
**Page 105**

*CONVENIENCE TRANSLATION*

[The offer and sale of articles in Apple Retail Stores in Germany take place through Apple Retail Germany B.V. & Co. KG.]

Furthermore, the Defendant no. 2 is referred to in the general terms and conditions for the Apple Store, which are accessible for everybody at https://www.apple.com/legal/sales-support/sales-policies/retail_de.html. The document states:

> "*The Apple Stores trade under Apple Retail Germany B.V. & Co. KG ("**Apple** ") registered under HRB 88898 at the Frankfurt am Main Local Court and can be contacted at the address Apple Retail Germany B.V. & Co. KG, Eschenheimer Anlage 1, 60316 Frankfurt am Main, Germany.* "

## D.
### Regarding the subsumption of infringement

The report of the company TechInsights, submitted as Exhibit K3, confirms that the Accused Products with the implemented Qorvo 81003M chip (hereinafter also "Qorvo chip") realize all of the features of independent device claim 1. The Accused Products, especially the devices of the type iPhone 7 and iPhone 7 Plus cited by way of example, are devices in accordance with the patent in suit which, through the use and interplay of the components in accordance with the claim – such as an inductor, a switcher, an envelope amplifier and a boost converter – make use of the teaching of the patent in suit and literally infringe the patent in suit in the scope of claim 1 – and moreover in the scope of dependent claims 2-5.

We are reproducing diagram 3.1 from Exhibit K3 below:

Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new

*CONVENIENCE TRANSLATION*



This indicates that the Qorvo chip comprises, inter alia, a boost converter, an envelope detector and a DC-to-DC converter. As will be shown below, these components serve to implement the teaching of the patent in suit, down to the details of the exemplary embodiments of the patent in suit. We will first discuss the infringement in the scope of independent claim 1 (**under I**) and then the dependent claims (**under II**).

**I.**
**Regarding the infringement in the scope of independent device claim 1**

**1.     Regarding the realization of features 1 and 1.1**

*"An apparatus comprising: an inductor operative to receive a switching signal and provide a supply current"*

The Accused Products are apparatuses comprising an inductor in accordance with the claim. In the following, we are reproducing Figure 3.4 of Exhibit K3 with color highlighting added. This is a schematic of the DC-to-DC converter:

Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new



*Exhibit K3, Figure 3.4 (highlighting added)*

The area bordered in black is enlarged below:



*Exhibit K3, Figure 3.4 (highlighting added)*

03536-00006/21482897.1                22                Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new

**MAUSER Exhibit 3**
**Page 108**

*CONVENIENCE TRANSLATION*

The inductor in accordance with the claim is shown here in the area bordered in red, comprising two components (which are again analyzed in detail in Figure 4.24 of Exhibit K3). The inductor receives, via the conductor path marked in green, the switching signal in accordance with the claim that is output by the driver (which is again analyzed in detail in Figure 3.4.2 of Exhibit K3). The inductor provides a supply current (whose flow direction is marked in blue). Features 1 and 1.1 are therefore realized.

2. **Regarding the realization of feature 1.2**

    *"switcher operative to sense an input current (Isen) and generate the switching signal to charge and discharge the inductor to provide the supply current"*

    The Accused Products also comprise a switcher in accordance with the claim. Below, we are again reproducing Figure 3.4 provided with (different) color markings, which graphically represents the DC-to-DC converter of the Qorvo chip.



*Exhibit K3, Fig. 3.4 (highlighting added)*

03536-00006/21482897.1      23      Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new

**MAUSER Exhibit 3
Page 109**

The area outlined in purple is the switcher in accordance with the patent in suit. It comprises a yellow-bordered voltage regulator block, which is analyzed in detail in Figure 3.4.6 of Exhibit K3. We are reproducing this Figure below with color highlighting:



*Exhibit K3, Fig. 3.4.6 (highlighting added)*

The voltage regulator block in turn comprises a voltage generator block, the output of which is analyzed in detail in Figure 3.4.6.8.3 of Exhibit K3. We are reproducing this Figure below with color highlighting:



*Exhibit K3, Figure 3.4.6.8.3 (highlighting added)*

The voltage generator block represents an envelope amplifier in accordance with the claim. It includes the current sensor outlined with an oval in the above figure (referred to as

03536-00006/21482897.1         24         Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new

**MAUSER Exhibit 3
Page 110**

*CONVENIENCE TRANSLATION*

"replica current sensing stage"). The latter passes the sensed envelope current to the comparison unit ("comparator") marked in red in Figure 3.4.6 as reproduced above.

