```
 1                    UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3
      APPLE INC.,                  .
 4                                 . Docket
                    Plaintiff,     . No. 17cv0108-GPC-MDD
 5                                 .
                    v.             . August 18, 2017
 6                                 . 1:30 p.m.
      QUALCOMM INCORPORATED,       .
 7                                 .
                    Defendant.     . San Diego, California
 8    . . . . . . . . . . . . . . .

 9                    TRANSCRIPT OF MOTION HEARING
              BEFORE THE HONORABLE GONZALO P. CURIEL
10                    UNITED STATES DISTRICT JUDGE

11                    A-P-P-E-A-R-A-N-C-E-S
      For Apple Inc.:         Fish & Richardson
12                            12390 El Camino Real
                              San Diego, California 92130
13                            By:  JUANITA R. BROOKS, ESQ.
                                   RUFFIN B. CORDELL, ESQ.
14                                 SETH SPROUL, ESQ.
                              - and -
15                            Boies, Schiller & Flexner LLP
                              1401 New York Avenue, N.W.
16                            Washington, DC 20005
                              By:  KAREN L. DUNN, ESQ.
17                                 WILLIAM A. ISAACSON, ESQ.
                                   GABRIEL R. SCHLABACH, ESQ.
18                                 AMY J. MAUSER, ESQ.

19    For Qualcomm           Cravath Swaine & Moore LLP
      Incorporated:          825 8th Avenue
20                           New York, NY 10019
                             By:  EVAN R. CHESLER, ESQ.
21                                J. WESLEY EARNHARDT, ESQ.
                                  JORDAN D. PETERSON, ESQ.
22                            - and -
                              Jones Day
23                            4655 Executive Drive, Suite 1500
                              San Diego, California 92121
24                            By:  KAREN P. HEWITT, ESQ.

25    Court Reporter:        Chari L. Bowery, RPR, CRR
      Reported by Stenotype, Transcribed by Computer
```

```
1              SAN DIEGO, CALIFORNIA; AUGUST 18, 2017; 1:30 P.M.

2                              -o0o-

3              THE CLERK:  Calling Item Number 12 on the calendar,

4    Case Number 17-cv-108, Apple, Inc., v. Qualcomm, Inc., on for a

5    motion hearing.

6              THE COURT:  Appearances, please.

7              MS. BROOKS:  Good afternoon, Your Honor.  Juanita

8    Brooks, from Fish & Richardson, on behalf of Apple.  Also from

9    Fish & Richardson, we have Ruffin Cordell and Seth Sproul.  And

10   also representing Apple is the law firm of Boies Schiller, and

11   from Boies Schiller, we have Bill Isaacson and Amy Mauser and

12   Gabe Schlabach and also Karen Dunn.  And in-house, from Apple,

13   we have Noreen Krall and Sarita Venkat, and the general counsel

14   of Apple, Bruce Sewell.

15             THE COURT:  Welcome, and good afternoon.

16             MS. BROOKS:  Thank you, Your Honor.

17             MR. HANNA:  Good afternoon, Your Honor.  Nick Hanna

18   and Jennifer Roh, on behalf of the contract manufacturer

19   defendants in the 1010 case.

20             THE COURT:  Let's do this.  We are going to proceed

21   first with the Apple v. Qualcomm, and afterwards, then, we will

22   call the second case, and then we will allow the attorneys to

23   make their appearances on that one.  All right?

24             MR. HANNA:  Thank you, Your Honor.

25             THE COURT:  Good to see you, Mr. Hanna.
```

1              MR. HANNA:  Nice to see you, Your Honor.

2              THE COURT:  And on behalf of Qualcomm?

3              MS. HEWITT:  Good afternoon, Your Honor.  Karen

4    Hewitt from Jones Day on behalf of Qualcomm.  With me at

5    counsel table is Evan Chesler from Cravath, Wes Earnhardt from

6    Cravath, and Mark Snyder, litigation counsel from Qualcomm.

7              MR. SNYDER:  Good afternoon, Your Honor.

8              THE COURT:  Good to see you.

9              MS. HEWITT:  Present in the room also --

10             THE COURT:  And you have additional attorneys here?

11             MS. HEWITT:  I do.  I will make the introductions.

12       From Qualcomm, the general counsel of Qualcomm, Don

13   Rosenberg is here; also John Scott, Kevin Kelly, Bob Giles, and

14   then the Cravath team, and also Jones Day.

15             THE COURT:  Well, it's great to see you all.

16       I have been doing a lot of reading the last week, and I

17   came out deciding that we would handle Apple v. Qualcomm first.

18   And as far as the first motion that I wanted to take up,

19   figuring that it required the least heavy lifting, was the

20   motion to consolidate.  At this point, I believe that it makes

21   sense to consolidate the two cases.  Whether or not they stay

22   consolidated for all purposes, including trial, we can revisit

23   that if necessary.  But as a starting point, for purposes of

24   discovery, it's clear that it makes sense to do that.

25             With respect to the joint discovery plan, as I understand

1    it, the parties have or will be meeting with Judge Dembin to go

2    over that with him; but ultimately, when he does that, he will

3    know that the Court has at this time consolidated the two

4    actions.

5        Do the parties wish to be heard further on that matter?

6            MR. CORDELL:  Not by Apple, Your Honor.

7            MR. CHESLER:  Not by QualComm, Your Honor.

8            THE COURT:  That's the easy part of the hearing.

9        Next we will move on to the motion for an antisuit

10   injunction.  Qualcomm has moved for such an injunction, and I

11   am prepared to hear further.  I have reviewed the pleadings.  I

12   have reviewed a number of exhibits relating to related actions,

13   not only filed by Apple, but additional actions filed by the

14   FTC, and actions brought I believe by Korea that resulted in a

15   December 2016 determination.  I believe there was a consent

16   decree that was reached by Qualcomm, and the Chinese government

17   in 2015.  And I have reviewed a significant amount of

18   information.

19       With that, let me turn to the moving party.

20           MR. CHESLER:  Thank you, Your Honor.  Again, I am

21   Evan Chesler from the Cravath firm in New York.  I appreciate

22   the Court's hospitality in having us admitted pro hac vice.

23       Your Honor, my client, Qualcomm, finds itself in a very

24   difficult position.  We are, we believe, under a worldwide

25   assault on our basic business model by the largest technology

1    company in the world.

2         THE COURT:  But also by the Republic of Korea and

3    other countries as well; would you agree?

4         MR. CHESLER:  Yes.  Proceedings in which, as I think

5    a lot of the court papers indicate, we believe Apple's hand is

6    very much involved, and they have been making presentations

7    both in open proceedings and behind closed doors to regulators

8    in various places around the world.

9         THE COURT:  And with respect to that cooperation, has

10   there been any -- what would I say -- any directives from the

11   foreign governments that are the equivalent of a subpoena which

12   has been the basis for securing Apple's cooperation?  Or do you

13   know anything about how it was that Apple came to provide that

14   information at the request of these countries?

15        MR. CHESLER:  Well, I think there has been both

16   formal and informal.  And we believe the informal preceded the

17   formal.  And there have been discussions, we believe, between

18   Apple and regulators around the world, which we believe have

19   played a prominent role, an important role in why those

20   proceedings have come about in certain places.

21        THE COURT:  Including the Chinese proceedings in

22   2015?

23        MR. CHESLER:  We believe so, Your Honor, but I don't

24   want to make representations for which I can't give you at this

25   point specifically.

1           THE COURT:  All right.

2           MR. CHESLER:  Now, if the matter before Your Honor

3    were just about how much Apple thinks it should pay, either

4    itself or through its contract manufacturers for our

5    technology, if that's all that were involved here -- it's

6    certainly one of the things involved -- but if that were all

7    that was involved, we do not believe they would have filed 11

8    lawsuits in four other countries within weeks of having

9    instituted litigation here because we believe that what is

10   going on is a much bigger agenda.

11       It is an agenda, we believe, to force my client

12   fundamentally to alter its business model before we ever get

13   our day in court.

14       There are two critical things, Your Honor, I would like to

15   point to before I go to the standards in the Ninth Circuit for

16   granting antisuit injunctions.

17       The first is this:  What Apple has said and pled is not

18   what Apple said in opposition to this motion.  There was an

19   earnings call on May 2 of this year, in which Mr. Cook, the CEO

20   of the company, told Wall Street and their investors that they

21   needed the courts to decide -- his words were, "We need the

22   courts to decide," and he said, "We are depending upon the

23   courts to do this," to determine how much they should pay or

24   their contract manufacturers should pay for our technology.

25       They have said the same thing in these various foreign

1   proceedings; so, for example, in Seoul, Korea, they said, and I

2   am quoting, "With the U.S. action, Apple wished to obtain a

3   judgment from the court of a fair license royalty standard,

4   coinciding with the FRAND principles."  And their complaint in

5   this case is replete with statements to exactly the same

6   effect.  Perhaps most importantly, in paragraph 199 of their

7   amended complaint, they say, quote, "The dispute over the

8   royalties to which Qualcomm is entitled has been placed

9   directly at issue by Apple's claims against Qualcomm."

10       And over and over again in the complaint -- in

11   paragraph 8, 159, 623 -- they say over and over again that we

12   have breached our FRAND commitments with respect to our

13   standard-essential patents; that our licensing practices

14   violate our FRAND promise, over and over.

15       And they say, in paragraph 94, since 2006, Apple has

16   quote, "Attempted to negotiate a lower royalty rate in the form

17   of a worldwide FRAND license directly from Qualcomm."

18           THE COURT:  The other thing that Apple says, in the

19   section starting at paragraph 158, is that Qualcomm's licensing

20   practices are not FRAND and foreclose competition, which seems

21   to segue into the other part of Apple's allegations, their

22   claims, that there's anticompetitive behavior being engaged in

23   by Qualcomm.

24       And so I am trying to figure out how can we end up

25   severing, carving out this anticompetitive behavior and still

1    permit Apple to raise the issues that it believes are properly

2    before not only this court but in the courts in Korea and UK

3    and Japan and China.

