1
2
3
4
5
6
7
8
UNITED STATES DISTRICT COURT
9
SOUTHERN DISTRICT OF CALIFORNIA
10
11
APPLE INC.,

Case No. 3:17-cv-00108-GPC-MDD
12
Plaintiff,
13
vs.
14

**ORDER DENYING ANTI-SUIT INJUNCTION**
15
QUALCOMM INCORPORATED,
16
Defendant.

(Redacted version)
17
18
19
ECF No. 92-1
20
QUALCOMM INCORPORATED,
21
Counterclaim-Plaintiff,
22
v.
23
APPLE INC.,
24
Counterclaim-Defendant.
25
26
27
28

1

1    Before the Court is a motion for anti-suit injunction filed by Defendant and

2    Counterclaim-Plaintiff Qualcomm Incorporated ("Qualcomm").  Dkt. No. 92-1.  The

3    motion has been fully briefed.  Plaintiff and Counter-Defendant Apple Inc. ("Apple")

4    filed an opposition on August 8, 2017 and Qualcomm filed a reply on August 15, 2017.

5    Dkt. Nos. 108, 114.  The Court heard oral argument on August 18, 2017.  Dkt. No. 118.

6    Upon review of the moving papers, the exhibits attached in support thereof, the

7    applicable law, and for the following reasons, the Court **DENIES** Qualcomm's motion

8    for anti-suit injunction.

9    **I. INTRODUCTION**

10    The underlying dispute arises out of what the parties refer to as the "FRAND

11    commitment" or the "FRAND Bargain."  In response to the globalization of the

12    telecommunications industry, key players in the industry have formed standard-setting

13    organizations ("SSOs") or standard-development organizations ("SDOs") to facilitate

14    worldwide connectivity.  The European Telecommunications Standards Institute

15    ("ETSI") is one of the most important and influential SSOs in the cellular

16    communications industry.  Both Apple and Qualcomm are members of ETSI, along with

17    eight hundred members from sixty-six other countries.

18    Before promulgating standards, ETSI requires — as do other SSOs — that any

19    putative owner of a standard-essential patent ("SEP") agree to make licenses available on

20    "fair, reasonable and non-discriminatory" (*i.e.*, FRAND) terms to willing licensees.  SEP

21    holders make this prohibitory promise with the understanding that they are entitled to

22    seek royalties from any and all entities that want to practice the standard.  The "FRAND

23    commitment" or "FRAND bargain," therefore, is a contractual obligation between the

24    SEP holder and the SSO.  Here, the contractual obligation is between Qualcomm and

25    ETSI.

26    Qualcomm holds thousands of FRAND-encumbered SEPs that comprise ETSI's

27    3G/UMTS and 4G/LTE cellular communication standards.  Apple's iPhones and other

28    cellular devices practice the 3G and 4G standards.  For years, Apple has practiced

Qualcomm's SEPs by relying on a license agreement between Qualcomm and the manufacturers who build Apple's iPhones and iPads (the "Contract Manufacturers").[1] Apple and Qualcomm have never executed a licensing agreement.

Since the introduction of the iPhone in 2007, Apple and Qualcomm have periodically engaged in negotiations regarding a direct license for Qualcomm's cellular SEP portfolio. The most recent took place between 2015 and 2017. In June 2016, Qualcomm offered Apple a license to Qualcomm's Chinese 3G and 4G cellular SEPs. A month later, and pursuant to Qualcomm's oral representations, Qualcomm offered Apple a license to Qualcomm's "rest-of-world" patent portfolio. Apple rejected both offers on the grounds that they were non-FRAND. Not long thereafter, Apple filed the instant suit.

## II. BACKGROUND

### A. Standard-setting organizations & intellectual property law

Standard-setting organizations are industry groups that create common platforms for the practice of modern technologies including telephones, the Internet, and other electronics. *See Microsoft Corp. v. Motorola, Inc.*, 871 F. Supp. 2d 1089, 1092 (W.D. Wash. 2012); *see also* Mark A. Lemley, *Intellectual Property Rights and Standard–Setting Organizations*, 90 Calif. L. Rev. 1889, 1892-93 (2002) (positively cited in *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 875 (9th Cir. 2012)). Through standardization, manufacturers from across the world can create products that interface with one another. *See Microsoft*, 871 F. Supp. 2d at 1092. Standardization benefits the consuming public by ensuring interoperability, lower product costs, and increased price competition. *Microsoft*, 696 F.3d at 876 (citing *Apple, Inc. v. Motorola Mobility, Inc.*, 2011 WL 7324582, *1 (W.D. Wis. June 7, 2011)).

---

[1] Qualcomm has sued the Contract Manufacturers in a related action for breach of their license agreements. Qualcomm Inc. v. Compal Electronics Inc. et al., 3:17-cv-01010-GPC-MDD (complaint filed May 17, 2017). The two cases were consolidated at the Court's August 18, 2017 hearing. Dkt. No. 118.

Yet as countless authorities have recognized, this private standardization process becomes complicated when the common technological platform is made up of intellectual property owned by different companies. *See Motorola*, 696 F.3d at 876. Entities that own patented technology essential to the operation of a technological standard are said to own standard-essential patents, or SEPs. In theory, SEP holders wield tremendous control over standards because, as patent holders, they have the right to exclude others from practicing their intellectual property. *See* Lemley, *Intellectual Property Rights*, at 1901. "As a result, standards threaten to endow holders of standard-essential patents with disproportionate market power." *Microsoft*, 696 F.3d at 876. To avoid this mischief and "to reduce the likelihood that owners of essential patents will abuse their market power, many standards setting organizations," including ETSI, "have adopted rules related to the disclosure and licensing of essential patents." *Microsoft*, 871 F. Supp. 2d at 1093.

To that end, ETSI requires all SEP participants to comply with the Intellectual Property Rights ("IPR") Policy.[2] The IPR policy requires members to disclose potentially standard-essential patents in a timely fashion. *Id.* § 4.1. More importantly, the IPR policy also obligates SEP holders to make a written commitment that they will grant irrevocable licenses to any willing licensee on fair, reasonable, and nondiscriminatory terms — that is, FRAND terms. *Id.* § 6.1. In the event an SEP owner is not prepared to license its intellectual property on FRAND terms, the IPR policy dictates that the governing body shall search for alternative technology to incorporate into the standard. *Id.* § 8.1.1.

By requiring all SEP holders to adhere to the FRAND commitment, ETSI and other SSOs mitigate the anticompetitive effects flowing from standardization. *See*

---

[2] *See* ETSI, ETSI Intellectual Property Rights Policy, Annex 6, (April 5, 2017), http://www.etsi.org/website/document/legal/etsi_ipr-policy.pdf. Apple cites to the IPR Policy in its complaint. *See*, *e.g.*, FAC ¶ 45, Dkt. No. 83 at 22. Qualcomm, in its answer, "refers [the Court] to ETSI's Intellectual Property Rights ("IPR") Policy for its contents." Answer to FAC ¶ 45, Dkt. No. 97 at 10. Given Qualcomm's referral, the Court finds it appropriate to take judicial notice of the provisions included in the IPR policy.

4

*Microsoft*, 696 F.3d at 876.  For if there was no FRAND commitment, then "once a standard has gained such widespread acceptance that compliance is effectively required to compete in a particular market, anyone holding a standard-essential patent could extract unreasonably high royalties from suppliers of standard-compliant products and services." *Id.* (quoting Mark A. Lemley, *Ten Things to Do About Patent Holdup of Standards (And One Not to)*, 48 B.C. L. Rev. 149 (2007)).  This potential abuse is well-documented in judicial opinions discussing FRAND and is often referred to as "patent hold-up." *See id.*; *see also Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1209 (Fed. Cir. 2014) ("Patent hold-up exists when the holder of a SEP demands excessive royalties after companies are locked into using a standard.").  The FRAND commitment, therefore, is designed to prevent patent holdup. *See Microsoft*, 696 F.3d at 876.

Qualcomm holds SEPs that are integral to practicing ETSI's 3G and 4G standards.  FACC ("First Amended Counterclaims") ¶ 96, Dkt. No. 70 at 78.  Qualcomm recognizes that those SEPs are encumbered by Qualcomm's FRAND commitment to ETSI. *Id.* Qualcomm also acknowledges that its FRAND commitment to ETSI has created a "contractual obligation" between the two parties. *Id.*

## B. U.S. action

On January 20, 2017, Apple filed suit against Qualcomm.  Dkt. No. 1.  Qualcomm filed an answer and counterclaims on April 10, 2017 and amended counterclaims on May 24, 2017.  Dkt. Nos. 61, 70.  Apple filed a first amended complaint ("FAC") on June 20, 2017.  FAC, Dkt. No. 83.  Qualcomm answered Apple's first amended complaint on July 21, 2017, Dkt. No. 97, and Apple answered Qualcomm's first amended counterclaims on August 4, 2017, Dkt. No. 107.

