Juanita R. Brooks, SBN 75934, brooks@fr.com
Seth M. Sproul, SBN 217711, sproul@fr.com
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA 92130
Phone: 858-678-5070 / Fax: 858-678-5099

Ruffin B. Cordell, DC Bar No. 445801, *pro hac vice*, cordell@fr.com
Lauren A. Degnan, DC Bar No. 452421, *pro hac vice*, degnan@fr.com
Fish & Richardson P.C.
1000 Main Avenue, S.W., Suite 1000
Washington, D.C. 20024
Phone: 202-783-5070 / Fax: 202-783-2331

William A. Isaacson, DC Bar No. 414788, *pro hac vice*, wisaacson@bsfllp.com
Karen L. Dunn, DC Bar No. 1002520, *pro hac vice*, kdunn@bsfllp.com
Boies, Schiller & Flexner LLP
1401 New York Avenue, N.W.
Washington, DC 20005
Phone: 202-237-2727 / Fax: 202-237-6131

*Attorneys for Plaintiff and Counterclaim-Defendant Apple Inc.*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE:<br><br>QUALCOMM LITIGATION, | Case No. 3:17-CV-00108-GPC-MDD<br><br>[Consolidated with<br>Case No. 3:17-CV-01010-GPC-MDD]<br><br>APPLE AND THE CONTRACT MANUFACTURERS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT THAT CERTAIN PATENTS ARE UNENFORCEABLE DUE TO EXHAUSTION (COUNT LIV OF APPLE'S AMENDED COMPLAINT AND COUNT LXVII OF THE CMS' COUNTERCLAIMS)<br><br>████████████<br><br>DATE:    November 9, 2018<br>TIME:    1:30 p.m.<br>DEPT:    2D<br>JUDGE:  Hon. Gonzalo P. Curiel |

# **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................. 1

II.   BACKGROUND ................................................................................. 2

III.  LEGAL STANDARD ......................................................................... 2

    A.    Summary Judgment ................................................................. 2

    B.    Patent Exhaustion .................................................................... 3

IV.  ARGUMENT ..................................................................................... 4

    A.    The Supreme Court's Recent *Lexmark* Decision Forecloses Qualcomm's Efforts To Circumvent the Exhaustion Doctrine ................................................................. 5

        1.    *Lexmark* Precludes Qualcomm's Use of Patent Rights To Impose Post-Sale Restrictions ............................... 6

        2.    Qualcomm Cannot Avoid Exhaustion Through Foreign Sales ....................................................................... 8

    B.    Qualcomm's Sale of Chipsets Exhausts Its Patent Rights ..................................................................................... 8

        1.    Qualcomm's Sale of Chipsets ██████████ Is an Authorized Sale That Exhau Rights ..................................................................................... 9

        2.    Qualcomm Cannot Avoid Exhaustion with Corporate Shell Games ......................................................... 10

        3.    Qualcomm's Sale of Chipsets Exhausts Qualcomm's Patents, Notwithstanding the Provision of Related Software ............................................. 11

    C.    Qualcomm Chipsets Substantially Embody the Patents-in-Suit ..................................................................................... 13

    D.    Qualcomm's Sale of Baseband Chipsets Exhausts the '725, '822, and '021 Patents as to Products Incorporating Those Chipsets Because the Chipsets Substantially Embody the Patent Claims .......................................... 14

        a.    The '725 Patent ................................................................ 14

        b.    The '822 Patent ................................................................ 18

        c.    The '021 Patent ................................................................ 20

V.   CONCLUSION ................................................................................. 22

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Cases**

*Alice Corp. v. CLS Bank Int'l,*
    134 S. Ct. 2347 (2014)........................................................................17

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)........................................................................2, 3

*Audio MPEG, Inc. v. Dell Inc.,*
    272 F. Supp. 3d 813 (E.D. Va. 2017) ...............................................10

*High Point SARL v. T-Mobile USA, Inc.,*
    640 F. App'x 917 (Fed. Cir. 2016)....................................................4

*Impression Prods., Inc. v. Lexmark Int'l, Inc.,*
    137 S. Ct. 1523 (2017)...............................................................*passim*

*JVC Kenwood Corp. v. Nero, Inc.,*
    797 F.3d 1039 (Fed. Cir. 2015) ....................................................4, 14

*Keurig, Inc. v. Sturm Foods, Inc.,*
    732 F.3d 1370 (Fed. Cir. 2013) .........................................................4

*Keurig, Inc. v. Sturm Foods, Inc.,*
    No. CIV. 10-841-SLR, 2012 WL 4049799 (D. Del. Sept. 13, 2012),
    *aff'd*, 732 F.3d 1370 (Fed. Cir. 2013)................................................13

*LG Elecs. Inc. v. Hitachi Am. Ltd.,*
    655 F. Supp. 2d 1036 (N.D. Cal. 2009)........................................*passim*

*LifeScan Scot., Ltd. v. Shasta Techs., LLC,*
    734 F.3d 1361 (Fed. Cir. 2013) .....................................4, 15, 18, 21

*Multimedia Patent Tr. v. Apple Inc.,*
    No. 10-CV-2618-H KSC, 2012 WL 6863471 (S.D. Cal. Nov. 9,
    2012) ...................................................................................................13

*Quanta Computer, Inc. v. LG Elecs., Inc.,*
    553 U.S. 617 (2008).................................................................*passim*

*Rembrandt Data Techs., LP v. AOL, LLC,*
    641 F.3d 1331 (Fed. Cir. 2011) ........................................................10

*Straus v. Victor Talking Mach. Co.*,
    243 U.S. 490 (1917)......................................................................7

*United States v. Univis Lens Co.*,
    316 U.S. 241 (1942).............................................................*passim*