**3.      Regarding the realization of feature 1.2.1**

*"the switcher adding an offset to the input current to generate a larger supply current via the inductor than without the offset"*

In the following, we are again reproducing Figure 3.4.6 of Exhibit K3 with color highlighting added.



*Exhibit K3, Fig. 3.4.6 (highlighting added)*

The voltage regulator block comprises a (blue-bordered) digital-to-analog converter (DAC) that controls the offset. In the following, we are reproducing a detailed view (portion of Figure 3.4.6.6 of Exhibit K3) with color highlighting added.

03536-00006/21482897.1                          25                          Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new

**MAUSER Exhibit 3**
**Page 111**

*CONVENIENCE TRANSLATION*



*Exhibit K3, Figure 3.4.6.6 (highlighting added)*

The digital-to-analog converter, via the programmable current sink (bordered in green) or the programmable current source (bordered in red), adjusts the current (in the programmable current sink bordered in green) and outputs it at the VG-VOUT1 connection to the aforementioned current sensing unit ("replica current sensor"). This current is then fed into the comparator, which generates the switching signal for the switcher. By adjusting the current, an offset in accordance with the patent in suit is added.

## 4.    Regarding the realization of feature 1.3

*"a boost converter operative to receive a first supply voltage and provide a boosted supply voltage having a higher voltage than the first supply voltage"*

Figure 3.0 of Exhibit K3 reproduced below shows that the Accused Products comprise a (red-bordered) boost converter, which is also designated as such in the report.

03536-00006/21482897.1                                    26                     Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new

**MAUSER Exhibit 3
Page 112**

*CONVENIENCE TRANSLATION*



*Exhibit K3, Figure 3.0 (highlighting added)*

Below we are reproducing an enlarged section with color highlighting added:



*Exhibit K3, Figure 3.0 (highlighting added)*

Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new

The boost converter receives the first supply voltage (e.g. VDD2_EX, blue) and provides an output voltage (e.g. VDD3, green), which – depending on whether the boost converter is currently boosting the voltage or not – can be a boosted supply voltage.

**5.     Regarding the realization of feature 1.4**

*"an envelope amplifier operative to receive an envelope signal and provide a second supply current based on the envelope signal"*

The aforementioned voltage generator block of the Accused Products constitutes an envelope amplifier in accordance with the claim. In the following, we are reproducing a portion of Figure 3.4.6 of Exhibit K3 with color highlighting added.



*Exhibit K3, Fig. 3.4.6 (highlighting added)*

The claimed envelope signal is received at the inputs ENV_AMP3O+ and ENVAMP3O-. In this regard, reference is also made to p. 16 of Exhibit K3, which states the following:

> *"The schematics of the Qorvo 81003M Envelope Detector die, presented in Figure 3.1, consist of three active amplifier stages that receive the RF input signals [RF+] and [RF-] and converts these differential signals into the single ended signals ENV_AMPO, ENV_AMP2O and the differential signals ENV_AMP3O+ and ENV_AMP3O-. The ENV_AMP2O signal is received by the Analog Processing Block. The filtered average level of this signal is compared with reference signals delivered by the main current generator. The digital output signal X_ENV2_CMP2 is driven into the ASIC core. The digital signal ENV2_CMP and the rest of the analog*

03536-00006/21482897.1                          28                    Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new

**MAUSER Exhibit 3
Page 114**

signals drive the Voltage Regulator Block (Figure 3.4.6) inside the DC-to-DC Converter (Figure 3.4)."

German translation:

[*German translation follows*]

The envelope amplifier provides a second supply current via VREG within the meaning of the claim. Feature 1.4 is thus realized as well.