4              MR. CHESLER:  Your Honor, the injunction motion which

5    we seek, which we are speaking about right now -- and

6    obviously, we will deal with the preliminary injunction

7    separately -- but the injunction we are seeking in the Apple

8    litigation doesn't try to carve that out at all.

9              THE COURT:  The antitrust or anticompetitive --

10             MR. CHESLER:  Absolutely not.

11        We simply say, those issues, which are all here -- they

12   are all pled both in Apple's claims against us and in our

13   counterclaims against Apple -- those claims should be litigated

14   here.

15             THE COURT:  But if there was a determination on the

16   anticompetitive cause of action, here, would that be -- would

17   that require these foreign tribunals to accept our findings and

18   our determinations?

19             MR. CHESLER:  No, Your Honor.  But what would happen

20   is this:  At the core of those allegations, all of them, is the

21   claim that we have not met our FRAND commitment; we have not

22   offered them a fair, reasonable, and nondiscriminatory license.

23   That is a question under the law that's been developed relating

24   to FRAND.  It is a contractually related question.  And that

25   issue, that dispute between the parties, as Apple has told its

1   investors, as it has told these other courts in Seoul and in

2   London, around the world -- they claim that they came to this

3   court to get that question resolved.

4        THE COURT:  And that is one of the questions that is

5   presented, certainly.

6        MR. CHESLER:  No question.  Here is the key, though,

7   Your Honor, the first point I wanted to make.

8        We then filed this motion.  All of the statements to which

9   I just referred were made by Apple before we filed this motion.

10       And when we filed this motion, there was, I think, quite

11  apparently an "uh-oh" moment at Apple because now, they were

12  confronted with a situation in which one of the critical tests

13  of whether we are entitled to this injunction is whether this

14  litigation is functionally the same in terms of its issues as

15  the lawsuits that they filed around the world, lawsuits which

16  they were telling those courts were functionally the same as

17  this lawsuit, but now, they have a motion in which that very

18  fact creates a problem for them with respect to this motion,

19  this antisuit injunction motion.

20       So what did they do when they filed their papers in

21  opposition to this motion?  Notwithstanding what Mr. Cook told

22  the Street, notwithstanding what they told the courts in Seoul

23  and London, here they said, quote, "Apple has not requested a

24  determination of a FRAND royalty rate for Qualcomm's worldwide

25  portfolio of cellular standard-essential patents."  They said

1   they do not want that determination, they have not sought that

2   determination --

3          THE COURT:  The worldwide determination.

4          MR. CHESLER:  Yes.  The worldwide.

5       But in fact, what they have said to this court in their

6   own pleading, as I pointed out, is they have tried to negotiate

7   a worldwide license with us, and they have told courts that, in

8   fact, they had come here to get that determination, until the

9   motion was filed.

10         THE COURT:  They didn't tell the other courts they

11  were seeking a worldwide determination, did they?

12         MR. CHESLER:  They told the other courts that they

13  had come to this court.  Apple wished to obtain a judgment from

14  the Court of a fair license royalty standard coinciding with

15  the FRAND principles.

16         THE COURT:  But not worldwide?

17         MR. CHESLER:  They didn't use the word "worldwide"

18  there.  They used, in fact, the word "worldwide" here, and Your

19  Honor --

20         THE COURT:  They used it here in terms of that's what

21  they are seeking for relief?

22         MR. CHESLER:  Yes.

23         THE COURT:  In the complaint?

24         MR. CHESLER:  Well, they said that they tried to get

25  it from us in negotiation.

```
 1            THE COURT:  In negotiation.  But they don't assert
 2    that as a basis in the complaint?
 3            MR. CHESLER:  But Your Honor, the thing that's
 4    important to understand --
 5            THE COURT:  So what should I be looking at?  Should I
 6    be considering what is actually in the complaint, or what the
 7    head of Apple had to say in a conversation with shareholders,
 8    what Mr. Cook said in those conversations, or what was
 9    negotiated back in 2016?
10        Isn't the complaint really what the Court should be
11    focusing on?
12            MR. CHESLER:  Yes, Your Honor, and that comes to my
13    point.
14        When one talks about a FRAND license, the evidence will
15    show here that one is talking about a worldwide situation.
16    That's what FRAND does.  It rises, in this instance, out of
17    French legal principles that are applied around the globe.  The
18    licenses that we are talking about are worldwide licenses.
19    Indeed, when we get to the other case, the licenses that are at
20    issue there are worldwide licenses.  FRAND and worldwide are,
21    in fact, congruent with one another.  That's what FRAND
22    licenses are.  Because in this industry, in this technology,
23    these products are made and sold around the world to customers
24    around the world.
25        And the standards involved -- if Your Honor were to go
```

1     back into your chambers and pick up your phone and make a

2     telephone call, even to an area code number from here in

3     San Diego, and the person who owns that phone happened to be

4     sitting in Stockholm, Sweden, you could speak to them, as I am

5     sure you know.

6          These are worldwide standards that ensure connectivity

7     around the globe, and the FRAND commitments that one speaks

8     about in order to implement those standards are worldwide

9     commitments.

10          THE COURT:  So that brings up a question regarding

11     the FRAND commitment and what the commitment does to the

12     third-party beneficiary.  Certainly, Qualcomm, to the extent

13     that it's a beneficiary of this standard-essential patent,

14     agrees, contracts, to make their patents available on FRAND

15     terms.

16          MR. CHESLER:  Yes, Your Honor.

17          THE COURT:  What obligations are you asserting Apple

18     then holds or has or is obligated to recognize by being a

19     willing licensee or a party that's willing to subscribe to this

20     license?

21          MR. CHESLER:  Well, let me, if I may -- can I restate

22     the question slightly?

23          THE COURT:  Sure.

24          MR. CHESLER:  If we, in fact, are meeting our FRAND

25     commitments, which is to offer licenses on fair, reasonable,

1   and nondiscriminatory terms, what is the significance or impact

2   of that on Apple, which claims to be a third-party beneficiary

3   of that commitment between Qualcomm and standard-setting

4   organizations.  And the answer is either to be a willing or an

5   unwilling licensee.  They can -- they don't have to accept the

6   license.  They can negotiate.  The parties can vary from

7   whatever the original offer was, to come to an agreement.

8        Or they can say, as they have said here, and as Microsoft

9   said in the *Motorola* case in the Ninth Circuit -- which I will

10  come to -- "I don't think what you have offered is reasonable."

11  They can try to litigate over it and come to a court, as

12  Mr. Cook told the investors he was doing by coming to this

13  court, to get that issue determined.

14       And if they, in fact, have been offered a FRAND license

15  and they are unwilling to take the FRAND license, then they are

16  no longer entitled to the benefits that they would have if we

17  were in fact encumbered by, as they say in the trade, our FRAND

18  obligation.

19            THE COURT:  Well, certainly, in *Motorola*, the Ninth

20  Circuit and Judge Robart found that, by Motorola having this

21  FRAND standard or essential patent, that they contracted to

22  this worldwide patent, and that once Microsoft filed their

23  action in Washington and then sought a determination of what

24  was in fact fair and reasonable and nondiscriminatory, that at

25  that point, Motorola wasn't free then, given its commitment, to

1    go and file an action in Germany.

2            MR. CHESLER:  Yes.

3            THE COURT:  So that that was the commitment that was

4    identified by the Ninth Circuit.

5         Here, there is not a similar argument, is there, as to

6    Apple?  Apple didn't commit to, by virtue of a FRAND, to a

7    worldwide patent, and as such, they didn't commit to having

8    litigation limited to one forum, did they?

9            MR. CHESLER:  I don't think the FRAND commitment,

10   Your Honor, was what limited, in that case, Motorola to one

11   forum.  In that case, I believe what happened was when Apple

12   decided that the -- excuse me -- when Microsoft decided that

13   the Motorola offer was not, in their view, FRAND, they came to

14   a U.S. court and they brought a lawsuit for a FRAND

15   determination.  Motorola countersued in the U.S. on several

16   patents.  Then Motorola filed a separate lawsuit on two German

17   patents, which would have been subject to this worldwide FRAND

18   commitment -- because, as I said, FRAND is a worldwide

19   obligation, a worldwide concept -- and that was what triggered

20   the motion for an antisuit injunction, which Microsoft made and

21   the District Court, affirmed by the Court of Appeals, said,

22   "There is functional similarity between the issues that are

23   being litigated in Germany and the United States.  If I, the

24   Federal District Court in the United States, resolve this FRAND

25   question before me, regardless of who brought it up first -- if

1    I resolve that FRAND dispute, it could well render the patent

2    litigation in Germany moot, because I would have determined

3    that there should be a license under some terms, which the

4    parties would agree to, and -- and it should not be the case

5    that there was a risk of inconsistent results."

6         And that lawsuit -- just as the litigation here, that

7    lawsuit in Germany was brought after the litigation was

8    commenced in the United States by the same -- involving the

9    same issues; and therefore, the Court resolved, there, that it

10   was vexatious litigation that should not be permitted to go on

11   in parallel as duplicative litigation with the U.S. litigation.

12        That's what happened there.  And I don't believe, Your

13   Honor, it turns on who filed first where.  What it turns on is

14   the standards the Ninth Circuit said apply here, the first of

15   which is are the parties and the issues functionally the same.

16        The second is the Unterweser factors, any one of them, and

17   the third is international comity.

18             THE COURT:  Let me ask you, are the issues

19   functionally the same, where we have this additional cause of

20   action relating to anticompetitive conduct?

21             MR. CHESLER:  Yes, Your Honor, they are.  They are.

22   In fact, the Ninth Circuit --

23             THE COURT:  And how is that?  Because part of it,

24   then, requires that, in deciding our issues, that we will be

25   able to decide the remaining issues?