### 1. Apple's First Amended Complaint

Apple's first amended complaint asserts sixty-three (63) causes of action against Qualcomm.  Those claims can be separated into three categories: breach of contract claims, patent claims, and antitrust claims.

Counts I through IV seek relief related to Qualcomm's rights and obligations under the Business Cooperation and Patent Agreement ("BCPA"), which addresses, among other matters, royalty rebates that Qualcomm pays to Apple.

Counts V through LVIII seek declarations stating that eighteen of Qualcomm's patents are not infringed by Apple's technology and that they are invalid under U.S. patent law.  In the alternative and in the event that the Court finds that the patents are valid and infringed, Apple asks the Court to set a FRAND royalty rate for all eighteen patents.

Count LIX seeks a declaration that the sale of Qualcomm's baseband processor chipsets to the Contract Manufacturers exhausts Qualcomm's patent rights and that, therefore, the eighteen patents-in-suit are unenforceable as to Apple.  Count LX seeks declaratory relief regarding the Strategic Terms Agreement ("STA"), which requires Apple to pay a license fee on Qualcomm's exhausted patents.  Count LXI, relatedly, seeks declaratory relief regarding the Contract Manufacturers' obligations to pay license fees on exhausted patents under their license agreements with Qualcomm.

Finally, Counts LXII and LXIII lodge antitrust and anticompetitive claims against Qualcomm.  Count LXII alleges that Qualcomm has unlawfully monopolized the market for cellular chipsets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  Count LXIII alleges that Qualcomm's licensing practices constitute unfair competition within the meaning of the Cal. Bus. & Prof. Code § 17200, *et seq.* (the "Unfair Competition Law").[3]

---

[3] Apple's January 20, 2017 complaint asserted twenty-five (25) causes of action against Qualcomm. Dkt. No. 1.  Of those causes of action, eighteen (18) were patent challenges directed at nine separate patents owned by Qualcomm.  Additional challenges launched at another nine patents, along with added invalidity claims as to the nine patents already asserted in the original complaint, account for thirty-six (36) of the extra causes of action in the FAC.  Thus, besides for the supplemental patent claims, the only other new causes of action raised by Apple in the FAC concern Claim LX (60), the request for declaratory relief on the STA and Claim LXI (61), the request for declaratory relief for Qualcomm's license agreements with the Contract Manufacturers.

### 2. Qualcomm's First Amended Counterclaims

Qualcomm's first amended counterclaims assert a number of contract-based causes of action against Apple and, in addition, seek for the Court to issue a number of declarations regarding Qualcomm's FRAND commitments and anticompetitive behavior.

Count I seeks to hold Apple accountable for tortiously interfering with Qualcomm's license agreements with the Contract Manufacturers. Count V alleges that Apple breached the Statement of Work, a contract providing for a high-speed chipset feature called "carrier aggregation," and Count XI claims that Apple breached the Master Software Agreement, a contract that provides Apple with software to operate Qualcomm's chipsets.

Counts VI through IX relate to Apple's and Qualcomm's obligations under the BCPA. Specifically, Qualcomm alleges that Apple breached the BCPA, the implied covenant of good faith and fair dealing with regard to the BCPA, and that Apple was unjustly enriched by its breaches. Count IX seeks declaratory relief finding that Apple's breaches relieved Qualcomm of its obligations under the BCPA as to royalty rebate payments.

Count X alleges that Apple violated California's Unfair Competition Law by covering up the superior performance of Qualcomm's chipsets in the iPhone 7s, as compared to Intel's chipsets, by declaring that there was no difference between the models, and by preventing Qualcomm from making statements on the matter.

Counts II and III seek declarations that Qualcomm's license agreements with the Contract Manufacturers do not violate Qualcomm's FRAND commitments to ETSI and do not violate competition law. Moreover and importantly for present purposes, Count IV seeks a declaration that Qualcomm has satisfied and discharged its FRAND commitment to ETSI with regards to Apple. More precisely, Qualcomm seeks for the Court to conclude that its licensing offers to Apple, including its June 2016 and July 2016 SEP portfolio offers, satisfied Qualcomm's FRAND commitment to ETSI. Alternatively and in the event the Court determines that Qualcomm's offers were not FRAND,

Qualcomm asks the Court to set a FRAND rate for the worldwide SEP portfolio that Qualcomm offered to Apple.

## C. Foreign actions

Between January 23, 2017 and April 11, 2017, Apple filed a total of eleven lawsuits against Qualcomm and its subsidiaries in the United Kingdom, Japan, China, and Taiwan.[4]  All but one of these lawsuits was filed before Qualcomm had answered Apple's original complaint.  The Taiwanese lawsuit was filed on April 11, 2017, the day after Qualcomm filed its answer and the above-mentioned counterclaims.

### 1. U.K. action

Apple initiated the U.K. proceeding in the Patent Court of the English High Court of Justice.  Harrison Decl. ¶ 2.  There are six claimants in the U.K. proceeding: Apple Retail UK Limited, Apple Distribution International, Apple Operations Europe, Apple GmbH, Apple Retail Germany B.V. & CO K.G., and Apple Inc.  *Id.* ¶ 3.  The four defendants in the UK proceeding are: Qualcomm UK Limited, Qualcomm Communications UK Limited, Qualcomm Technologies International Ltd, and Qualcomm Incorporated.  *Id.* ¶ 4.  Apple does not seek any global relief in the U.K. action.  *Id.* ¶ 7 (". . . none of these [claims] involve any global relief, including any determination relating to a global licence [sic] of any of Qualcomm's patents.").

Claims 1 and 2 of the UK proceeding seek declarations that the U.K. Defendants have breached their obligations under Article 102 of the Treaty of the Functioning of the European Union, Article 54 of the Agreement on the European Economic Area, Section 18 of the Competition Act of 1998, and/or their obligations to ETSI by (1) abusing their dominant position in the markets for LTE, CDMA, and WCDMA/UMTS chipsets and (2)

---

[4] Apple filed a single complaint in the U.K. on January 23, 2017.  Harrison Decl. ¶ 2 , Dkt. No. 108-3 at 2.  It filed four complaints in Japan on February 16, 2017, Yakura Decl. ¶¶ 3, 15, Dkt. No. 108-6 at 2, 5.  Thereafter, Apple filed five complaints in China.  Yang Decl. ¶ 5, Dkt. No. 108-8 at 2.  Finally, on April 11, 2017, Apple filed a complaint against Qualcomm in Taiwan.  Wang Decl. ¶ 2, Dkt. No. 108-4 at 2.  Although the Yang declaration does not include the precise date that the five Chinese actions were filed, Qualcomm has not objected to Apple's representation that all lawsuits were filed before April 11, 2017.

abusing their ownership of SEPs in licensing practices. *Id.* ¶ 8. Claim 3 requests that the U.K. Defendants be required to offer the U.K. Claimants a direct license, on FRAND terms, of the SEPs practiced in Apple devices for sale in the European Union. *Id.* Claims 4 through 6 seek an order declaring that the five U.K. patents-in-suit are invalid, that they should be revoked, and that they are not essential to ETSI's telecommunications standards. *Id.* Claim 7 asserts that the U.K. Defendants' rights under the patent-in-suits have been exhausted with respect to any device that incorporates a Qualcomm chipset. *Id.* Claims 8 through 11 seek damages, costs, interest, and other relief. *Id.*

### 2. Japanese action

Apple filed four Japanese complaints against Qualcomm Inc., Qualcomm Japan, Qualcomm Technologies, Inc., and Qualcomm CDMA Technologies Asia-Pacific Pte. Ltd. in three separate departments at the Tokyo District Court. Yakura Decl. ¶ 11. The first complaint involves antitrust law and alleges that Qualcomm has violated Japan's Antimonopoly Act through monopolization and abuse of its superior bargaining position and that it has also violated various Japanese civil codes by failing to comply with its FRAND obligations. *Id.* ¶ 15. The second, third, and fourth complaints each challenge a single Qualcomm-owned patent and allege that the patent is invalid, that it is not infringed by Apple's products, and that Qualcomm's rights to the patent are exhausted under Japanese law. *Id.* ¶¶ 3, 10. None of these claims request that the Japanese courts determine a FRAND rate for Qualcomm's global license portfolio. *Id.* ¶ 2.

### 3. Chinese action

The claimants in the Chinese proceedings are Apple Inc. and Apple Electronic Products Commerce (Beijing) Co., Ltd. and the defendants are Qualcomm Incorporated, Qualcomm Technologies, Inc., Qualcomm Wireless Communications Technologies (China) Co., Ltd., and Qualcomm Wireless Semiconductor Technologies Co., Ltd. Yang Decl. ¶ 2. The first claim in the Chinese proceeding asserts, in part, that the Chinese Defendants have abused their market dominance under the China Anti-Monopoly Law by charging the Chinese Claimants excessive royalties on Apple's products sold in China.