**Other Authorities**

FED. R. CIV. P. 8(d)(2).....................................................................13

FED. R. CIV. P. 56(a) ........................................................................2

# I.     INTRODUCTION

For years, Qualcomm's "no license, no chips" policy has required purchasers of its chipsets to separately pay for a license to its patents even where the chipsets substantially embody those patents.  SOF ¶¶ 1, 3.  The United States Supreme Court's decision in *Impression Products, Inc. v. Lexmark International, Inc.*, 137 S. Ct. 1523 (2017) ("*Lexmark*"), eliminates the very foundation of this practice.  Affirming what it previously referred to as "the longstanding doctrine of patent exhaustion," the Court explained that a patent holder may demand only "one reward" for "every item that passes outside the scope of the patent monopoly," and when it has secured the reward for its invention through the sale of a patented product, it may not further restrict the use or enjoyment of the item under the patent laws.  *Id.* at 1537.  Here, the patented products are Qualcomm's baseband chipsets that substantially embody Qualcomm patents.  *E.g.*, SOF ¶¶ 58, 93, 97, 99, 103, 113, 125.  Qualcomm seeks to restrict purchasers' ability to use the chipsets they buy and, by its own admission, requires them to pay both the price of the chipsets and separate patent royalties for the right to make, use, and sell products that include the chipsets.  SOF ¶¶ 1-3.  Qualcomm's patent tribute can exceed the entire price of the chipset, essentially doubling the cost of the product to its licensees.

*Lexmark* forbids this double-dipping.  The Patent Act ensures that Qualcomm "receives one reward" for its alleged invention—***either*** the sale price of the chipsets ***or*** the license fee—but not both.  *Id*.  To do otherwise would render the longstanding exhaustion requirement a nullity, which is precisely what Qualcomm has schemed to achieve.  Qualcomm's decision to sell chipsets in which its patents are substantially embodied—and in turn receive whatever fee it decides is appropriate "for the article and the invention which it embodies"—exhausts its patent rights.  *Id.* (internal quotations omitted).  Qualcomm's desire ***also*** to charge royalties for those same patents is not permitted under the law.

Qualcomm's double-dipping comes at a high price to Apple and the Contract

Manufacturers ("CMs") who assemble Apple's products. Qualcomm sells components to the CMs, who build those components into the Apple products they make and then sell to Apple. SOF ¶¶ 11, 15. Qualcomm then charges the CMs a license royalty on those products, ████████████████████████ ████████████████ SOF ¶¶ 15, 29. ████████████████████████ ████████████████████ SOF ¶ 15. ████████████████████ ████████████████████████████████████████████████████ ████ SOF ¶¶ 15, 30. The parties do not dispute that the CMs incorporate the purchased baseband chipsets into Apple products. SOF ¶¶ 14, 47. There is also no genuine dispute that Qualcomm's baseband chipsets substantially embody the patents at issue in this motion—Qualcomm itself identifies a baseband processor in Apple's products as the component that allegedly causes infringement. SOF ¶ 48.

Therefore, this Court should grant summary judgment that Qualcomm's patent rights are exhausted by Qualcomm's authorized sale of chipsets to the CMs.

## II.   BACKGROUND

The Statement of Material Facts sets forth the relevant details relating to Qualcomm's authorized sale of products that exhaust U.S. Patent Nos. 7,095,725 ('725 patent), 9,137,822 ('822 patent), and 7,096,021 ('021 patent).[1]

## III.   LEGAL STANDARD

### A.   Summary Judgment

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Any evidence must be viewed in the light most favorable to the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)).

---

[1] This motion does not address exhaustion of all nine patents-in-suit, but rather selects exemplary patents to illustrate the analysis and fit within the page limits. A favorable ruling on this motion would inform the parties as to the exhaustion issues for the other patents.

"By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247–48. Disputes over facts that are irrelevant or unnecessary will not defeat a motion for summary judgment. *Id.* at 248. A dispute about a material fact is "genuine" only when the evidence is "such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

### B.     Patent Exhaustion

"The longstanding doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates all patent rights to that item." *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 625 (2008); *see also Lexmark*, 137 S. Ct. at 1527. This doctrine "marks the point where patent rights yield to the common law principle against restraints on alienation." *Lexmark*, 137 S. Ct. at 1531. It reflects the "hostility toward restraints on alienation," which are "hateful to the law" and "obnoxious to the public interest." *Id.* at 1532 (quoting *Straus v. Victor Talking Mach. Co.*, 243 U.S. 490, 501 (1917)). Therefore, when a patentee chooses to sell a patented product, that product "'is no longer within the limits of the monopoly' and instead becomes the 'private, individual property' of the purchaser, with the rights and benefits that come along with ownership." *Id.* at 1531 (quoting *Bloomer v. McQuewan*, 55 U.S. 539, 549-50 (1853)). This is true even if the sale is made pursuant to "an express otherwise lawful restriction." *Id.* at 1533.

"[T]he traditional bar on patent restrictions following the sale of an item applies when the item sufficiently embodies the patents—even if it does not completely practice the patent—such that its only and intended use is to be finished under the term of the patent." *Quanta*, 553 U.S. at 628; *id.* at 637 ("[M]aking a product that substantially embodies a patent is, for exhaustion purposes, no different from making the patented article itself."); *see also United States v. Univis Lens Co.*, 316 U.S. 241, 250-51 (1942). In such cases, courts apply the doctrine where the sale

of a product substantially embodies a patent.  *Quanta*, 553 U.S. at 636, 638; *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1373 (Fed. Cir. 2013).  The same analysis applies to method claims.  *See Quanta*, 553 U.S. at 621, 628-30.

A product "substantially embodies" a patent "if (1) the only reasonable and intended use of the article is to practice the allegedly exhausted patent; and (2) the article embodies the essential or inventive features of the allegedly exhausted patent."  *JVC Kenwood Corp. v. Nero, Inc.*, 797 F.3d 1039, 1046 (Fed. Cir. 2015); *see also Quanta*, 553 U.S. at 631; *Univis Lens*, 316 U.S. at 249; *Keurig*, 732 F.3d at 1373.  Alternative uses are relevant to the exhaustion inquiry if they are both "reasonable and intended" by the patentee or its authorized licensee, but "the features partially practicing the patent are what must have an alternative use."  *Quanta*, 553 U.S. at 631, 632 n.6.