**6.      Regarding the realization of feature 1.4.1**

*"wherein the envelope amplifier selectively operates based on the first supply voltage or the boosted supply voltage"*

The envelope amplifier of the Accused Products operates with the output of the boost converter, marked in green in Figure 3.4.6 reproduced above and designated "VDD3I2." This can selectively be the boosted voltage or the first voltage within the meaning of the claim. This follows from Figures 3.2 and 3.2.9 of Exhibit K3, which are reproduced below.



*Exhibit K3, Figure 3.2 (highlighting added)*

03536-00006/21482897.1                    29                    Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new

**MAUSER Exhibit 3
Page 115**

*CONVENIENCE TRANSLATION*



*Exhibit K3, Figure 3.2.9 (highlighting added)*

The boost converter comprises a switching block with switches with inputs tied to VDD_EX. These switches can be configured so that the converter selectively can output either the non-boosted first supply voltage (VDD2_EX) or the boosted voltage as its output voltage (VDD3). Feature 1.4.1 is thus realized as well.

**7.   Regarding the realization of feature 1.5**

*"wherein a total supply current (Ipa) comprises the supply current from the switcher and the second supply current from the envelope amplifier"*

In the Accused Products, the supply currents provided by the envelope amplifier and by the inductor are also summed within the meaning of the patent in suit. In the following, we are reproducing Figure 3.4 of Exhibit K3.

03536-00006/21482897.1                    30                    Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new

MAUSER Exhibit 3
Page 116

*CONVENIENCE TRANSLATION*



*Exhibit K3, Figure 3.4 (highlighting added)*

We are showing the area outlined in purple below in an enlarged section.



*Exhibit K3, Figure 3.4 (highlighting added)*

03536-00006/21482897.1                    31                    Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new

**MAUSER Exhibit 3**
**Page 117**

A first current (red) provided by the inductor and a second current (blue) provided by the envelope amplifier are combined to provide a total supply current (yellow) to the power amplifier via the output labeled "EXT_OUT."

The Accused Products comprise a plurality of power amplifiers supported by the Qorvo chip. In the figure below from Exhibit K 3 (cf. p. 13), such an amplifier – specifically the Broadcom Avago AFEM-8050 mid-band power amplifier module – is highlighted in green.



*Photograph 2.3.6: Image of the iPhone 7 PCB board (back)*

*Exhibit K3, Photograph 2.3.6 (highlighting added)*

Feature 1.5 is therefore also realized. Consequently, the Accused Products literally infringe the patent in suit in the scope of claim 1.

## II.
### Regarding the dependent claims

As will be shown below, the Accused Products also infringe the patent in suit in the scope of dependent claims 2 to 5.

## 1.     Infringement in the scope of claim 2

„*the switcher operates based on a first supply voltage, and wherein the offset is determined based on the first supply voltage*"

03536-00006/21482897.1                              32                              Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new

**MAUSER Exhibit 3**
**Page 118**

As follows from Figure 3.4 of Exhibit K3 reproduced below, the Accused Products contain a switcher that operates based on a first supply voltage (e.g., VDD2_EX).



*Exhibit K3, Figure 3.4 (highlighting added)*

The offset provided by said switcher is determined based on the first supply voltage. As follows from the circuit diagram of the voltage regulator block reproduced below, the switcher comprises an offset DAC with a control loop that adjusts the bias of the offset current sources based on VBAT and the duty cycle. Active RC filter is used to generate a DC voltage based on the control signal sent to the timing control block.

03536-00006/21482897.1                          33                          Complaint of 17 July 2017
                                                                in the matter Qualcomm / Apple Distribution et al.
                                                                Munich I District Court, case no. new

**MAUSER Exhibit 3**
**Page 119**



*Exhibit K3, Figure 3.4.6 (highlighting added)*



*Exhibit K3, Figure 3.4.6.6 (highlighting added)*

03536-00006/21482897.1      34      Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new

**MAUSER Exhibit 3**
**Page 120**

*CONVENIENCE TRANSLATION*

## 2.    Infringement in the scope of claim 3

*"the switcher comprises a summer operative to sum the input current and an offset current and provide a summed current, a current sense amplifier operative to receive the summed current and provide a sensed signal, and a driver operative to receive the sensed signal and provide at least one control signal used to generate the switching signal for the inductor"*

As follows from Figures 3.4.6.6 and 3.4.6 of Exhibit K3 reproduced below, the offset current in the Accused Products is being summed with replica input current at the summing node. Thus, the sensed current is a replica of the input current with the offset added to adjust the trip point of the comparator.