1          MR. CHESLER:  Yes.

2          THE COURT:  All right.  So how will a determination

3  of what is a fair and reasonable royalty, in our case, then

4  determine for these foreign tribunals whether or not Qualcomm

5  engaged in anticompetitive behavior by offering these -- or if

6  not offering, by essentially demanding these tying

7  arrangements, these bundling arrangements, and agreeing to

8  terms that the plaintiffs claim are anticompetitive, that the

9  countries of Korea and China have identified as being

10 anticompetitive?  How is it that our determination of a fair

11 and reasonable royalty would decide those issues?

12         MR. CHESLER:  There are two parts to the answer.  The

13 first is that in all of these litigations, Apple has tethered

14 very tightly the claim that we have not met our FRAND

15 obligations to the claim that we are acting anticompetitively.

16 They have linked the two very tightly.  They have done that

17 here and they have done it overseas.

18     Now, admittedly, overseas, they are talking about

19 different antitrust legal regimes.  They are not bound by U.S.

20 law, just as you are not bound by their law.

21     But they are arguing that dispute begins, the core of the

22 dispute, is that we have not offered license terms which they

23 say are fair, reasonable, and nondiscriminatory.

24     So to the extent that that issue is before this Court,

25 that issue, we believe, should be litigated in this court,

1    where Apple first brought that issue, and where we have set

2    that issue up in our counterclaims absolutely explicitly.

3         The second point, Your Honor, is this:  There is no

4    requirement, for antisuit injunctions, that every piece of the

5    litigation in every one of those foreign litigations will in

6    fact end and there will be no further litigation to take place

7    overseas in order for this Court to enter an antisuit

8    injunction.

9         In fact, in the Microsoft case, the antisuit injunction

10   applied to receiving, obtaining, and enforcing injunctive

11   relief on the patents in the German litigation.  The Ninth

12   Circuit and the District Court explicitly said, "To the extent

13   that there are damages claims, for example, arising out of

14   those very same patents, that litigation can proceed after the

15   determination in the United States of the underlying issue.  If

16   they still want to litigate under German patent law whether

17   they are entitled to damages for infringement of a German

18   patent in Germany, they are free to do that."  There need not

19   be an entire cessation of litigation in the foreign actions

20   because, as the Ninth Circuit said, the Court in the United

21   States is not determining foreign law questions.  It is

22   deciding whether an American litigant, over whom the American

23   court has jurisdiction, should be enjoined in the first

24   instance from litigating functionally the same issues in

25   multiple courts.  They are not telling the foreign court that

1    it must do or not do anything.  They are telling an American

2    litigant that it must do something.  And if there are issues

3    that need to be resolved thereafter in those foreign courts,

4    the United States courts don't presume to tell those courts

5    what they can't do or to decide questions of foreign law in a

6    U.S. court.

7        That's what happened in that case.  That's what has

8    happened in a number of the antisuit injunction cases that have

9    been entered in years since the *Seattle Totems* case, where

10   there have been, I think, nine antisuit injunction cases in the

11   Ninth Circuit.  And in all but one of those nine cases, the

12   Ninth Circuit has either affirmed the entry of an antisuit

13   injunction by the lower court or reversed the denial of an

14   antisuit injunction in the lower court.  Eight out of the nine

15   cases.

16       And in a number of those cases, there were foreign

17   lawsuits pending, and in some of those cases, there were issues

18   that still had to be litigated in the foreign lawsuits after

19   the common determinations were made by the U.S. courts.  That

20   is what happened in *Microsoft*, and that might happen here, for

21   all we know.

22       Our point, Your Honor, is this --

23           THE COURT:  Let me ask you, certainly, cases that

24   have raised the antisuit injunctions have been far more

25   compact, far simpler than what we have here, wouldn't you

1    agree?  Here we have a lead-up, in terms of foreign countries

2    investigating Qualcomm for their behavior.  We have certain

3    judgments and consent decrees.  And here, in the United States,

4    we have an ongoing action relating to Qualcomm's business

5    model.  So it's much more complicated than what you would have

6    had in *Microsoft v. Motorola.*

7         Given the additional complications that we have, what is

8    your view as to whether or not that affects the ultimate

9    analysis?

10            MR. CHESLER:  I think, Your Honor, it actually cuts

11   in favor of this injunction motion.

12            THE COURT:  How?

13            MR. CHESLER:  First, there is nothing that we are

14   asking this Court to do -- nothing -- with respect to

15   regulatory investigations or proceedings anywhere, not even

16   including the Federal Trade Commission up the 101, in San Jose,

17   let alone regulators in Taiwan or China.  We haven't come to

18   this Court to ask you to do anything with respect to those

19   regulators and, notwithstanding my respect for this Court, I am

20   not sure you could do that even if you wanted to.

21        So the fact that there are regulatory proceedings going on

22   in those countries I don't think has anything to do with the

23   relief we are requesting.  And the fact that there are other

24   lawsuits proceeding overseas is -- again, there may be more of

25   them -- in Microsoft, there was only one in Germany -- but the

1    reason I say it cuts in favor, Your Honor, is when the Ninth

2    Circuit said there's a risk of inconsistent results here and

3    that's one of the really important factors, compare the risk of

4    inconsistent results between a situation where you have one

5    lawsuit in Germany over two patents and the litigation in the

6    United States over three patents and FRAND obligations, with

7    the risk of inconsistent results involving 11 lawsuits in four

8    countries, involving the same basic FRAND claim being asserted

9    over and over again but with different subsets of patents being

10   litigated.  With 11 lawsuits in four countries, Your Honor,

11   surely the risk of inconsistent outcomes is a great amount

12   greater than it would be in the Microsoft situation.

13          THE COURT:  Let me ask you, with respect to the

14   action that Qualcomm has filed before the International Trade

15   Commission and I believe two actions in Germany, does that end

16   up also creating the likelihood of inconsistent judgments?

17          MR. CHESLER:  No, Your Honor, and I will tell you

18   why.

19        Unlike the lawsuits that Apple has brought, the lawsuits

20   that Qualcomm has brought overseas and before the ITC involve

21   what are called NEPs, N-E-Ps, nonessential patents.  The

22   lawsuit that -- the lawsuits that Apple has brought and the

23   patents that they have raised in the patent portion of their

24   case here are what are called SEPs, standard-essential patents.

25        The FRAND obligation does not apply to nonessential

1    patents.  The whole concept of FRAND is, if you have a

2    patent -- or in this case many patents -- which are essential

3    to the practice of a standard, and it is critical that those

4    standards are implemented so that phones can connect with one

5    another and the system can work, then you have an obligation

6    for such patents to offer them on fair, reasonable, and

7    nondiscriminatory terms.  And people who would want to practice

8    that technology are, the courts have held, third-party

9    beneficiaries of that commitment.

10        If the patent you are dealing with is not an essential

11   patent to a standard -- a NEP, which is what our claims are --

12   the FRAND commitment and the NEP do not intersect.

13        And Qualcomm was very careful to try to do two things.  We

14   believe we are standing in a boxing ring with our gloves up,

15   with the biggest boxer who is out there punching away at us,

16   and we have to defend ourselves.  And we have brought those

17   claims, as we have said publicly and as I say to this Court, as

18   part of an effort to defend ourselves so we are not taking just

19   incoming shells, but we were very careful not to step over any

20   line with respect to FRAND.  That issue is here.  We believe

21   that issue should be litigated here, in a federal court in

22   California between two California companies.

23        So there's simply not an equality of issue with respect to

24   the cases we brought and the cases that they brought.

25             THE COURT:  All right.

1          MR. CHESLER:  So, Your Honor, if I may just quickly

2    go through the three prongs of the test.

3          THE COURT:  Yes.

4          MR. CHESLER:  So prong one under the Ninth Circuit

5    standard is are the parties and the issues functionally the

6    same and would a disposition of the one case result in a

7    disposition of the common issues in the other case.

8          There isn't any dispute, I think, as to whether the

9    parties are the same.  This is a fight between Qualcomm and

10   Apple.

11         The key issue -- turning to the issue part of prong one --

12   the key issue here and the other cases, as I have said, Your

13   Honor, before is whether Qualcomm has complied with its global

14   FRAND commitments with respect to Apple and whether Apple has

15   or has not forfeited its rights as a third-party beneficiary by

16   being an unwilling licensee.  Those are the issues we

17   presented.  Those are the issues that Apple appeared to present

18   to this Court until we filed this motion.

19         They have admitted, Your Honor, as I said have before --

20   they have admitted before this motion was filed that the cases

21   in fact raise functionally the same issues.  What they said in

22   their complaint in the United Kingdom, at paragraph 129, is,

23   quote, "Apple Inc. has brought proceedings against Qualcomm in

24   other jurisdictions, pursuing similar complaints under

25   applicable laws."

1    "Similar complaints under applicable laws"; that is their

2    statement to the UK Court, not ours.  That's the standard

3    that's applied in the circuit to say, "Why are we litigating

4    these issues all over the world when they are already being

5    litigated here?"  So they have conceded, Your Honor.

6        And the patents on which they are suing elsewhere are

7    foreign counterparts of U.S. patents that are the subject of

8    litigation here that would be covered by the FRAND license

9    here.

10       So it seems to us, Your Honor, that there's really not a

11   serious argument that the issues are not functionally the same,

12   and there's no dispute about the parties.

13       And as I said before, if the FRAND issues are resolved

14   here, then the FRAND issue is resolved.  And if there's any

15   tail of an antitrust claim someplace else that isn't swallowed

16   by a determination that we have offered a FRAND license, or in

17   fact what we have asked for in the alternative, which is a

18   determination of what the FRAND terms are, there's nothing that

19   we are asking you to do that would stop them from litigating

20   those non-U.S. law issues in courts elsewhere.

21       The second factor is the Unterweser factors, and those are

22   disjunctive.  There are four, and the Ninth Circuit has said

23   any one of them satisfies the second prong of the test.

24       We believe, just as in Microsoft, two of them are

25   satisfied here.  And the first one is vexatious and oppressive

1   litigation.  As I said, Your Honor, 11 lawsuits in four

2   countries within a matter of weeks of filing this lawsuit.  I

3   don't think there could be any serious question of what they

4   were up to.