*Id.* ¶ 6.  The second claim asks the Chinese court to settle disputes over licensing conditions for the Chinese Defendants' SEPs.  *Id.* ¶ 2.  ███████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████    *Id.*, Exhibit 2, Dkt. No. 140-2 at 22-23 (under seal).  The third through fifth claims, in turn, seek for the court to declare that the Chinese Claimants are not liable for patent infringement on any of the three Chinese patents-in-suit.  Yakura Decl. ¶ 2.  None of the Chinese proceedings seek a determination of a FRAND rate for Qualcomm's global patent portfolio.  *Id.* ¶ 5.

### 4.  Taiwanese action

In the Taiwanese proceeding, Apple Inc. and Apple Asia LLC have sued Qualcomm Incorporated, Qualcomm Technologies Inc., Qualcomm Taiwan Corporation, and Qualcomm CDMA Technologies Asia-Pacific PTE Limited.  Wang Decl. ¶ 1.  The Taiwanese action alleges that the Taiwanese Defendants have violated the Taiwan Fair Trade Law and have abused their patent rights through its activities in the baseband chipset market and SEP licensing market.  *Id.* ¶¶ 2, 4.  The Taiwanese suit does not request any worldwide FRAND determination.  *Id.* ¶ 5.

### **III. DISCUSSION**

Qualcomm has moved for an anti-suit injunction against Apple.  The motion seeks to enjoin Apple from pursuing all of the claims in all of the foreign actions and from filing any other foreign action during the pendency of the U.S. action.  Neither Qualcomm's motion nor its reply asks, in the alternative, for a more limited anti-suit injunction that only targets certain claims.  Qualcomm contends that an anti-suit injunction is appropriate because all of Apple's foreign actions are part of a single licensing dispute already before this Court in the U.S. action.  Qualcomm avers that the "essence of Apple's [U.S. claim] is that Qualcomm's royalties (both in the existing license agreements with the Contract Manufacturers and in Qualcomm's offer to Apple for a direct license) are not FRAND."  Dkt. No. 92-1 at 6.  Accordingly, Qualcomm

argues, the foreign actions are duplicative because this Court will already "determine whether Qualcomm has satisfied its *global* FRAND commitment as to Apple under the ETSI contract[.]" *Id.* at 18. For the following reasons, however, the Court disagrees with Qualcomm's contentions and finds that none of the anti-suit injunction factors weigh in favor of the requested relief. Accordingly, the Court denies Qualcomm's motion for an anti-suit injunction.

### A. Anti-suit injunctions

"Courts derive the ability to enter an anti-suit injunction from their equitable powers." *E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 989 (9th Cir. 2006). Anti-suit injunctions "allow the court to restrain a party subject to its jurisdiction from proceeding in a foreign court in circumstances that are unjust." *Id.* The injunction thus operates in personam. *Id.* The court enjoins the claimant, not the foreign court. *Id.* Although the district court has the power to enjoin a party from proceeding with a suit in a foreign country, the power should be used sparingly. *Microsoft*, 696 F.3d at 881.

A three-part inquiry governs a district court's assessment of the propriety of an anti-suit injunction. *Id.* First, the court must evaluate "whether or not the parties and the issues are the same, and whether or not the first action is dispositive of the action to be enjoined." *Applied Med. Distrib. Corp. v. Surgical Co.*, 587 F.3d 909, 914 (9th Cir. 2009). Second, the court must assess "whether at least one of the so-called 'Unterweser factors' applies." *Microsoft*, 696 F.3d at 881. Third, the court must inquire into whether the impact on comity is tolerable. *Id.*

The *Unterweser* factors were first articulated by the Fifth Circuit in *In re Unterweser Reederei GMBH*, 428 F.2d 888, 896 (5th Cir. 1970), *aff'd on reh'g*, 446 F.2d 907 (5th Cir. 1971) (en banc) (per curiam), *rev'd on other grounds sub nom. M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1 (1972). The Ninth Circuit adopted the Fifth Circuit's decision in *Unterweser* as instructive in *Seattle Totems Hockey Club, Inc. v. Nat'l Hockey League*, 652 F.2d 852 (9th Cir. 1981) and has since held that "any of the *Unterweser* factors" may justify anti-suit injunctive relief. *Microsoft*, 696 F.3d at 882 &

3:17-cv-00108-GPC-MDD

n.9.  The four *Unterweser* factors are as follows: whether the foreign litigation would (1) frustrate a policy of the forum issuing the injunction; (2) be vexatious or oppressive; (3) threaten the issuing court's *in rem* or *quasi in rem* jurisdiction; or (4) prejudice other equitable considerations.  *Id.* at 882 (quoting *Gallo*, 446 F.2d at 990).  Thus, so long as one of these factors applies, a court may grant an anti-suit injunction.

### B. The issues are not the same and the U.S. action will not dispose of the foreign actions

Whether or not the parties and issues are the same is a functional inquiry. *Microsoft*, 696 F.3d at 882 (quoting *Applied Med.*, 587 F.3d at 915).  There is no dispute, here, that the parties in the U.S. and foreign actions are functionally the same.  The focus of the Court's inquiry, therefore, is on whether the issues are functionally the same. Functional similarity depends upon whether "all the issues in the foreign action can be resolved in the local action."  *Id.* at 832-33 (internal punctuation omitted).  The issues "need not be 'precisely and verbally identical,' as 'the verbal form of laws in different countries will inevitably differ.'"  *Id.*; *see also Applied Med.*, 587 F.3d at 915 (". . . . requiring issues to be precisely and verbally identical would lead to counterproductive, and perhaps unintended, results.").  Rather, "the crux of the functional inquiry in the first step of the analysis is to determine whether the issues are the same in the sense that all the issues in the foreign action . . . can be resolved in the local action."  *Applied Med.*, 587 F.3d at 915.

### 1. Qualcomm's position

Qualcomm argues that the issues in the U.S. and foreign actions are the same for purposes of an anti-suit injunction because "[w]hether Qualcomm has complied with its contractual FRAND obligations as to Apple is squarely before this Court and is raised repeatedly throughout Apple's foreign complaints."  Dkt. No. 92-1 at 18.  Given the parties' inability to agree on FRAND terms for Qualcomm's global SEP portfolio, "Qualcomm has asked this Court to declare that Qualcomm has satisfied and discharged its FRAND commitments as to Apple or, in the alternative, to declare the FRAND royalty

12

terms for Qualcomm's global portfolio of cellular SEPs that it has offered to Apple." *Id.* at 20.  Thus, Qualcomm contends, "This global determination will resolve the FRAND issues between Apple and Qualcomm in Apple's foreign lawsuits." *Id.*

As to the non-FRAND issues raised in Apple's foreign actions, Qualcomm argues that those, too, should be enjoined because they are "tied to Qualcomm's FRAND obligations" and will become "moot" by resolving the parties' global licensing dispute. *Id.* at 22-23.  The antitrust and patent claims included in Apple's foreign actions will become moot, Qualcomm contends, because the foreign patent and antitrust claims "depend on the determination of the core FRAND questions as between Apple and Qualcomm" currently before this Court.  Dkt. No. 114 at 8-9.  In other words, and as Qualcomm articulated at the August 18, 2017 hearing, Apple's foreign claims and arguments will "evaporate because they are all premised on the notion that they can't get to our technology under FRAND terms."  Transcript, Dkt. No. 122 at 52.

### 2.  Functional similarity in the Ninth Circuit

To understand why Qualcomm's position on the functional similarity of the U.S. and foreign claims is unpersuasive, the Court must first review those cases that have passed the Ninth Circuit's threshold inquiry.  Qualcomm would have this Court conclude that the FRAND claims that Apple has asserted in this action, along with Qualcomm's global FRAND counterclaim, dispose of all of the claims in Apple's foreign suits, including Apple's anticompetitive and patent claims.  Such a conclusion, however, does not follow from the Ninth Circuit's reasoning in its most recent anti-suit cases, including its decision in *Microsoft v. Motorola*, upon which Qualcomm's position heavily relies. The Court will thus address these cases first.

Prior to the *Microsoft* decision, the two seminal cases on anti-suit injunctions were *Gallo* and *Applied Medical.*  In *Gallo*, the plaintiff, Gallo, moved to enjoin the defendant, Andina, from proceeding with foreign litigation in Ecuador.  446 F.3d at 986-87.  Gallo, a large California winery, had entered into a distributorship agreement with Andina, an Ecuadorian wine and liquor distributor, that contained a forum-selection and choice of

law clause in favor of California. *Id.* at 987. Subsequently and after a number of disputes arose concerning late shipments and the exclusivity of Andina's distributorship, Andina filed suit in Ecuador alleging that Gallo had breached the distributorship agreement under Ecuadorian law. *Id.* Some weeks later, Gallo filed suit in California state court, and the case was removed to federal district court. *Id.* at 988. Thereafter, Gallo moved the district court for a preliminary injunction preventing Andina from proceeding with its litigation in Ecuador. *Id.* at 986-87. Ultimately, the district court denied the injunction "because the California and Ecuador cases arose from different acts" and because "enjoining the Ecuador action would deprive it [Andina] of its right to pursue its claims under Ecuadorian law." *Id.* at 991.