The "essential" features of a patent are those that contribute to the "inventive" part of the patent.  *Quanta*, 553 U.S. at 633; *High Point SARL v. T-Mobile USA, Inc.*, 640 F. App'x 917, 929 (Fed. Cir. 2016).  "What is 'inventive' about patent claims in the patent exhaustion context is what distinguishes them from the prior art."  *LifeScan Scot., Ltd. v. Shasta Techs., LLC*, 734 F.3d 1361, 1369 (Fed. Cir. 2013).  Where a sold item embodies only some of the claimed elements or steps, it will substantially embody the claim where the missing elements or steps are "common and noninventive" or "standard parts."  *Quanta*, 553 U.S. at 633-34.  Therefore, the need to combine the sold item with standard parts is no bar to exhaustion.  *Id.* at 637 ("[N]o further 'making' results from the addition of standard parts . . . to a product that already substantially embodies the patent.").

## IV.  ARGUMENT

Qualcomm sells baseband processor chipsets to the CMs ████████████ ████████████████████████ intending for such chipsets to be incorporated into Apple products.  SOF ¶¶ 9-13.  These sales are authorized by Qualcomm.  SOF ¶ 14.  Once Qualcomm authorizes the sale of chipsets, in which its

patents—including the ones that are the subject of this motion—are substantially embodied, Qualcomm can no longer control the chipsets through the patent laws. *Lexmark*, 137 S. Ct. at 1529.

Qualcomm has attempted to evade the exhaustion doctrine by structuring the sale of chipsets, provision of certain software needed to implement those chipset, and rights to practice patents embodied in those products in a shell game across multiple entities and separate agreements. What matters, however, "is the patentee's decision to make a sale." *Lexmark*, 137 S. Ct. at 1538. The CMs, who purchase the chipsets from Qualcomm, and all subsequent owners of those chipsets (e.g., Apple) are thus "free to use or resell the product just like any other item of personal property, without fear of a [patent] infringement lawsuit." *Id.* Likewise, Apple can freely sell and use products containing these chipsets.

There is no material factual dispute that the three patents discussed below are substantially embodied in Qualcomm's chipsets. Therefore, this Court should enter summary judgment that Qualcomm's rights in these patents are exhausted by the authorized sale of its baseband chipsets to the CMs as to products that incorporate those chipsets.

A.    **The Supreme Court's Recent *Lexmark* Decision Forecloses Qualcomm's Efforts To Circumvent the Exhaustion Doctrine**

The patent exhaustion doctrine is a limit on the scope of the patentee's rights when it sells a patented article or a product in which its patents are substantially embodied. *Lexmark* expressly rejects the argument that a patentee who sells an item can later restrict the purchaser's right to reuse or resell that product through a patent infringement lawsuit. *Id.* at 1529. The Court explained that the patentee "exhausted its patent rights in [its products] the moment it sold them." *Id.* at 1531. The exhaustion rule "functions automatically" to terminate all patent rights, and it applies regardless of whether the patentee may have separate, enforceable non-patent rights. *Id.* ("A patentee is free to set the price and negotiate contracts with

purchasers, but may not, 'by virtue of his patent, control the use or disposition' of the product after ownership passes to the purchaser." (citing *Univis Lens*, 316 U.S. at 250)). Accordingly, "even when a patentee sells an item under an express restriction, the patentee does not retain patent rights in that product." *Id.* at 1532.

It is the authorized sale of the item by the patentee that prevents the patentee from enforcing any further restrictions on that item through patent infringement suits. *Lexmark*, 137 S. Ct. at 1533 ("Without so much as mentioning the lawfulness of the contract, we held that the patentee could not bring an infringement suit because the 'authorized sale . . . took its products outside the scope of the patent monopoly.'" (citing *Quanta*, 553 U.S. at 638)). Therefore, once sold, products pass outside the patent monopoly and the patentee then has no exclusionary patent right left to enforce. *Id.* at 1533-34. The same reasoning holds true when applied to sales of covered products by licensees. "So long as a licensee complies with the license when selling an item, the patentee has, in effect, authorized the sale" and for exhaustion purposes that sale is treated "as if the patentee made the sale itself." *Id.* at 1535. In this way, "patent exhaustion is uniform and automatic." *Id.* The locus of the inquiry remains a concern with restraints on alienation and the rights of the purchaser—here, the CMs. "A purchaser has the right to use, sell, or import an item because those are the rights that come along with ownership, not because it purchased authority to engage in those practices from the patentee." *Id.* at 1527.

### 1. *Lexmark* Precludes Qualcomm's Use of Patent Rights To Impose Post-Sale Restrictions

Applied to this case, the operative effect of *Lexmark* is to void Qualcomm's sales contracts that purportedly decouple patent rights from chipsets that substantially embody Qualcomm's patents. Specifically, the chipsets are sold ▮▮▮

████████████████ (redacted).

SOF ¶¶ 23-24 (emphasis added).

The separate license Qualcomm forces on the CMs is known as the Subscriber Unit License Agreement ("SULA"), which Qualcomm Inc. executes. SOF ¶¶ 25-26. The SULA itself confirms Qualcomm's unlawful intent to evade the exhaustion doctrine by restraining the CMs' ability to use chipsets without the separate license:

████████████████████████████████████

█ SOF ¶ 27. That is, unless the CMs have signed a SULA, Qualcomm forbids the CMs from ██████████████ iPhones and iPads using the very baseband chipset components Qualcomm sold to the CMs. SOF ¶ 28.

████████████████████████████ " agreement that covers the ***same*** patent rights that were—as a matter of law— automatically exhausted upon Qualcomm's sale of ██████ *Lexmark*, 137 S. Ct. at 1535. These sorts of provisions do not survive under *Lexmark*. *See id.* at 1534 (noting that the sale of a patented good "transfers the right to use, sell, or import because those are the rights that come along with ownership, and the buyer is free and clear of an infringement lawsuit because there is no exclusionary right left to enforce"). Indeed, Qualcomm's attempt to extend its patent rights beyond the first sale to the CMs exemplifies the type of "restraints on alienation" that courts have historically found to be "hateful to the law" and "obnoxious to the public interest." *Straus*, 243 U.S. at 501. In short, Qualcomm has violated the very essence of the Supreme Court's ruling in *Lexmark*:

Allowing patent rights to stick remora-like to that item as it flows through the market would violate the principle against restraints on alienation. Exhaustion does not depend on whether the patentee receives a premium for selling in the United States, or the type of rights that buyers expect to receive. As a result, restrictions and location are irrelevant; what matters is the patentee's decision to make a sale.