*Exhibit K3, Figures 3.4.6.6 (left) and 3.4.6 (right) (highlighting added)*

The switcher comprises a current sense amplifier (marked in green as comparator) that compares the summed current with a reference signal and acts as a high-gain amplifier that amplifies the difference between the two input signals to create a digital sensed signal (e.g., VR_CMP02), as illustrated in below Figure 3.4.6 of Exhibit K3.

Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new

*CONVENIENCE TRANSLATION*



*Exhibit K3, Figure 3.4.6 (highlighting added)*

The timing control block receives the sensed signal (e.g., VR_CMP02) and generates the main switching clock control signal (e.g., DC_DC_CLK), which is then fed to the driver, as illustrated below.



*Exhibit K3, Figure 3.4.6 (highlighting added)*

As follows from the below circuit diagrams of the driver block and the main switcher block illustrate (Figure 3.4.2 of Exhibit K3) the driver generates on the basis of the switching clock

03536-00006/21482897.1                36                Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new

**MAUSER Exhibit 3
Page 122**

control signal (e.g., DC_DC_CLK) the first control signal and second control signal, which are used by the PMOS and NMOS of the main switcher to generate the switching signal for the inductor.



*Exhibit K3, Figure 3.4.2 (highlighting added)*



*Exhibit K3, Figure 3.4.2.9 (highlighting added)*

03536-00006/21482897.1                    37                    Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new

**MAUSER Exhibit 3**
**Page 123**

*CONVENIENCE TRANSLATION*

**3.    Infringement in the scope of claim 4**

*"the at least one control signal comprises a first control signal and a second control signal, and wherein the switcher further comprises a P-channel metal oxide semiconductor (PMOS) transistor having a gate receiving the first control signal, a source receiving a first supply voltage, and a drain providing the switching signal, and an N-channel metal oxide semiconductor (NMOS) transistor having a gate receiving the second control signal, a drain providing the switching signal, and a source coupled to circuit ground"*

The control signal in the driver element of the switcher in the Accused Products includes a first control signal and a second control signal, titled PUDRVB3 and PDDRVB3 in Figure 3.4.2 of Exhibit K3 reproduced below in extracts.



*Exhibit K3, Figure 3.4.2 (highlighting added)*

The following circuit diagram of the switcher block (Figure 3.4.2.9 of Exhibit K3) illustrates that the switcher further comprises the claimed PMOS and NMOS transistors.

03536-00006/21482897.1                                        38                        Complaint of 17 July 2017
                                                                    in the matter Qualcomm / Apple Distribution et al.
                                                                       Munich I District Court, case no. new

**MAUSER Exhibit 3**
**Page 124**

*CONVENIENCE TRANSLATION*



*Exhibit K3, Figure 3.4.2.9 (highlighting added)*

Said PMOS in the Accused Products has a gate receiving a first control signal, a source receiving a first supply voltage (e.g., VDD2_EX), and a drain providing the switching signal.



*Exhibit K3, Figure 3.4.2.9 (highlighting added)*

The aforementioned NMOS in the Accused Products has a gate receiving a second control signal, a drain providing the switching signal, and a source coupled to circuit ground (e.g., VSS2).

03536-00006/21482897.1                    39                    Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new

**MAUSER Exhibit 3**
**Page 125**

*CONVENIENCE TRANSLATION*



*Exhibit K3, Figure 3.4.2.9 (highlighting added)*

**4.      Infringement in the scope of claim 5**

„*the apparatus further comprises a power amplifier operative to receive the supply current from the inductor and to receive and amplify an input radio frequency (RF) signal and provide an output RF signal"*

As already explained in relation to feature 1.5, the Accused Products comprise several RF power amplifiers (e.g., Broadcom Avago AFEM-8050) operative to receive the supply current from the inductor and to receive and amplify an input radio frequency (RF) signal and provide an output RF signal.