5        And in fact, if there were any doubt about it, their

6   general counsel wrote to our general counsel, back in April,

7   and said, "We are not going to pay" -- i.e., our contract

8   manufacturers are not going to be able to pay because we have

9   told them not to -- "until all of those litigations are over."

10       Now, I would submit to Your Honor it can't be -- it cannot

11   be that those other lawsuits are not raising the functionally

12   same issues as this lawsuit and Apple say, "I am not going to

13   pay you any license royalties until those other lawsuits are

14   resolved."  How can they hold this as a hostage to the

15   resolution of lawsuits that don't raise the same issues?  That

16   wouldn't even hold up in terms of its internal common sense to

17   make that threat unless it was perfectly clear that there is a

18   web of related lawsuits that they have filed around the world

19   and they are going to hold out and refuse to pay us and not let

20   their contract manufacturers pay us under those licenses which

21   exist today until all of that other stuff is resolved.

22       Obviously, the functional sameness is involved, or that

23   threat would make absolutely no sense.

24            THE COURT:  By the way, you assert that Apple is

25   ordering their contractors, their manufacturers of the

1    electronic devices, to stand down, to not pay Qualcomm.  Is

2    that something that Apple is entitled to do, to order its

3    subcontractors not to make payment on something?

4         MR. CHESLER:  Absolutely not.  Absolutely not.

5         THE COURT:  So to the extent that Apple would have no

6    legal right to do so, then ultimately these contractors

7    wouldn't have any obligation to listen to or to abide by

8    Apple's direction?

9         MR. CHESLER:  It is not a legal obligation, Your

10   Honor, it is a financial one, because the way this works is

11   they have licenses -- we are kind of moving over to the other

12   case, but I want to respond to Your Honor's question.

13        They have licenses that go by the acronym SULA, S-U-L-A.

14   They are software licenses.  They are patent licenses.

15        They have licenses to use our technology, among other

16   things, to make devices -- smartphones, iPads, et cetera.

17   There's nothing in those licenses that says a word about Apple

18   reimbursing them, Apple having to give them permission.  It

19   says, "We are licensing you this technology; you are paying us

20   a royalty."

21        But what happens in fact is they, then, make those phones

22   and sell them to Apple.  And in the price that they charge

23   Apple is a pass-along of the royalties that they pay to us.

24        So the reality is, when Apple says, "I am not paying any

25   more," the contract manufacturers stop paying.

 1          THE COURT:  You answered the question.  Thank you.

 2          MR. CHESLER:  So, Your Honor, with respect to the

 3    third prong, it's comity.  Just as the Ninth Circuit said in

 4    the *Microsoft* case, this is a private dispute between private

 5    companies -- they are public companies but it is a private law

 6    dispute.  There is no foreign government involved, nor any

 7    suggestion that a foreign government will be involved in the

 8    litigation.  The regulatory proceedings are not those

 9    litigations.  The litigations overseas are between the same

10    parties, Apple and Qualcomm.

11       And as I said before, we have not asked this Court to

12    enjoin anything by a foreign court.  We have asked this Court

13    to enjoin a U.S. company from conducting those lawsuits in

14    parallel on the issues that overlap.

15          THE COURT:  Let me ask you something.  This set of

16    facts that we have here, where a company has gone to foreign

17    tribunals and sought relief under that country's legal system,

18    both as far as patent protection and proceeding under FRAND,

19    most notably, and anticompetitive behavior, are you familiar

20    with any other cases where a plaintiff has engaged in similar

21    conduct?

22          MR. CHESLER:  I assume you mean, Your Honor, by

23    "similar conduct" we are talking about a FRAND dispute of this

24    kind?

25          THE COURT:  Yes, where they similarly ended up filing

1    in two, three, four, five different countries, seeking similar

2    forms of relief?

3            MR. CHESLER:  Yeah.  I believe that was in fact --

4    close to --

5            THE COURT:  Besides *Motorola*.

6            MR. CHESLER:  That's the one I was going to say.

7    That's the case.  There may be others.  As I stand here, I

8    can't think of another one right now.

9            THE COURT:  Are you aware of whether or not Qualcomm

10    has ever done something along those same lines, of bringing

11    FRAND actions in more than one forum, at least one country's

12    forum.

13            MR. CHESLER:  There was, some years ago, a big

14    dispute between Nokia, when it was in this business, and

15    Qualcomm involving FRAND issues.  I don't remember every court

16    in which lawsuits were filed.  But it ultimately ended up -- I

17    and some of my colleagues and the lawyers for Nokia spent a lot

18    of time before Vice Chancellor Leo Strine, in Delaware, where

19    everything ended up being litigated on the FRAND questions.

20    And in fact, we spent a very long night in a hotel in

21    Wilmington, Delaware, and settled the dispute between the

22    parties the day before that case was set to go to trial before

23    Vice Chancellor Strine, and it ended the hostilities worldwide.

24            THE COURT:  In that case, there were other actions

25    filed in other countries?

1          MR. CHESLER:  There were.  It was in a state court,

2     remember.  At one point, actually, the issue was -- one of the

3     lawsuits was removed to federal court and remanded to state

4     court, back to Vice Chancellor Strine, so I do not believe

5     there was a federal action.

6          THE COURT:  It was a U.S. action, and you said there

7     were other actions filed in other countries?

8          MR. CHESLER:  Yes.  But there was no federal U.S.

9     action, except for a very short time, where it was removed and

10    then remanded, where this kind of a motion could be brought.

11    It is obviously a motion unique to the federal courts.  I don't

12    know of antisuit injunctions that have been brought in state

13    court proceedings.  I do not believe one was brought in those

14    cases.  As a practical matter, it all ended up being fought out

15    before Vice Chancellor Strine, settled across the street from

16    his courthouse, and hostilities came to an end the next day.

17         THE COURT:  And I expect, at some point, hostilities

18    will come to an end between all the parties here.

19         But I interrupted you.  Go ahead.

20         MR. CHESLER:  Your Honor, I was simply going to

21    conclude, having said that, I think we satisfied all three of

22    the prongs, with the request which, of course, is the

23    centerpiece of our motion, which is:  This issues are being

24    litigated all over the place.  We have come here to ask this

25    Court to let us litigate them here.  Both of these companies

1    sit in the middle of the state, the bottom of the state.  We

2    are in California.  We can litigate it here.  Apple began the

3    litigation here.  They filed this lawsuit first.  We have made

4    our counterclaims.

5        Your Honor just said that this litigation, for at least

6    pretrial purposes, is going to be consolidated with the

7    contract manufacturers' litigation.  Their claims are in most

8    respects mirror images of the Apple claims, which is not

9    surprising since Apple is indemnifying them all, and their

10   claims echo what the Apple lawyers have drafted.  It is all

11   here.  We don't need for it to be anyplace else.

12       It is indeed vexatious.  It is indeed oppressive for us to

13   have to defend these claims all over.  And again, if there is

14   anything left on those claims that is not subsumed within what

15   is done here, the *Microsoft* case is itself proof that these

16   injunctions don't prohibit that because the non-injunction

17   claims in Germany were permitted by the terms of that

18   injunction to go forward anyway.

19           THE COURT:  Let me ask you one final question, at

20   least at this moment.

21           MR. CHESLER:  Yes, Your Honor.

22           THE COURT:  You have sought to quash or shut down

23   these lawsuits in these foreign tribunals in total.  What is

24   your position with respect to a preliminary injunction that

25   would only halt proceedings or direct Apple to halt its

1  proceedings with respect to just the FRAND issue but allow the

2  other anticompetitive cause of action to go forward?

3       MR. CHESLER:  Your Honor, if that was as far as you

4  would be willing to go, we would be quite anxious to get that

5  relief because, as it stands now, we have no relief.  We have

6  multiple-front wars.  And it's really, really terribly

7  burdensome on this company.  Anything that Your Honor gives us

8  to focus -- because, believe me, I believe that if the FRAND

9  issue gets resolved -- and we now have a schedule from the

10  magistrate judge and we understand Your Honor set a final

11  pretrial conference date coincident with the entry of that

12  schedule, which we just found out about a few hours ago -- if

13  this case proceeds with alacrity and the FRAND issues get

14  litigated in this court, which is what we want, that's going to

15  have a profound impact on those other lawsuits, including the

16  competition-related claims in those lawsuits.

17       Not because of formal issue preclusion across

18  international borders.  I know that doesn't exist.

19       Not even because of treaties that deal with enforcement of

20  judgments because that requires an absolute final judgment no

21  longer subject to any appeals within the domestic system of

22  that country before those treaties apply, assuming there even

23  is in a treaty, but because, as a practical matter, the core of

24  this dispute is this FRAND licensing question.  And when that

25  gets resolved, it's going to have a profound effect upon the

1   other claims, whether they neatly, in a formal sense, fall into

2   that bucket or not.

3           THE COURT:  Thank you.

4           MR. ISAACSON:  Bill Isaacson for Apple.

5       We have put our presentation on slides and handed them up

6   to you.

7       At the outset, Your Honor, what I would like to say on

8   behalf of Apple, as the master of its complaint in all of these

9   jurisdictions, is that Apple is not seeking a worldwide FRAND

10  determination in this court or any other court.  In fact, when

11  you look at our pleadings, we are seeking FRAND determinations

12  on 18 specific patents, as well as other determinations about

13  those patents.  In fact, it is Apple's position that if

14  someone -- if Qualcomm makes a motion for a worldwide FRAND

15  determination, we are going to oppose it in any jurisdiction.

16          THE COURT:  Why?

17          MR. ISAACSON:  Couple of reasons.  First of all,

18  there is simply no authority, particularly in the United

19  States, for a nonconsensual determination of the outcome of a

20  negotiation.  It is -- and you were getting at this issue in

21  your discussion with Mr. Chesler.  Yes, there's a negotiation

22  that has gone on; it was unsuccessful.  It is referenced in

23  pleadings, as part of the background of this case.