On appeal, the Ninth Circuit disagreed with the district court's reasoning regarding the legal differences between the two cases. Whereas the district court held that the suits were distinct because they arose under different laws, the *Gallo* court held that the issues were, in fact, functionally the same because both suits arose out of the same alleged breach of the distributorship agreement. *See id.* The *Gallo* court moreover noted that because the distributorship agreement contained a choice of law clause, it was not even clear that Andina had the right to seek a remedy under Ecuadorian law. *Id.* In addition, and in the section addressing whether any public policy weighed toward granting an anti-suit injunction, the *Gallo* court held that the public policy in favor of enforcing forum-selection clauses further justified enjoining the foreign action. *See id.* at 991-93. Accordingly, the Ninth Circuit reversed the district court's opinion with instructions to grant what it deemed to be a "paradigmatic case for a preliminary anti-suit injunction." *Id.* at 995.

The Ninth Circuit's similarity-of-issues inquiry in *Applied Medical* turned even more explicitly on the parties' forum-selection and choice of law clause. In *Applied Medical*, the plaintiff was a California corporation that sold surgical supply products and the defendant was a Netherlands limited liability company that purchased plaintiff's products for distribution in Europe. 587 F.3d at 911. Like the parties in *Gallo*, the

*Applied Medical* parties had signed a distributorship agreement that included a forum-selection clause in favor of California and its laws. *Id.* Later on, a dispute arose after the plaintiff, Applied, notified the defendant, Surgical, that it would be exercising its right not to renew the distributorship agreement. *Id.* at 912. In response, Surgical asserted that any failure to renew the agreement would entitle it to compensation under the Belgian Act of 1961. *Id.* Thereafter, Applied filed a complaint in federal district court seeking declaratory relief and Surgical filed suit in Belgium a month later. *Id.* Both lawsuits concerned whether Applied owed Surgical pre-termination damages given the terms of their contract. *Id.* at 912-13.

Below, the district court had held that the U.S. and foreign suits were not functionally the same because the Belgian claims were "potentially broader" than the U.S. claims and, therefore, did not necessarily turn on the termination of the distributorship agreement. *Id.* at 913. The *Applied Medical* court, however, found this reasoning to be in error because the U.S action was nonetheless dispositive of the foreign action. "We hold that the present action is dispositive of the Belgian action because all of the claims in the Belgian action arise out of the Agreement, are subject to the forum selection clause, and therefore must be disposed of in the California forum if at all." *Id.* at 916 (internal citations omitted). In other words, the *Applied Medical* court concluded that the issues were functionally the same because the domestic action, via the forum-selection clause, would dispose of all the issues in the foreign action. *Id.* at 915 (" . . . to the extent the domestic action is capable of disposing of all the issues in the foreign action and all the issues in the foreign action fall under the forum selection clause, the issues are meaningfully 'the same.'").

In *Microsoft*, the Ninth Circuit addressed for the first time what functionally similar claims look like absent a forum-selection clause. *Microsoft*, 696 F.3d at 882 ("Although the contract at issue in this case does not contain a forum-selection clause, we are nevertheless informed by *Applied Medical*'s emphasis on the functional character of the threshold similarity-of-issues inquiry."). The dispute between the *Microsoft* parties,

unlike the *Gallo* and *Applied Medical* parties, did not arise from a contract executed between the plaintiff and the defendant.  Rather, it arose out of an agreement entered into by the defendant, Motorola, and two standard-setting organizations, the International Telecommunications Union ("ITU") and the Institute of Electrical and Electronics Engineers ("IEEE").  *Id.* at 875-76.  Motorola, like Qualcomm, had made written representations to a standard-setting organization promising to offer worldwide licenses to its SEPs on RAND terms — that is reasonable and non-discriminatory terms.  *See id.* at 876.  Microsoft, the plaintiff, later sued Motorola in district court alleging that Motorola had breached its contract with the SSOs by offering Microsoft a global SEP license that was non-RAND.  *Id.* at 877-78.  Microsoft posited that it had standing to assert such a claim because it was a third-party beneficiary of Microsoft's contractual obligations to the ITU and IEEE.  *Id.* at 878.

Months after the U.S. action commenced, Motorola filed suit against Microsoft in Germany alleging that Microsoft was infringing upon two of Motorola's German standard-essential patents.  *Id.* at 879.  After reviewing the positions of the parties, the German court rejected Microsoft's key contention that it could enforce Motorola's RAND commitment to the ITU because German law does not recognize third-party contractual rights.  *Id.*  As such, and having ultimately found that Microsoft was infringing upon Motorola's German SEPs, the German court issued an injunction prohibiting Microsoft from marketing or selling any of its infringing products in Germany.  *Id.*

In the meantime and while the German court's decision was still pending, Microsoft asked the U.S. district court to enjoin Motorola from enforcing any injunction obtained from the German court.  *Microsoft*, 871 F. Supp. 2d at 1100.  In so doing, Microsoft argued that an anti-suit injunction was appropriate because the relief that Motorola sought in the foreign action was "squarely before" the district court.  Ultimately, the district court agreed.  After evaluating Microsoft's request under the three-part *Applied Medical* rubric, it concluded that the issues were functionally the same

because whether injunctive relief was an appropriate remedy for infringement of Motorola's SEPs depended upon the district court's adjudication of the parties' contractual obligations.  *See id.* at 1099.  As such, the court concluded, and because the district court "in no way enjoined Motorola from pursuing the German Action" and because it "in no way prohibited further proceedings in Germany," the court granted what it deemed to be a very "limited" injunction.  *Id.* at 1100.

The Ninth Circuit approved of this reasoning on appeal.  In its opinion, the *Microsoft* court emphasized that the district court was correct to issue the injunction because it "[wa]s not enforcing German patent law but, rather, the private law of the contract between the parties."  *Id.* at 884.

> . . . the district court concluded that the pending *contract* action before it would be dispositive of the German *patent* action, because the European Patents at issue in the German Action were included in Motorola's October 29 Letter offering a worldwide license for Motorola's H.264 Standard-essential patents, and because Motorola contracted with the ITU to license the European Patents on RAND terms to all applicants on a worldwide basis.

*Id.* at 880 (emphasis in original) (internal citations omitted).  Accordingly and because "there is no reason a party may not freely agree to reservations or limitations on rights that it would have under foreign patent law (or any other rights that it may have under foreign law)," the *Microsoft* court held that Motorola's licensing commitment to the ITU prevented it from seeking injunctive relief against infringement.  *Id.* at 884.

### 3. The import of the decision in *Microsoft*

Qualcomm argues that the Ninth Circuit's decision in *Microsoft* is "squarely on point" and governs the instant anti-suit injunction.  Dkt. No. 92-1 at 7-8.  This is so, Qualcomm avers, because here, like in *Microsoft*, the parties have asked the Court to resolve their global FRAND dispute after being unable to reach an agreement during

negotiations.[5]  *Id.* at 8.  As such, Qualcomm argues, just as the anti-suit injunction was necessary in *Microsoft* to allow the "district court to resolve the global FRAND issues," it is likewise necessary here to enjoin Apple's foreign actions so that they cannot "impede this Court's ability to resolve the issues before it."  *Id.*

Qualcomm's analogy to *Microsoft* is specious.  While *Microsoft* and the instant matter undoubtedly share the same general set of circumstances, key differences between the cases overpower any superficial similarities.  In *Microsoft*, the court enjoined the party — that is, Motorola — that had made the binding commitment to the standard-setting organization.  This distinction is legally significant.  Just as the parties in *Gallo* and *Applied Medical* entered into a binding forum-selection and choice-of-law clause, Motorola entered into a binding commitment to offer licenses to its patented technology on RAND terms.  In exchange for having its SEPs incorporated into the ITU standard, Motorola promised the ITU that it would license its SEPs to all willing licensees.  By striking this bargain, therefore and according to the *Microsoft* district court, Motorola willingly limited itself to one of two alternatives: either make Microsoft, and all other willing licensees, a RAND offer through bilateral negotiation or after adjudication by the courts.  *Microsoft*, 871 F. Supp. 2d at 1099.  In other words, by making a FRAND