*Lexmark,* 137 S. Ct. at 1538.

### 2. Qualcomm Cannot Avoid Exhaustion Through Foreign Sales

*Lexmark* also forecloses another path Qualcomm had pursued in its efforts to elude exhaustion—selling patented articles extraterritorially—by holding that the location of the sale is "irrelevant." *Id.* at 1538. "An authorized sale outside the United States, just as one within the United States, exhausts all rights under the Patent Act." *Id.* at 1535. The consequence here is that ███████████ ███████████ to sell chipsets to CMs abroad provides no escape from the exhaustion doctrine. Qualcomm's patent rights are extinguished by those foreign sales just as they would have been had the sales occurred within the United States.

### B. Qualcomm's Sale of Chipsets Exhausts Its Patent Rights

Qualcomm does not dispute that the CMs purchase baseband processor chipsets from Qualcomm for the purpose of incorporating them into the iPads and iPhones they will build (i.e., ███████████). SOF ¶ 13. Qualcomm sells chipsets to the CMs and licenses software for use in those chipsets to the CMs ███████████ SOF ¶¶ 17-18. The chipsets are sold ███████ ███████████████████████████ ███████████████ ███████. SOF ¶ 18. The software is licensed to the CMs pursuant to a Master Software Agreement ("MSA") ███████████. SOF ¶¶ 17, 31.

That Qualcomm divides the chipset sales and software license across two agreements—███████████████████████████ ███████████████████—is pure artifice intended to circumvent exhaustion. Examining each agreement in context reveals the singular nature of the transaction under Qualcomm's global direction.

**1. Qualcomm's Sale of Chipsets ████████ Is an Authorized Sale That Exhausts Its Patent Rights**

Starting with the Component Supply Agreement, Qualcomm (through its ████████ ███████ provides the CMs with certain ████████ which include ████ ████████████ (i.e., the chipsets) needed to build iPhones and iPads:[2]

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████ .

SOF ¶¶ 19-21.  Importantly, the ████████████ ██████████████████ ████████████████████████████ SOF ¶ 22 ("████████████████ ████████████████████ ").  ████████████ Qualcomm has completed an authorized sale, which exhausts any and all patent rights it may have in ████████████ (including, specifically, baseband chipsets).  *Lexmark*, 137 S. Ct. at 135 ("Once a patentee decides to sell—whether on its own or through a licensee—that sale exhausts its patent rights, regardless of any post-sale restrictions the patentee purports to impose, either directly or through a license.").

Qualcomm's baseband chipsets have no "utility" and the "only object of the sale [was] to enable" the CMs to install the baseband chipsets into end devices so that they can operate as designed and in accordance with the cellular standards.  *See Quanta*, 553 U.S. at 631-32.  Consequently, sale of the chipset exhausts any patent rights Qualcomm may have in the operation of the chipset, including any cellular patents that are necessarily practiced by use of the baseband chipsets in the cellular networks.  *See id.* ("The lens blanks in *Univis* met this standard because they were 'without utility until [they were] ground and polished as the finished lens of the patent.'  Accordingly, 'the only object of the sale [was] to enable the [finishing retailer] to grind and polish it for use as a lens by the prospective wearer.'" (citations and footnote omitted)).

---

[2] ████████████ ████████████████████████████████████  SOF ¶ 20.

### 2. **Qualcomm Cannot Avoid Exhaustion with** ██████████

This Court should reject any Qualcomm attempt to obtain more than "one reward" ████████████████. The central inquiry for this Court is whether the sale is "authorized." ██████████████████████████████████████

██████████ "To have an 'authorized sale,' a patentee may either directly sell their invention or may ***authorize someone else to sell their invention*** through a license agreement." *Audio MPEG, Inc. v. Dell Inc*., 272 F. Supp. 3d 813, 821 (E.D. Va. 2017) (emphasis added); *see also Quanta*, 553 U.S. at 625 (applying exhaustion where technology company sold microprocessors with authorization from a different party, the patentee); *Rembrandt Data Techs., LP v. AOL, LLC*, 641 F.3d 1331, 1335 (Fed. Cir. 2011) (affirming district court's grant of summary judgment on the basis that a sale by a sub-licensee exhausted patentee's rights). If Qualcomm were permitted to use the fact that it has organized itself into a coordinated body of subsidiaries in order to avoid exhaustion, this important, 160-year-old patent exhaustion doctrine would be rendered a dead letter.

Qualcomm cannot credibly claim ██████████ sales of chipsets to the CMs are unauthorized. Qualcomm owns the Qualcomm patents it later seeks to license to the CMs, including the patents that are the subject of this motion. SOF at ¶ 7. As owner of both its patent portfolio and ███████████ ████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████. SOF ¶¶ 4, 6, 8. For example, ████████████████████████████████████████████ ██████████████████████████ SOF ¶ 5 ██████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████ Qualcomm thus works ████████████████ to implement the "no license, no chips" policy, which prevents sales of chipsets to manufacturers unless they pay for exhausted patents by entering into separate patent license

agreements. SOF at ¶ 1. In the words of Qualcomm's former president Derek Aberle, ████████████████████████████████████████ ████████████████████████████████ SOF ¶ 2.

Importantly, Qualcomm defines its policies as a uniform whole across its corporate structure. As an example, many of the contracts between Apple and Qualcomm are between Apple Inc. and ***Qualcomm Inc.***—the parent company and patent owner—demonstrating that Qualcomm has the power to, and does, authorize the sales in question. *E.g.*, SOF ¶ 43. These contracts include, for example, the Amended and Restated Strategic Terms Agreement, between Apple and Qualcomm Inc., under ██████████████████████████████████ ██████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ █ SOF ¶ 44. Under this agreement, Qualcomm Inc. and Apple can enter into Statements of Work ("SOW"), which set forth ████████████████ ████████████████████████████████████ ████████████████████████████████████ ████ SOF ¶ 45 ████████████████████████ ████████████████████████████████████ ████████████████████████████████ █████ SOF ¶ 46. Therefore, there is no genuine dispute that Qualcomm authorizes ██████████ sales of chipsets to the CMs.