*Photograph 2.3.6: Image of the iPhone 7 PCB board (back)*

*Exhibit K3, Photograph 2.3.6*

03536-00006/21482897.1                                          40                                          Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new

**MAUSER Exhibit 3**
**Page 126**

*CONVENIENCE TRANSLATION*



*Exhibit K4, p. 8 (highlighting added)*

### E.
### Regarding the legal assessment

### I.
### On standing to be sued

As described in section C.II., the Defendant no. 1 operates the Apple Online Store, through which the Accused Products are shipped to Germany, and also the Defendant no. 2 distributes the patent-infringing devices in Germany via its physical Apple stores.

### II.
### On the legal consequences

The asserted claims for injunctive relief, damages and accounting are legally based on Sections 139, 140 b of the Patent Act [Patentgesetz, PatG] and Section 242 of the German Civil Code [Bürgerliches Gesetzbuch, BGB], the recall and destruction claims follow from Section 140 a PatG.

03536-00006/21482897.1                    41                    Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new

**MAUSER Exhibit 3**
**Page 127**

*CONVENIENCE TRANSLATION*

1.  The offering and distribution of the Accused Products constitutes a direct violation, which entails a risk of recurrence for the claim to cease and desist pursuant to Section 139 (1) in conjunction with Section 9 PatG.

2.  In order to be able to quantify the damages incurred in the future, a claim for the provision of information and the rendering of accounts, which is derived from Sections 140b PatG, 242 BGB, also applies.

3.  The destruction claim follows from Section 140a (1) PatG. Besides Defendant no. 2, Defendant no. 1 is also liable under Section 140a (1) PatG, since it has at least indirect possession of the Accused Productsmarketed by it until their delivery to the buyers. In the General Terms and Conditions of the Apple Online Store for which Defendant no. 1 is responsible according to the website of the Apple Online Store (accessible for everybody at *https://www.apple.com/de/shop/open/salespolicies*) the following is stated with respect to shipping and delivery:

    > *"Apple is responsible for delivery of the products bought in the Apple Store; the risk of loss and damage to the product(s) transfers to the buyer once the product(s) physically arrive(s) in the possession of the buyer or a person identified by the buyer."*

4.  The claim for recall and removal from the sales channels follow from Section 140a (3) PatG.

5.  Since the Defendants are to blame for negligent behavior with respect to the acts of infringement in any case, they are also liable for damages pursuant to section 139 (2) PatG. Given the due care required in business transactions, the Defendants must realize that the Patent in Suit is infringed by the Accused Products at the latest within one month of publication of the notification of the grant of the Patent in Suit, since they are obliged to continuously inform themselves of the property rights situation in the technical field in which they are active with their products. Since the Plaintiff is currently unable to quantify the claims for damages, the petition for a declaratory judgment is justified under Section 256 of the Code of Civil Procedure [ZPO].

## F.
## Miscellaneous

1.  The Munich I District Court has jurisdiction over the merits of the case according to Sec. 143 par. 1 PatG. Due to the Germany-wide offering and putting on the market of the

03536-00006/21482897.1        42        Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new

**MAUSER Exhibit 3**
**Page 128**

*CONVENIENCE TRANSLATION*

Accused Products, the Munich I District Court has international and local jurisdiction according to Art. 7 par. 2 EuGVVO, Sec. 32 ZPO, 143 par. 2 PatG in connection with Sec. 38 No. 1 GZVJu. The Munich I District Court furthermore has local jurisdiction over Defendant no. 2 since it operates an Apple Store in Munich.

2.    We provisionally estimate the amount in dispute at EUR 10 million. We attach a direct debiting authorization for the necessary advance payment on court fee in the amount of EUR 113,208.

3.    Translations of the Complaint for service of process will be furnished subsequently.


(Dr. Jan Ebersohl)
Attorney at Law


<u>Exhibits</u>

K1 to K4

03536-00006/21482897.1                           43                    Complaint of 17 July 2017
in the matter Qualcomm / Apple Distribution et al.
Munich I District Court, case no. new

**MAUSER Exhibit 3
Page 129**