24      However, Apple does not have any obligation to enter a

25  license with Qualcomm on the terms that Qualcomm says should be

1    FRAND.  Apple has made what it believes to be a FRAND offer.

2    Qualcomm disagrees.  However, the fact that those negotiations

3    broke down does not mean that the Court has the authority to

4    step in and say, "I will determine what is fair in these

5    circumstances," especially when you consider this across a

6    portfolio of what Qualcomm says is thousands of patents, which

7    gets to the other problem.

8         The patents, which would be the subject of the worldwide

9    FRAND determination, are not before this Court.  They are not

10   in any of the pleadings.  They are not -- there's no one asking

11   you to review those.  In fact, it is the opposite.  Qualcomm

12   very much wants you to set a FRAND rate without actually

13   looking at the patents; in other words, to have this Court set

14   a royalty for licensing of a patent without knowing what the

15   patents are.  They are not in the pleadings.

16        THE COURT:  Did Judge Robart do something along those

17   lines in the *Microsoft* case?

18        MR. ISAACSON:  The only time this has ever happened

19   is by consent.  It has never happened in the United States when

20   one party has opposed it, and that was the *Apple v. Ericsson*

21   case, for example.

22      In fact, that's -- it's sort of a hint as to what is going

23   on when the major case that Qualcomm is relying on is from a

24   British court.  But even in that British court -- this is

25   *Unwired Planet* -- the parties consented to this procedure, but

1    it was a different procedure because there, before you got to

2    the FRAND determination issues, there were technical hearings

3    about infringement and patent construction of specific patents.

4        What they want this Court to do would both exceed -- it

5    exceeds the power of the scope of a patent for a Court to

6    impose a royalty without having considered the patent.  It

7    violates due process for the Court to set a royalty without

8    determining the issue of infringement of a specific patent,

9    without determining -- without hearing defenses as to validity.

10   You have to go through all of those steps.  And they want --

11            THE COURT:  Do you have any cases that stand for that

12   proposition?

13            MR. ISAACSON:  Yes.  The Apple case that I cited for

14   you, *Ericsson*.

15       But it really does go to just basic principles of not

16   exceeding the power of the patent.  You can't order a royalty

17   without knowing about the patent.  It goes to basic issues of

18   due process to say we -- if they are saying we are using their

19   patents and that we should be paying a royalty, we are allowed

20   to defend against those patents.  They have to show we are

21   using them, that we are infringing them.  We are allowed to

22   defend that they are not valid.  You can't just jump to the end

23   line and say, "Oh, okay.  What should be the royalty rate in

24   this circumstance?"

25            They are actually -- there's several extraordinary aspects

1   of this motion.  One is that it's worldwide, trying to shut

2   down lawsuits because it attacks their business model.  And the

3   other is --

4        THE COURT:  Let me ask you the same question I

5   previously asked, as far as whether or not you are familiar

6   with other situations where we have Apple or Qualcomm filing

7   various actions around the world, based upon the same --

8   basically the same FRAND dispute.

9        MR. ISAACSON:  I am not going to say basically the

10  same.  I am not going to represent that to you.  But I can tell

11  you that Qualcomm sued a company named Meizu, in China, Europe,

12  and another area, saying that they were infringing their

13  patents, in order to seek -- and they were standard-essential

14  patents, subject to a FRAND obligation, which resulted in a

15  resolution of that litigation, of some sort of FRAND license.

16      It is not unusual in this global world to file multiple

17  patent actions because you have U.S. patents, you have British

18  patents, you have Japanese patents.  It is not unusual to file

19  antitrust claims in multiple jurisdictions, where you have

20  business in multiple jurisdictions, because if you file your

21  action in the United States, you can get your U.S. damages.

22  You can't get your damages in Japan and in Europe.  And those

23  laws are different.

24      And that's fundamentally what is going on here, is that

25  what they are objecting to is Apple exercising its rights under

1    foreign law, because in each of those jurisdictions -- and this

2    is laid out in the attorney affidavits that we have set forth

3    in our pleadings -- we are bringing foreign cases under foreign

4    law under foreign antitrust laws dealing with foreign patents

5    and foreign damages.  We are not seeking a worldwide FRAND

6    determination in any of those.  And what --

7            THE COURT:  Does it make sense to do that, to obtain

8    a worldwide FRAND determination?

9            MR. ISAACSON:  We don't -- worldwide FRAND

10   determinations are a negotiation.  It is something parties can

11   decide to do if it fits their circumstances.

12           THE COURT:  But would it make sense for a court to

13   engage in that?

14       I guess you are saying that, absent the parties'

15   consenting, that I can't engage in that process, of determining

16   a worldwide FRAND royalty?

17           MR. ISAACSON:  Right.  Right.  Because even if you --

18   you can't do it in this structure because of the absence of the

19   patents being before you.  But even if you had the patents

20   before you, if parties are in a negotiation and they are

21   saying -- one side is saying, "You are unfair," and the other

22   side is saying, "You are unfair."  You can't come before the

23   Court and say "Resolve this."  You can go to a mediator.  But

24   in the absence -- what you bring before a court is legal

25   claims.  And there isn't such a thing as a legal claim to say,

1    "Please help us resolve this negotiation."

2         And both parties -- and that's why it doesn't happen

3    except by consent.  There is simply no precedent for anything

4    like this.

5         What there is precedent for is the standard -- are the

6    type of actions Apple has brought.  We have legal claims.  We

7    have legal claims under the antitrust laws of different

8    countries, under the patent laws of different countries, under

9    foreign patents and damages saying, "Yes, this business model

10   is illegal."  It is something that regulatory agencies are also

11   saying.  But we can bring these in different countries.

12        And the incoherence of what is happening here -- and also

13   the overreach -- is illustrated by what the answer -- when you

14   asked the question about, "Well, can I just enjoin FRAND?"

15        Now, what their papers do is ask for an injunction where

16   you just stop all these lawsuits.  Come to a dead halt.  And as

17   I understood what Mr. Chesler said is they will just be halted

18   until some day this Court does a worldwide FRAND determination,

19   and then I guess you remand the issue to these foreign courts

20   and say, "Do you have anything left over there?  Anything left

21   in the antitrust claims?  Anything left in the foreign patent

22   claims?  Now you can go ahead."

23        That would be absolutely an extraordinary breach of

24   principle as a company.  That would be this Court running

25   courts around the world.  But separate from that, the -- when

1    you just say "the FRAND issue," that is not like -- there's

2    like one FRAND claim.  We are not seeking a worldwide FRAND

3    determination.  We do say, for example, in the antitrust claim,

4    as part of it, that they are above FRAND.  That does not seek a

5    FRAND determination.  That allegation is part of the FTC's

6    case.  It is part of the Korean authorities.  It is part of our

7    complaint.  It is part of the class action complaint, up in

8    Northern California.

9        They want you to say, "No.  No.  No.  No.  You can't --

10   you can't -- foreign courts, you can't even look at the FRAND

11   issue even if it is part of the antitrust claim, even if it is

12   part of a damages claim, even if it has something to do with

13   the foreign patents."  Right?

14       That is completely outside of the rubric of the type of

15   injunction that they are seeking, and it would be the grossest

16   breach of comity imaginable.

17       If I can show you slide 9, in our presentation.  Here is

18   where we have outlined, hopefully simply, that no Apple case

19   seeks a global FRAND determination.  And it is worth pointing

20   out, all these cases are at the early stage, they are basically

21   at the complaint stage, so there is no motion.  There's no

22   request for a global FRAND determination.  And as I said, if

23   there were such a one, we would oppose it.

24       And in the United States, we have individual accounts for

25   FRAND determinations of specific patents in suit, numbered

1  patents.  For example, Count 7, there's 18 similar counts,

2  along those lines.

3      As we have explained in our affidavits of China, the UK,

4  Taiwan and Japan, that none of those cases are seeking a

5  worldwide FRAND determination, and each one involves issues of

6  foreign law; principally, antitrust law and patent law.

7      So when Mr. Chesler points to the comments of Mr. Cook,

8  saying, "We need the Court's help," it's not -- yes, Mr. Cook

9  did not say, "We have 18 specific counts where we are asking

10 the Court's help with FRAND."  That's neither here nor there.

11     He also quotes a statement in Korea, which is not one of

12 these pieces of litigation, where we say yes -- are we seeking

13 a fair royalty license?  Yes.  For 18 specific patents.

14     He points to paragraphs of our complaint.  Often those are

15 within the antitrust claims, and then he says that, at its

16 core -- the FRAND issue is at the core of our antitrust case.

17 That is incorrect.

18     It is important to the antitrust case, but the antitrust

19 case -- similar to the case of the FTC -- talks about, first,

20 Qualcomm's policy of not licensing to competitors.  Second, its

21 no license/no chips policy; that if you want to buy their

22 chips, you are going to have to license and pay a royalty.

23 Part of that discussion there is that the royalty ends up being

24 above FRAND, but it's only part of that.

25     Third, is the exclusive contracts and discriminatory

1   contracts that it enters in order to maintain its monopoly

2   power.

3       And finally, the Apple case talks about a gag order that

4   was imposed on us so we not challenge the patent is exhausted

5   or is above FRAND, as well as the next step, where they

6   withhold almost a billion dollars in rebates because we were

7   cooperating with antitrust authorities.

8       And actually, where they said, "We will give you the

9   almost $1 billion back if you change your testimony and say

10  what you said was false."

11      There wasn't an "uh-oh" moment when we got their papers.

12  There was some confusion as to what were they talking about,

13  because they were asking to enjoin us from seeking something

14  that we were not going to seek and that we would oppose.

15      But what is really at issue is where Mr. Chesler started

16  off.  They don't like a worldwide assault on their business

17  model, a business model they have described as unique, that we

18  have described as unique, that the FTC has described as unique,

19  all because they charge -- you buy the chips, and unlike any

20  other licensing group, they then charge you a royalty above

21  that, and that has been used to maintain the monopoly power and

22  charge royalties on exhausted patents and to achieve rates

23  above FRAND and the other elements of our claim.  Completely

24  unique.