---

[5] The Court observes that Apple's complaint does not ask for a worldwide FRAND determination.  That relief is found only in Qualcomm's counterclaim.  Notwithstanding this fact, Qualcomm argues that Apple's complaint nevertheless places the parties' global FRAND dispute in issue because the parties' failed licensing negotiations precipitated the current dispute.  Accordingly and because Apple's complaint has placed the global FRAND dispute in issue, Qualcomm avers that this Court should resolve the global FRAND issues between Apple and Qualcomm.  Dkt. No. 92-1 at 20.  At oral argument, it became apparent that Apple's position is that this Court does not have the authority to adjudicate Qualcomm's counterclaim for a global FRAND determination because Apple is under no obligation to accept Qualcomm's license offer regardless of whether the offer is FRAND and because Apple has not consented to be bound by any global FRAND determination.  Transcript, Dkt. No. 122 at 41-47. As such, Apple argues that any decision by this Court setting a global FRAND rate would be an advisory opinion.  *See generally Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1039 n.13 (9th Cir. 2015); *TCL Commc'ns Tech. Holdings Ltd. v. Telefonaktenbologet LM Ericsson*, 2014 WL 12588293, *5 (C.D. Cal. Sept. 30, 2014); *Realtek Semiconductor Corp. v. LSI Corp.*, 2012 WL 4845628, *5 (N.D. Cal. Oct. 10, 2012).  The Court, however, need not decide this question to resolve the instant motion.  Regardless of whether or not Qualcomm's counterclaim is proper, the anti-suit injunction fails.

commitment to the ITU, Motorola surrendered its right to seek infringement actions against a willing licensee, including Microsoft, because, when all was said and done, Motorola had to offer Microsoft a RAND license.

Understood in this way, the *Microsoft* court applied the same principle articulated in *Gallo* and *Applied Medical* by similarly holding the enjoined party to its contractual bargain. Motorola, through its RAND commitment to the standard-setting organization, promised to license, on RAND terms, any entity that wanted to practice the relevant standard. In so doing and according to the *Microsoft* court, Motorola gave up the right to pursue infringement actions except against an unwilling licensee. It was, therefore, plainly improper, vexatious, and duplicative for Motorola to bring an infringement action in a foreign court for a patent that Microsoft had wanted to license, but could not, due to Motorola's failure to make a RAND offer.

This reasoning, however, does not translate into the instant set of circumstances. Here, Qualcomm seeks to enjoin Apple from proceeding with foreign litigation based upon Apple's mere invitation to deal with Qualcomm. Apple, unlike Qualcomm, has not made any binding commitment to ETSI.[6] And Apple does not have a licensing agreement with Qualcomm. The only contractual rights and obligations implicated by this lawsuit are Apple's rights and obligations as a third-party beneficiary of Qualcomm's promises to ETSI. Stated differently, Apple, unlike Motorola and Qualcomm, has made no binding commitment that limits the relief that it may seek or how it may enforce that relief. Whereas Qualcomm's negotiations with Apple are constrained by its contractual obligations to ETSI, Apple is free to decline or accept Qualcomm's offer regardless of whether it complies with FRAND.[7]

---

[6] The Court observes that Apple is a member of ETSI. Qualcomm, however, has made no argument that through its membership, Apple has somehow agreed to circumscribe or limit how it may seek to enforce other members' obligations to ETSI.

[7] Of course, if Apple wishes to enforce Qualcomm's commitment to ETSI it must demonstrate that it was a willing licensee and, therefore, a proper third-party beneficiary. The nature of that obligation, however, is different in kind than Qualcomm's obligation to ETSI. If Apple is not a willing licensee, it

In light of these legal rights and obligations, and notwithstanding Qualcomm's protestations to the contrary, the *Microsoft* holding is not "squarely on point." The *Microsoft* court concluded that the U.S. and foreign actions were functionally the same because Motorola's contractual commitment to the standard-setting organization effectively mooted any right Motorola had to bring an action for infringement in a foreign court. The same cannot be said of Apple's U.S. and foreign actions. Apple has made no binding commitment that limits where it can bring a lawsuit, under what laws, or how it can enforce its third-party beneficiary rights under ETSI. As a baseline matter, therefore, Apple is free to exercise its rights in the United Kingdom, China, Taiwan, and Japan under those countries' laws. Accordingly, the similarity-of-issues principle that underpinned *Gallo*, *Applied Medical*, and *Microsoft* does not dictate the outcome of the threshold similarity-of-issues inquiry here.

**4. The U.S. action is not dispositive of the foreign actions**

With this background in mind, the Court now turns to the question of whether this Court's adjudication of the claims before it will be dispositive of Apple's foreign actions. Qualcomm, of course, argues that this Court's "ruling on Qualcomm's FRAND obligation will be dispositive of Qualcomm's obligations as to Apple (and the extent to which they were satisfied) worldwide." Dkt. No. 92-1 at 7. More specifically, Qualcomm asserts that this Court's "binding, global FRAND determination as to the obligations owed between Apple and Qualcomm and the extent to which they were fulfilled . . . will resolve issues at the core of the foreign actions[.]"[8] *Id.* at 25.

Apple begs to differ. Apple contends that even the global FRAND issue will not dispose of the foreign actions because Apple's foreign suits have challenged the validity and exhaustion of Qualcomm's foreign patents, under foreign patent law, and have

---

simply loses the right to enforce Qualcomm's contract with ETSI. Yet if Qualcomm fails to offer a FRAND license, it has breached its contractual obligations.

[8] The Court again observes that Apple disputes that it would be bound by any global FRAND determination made by this Court because it does not have to accept a license from Qualcomm.

additionally challenged Qualcomm's licensing practices under foreign competition and anti-trust laws.  Dkt. No. 108 at 21.  Apple moreover argues that this Court does not have the authority to make determinations regarding the validity of U.K., Chinese, Japanese, or Taiwanese patents under their laws, and that any antitrust relief sought under U.S. law could not apply out of the U.S. territory.  *See* Dkt. No. 108 at 21-23.

Qualcomm's response to these legitimate concerns is lacking and otherwise unconvincing.  In its reply brief, Qualcomm emphasizes that Apple's arguments miss the mark because Qualcomm's contractual FRAND obligation applies worldwide.  Thus, it argues, "while a U.S. antitrust claim may concern only U.S.-related activity, the contractual FRAND inquiry necessarily concern global activities."  Dkt. No. 114 at 8. With regards to Apple's patent-based contentions it argues along similar veins that "Because the foreign patent claims are intertwined with the same FRAND issues before this Court, the U.S. Action will dispose of core issues in the foreign patent claims."  *Id.* (footnote omitted).  Qualcomm's response to Apple's concerns at oral argument likewise lacked specificity.  When the Court directly asked Qualcomm to explain how the U.S. action would dispose of Apple's anticompetitive claims in the foreign suits, Qualcomm simply reiterated, without explaining, that the parties' FRAND dispute is a worldwide contractual question and that that contractual FRAND question will moot the foreign actions as was the case in *Microsoft*.  *See* Transcript, Dkt. No. 122 at 9-12, 15-17.

Yet what Qualcomm left out of its response, both in its briefing and at oral argument, is telling.  Apple has asserted anticompetitive-based causes of action under Article 102 of the Treaty of the Functioning of the European Union, Article 54 of the Agreement on the European Economic Area, Section 18 of the U.K. Competition Act of 1998, Japan's Antimonopoly Act, the Chinese Anti-Monopoly Law, and the Taiwan Fair Trade Law.  Qualcomm, however, has not even attempted to explain (other than relying on *Microsoft*) why this Court's findings on Qualcomm's FRAND obligations to ETSI would be dispositive of Apple's anticompetition claims under these laws.  Qualcomm does not argue that the foreign courts are bound by this Court's FRAND determination.

1    In fact, it does not even explain why this Court's global FRAND determination would
2    moot Apple's suit challenging purely foreign conduct and foreign effects.  Qualcomm has
3    wholly failed to demonstrate how an adjudication on the merits, here, would dispose of
4    Apple's anticompetitive claims abroad.  Accordingly and for the reasons previously
5    stated, this Court is not persuaded that even resolution of Qualcomm's global contractual
6    obligations to ETSI will dispose of Apple's competition-based causes of action arising
7    under foreign laws.

8           What is more, Apple has also asserted patent-based causes of action alleging that
9    Qualcomm's U.K. SEPs are invalid and exhausted under U.K. law, that Qualcomm's
10   Chinese SEPs are invalid and exhausted under Chinese law, that Qualcomm's Japanese
11   SEPs are invalid and exhausted under Japanese law, and that Qualcomm's Taiwanese
12   SEPs are invalid and exhausted under Taiwanese law.  But yet again, other than pointing
13   to the outcome in *Microsoft*, Qualcomm has failed to adequately explain how this Court's
14   adjudication of Qualcomm's global contractual FRAND commitment to ETSI would
15   moot Apple's foreign patent claims.  Apple is not obligated to accept a worldwide
16   FRAND license from Qualcomm.  Apple, therefore, has not contracted away its right to
17   ask foreign courts for declarations that their products do not infringe upon Qualcomm's
18   SEPs because those SEPs are either non-essential, invalid, or exhausted under foreign
19   law.  Accordingly and even if this Court ultimately sets a worldwide FRAND rate for
20   Qualcomm's global portfolio, Apple's patent claims for invalidity and exhaustion under
21   foreign law as to foreign patents will remain unaddressed.