### 3. Qualcomm's Sale of Chipsets Exhausts Qualcomm's Patents, Notwithstanding the Provision of Related Software

The sale of chipsets exhausts Qualcomm's patents, even though the chipset is designed to work with software that Qualcomm provides.

The CMs' MSAs with Qualcomm provide the CMs with a license to certain Qualcomm-provided software for use with its baseband chipsets in subscriber

equipment such as iPhones and iPads, as the MSA's Recitals reflect:

█████████████████████████████████████████
█████████████████████████████████████████
███████████████████████████████████████ .

SOF ¶ 32 (emphasis added). The term "████████████" refers to ████████████ ████████████████████ (i.e., the baseband chipsets).[3] SOF ¶ 33. The specific software Qualcomm provides under the MSA is "███████████," collectively defined to include ████████████████████████████████ ████████████████████████ . SOF ¶ 34. Qualcomm's definition echoes the Recitals by specifying ████████████ is "█████████████████████████ ██████ ." SOF ¶ 35. The definition of "████████████████" is a mirror image, expressly reciting that it must be "██████████████████████████ ██████████████████████████████ ." SOF ¶ 36.[4] In other words, Qualcomm's chipsets and software indisputably are a matched pair by design, each intended to be used with, and only with, the other. SOF ¶¶ 16, 37.

The sale of the chipset alone exhausts any patent rights Qualcomm may have, even before the software is loaded onto the device, because the "only object of the sale [was] to enable" the CMs to utilize the chipsets. *Quanta*, 553 at 631-32 (citations omitted) (footnote omitted). As the Supreme Court explained in *Univis*:

> [W]here one has sold an uncompleted article which, because it embodies essential features of his patented invention, is within the protection of his patent, and has destined the article to be finished by the purchaser in conformity to the patent, he has sold his invention so far as it is or may be embodied in that particular article.

*Univis Lens*, 316 U.S. at 251.[5] Thus, the fact that software assists the Qualcomm

---

[3] ██████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████

[5] ██████████████████████████████████████████ .
cerns lens "blanks" that were sold for eventual grinding into multifocal eyeglass lenses in accordance with patents there at issue. *Id*. at 243.

chipsets in performing their intended function does not defeat Apple and the CMs' claim for exhaustion.

Even if utilizing the essential features embodied by Qualcomm's chipsets required still other, additional software authored by a party other than Qualcomm, the result does not change. The exhaustion analysis turns not on the source of the materials needed to place the patented article in its "completed form," but whether the patentee has transferred the article, and received a reward for the patent monopoly in the form of the purchase price.

> The first vending of any article manufactured under a patent puts the article beyond the reach of the monopoly which that patent confers. Whether the licensee sells the patented article in its completed form or sells it before completion for the purpose of enabling the buyer to finish and sell it, he has equally parted with the article, and made it the vehicle for transferring to the buyer ownership of the invention with respect to that article. To that extent he has parted with his patent monopoly in either case, and has received in the purchase price every benefit of that monopoly which the patent law secures to him.

*Id.* at 252.

Viewing the ██████████████████████ MSA, Qualcomm approves the activities ████████████ to effect sales that are "authorized" and exhaustive.

## C. Qualcomm Chipsets Substantially Embody the Patents-in-Suit

There can be no genuine dispute that Qualcomm's baseband chipsets substantially embody the patents at issue in this motion. In its opening expert reports, Qualcomm alleged that Apple products infringe these patents. SOF ¶¶ 48-51. These allegations help to show that the claims would be substantially embodied in the baseband chipsets, if the claims were practiced at all.[6] This Court may rely on

---

[6] Apple's allegations of noninfringement are no impediment to summary judgment on the issue of exhaustion. An exhaustion theory can exist in the alternative with a noninfringement one, *see* FED. R. CIV. P. 8(d)(2), and courts have ruled on exhaustion without reaching the merits of noninfringement. *See Multimedia Patent Tr. v. Apple Inc.*, No. 10-CV-2618-H KSC, 2012 WL 6863471, at *5 (S.D. Cal. Nov. 9, 2012) (finding noninfringement argument mooted by deciding exhaustion in favor of accused infringer); *Keurig, Inc. v. Sturm Foods, Inc.*, No. CIV. 10-841-

these allegations for the purposes of this motion. *See LG Elecs. Inc. v. Hitachi Am. Ltd.*, 655 F. Supp. 2d 1036, 1044, 1048 (N.D. Cal. 2009) (granting summary judgment based on patentee's infringement contentions).

### D. Qualcomm's Sale of Baseband Chipsets Exhausts the '725, '822, and '021 Patents as to Products Incorporating Those Chipsets Because the Chipsets Substantially Embody the Patent Claims

Qualcomm alleges that Apple mobile devices equipped with an Intel baseband chipset (which are manufactured by the CMs) infringe the '725, '822, and '021 patents. SOF ¶ 49. Qualcomm supports its infringement allegations using only baseband chipset source code (i.e., source code that is compiled and run by the baseband chipset). SOF ¶ 50. The infringement allegations are equally applicable to Qualcomm's own chipset, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Therefore, if Apple's products practice the '725, '822, and '021 patents, then all claims of those patents would be substantially embodied in the baseband chipset. As a result, the authorized sale of Qualcomm's chipset to the CMs exhausts Qualcomm's patent rights in these patents with respect to products that incorporate those baseband chipsets. *See Quanta*, 553 U.S. at 638.

#### a. The '725 Patent

The '725 patent relates to controlling the data rate on the reverse link of a wireless communication system to reduce delays in data transmission. SOF ¶ 52; Dkt. 501 at 45. The '725 patent specifically deals with situations where a mobile

---

SLR, 2012 WL 4049799, at *4 (D. Del. Sept. 13, 2012) (despite defendant's raising a variety of defenses, including noninfringement, "the court focuses on the issue of patent exhaustion, which is determinative"), *aff'd*, 732 F.3d 1370 (Fed. Cir. 2013); *cf. JVC Kenwood Corp. v. Nero, Inc.*, 797 F.3d 1039, 1046 (Fed. Cir. 2015) (affirming summary judgment of noninfringement while recognizing the potential for summary judgment on the alternative ground of patent exhaustion).

station does not have data to transmit, and the data-justified rate subsequently drops to zero.  SOF ¶ 53; Dkt. 501 at 45.  The '725 patent addresses this issue by the utilization of a "dummy rate" that constrains the data-justified rate, and thereby helps to ensure that a mobile station will not experience delays when it increases the transmission rate.  SOF ¶ 54; Dkt. 501 at 45.