25      And we are allowed, in many countries, to exercise our

1    rights to bring cases to challenge that model.

2        And it's interesting that Mr. Chesler says, "We are not

3    seeking an injunction against government regulators."

4        All right.  Government regulators don't -- in many cases,

5    including the United States, including the FTC -- don't bring

6    actions on behalf of private parties.  But when government

7    agencies do take action, it is not unusual for private parties

8    to step in and exercise their own rights in order to take care

9    of whatever compensation or anything else they are entitled to,

10   injunctive relief, following on the government action, such as

11   the FTC action up north.

12       What they want is those private actions shut down

13   worldwide, in order to protect their business model, just like

14   they did when they said we are going to withhold almost a

15   billion dollars because you are cooperating in an attack on our

16   business model.

17       Mr. Chesler said something else, too, which was

18   interesting.  You asked him about the ITC proceeding, and he

19   said, "Well, that's different, because that has to do with

20   nonstandard-essential patents, NEPs," which is true.

21       But that was not what we were pointing out in our papers.

22   What we were pointing out in our papers is similar to them

23   withholding almost a billion dollars because we were a witness

24   in proceedings, similar to this injunction effort to shut down

25   lawsuits around the globe that assault their business model.

1    And the ITC -- they are actually taking action to strip this

2    Court of authority to order relief on some of our claims

3    because in the ITC, based on their NEPs --

4              THE COURT:  Based upon their what?

5              MR. ISAACSON:  Their NEPs, their nonessential

6    patents.  They are asking this relief.  Not a ban on imports of

7    all iPhones and iPads, which would be the standard relief.

8    They are asking only for a ban on imports of those where they

9    contain the chip of their competitor, their only competitor.

10   And they have said to the ITC it should not be concerned about

11   this affecting consumers because they can fill in the rest of

12   the supply.  In other words, what they want out of the ITC

13   proceeding is a government agency ordering them into an

14   exclusive arrangement, which they lost last year with Apple.

15       And part of Apple's complaint in the antitrust issue, as I

16   explained, is those exclusive agreements are part of how

17   Qualcomm has foreclosed competition.  That's part of the FTC's

18   complaint as well.  It would be a valid issue before the Court

19   up north that what they are doing in the ITC is foreclosing the

20   jurisdiction of the Court.

21       That injunction, which we are not asking for, is far

22   closer to the traditional simple injunction to protect the

23   jurisdiction of a court than what we are talking about.

24       We list, on slide 9, how the previous cases have been

25   consensual, and we give you the citations there.  Mr. Chelser

1    says, to defend the Court from doing a worldwide FRAND

2    determination.  And again, the irony here is that they are

3    seeking an injunction to stop us from asking for something we

4    don't want to ask for and we will oppose, in order to protect

5    their right to something we don't think they have, and that's

6    the right to seek a worldwide FRAND determination.

7        And he says FRAND is a worldwide commitment.  That's all

8    well and good.  Right?  There are many commitments that spread

9    across international lines.  That does not mean a court has

10   jurisdiction to step in, resolve a negotiation that is going on

11   over worldwide issues.  It doesn't make the whole thing

12   jurisdictional.

13       What we will point out here, on slide 10, a U.S. case is

14   not going to resolve the foreign claims.  We believe it has to

15   resolve all the claims, and that is what the case says, but it

16   is not going to resolve the core of them.  It is not going to

17   resolve probably any of them.  It may have an effect on the

18   case, but it is not going to resolve the claims because we have

19   claims under foreign patents, foreign antitrust laws, and

20   damages claims under foreign law.

21       Mr. Chesler quoted a pleading in England, I think, where

22   Apple said we have similar claims under applicable laws across

23   the globe.  Yes, we have antitrust claims, which have some

24   similarities, across the globe, under different foreign laws.

25   We could not bring those claims here.  That's the only way to

1    bring those claims, nor would this Court have authority to

2    enjoin.  The same thing with foreign patents and foreign

3    damages claims.  And that's simply because of the territorial

4    limits of a U.S. Court.

5        As we point out on slide 11, U.S. patents claims are

6    territorial because U.S. patents have no extraterritorial

7    effects.  You don't -- and this Court -- you could not -- it

8    would be improper to bring before this Court foreign patents

9    and ask it to look at infringement and validity issues.  And

10   that is part of the worldwide FRAND issue.  That's exactly what

11   you would have to do to do a worldwide FRAND determination.

12       If they want a worldwide FRAND determination of Japanese

13   patents, Chinese patents, German patents, they have to come

14   before you and say, "They are using these.  They are infringing

15   them.  We should get paid."

16       And we should have the right to say, "That's not a valid

17   patent."  And all of a sudden this Court becomes the worldwide

18   patent court, which it's not permitted to do and probably

19   doesn't want to do.

20       Antitrust laws are similar -- slide 13.  They are limited

21   by the U.S. territories.  There are rules on this, but we are

22   not in any gray area here.  We have rights in these other

23   countries, under different antitrust laws, and it's recognized,

24   by the Supreme Court on down, that those laws are not

25   sufficiently analogous that a violation of one would be assumed

1   to be a violation of the other.

2      In fact, what is interesting is that Qualcomm, buried in

3   its papers, has recognized this.  This is on slide 14.

4      So in its answer to the FTC case before Judge Koh -- and

5   Judge Koh's opinion, by the way, on the motion to dismiss is

6   quite helpful in explaining the antitrust claims that overlap

7   between this case and that case.  And like any other decision

8   on a motion to dismiss, it accepts the allegations of the

9   complaint as true.  There have been no factual findings, but

10   there are legal rulings in there about things that aren't

11   contested; for example, if you accept as true that Qualcomm has

12   a no license/no chips policy, she makes important rulings as to

13   why that would be anticompetitive.  Qualcomm doesn't deny it

14   has a no license/no chips policy; instead, it is defending it.

15      In answer to that, the FTC is saying that you are above

16   FRAND.  They are not asking for FRAND determination, but they

17   are saying you are above FRAND.  And in their answer, they say,

18   "Any requested relief that would apply to the licensing of

19   patents issued by a jurisdiction other than the United States

20   would be barred as beyond the reach of the U.S. antitrust laws,

21   including the FTC Act, or as an improper application of those

22   laws due to the principles of international comity."

23      So we pointed that out in our opposition, and in reply,

24   here is what they said in explanation of that direct

25   contradiction of what they are doing here, where they are

1    actually asking for an injunction against the foreign antitrust

2    claims.

3        In its answer in the FTC action, Qualcomm stated, "If the

4    Court found a violation of U.S. antitrust law, the FTC could

5    not obtain extraterritorial relief related to licensing of

6    foreign patents because U.S. antitrust law applies only to

7    U.S.-related conduct."

8        That precisely makes the point that we are making, that

9    your ruling here, on antitrust laws, including whether

10   something is above FRAND, will not have an extraterritorial

11   effect, and therefore, if we have rights in some other

12   location, we have to pursue them there.

13       And it's relevant to point out that when you look at the

14   antitrust claims, asking if they are above FRAND, you will not

15   have to determine exactly what the FRAND rate is.  You can make

16   rulings as to whether something is above FRAND.  And that is

17   illustrated on slide 15.

18       Judge Koh talked about this in her decision on the motion

19   to dismiss because the FRAND -- whether someone is above FRAND

20   is both -- pull in some legal language -- is both procedural

21   and substantive.  Judge Koh explains how that the no license/no

22   chips policy stops a fair negotiation because you don't

23   enter -- when you are negotiating with Qualcomm about a

24   royalty, you are concerned about not having the chips.  And

25   that disrupts and eliminates the FRAND process.  Because of the

1    tax that Qualcomm imposes uniquely on the -- on the OEMs and

2    the customers, above and beyond the cost of the chips, that

3    disrupts the FRAND process.

4          It's also the case -- and we have put this in our

5    affidavits -- that the rates that Qualcomm is demanding from us

6    are much higher -- and this is illustrated down at the bottom

7    of this chart -- than all the four major SEP holders.  They are

8    cellular SEPs.  You will see what Qualcomm is demanding in the

9    left bar, what we pay the other four major SEP holders in the

10   right bar.  And those four major SEP holders have more

11   standard-essential patents declared than Qualcomm does.

12         Now, a declaration is not the same thing as actually

13   having a standard-essential patent, but it's one method of

14   comparison at this early stage.

15         THE COURT:  Let me ask you something.  Under the

16   three-part inquiry for assessing the propriety of an antisuit

17   injunction, the first consideration or first factor is whether

18   or not the parties or the issues are functionally the same.

19         As I understand it, you are saying that the issues are not

20   functionally the same because, number one, given that this

21   Court is not in a position to make a worldwide FRAND

22   determination, it could never resolve that issue as it relates

23   to these actions in the UK, Korea, Japan, and China.

24         MR. ISAACSON:  I would add to that, whether or not

25   you agree with our decision on that, we are not seeking that in

1   any of the jurisdictions.

2          THE COURT:  But in the counterclaim, I think Qualcomm

3   has offered up all of their SEPs that relate to the action,

4   correct?

5          MR. ISAACSON:  They have said they want their last

6   offer to us to be declared to be FRAND.  So that is one way of

7   answering your question yes, with some specificity.

8          THE COURT:  You are saying that just because Qualcomm

9   has introduced that offer and those issues in a counterclaim,

10  that that still doesn't get over the fact that, ultimately,

11  this Court cannot make that worldwide FRAND determination

12  absent the consent of the parties?

13         MR. ISAACSON:  That would be our position, yes, Your

14  Honor.

15     But our position would also be that even if they are

16  seeking that here, we are not seeking it elsewhere.