22          As such and in the absence of any argument explaining how the U.S. action
23   specifically moots each of the distinct claims asserted in Apple's foreign actions, the
24   Court concludes that Qualcomm has failed to demonstrate that the issues in Apple's U.S.
25   and foreign actions are functionally similar in the sense that an adjudication on the merits
26   here would dispose of the claims abroad.  The Court moreover concludes that even if
27   Qualcomm had demonstrated that the issues in the U.S. action and the foreign actions are
28

1    "functionally similar," the Court's ultimate decision would not change as the Court

2    additionally finds that the remaining two anti-suit factors are also absent.

3         **C. None of the articulated *Unterweser* factors applies**

4         The second step in deciding an anti-suit injunction requires the Court to assess

5    whether the foreign litigation would (1) frustrate a policy of the forum issuing the

6    injunction; (2) be vexatious or oppressive; (3) threaten the issuing court's *in rem* or *quasi*

7    *in rem* jurisdiction; or (4) prejudice other equitable considerations. *Microsoft*, 696 F.2d

8    at 881-82. Only one of these factors needs to be met in order to weigh in favor of

9    granting an anti-suit injunction. *Id.* at 885. Qualcomm contends that at least two of the

10   *Unterweser* factors applies: namely, the second, that Apple's foreign actions are

11   vexatious and oppressive, and the fourth, that Apple's simultaneous U.S. and foreign

12   proceedings prejudice other equitable considerations.[9] Dkt. No. 92-1 at 25.

13        **1. Apple's foreign suits are not vexatious or oppressive**

14        A party demonstrates that suit is "vexatious" if it can show that the suit was

15   "without reasonable or probable cause or excuse; harassing; annoying." *Microsoft*, 696

16   F.2d at 886. Qualcomm avers that Apple's foreign lawsuits are vexatious because they

17   are duplicative and because the duplicative nature of the lawsuits demonstrates that Apple

18   seeks to harass Qualcomm in order to gain leverage in future licensing negotiations. Dkt.

19   No. 92-1 at 26-27. As such, Qualcomm argues, the "additional foreign actions [that]

20   Apple has brought . . . can only be described as vexatious." *Id.* at 27.

21        The record before the Court, however, does not support Qualcomm's contentions.

22   For one, Apple filed the U.S. action in January 2017 and it filed the U.K., Japanese,

23   Chinese, and Taiwanese actions one after the other between January 2017 and April

24   2017. All of Apple's foreign actions, therefore, were filed before the parties' pleadings

25

26   _____

27   [9] The Court observes that it is telling that the two factors that Qualcomm has identified as applicable are the two factors deemed less important elsewhere. *See, e.g.*, *Ibeto Petrochemical Indus. Ltd. v. M/T*

28   *Beffen*, 475 F.3d 56, 64 (2d Cir. 2007) (concluding that the first and third *Unterweser* factors hold greater significance than the second and fourth).

were finalized and before this Court ever made a ruling on the merits.  As such, this is not a case where the delay between the filing of the first action and the subsequent actions raises concerns about forum-shopping or harassing motive.  *See Microsoft*, 871 F. Supp. 2d at 1100 (finding vexatious duplication where Motorola filed a single foreign action alleging infringement of two patents six months after Microsoft had filed a U.S. action seeking to resolve Microsoft's dispute with Motorola concerning those same patents and one hundred additional patents).

Two, Apple has submitted declarations from each of their respective representatives before the U.K., Japanese, Chinese, and Taiwanese courts explaining why the foreign claims that Apple has filed and the relief that it seeks under foreign laws are not duplicative of the claims and relief sought in the U.S. action.  *See, e.g.*, Wang Decl. ¶¶ 6-7 ("The relief that Apple seeks is primarily in the form of injunctive relief, focused on ensuring that Qualcomm ceases its licensing practices and terms that are in violation of the Taiwan Fair Trade Act and/or constitute abuse of patents rights in Taiwan.  To the extent Apple is seeking damages for past excessive royalties paid to Qualcomm, those damages would be limited to royalties paid for products sold in *Taiwan*, to the extent such royalties violate the Taiwan Fair Trade Act.") (emphasis in original); Yang Decl. ¶ 5 ("The claims in the China Actions are focused on *Chinese* patents, *Chinese* markets, and harm to competition in *China*.  None of the China Actions seeks a determination of what a fair, reasonable, and non-discriminatory ("FRAND") royalty would be for Qualcomm's global patent portfolio.") (emphasis in original); Yakura Decl. ¶ 2 (". . . Apple has filed patent and antitrust cases in Japan, focusing on Japanese patents and harm in Japanese markets.  None of those actions request the court to determine what a fair, reasonable, and non-discriminatory ("FRAND") royalty would be for Qualcomm's patents on a global portfolio-wide basis."); Harrison Decl. ¶ 9 (". . . the claims that Apple filed in the United States . . . are neither dispositive of the UK proceedings, nor do the US Proceedings and the UK Proceedings overlap in such a way that the outcome of the US Proceedings would resolve the issues and claims raised in the UK proceedings.").

In light of these declarations, the Court concludes that any duplication evident in the U.S. actions and foreign actions is not so "unreasonable" that it suggests motive to harass or annoy.  Although it is true that Apple's foreign actions attack the same conduct underlying the U.S. action, the Court does not find that Apple acted unreasonably by filing the separate foreign actions.  Apple's declarations make evident that it has sought to challenge Qualcomm's patent licensing practices and anticompetitive conduct territory by territory.  While Qualcomm may object to this litigation strategy as duplicative, the Court will not conclude that Apple's exercise of its rights under foreign laws is vexatious. *See 1st Source Bank v. Neto*, 861 F.3d 607, 614 (7th Cir. 2017) (concluding that it was not vexatious for a party to pursue parallel litigation in Brazil where the party was exercising its contractual rights to protect its interests under foreign law).  Because antitrust laws differ significantly from jurisdiction to jurisdiction, Apple had a legitimate reason to file separate foreign actions.  *See F.Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 167-68 (wherein foreign governments advocated for the Supreme Court to hold that U.S. antitrust law did not extend to the disputed conduct because their countries' remedial schemes differed significantly from the U.S. system).

Furthermore, the Court concludes that Apple also had and has a reasonable interest in challenging Qualcomm's patents forum by forum.  At oral argument, Apple emphasized that Qualcomm's practice of licensing its SEPs on a portfolio-level basis insulates Qualcomm from challenges to the validity or essentiality of its patents because licensees do not know what patents are included in Qualcomm's portfolio.[10] Accordingly, Apple brought patent claims in the various foreign suits as a means to verify that Qualcomm's various patents are, in fact, valid and essential before Apple agrees to license Qualcomm's global patent portfolio.  *See id.* at 60-61 ("We want to look at the patents before we pay some extraordinary amount[.]").  That Apple wants to

---

[10] In its 2016 decision, the Korea Fair Trade Commission ("KFTC") found that this practice violated Qualcomm's FRAND commitment to ETSI.  *See infra* Part D.

3:17-cv-00108-GPC-MDD

1   litigate any alleged infringement of Qualcomm's SEPs before it accepts a global offer to

2   license Qualcomm's SEP portfolio, therefore, is yet another reasonable justification for

3   filing the foreign actions.  After all, and as neither party disputes, this Court cannot

4   adjudicate or enforce the patent law of the U.K., China, Japan or Taiwan.  *See Microsoft*,

5   696 F.3d at 884 ("To be sure, if the district court had based its injunction in an

6   expectation that U.S. *patent* claims could dispose of German patent claims, then it would

7   have erred.").  As such and in light of these legitimate considerations, the Court

8   concludes that any duplication between Apple's U.S. action and foreign actions was not

9   so unreasonable that it was vexatious and designed to only harass and annoy.

10   ### 2.  "Other equitable considerations" do not justify the relief sought

11   Next, Qualcomm contends that Apple's foreign lawsuits prejudice "other equitable

12   considerations" because (1) they are a pretext for withholding royalties to gain leverage

13   in licensing negotiations; (2) they threaten to delay a speedy and efficient resolution of

14   the FRAND issues; (3) they will cause substantial inconvenience, unnecessary expense

15   and a duplication of efforts; and (4) they could result in inconsistent rulings or a race to

16   the judgment.  Dkt. No. 92-1 at 27-29.  The Court will address each of these assertions in

17   turn.