During prosecution of the patent, Qualcomm amended claims 1, 6, 9, and 18 to include that the "data transmission rate is constrained to be no less than a predetermined amount less than the data-justified rate for the previous frame" or "the data-justified rate is constrained to be no less than a dummy rate"—subject matter identified by the Patent Office to be allowable.  SOF ¶ 55.  Independent claims 19, 26, and 32 were deemed allowable in the first instance because they already recited a "ramp-up-limited rate" constraint to the data transmission rate: "the data transmission rate . . . is set equal to the greater of [a current or first] data transmission rate and a sticky rate."  SOF ¶ 56; *LifeScan*, 734 F.3d at 1369 ("What is 'inventive' about patent claims in the patent exhaustion context is what distinguishes them from the prior art.").

Each claim limitation, including the inventive aspect, would be performed by functionality within a baseband chipset.  SOF ¶ 57.  A baseband chipset is the part of a mobile station that would determine data transmission rates.  SOF ¶ 59.  It is also the part that would transmit data on the reverse link (i.e., from the mobile station to the base station) at those data transmission rates.  SOF ¶ 60.  Even if the "transmitting" steps were performed by circuitry that resides outside the Qualcomm baseband chipset, "transmitting" is a standard, well-known operation that is carried out using standard, well-known components such as RF circuitry.  SOF ¶ 61.  Like the step of connecting a chipset to memory in *Quanta*, the transmitting step here is common and noninventive.  *Quanta*, 553 U.S. at 634.  The baseband chipset thus substantially embodies the claims because it "carr[ies] out all the inventive processes when combined, according to [its] design, with standard components" like

RF circuitry that enables data transmission. *Id.*

Qualcomm acknowledges that the baseband chipset is the component responsible for data transmission rates and transmitting data on the reverse link in its infringement allegations. SOF ¶ 62 (Qualcomm's expert alleging Apple infringes claims 9-10). According to Qualcomm, the baseband chipset is configured to perform the recited determining steps, and the Apple products "transmit data using HSUPA using an Intel baseband chipset." SOF ¶¶ 63-65. The baseband chipset is "configured to run the compiled source code shown by the Jones Report" to allegedly perform the determining limitations of claim 9. SOF ¶ 64. The same is true of Qualcomm's allegation related to infringement of dependent claim 10. SOF ¶ 66. Qualcomm, through its expert Dr. Min, thus confirmed that the baseband chipset controls the data rate on the reverse link.

This conclusion is equally true of the Qualcomm chipset as it is the Intel chipset because both are required to comply with Apple's PRDs. ███████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████ SOF ¶ 67. Notably, Qualcomm identifies no component of an Apple product, other than a baseband chipset, that controls the data rate on the reverse link. SOF ¶ 68. Accordingly, there is no genuine issue of material fact that the baseband chipset embodies the identified inventive feature of the '725 patent. *See LG Elecs.*, 655 F. Supp. 2d at 1044. Furthermore, the only reasonable and intended use of this functionality in the baseband chipset is to practice the identified inventive features of the '725 patent. SOF ¶ 69. In fact, the baseband chipset "all but completely practice[s] the patent." *Quanta*, 553 U.S. at 633.

The rest of the claims would likewise be substantially embodied in the baseband chipset. Independent claims 1, 6, and 19 recite steps for "determining" data transmission rates and "transmitting" data on the reverse link at those transmission rates, similar to the limitations of claim 9 except in method form. SOF

¶ 70. As confirmed by Dr. Min with respect to claim 9, the "determining" and "transmitting" steps would be performed by the baseband chipset. SOF ¶ 71; *Cf. Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2360 (2014) (holding, in §101 analysis context, the form of the claim is immaterial). As discussed above, even if the "transmitting" steps were performed, in part, by circuitry that resides outside the Qualcomm baseband chipset, standard, well-known components such as RF circuitry would do so. *See* SOF ¶ 61. Accordingly, to the extent they are practiced by a mobile station, independent claims 1, 6, and 19 would be substantially embodied in the baseband chipset. SOF ¶ 72.

Independent claim 26 recites an apparatus comprising a "transmit subsystem" and a "processor" coupled to the transmit subsystem and configured to determine a new data transmission rate in the same way as claim 9. SOF ¶ 73. Independent claims 18 and 32 recite a "software product" with instructions configured to cause a data processor to perform steps to "determine" data transmission rates and "transmit" data on a reverse link, like in claims 1, 6, 9, and 19. SOF ¶ 75. These instructions would be included within software running on a baseband chipset. SOF ¶ 76. Accordingly, claims 18, 26, and 32 would be substantially embodied in the baseband chipset for the same reason as claims 1, 6, 9, and 19. SOF ¶¶ 74, 77.

The dependent claims do not add any limitations that impact the substantial embodiment analysis for those claims. Those claims recite additional steps for determining a second data transmission rate, and would be practiced at the baseband chipset. SOF ¶¶ 78-79. Therefore, the dependent claims would also be substantially embodied in the baseband chipset. SOF ¶ 80.

For the foregoing reasons, Qualcomm cannot legitimately dispute that, under its own infringement theory, the baseband chipset substantially embodies all claims of the '725 patent. *See LG Elecs.*, 655 F. Supp. 2d at 1044. As a result, the authorized sale of Qualcomm's chipset to the CMs exhausts Qualcomm's patent rights in the '725 patent with respect to Apple products that incorporate Qualcomm

baseband chipsets.  *See Quanta*, 553 U.S. at 638.