17         THE COURT:  I get that.

18     So that's, I would think, one of the primary underpinnings

19  of your position, that the issues in these two cases are

20  functionally not the same, and then there's obviously the

21  question about the antitrust litigation and the matter of

22  damages and then the specifics as to patents, correct?

23         MR. ISAACSON:  Right.

24     I think it's worthy of note, when you look at the

25  affidavits of the foreign counsel of both parties, that our

1  affidavits explain how the issues are different from the U.S.

2  case; whereas, their -- their affidavits simply explain the

3  state of the proceedings there and attach the relevant

4  complaint.

5          THE COURT:  And then, as far as the Unterweser

6  factors, Qualcomm asserts that this litigation that you have

7  filed in foreign tribunals is vexatious or oppressive.  Can you

8  respond to that assertion?

9          MR. ISAACSON:  Yes.  To some extent, they are

10  intertwined.  It is not vexatious to exercise your independent

11  legal rights in foreign courts under foreign law.  That's

12  actually what you are supposed to be doing.  That goes to what

13  Mr. Chesler started off saying, "We should not have our

14  business model attacked in multiple courts."  That is what they

15  are saying is vexatious.

16      But parties have the right to bring their foreign law

17  claims in the courts where they are supposed to be.  And they

18  are not actually, with respect to these patent claims and

19  antitrust claims, allowed to even bring them into this court.

20      This other point about vexatious is about the withholding.

21          THE COURT:  Are you concerned at all about

22  inconsistent determinations with respect to FRAND issues?

23          MR. ISAACSON:  No.

24          THE COURT:  Is there that possibility?

25          MR. ISAACSON:  No.  Because we are seeking FRAND

1  determinations of specific U.S. patents.  There will be no

2  foreign court making a FRAND determination of any U.S. patent.

3       THE COURT:  To the extent the counterclaim invites or

4  requests this Court to go further than Apple's complaint,

5  wouldn't, then, there be the probability or likelihood of

6  inconsistency?

7       MR. ISAACSON:  No, because we will not be seeking

8  that determination in any other court.  You would be the only

9  Court doing it.  You would have no one to be inconsistent with.

10      THE COURT:  All right.

11      MR. ISAACSON:  And the other -- Mr. Chesler's other

12  point on the "vexatious" is we are withholding money.  It is

13  worth noting that the withholding began with Qualcomm

14  withholding almost a billion dollars.  So it's somewhat ironic

15  to say that, when you are supposed to look at something being

16  vexatious, that you should consider the fact that we are

17  withholding money.

18      And he quotes a letter, which is neither here nor there to

19  what he is talking about, because if this Court or a court

20  elsewhere orders us to pay money, we are, of course, going to

21  honor that order.

22      There's no issue of us saying to -- for example, to Your

23  Honor, "We are not going to pay a judgment until this is

24  resolved over there."

25      This is just them being unhappy about what they started.

```
 1              THE COURT:  Could you address the comity issue.
 2              MR. ISAACSON:  Yes.
 3        This is where things become, I think, remarkable and
 4   egregious, and it's illustrated by the Ninth Circuit law.
 5   The -- and Your Honor was right; when this has come up before,
 6   it's been kind of clean and simple.
 7        It is simply unheard of for a U.S. court to enjoin foreign
 8   antitrust claims, to enjoin proceedings on foreign patents, or
 9   to enjoin foreign damages actions.
10        It would also be a complete insult to these countries and
11   their courts to say, "All right.  I will let you go ahead with
12   everything except you should not listen to anything about
13   FRAND."  I am not sure how this order is written, but to say,
14   on an antitrust claim, that the FTC in our country can say it
15   is above FRAND, but in your court, over there, you can't.  That
16   would be unheard of.
17        On slide 20, we point out -- they actually make the
18   statement in the reply brief that the Ninth Circuit always
19   affirms antisuit injunctions.  These are pretty easy, right?
20   The central cases on this --
21              THE COURT:  Just so you know, I have looked closely
22   at all the cases and I have reviewed your PowerPoint --
23              MR. ISAACSON:  I won't proceed with that.
24        I think I will wrap up with that, that what this
25   injunction is seeking is what Mr. Chesler said at the outset,
```

1    which would be a gross abuse of the injunction power.  It is

2    trying to stop lawsuits challenging their model.  They have

3    tried that a number of ways, by withholding rebates for talking

4    to competition authorities, by an ITC action which would impose

5    exclusivity.  They want this unique business model, and the

6    Court simply should not and does not have the authority to say,

7    "I am going to shut down all these attacks on the business

8    model."  And once you look at are we seeking a worldwide FRAND

9    determination, the answer is no.

10        And this is a preview of what you are going to hear when

11   they ask for one and we say, "No, Your Honor, you should not do

12   that."

13            THE COURT:  All right.  Thank you.

14        Mr. Chesler.

15            MR. CHESLER:  Thank you, Your Honor.

16        I will be brief, Your Honor.  I want to begin where I

17   think Mr. Isaacson sort of ended in response to one of your

18   questions.  And I want to be absolutely clear with the Court.

19        You have the authority to make a worldwide FRAND

20   determination here.  You absolutely have that authority.

21   Because they have tried to conflate two different things.

22   Thing one is a contractual question, which relates to the

23   commitments that we have made to standards organizations for

24   which they claim to be that third-party beneficiary.  That's a

25   contract question.  And they have tried to conflate that with

1   the litigation of one-off patent disputes, which, if the

2   licensing contractual question were resolved, would become

3   moot, because they would have the ability, whether they choose

4   to take it or not, to accept a license that would moot the

5   patent disputes on FRAND terms, and they don't have to take it.

6       I agree with Mr. Isaacson, they are under no obligation to

7   in fact enter into a license with us.  But as I said to Your

8   Honor in my opening remarks, if there's a FRAND determination

9   made and they then choose not to enter into that license, then

10  they are an unwilling licensee, and all of these arguments they

11  are making evaporate because they are all premised on the

12  notion that they can't get to our technology under FRAND terms.

13      And for Mr. Isaacson to stand here and tell you that you

14  don't have the authority to make a determination of what would

15  be a FRAND offer -- whether they choose to accept it or not --

16  between two American companies located in California is

17  remarkable.  It's absolutely remarkable.

18          THE COURT:  So walk me through this *Apple v. Ericsson*

19  case that's referenced by Apple.  And it begins with, "Due

20  process does not permit Apple to be compelled to have a

21  worldwide FRAND license.  Apple has the right to defend itself

22  against infringement charges by putting Qualcomm to its burden

23  on the individual patents that make up the portfolio."

24          MR. CHESLER:  Right.  First, because we are talking

25  about the difference between whether we have a right to get a

1  worldwide determination on the one hand and whether they have

2  an obligation to accept what they have been offered on the

3  other hand.

4       If it were in fact not possible for you to enter an order

5  that says, "What Qualcomm offered was a worldwide

6  determination," then it would mean that every single FRAND

7  dispute would have to be resolved one patent at a time in

8  courts all over the world.  It would be absolute chaos, Your

9  Honor.

10      In fact, Your Honor -- in fact, in one of the lawsuits

11  which we cite to Your Honor, the Apple against Motorola case,

12  Apple took the position in that case that the litigation -- the

13  issue of FRAND determination should not be done on a

14  patent-by-patent basis.  They argued exactly the opposite of

15  the position that they just argued to you.  And in fact, they

16  came up with a bunch of alternative ways to value the portfolio

17  of patents on the table between Apple and Motorola.

18      This was a Western District of Wisconsin case from 2012.

19      The Court didn't like the valuation options that they

20  offered in that case.  The Court then dismissed the case

21  because in that case there was no counterclaim, as there is

22  here; so the Court said, "You know what?  Thinking about this,

23  I don't have a justiciable controversy because Apple is

24  refusing to be bound by any FRAND determination I make.  I

25  can't order them to enter into a license, so all Apple is

1    asking me for is to set a ceiling of licensing terms, and I

2    don't give advisory opinions.  I am an Article III judge," and

3    she threw their case out.

4        What they were arguing there was you should not value the

5    portfolio patent by patent.  What they just told you now was

6    you have to.  Not only should you; you must allow them to value

7    it patent by patent, and they have told you you have no

8    authority to determine that what we have offered is FRAND.

9        I want to be absolutely clear, Your Honor, we are not

10   standing here and we would never stand here telling you you

11   have the authority to order them to enter into a license with

12   us.  You don't.  And we are not asking for that.  But you

13   absolutely have the authority to say what we offered satisfies

14   our FRAND obligation, and then it's up to Apple to decide what

15   to do.

16       They can accept it; they can come to some other agreement

17   with us that we will agree to and walk away happily into the

18   sunset; or they can refuse to take it and take the risks that

19   are associated with being an unwilling licensee.

20       But to suggest that you can't make that determination,

21   that our declaratory judgment objection asks you to exert

22   authority you don't have, is untenable.  And it's

23   irreconcilable with the position that they took in the *Motorola*

24   litigation, where they argued against a patent-by-patent

25   determination.

```
 1        Also, Your Honor, with respect to the Ericsson against

 2   Samsung case, which we also cited in our papers -- in that

 3   case, the Court started down the road of making a

 4   patent-by-patent determination, and then, one of the parties

 5   moved under Rule 42B and said, "This makes no sense.  We are

 6   going to be at this forever going patent by patent."  They

 7   said -- the party that moved for a 42B trial said, "We should

 8   try the FRAND case first, the FRAND issues first, because if in

 9   fact there's a determination that we have made a FRAND offer,

10   there's no reason to litigate patent by patent."  That's why

11   people take licenses to portfolios because they would otherwise

12   be left with an endless stream of patent-by-patent litigation.

13        Our SULAs, our licenses to their contract manufacturers,

14   which they are the beneficiaries of via the pass-through,

15   involve thousands of patents.  The reason they take licenses --

16   and hundreds of licensees in this industry have taken them --

17   is precisely to avoid what Mr. Isaacson has told you is the

18   only route that you have, which is to require a

19   one-patent-at-a-time litigation.

20        I tell Your Honor something you are going to hear over and

21   over again from me in this litigation:  You could decide that

22   every one of the 18 patents on which they have raised claims --

23   we think you should, based on the merits, but you could decide

24   every one of them is invalid.  You could decide every one of is

25   uninfringed.  It would not move the needle of the licensing
```

1   dispute between these parties one second, one inch, because we

2   have thousands of patents at issue.  Those 18 patents are a

3   flea on the tail of the dog.  The dog is the contract question.