18   Qualcomm argues that the Court should conclude that Apple's foreign actions are

19   pretext for withholding royalties because "Apple has told Qualcomm that it plans to

20   withhold from the Contract Manufacturers payments for all royalties—hundreds of

21   millions of dollars each calendar quarter—until the global litigation has been resolved."

22   *Id.* at 27; *see also* Rogers Decl. ¶ 12, Dkt. No. 92-4 at 5 (stating that Qualcomm received

23   a letter from Apple on April 25, 2017, stating that "it will continue to withhold

24   Qualcomm royalties for the indefinite future . . . until Apple's litigation against

25   Qualcomm ends.").  The Court, however, finds that the record before the Court does not

26   support any assertion of pretextual motive.  For all the reasons stated above, the Court

27   finds that Apple has legitimate reasons for pursuing parallel actions in the U.S. and

28   abroad, including Apple's interest in vindicating its rights under foreign anticompetition

1   and patent law.  Accordingly, the Court rejects Qualcomm's contention as being

2   unsupported by the facts before the Court.

3        Second, Qualcomm argues that Apple's foreign actions will "necessarily prolong

4   the dispute and delay any final resolution."  Dkt. No. 92 at 28.  The Court is unpersuaded

5   by the conclusory nature of this argument.  The Court will hear the parties' respective

6   motions to dismiss at the end of September 2017.  The Court will hold a claim

7   construction hearing on March 22, 2018.  Dkt. No. 117.  All discovery, including expert

8   discovery, will conclude on May 11, 2018 and the final pre-trial conference will be held

9   on September 28, 2018.  Dkt. No. 116.  Given that the Court had already set a number of

10  key litigation dates and in light of the fact that Qualcomm has offered no reason why this

11  timeline will necessarily be delayed by the parallel proceedings, the Court declines to

12  find that the need for a speedy and efficient determination of this case requires enjoining

13  Apple's foreign suits and overcomes Apple's legitimate interest in pursuing those suits.

14       Third, Qualcomm argues that allowing the foreign actions to proceed will "lead to

15  substantial inconvenience, unnecessary expense, and an absurd duplication of effort."

16  Dkt. No. 92 at 28.  More specifically, Qualcomm contends that parallel proceedings will

17  force the parties to "shuttle witnesses back and forth across the globe for duplicative

18  testimony" and will "waste judicial resources" as Apple "uses courts around the world as

19  sounding boards for its position on the same issue."  *Id.*  The Court likewise finds this

20  contention to be without merit.

21       As an initial matter and for the reasons previously stated, the Court does not find

22  that judicial resources will be wasted on the foreign actions.  Apple's foreign suits raise

23  legitimate questions under foreign anticompetition and patent law that are distinct from

24  the claims before the Court.  Accordingly, the Court does not find that allowing the

25  concurrent proceedings to move forward wastes judicial resources.

26       In addition, the Court is also not persuaded that the resulting inconvenience or

27  expense to Qualcomm justifies anti-suit relief.  Any defendant who faces parallel

28  litigation in a foreign suit will be inconvenienced.  Any defendant who is sued in parallel

proceedings will bear the costs of defending themselves in each.  Qualcomm, however, has offered no reason why the inconvenience or expense that it will incur as a result of these related proceedings are so extraordinary or substantial that they justify equitable injunctive relief.  *See China Trade & Dev. Corp. v. M.V. Choong Yong*, 837 F.2d 33, 36 (2d Cir. 1987) ("Since these factors [additional expense and race to judgment] are likely to be present whenever parallel actions are proceeding concurrently, an anti-suit injunction grounded on these additional factors alone would tend to undermine the policy that allows parallel proceedings to continue and disfavors anti-suit injunctions.").

Moreover, and even if Qualcomm had offered such reasons, the Court's decision would not change.  Because Apple's U.S. and foreign actions are not identical and because the foreign suits assert Apple's rights under foreign anticompetition and patent law, the Court is not prepared to conclude that any inconvenience or expense is so unnecessary or absurd that it overwhelms Apple's right to pursue concurrent proceedings. Equity does not demand that a court enjoin a non-identical parallel proceeding simply because it is burdensome to defend oneself.  Accordingly and absent any persuasive showing that Qualcomm is uniquely-situated such that it will be substantially inconvenienced and expensed by the concurrent proceedings, the Court concludes that this equitable consideration does not weigh in favor of an anti-suit injunction.

Fourth, Qualcomm argues that "Apple's duplicative lawsuits create a serious risk of inconsistent judgments" and that "Apple's duplicative lawsuits raise related concerns that Apple is engaged in an improper 'race to judgment.'"  Dkt. No. 92 at 29.  The Court disagrees.  Both of these arguments ring hollow in light of the record before the Court and the context in which these proceedings have arose.

One and for the reasons previously mentioned, because Apple's U.S. and foreign complaints are sufficiently distinct, they do not raise concerns that Apple is, as Qualcomm says, "test[ing] the waters in each court and then opportunistically rac[ing] to judgment[.]"  *Id.*  Apple does not ask this Court for worldwide relief.  It has not asked this Court to determine whether Qualcomm's global license offer complies with FRAND.

1   Rather, it was Qualcomm who counterclaimed for a determination that its worldwide

2   global SEP offer to Apple was FRAND.  That Qualcomm asked for this relief, and not

3   Apple, belies Qualcomm's assertion that Apple's foreign suits opportunistically seek to

4   litigate the same or overlapping issues in five different jurisdictions.  Qualcomm placed

5   global relief on the table, not Apple.  Accordingly, the Court is not prepared to find that

6   the threat of granting Qualcomm the relief that it seeks, here, is reason enough to enjoin

7   the otherwise legitimate lawsuits that Apple filed elsewhere.

8         Furthermore, the Court is also not persuaded that any risk of inconsistent rulings

9   among the five jurisdictions justifies the extraordinary relief that Qualcomm seeks.

10  Qualcomm suggests that it would be untenable or unfair for it to have to alter its behavior

11  territory by territory in order to comply with potentially inconsistent rulings.  Yet

12  Qualcomm has already been the recipient of rulings regarding the anticompetitive nature

13  of its business model that only apply throughout the territory issuing the ruling.  Take

14  China for instance.  In 2013 the Chinese National Development and Reform Commission

15  ("NDRC") conducted an investigation into Qualcomm's licensing and baseband chipset

16  supply practices and their effect on competition in the China markets.  Yang Decl. ¶ 13.

17  Upon completion of the investigation, China fined Qualcomm close to $1 billion dollars

18  and Qualcomm issued a Chinese-specific rectification plan in order to comply with the

19  resulting decision.  *Id.* (stating that the rectification plan specifically addressed the

20  royalties paid on Qualcomm's 3G and 4G standard-essential Chinese patents for devices

21  sold in China); *see also* Qualcomm's Answer to First Amended Complaint, Dkt. No. 97

22  ¶ 201.  That Qualcomm has already modified its licensing practices and conduct in order

23  to conform to a judicial ruling that only applied to one jurisdiction significantly lessens

24  the weight of Qualcomm's otherwise conclusory assertion that it would be placed in the

25  "impossible position of attempting to alter is behavior in an attempt to satisfy conflicting

26  rulings" in different countries.  Dkt. No. 92 at 29.

27

28

1   As such, and especially in light of the fact that Apple's foreign suits are not, as

2   Qualcomm contends, identical, the Court concludes that any risk of inconsistent

3   judgments does not weigh in favor of an anti-suit injunction.

4       **D. The effect on comity is not tolerable.**

5       "Comity is the recognition which one nation allows within its territory to the

6   legislative, executive or judicial acts of another nation, having due regard both to

7   international duty and convenience, and to the rights of its own citizens, or of other

8   persons who are under the protection of its laws." *Gallo*, 446 F.3d at 994 (internal

9   citations omitted). "The extension of comity to a foreign judgment is neither a matter of

10  absolute obligation, on the one hand, nor of mere courtesy and good will, upon the

11  other." *Applied Med.*, 587 F.3d at 920.  As such, it is not necessary to "calculate the

12  precise quantum of [an] injunction's interference with comity," but rather it is enough to

13  "estimate whether any such interference is so great as to be intolerable." *Microsoft*, 696

14  F.3d at 886.  The comity inquiry, therefore, is flexible, fact-specific, and context-specific.

15  *Id.*

16      Qualcomm contends that enjoining the foreign suits will have no impact on comity

17  because "[a]t its core, this is a dispute between two California corporations concerning

18  licensing negotiations that occurred primarily in California." Dkt. No. 92-1 at 30.  Since

19  the key issue in each foreign action is Apple's "claim as a third-party beneficiary of

20  Qualcomm's contractual commitment to ETSI" and because no foreign government is

21  involved, Qualcomm argues that there is no negative effect on comity. *Id.*  Stated

22  differently and in Qualcomm's own words, "Ordering one American corporation to stop

23  pursuing duplicative foreign actions concerning the contractual relationship with another

24  American corporation will have no adverse impact on comity." *Id.*

25      Apple argues the opposite.  According to Apple, issuing the anti-injunction would

26  plainly offend comity concerns because it would be akin to "forbid[ding] a foreign court

27  from adjudicating legal issues under its own law." Dkt. No. 108 at 28.  Specifically,

28  Apple avers that it would be improper to prevent the foreign courts from adjudicating the

3:17-cv-00108-GPC-MDD

infringement and antitrust-related claims or even from delaying adjudication of either type of claim.  *Id.*  In reply, Qualcomm emphasizes that the anti-suit injunction does not ask this Court to adjudicate the foreign patent and foreign anti-trust claims, but rather, asks this Court to prevent Apple from litigating "the same private contractual dispute over and over again around the world."  Dkt. No. 114 at 11.  As such Qualcomm asserts, and because the "contractual FRAND determination in this action will resolve the claims and issues in the foreign actions based on the same FRAND contract" any "remaining foreign issues can be resolved by the foreign courts in due course, after this Court's resolution of the global FRAND issues."  *Id.* (footnote omitted).