### b.    The '822 Patent

The '822 patent relates to communications between a mobile station (aka access terminal) and an access point, such as a base station. SOF ¶ 81; Dkt. 501 at 35.  The patent identifies a need to send more efficiently an acknowledgment message from a base station to a mobile station.  SOF ¶ 82.  To address this need, the '822 patent recognizes that the mobile station can send information regarding forward link channel quality during its initial access attempt with the base station. SOF ¶ 82; Dkt. 501 at 35.

During prosecution of the patent, Qualcomm stressed the claimed process of selecting an access sequence from a group of access sequences.  To convince the patent examiner that its claims were patentable, Qualcomm authorized the examiner to amend the independent claims to recite that the access sequences being selected "are distributed in proportion to a number of access terminals requiring a given amount of power needed to send an indicator of acknowledgment to an access terminal." *See* SOF ¶ 83.  Qualcomm thus signaled that the access sequence selection limitation is the inventive feature.  *See LifeScan*, 734 F.3d at 1369.

A baseband chipset is the part of a mobile station that would provide the functionality of selecting an access sequence as part of its implementation of an access procedure.  SOF ¶ 84.  Qualcomm acknowledges as much when it accuses Apple products of infringing this patent.  *Id.*  The infringement analysis focuses on source code found in and executed by the baseband processor in Apple devices. SOF ¶ 85.  Specifically, Qualcomm's expert Dr. Villasenor opined that the baseband processor "meets all of the elements of claim 12."  SOF ¶ 86.  Focusing on the "access sequence" limitation, he identified sections of the chipset source code as practicing claim 12.  *Id.*  Dr. Villasenor thus confirmed that the baseband chipset would be responsible for selecting an access sequence.  Qualcomm identified no other component that would perform this function.  SOF ¶ 87.  Accordingly, there is

no genuine issue of material fact that a baseband chipset would embody the inventive feature of the '822 patent. *See LG Elecs.*, 655 F. Supp. 2d at 1044. Further, the only reasonable and intended use of this functionality in the baseband chipset is to practice the identified inventive features of the '822 patent. SOF ¶ 88.

Claim 12 also recites a memory element. SOF ¶ 89. ███████████ ███████████████████████████████████████████████████████ SOF ¶ 91. Even if the memory element resides outside the baseband chipset,[7] it is a standard, well-known component performing a standard, well-known operation, namely, storing a computer program. SOF ¶ 92. In *Quanta*, "the final step to practice the patent [wa]s common and noninventive: . . . connecting a microprocessor or chipset to buses or memory." 553 U.S. at 634. Likewise, here, the claim requires a generic memory element, which is a common and noninventive element. Therefore, as in *Quanta*, the baseband chipset embodies the essential features of claim 12 because the chipset "carr[ies] out all the inventive processes when combined, according to [its] design, with standard components" like a memory element. *Id.* Claim 12 is substantially embodied in the baseband chipset. SOF ¶ 93.

The same is true for each of the other independent claims. Qualcomm similarly amended claims 1, 20, 28, 30, 31, and 33 to recite the claimed process of selecting an access sequence from a group of access sequences. SOF ¶ 94. As confirmed by Dr. Villasenor with respect to claim 12, the selection of an access sequence would be performed at the mobile station by the baseband chipset. SOF ¶ 95. Claims 1, 28, and 31 do not add any additional limitations that are not performed by a baseband processor, whereas claim 20 recites a common "memory," like in claim 12. SOF ¶¶ 96, 98. Claims 30 and 33 recite an additional step of "transmitting the selected access sequence and the CQI value." SOF ¶ 100. The

---

[7] Dr. Villasenor does not say whether the memory element is in the baseband chipset or not. SOF ¶ 90. Instead, he states that "any difference between the computing and selection of access sequences and 'a memory element configured to store a plurality of groups of access sequences' is insubstantial." *Id.*

transmission step is performed with the help of instrumentalities, such as a mobile antenna, located outside of the baseband chipset. SOF ¶ 101. However, like the memory element of claim 12, the claimed transmitting functionality is common and noninventive such that the transmitting step does not change the exhaustion analysis. SOF ¶ 102; *Quanta*, 553 U.S. at 634. Accordingly, to the extent they are practiced by the mobile station, the remaining independent claims would also be substantially embodied in the baseband chipset. SOF ¶¶ 97, 99, 103.

The dependent claims either relate to the access sequence selection process itself, or the step of transmitting the selected access sequence, both of which would be practiced at the baseband chipset alone or with a standard transmitter element. SOF ¶ 104. Because it is a standard part, the transmitter element does not change the exhaustion analysis. *Quanta*, 553 U.S. at 633-34; SOF ¶ 105. Accordingly, the dependent claims would also be substantially embodied in the baseband chipset.

For the foregoing reasons, Qualcomm cannot legitimately dispute that, under its infringement theory, its baseband chipset substantially embodies all claims of the '822 patent. *See LG Elecs.*, 655 F. Supp. 2d at 1044. As a result, the authorized sale of Qualcomm's chipset to the CMs exhausts Qualcomm's patent rights in the '822 patent with respect to Apple products that incorporate Qualcomm baseband chipsets. *See Quanta*, 553 U.S. at 638.

### c. The '021 Patent

The '021 patent relates to inter-system handover, which is the handover from a mobile station from a first cellular system to a second cellular system. SOF ¶ 106; Dkt. 501 at 8. The '021 patent provides a method for a mobile station to perform power measurements of the second cellular system when the power level of the first cellular system remains below a certain threshold level. SOF ¶ 107; Dkt. 501 at 8.

During prosecution of the patent, Qualcomm stressed that the claims recite a method of initiating, in a mobile station, measurements "to enable a decision to handover" **only after** the "power level of the signal remains below a predetermined

threshold value." SOF ¶ 108. Qualcomm even amended the claims to recite the "only after" feature expressly. SOF ¶ 109. Qualcomm thus signaled that measuring the power level of the second base station "only after" the power level of the first base station remains below a threshold value is the inventive feature of the patent. *See LifeScan*, 734 F.3d at 1369.