4   And the contract question is a universal, worldwide question.

5        We are not talking about ordering any foreign court to do

6   anything.  We are asking this Court to say, "I have the

7   authority to decide that question.  I should decide it here.

8   It shouldn't be litigated piecemeal in other places while I am

9   deciding it here.  And whatever else those foreign courts

10  ultimately decide to do on their unique issues is up to them.

11  But I can tell Apple -- not Germany, not the UK, not Taiwan --

12  I can tell Apple that Qualcomm has raised a valid counterclaim

13  for declaratory judgment, and whether they want to take the

14  license or not, that's their business.  But I can decide

15  whether the license meets FRAND or not."

16       You absolutely have that authority because otherwise the

17  world descends into chaos.  If we have thousands of patents,

18  Your Honor, ask yourself, how would we ever get to a licensing

19  result on a patent-by-patent basis?  It would never happen.

20       We would be -- not only thousands of patents, but scores

21  and scores -- most of these patents have foreign counterparts

22  all over the world.  We would be at this forever.

23       That's why the court in the Ericsson case ordered a 42B

24  trial on FRAND ahead of the patents -- by they way, over the

25  objection of Samsung.  Mr. Isaacson said this was all done on

1   consent.  That is sleight of hand.  What was consented to was

2   the Court ought to rule on FRAND.  Samsung fought like the

3   dickens to prevent a FRAND case being litigated before the

4   patents were litigated.  And over their objection, the Court

5   said, "It makes no sense to do this patent by patent; we are

6   going to do it by portfolio," which ironically is exactly what

7   they argued in the Motorola case, where they said, "Don't it

8   patent by patent.  Look at other licensing situations.  Get

9   what real estate brokers do; look for comparables, like other

10  houses.  Figure out" -- what the judge doesn't like in that

11  case, they said, is "How many patents do we have as a

12  percentage of all the SEPs?  How many patents do they have as a

13  percentage of all the SEPs?  And let's just figure out what the

14  relative market share of the SEPs is between these two

15  companies, and that's the way on which you can decide how much

16  we owe them and they owe us."

17      And the Court said, "That's a dumb idea because one patent

18  can be very valuable and another patent could be valueless.

19  You are just doing it on a per-patent basis, and that is not a

20  way to do it."

21      The significance here was they were arguing against doing

22  it patent by patent and they were trying to come up with

23  valuation bases on a portfolio basis.  Why did they spend, they

24  claim, since 2006 -- if FRAND is not a worldwide licensing

25  question, why would a company as smart as Apple, with as many

1    lawyers as Apple has, spend 11 years trying to get a portfolio

2    license from us directly if this were not in fact what happens

3    worldwide in the real world?  That is simply disingenuous, Your

4    Honor.  It makes no sense.

5         The Meizu case.  There was one FRAND case in Meizu.  It

6    was in China.  Mr. Isaacson misspoke if he suggested to Your

7    Honor that there were comparable situations where we were

8    litigating FRAND all over the world.  Not so.  It was one

9    place.  They were an unwilling licensee.  We had one FRAND

10   litigation, and it was in China.

11        With respect to the claims he made about the BCPA, this

12   business cooperation agreement.  The facts, Your Honor, are

13   these.  They breached their agreement.  They breached it

14   because they went out and said things to regulators and did

15   things they promised not to do, in exchange for which we paid

16   them millions and millions of dollars.  And they came to us,

17   and they said, "What can we do to resolve this dispute?"

18        And we said, "Tell the truth."  That's what happened.

19        And they didn't tell the truth then, and they haven't told

20   the truth since, and all of that is going to come out

21   ultimately when we get to trial.  That's what that dispute was

22   about.

23        To compare that to what they have done with respect to

24   withholding royalties absolutely doesn't hold water.

25        And Your Honor asked me a question earlier, do they have

1   the legal authority to tell the contract manufacturers to stop

2   paying, and I said absolutely not.  They can't compare a

3   situation in which they breached agreement and we said we are

4   not going to continue to pay you money in response to that

5   blatant breach to a situation in which they ordered third

6   parties, in a contract to which they are not a party, to stop

7   paying us.  And we will get to that hopefully in a few minutes.

8       My last point, Your Honor.  In the Microsoft case, the

9   question of the fact that there are different legal systems

10  with different legal standards came up precisely as it does

11  here, and here is what the Ninth Circuit said.  "The mere fact

12  that different jurisdictions answer the same legal question

13  differently does not, without more, constitute an intolerable

14  comity problem."

15      If Apple's argument is correct that because they have

16  brought claims in foreign countries under foreign law means

17  that you don't have the authority to enjoin them to stop

18  duplicative litigation, then there would never be an antisuit

19  injunction entered by a U.S. court because any party that was

20  the subject of that motion could just file some claim in a

21  foreign court under foreign law and say "Can't stop me" because

22  you can't control what a foreign court does.

23      The antisuit injunction is against an American company,

24  not against a foreign court, for functionally the same claims.

25  And they cannot skirt that by saying, "In Germany, I want you

1  to go patent by patent.  In the UK, I want you to go patent by

2  patent.  Qualcomm wants you to go for a whole portfolio."

3      It is the same contractual question.  They can't change it

4  into different issues by saying, "I want to work from the

5  bottom up, through thousands and thousands of patents," which

6  they said was a terrible idea in the Motorola litigation, "and

7  you want to work from the top down and say let's license the

8  entire portfolio, as you have been trying to do for 11 years."

9  That doesn't make the issues different.

10          THE COURT:  Thank you.

11          MR. CHESLER:  Thank you, Your Honor.

12          THE COURT:  Mr. Isaacson, let me have you have

13  respond to the argument that was presented regarding Apple's

14  position in *Apple v. Motorola* and how, in that case, Apple

15  sought a portfolio-wide determination versus patent-by-patent

16  and what is your argument.

17          MR. ISAACSON:  Yes.  There's an element of truth to

18  what he is saying because that's an argument we made and lost.

19  And Judge Crabb, there, explained exactly what Mr. Chesler was

20  saying.

21      If there's -- he is saying that if you reach a worldwide

22  FRAND determination, there will be no obligation on our part to

23  accept it.  That's the problem that Judge Crabb had, in

24  Wisconsin.  Judge Crabb said, "That's an advisory opinion."

25  Right?  That's two parties in a negotiation asking for a court

1    to say, "Here is the fair result," but nobody has to accept it.

2    And that's the same result that was reached by Judge Donato in

3    the *Apple v. Ericsson* case.

4        So we have learned from that experience, and so our

5    preference is to no longer go through the situation where we

6    are just told about a portfolio.  We have put in 18 patents.

7    We have invited them to put in patents that could help resolve

8    the dispute between us, but we do want -- we don't want to see

9    the tail of the dog.  We want to see the dog, we want to see

10   the fleas.  We want to look at the patents before we pay some

11   extraordinary amount they are demanding to see what they are

12   worth.  And we think the Court would have to do that, too.

13            THE COURT:  How do you respond to the argument that,

14   even if you had 18 patents out of thousands of patents that

15   were declared invalid, that would not move the needle at all?

16            MR. ISAACSON:  So there's two needles.  There's --

17   needle one is the claims before the Court.  We have brought

18   claims before the Court.  We will ask the Court to resolve

19   them.  There's a schedule for resolving them.  They will get

20   resolved.

21       The second needle is will these two parties enter a

22   license, which they have never entered.  He talks about there's

23   chaos.  There has been no license ever.

24       We believe that litigating the 18 patents will move the

25   needle and assist the parties and create the possibility of a

1    license.  I don't know whether that will happen or not.

2    They -- we have invited them to say -- "Bring your patents in

3    here that you say we are infringing, your standard-essential

4    patents."  They are resolute in not doing that.  If they think

5    that moves the needle of the negotiations, we have invited them

6    to do that.

7        But ultimately, it is not the Court's job to resolve

8    needle two.  It is the Court's job to do what the Court does,

9    to have claims before it and resolve those claims.  And that's

10   what will happen in this case.  I have no doubt about that.

11   But the worldwide FRAND determination is not something

12   that's -- is not something that's going to do that, and the 18

13   patents will resolve part of this case, specific counts of the

14   complaint.

15             THE COURT:  Specific counts of the complaint, but as

16   a practical matter, in the big picture, what does it really do?

17             MR. ISAACSON:  We think that those patents are

18   important in the picture, and so we think it will have an

19   effect.

20       It also is of some relevance that, when one party says,

21   "Pay us a lot of money to license a portfolio," and it turns

22   out that the only patents in the case that were brought forward

23   were not infringed or invalid or were declared improperly, and

24   they can't come up -- forward with valuable patents that we are

25   using and that are valid, right, that sends a strong message

1    about what this portfolio is actually about.

2           THE COURT:  All right.  The matter will be taken

3    under submission.

4        (End of proceedings at 3:04 p.m.)

5                            -o0o-

6                  C-E-R-T-I-F-I-C-A-T-I-O-N

7

8           I hereby certify that I am a duly appointed,

9    qualified and acting official Court Reporter for the United

10   States District Court; that the foregoing is a true and correct

11   transcript of the proceedings had in the aforementioned cause;

12   that said transcript is a true and correct transcription of my

13   stenographic notes; and that the format used herein complies

14   with rules and requirements of the United States Judicial

15   Conference.

16           DATED:  August 23, 2017, at San Diego, California.

17

18                  /s/  Chari L. Bowery

19                  _____
                    Chari L. Bowery
20                  CSR No. 9944, RPR, CRR

21

22

23

24

25