For many reasons, the Court disagrees that enjoining the foreign suits would have a tolerable impact on comity.  Throughout its briefing, Qualcomm emphasizes that this is a "private contractual dispute" between Apple and Qualcomm.  Accordingly, and to the extent that private commercial obligations do not implicate public concerns, Qualcomm argues that an anti-suit injunction would have no effect on comity.  *See Microsoft*, 696 F.3d at 887 (holding that district court did not abuse its discretion in granting anti-suit injunction because case involved private dispute under Washington state contract law and did not raise any public international issue).  Yet given the specific claims raised in Apple's foreign lawsuits — which include antitrust and patent claims — and given the numerous lawsuits filed against Qualcomm by international bodies, the Court finds it improper to demote this action to no more than a "private contractual dispute."

As Qualcomm reiterated throughout oral argument, Qualcomm's FRAND commitment to ETSI is global.  Indeed, Apple is not the only third-party beneficiary with an interest in enforcing Qualcomm's contractual obligations to ETSI.  ETSI's IPR policy, in fact, plainly states that any willing licensee is entitled to license Qualcomm's intellectual property at a FRAND rate.  There are, therefore, any number of corporations in China, Japan, the U.K., and Taiwan that are similarly-situated to Apple and that are similarly entitled to benefit from Qualcomm's FRAND promise to ETSI.  Viewed in this

1   light, it is far from accurate to say that this is a paradigmatic "private contractual dispute"

2   that only implicates the rights and obligations among Apple and Qualcomm.

3           Moreover and because Qualcomm's promises to ETSI are global in scope, whether

4   Qualcomm is upholding its FRAND commitment has global consequences and is of

5   global significance.  Long before Apple ever filed suit in this Court, adjudicative bodies

6   in the countries implicated by this anti-suit injunction began to investigate Qualcomm's

7   licensing practices.[11]  In 2009, the Korea Trade Fair Commission imposed a corrective

8   order and fined Qualcomm $208 million dollars "[f]or abusing its dominant position by

9   charging discriminatory royalties and offering conditional rebates."[12]  Also in 2009, the

10  Japan Fair Trade Commission issued an order finding that Qualcomm had violated

11  Article 19 of the Anti-Monopoly Act by coercing Japanese manufacturers to accede to a

12  FRAND-encumbered license agreement that guaranteed Qualcomm "royalty-free licenses

13  for the intellectual property rights of the Japanese Manufacturers" and that prevented the

14  Japanese Manufacturers from "assert[ing] their intellectual property rights against

15  Qualcomm[.]"[13]  In 2014 and as explained in further detail above, the Chinese National

16  Development and Reform Commission concluded that Qualcomm's licensing practices

17  violated China's Anti-Monopoly Law.   In 2015, the European Commission issued two

18  "Statements of Objections" alleging, among other matters, that Qualcomm abused its

19  dominant position in the baseband chipset market by paying a "major smartphone and

20  tablet manufacturer" significant amounts of money in order to be the company's

21

22  _____

23  [11] The following decisions were specifically identified in Apple's first amended complaint.  *See* FAC
24  ¶¶ 200-06.  In its answer, Qualcomm acknowledges the existence of each of these cases, but refers the
     Court "to the foregoing documents for their contents."  Answer to FAC ¶¶ 200-06.  Thus, the Court
25  finds it proper to take judicial notice of the contents of these decisions and the official documents
     explaining the grounds for the decisions.
26  [12] Qualcomm's Abuse of Market Dominance, KFTC (July 23, 2009),
     http://www.ftc.go.kr/eng/solution/skin/doc.html?fn=d83c42bbd9236e343cf78a7250d57b2292383b1f0ca
27  3eb1d83cccaf4e6854dd2&rs=/eng/files/data/result/files/bbs/2009/.
     [13] Cease and Desist Order against Qualcomm Incorporated, JFTC (Sept. 30, 2009),
28  http://www.jftc.go.jp/en/pressreleases/yearly-2009/sep/individual-000038.files/2009-Sep-30.pdf.

3:17-cv-00108-GPC-MDD

exclusive manufacturer of baseband chipsets.[14]  In 2017, the KFTC issued a decision that specifically found that Qualcomm had violated its FRAND commitment to ETSI by (1) refusing to license rival chipset makers; (2) coercing manufacturers to sign unfair license agreements by linking Qualcomm's chipset supply with their patent license agreements; (3) and by offering their "comprehensive portfolio license" without "undergoing a reasonable value assessment process."[15]  And finally, as of the date of Apple's complaint, the Taiwanese Fair Trade Commission had begun to actively investigate Qualcomm's business model as well.  FAC ¶ 208; Answer to FAC ¶ 208.

That multiple sovereign and international bodies have concluded or alleged that aspects of Qualcomm's business model are anticompetitive demonstrates that this dispute implicates global public concerns in a way not evident from the record in *Microsoft v. Motorola*.  Through the U.S. and foreign actions, Apple has specifically alleged that Qualcomm's licensing practices are anticompetitive under U.S. antitrust law and anticompetition laws in the U.K., China, Japan, and Taiwan.  That anticompetitive conduct is, moreover and as both parties concede, inextricably intertwined with Qualcomm's FRAND obligations to ETSI.  Enjoining Apple, therefore, from proceeding with its foreign suits, or even just part of them, would effectively deprive the U.K., China, Japan, and Taiwan of its jurisdiction to consider whether licensing agreements that Qualcomm executes within those jurisdictions, have anticompetitive effects in those territories.  *See China Trade*, 837 F.2d at 35-36 (citations omitted) ("The fact that the injunction operates only against the parties, and not directly against the foreign court, does not eliminate the need for due regard to principles of international comity, because

---

[14] Press Release, <u>Antitrust: Commission Sends Two Statements of Objections on Exclusivity Payments and Predatory Pricing to Qualcomm</u>, European Commission (Dec. 8, 2015), http://europa.eu/rapid/press-release_IP-15-6271_en.htm.

[15] <u>KFTC imposes sanctions against Qualcomm's abuse of SEPs of mobile communications</u>, KFTC (Dec. 28, 2016), http://www.ftc.go.kr/eng/solution/skin/doc.html?fn=0575fbdccbed8ced77b565db3dc7d32ffc7051e67ef109afad6d4f1cd780d6e8&rs=/eng/files/data/result/files/bbs/2017/.

such an order effectively restricts the jurisdiction of the court of a foreign sovereign[.]"). Yet such a result is intolerable given that numerous foreign bodies, including those slated to adjudicate the foreign suits, have proactively sought to investigate and terminate the anticompetitive effects of Qualcomm's licensing and patent practices in their respective jurisdictions.

In sum, this is not a case where the only assertion of comity is "vague and omnipotent." *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 627 (5th Cir. 1996). The record before the Court demonstrates that the boundaries of this dispute are not limited to the United States. Multiple sovereign states and bodies have posed legal challenges to Qualcomm's business model on the belief that Qualcomm's conduct in their respective jurisdictions has an adverse effect on competition in their territories. To issue an anti-suit injunction, therefore, would directly impede upon the ongoing efforts in the U.K., China, Japan, and Taiwan to assess the anticompetitive effects of Qualcomm's licensing and chip practices on their markets. Accordingly, the Court finds that the impact on comity is not tolerable and weighs against the issuance of an anti-suit injunction.

## IV. CONCLUSION

For the foregoing reasons, and because the Court finds that none of the three anti-suit factors weigh in favor of granting Qualcomm the injunction that it seeks, the Court **DENIES** Qualcomm's request for an anti-suit injunction.

**IT IS SO ORDERED**.

Dated: September 7, 2017

Hon. Gonzalo P. Curiel
United States District Judge