A baseband chipset is the part of a mobile station that would determine whether the power level has remained below a threshold value and initiate measurements only after the power level remained below that threshold value. SOF ¶ 110. To do so, the baseband chipset would receive the signal and process it to deduce the power level of the received signal. SOF ¶ 111. The baseband chipset also would be used to create messages that maintain connection with the first cellular system while measuring the second cellular system. SOF ¶ 112. Qualcomm acknowledges as much by accusing Apple mobile devices equipped with an Intel baseband chipset of infringing claims 1, 2, 4, and 9-11 of the '021 patent. SOF ¶ 114. According to Qualcomm, the chipset in Apple's products is configured to perform "inter-RAT handover," for example "when those products are handed over from a 4G/LTE system to a non-4G/LTE (e.g., UMTS) system." *Id.* (Qualcomm's expert opining that the source code is "capable of being configured to operate in the [claimed] manner"). This functionality is not unique to Intel's chipset, and it would similarly be practiced by Qualcomm's chipset. SOF ¶ 115. Significantly, Qualcomm identifies no component other than a baseband chipset that would perform this function. SOF ¶ 116. Accordingly, there is no genuine issue of material fact that the baseband chipset embodies the inventive feature of the '021 patent. *See LG Elecs.*, 655 F. Supp. 2d at 1044. Further, the only reasonable and intended use of this functionality in the baseband chipset is to practice the identified inventive features of the '021 patent. SOF ¶ 117. In fact, the baseband chipset "all but completely practice[s] the patent." *Quanta*, 553 U.S. at 633; SOF ¶ 113.

Dependent claims 2-11 relate to defining specific threshold values, processing

the power levels of base stations, and relaying power level information back to the network, all of which would be practiced at the baseband chipset. SOF ¶¶ 118-19. For dependent claims 3 and 7, which include limitations that would be performed by the network, those operations are common procedures that do not qualify as inventive features. SOF ¶¶ 120-21. Therefore, the network-performed limitations do not change the exhaustion analysis. *Quanta*, 553 U.S. at 633-34 (finding substantial embodiment in a chipset, despite limitations relating to common and noninventive elements practiced outside the chipset). Dependent claims 2-11 would be substantially embodied in the baseband chipset. SOF ¶ 122.

Claims 12-14 of the '021 patent include a term that the Court has determined is indefinite. Dkt. No. 501 at 9-15 (holding "the '021 patent fails to disclose adequate structure corresponding to the 'comparing' function" in claim 12); SOF ¶ 123. Claims 12-14 are therefore invalid. If these claims were not invalid, they would be substantially embodied in the baseband chipset. SOF ¶¶ 125-27. Specifically, claims 12 and 13 contain similar limitations to claims 6 and 7 in a means-plus-function form, and claim 14 clarifies that the terminal is a mobile station. SOF ¶¶ 124, 126. Therefore, claims 12-14, if valid, would be substantially embodied in the baseband chipset for the same reasons as claims 6 and 7.

Accordingly, there is no genuine issue of material fact that the baseband chipset substantially embodies all claims of the '021 patent. *See LG Elecs.*, 655 F. Supp. 2d at 1044. The authorized sale of Qualcomm's chipset to the CMs exhausts Qualcomm's patent rights in the '021 patent with respect to Apple products that incorporate Qualcomm baseband chipsets. *See Quanta*, 553 U.S. at 638.

## V.  CONCLUSION

As a result, this Court should grant partial summary judgment on Count LIV of Apple's Amended Complaint and Count LXVII of the CMs' Counterclaims and hold the '725, '822, and '021 patents unenforceable due to exhaustion.

Dated: August 31, 2018                Respectfully submitted,

By:  /s/ Seth M. Sproul

Juanita R. Brooks, SBN 75934, brooks@fr.com
Seth M. Sproul, SBN 217711, sproul@fr.com
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA 92130
Phone:  858-678-5070 / Fax: 858-678-5099

Ruffin B. Cordell, DC Bar No. 445801,
*pro hac vice*, cordell@fr.com
Lauren A. Degnan, DC Bar No. 452421,
*pro hac vice*, degnan@fr.com
Fish & Richardson P.C.
1000 Main Avenue, S.W., Suite 1000
Washington, D.C.  20024
Phone:  202-783-5070 / Fax:  202-783-2331

William A. Isaacson, DC Bar No. 414788,
*pro hac vice*, wisaacson@bsfllp.com
Karen L. Dunn, DC Bar No. 1002520,
*pro hac vice*, kdunn@bsfllp.com
Boies, Schiller & Flexner LLP
1401 New York Avenue, N.W.
Washington, DC 20005
Phone: 202-237-2727 / Fax: 202-237-6131

Attorneys for *Plaintiff and Counterclaim-Defendant Apple Inc.*

By:  /s/ Jennifer J. Rho

THEODORE J. BOUTROUS, JR. (SBN 132099)
tboutrous@gibsondunn.com
DANIEL G. SWANSON (SBN 116556)
dswanson@gibsondunn.com
JASON C. LO (SBN 219030)
jlo@gibsondunn.com
JENNIFER J. RHO (SBN 254312)
jrho@gibsondunn.com
MELISSA PHAN (SBN 266880)
mphan@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071

23        Case No. 3:17-CV-00108-GPC-MDD

Tel:  (213) 229-7000; Fax:  (213) 229-7520

CYNTHIA RICHMAN (DC Bar No. 492089,
*Pro Hac Vice*)
crichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Tel: (202) 955-8500; Fax: (202) 467-0539

*Attorneys for Defendants, Counterclaimants, and
Third-Party Plaintiffs Compal Electronics, Inc., FIH
Mobile Ltd., Hon Hai Precision Industry Co., Ltd.,
Pegatron Corporation, and Wistron Corporation*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **FILER'S ATTESTATION**

Pursuant to Section 2(f)(4) of the Electronic Case Filing Administrative Policies and Procedures of the United States District Court of the Southern District of California, I certify that authorization for the filing of this document has been obtained from each of the other signatories shown above and that all signatories have authorized placement of their electronic signature on this document.

Dated: August 31, 2018

By: _/s/ Seth M. Sproul_

Seth M. Sproul

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on August 31, 2018 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4. Any other counsel of record will be served by electronic mail, facsimile and/or overnight delivery.

Executed on August 31, 2018, at San Diego, California.

*/s/ Seth M. Sproul*
Seth M. Sproul