1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: QUALCOMM LITIGATION | No. 17-cv-0108-GPC-MDD |
| | **JOINT PRETRIAL BRIEF IDENTIFYING DISPUTED CONTRACT PROVISIONS AND THE PARTIES' POSITION ON EACH DISPUTED PROVISION** |
| | ███████████ |

# TABLE OF CONTENTS

INTRODUCTION .................................................................................1

AGREEMENTS BETWEEN THE CONTRACT MANUFACTURERS ("CMs") AND QUALCOMM.................................................................4

I.  Subscriber Unit License Agreements—Between Qualcomm and the CMs ("SULA").................................................................4

    A.  Selling Price (§ 1), Audits/Inspections (§ 14.2) & Late Charge (§ 25) 4

    B.  Integration Clause (§ 27) .....................................21

II. Component Supply Agreements—Between Qualcomm and the CMs ("CSA") and Master Software Agreements—Between Qualcomm and the CMs ("MSA").................................................................28

AGREEMENTS BETWEEN APPLE AND QUALCOMM.................................28

III. Business Cooperation and Patent Agreement—Between Qualcomm and Apple, dated January 1, 2013 ("BCPA")..............................28

    A.  Section 4 .....................................................29

    B.  Section 7 .....................................................34

    C.  Implied Covenant of Good Faith and Fair Dealing............................44

IV. Statement of Work for Qualcomm Chipsets for Mav 7/8, Mav 10, and Mav 13—Between Qualcomm and Apple, dated February 28, 2013 ("2013 SOW") .................................................................45

TIA, ATIS AND ETSI POLICIES .................................................53

V.  The FRAND Commitment .................................................53

VI. The Disclosure Obligation.................................................66

VIII. Essentiality.................................................70

**INTRODUCTION**

In accordance with the Court's December 19, 2018 Trial Preparation and Scheduling Order (ECF 749), Qualcomm Incorporated ("Qualcomm"); Apple Inc. ("Apple"); and FIH Mobile Ltd. and Hon Hai Precision Industry Co., Ltd. (together, "Foxconn"), Pegatron Corporation, Wistron Corporation, and Compal Electronics, Inc. (collectively, "the CMs") submit this joint brief identifying disputed contract provisions and the parties' respective positions on each provision for the Court's consideration. Additional contract interpretation disputes may arise prior to, or during trial, and the parties reserve the right to raise such issues as necessary.

***Qualcomm Introduction.*[1&2]**

Each of the contracts addressed in this joint brief concerns one of Qualcomm's two primary businesses, the licensing of its patents and the sale of modem chips.

**Licensing:**  Through its business unit, Qualcomm Technology Licensing ("QTL"), Qualcomm licenses its vast portfolio of standard essential patents ("SEPs") and non-standard essential patents ("NEPs") relating to cellular and other technologies. Qualcomm makes licenses to its SEPs available on "fair, reasonable and non-discriminatory", or FRAND, terms pursuant to the commitments it has made to various standard-development organizations ("SDOs"), most importantly the European Telecommunications Standards Institute ("ETSI"), the leading SDO in the cellular

---

[1]  Apple and the CMs object to Qualcomm's introduction, which contains unnecessary, one-sided characterizations of the parties and the issues in this case, and exceeds the scope of the Court's request for briefing concerning the interpretation of the contracts in this case. Dkt. 749.  Apple and the CMs are not responding to these arguments.  This should not be taken as an admission that Qualcomm's characterizations are accurate, and Apple and CMs reserve all objections.  Where necessary, Apple and the CMs' introductions to the relevant agreements are included in their respective sections below.
[2]  On February 15, 2019, Qualcomm's counsel informed Apple and the CMs that Qualcomm "will not pursue its claim for breach of the Apple MSA."  Qualcomm Counterclaim XI.  As a result, Apple and the CMs are not briefing their interpretation disputes with Qualcomm regarding that contract.

communications industry.  QTL has licensed its patents to the makers of cellular phones and other devices on FRAND terms for more than 30 years through royalty-bearing patent license agreements often called Subscriber Unit License Agreements ("SULAs").  Qualcomm has negotiated and executed license agreements with hundreds of licensees.

**Modem Chips:**  Qualcomm Technologies, Inc. ("QTI"), a subsidiary of Qualcomm, operates a business called Qualcomm CDMA Technologies, Inc. ("QCT"), which is a leading developer and supplier of baseband chips used in cellular devices; at certain times, Apple used chips supplied by Qualcomm in its products.  QTI also develops software for use with its baseband chips.  Another subsidiary of QTI enters into Component Supply Agreements ("CSAs") that govern the purchase and use of baseband chips, and QTI enters into Master Software Agreements ("MSAs") to license the related software.  For certain customers, like Apple, Qualcomm also enters into Statements of Work ("SOW") that govern the development and supply of customized baseband chip solutions.  QCT does not charge for IP in pricing its chips; rather, Qualcomm charges for its IP only through QTL's licenses.

Several business agreements have governed the relationship between Qualcomm, on the one hand, and the CMs and Apple, on the other.

**The CMs:**  Between 2000 and 2010, Qualcomm entered into SULAs with each of the four CMs.  Those agreements license the CMs to practice certain Qualcomm SEPs and NEPs (and other intellectual property) in connection with manufacturing and selling cellular devices for a number of entities, including Apple.  QTI, through a subsidiary, has also entered into a CSA with each of the CMs for the baseband chips the CMs purchase.  QTI has entered into an MSA with each of the CMs.

**Apple:**  When Apple entered the cellular industry in 2007, it chose to outsource manufacturing of its products to the CMs and to rely on the CMs' existing SULAs with Qualcomm instead of entering into a license agreement of its own.  Apple did not use any of Qualcomm's baseband chips in its devices until 2011.  When Apple has used

Qualcomm's baseband chips in its devices, Apple has required Qualcomm to customize those chips for Apple's products and directed each CM to purchase them.

Qualcomm and Apple have also entered into agreements that have governed various aspects of their relationship, including several addressed in this brief:  a Statement of Work, dated February 28, 2013, governing the supply of certain of Qualcomm's customized baseband modem solutions for Apple's use and the Business Cooperation and Patent Agreement, dated January 1, 2013.

This brief identifies only disputes over the interpretation of certain provisions in the contracts between Qualcomm and Apple and/or the CMs.  Importantly, though, the brief does <u>not</u> address contract disputes that turn on something other than how particular provisions should be interpreted.  Critically, for example, Qualcomm contends that the CMs have breached their SULAs by not paying any royalties at all owed pursuant to those agreements since Apple sued Qualcomm in January 2017.  Although Apple and the CMs contend those agreements are unenforceable, they do not dispute the language of the SULAs requiring the royalties to be paid, and the enforceability of that part of the SULAs does not turn on any disputes regarding the SULA language.  As a result, that core issue is not addressed in this brief.

Finally, Qualcomm also contends that, with the exception of Qualcomm's commitments to the SDOs, the contractual provisions discussed in this brief do not warrant jury instructions regarding how they should be interpreted.  The provisions are clear, and to the extent the Court determines the provisions are ambiguous, the resolution of that ambiguity should be left to the jury.  The Court should decline Apple's and the CMs' efforts to seek advisory rulings about their preferred interpretations, which contradict the plain language of the agreements.  The Court should also decline Apple's and the CMs' efforts to seek what would amount to dispositive rulings on certain of Qualcomm's claims masked as questions of contract interpretation.

## AGREEMENTS BETWEEN THE CONTRACT MANUFACTURERS ("CMs") AND QUALCOMM

**I.    Subscriber Unit License Agreements—Between Qualcomm and the CMs ("SULA")**

    **A.    Selling Price (§ 1), Audits/Inspections (§ 14.2) & Late Charge (§ 25)**

        **i.    Apple and the CMs' Position**

The terms at the heart of Qualcomm's claims against the CMs (and its interference claims against Apple) are stated in plain and unambiguous language.  And the plain meaning of those provisions undermines Qualcomm's allegations.

First, Qualcomm alleges that, by only paying royalties on consideration received for the physical iPhone and iPad units themselves, the CMs failed to pay royalties on any convoyed or collateral revenue related to those sales.  For example, Qualcomm asserts that the CMs failed to pay royalties "on royalties" (i.e., royalties on revenue charged for obtaining IP rights for customers) as well as on any non-recurring engineering ("NRE") work related to the devices.  *E.g.*, No. 17-cv-1010-GPC-MDD, Dkt. 1, ¶¶ 122, 143, 167, 190, 215.  Qualcomm also alleges that Apple interfered with those payments.  *E.g.*, No. 17-cv-00108, Dkt. 469, ¶¶ 207, 212–213.  But the SULAs define the "Selling Price" on which royalties are calculated (i.e., the royalty base) as *only including consideration received "for" the physical phone* (i.e., "for each Subscriber Unit in the form in which it is Sold"), not including other services.[3]  The SULAs do not include collateral revenue related to IP acquisitions or engineering services in the royalty base (i.e., "Selling Price").

Second, Qualcomm alleges that the CMs failed to fully cooperate with "audits" under its SULAs (and that Apple interfered with the same).  But the CMs' SULAs (§ 14.2) *expressly limit Qualcomm's inspection capacity* to only those records necessary

---

[3]  The CMs' SULAs are provided as Docs. 1-4 ("Doc." refers to the Joint Contracts Compendium).  As described below, the definitions of "Selling Price" are identical in each, with the exception that Pegatron's definition of "Selling Price" includes certain specific NRE charges.

1    "to confirm that LICENSEE has underpaid the royalties due."  Section 14.2 does not

2    afford it continued inspection rights once that purpose is met.

3         Third, Qualcomm asserts that the CMs collectively owe over $1.3 billion[4] in "late

4    charges."  But Qualcomm's late charge provision (§ 25) is unenforceable.  The three

5    SULAs that account for nearly all alleged "late charges"—Foxconn, Pegatron, and

6    Wistron SULAs—expressly state that late charges are "administrative in nature and are

7    intended to defray [Qualcomm's] costs in processing and handling late payments."  No

8    view of the contracts or circumstances can reasonably deem a $1.3 billion fee as relating

9    to "processing and handling" costs, rendering it unenforceable.

10         It is axiomatic that, to interpret a California contract, a court "must first look to the

11    plain meaning of the agreement's language."  *Buckley v. Terhune*, 441 F.3d 688, 695 (9th

12    Cir. 2006).  "The language of a contract is to govern its interpretation" and its words "are

13    to be understood in their ordinary and popular sense."  Cal. Civ. Code §§ 1638, 1644.

14    The "'clear and explicit' meaning of these provisions . . . controls judicial interpretation."

15    *Santisas v. Goodin*, 17 Cal. 4th 599 (1998).

16            **1.**    **The Definition of "Selling Price" in the SULA (§ 1)**

17         In the SULAs, royalties are calculated from the "Net Selling Price" of licensed

18    products (§ 5.2), which is defined in terms of the products' "Selling Price." That is

19    plainly defined in § 1 as consideration received for the physical products.

20         Specifically, the SULAs define "Selling Price" as "the gross selling price and/or

21    value of other consideration charged by the LICENSEE . . . ***for each Subscriber Unit in***

22    ***the form in which it is Sold***."  § 1 at "Selling Price" (emphasis added).  A "Subscriber

23    Unit" itself is defined as "a complete CDMA telephone" that practices Qualcomm's

24    patents and is capable of "initiat[ing] and/or receiv[ing] Wireless telecommunications

25    transmissions."  *See* § 1 at "Subscriber Unit."  That is, ***a "Subscriber Unit" is the***

26

27    ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
    [4]  Qualcomm quantifies these fees as $██████████████████████████
    ██████████████████████████████████████    *See* ACM Ex. 1.

28

*physical* **cellular device itself—the** *physical* **phone**.  The SULA thus expressly defines the royalty base in the "Selling Price" as the "consideration charged" for *the physical* *phone* "in the form in which it is Sold"—i.e., *the royalty base is "consideration* *charged" for a* *physical* *iPhone or iPad.*

Qualcomm asserts that Selling Price captures not just consideration for the physical devices (iPhones), but also amounts the CMs get for collateral services (services *related* *to* iPhones), such as for obtaining IP licenses for customers, or for other services like design or repair work, etc.  But the SULA royalty base ("Selling Price") does *not* state that it covers revenue from convoyed or collateral sales.  "Selling Price" is *not* defined to extend to revenue for other products or services that CMs may also provide customers, just because they are offered in addition to or in relation to iPhone or iPad sales (i.e., collateral transactions).[5]  To the contrary, the SULAs **explicitly** state that, even if "Subscriber Units" are sold in combination with other products or services, *the definition* *of "Selling Price"* ___expressly___ *excludes the "expenses for providing those products or* *services."*  § 1 (emphasis added).[6]

For example, each of the CM's SULAs defines "Selling Price" without mentioning or including collateral charges that the CMs may bill to customers for acquiring intellectual property rights on their behalf.  The CMs' provision of IP license rights for customers is a collateral service offered *in addition to* the sale of a Subscriber Unit (i.e., phone).  IP rights are not part of the phone itself—they are not part of the "Subscriber

---

[5]  Qualcomm's argument that fees for collateral services are not permitted "deductions" from the "Selling Price" misses the point—collateral services are not included in "Selling Price" to start.  The CMs are not saying they can *deduct* royalty or design fees from the price.  Those fees are not *in* the defined royalty base to start.  Indeed, Qualcomm tried to—but did not—amend one SULA to encompass the very interpretation it now argues is inherent in the language of the existing SULAs.

[6]  The wording in the Compal SULA is slightly different, but to the same effect.

Unit in the form in which it is sold." IP rights are neither a physical component of a phone, nor a necessary accompaniment. A phone sold by a CM that practices Qualcomm's patents and is capable of "initiat[ing] and/or receiv[ing] Wireless telecommunications transmissions" is a Subscriber Unit as Qualcomm defined that term in its SULAs regardless of whether or not a license fee is paid, and regardless of whether the CM charges its customer for acquiring IP rights from Qualcomm or any other licensor. § 1 at "Subscriber Unit."[7]

Yet, Qualcomm's view—unsupported by the SULA text—is that, for every dollar paid to it in royalties, it should be paid *another 5% royalty* on top of its original royalty simply because a CM bills customers for its acquisition of IP related to a phone. Qualcomm's royalty-on-royalties demand thus taxes its own tax. This levels an effective royalty rate that is higher than the 5% of the value of the "Subscriber Unit" called for in the SULA—5% being charged in the first go-around, and then 5% of that charged again. Qualcomm's "royalty on royalties" demand is thus not only textually unmoored from the SULA, but it leads to the absurd. *See* Cal. Civ. Code §1638 (contract interpretation cannot lead to "an absurdity").

For example, if a CM sells Apple a pallet of iPhones valued at $1M, the SULAs state that the CM must remit $50,000 in royalties—the 5% royalty spelled out in § 5.2. But per Qualcomm, if Apple is then charged for and pays the CM's for having acquired IP from Qualcomm, Qualcomm can demand an *added* 5% royalty on the cost of that service, and the CM must remit another $2500—a royalty on the original royalty. If Apple is charged for the added fee, the CM must remit another $125. If that is charged to Apple, the CM must remit a check for $6.25, then one for $.31, then another for $.0156 and so on *without end*—royalties on royalties on royalties on royalties on royalties…. Notably, this pattern occurs even if the service charges to Apple were for rights from a

---

[7] Qualcomm drafted these definitions. *Cf.* Cal. Civ. Code§ 1654. No doubt, it could have drafted Selling Price to include collateral service revenue, but it did not.

*third-party licensor,* not Qualcomm.  There, Qualcomm still asserts that it is entitled to a further 5% royalty on the value of any third-party IP.  This stretches well beyond any reasonable reading of the SULAs.[8]

Likewise, with the exception of certain limits for Pegatron, the definition of "Selling Price" does not state that it includes compensation for engineering, repair, or design services, *even if* convoyed or related to royalty bearing products.[9]  For example, assume Apple paid a CM an extra $20 per iPhone to repair it should it break, or an extra $10 per phone to disassemble it for recycling at the end of its life.  While these would be collateral transactions "related to" the phone sale, they would not constitute "consideration … for each Subscriber Unit"—the extra charges would be consideration *for repair or recycling services* that are not royalty bearing under the SULA definition of "Selling Price."  Yet, Qualcomm would charge a royalty on these transactions notwithstanding that they are unrelated to Qualcomm's patents.

Similarly, assume Apple engaged a CM to design a new exterior shell for a future iPhone, paying the CM's engineering cost.  Paying the CM for design services would not be consideration for a "Subscriber Unit in the form in which it sold"—it would be compensation *for design services*.  But under Qualcomm's overreading of the SULA, it is entitled to a 5% tribute on all monies a CM receives for any of the above services if those services *relate* to a phone, ***regardless of whether such activity is covered by its patents or related to a cellular standard***.  If an engineering project costs $10 million, Qualcomm

---

[8]  Qualcomm's touted X/(1-5%) formula ignores that the SULA does not require royalties on royalties in the first instance and yields a royalty *above* the SULA's 5%.

[9]  Pegatron's SULA includes in its "Selling Price" that the "payment of non-recurring charges for design or tooling" that are specifically tied to and charged for a Subscriber Unit.  This speaks volumes of its omission in other SULAs.  Qualcomm could have drafted other SULAs with the same language.  Regardless, even Pegatron's "Selling Price" does not state that royalty on royalties are owed and does not include collateral IP acquisition services in the "Selling Price" royalty base.

demands a $500,000 windfall.[10]

The express language here—"the gross selling price and/or value of other consideration charged by the LICENSEE … *for each Subscriber Unit in the form in which it is Sold*"—is reasonably susceptible to only one meaning: the consideration charged for the physical device.  It cannot stretch to cover convoyed, collateral, or related sales *of other services*, and especially in light of the express statements in the SULA to the contrary.  To support its claim that it is owed royalties on collateral fees or services, Qualcomm therefore must ignore the express exclusion of other products or services from the SULAs' Selling Price and instead construe "Selling Price" to stretch to any amounts or services "related to" a CM's manufacture of a "Subscriber Unit" (i.e., not just consideration "for" the Unit itself).  Qualcomm essentially seeks to redraft "Selling Price" as "the gross selling price and/or value of other consideration charged by the LICENSEE … for*, collateral to, or related to,* each Subscriber Unit ~~in the form in which it is Sold,~~" also striking any later language addressing collateral services.[11]

But "when courts construe an instrument, a judge is not to insert what has been

---

[10]  Qualcomm misleadingly suggests its windfall is softened by a royalty cap of $20 ($400 x 5%).  But this cap—which Qualcomm asserts it can end any time—applies *per phone*.  Qualcomm has never agreed this cap limits its claim that it is owed 5% of all iPhone-related CM engineering fees to $20 *per engineering event*.  Qualcomm has demanded via audits 5% of *all* such collateral service fees without such limit.

[11]  While Qualcomm may argue that redrafting avoids gamesmanship, such as a CM overcharging for collateral or related services while undercharging for phone units, Qualcomm has not alleged that this ever occurred.  Moreover, redrafting is unnecessary to address pricing gamesmanship, as the implied covenant of good faith and fair dealing is available to remedy any effort to suppress a phone's sales price.

Qualcomm also argues that, absent a non-textual construction, CMs will game "Selling Price" by selling phones as multiple components.  But the SULA bars this in § 5.1, which prohibits CMs from selling "Components" they do not design.  Components are also still a physical part of a phone, not collateral services.  No reference to "component" in the SULA suggests it includes collateral *services*.  To the contrary, § 1 explicitly defines "Components" as physical chip-based circuits.

1  omitted, or to omit what has been inserted." *E.g.*, *Edwards v. Arthur Andersen, LLP*, 44

2  Cal. 4th 937, 954 (2008) (quote omitted).  "[T]he office of the Judge is simply to

3  ascertain and declare what is in terms or in substance contained therein, not to insert what

4  has been omitted, or to omit what has been inserted…."  Cal. Code Civ. Proc. § 1858.

5  Nor are courts "empowered to make for the parties a contractual arrangement which they

6  did not see fit to make themselves," nor to "write into [an] agreement a provision which

7  the parties did not make."  *Apra v. Aureguy*, 55 Cal. 2d 827, 830 (1961).  In sum, a court

8  "cannot insert in the contract language which one of the parties now wishes were there."

9  *Levi Strauss & Co. v. Aetna Cas. & Surety Co.*, 184 Cal. App. 3d 1479, 1486 (1986).

10      Qualcomm is thus left with no textual basis for its asserted interpretation of the

11  "Selling Price" definition.[12]  Indeed, rather than explain how the text justifies its

12  interpretation, Qualcomm instead makes a non-textual reading that relies almost solely on

13  its cherry-picked extrinsic evidence (much of which is taken out of context).[13]  But, under

14  California law, extrinsic evidence cannot used to alter the terms of the SULAs, which

15  Qualcomm concedes below are integrated contracts (§ 27).  As the California Supreme

16  Court has held, "extrinsic evidence may not be relied upon to alter or add to" an

17

18  [12]  Qualcomm's observation that "Selling Price" is agnostic as to whether the phone is
    sold assembled or not is irrelevant.  The parties agree that Selling Price covers the
19  *physical* phone whether sold in one, two, or ten pieces, or missing a piece (like a battery).
20  This in no way suggests that the royalty base extends to collateral services *beyond the*
    *physical phone*.  Nor does deducting for items like shipping or packaging costs for the
21  *physical* phone suggest that separate collateral services for engineering, design, repair
22  work, recycling or IP are included in the royalty base in the first place.

23  [13]  For example, Qualcomm appears to argue that the CMs pay "royalties on royalties" if
    they charge customers a flat price without also charging any IP service fee.  As an initial
24  matter, this extrinsic evidence argument should be disregarded; extrinsic evidence cannot
    be used to vary the terms of a written contract. Regardless, the argument also misses the
25  point.  Whether the CMs do not charge separate IP fees with some contracts is irrelevant.
26  It does not evidence that the SULA's "Selling Price" definition requires a royalty be
    remitted on collateral fees if they *are* charged (particularly given that requiring such is
27  contrary to the express terms of the SULA).

28

integrated contract. *Riverisland Cold Storage v. Fresno-Madera Prod. Credit Ass'n*, 55 Cal. 4th 1169, 1174 (2013); *see also Thrifty Payless, Inc. v. Mariners Mile Gateway, LLC*, 185 Cal. App. 4th 1050, 1061 (2010) (cannot be used to "vary or contradict"); *Grey v. Am. Mgmt. Servs.*, 204 Cal. App. 4th 803, 809 (2012) (same). "[E]xtrinsic evidence inconsistent with any interpretation to which the instrument is reasonable susceptible becomes irrelevant[.]" *Tahoe Nat' Bank v. Phillips*, 4 Cal. 3d 11, 23 (1971).

Where, as here, "contract language is clear and explicit and does not lead to absurd results, [courts] ascertain intent from the written terms and go no further." *Ticor Title Ins. v. Employers Ins. of Wausau*, 40 Cal. App. 4th 1699, 1707 (1995). Thus, the Court should construe the SULAs as assessing a royalty on the physical device, not on collateral or related services, such as fees for providing IP rights.

### 2. The Scope of the SULA Audit/Inspection Allowance (§ 14.2)

Qualcomm's view of the SULA's allowance for "audits" of the CMs also departs from its text. Per § 14.2, the SULAs expressly limit Qualcomm's inspection allowance to "applicable books and records" "to confirm that LICENSEE has not underpaid the royalties due to QUALCOMM in fulfilling its obligations under the terms and conditions set forth in Section 5.2 above" (i.e., to confirm that the CM did not underpay royalties). § 14.2. Section 14.2 then states the CM has to provide "*necessary* books and records for such audit to be carried out" (emphasis added), not *all* records.

This provision means what it says—Qualcomm can inspect records as "necessary" to "confirm that LICENSEE has not underpaid the royalties due." Qualcomm, however, contends that the SULA authorizes it not only to "confirm that LICENSEE has not underpaid" but that it can inspect ***any*** CM records or Apple records in the CMs' possession ***even if not needed for that purpose***, so long as they relate to iPhones or iPads. In fact, Qualcomm appears to contend that, once an audit's stated goal is achieved, § 14.2 allows it ***to continue*** to inspect whatever records it desires. Qualcomm has cited § 14.2 to demand confidential data from Apple and the CMs despite that data being irrelevant to

the royalty owed.

Qualcomm is wrong that interpreting § 14.2 should be left to the jury. Interpretation is for a jury only if a term is ambiguous, and § 14.2 is not ambiguous. After the Court construes § 14.2, *factual questions* of if the CMs gave Qualcomm access to records reasonably needed to confirm royalty payments can be decided by the jury, as will whether Qualcomm's demands overstepped § 14.2.  Qualcomm's factual argument below conflates construction (Court) with application (jury).

In sum, Qualcomm's view that § 14.2 affords it a fishing license to inspect records concerning Apple products is untethered to the text and renders surplusage its stated purpose and limit—"to confirm that LICENSEE has not underpaid the royalties due." *See, e.g.*, *Boghos v. Certain Underwriters at Lloyd's of London*, 36 Cal. 4th 495, 503 (2005) (rule against rendering terms "surplusage").  But the plain-language reading that Apple and the CMs request the Court to confirm allows Qualcomm access to records as reasonably needed to confirm royalty payments for product units (but not beyond), and tracks the provision's express wording.

### 3.    The Scope of the SULA Late Charge Provision (§ 25)

Qualcomm asserts that, per § 25 of the SULAs, it is owed over $1.3 billion in late charges (i.e., 1.5%/mo., compounding, on disputed royalties).  But this demand is unrelated to Qualcomm's actual or foreseeable damages and ignores restrictions expressly stated in the underlying provision, rendering this demand unenforceable.

Foxconn's, Pegatron's, and Wistron's SULAs expressly state that "[t]he Parties agree that such late charges are *administrative in nature* and are *intended to defray each Party's costs in processing and handling late payments*."  § 25 (emphasis added).  The provision is also expressly limited to "the maximum amount permitted by law" *Id.*[14]  Thus, any "late charge" here must be construed as limited to "to defray[ing]"

---

[14]  Contrary to Qualcomm's view, the parties did not agree to a per se 1.5%/mo. compounding fee.  The fee is expressly limited to that "permitted by law."

1  Qualcomm's "costs in processing and handling late payments."

2  In California, "[a] contract must be so interpreted as to give effect to the mutual

3  intention of the parties as it existed at the time of contracting, so far as the same is

4  ascertainable and lawful."  Civ. Code § 1636; *see also id.* §§ 1639, 1648.  Where, as here,

5  the contract contains a clear statement of intent, that statement controls.  *Ticor Title*, 40

6  Cal. App. 4th at 1707 ("Where contract language is clear and explicit . . . , we ascertain

7  intent from the written terms and go no further.").  Qualcomm agreed these late charges

8  were "administrative" to "defray" "costs in processing and handling."  Thus, the intent

9  and scope of the provision *expressly* excludes compensating for any time-value of money

10  and disclaims using fees to encourage (or coerce) timely performance.[15]

11  Yet Qualcomm has demanded that Foxconn, Pegatron, and Wistron pay ***$1.3***

12  ***billion*** in late charges, a number disconnected from any "processing and handling"

13  expense Qualcomm could have incurred (much less foreseen) as a result of any possible

14  late payment.  Qualcomm's late "processing" charge—1.5%/month of any disputed

15  amount, compounding—increases dramatically with the amount of the tardy payment and

16  with the passage of time.  It therefore increases unconnected to the express administrative

17  purpose of the provision.  The late charge thus operates "without regard to the damages

18  sustained by the party aggrieved" and therefore constitutes a "penalty provision [that]

19  operates to compel performance."  *Ridgley v. Topa Thrift & Loan Ass'n*, 17 Cal. 4th 970,

20  977 (1998) (quoting *Garrett v. Coast & So. Fed. Sav. & Loan Ass'n*, 9 Cal. 3d 731, 739

21  (1973)).  This is an ***illegal, unenforceable liquidated damages penalty*** barred by Cal.

22  Civ. Code § 1671(b).[16]

---

[15]  Thus, Qualcomm's cases are inapposite—none involved express disclaimers or
statements of intent limiting the purpose of the provision as in the SULAs.  To the
contrary, its cited cases involve provisions that contemplated compensating for lost
profits or a time value of money, neither of which is allowed under SULA § 25.
[16]  That Qualcomm's late charge provision is unenforceable does not affect Qualcomm's
ability to sue for and recover *actual* damages from an alleged breach.

To be valid, liquidated damages "'must represent the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained.'" *Ridgley*, 17 Cal. 4th at 977 (quoting *Garrett*, 9 Cal. 3d at 739). That standard cannot be met here. As the California Supreme Court has held, if, as here, a late fee provision charges an amount "disproportionate to the anticipated damages," that provision is unenforceable. *Id.* (quote omitted). "The characteristic feature of a penalty is its lack of proportional relation to the damages which may actually flow from failure to perform under a contract.'" *Id.* (quoting *Garrett*, 9 Cal. 3d at 739). Like here, "'[i]n the absence of such a relationship, a contractual clause purporting to predetermine damages 'must be construed as a penalty.'" *Id.*

The unenforceability of the SULA late charge is well illustrated by the similar provision in *Poseidon Dev., Inc. v. Woodland Lane Estates, LLC*. Like here, the stated purpose of that late charge "was to compensate [the non-breaching party] for administrative expenses" and "never intended to compensate [the party] for the loss of use of the money due." 152 Cal. App. 4th 1106, 1115 (2007). Like here, that late charge scaled up depending on the amount of the overdue payment. But the court held that "[t]here is no reason to believe that processing and accounting expenses caused by failure to make an installment payment would vary appreciably depending on the amount of the overdue payment." *Id.* Thus, the court held that the upwardly scaling charge—in that case, a $77,614 fee for liquidated "administrative expenses"—"could not possibly be considered a reasonable estimate of the damages contemplated by a breach" and was therefore "an unenforceable penalty." *Id.*

Here, Qualcomm seeks over ***$1.3 billion*** in upwardly spiraling, compounding fees as liquidated damages for supposed "administrative" costs for "processing and handling."[17] This scaling, compounding late fee cannot, under any view, constitute "a

---

[17] The actual amount of Qualcomm's punitive late charge is much higher. $1.3B was calculated as of June 2018, and Qualcomm contends it continues to compound.

reasonable attempt to estimate actual administrative costs incurred" when the SULAs were made.  Thus, it is unenforceable.  *Id*. at 1116; Civ. Code § 1671(b).

### ii.   Qualcomm's Position

#### 1.   The Definition of "Selling Price" in the SULA (§ 1)

Qualcomm entered into SULAs with the CMs in 2000 (Compal), 2005 (Foxconn), 2007 (Wistron), and 2010 (Pegatron).  Pursuant to those long-standing agreements, the CMs are obligated to pay royalties to Qualcomm on both Apple and non-Apple devices. In exchange, the SULAs provide the CMs with rights to practice Qualcomm's cellular patents for the specified standards.  Each CM has breached its SULA by refusing to pay Qualcomm the royalties owed under that agreement for the last two years.  None of the issues raised regarding the interpretation of the SULA provisions in this brief addresses that fundamental breach claim, which will be an issue for the jury at trial.

The royalties due under each CM's SULA are calculated as a percentage of the wholesale selling price of the relevant device (*e.g.*, iPhones or iPads)—that is, the consideration charged by the CM to its customer.  The selling price is defined to be inclusive:  "gross selling price and/or value of other consideration charged by the LICENSEE [CM] or its final vendee Related Buyer for each Subscriber Unit" with only *specific delineated deductions* for direct packing costs, insurance/transportation costs, and certain tax-related costs (such as import and export taxes).  (*See, e.g.*, App'x Doc. No. 3 at 7-8.)[18]  Qualcomm uses an inclusive selling price definition with carefully limited deductions to prevent gamesmanship.  If it did not, a manufacturer could break the phones it sells into hundreds of separate transactions to reduce artificially the "selling" price—and thereby Qualcomm's royalties.  (Ex. 39 at 271:1-272:9.)  Qualcomm contends that Section 1 of the SULAs is clear on its face.

The CMs' arguments are an attempt to avoid the plain language of the contracts to

---

[18] "Ex." refers to exhibits attached to the Declaration of Anders Linderot.

1   which they agreed.  Applying facts to the contract language is for the jury. *See Stetson v.*
2   *Savenet*, 1988 WL 86214, at *2 (9th Cir. Aug. 10, 1988).

3        *First*, the CMs argue that they can exclude from the consideration they receive
4   from Apple amounts labeled as reimbursements for Qualcomm's royalties.  For many of
5   their customers, the CMs simply charge a single price to the customer for the
6   manufacture of phones and other devices.  Baked into that price is whatever amount of
7   Qualcomm's royalty charge they wish to pass along.  (*See, e.g.*, Ex. 33 at 89:22-24
8   ("There is no separate payment from the customer—Dell, HP, and VAIO—for the royalty
9   amount we pay to Qualcomm."); Ex. 31 at 130:2-20 ("[O]nce customer has reached
10  agreement with us about the quoted price, and they will pay the invoice price . . . Royalty
11  is our cost.  That means our cost includes royalty also.").  For those customers, the CMs
12  have complied with the plain language of "Selling Price".  At Apple's request, however,
13  the CMs charge Apple one price for the device and a separate price for the Qualcomm
14  royalty on that device.  (*See, e.g.*, Ex. 33 at 90:18-19; Ex. 48 at 211:16-3.)  Based on that
15  separation of payments, the CMs have frequently refused to include in the selling price of
16  Apple devices the separate consideration paid for royalties.  But the language of the
17  SULAs is clear—however and whenever charged, royalties constitute consideration
18  charged for the device and must be included.  And the CMs have in fact stated that they
19  have paid royalties based on this consideration received from Apple previously.  For
20  example, during Qualcomm's audit of Foxconn in 2015, Foxconn told Qualcomm's
21  auditors that the "selling price" for Apple devices "includes the costs of royalties paid to
22  Qualcomm".  (Ex. 17 at '0527.)

23       The CMs argue that the royalty base is "consideration charged" for a "physical"
24  device.  But that is not what the SULA says.  In the definition of "Selling Price", the
25  phrase "in the form in which it is sold" is immediately explained by a parenthetical:
26  "whether or not assembled and without excluding therefrom any Components or
27  subassemblies thereof which are included with such Subscriber Unit".  It confirms that

28

the definition of Selling Price is agnostic as to the form in which the phone is sold—assembled or not.  It *broadens*, rather than limits, the definition.  Similarly, the limited deductions allowed by the SULA include several intangible items like taxes and custom duties.  That the parties agreed to deduct some intangible items—but not others like labor costs, the CMs' "value added" costs, or various IP costs—demonstrates that those other charges must be included in the Selling Price, like any other production cost.  The CMs propose a regime by which they pick and choose certain of their production costs and unilaterally exclude them from the selling price.  The SULAs offer no basis to do so, or to treat royalty costs differently from any other cost.[19]

The CMs also argue that including royalties in the selling price would cause a calculation "without end".  But that is wrong, as Qualcomm explained to the CMs; if a CM wishes to recover $100 from its customer, it should price a Subscriber Unit at $100/(1-the royalty rate).  (Ex. 14 at '5176-77; Ex. 49 (Siemens explaining Foxconn should use this same method of calculation regarding its royalties).)

*Second*, the CMs also argue they should be allowed to deduct certain non-recurring engineering ("NRE") costs from the consideration they receive from Apple before calculating royalties.  The particular engineering costs at issue are those that they charge to Apple in connection with a particular iPhone or iPad.  (Ex. 29 at 61:3-8.)  The definition of Selling Price in the SULAs, therefore, includes these amounts because they are "consideration charged by the [CM]" to Apple for iPhones and iPads.  In fact, Pegatron explicitly agreed that such amounts *are* part of the "Selling Price" when it signed its SULA.  The Pegatron SULA defines "Selling Price" as "the gross selling price and/or value of other consideration (e.g., without limitation, the value of consignment

---

[19] The CMs point to language in the SULAs addressing instances where Subscriber Units are combined with other "products and services".  But they ignore the actual language, which is "***separate and distinct*** products or services".  (emphasis added.)  That has no bearing on production costs like the IP costs or engineering expenses.

1    parts for use in the Subscriber Unit, payment of ***non-recurring charges for design or***

2    ***tooling for such Subscriber Unit***)".) (emphasis added).  That clarification was not a

3    change to the definition of Selling Price, but instead confirms what was always included.

4    The other CMs have similarly agreed that engineering costs are included in the definition

5    of Selling Price when manufacturing phones for customers other than Apple.  (*See, e.g.*,

6    Ex. 9 (Foxconn paying royalties on NRE and tooling payments it has received from

7    *fourteen* other customers); Ex. 32 at 42:12-16.)

8           The CMs argue that this interpretation could give Qualcomm a windfall by

9    receiving royalties on all CM engineering projects.  That is not true.  The SULA provides

10   that Qualcomm is entitled to royalties on consideration (including NRE fees) for devices

11   that are actually sold, not just engineering projects generally.  In any event, ███████

12   ████████████████████████████████████████████████████████████████████████████

13   ████████████████    For nearly the entire time the SULAs have been in effect, the price

14   used for royalties has been far below the cap.  There is no windfall.

15          The Court should find that the definition of "Selling Price" under each CM's

16   SULA includes all compensation received from the CMs' customers for Subscriber Units,

17   except explicitly permitted deductions.

                2.        **The Scope of the SULA Audit/Inspection Allowance (§ 14.2)**

19          Under Section 14.2 of the SULA, Qualcomm is permitted to conduct an annual

20   audit of each CM's books and records.  The purpose of the audit is to allow Qualcomm

21   "to confirm that LICENSEE [CM] has not underpaid the royalties due to QUALCOMM

22   in fulfilling its obligations under the terms and conditions set forth in Section 5.2".

23   Qualcomm contends Section 14.2 is clear on its face.  The dispute raised by the CMs

24   goes to the application of Section 14.2 and should be left to the jury.

25          Exercising its right to conduct audits using a designated auditor, Qualcomm

26   retained independent auditors at PricewaterhouseCoopers and Deloitte.  Almost every

27   audit has ended the same way—with the auditors unable to confirm aspects of each CM's

compliance with its SULA because the CM withheld necessary information. (*See, e.g.*, Ex. 15 at '8314–'17; Ex. 11 at '0354–57; Ex. 13)

That Qualcomm has the right to access "applicable books and records" necessary to confirm that each CM was not "underpaying" royalties is clear. What records are "applicable" to that inquiry is a fact question for the jury. *See Stetson*, 1988 WL 86214 at *2 ("resolution of the meaning of the contract is a function for the finder of fact"). It requires the assessment of the facts about each individual audit and the information provided by the CMs. (Ex. 39 at 54:17-21.)

The CMs do not explain how they believe the audit provision should be interpreted, beyond what the plain language says. They simply assert that Qualcomm should not have access to certain categories of information—such as "product sales in different countries"—because such information is, in their view, "irrelevant to the royalty owed". But that information is, in fact, *required* to be provided under the terms of the SULAs. Section 14.1 requires each CM to provide Qualcomm a certificate (in the form attached as Exhibit B to the SULA) showing certain royalty-related information, including the "Country of Sale by [CM] and Affiliates". (*E.g.*, App'x Doc. 3 § 14.1, Ex. B.) And it is a reasonable audit request—as determined by independent auditors; for example, it allows comparisons to industry reports to verify sales. (Ex. 39 at 42:2-15.) In short, this is a fact issue for the jury.

### 3.    The Scope of the Late Charge Provision (§ 25)

Since late 2016, the CMs have withheld, in aggregate, more than ***$7 billion***[20] in royalty payments due under their SULAs for the devices they have manufactured and sold to Apple. Section 5.2 of each SULA requires payment of royalties by the CM "within thirty (30) days after the end of each calendar quarter". Each CM agreed that if it fails to make any payment due under the SULA, Qualcomm may impose a late charge

---

[20] Final amounts owed will be calculated at the time of trial.

1   "equal to the lesser of one and one-half percent (1 1/2%) per month, pro-rated, or the

2   maximum amount permitted by law."[21]  (*E.g.*, App'x Doc. No. 3 § 25.)  The parties

3   *agreed* that the late charge amount of 1.5% per month was not a penalty, but rather was

4   "administrative in nature" and "intended to defray each Party's costs in processing and

5   handling late payments".  (§ 25.)  Such provisions are routine and routinely enforced.

6   *See, e.g.*, *Xnergy Fin. LLC v. Champion Pain Care Corp.*, 2017 WL 7156284, at *6 (C.D.

7   Cal. Oct. 5, 2017) (enforcing 1.5% per month late charge); *Intelepeeler Cloud Comms.,*

8   *LLC v. Explore Travels Corp.*, 2016 WL 4699731, at *6 (N.D. Cal. Aug. 19, 2016)

9   (same), *report and recommendation adopted by* 2016 WL 4699731 (N.D. Cal. Sep. 6,

10   2016).  The CMs' position on the late fee provision—raised for the first time in this

11   brief—is tantamount to a motion for summary judgment.  Even if the CMs had timely

12   moved (which they did not), their position is without merit.  Under Section 25, which is

13   clear on its face, Qualcomm is entitled to late fees.

14       Under California law, a late fee provision is "valid unless the party seeking to

15   invalidate the provision establishes that the provision was unreasonable *at the time the*

16   *contract was made*".  Cal. Civ. Code § 1671(b) (emphasis added).  A liquidated damages

17   clause is only unenforceable if it "bears no reasonable relationship to the range of actual

18   damages that the parties could have anticipated would flow from a breach" and should

19   instead "represent the result of a reasonable endeavor by the parties to estimate a fair

20   average compensation for any loss that may be sustained".  *MGSY Corp. v. LiveUniverse*

21   *Inc.*, 2010 WL 11596708, at *7 (C.D. Cal. Feb. 25, 2010).  The burden is on the party

22   challenging the provision.  *See Radisson Hotels Intern., Inc. v. Majestic Towers, Inc.*, 488

23   F. Supp. 2d 953, 959 (C.D. Cal. 2007); Cal. Civ. Code § 1671(b).

24       A 1.5% per month late fee has been upheld as valid and enforceable.  In *O'Connor*,

25   a California Court of Appeal upheld a provision in a contract that subjected past due

26   invoice payments to a "late charge of 1 1/2% per month".  *O'Connor v. Televideo System,*

27

---

28   [21] Although the CMs use the word "compounding" no fee is charged on accrued fees.

*Inc.*, 218 Cal. App. 3d 709, 719 (Cal. Ct. App. 1990).  The party seeking to avoid the fee in that case could not establish that the provision—nearly identical to the one found in the SULAs—"was unreasonable under the circumstances existing at the time it was made".  *See O'Connor*, 218 Cal. App. 3d at 719; *see also Fox v. Federated Department Stores, Inc.*, 156 Cal. Rptr. 893, 905 (Cal. Ct. App. 1979) (holding that 1.5% monthly late charge is a "reasonable endeavor" to fix "probable loss resulting from delinquent payments").[22]

The CMs argue that the Court should ignore the rate in the contract and instead calculate a new one (or discard it entirely) because they believe the total amount of late fees they owe today is too high.  But the burden is on the CMs to demonstrate it was unreasonable "*at the time it was made*".  *See* Cal. Civ. Code § 1671(b)  The total amount accrued now has no bearing on the reasonableness of the provision at the time it was agreed.  The CMs owe a significant amount of late fees only because they have refused to make royalty payments for Apple products entirely for ***more than 2 years*** while still continuing to manufacture and sell those devices.  Thus, the CMs have continued to reap the benefits of Qualcomm's technology while paying nothing for it at all.  Had the CMs continued to pay while Apple sued Qualcomm (or stopped manufacturing and selling Apple devices), they would owe no late fees.  The CMs' flagrant breach—and choice to profit at Qualcomm's expense—cannot be used retroactively to invalidate a reasonable late charge provision; and it says nothing about whether the provision was reasonable at the time of contracting.  The CMs have done nothing to satisfy their burden.

**B.   Integration Clause (§ 27)**

**i.   Qualcomm's Position**

---

[22] The CMs' cases do not support their position.  In *Ridgley*, the provision invalidated was a late fee that required six months of interest to be paid on a single late payment.  *Ridgley v. Topa Thrift and Loan Ass'n*, 17 Cal. 4th 970, 981 (Cal. 1998).  In *Poseidon Development*, the parties agreed that a late charge of 10% was *reasonable* as applied to a loan's installment payments.  *Poseidon Development Inc. v. Woodland Land Estates, LLC*, 152 Cal. App. 4th 1106, 1114-15 (Cal. Ct. App. 2007).  The disagreement was the application of that charge to a balloon payment.

1       Although the CMs have operated under the SULAs for many years (and continue

2 to pay royalties for *non-Apple* products), they now contend that Qualcomm is in breach

3 of its FRAND commitments because the terms of the SULAs are "unfair and

4 unreasonable". (CMs' Counterclaims ¶¶ 352-66.) The CMs further allege that, because

5 they are third-party beneficiaries of Qualcomm's FRAND commitments, the Court can

6 invalidate the SULAs on the basis of those FRAND commitments. (*Id.*, Prayer at T-U)

7 Both contract claims are barred by the plain language of the integration clause found in

8 each CM SULA. Qualcomm contends these provisions are clear.

9       Section 27 of each SULA contains an integration provision stating that the SULA

10 "supersede[s] and replace[s] all prior and contemporaneous oral or written

11 understandings between the Parties with respect to the subject matter thereof and

12 constitute the entire agreement of the Parties with respect to such subject matter". (*See,*

13 *e.g.*, App'x Doc. No. 3 § 27.) The Pegatron SULA confirms that the understandings

14 include any third party beneficiary contract, such as Qualcomm's FRAND commitment,

15 "without limitation . . . being a beneficiary of an understanding in accordance with a prior

16 agreement *between any third party and one of the Parties to this Agreement*". (*See* § 27

17 (emphasis added).)[23] Each of the SULAs has a choice of law provision stating that the

18 agreement will be governed by and construed in accordance with California law. (*E.g.*,

19 App'x Doc. No. 3 § 23.)

20       California courts consistently give effect to integration clauses, holding that

21 evidence of prior agreements may not be introduced or added to vary the obligations of

22 the parties as established in the integrated agreement. *See Grey v. American Servs.*, 204

23 Cal. App. 4th 803, 809 (Cal. Ct. App. 2012) ("[T]he parol evidence rule generally

24 prohibits the introduction of extrinsic evidence—oral or written to vary or contradict the

25

26      [23] The CMs argue that integration clauses cannot apply to third party contracts. That

is wrong. The cases they cite stand for the proposition that a third party's rights cannot

27 be waived by a contract they are not party to. *See Silver v. Goldman Sachs Group, Inc.*,

2011 WL 1979241, at *3 (C.D. Cal. May 19, 2011). The CMs are parties to the SULAs.

28

terms of an integrated written instrument".); *see also Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 109 Cal. App. 4th 944, 954-55 (Cal. App. 4th Dist. 2003).

The integration clauses in each SULA states that the terms and conditions of the SULA "supersede and replace" any other understanding with regard to the subject matter of the SULAs.  The subject matter of each SULA clearly includes the licensing of Qualcomm's patents, including its SEPs.  (*See, e.g.*, App'x Doc. 3 at 1 ("LICENSEE desires to obtain a license to QUALCOMM's Intellectual Property to manufacture and sell Subscriber Units"[24].).)  Therefore, the SULAs are the entire and only agreements governing the patents licensed thereunder and there can be no post-signing claim under any other contract (such as the ETSI IPR Policy) regarding the licensing of those patents.

This result is consistent with French law, which the parties agree governs the ETSI IPR Policy, even in the absence of an integration clause.  As a matter of French law, by executing license agreements with Qualcomm, the CMs received the benefit of their status as third-party beneficiaries, and Qualcomm's obligation under the FRAND commitment was discharged.  *See* QC's 44.1 Motion.

That the SULAs are the only agreements governing the patents licensed thereunder is fatal to any claim by the CMs that the SULAs violate Qualcomm's FRAND commitments.  The CMs, through the integration clauses, agreed that the SULAs superseded Qualcomm's FRAND commitments and, from the moment of signing, those commitments no longer applied to the CMs.  In other words, the CMs were third party beneficiaries to Qualcomm's FRAND commitment with respect to the licensing of its SEPs.  When Qualcomm later agreed to license its SEPs to each CM, that agreement, "supersede[d] and replace[d]" any prior agreement, including the FRAND commitment.

The CMs mistake several fundamental points.  *First*, the integration clause does

---

[24] The SULAs refer to the covered SEPs as "Technically Necessary IPR".  (*See, e.g.*, App'x Doc. 3 at 7.)

not bar antitrust claims or other claims for invalidity of the SULAs on, for example, public policy grounds.  It merely means that the CMs agreed that the SULAs were the "entire Agreement of the Parties with respect to such subject matter", and therefore, as a matter of basic contract law, they cannot enforce Qualcomm's prior FRAND commitment because it was superseded.  (§ 27.)  For that reason, all of the cases the CMs cite regarding invalidity are irrelevant.

*Second*, the CMs argue that Qualcomm's FRAND commitment and the SULAs do not cover the same subject matter.  But the former is a commitment to license certain patents; the latter are the actual licenses to those patents.  The subject matter of both is licenses to Qualcomm's patents.  The CMs cannot both allege that the SULAs violate Qualcomm's FRAND commitment and that they do not cover the same subject matter.  Proceeding from that flawed premise, the CMs cite a number of cases that stand for the unremarkable proposition that the superseded agreement and the current agreement have to overlap for the integration provision to be relevant.  For example, in *Cione*, the court held that the integration clause in an employment agreement did not apply to a prior arbitration agreement because the employment agreement was silent as to dispute resolution.  *Cione v. Foresters Equity Servs. Inc.*, 58 Cal. App. 4th 625, 637 (Cal. Ct. App. 1997).  In contrast, Qualcomm's obligation to offer FRAND terms and the terms it offered—both for patent licenses—clearly address the same subject.[25]

Finally, it is the CMs' proposed interpretation, *not* Qualcomm's that leads to an absurd result.  The CMs argue they could sign license agreements with Qualcomm, enjoy the benefits of those agreements for years, and then sue to invalidate them on the grounds that they are contrary to another, prior contract (the FRAND commitment) that was about the same subject matter and was superseded by the license agreement.  The CMs had two choices:  sue Qualcomm for breaching its FRAND obligations before signing a SULA, or

---

[25] When a contracts overlap in subject matter, courts enforce integration clauses.  *See Grey v. Am. Mgmt. Servs.*, 204 Cal. App. 4th 803, 807-08 (2012).

1   sign and release that potential claim.  They chose the former and as sophisticated parties

2   with legal counsel they "should be held to their agreement".  *See Battaglia Enterprises,*

3   *Inc. v. Superior Court*, 215 Cal. App. 4th 309, 318 (Cal. Ct. App. 2013).

4                   **ii.    Apple and the CMs' Position**

5           Integration clauses limit the use of evidence of prior agreements to *vary* the terms

6   of an agreement.  *E.g.*, *Thrifty*, 185 Cal. App. 4th at 1061.  The SULA clauses thus limit

7   extrinsic evidence from altering the terms *of those SULAs*.  They do not alter the separate

8   promises Qualcomm made to SSOs or waive CM claims or rights.

9           ***No Integration Clause Ever Bars Evidence of Contract Invalidity.***  No integration

10  clause can prevent the CMs from using anticompetitive conduct (including FRAND

11  violations) to demonstrate that the SULAs are unenforceable as Qualcomm proposes.[26]

12  California law always allows evidence to show that a contract is invalid.  Code Civ. Proc.

13  § 1856(f); *Riverisland*, 55 Cal. 4th at 1174.

14          ***The Integration Clauses Do Not Affect Third-Party SSO Agreements.***  The

15  integration clauses, by their own terms, integrate all "prior and contemporaneous . . .

16  understandings *by or between the Parties*."  § 27 (emphasis added).  The clauses do not

17  mention agreements *with other entities*.  Thus, they do not affect (much less nullify)

18  rights from third-party contracts, including those to which the CMs are *third-party*

19  *beneficiaries*.[27]  *E.g.*, *Silver v. Goldman Sachs Group, Inc.*, 2011 WL 1979241 *3 (C.D.

20

21  [26] Qualcomm's reading only evidences its monopoly power and anticompetitive conduct.

22  Licensees in a competitive market would not willingly self-gag and surrender the right to
    fair licensing treatment, as Qualcomm contends occurred here.  This view, evidencing

23  monopoly power and protecting Qualcomm's practices from legal scrutiny, thus renders
    these clauses unenforceable as a matter of public policy.  A contract "must receive such

24  an interpretation as will make it lawful."  Cal. Civ. Code § 1643.  Thus, the Court cannot

25  adopt Qualcomm's interpretation here.

    [27]  Although Pegatron's clause references "being a beneficiary of an understanding in
26  accordance with a prior agreement between any third party and one of the Parties to [the

27  SULA]," that *modifies* the phrase "understandings by or between the Parties."  The clause

28

1  Cal 2011) (integration clause limited to parties); *see also* Cal. Civ. Code§ 1654

2  ("uncertainty" must be "interpreted most strongly against" Qualcomm, the drafter);

3  *Ballard v. MacCallum*, 15 Cal. 2d 439, 444 (1940) (interpretation that "avoids forfeiture

4  must be made if it is at all possible").[28]

5       Dispositive here, Qualcomm's argument has been rejected by the California Courts

6  of Appeal.  In *Cione v. Foresters Equity Servs.*, an employer entered an employment

7  contract with Cione containing an integration clause substantively identical to those

8  asserted by Qualcomm.  58 Cal. App. 4th 625, 636–37 (1997).  The employer was also a

9  beneficiary of an earlier third-party contract requiring Cione to arbitrate disputes based

10  on his separate promise to the NASD.  *Id*.  The court held that "even if we were to deem

11  Cione's written employment agreement . . . to be wholly integrated . . . [the] arbitration

12  obligation was not superseded."  *Id*.  "[B]y entering into the written employment

13  agreement with Cione, [the employer] did not waive its right to compel arbitration as a

14  third party beneficiary" of Cione's promise to NASD.  *Id*.  ***This forecloses Qualcomm's***

15  ***argument***.

16       ***Qualcomm's SULAs Do Not Cover the Same Subject as Its SSO Promises***.

17  Qualcomm's FRAND commitments do not concern the same "subject matter" as the CM

18  SULAs.  While both abstractly relate to patent licensing, they cover different obligations

19  and parties.  Qualcomm's FRAND commitments are ***its*** promises to SSOs to license on

20  reasonable terms in exchange for inclusion in an SSO-controlled standard.  The SULAs,

21  by contrast, do not identify the terms on which ***Qualcomm is <u>obligated</u>*** to offer licenses.

22  The SULAs set the rate ***the CMs*** are to pay.

23  ────────────────────

24  thus limits evidence of a prior *Qualcomm-Pegatron* understanding of Qualcomm third-
   party commitments to vary the terms the SULA.

25

26  [28]  Even under Qualcomm's reading, the integration clauses cover only its *prior* FRAND
   commitments and not its *later* FRAND ones.  Qualcomm has continued to declare patents

27  to SSOs and commit that it will license them on FRAND terms.  These ongoing
   commitments give rise to separate, enforceable rights for the CMs.

28

That two agreements cover *related* subject matter does not mean that they cover the *same* subject matter. *E.g.*, *Mytee Prods., Inc. v. H.D. Prods., Inc.*, 2007 WL 1813765 *6 (S.D. Cal. 2007). Rather, an integration clause must be examined "to determine whether the parties intended the subjects . . . to be included in, excluded from, or otherwise affected by the writing." *Id.* at *5 (citing *Masterson v. Sine*, 68 Cal. 2d 222, 225–226) (1968)). No evidence suggests that the parties contemplated the SULAs as covering Qualcomm's SSO promises.

***The Integration Clauses Do Not and Cannot Waive CM Claims.*** Qualcomm cites no case to support interpreting these clauses as *sub silentio* waivers. Absent clear, explicit, and unambiguous evidence of intent to the contrary, integration clauses do not work a forfeiture or constitute a waiver or release of prior claims or rights. To constitute a release of claims, a provision must be "clear, explicit and comprehensible in each of their essential details." *Skrbina v. Fleming Cos.*, 45 Cal. App. 4th 1353, 1368 (1996) (quote omitted). The language "must clearly notify the prospective releasor … of the effect of signing the agreement." *Id.* (offering example of "clear" language); *see also Operating Eng'rs' Pension Trust Fund v. Clark's Welding & Mach.*, 688 F. Supp. 2d 902, 910–911 (N.D. Cal. 2010) (clause "could not be any clearer that it is an integration" and not a release). Indeed, the very purpose of Qualcomm's FRAND promises is that it will not gouge licensees. It is illogical—and against public policy—that, with a generic, boilerplate integration clause, Qualcomm can be absolved. This vitiates the point of the SSO contract.

For a third-party beneficiary to waive rights, "the burden is on the party claiming the waiver . . . to prove it by clear and convincing evidence that does not leave the matter to speculation." *Bass v. John Hancock Mut. Life Ins. Co.*, 10 Cal. 3d 792, 796 (1974). No argument suggests that these clauses "clearly notified" the CMs that they were

waiving legal claims, much less clear and convincingly.[29]

## II.   Component Supply Agreements—Between Qualcomm and the CMs ("CSA") and Master Software Agreements—Between Qualcomm and the CMs ("MSA")

### i.   Apple and the CMs' Position

Before Qualcomm will sell chips to a CM, it requires the CM sign a Component Supply Agreement governing chipsets and a Master Software Agreement governing chip software. Each such agreement has an "Intellectual Property" provision that states that the CM "may not use" or sell resulting products "without a separate license from QUALCOMM under all applicable patents." Docs. 4-12. This thus obligates the CM to sign a SULA before it can use or sell chip products.

Although this provision is clear, Qualcomm has refused to stipulate to its meaning, only offering the careful wording below. This will unnecessarily require the issue to be presented at trial. Apple and the CMs thus respectfully ask the Court to construe this provision accordingly to its plain text, namely as requiring CMs to first enter into a SULA before it can use or sell products that use Qualcomm chips.

### ii.   Qualcomm's Position

Qualcomm does not believe that there is a genuine dispute of interpretation regarding the Intellectual Property provisions in the CM CSAs and MSAs. Nor is it necessary for the parties to stipulate that they should be interpreted according to their unambiguous, plain meaning.

## AGREEMENTS BETWEEN APPLE AND QUALCOMM

## III.   Business Cooperation and Patent Agreement—Between Qualcomm and Apple, dated January 1, 2013 ("BCPA")[30]

---

[29] Qualcomm's argument that the CMs "gave up their status" under *French law* is equally a red herring. Qualcomm's pronouncement is merely disputed *ipse dixit*.

[30] The issues related to the disputed BCPA provisions are more thoroughly discussed in the briefing related to Apple's Motion for Summary Judgment on the BCPA Counterclaims (ECF 602, 632 and 664) and Qualcomm's Supplemental Opposition to Apple's Motion for Summary Judgment on the BCPA Counterclaims (ECF 758 and 773).

1      Apple has moved for summary judgment on Qualcomm's BCPA Counterclaims

2  and Qualcomm has cross-moved.  Many of the contractual interpretation issues below

3  regarding Section 4, Section 7, and the implied covenant of good faith and fair dealing

4  are in the parties' prior briefing.

5      **A.    Section 4**

6      Qualcomm asserts that Apple has breached Section 4 of the BCPA.  *See*

7  Qualcomm Counterclaims VI.

8                  **i.    Apple's Position**

9      ***Whether Qualcomm can recover BCP Payments for alleged breach of Section 4***

10  ***of the BCPA.***  Qualcomm seeks to recover the BCP Payments as a result of Apple's

11  purported breach of BCPA § 4.  Doc. 13.  But Section 4 is independent of the BCP

12  Payments, which arise out of BCPA § 7.   Qualcomm's request runs afoul of California

13  Civil Code § 3300, which provides that the measure of damages for breach of contract

14  must be causally related to the underlying breach.  Qualcomm has not provided any

15  expert analysis on this point, and Apple is unaware of any basis for such a claim.

16  Because Qualcomm has not and cannot demonstrate this causal relationship, its request

17  for damages must be denied.  Dkt. 602-1 at 15–16.

18      Qualcomm's argument also fails because the BCPA includes a Limitation of

19  Liability Provision that limits recovery under the BCPA to general damages, foreclosing

20  all "indirect, incidental, consequential, special, or exemplary damages arising out of or

21  related to this agreement" except under circumstances not at issue here.  (Dkt. 602-6 at

22  17.)  Under California law, "[g]eneral damages are often characterized as those that flow

23  directly and necessarily from a breach of contract, or that are a natural result of a breach."

24  *Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.*, 34 Cal. 4th 960, 968

25

26

27

28

1   (2004).[31]  The BCP Payments are not related to the purported breach of § 4 (Apple's
2   alleged interference), and thus do not "flow directly or necessarily" from it.  They thus
3   cannot qualify as "general damages"—and are barred by the BCPA's Limitation on
4   Liability Provision.[32]  Dkt. 602-1 at 16.

5        Qualcomm argues that Apple interfered with CM SULAs during the BCPA term
6   by making suggestions to the CMs about shell entities or buying parts on consignment.
7   Dkt. 758 at 13-14.  But Qualcomm only points to exhibits that at most show that Apple
8   ███████████████████████████████████████, and points to no evidence
9   that Apple ████████████████ during the BCPA period.  Dkt. 773 at 18.
10  Qualcomm identifies no authority for the proposition that thoughts, rather than actions,
11  can constitute breach.

12       Lastly, Qualcomm's assertion that it can recover all BCP Payments as a result of
13  Apple's purported breach of BCPA § 4 would render § 4 an unenforceable liquidated
14  damages provision.  *Ridgley v. Topa Thrift & Loan Ass'n*, 17 Cal. 4th 970, 977 (1998).
15  The BCP Payments are not related to the harm Qualcomm may suffer as a result of
16  Apple's alleged breach of § 4.

17       ***Whether the SULAs and Section 4 preclude a finding of breach.***  Qualcomm

18  _____

19  [31]  For similar reasons, Qualcomm's position that for a § 4 breach it is entitled to return of
    BCP Payments post-alleged breach *and* to any other damages caused by Apple's alleged
20  breach under Cal. Civ. Code § 3300 also fails.  Even if Qualcomm is entitled to relief, the
    BCPA's Limitation of Liability Provision caps damages at general damages—those that
21  "flow directly and necessarily" from a breach.
22  [32]  Qualcomm belatedly responds to the Civ. Code § 3300 and Limitation of Liability
    issues in this Joint Motion, but Apple raised both issues in its Motion for Summary
23  Judgment on BCPA Counterclaims (Dkt. 602-1 at 15–16), and Qualcomm failed to
24  respond in its next two briefs.  Dkt. 632 at 18; Dkt. 758 at 22.  Qualcomm has thus
    waived its arguments, since its "silence on this issue shows [it has] abandoned this
25  theory."  *Lesnik v. Eisenmann SE*, No. 16-CV-01120-LHK, 2018 WL 4700342, at *5
26  (N.D. Cal. Oct. 1, 2018); *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F.
27  Supp. 2d 1125, 1132 (C.D. Cal. 2011).

28

1   contends that Apple has breached Section 4 by (a) "inducing the CMs to reduce royalty

2   payments to Qualcomm,"[33] (b) "interfering with the audit procedures provided for in the

3   [SULAs]" and (c) "directing the [CMs] to misstate the net selling price" of devices.  Dkt.

4   469 ¶ 360.  First, as discussed *supra*, these claims are premised on an unsupportable

5   reading of the SULAs.  Second, Qualcomm was aware of the bases of its allegations that

6   Apple interfered in Qualcomm's audit procedures under the SULAs with the CMs by

7   2012 at the latest (Dkt. 599-1)—well before the BCPA was executed in 2013.  The last

8   sentence of § 4 accounts for audit issues.  That sentence states that "nothing in" § 4 is

9   intended to modify any . . . agreement between Apple and any Qualcomm Licensee."

10  Dkt. 602-6 at 3.  Apple considered the information requested during CM audits to be

11  Apple confidential per Apple's separate agreements with the CMs, and Qualcomm was

12  well aware of this prior to signing the BCPA.  Dkt. 599-1.  This portion of § 4 makes

13  clear that Apple's exercise of its right to maintain confidentiality over its information

14  pursuant to its agreements with the CMs cannot support breach.

## ii.   Qualcomm's Position

16       In 2013, Apple and Qualcomm entered into the BCPA.  The agreement was in part

17  a truce.  For a four-year period, the parties agreed to work together and to refrain from

18  taking certain actions that could harm each other's interests.  Apple agreed not to

19  interfere with Qualcomm's relationships with its licensees, including the CMs, and not to

20  bring certain claims (directly or indirectly) against Qualcomm.  In exchange for those

21  commitments and other consideration, Qualcomm agreed to pay Apple billions of dollars

22  in quarterly Business Cooperation and Patent Payments ("BCP payments").

23       Pursuant to Section 4 of the BCPA, Apple agreed not to interfere with

24  Qualcomm's relationships with its licensees, including the CMs.  Specifically, Apple was

25  prohibited from "prevent[ing], restrict[ing], or discourag[ing]" any Qualcomm licensee

26

27  [33] Apple understands this allegation to relate to alleged non-payment of royalties on
    royalties, discussed in Apple's Motion for Partial Summary Judgment (Dkt. 599-1).

28

1  from "complying fully with the terms of" the licensee's License Agreement.  (App'x

2  Doc. No. 13 § 4.)  Qualcomm contends that Section 4 of the BCPA is clear on its face.

3       There is no question that Apple materially breached Section 4, as Qualcomm will

4  demonstrate at trial.  Whether a breach is material depends on "the importance or

5  seriousness [of the breach]. . . and the probability of the injured party getting substantial

6  performance".  *See GoDigital, Inc. v. Contentbridge Sys.,* LLC, 2018 WL 1918731, at *4

7  (C.D. Cal. Mar. 23, 2018).  The materiality of a breach is "a question for the trier of fact".

8  *Whitney Inv. Co. v. Westview Dev. Co.*, 273 Cal. App. 2d 594, 601 (Cal. Ct. App. 1969).

9       At least as far back as 2008, ███████████████████████████████

10 ████████████████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████████████████████

12 ████████████████████████████████████████.)  Apple has never contested that there is a

13 fact issue for the jury to decide with respect to its compliance with Section 4.[34]  (*See* ECF

14 758 at 22.)

15      As a result of Apple's material breaches of Section 4, Qualcomm was relieved of

16 its obligations to continue making BCP payments.  "[I]n contract law a material breach

17 excuses further performance by the innocent party." *Plotnik v. Meihaus*, 208 Cal. App.

18 4th 1590, 1602 (Cal. Ct. App. 2012).  Here, future performance by Qualcomm would

19 have been making the BCP payments; it was relieved of that obligation when Apple

20 breached Section 4.   Therefore, if the jury finds Apple materially breached Section 4,

21 Qualcomm is entitled to the return of the BCP payments made after that breach.

22      Qualcomm also would be entitled to any other damages caused by Apple's breach.

23 *See* Cal. Civ. Code. § 3300 ("For the breach of an obligation arising from contract, the

24 measure of damages, except where otherwise expressly provided by this Code, is the

25

26   [34] Contrary to Apple's suggestion, ████████████████████████████████████

27 ████████████████████████████████████████████████████ (ECF 758 at 13-14.)

28 ████████████████████████████████████████████████████

amount which will compensate the party aggrieved for all the detriment proximately caused thereby.").  The extent of those damages is a question for the jury.  *See Estrada v. Orwitz*, 75 Cal. App.  2d 54, 60 (Cal. Ct. App. 1946) (stating that the "assessment of damages is . . . the province of the jury").

Apple's two arguments regarding Section 4 are wrong.  *First*, Apple argues that a breach of Section 4 does not entitle Qualcomm to the return of BCP payments because Section 7 of the BCPA (which contains the BCP Payment obligation) is not impacted by a breach of Section 4.  (*See* ECF 602 at 15-16.)  Apple asserts, therefore, that seeking return of BCP payments is a penalty.  But Apple does not point to anything that would require Qualcomm to continue performing under a contract that has been materially breached.  To the extent Qualcomm made BCP payments it was not required to make, the jury is entitled to find that Qualcomm was damaged by at least the amount of those unnecessary payments.  *See Hickcox-Huffman v. U.S. Airways, Inc.*, 855 F.3d 1057, 1064-65 (9th Cir. 2017) ("refunds are among the remedies traditionally recognized as among those which may be granted").  Apple also ignores that the measure of damages is one for the jury to decide, whether it includes BCP payments or not.  *See Estrada*, 75 Cal. App. 2d at 60.

*Second*, Apple argues—for the first time—that Apple and Qualcomm's pre-BCPA course of dealing purportedly demonstrates that Qualcomm had acquiesced to Apple's interference with the CM SULAs.  That is wrong.  Apple promised not to "knowingly take (*or continue taking*) any action" that "prevents, restricts, or discourages" the CMs from "complying fully with the terms" of each CM's SULA.  (§ 4 (emphasis added).)  Course of dealing or course of performance may only "explain[] or supplement[]" the terms of a contract, not contradict them.  *See* Cal. Civ. Proc. Code § 1856(c).  Apple's cited authority merely addresses the proper use of course of dealing—to address an ambiguity in a contract, not outright contradict it.  Regardless, the parties' "course of dealing" demonstrates Qualcomm objected to and sought to stop Apple's interference by

1   entering into the BCPA.  Both before and after signing the BCPA, Qualcomm repeatedly

2   complained about Apple's interference (*see, e.g.*, Ex. 8; Ex. 21 at 389:8-24; 394:11-17;

3   Ex. 16 at '2720.)

4         The measure of damages for Apple's breach of Section 4 is a question for the jury

5   and the jury can award any amount supported by the evidence.

6         **B.**    **Section 7**

7         Apple and Qualcomm each assert the other has breached Section 7 of the BCPA.

8   *See* Apple Claims I–IV; Qualcomm Counterclaims VI–IX.

9         **i.**    <u>**Apple's Position**</u>

10         Qualcomm breached § 7 of the BCPA by withholding payments to which Apple

11   was entitled in 2016, totaling $963,453,309, along with other defenses and claims.  Dkt.

12   83 ¶¶ 245–280.  The following contract provisions are at issue.

13         ***Whether Apple could have breached the BCPA if it responded to agency requests***

14   ***in any investigation that was already open, including if Apple "advocated" for or***

15   ***sought to "expand" it.***  Section 7 prohibits Apple only from *initiating* Litigation, or

16   actively inducing a third party to *initiate* Litigation.  Apple could not have initiated or

17   "actively induced" any government agency to "initiate" an investigation where that

18   investigation was already ongoing before Apple made any statements.  Summ. J. Hr'g Tr.

19   at 57:21–58:3 ("THE COURT: "you can only initiate something once").  And § 7

20   permitted Apple to respond to agency requests without restriction on the response's

21   content.  Dkt. 602-1 at 5, 6–9; Dkt. 773 at 4.

22         Qualcomm takes the position that an effort to "expand" an agency investigation

23   during the term of the BCPA would constitute "active inducement" or "initiation," even if

24   the investigation already encompassed Qualcomm's licensing practices.  Dkt. 632 at 12;

25   Dkt. 758 at 17–18.  But this interpretation runs counter to the plain text of the BCPA,

26   because nowhere in its text, or in a reasonable meaning of "induce" or "initiate," is there

27   a prohibition on "advocacy" or attempted "expansion."  Dkt. 602-6 at 7.  Apple could not

28    

1  have "actively induced" any agency to "initiate" an investigation that was already

2  ongoing, regardless of whether Qualcomm portrays Apple's conduct as "advocacy" or

3  attempted "expansion."

4  　　　In addition, regardless of how categorized, Apple's submissions were permitted by

5  the safe harbor provision in the third paragraph of § 7, which allowed Apple to respond

6  freely to agency requests.  Dkt. 602-1 at 5, 6–9; Dkt. 773 at 4.  Qualcomm's absurd

7  interpretation, if accepted, would mean that anything Apple said in response to an agency

8  request could be said to trigger an "expansion" of the inquiry if the agency took action as

9  a result of Apple's statements (such as asking follow-up questions), and any statement

10 could be labeled "advocacy" after the fact.  Similarly, Apple's submissions regarding

11 remedies in any ongoing investigation cannot have "actively induced" the "initiation" of

12 any investigation.  Dkt. 602-1 at 9–10; Dkt. 664 at 5; Dkt. 773 at 12.

13 　　　Finally, Qualcomm's interpretation of § 7 would violate public policy in favor of

14 full, candid responses to agency requests.  Dkt. 602-1 at 9–12; Dkt. 664 at 2–4; Dkt. 773

15 at 6–7, 15–17.  Any interpretation that would prohibit Apple from freely responding to

16 agency requests or inquiries—including one that permitted Qualcomm to audit Apple's

17 responses—would violate public policy.  *See infra.*

18 　　　***Whether Qualcomm could withhold BCP Payments based on Apple's responses***

19 ***to agency requests based on actions <u>before</u> the BCPA's term.***  Only actions during the

20 BCPA's term—January 1, 2013, to December 31, 2016—could relieve Qualcomm of its

21 obligations to make BCP Payments.  Dkt. 602-1 at 5; Dkt. 773 at 6.  Apple was free to

22 respond to agency requests during the term of the BCPA no matter its actions before

23 January 1, 2013.[35]  Qualcomm maintains that, if Apple "actively induced" an agency

24 investigation <u>before</u> the BCPA was effective, then Apple forfeited the safe harbor.  Dkt.

25 632 at 9–10; Dkt. 758 at 16.  Qualcomm's interpretation is contrary to the BCPA's

---

[35]  Nothing in this brief should be construed as any admission on any factual issue,
including whether Apple "actively induced" any agency investigation.

1   language and structure.  The reference to "active inducement" in paragraph 3 of § 7 of the

2   BCPA must be read in reference to the prohibition on active <u>inducement</u> in paragraph 2,

3   which only restricts actions during the BCPA's term.  *See* Dkt. 664 at 2; Summ. J. Hr'g

4   Tr. 42:6–44:13.

5       Also, Qualcomm's interpretation—which would forbid Apple from responding to

6   valid agency requests based on actions taken before the BCPA existed—would violate

7   public policy requiring Apple to cooperate with and respond to the agencies.  Dkt. 602-1

8   at 11–12; Dkt. 664 at 2–4; Dkt. 773 at 15–17.  Because California law requires the Court

9   to construe a contract so as to ensure that it is "lawful," "operative," and "reasonable,"

10  the Court should reject Qualcomm's interpretation.  *Segal v. Silberstein*, 156 Cal. App.

11  4th 627, 633 (2007).

12      ***Whether Apple had any obligation to refrain from "active inducement" or***

13  ***initiation of Litigation on topics other than infringement, FRAND, or exhaustion.***

14  Apple was permitted to initiate or actively induce the initiation of Litigation on any topic

15  not identified in the BCPA, including Qualcomm's anticompetitive conduct.  Dkt. 602-1

16  at 2, 4–5; Dkt. 773 at 4–5.  Apple was prohibited only from initiating or actively inducing

17  an agency to initiate investigations that included "any claim that (a) a Qualcomm party

18  has failed to offer a license on FRAND or RAND terms" or "(b) the sale of a Qualcomm

19  Component exhausts any" Qualcomm patent.  Dkt. 602-1 at 5. Qualcomm claims that it is

20  "illogical" to interpret the BCPA only to focus on "formal counts" for FRAND or

21  exhaustion, but Qualcomm's argument is a straw man.  Any time Apple mentioned

22  FRAND or exhaustion to an agency during the BCPA's term, it was responding to an

23  agency request, as Apple detailed in its summary judgment papers.  *See* Dkt. 602-1 at 7–

24  8; Dkt. 773-1.

25      ***Whether Qualcomm could withhold BCP Payments if an agency did not <u>actually</u>***

26  ***initiate an investigation or dispute-resolution procedure during the BCPA's term that***

27  ***contained a FRAND or exhaustion claim***.  The conditions of § 7 of the BCPA are only

28

triggered if Apple or a third party (with Apple's active inducement) actually "initiate[d]" Litigation against Qualcomm, as defined in the BCPA, and only if that Litigation contains a claim relating to patent infringement, FRAND, or exhaustion. Dkt. 773 at 2, 4–5. First, the prohibition on "active inducement" applies only "where such Litigation includes any claim" of FRAND or exhaustion; the use of the present tense "includes" demonstrates that the claim must be actual rather than speculative. Dkt. 602-6 at 7. Second, the final sentence of paragraph 2 provides that "Qualcomm's obligations under" § 7 "will not cease to apply if Apple (or the third party induced by Apple) withdraws such Apple assertion within thirty (30) days after receiving a written request from Qualcomm to withdraw" the investigation. *Id.* The entire concept of withdrawing an assertion or claim requires the existence of an actual investigation or Litigation. Moreover, the definitions of "induce," "instigate," and "initiate" all contain a causal element; absent the initiation of an actual investigation on the topics identified in the BCPA, there could be no active inducement, instigation, or initiation. Dkt. 773 at 5.

*Whether Qualcomm could withhold payments based on its view of the truth or falsity of Apple's statements to regulatory agencies.* Qualcomm contends that Apple made false statements to agencies and, because false statements are not "responsive" to agency requests, those statements fell outside the § 7 safe harbor. Dkt. 632 at 11; Dkt. 758 at 18–20. That interpretation is flat wrong. Nothing in the BCPA gave Qualcomm the right to audit the contents of Apple's responses, and Qualcomm's strained interpretation of the word "respond" finds no support in common understandings of that word. Dkt. 602-1 at 9. Moreover, Qualcomm's proposed interpretation—which would give the target of an investigation the right to punish responders for answers that the target did not like—would contravene public policy. Dkt. 664 at 4–5; Dkt. 773 at 14–15; *see infra*. And to the extent Apple's statements to regulators did not concern FRAND, exhaustion, or patent infringement, they were altogether outside the scope of the BCPA. Dkt. 664 at 5.

1    ***Whether paragraph 2 of Section 7 is a condition precedent.***  Qualcomm appears

2    to interpret the second paragraph of Section 7 as a condition precedent, and claims that

3    Apple bears the burden of showing demonstrating that it did not actively induce any

4    agency to initiate an investigation into Qualcomm's licensing practices.  Qualcomm's

5    Proposed Jury Instrs., served Feb. 1, 2019.  But the provision is a condition ***subsequent***,

6    i.e., a condition of breach.  Cal. Civ. Code § 1438; Rest. (2d) of Contracts § 230 (1981);

7    *Title Guar. & Sur. Co. v. Nichols*, 224 U.S. 346, 351 (1912). Qualcomm thus bears the

8    burden of demonstrating that the condition occurred.  *Nichols*, 224 U.S. at 351 ("if the

9    contract sued upon is subject to a condition subsequent, there is no occasion for any

10   averment in respect to the condition. It is a matter of defense, which must come from the

11   other side."); *accord Searle v. Allstate Life Ins. Co.*, 38 Cal. 3d 425, 437–38 (1985);

12   *Javierre v. Central Altagracia*, 217 U.S. 502, 507 (1910). Nothing in Apple's

13   complaint—which recited boilerplate elements of a contract claim—is any kind of

14   "admission" otherwise.

15   ***Whether paragraph 2 of Section 7 of the BCPA is a liquidated damages***

16   ***provision.***  Qualcomm's interpretation of the BCPA would render § 7 an unlawful

17   liquidated damages provision under § 1671(b) because it contemplates a single, definite

18   performance—Apple's forbearance from making negative statements about Qualcomm—

19   and imposes a penalty contingent on breach of that performance that "bears no reasonable

20   relationship to the range of actual damages that the parties could have anticipated would

21   flow from a breach."  *Ridgley v. Topa Thrift & Loan Ass'n*, 17 Cal. 4th 970, 977 (1998).

22   The BCP Payments Qualcomm withheld under § 7 are calculated based on the number of

23   chipsets sold to Apple's CMs—not the actual harm Qualcomm might have suffered as

24   any alleged active inducement of the initiation of an agency investigation.  *See Med.*

25   *Sales & Consulting Grp. v. Plus Orthopedics USA, Inc.*, 2011 WL 5075970, at *8, at *22

26   (S.D. Cal. Oct. 25, 2011) (provision providing increased pay where employer failed to

27   give employee title was unenforceable because payment bore no relationship to the

28

1  damages that might actually flow); *Ridgley*, 17 Cal. 4th at 977 (prepayment fee equal to

2  six months' interest in the event of any late payment was an unenforceable penalty).

3       Qualcomm has argued that the second paragraph of § 7 is merely a condition.  Dkt.

4  758 at 5.  But Qualcomm accuses Apple of ***breaching*** the BCPA, Dkt. 469 ¶¶ 355–359.

5  When "it is manifest that a contract expressed to be performed in the alternative is in fact

6  a contract contemplating but a single, definite performance with an additional charge

7  contingent on the breach of that performance, the provision cannot escape examination in

8  light of pertinent rules relative to the liquidation of damages."  *Blank v. Borden*, 11 Cal.

9  3d 963, 970 (1974) (quoting *Garret v. Coast & S. Fed. Sav. & Loan Ass'n*, 9 Cal. 3d 731,

10  738 (1973)).  Section 7 of the BCPA contemplated a single performance (refraining from

11  active inducement), not a rational choice between alternative performances.  The

12  provision was based on the assumption that Apple would forbear from initiating defined

13  Litigation, such that "the only purpose and effect of" ending forbearance was "to hold

14  over … the larger liability"—loss of BCP Payments—"as a threat."  *Blank*, 11 Cal. 3d at

15  971 (1974).

16       ***Whether the BCPA was a valid contract even if the parties disagree about the***

17  ***meaning of Section 7.***  Qualcomm claims, in the alternative to its breach of contract and

18  implied covenant claims, that it is entitled to restitution of all past BCP Payments because

19  there was no "meeting of the minds."  Dkt. 469 ¶¶ 372–374.  But under California's

20  "objective test of contract formation, a 'meeting of the minds' is unnecessary,"

21  *Blumenfeld v. R.H. Macy & Co.*, 92 Cal. App. 3d 38, 46 (1979), and Qualcomm's after-

22  the fact supposed "misunderstanding" about the scope of § 7 does not void the contract.

23  Dkt. 602-1 at 13; Dkt. 664 at 3, 6–7; Dkt. 773 at 18–19.

24                 **ii.   <u>Qualcomm's Position</u>**

25       Qualcomm contends that Section 7 of the BCPA is clear on its face.  Under Section

26  7, Qualcomm's payment obligation would run "only so long as" Apple kept its side of the

27  bargain by not "actively inducing" any litigation or investigations of Qualcomm.  Section

28

1  7 further specified that "suggesting (or inducing a third party to suggest) to a

2  governmental authority that it instigate an investigation" was sufficient to constitute

3  "active inducement".  And Section 7 included a "safe harbor" provision that clarified

4  Apple could "respon[d]" to inquiries from regulators.  However, consistent with the

5  overall purpose of the agreement to establish peace between the companies, the safe

6  harbor was limited to an investigation that "was initiated without any Apple Party's

7  active inducement", no matter when that "active inducement" occurred.

8        A few fundamental principles of contract interpretation guide the analysis of

9  BCPA Section 7.  Contracts should be "interpreted so as to give effect to the[ir] main

10 purpose".  *Petty v. Hill*, 2006 WL 280826, at \*5 (Cal. Ct. App. Oct. 3, 2006).  And

11 interpreting a contract should not result in an "absurdity"  *See* Cal. Civ. Code § 1638;

12 *Southland Corp. v. Emerald Corp.*, 789 F.2d 1441, 1443 (9th Cir. 1986).  Furthermore,

13 contracts should be interpreted "in a manner which gives force and effect to every clause

14 rather than to one which renders clauses nugatory".  *Titan Corp. v. Aetna Cas. & Sur.*

15 *Co.*, 22 Cal. App. 4th 457, 474 (Cal. Ct. App. 1994); *see also* Cal. Civ. Code § 1641.  If a

16 clause of a contract is susceptible to more than one reasonable interpretation, and the

17 parol evidence conflicts on which meaning should apply, the meaning of the contract

18 term is a question for the jury.  *See Stetson*, 1988 WL 86214, at \*2.

19        There are numerous disputes about the proper interpretation of Section 7:

20        *First*, the parties dispute whether Apple's efforts to induce investigations must

21 have been successful to constitute "active inducement" as defined in Section 7.  Under

22 the plain language of Section 7, it is enough merely for Apple to "suggest" that an

23 investigation should occur.  Qualcomm does not need to demonstrate that Apple actually

24 caused an investigation.  The BCPA is clear:

> For the further avoidance of doubt, ***suggesting*** (or inducing a third party to
> suggest) to a governmental authority that it instigate an investigation
> regarding a Qualcomm Party's licensing practices constitutes "actively
> inducing" and "active inducement" as those terms are used in this Section 7.
> (App'x Doc. No. 14 § 7 (emphasis added).)

1       "Suggesting" should be given its plain meaning: "[t]o mention or imply as a

2 possibility". *Suggest, Merriam-Webster Dictionary of Law* (2d ed. 2011); *see also*

3 *Suggestion, Oxford English Dictionary* (3rd ed. 2018) ("An idea or plan put forward for

4 consideration"). By its very definition, a suggestion does not have to *succeed* in

5 influencing another party in order to qualify as a suggestion. Apple points to no evidence

6 contradicting the plain language of the agreement and this common-sense definition.

7       *Second*, the parties dispute what constitutes "responding" to government inquiries

8 or requests. Although the BCPA safe harbor allows Apple to "respond" to government

9 inquiries, it did not provide carte blanche for Apple to use its responses to lie to

10 regulators to Qualcomm's detriment or to instigate investigations further while still

11 receiving payments from Qualcomm. Apple made false statements ████████████

12 ████████████████████. (*See* ECF 758 at 10-12). A false statement to a regulator

13 cannot be considered a "response". False statements hinder, rather than facilitate,

14 investigations. Indeed, lying to government regulators is a criminal offense and the

15 BCPA states that "each party [would] comply with all [laws] of any jurisdiction

16 applicable to its performance under this Agreement". (App'x Doc. No. 13 at 16.)

17       Similarly, a response must be responsive. A response designed to encourage the

18 *expansion* of an investigation—████████████████████ (*see*

19 ECF 632 at 12; 758 at 8-9, 16-17)—is not a response, but rather disguised inducement.

20 The parties were clear about this when negotiating the BCPA. Although Apple was

21 permitted to provide its views of FRAND if asked, Apple was not permitted to "go on to

22 say 'and you should investigate QC for this' in a situation where [Qualcomm was] not

23 already being specifically investigated." (*See* ECF 602, Ex. S at '0629).)

24       *Third*, the parties dispute whether Apple could actively induce an investigation that

25 has already begun. The answer must be yes. The BCPA specifically provides a safe harbor

26 for responses to government inquiries for that very reason. Government inquiries arise out

27 of government investigations. If Apple could never "induce" in the context of an

28

1   investigation that had already begun, then there would be no need for a safe harbor for

2   Apple's responses to that investigation.  Apple could simply respond knowing the

3   investigation had already begun and so its response could not possibly be inducement.  Any

4   interpretation of Section 7 that is inconsistent with the entirety of the section should be

5   rejected.  *See* Cal. Civ. Code § 1641; *Titan Corp.*, 22 Cal. App. 4th at 474.

6        *Fourth*, the parties dispute whether Apple's active inducement needs to occur

7   *during* the BCPA term for any subsequent responses by Apple related to that

8   investigation to be outside the safe harbor.  The answer is no.  The safe harbor applies

9   only where, per the BCPA terms, the relevant investigation "was initiated without any

10  Apple Party's active inducement".  The provision places no temporal limitation on how

11  much earlier the inducement must have occurred; instead it defines the characteristics of

12  the investigation Apple is responding to.

13       *Fifth*, Apple argues that it was only obligated to refrain from actively inducing

14  investigations or litigations that included specific, formal counts for patent infringement,

15  FRAND or exhaustion.  Apple argues, for example, that it was free to induce antitrust

16  litigation, even if the purported antitrust violations are premised on FRAND or

17  exhaustion theories.  Apple's position is illogical.  Under Section 7, the BCP payments

18  are conditioned on Apple not actively inducing "Litigation against a Qualcomm Party . . .

19  where such Litigation includes any claim that (a) a Qualcomm Party has failed to offer a

20  license on FRAND or RAND terms and conditions or (b) the sale of a Qualcomm

21  Component exhausts any of a Qualcomm Party's patents".  The definition of the term

22  "Litigation" demonstrates that "any claim" does not have a formalistic meaning, but

23  rather should be interpreted in the broadest sense of the word.  "Litigation" is defined to

24  include "*any* procedure for the resolution of a controversy or dispute in any jurisdiction in

25  the world whether created by a claim, a counterclaim *or otherwise, in the broadest sense*

26  *and in whatever form, whether administrative, judicial, arbitral or otherwise*".  (App'x

27  Doc. No. 13 at 12.)  "[A]ny claim" is intended to have the broadest possible meaning;

28

1  thus, "claim" is not limited to a formal count, but includes any supporting allegations and

2  theories.  Under Apple's theory, Apple could mask a FRAND or exhaustion claim as an

3  antitrust count (or other theory), while continuing to receive BCP payments.  That absurd

4  result should be rejected.  *See* Cal. Civ. Code § 1638.

5      *Sixth*, Apple's obligation not to induce litigations or investigations is a condition

6  precedent to Qualcomm's payment obligation.  A condition precedent is one "which is to

7  be performed before some right dependent thereon accrues, or some act dependent

8  thereon is performed".  *See* Cal. Civ. Code § 1436 (definition of condition precedent).

9  Section 7 states Qualcomm's obligation exists "only so long as" Apple has complied with

10 its obligation.  One purpose of the BCPA was to elicit Apple's promise that it would not

11 engage in active inducement of litigation or investigations against Qualcomm.  Notably,

12 Apple itself previously agreed with that interpretation—stating in its complaint that, "all

13 conditions *precedent* for Qualcomm's performance have been fulfilled".  (Apple First

14 Am. Compl. ¶ 254.)  The Court should find Apple was right the first time.

15     *Seventh*, Apple argues that the condition Section 7 placed on Qualcomm's

16 obligation to make BCP payments is a liquidated damages provision.  A liquidated

17 damages provision is "an amount of compensation to be paid in the event of a breach of

18 contract".  *Free Range Content, Inc. v. Google Inc.*, 2016 WL 2902332, at *10 (N.D. Cal.

19 May 13, 2016).  The second paragraph of Section 7 is not a liquidated damages provision

20 because it does not call for damages; rather, it conditions Qualcomm's payment

21 obligations on Apple's performance.  Qualcomm is entitled to return of BCP payments

22 because it continued making payments even after (unbeknownst to Qualcomm) Apple

23 had breached and was no longer entitled to them.  But those are direct damages.

24     *Finally*, Apple also argues that the BCPA was a valid contract even if the parties

25 disagree about the meaning of Section 7.  That is not a contractual language dispute for

26 the Court to decide here.  Nevertheless, Qualcomm has already explained that it would be

27 entitled to a refund of all BCP Payments based on Apple's unjust enrichment if the Court

28

determines that Qualcomm paid Apple without actually receiving any promise from Apple in return.  (*See* ECF 632 at 15-16; ECF 758 at 20-21.)

## C.   Implied Covenant of Good Faith and Fair Dealing

### i.   Apple's Position

Qualcomm claims that Apple's actions before or after the effective date of the contract and in "assisting" government investigations breached the implied covenant. Dkt. 632 at 15, Dkt. 758 at 20–21.  But the BCPA's safe harbor expressly permitted Apple to respond to government inquiries.  Dkt. 602-6 at 7.  The implied covenant may not "be read to prohibit a party from doing that which is expressly permitted by an agreement."  *Carma Developers (Cal.), Inc. v. Marathon Development Cal., Inc.*, 826 P.2d 710, 728 (Cal. 1992).  Qualcomm also attempts to write into the BCPA obligations before and after its term and Qualcomm's ability to audit Apple's statements to regulators.  But the implied covenant cannot create terms where "no express terms exist on which to hinge an implied duty."  *Abbit v. ING Annuity & Life Ins. Co.*, 999 F. Supp. 3d 1189, 1198 (S.D. Cal. 2014).

Apple, for its part, claims that Qualcomm deprived Apple of the benefits of its bargain by improperly withholding BCP Payments in 2016, in retaliation for Apple's interactions with government regulators, based on specious excuses that find no home in the language of the BCPA.  Dkt. 79 at ¶¶ 261–267 (Count II).

### ii.   Qualcomm's Position

"Every contract in California contains an implied covenant of good faith and fair dealing that neither party will do anything which will injure the right of the other to receive the benefits of the agreement."  *Ladd v. Warner Bros. Entm't Inc.*, 110 Cal. Rptr. 3d 74, 81 (Cal. Ct. App. 2010).  A party breaches the implied covenant when it engages in "unfair dealing, whether or not it also constitutes a breach of a consensual contract term, prompted by a conscious and deliberate act that unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party".

1    *Celador Int'l Ltd. v. Walt Disney Co.*, 347 F. Supp. 2d 846, 852 (C.D. Cal. 2004).

2         As discussed in Qualcomm's summary judgment briefing, Apple never intended to

3    give Qualcomm the peace for which it bargained.  (*See* ECF 758 at 20-21.)  Apple instead

4    escalated its campaign against Qualcomm and "unfairly frustrate[d] the agreed common

5    purposes" of the BCPA.  *See Celador*, 347 F. Supp. 2d at 852.  The Court should instruct

6    the jury on the law applicable to Qualcomm's claim and decline Apple's request for an

7    instruction that would effectively dictate the jury's verdict.

8    **IV.    Statement of Work for Qualcomm Chipsets for Mav 7/8, Mav 10, and Mav**
     **13—Between Qualcomm and Apple, dated February 28, 2013 ("2013 SOW")**

9              **i.    Qualcomm's Position**

10        The 2013 SOW was one of a series of agreements between Qualcomm and Apple

11   governing the supply of customized baseband chips Qualcomm created primarily for

12   Apple devices.  Apple has withheld approximately ▮▮▮▮▮▮ that it *admits* it owes

13   under the 2013 SOW.  The only dispute is whether the amount of damages under the

14   2013 SOW should be ▮▮▮▮▮▮▮▮▮.  The plain language of the contract

15   demonstrates that Apple owes the higher amount.

16        When Apple first entered the cellular industry in 2007, it did not use any

17   Qualcomm baseband chips in its products.  The parties entered into the Strategic Terms

18   Agreement ("STA") in 2009, which specified general supply terms for a Qualcomm

19   baseband chip commonly referred to as a "thin modem", customized for Apple products.

20   Pursuant to that agreement and a later amendment, Apple and Qualcomm entered into

21   Statements of Work that provided more specific requirements for particular models of

22   baseband chips.  Apple directed the CMs to purchase and begin including Qualcomm's

23   thin modems for an Apple product released in 2011.

24        Qualcomm's MDM9625 chip, which is one chip governed by the 2013 SOW, has a

25   built-in feature related to technology known as carrier aggregation, which offers

26   increased bandwidth and faster data speeds.  Apple refused to pay for the carrier

27

28

aggregation feature as part of the MDM9625 chipset's up-front cost.  Instead, Apple insisted that payments compensating Qualcomm for the carrier aggregation feature, termed "Adder" payments, be made only upon the occurrence of certain triggering events.  Section 4.2 of the 2013 SOW lists four criteria of "CA-Enabled Apple Product", each of which, standing alone, could trigger Apple's Adder payments:

> (A)    is Activated on any CA-Enabled Network, unless enabling Carrier Aggregation on that network would materially degrade the user experience or devalue the Apple Product;
> (B)    has been granted technical approval (TA) to support Carrier Aggregation on the cellular wireless network on which it is Activated;
> (C)    is enabled by Apple via software to support Carrier Aggregation on the cellular wireless network on which it is Activated; **or**
> (D)    has been marketed by Apple or a cellular wireless network operator as being capable of supporting Carrier Aggregation specifically on the cellular wireless network on which it is Activated or has been marketed generally by Apple as being capable of supporting Carrier Aggregation.

(*See* App'x Doc. No. 14 § 4.2) (emphasis added).

The word "or" at the end of Section 4.2(C) confirms that each of these is an independent criterion.  If any one of them is met, Apple owes Adder payments.

The interpretation of the 2013 SOW implicates basic tenets of contract law. Contracts are interpreted according to their plain language.  Cal. Civ. Code § 1644; *Santisas v. Goodin*, 17 Cal. 4th 599, 608 (1998) ("The 'clear and explicit' meaning of the[] provisions . . . controls judicial interpretation").  When interpreting a contract, "the whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."  Cal. Civ. Code § 1641.

Apple owes Adder payments based on two triggering events.  *First*, Apple owes Adder payments under Section 4.2(D) because Apple marketed certain Apple devices' carrier aggregation capabilities at a September 9, 2014 iPhone 6 launch event and an October 16, 2014 iPad Air 2 launch event.  (*See* Ex. 37 ¶ 67-68, 70.)  Section 4.2(D) states that Apple would owe Adder payments if an Apple device has been marketed as having carrier aggregation capabilities.  "Marketed" is not defined in the 2013 SOW

1  itself, but its common meaning is straightforward:  to "market" means to "advertise or

2  promote".  *Market*, *Oxford English Dictionary* (3rd ed. 2018).  Accordingly, Apple

3  "markets" by, among other things, making any statement promoting an Apple device

4  because it has carrier aggregation capabilities.  ██████████████████████████████

5  ████████████████████████████████████████████████████████████████████████████

6  ██████████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████

9      *Second*, Apple owes Adder payments under Section 4.2(A) because certain Apple

10  devices were Activated on CA-Enabled Networks, like Verizon and T-Mobile as early as

11  September 2014.  (*See* Ex. 37 ¶¶ 71-76, 78.)  A CA-Enabled Network is defined in the

12  agreement as "a cellular wireless network service in a specific country that has

13  commercially launched support for Carrier Aggregation in any market".  (§ 4.2.)

14  Section 4.2(A) states that any Apple device activated for the first time on a CA-Enabled

15  Network triggers Adder payments.  This means that the activation of any Apple phone

16  containing the MDM9625 chip on any network that can support carrier aggregation

17  triggers Adder payments.

18      Based on those two triggers, Apple owes a total ██████████████████████

19  ██████████████████████████████████████████████  Apple admits that it owes

20  ████████████████████████████████████████████████████████████████████████████

21  ██████████████████████████████  Apple is wrong.

22      With respect to the marketing trigger under Section 4.2(D), Apple argues its

23  statements at product launch events are not "marketing" because Apple did not

24  sufficiently broadly market the phone as being capable of supporting carrier aggregation.

25  To begin with, Apple specifically touted that the iPhone 6 supports carrier aggregation at

26  the iPhone 6 launch event during the keynote speech, a large and carefully-planned

27  marketing event.  Carrier aggregation was, by all reasonable understandings, marketed to

28

1   a large audience.  Moreover, the contract itself requires only that an Apple product was

2   "marketed generally . . . as being capable of supporting Carrier Aggregation".  (§ 4.2(D).)

3   Nothing in the language of the contract suggests that Apple had to reach a certain size

4   audience or repeatedly tout the carrier aggregation feature to meet the trigger.  Although

5   the second clause of 4.2(D) states that the trigger occurs when a product has been

6   "marketed *generally* by Apple as being capable of supporting Carrier Aggregation", the

7   word "generally" serves only to distinguish the second clause from the first, which also

8   triggers Adder payments if an Apple product has been "marketed . . . as being capable of

9   supporting Carrier Aggregation *specifically on the cellular wireless network on which it

10  is Activated*."  (§ 4.2(D).)  The word "generally" does not mean "widely"; instead, it

11  refers to the context in which carrier aggregation is marketed.  Apple's deconstruction of

12  the relationship between "generally" and "marketed" fails because it ignores the entire

13  first half of the provision—which makes clear the juxtaposition is about the content of the

14  marketing and not the size of its audience.

15        With respect to the Activation trigger under Section 4.2(A), Apple argues that

16  Adder payments were triggered only when carrier aggregation was enabled both on the

17  network *and* on the Apple device itself because the definition of carrier aggregation

18  includes the phrase "supported by the Apple Product".  (*See* Ex. 45 at ¶ 33.)  But, the

19  definition of carrier aggregation merely identifies the relevant specification of carrier

20  aggregation on the MDM9625 chip in Apple's devices.  And Apple's cramped reading

21  ignores the actual definition of a "CA-Enabled Apple Product", which includes multiple,

22  independent triggers that would be superfluous if the "true" requirement were that the

23  Apple product must be in fact using carrier aggregation.   Indeed, activation on the Apple

24  device is a separate trigger for Adder payments in § 4.2(C), which triggers Adder

25  payments for a device "enabled by Apple software to support Carrier Aggregation".

26  Apple essentially argues that both Section 4.2(A) (activated on a network capable of

27  supporting carrier aggregation) *and* Section 4.2(C) (enabled on the device via software)

28

1    must have been satisfied to trigger Adder payments.  Apple's reading would replace an

2    "or" with an "and".[36]  Apple cannot rewrite the contract.

3          Finally, Apple argues that the plain language of the 2013 SOW leads to an

4    "absurd" result.  Not so.  Apple would not have touted the carrier aggregation capabilities

5    of Qualcomm's MDM9625 chip at its product launch event if it did not believe there

6    were a commercial advantage in doing so.  And it is perfectly reasonable to expect Apple

7    to pay for technology that was available on Qualcomm's MDM9625 chips and the

8    networks on which its phones operated even if Apple did not always choose to enable

9    that technology.  That is what the parties agreed.

10                  ii.    **Apple's Position**

11          In Section 4.2 of the 2013 SOW, the parties agreed that Apple would pay

12    Qualcomm an "Adder"—specified in Attachment 1 to the agreement—for "each CA-

13    Enabled Apple Product that is Activated."  Doc. 14.  This provision requires Apple to pay

14    an Adder *only* where Apple or its customers actually obtained a benefit from the

15    inclusion of Carrier Aggregation technology—as defined in the agreement—in certain

16    iPhones or cellular iPads.[37]  Apple acknowledges that it is obliged to make *some*

17    payments under Section 4.2, and has offered to make those payments, but disagrees with

18

19          [36] Apple also points to the second half of Section 4.2(A), which limits Adder

20    payments if enabling Carrier Aggregation "would materially degrade the user

21    experience".  Apple offers no evidence that was the case on any relevant network.

       Moreover, that provision underscores that Apple's iPhones did not need to be in fact

22    using carrier aggregation to trigger Adder Payments under § 4.2(A).  Otherwise, if Apple

23    were right, there would be no need to have a carve out for an instance where a network is

       enabled to support carrier aggregation, but Apple does not want its devices to be enabled.

24    Apple could simply not enable its devices and not pay the Adder payments.

25    [37] This is consistent with a proposal from Cristiano Amon (then President of

       Qualcomm's chipset business) before the parties' final negotiations: ███████████

26    ██████████████████████████████████████████████████

27    ██████████████████████  ACM Ex. C at -397.

28                                                        Case No. 17-cv-0108-GPC-MDD

1    Qualcomm regarding what payments are due.

2        Qualcomm argues it is owed an Adder under Section 4.2(A) for all devices

3    Activated on networks where carrier aggregation was enabled, even if that feature was

4    not enabled for *Apple products*.  Qualcomm thus claims Apple should pay for devices

5    activated on the Verizon and T-Mobile networks as early as September 2014, even

6    though carrier aggregation was not enabled for Apple Products on Verizon until

7    September 2015, and has never been enabled on T-Mobile.  ACM Ex. B (Apple's First

8    Supp. Response to Qualcomm Interrogatory No. 22) at 3.

9        Qualcomm's interpretation ignores that "Carrier Aggregation" is a defined term in

10   the 2013 SOW and is limited to the form of carrier aggregation that is "*supported by the*

11   *Apple Product.*"  § 4.2 (definition of Carrier Aggregation) (emphasis added).[38]  Section

12   4.2(A) incorporates that definition through its use of the defined term "CA-Enabled

13   Network," which is a cellular network "that has commercially launched support for

14   Carrier Aggregation."  Read together, Section 4.2(A) only applies to Apple Products

15   activated on cellular networks that had commercially launched support for the form of

16   carrier aggregation supported by those Apple Products.  It does not apply to Apple

17   Products that did not support carrier aggregation.

18       Qualcomm also fails to address the second part of Section 4.2(A), which excludes

19   activations where "enabling Carrier Aggregation on a network would materially degrade

20   the user experience or devalue the Apple product."  This is fatal to Qualcomm's claim

21   that "the activation of any Apple phone containing the MDM9625 chip on any network

22   that can support carrier aggregation triggers Adder payments."  On some networks,

---

23   [38]  "The whole of a contract is to be taken together, so as to give effect to every part, if
24   reasonably practicable, each clause helping to interpret the other."  Cal. Civ. Code
     § 1641.  Section 4.2 uses the word "support" to modify Carrier Aggregation in several
25   instances:  the definitions of "CA-Enabled Network" and "Carrier Aggregation," as well
26   as in Sections 4.2(B), 4.2(C), and 4.2(D).  It is evident based on the repetition of this term
     throughout Section 4.2 that Apple did not intend to and did not agree to pay for
27   technology that was not actually used in its products.

Apple's hardware or software could not support carrier aggregation, and enabling carrier aggregation technology earlier or at all would "materially degrade the user experience." This provision makes it explicit that no Adder was due for activations in those cases.

Qualcomm furthers contends that Apple owes payments under Section 4.2(D) because Apple "marketed certain Apple devices' carrier aggregation capabilities" at two launch events in the fall of 2014. Qualcomm's interpretation again impermissibly ignores the plain meaning of the 2013 SOW. Cal. Civ. Code § 1644 ("The words of a contract are to be understood in their ordinary and popular sense."); *id.* § 1638 ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.").

Section 4.2(D) applies to Apple Products "marketed generally by Apple as being capable of supporting Carrier Aggregation." As Qualcomm notes, "marketed" is not defined, but means to "advertise or promote," or to "expose for sale in a market." *Merriam-Webster Online Dictionary*, https://www.merriam-webster.com/dictionary/market (last visited Feb. 15, 2019). "Generally" is also not defined, but means "in disregard of specific instances and with regard to an overall picture," "as a rule," "in most cases," "usually," or "widely." *Id.*; *New Oxford American Dictionary* (3d ed. 2010). The last antecedent rule "provides that qualifying words, phrases and clauses are to be applied to the words or phrases immediately preceding and are not to be construed as extending to or including other more remote." *White v. Cty. of Sacramento*, 31 Cal. 3d 676, 680 (1982) (internal quotation marks omitted); *see WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1051 n.3 (9th Cir. 2011) (collecting cases). Accordingly, the term "generally" in Section 4.2(D) is modifying the word "marketed," rather than "capable."

A common-sense, plain meaning interpretation of this subsection dictates that the phrase "marketed generally" applies to Apple Products that were as a rule or widely marketed—i.e. advertised, promoted, or exposed for sale—as being capable of supporting

Carrier Aggregation.  Put succinctly, Section 4.2(D) would only apply to Apple Products where support for Carrier Aggregation was a core part of Apple's marketing for that product.  Qualcomm's interpretation—that "the word 'generally' serves only to distinguish the second clause [of Section 4.2(D)] from the first," *could* be correct if the contract required an Adder payment for Products "marketed by Apple as being *generally capable* of supporting Carrier Aggregation," such that "generally" modified "capable." But that is not what the contract says.

Finally, both of Qualcomm's disputed contract interpretations violate the principle that a contract should not be interpreted to lead to an unjust, inequitable, or absurd result. *See Castillo v. CleanNet USA, Inc.*, 2018 WL 6619986, at *23 (N.D. Cal. Dec. 18, 2018) (quoting *Ticor Title Ins. Co. v. Rancho Santa Fe Assn.*, 177 Cal. App. 3d 726, 730 (Ct. App. 1986)); *Cty. of Marin v. Assessment Appeals Bd.*, 64 Cal. App. 3d 319, 325 (Ct. App. 1976); Cal. Civ. Code § 1638.  As explained above, under Qualcomm's interpretation of Section 4.2(A), Apple would be required to pay over ▮▮▮▮▮▮▮ for Apple Products that did not support carrier aggregation.  Qualcomm's reading of Section 4.2(D) is even less reasonable.  Phil Schiller's two references to carrier aggregation were made in less than a minute, combined, during two events that were each more than an hour long.  Apple Keynotes, iTunes, 9/9/2014 Keynote at 25:45 and 10/16/2014 Keynote at 50:20, *available at* https://itunes.apple.com/us/podcast/apple-keynotes-1080p/id509310064?mt=2.  The slides presented during the events did not so much as mention carrier aggregation.  *See* Ex. 1 at -4474-85.[39]  Yet under Qualcomm's interpretation of the 2013 SOW, Apple agreed to pay ▮▮▮▮▮▮▮ of dollars for those two mentions, in addition to Adder payments on Apple Products that *actually supported* carrier aggregation.  Those results would be unjust, inequitable, and absurd.

---

[39]  Phil Schiller testified that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. ACM Ex. D (Schiller 5/31/2018 Dep.) at 298:15-25, 307:21-308:7, 311:16-24.

# TIA, ATIS AND ETSI POLICIES

## V.    The FRAND Commitment

### i.    Apple's and the CMs' Position

Standard setting organizations (SSOs), including the Telecommunications Industry Association (TIA), the Alliance for Telecommunications Industry Solutions (ATIS), and the European Telecommunications Standards Institute (ETSI), create and distribute common standards for all members to follow. *See generally* Dkt. 79 (Apple's 1st Am. Compl.). Each SSO has its own intellectual property rights (IPR) policy, which sets out the commitments SSO members make by participating in that SSO and by submitting written assurances to that effect.[40] Docs. 16-19. Thus, each IPR policy is a contract between the SSO and SSO members, such as Qualcomm. As a member of TIA, ATIS, and ETSI, Qualcomm has undertaken contractual commitments outlined in the respective IPR policies. The Court will need to interpret provisions in the IPR policies of these three SSOs concerning (1) Qualcomm's FRAND obligations, (2) Qualcomm's disclosure obligations regarding its IPR, and (3) essentiality determinations.

Apple and the CMs contend that, as part of or as a result of Qualcomm's unlawful monopolization scheme, Qualcomm has violated its FRAND commitments to SSOs involved in the creation and distribution of cellular standards. *See* Dkt. 79 at ¶¶ 30, 34, 37, 44, 45, 49, 618. Qualcomm, in turn, seeks a declaration that it has complied with its FRAND obligations to ETSI. Whether Qualcomm has complied with its FRAND commitments to SSOs is relevant to a number of the claims in these consolidated cases. *E.g.*, Apple Claims LXI, LXII, LXIII; CMs Counterclaims I–III, V–IX; Qualcomm Counterclaims II, IV. Qualcomm's compliance with its FRAND commitments is also relevant to many of the defenses in this case. For example, Apple and the CMs are defending against Qualcomm's efforts to enforce the SULAs by contending that the

---

[40] ATIS has adopted the patent policy of the American National Standards Institute (ANSI), which is included here for completeness.

1   SULAs are not FRAND.

2   The jury will be asked to consider various commitments an owner of declared-

3   essential patents makes to SSOs. **First**, the jury will consider whether certain of

4   Qualcomm's licensing royalties are FRAND or, as Apple and the CMs contend, well

5   above FRAND. In order for the jury to make this determination the Court must first

6   determine whether TIA, ATIS, and ETSI require an owner of FRAND-encumbered

7   patents merely to offer licenses on FRAND terms, such that the jury may assess FRAND

8   using known and accepted legal and economic principles. **Second**, the jury will be asked

9   to consider whether refusing to license competitors is an act that furthers Qualcomm's

10  alleged antitrust behavior. Here, the Court must first construe whether the SSOs in

11  question require SEP owners to offer FRAND licenses to anyone who asks (e.g., "all

12  applicants" under the TIA IPR Policy, "applicants desiring to utilize the license for the

13  purpose of implementing the standard" under the ATIS IPR Policy, and "those who seek

14  licenses" under the ETSI IPR Policy), including competitors.

15  Both of these determinations implicate provisions of the IPR policies of TIA,

16  ATIS, and ETSI. *See* Docs. 16-19 (TIA IPR Policy § 3.1.1; ATIS IPR Policy §§ 10.4.1,

17  10.4.2; ANSI Patent Policy § 3.1.1; ETSI IPR Policy cl. 6.1, 15.4, 15.5, 15.8).

18  As a preliminary matter, neither TIA nor ATIS includes a choice-of-law clause in

19  the respective IPR policy. Therefore, California contract law applies when interpreting

20  the terms of the respective IPR policy. *See Fed. Trade Comm'n v. Qualcomm Inc.*, No.

21  17-CV-00220-LHK, 2018 WL 5848999, at *7 (N.D. Cal. Nov. 6, 2018). In contrast, the

22  ETSI IPR Policy is explicit in its adoption of French law. Doc. 19 at -243 (ETSI IPR

23  Policy, cl. 12).[41] However, similar contractual obligations must be interpreted

24  consistently. *See Qualcomm*, 2018 WL 5848999, at *10 (interpreting TIA and ATIS IPR

25  policies consistent with other IPR policies considered by the Ninth Circuit because the

26

27  ──────────────
    [41] ETSI also explicitly confers national courts of law with the authority to resolve IPR
    disputes. ACM Ex. E (IPR Guide) § 4.3.

28

1   FRAND commitments are nearly identical).  Thus, the FRAND obligation cannot mean

2   one thing under ETSI's IPR Policy and an entirely different thing under TIA's IPR

3   Policy.  In fact, where there is an inconsistency between legal interpretations of identical

4   contractual obligations, U.S. law must prevail.  *Apple Inc. v. Samsung Elecs. Co., Ltd.*,

5   2012 WL 1672493 at *10 (N.D. Cal. May 14, 2012) (noting that foreign law cannot be

6   "contrary to any fundamental California policy"); *see Animal Sci. Prods. v. Hebei*

7   *Welcome Pharm. Co. Ltd.*, 138 S. Ct. 1865, 1869–70 (2018).

8         ***First***, the IPR policies of TIA, ATIS, and ETSI all require patent owners to make

9   FRAND offers, but none specifically defines "fair, reasonable, and nondiscriminatory."

10  Where, as here, a jury will decide whether or not a specific offer complies with a patent

11  owner's FRAND commitments, it is important to instruct the jury on the proper legal and

12  economic principles for determining whether the patent owner has made a FRAND offer.

13  *See TCL Commc'n Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*, 2018 WL

14  4488286, at *8 (C.D. Cal. Sept. 14, 2018) ("Neither the history of ETSI's policy

15  development nor the meager case law development of the FRAND concept provides the

16  Court definitive guidance in assessing whether Ericsson's offers have been non-

17  discriminatory.  As TCL suggests, the Court must turn to law, logic, and economics.").

18  These legal and economic principles apply equally between SSOs.  For example, the

19  Model Patent Jury Instructions for the United States District Court for the Northern

20  District of California does not distinguish between SSOs in instructing juries about how

21  to analyze damages for FRAND-encumbered patents.  *See* N.D. Cal. Model Patent Jury

22  Instructions at 53 ("5.10 Reasonable Royalty—Commitment to License on Reasonable

23  and Nondiscriminatory Terms").

24        Patent damages principles are particularly applicable in assessing FRAND because

25  a FRAND license or FRAND offer deals with patents.  *See, e.g., TCL Commc'n*, 2018

26  WL 4488286 (determining FRAND royalty for patents declared essential to ETSI); *In re*

27  *Innovatio IP Ventures, LLC Patent Litig.*, 2013 WL 5593609 (N.D. Ill. 2013)

28

1   (determining FRAND royalty); *GPNE Corp. v. Apple, Inc.*, 2014 WL 1494247 (N.D. Cal.

2   Apr. 16, 2014) (discussing approaches to determining FRAND royalty in a case dealing

3   with non-SEP patents); *see also, e.g., Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201

4   (Fed. Cir. 2014).  Fact and expert witnesses will discuss the issues associated with

5   figuring out whether Qualcomm's royalties are FRAND or above FRAND.  Such issues

6   include analyzing comparable license agreements, issues of royalty stacking, issues

7   surrounding the value attributable to the patented technology, as well as how patent

8   merits matter to a proper FRAND analysis.

9        ***Second***, the IPR policies of TIA, ATIS, and ETSI do not distinguish between

10  potential recipients of the patent owner's FRAND offer.  Thus, a FRAND offer must be

11  made to any party who requests a SEP license, including baseband chipset manufacturers.

12  *See Microsoft Corp. v. Motorola Inc.*, 795 F.3d 1024, 1031 (9th Cir. 2015) (A "SEP

13  holder cannot refuse a license to a manufacturer who commits to paying the RAND

14  rate.").  Judge Koh recently ruled on this issue, finding it was inconsistent with

15  Qualcomm's FRAND obligations to TIA and ATIS for Qualcomm to refuse to license to

16  baseband chipset competitors, such as Intel.  *Qualcomm*, 2018 WL 5848999, at \*15.

17  Judge Koh considered, and rejected, Qualcomm's argument that the FRAND obligation

18  does not extend to chipset manufacturers because a chipset does not "practice" or

19  "implement" standards:

20         However, that distinction not only violates the non-discrimination
           obligation, but also makes little sense. As Qualcomm's founder conceded
21         and Qualcomm's own documents demonstrate, modem chips may be
           "compliant" with cellular standards.
22
    *Id.* at \*14.  The FRAND obligation is about a license to practice patents and "Qualcomm

23  concedes that Qualcomm owns SEPs that are infringed by typical modem chips."  *Id.*

24  (discussing *Ericsson*, 773 F.3d at 1209, and finding that "if a modem chip infringes a

25  SEP, practice or implementation of the relevant standard would require a license to that

26  SEP"); *see also* ACM Ex. F (Tiedemann Dep.) at 228:6-229:4 (inventor testifying as to

27  his belief that SEPs are implemented at the chipset); ACM Ex. G (Qualcomm tax memo)

28

1    at -414 to -415 ("[B]y virtue of incorporating QCOM designed ASICs [chipsets] in their

2    products, licensee's CDMA products necessarily infringe on many QCOM patents.").

3          Judge Koh considered Qualcomm's own documents and statements (including the

4    testimony of Qualcomm's founder), as well as Qualcomm's evidence regarding industry

5    practice.[42]  *Qualcomm*, 2018 WL 5848999, at *12-13.  Furthermore, it is neither relevant,

6    nor surprising, that Qualcomm and other large cellular SEP owners, in the business of

7    monetizing their patents and promoting their technology for inclusion in standards, also

8    have historically demanded device level licenses.  As Qualcomm candidly told the IRS,

9    "[not being] able to collect a royalty on [a] patent from the guy who makes the cell phone

10   . . . would be a very bad thing because we collect a royalty on a cell phone that's based

11   on the price of the cell phone and ***that's a lot higher than the price of a chip***.  So given a

12   choice, you're always going to want to collect a royalty on the cell phone, not on the

13   chip."  ACM Ex. H at 26 (emphasis added); *id.* at 71 ("[H]aving to choose between

14   [handset level] or [chipset level licensing] then you're right, obviously the handset is

15   humongously more lucrative for a bunch of reasons.").   Qualcomm admits the materials

16   before Judge Koh are no different from those Qualcomm now proffers.

17         "Ninth Circuit precedent establishes that Qualcomm's FRAND commitments

18   include an obligation to license to all comers, including competing modem chip

19   suppliers."  *Id.* at *10.  The TIA and ATIS IPR policies contain language "almost

20   identical" to the IEEE IPR policy the Ninth Circuit interpreted.  *Id.* at *11.  The parties

---

[42]  Qualcomm submitted the declarations of Lorenzo Casaccia, Louis Lupin, Edward
Tiedemann before Judge Koh during the summary judgment proceeding.  *See* No. 5:17-
cv-00220 (N.D. Cal.), Dkt. 870-18, -20, -22.  This evidence cannot be used to vary the
terms of the SSOs' IPR policies.  *United States v. King Features Entm't, Inc.*, 843 F. 2d
394, 398 (9th Cir. 1988).  Further, Qualcomm's reliance on Mr. Casaccia is concerning.
Mr. Casaccia submitted a Rule 26 Disclosure in this litigation on the specific areas on
which he is expected to testify and confirmed this at deposition.  ACM Ex. I (Casaccia
Disclosure) at 2; ACM Ex. J (Casaccia Dep.) at 171:23-172:18.  The testimony in the
declaration Qualcomm now relies on is not among those areas.  Moreover, Mr.
Casaccia's knowledge on SSOs is limited.  *Id.* at 172:19-173:6.

1  agree that ETSI's policy cannot be interpreted in a way that would make the meaning of
2  FRAND inconsistent between SSOs.

3  ## ii.   Qualcomm's Position

4  Qualcomm makes licenses to its SEPs available on "fair, reasonable and non-
5  discriminatory" ("FRAND") terms pursuant to commitments it has made with various
6  SDOs, including ETSI, ATIS and TIA.  Apple and the CMs raise two issues relating to
7  the FRAND commitment:  (1) how to determine whether Qualcomm has offered FRAND
8  terms; and (2) whether the IPR Policies of ETSI, ATIS and TIA require the licensing of
9  the sale and manufacture of components, such as chips.

10  Qualcomm contends that the Court should instruct the jury regarding the meaning
11  and impact of Qualcomm's FRAND commitment to ETSI, ATIS and TIA.  The specific
12  determinations Qualcomm seeks with respect to ETSI are addressed in Qualcomm's
13  separate Rule 44.1 Motion because the ETSI IPR Policy is governed by French law.  The
14  Court's instructions with respect to ATIS and TIA should be informed by and similar to
15  its instructions regarding ETSI because ETSI is the most important of the SDOs, and the
16  IPR policies of each of ETSI, TIA and ATIS are required to be consistent.

17  The Court should decline to instruct the jury as to particular methodologies to
18  apply when determining whether Qualcomm's royalties are consistent with Qualcomm's
19  FRAND commitments.  It is up to the jury, based on the testimony from fact and expert
20  witnesses, to apply its own judgment.

21  1. Determination of FRAND Royalties

22  Whether Qualcomm's royalties are FRAND is a fact-intensive inquiry that will be
23  the subject of extensive fact and expert testimony, and it is a question for the jury to
24  decide.[43]  Aside from acting in a gate-keeping function to keep from the jury fact or

25

26  ───────────────

    [43] Because Qualcomm's FRAND commitments arise from contractual commitments
27  it makes to various SDOs, those commitments have meaning only in relation to a
    particular IPR Policy of a particular SDO.
28

expert testimony that should not be admitted, a court's role is not to bless or explain any particular methodology. *United States v. Sarno*, 73 F.3d 1470, 1485 (9th Cir. 1995); *E.E.O.C. v. AutoZone, Inc.*, 809 F.3d 916, 923 (7th Cir. 2016) ("[T]he judge may and usually should leave the subject of the interpretation of the evidence to the argument of counsel."). The Court need only properly instruct the jury on the *legal* aspects of FRAND commitments (*e.g.,* they are contractual) and allow the jury to assess the evidence presented to reach decisions on the FRAND-related claims. *Noel v. Artson*, 641 F.3d 580, 587 (4th Cir. 2011) ("[G]ood jury instructions . . . let counsel argue factually in terms of a legal standard, rather than having the judge make counsel's particularized arguments for them".). It would be inappropriate for the Court to instruct the jury on *economic* principals.

Apple and the CMs appear to misunderstand this basic procedure because in their proposed jury instructions, they have asked the Court to give instructions on particular valuation methodologies. These have no place in jury instructions. For example, Apple seeks an instruction that FRAND royalties should be calculated based on the price of the "smallest salable unit" that practices the patent ("SSPPU") and has a close relation to the claimed invention.[44] Similarly, Apple has requested an instruction indicating that the jury may use a "top-down approach to determine whether a royalty is FRAND". Such instructions are improper, as they serve only to bolster the theories of Apple's experts. *See AutoZone, Inc.*, 809 F.3d at 923; *Noel*, 641 F.3d at 587.

As Apple and the CMs recognize, the parties have fact and expert witnesses that will discuss the issues associated with determining whether Qualcomm's offered royalties are FRAND. The Court should not bless (or critique) through jury instructions any of the methodologies offered by the expert witnesses.

2. Licensing of Component Chipsets

---

[44] For the reasons explained in Qualcomm's motion *in limine* to exclude testimony concerning component-level royalty base, SSPPU is inappropriate in this case.

1      Apple argues that Qualcomm is required by its FRAND commitments to ETSI,

2  ATIS and TIA to license the manufacture and sale of baseband chipsets.  That is

3  incorrect.  The plain text of the Policies requires licensing only the production and sale of

4  systems or devices (*i.e.*, infrastructure or handsets) and not the production or sale of

5  components (*e.g.*, chipsets).  Significantly, at the time the Policies were adopted and ever

6  since, the prevailing and widely acknowledged practice in the cellular industry has been

7  to license exclusively device manufacturing, not component making.  While these

8  Policies require the licensing of devices, they do not require the licensing of components.

9      The ETSI IPR Policy requires licensing only at the device level and does not

10  require component licensing for the reasons explained in Qualcomm's Rule 44.1

11  motion.[45]  While Qualcomm will not repeat its Rule 44.1 briefing here, Qualcomm's

12  argument in that brief is based on an examination of the precise language of the Policy, as

13  well as testimony regarding the intent of the drafters and a review of industry practice, all

14  factors to which a French court would look, and all factors that Apple fails to address.

15      Because the ETSI IPR Policy does not require component licensing, neither can the

16  ATIS or TIA IPR Policies.  ETSI has long been considered as having the leading IPR

17  policy in the cellular industry (Ex. 43 ¶ 8), and the governing rules among the relevant

18  SDOs require that their IPR policies remain "compatible".[46]  Apple acknowledges that

19  the IPR policies of ETSI, ATIS and TIA cannot be interpreted inconsistently. Because

20  ETSI does not require licenses to be made available for the manufacture and sale of

21  cellular chips, then, to be compatible with the ETSI IPR policy, the ATIS and TIA IPR

---

23  [45] The parties agree that the ETSI IPR Policy should be interpreted under French law, and the ATIS and TIA IPR Policies under California law.

24  [46] This requirement is well established.  Both ETSI and ATIS are Organizational

25  Partners of 3GPP.  3GPP develops technical specifications, which are, in turn, adopted by

26  its Organizational Partners into cellular standards for the regions governed by the Organizational Partner (such as Europe for ETSI and North America for ATIS).  (Ex. 18.)

27  The operating rules and procedures of 3GPP IPR policies require that the ETSI and ATIS IPR Policies be "compatible" with one another.  (*Id.*)

Policies cannot either.  For such licensing to be required under some SDO's policies and not required under others would introduce an obvious incompatibility.

Apple's argument that the ATIS and TIA IPR Policies require Qualcomm to license the manufacture and sale of chips relies heavily on Judge Koh's decision granting the FTC's motion for partial summary judgment.  *See FTC v. Qualcomm*, 2018 WL 5848999 (N.D. Cal. Nov. 6, 2018).  When Judge Koh decided the FTC's motion, she was not asked to determine whether the ETSI IPR Policy required licensing of baseband chip suppliers because the FTC moved only for partial summary judgment on whether the ATIS and TIA IPR Policies required Qualcomm to license its SEPs to component makers, explicitly excluding ETSI.  *See FTC*, 2018 WL 5848999, at *3.[47]

Apple's argument that the ATIS and TIA IPR Policies require SEP holders to license the manufacture and sale of chips also fails on its own terms, even apart from any consideration of the ETSI IPR Policy.  *First*, the ATIS and TIA IPR Policies, while requiring the licensing of cellular devices, do not require the licensing of cellular chips because cellular chips do not "implement" or "practice" the ATIS or TIA cellular standards respectively.  The ATIS licensing commitment requires that licenses be made available only to applicants "desiring to utilize the license for the purpose of implementing the [relevant ATIS] standard".  (App'x Doc. No. 17 at § 10.4.2.)  The 3GPP cellular standards adopted by ATIS ("3GPP Cellular Standards") specify the performance, interoperability and communication protocols between two broad "domains" of a cellular system:  (1) Infrastructure, which comprises fixed equipment such as base stations that send and receive wireless signals and relay those signals over

---

[47] Judge Koh declined to consider evidence that the ETSI IPR Policy does not require component licensing because it was unrelated to "circumstances surrounding the making" of the TIA and ATIS IPR Policies.  *SFTC*, 2018 WL 5848999, at *1 (relying upon *Pacific Gas & Electric Co. v. G.W. Thomas Drayage & Rigging Co.,* 69 Cal. 2d 33 (1968)).  But there is no such limitation.  In *Pacific Gas*, the California Supreme Court recognized that evidence not directly related to the circumstances of the making of the contract, such as trade usage and custom, could be admissible extrinsic evidence.  *Id.* at 39 n.6.

wired connections, and (2) User Equipment ("UE"), an operational device such as a smartphone. (Ex. 41 ¶ 7, 13.) By contrast, "the 3GPP Cellular Standards have no notion of modem chips, and the 3GPP Cellular Standards do not define a modem chip or how a modem chip should be implemented." (*Id.* ¶ 8.) Similarly, "3GPP Cellular Standards define and provide for testing to determine conformance of devices with the standards' requirements," and the "testing specifications are at the device level." (*Id.* ¶ 10.d.) The 3GPP Standards therefore show that, while a modem chip may *facilitate* compliance with a standard, based on its inclusion in an end user device, it cannot *achieve* by itself such compliance; actual implementation of the standard depends on the complete end-user device. (*Id.* ¶¶ 5, 8, 10.) Thus, Qualcomm's licensing commitments to ATIS do not require licenses to be made available for modem chips because they do not implement cellular standards; only complete end-user devices (and infrastructure) can do that.[48]

The TIA licensing commitment requires that licenses be made available to applicants only "to the extent necessary for the practice of [the relevant TIA standard]." (App'x Document No. 16 § 3.1.1.) TIA is the U.S. Organizational Partner of 3GPP2, a global collaborative partnership that, like 3GPP, has developed cellular standards. (Ex. 7.) 3GPP2 develops technical specifications, which are then adopted by their Organizational Partners into cellular standards. (*Id.*) Like the 3GPP technical specifications, the 3GPP2 technical specifications that have been adopted by TIA specify the protocols between two broad "domains" of a cellular system: (1) Infrastructure; and (2) Mobile Station, an operational device such as a smartphone (referred to as "User Equipment" in 3GPP parlance). (Ex. 42 ¶ 16.) The 3GPP2 standards do not define how a mobile station is constructed, nor do they define the components of a mobile station. (*Id.*) The standards include thousands of instances stating that the "mobile station shall"

---

[48] For its analysis of the ATIS standards, Qualcomm offers the declaration of Lorenzo Casaccia, a VP of Engineering of Qualcomm Technologies, Inc. Mr. Casaccia has been involved in 3GPP cellular standards development since 2001. (Ex. 41 ¶ 1.) Apple has not provided any proof regarding what it means to "implement" ATIS cellular standards.

1   meet some particular performance or communication requirement but do not provide that

2   a "modem chip" (or equivalent term) must meet any such requirement.  (*Id.*)  All testing

3   specifications are at the mobile station level.  (*Id.*)  The 3GPP2 standards simply have no

4   notion of modem chips, (*id.* ¶ 13), so the standards "cannot be practiced by a modem chip

5   by itself", (*id.* ¶ 17).[49]  Therefore, there can be no obligation to offer a FRAND license to

6   manufacture or sell modem chips under the TIA IPR Policy.[50]

7       Apple and the CMs focus upon the fact that the Policies do not create any

8   distinctions within the ***class of recipients*** entitled to invoke the SEP holders' FRAND

9   commitments.  But they never address the pertinent question of the ***scope of what must***

10  ***be licensed*** to that class.  Put differently, Apple and the CMs do not address whether the

11  ATIS or TIA Policies have any limitations on *what* (as opposed to *who*) must be licensed

12  under the IPR Policy.  Judge Koh's decision suffered from the same critical flaw.  In

13  particular, Judge Koh relied on the Ninth Circuit's decisions in *Microsoft Corp. v.*

14  *Motorola, Inc.*, 696 F.3d 872, 876 (9th Cir. 2012) ("*Microsoft II*"), and *Microsoft Corp.*

15  *v. Motorola, Inc.*, 795 F.3d 1024, 1031 (9th Cir. 2015), *FTC*, 2018 WL 5848999 at *10,

16  which discussed the IPR Policies of the International Telecommunications Union ("ITU")

17

---

18      [49] For its analysis of the TIA standards, Qualcomm offers the declaration of Dr.
19  Edward G. Tiedemann, Jr.  Dr. Tiedemann has led Qualcomm's standardization and
    industry activities since 1991 and been involved with TIA since 1992.  (Ex. 42 ¶ 1.)
20  Apple has not provided any proof regarding what it means to "practice" TIA standards.

21      [50] Apple relies on statements that Qualcomm owns SEPs with claims that are
    infringed by a typical modem chip.  That has no bearing on whether a modem chip
22  "implements" or "practices" an ATIS or TIA *standard*.  The ATIS and TIA IPR Policies
23  do not require SEP holders to license applicants for the purpose of implementing or
    practicing any *claim* of any *SEP*; rather, they require SEP holders to license applicants
24  for the purpose of implementing or practicing *the standards* as a whole.  A claim in a
    patent can specify a narrow function that could be infringed by a single component such
25  as a chip.  But a standard, unlike a patent claim, specifies hundreds, if not thousands, of
26  functions required to be carried out by handsets and infrastructure, each of which
    comprises hundreds of components.  (Ex. 41 ¶ 23.)

27

28

and the Institute of Electrical and Electronics Engineers ("IEEE") (neither of which are at issue in this case)—but did not address whether there were any limitations in the ITU or IEEE Policies as to the products that were required to be licensed.  Rather, the Ninth Circuit stated that many SDOs require SEP holders to license their SEPs "to all comers" on FRAND terms, *Microsoft II*, 696 F.3d at 885 (quoted in *FTC*, 2018 WL 5848999, at *10) and that the ITU IPR Policy had "no limitations as to who or how many applicants could receive a license", *id.* (*FTC*, 2018 WL 5848999, at *11)—a position with which Qualcomm agrees with regard to the IPR Policies at issue here.  But the central issue here—whether an IPR Policy requires licensing the sale and production of chips as well as devices—was never at issue in the *Microsoft* cases, and reliance on those cases for the outcome reached by Judge Koh is misplaced.

*Second*, the long-standing cellular industry practice for SEP owners to make licenses available for the manufacture and sale of end-user devices, but not for the manufacture and sale of components such as modem chips, confirms that the ATIS and TIA IPR Policies require device-level licensing but not component-level licensing.



.[51]  Device-level licensing

[52]  InterDigital's Ranae

---

[51]

[52]  Christina Petersson, Vice President of IPR and Legal Affairs,

1   McElvaine affirmed that ████████████████████████████████

2   ████████████████████████████████████████████████████

3   ██████████████████████████████

4        Even testimony from component makers confirms that the predominant industry

5   practice is to license only at the device level. ████████████████████

6   ████████████████████████████████████████████████

7   ████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████

9   ████████████████████████████████████████████

10   ████████████████████████████████████████████

11   ██████████████████████████████████████████████[53]

12        Dr. Bertram Huber, an expert in licensing practices in the cellular industry, gives

13   the opinion that ████████████████████████████████████████

14   ████████████████████████████████████████ (Ex. 35 at 3,

15   46-47.)  In a recent decision entered *after* Judge Koh's partial summary judgment

16   decision, a U.S. district court held that, under the ETSI IPR Policy, royalties are not

17   required to be calculated based on the price of the chip instead of the price of the device.

18   *HTC Corp. v. Telefonaktiebolaget LM Ericsson*, 2019 WL 126980, at *5 (E.D. Tex. Jan.

19   7, 2019).  In doing so, the court held, in language directly relevant here, that "[s]everal

20   independent sources confirm that the prevailing [cellular] industry standard or approach

21   has been to base FRAND licenses *on the end-user device* and not on the SSPPU."  *Id.*



[53] ███████████████████████████████████████

(emphasis added).  Thus, long-standing industry practice confirms that the ATIS and TIA IPR Policies do not require licensing of cellular chips.[54]

Apple's position that the ETSI, ATIS and TIA IPR Policies require licensing the manufacture or sale of component would radically reshape licensing in the cellular industry, not just for Qualcomm but for all cellular SEP holders that have made FRAND commitments and license only at the device level.  The industry practice of licensing exclusively at the device level refutes the scenario envisaged by Judge Koh, and relied upon by Apple and the CMs, whereby a SEP holder who makes chips might prevent another chip maker from selling chips to device makers, thereby achieving a monopoly.  *FTC*, 2018 WL 5848999, at *13.  The industry practice evidence shows that multiple current and former suppliers of modem chips do not have a single license for cellular SEPs, and that no SEP holder has ever tried to prevent them from selling components.  This telling absence leads to but one conclusion:  the ATIS and TIA IPR Policies do not mandate the grant of a license for the manufacture or sale of components.

## VI.    The Disclosure Obligation

### i.    Apple and the CMs' Position

The Court will need to interpret the scope of Qualcomm's disclosure obligations to TIA, ATIS, and ETSI—specifically, good faith and timing—in order for the jury to determine whether Qualcomm has complied with those obligations.  Compliance with the

---

[54] Evidence regarding industry practice was presented to Judge Koh, but contrary to Apple's suggestion, was not considered because she found it was not "tethered to an interpretation of any IPR Policy".  *FTC*, 2018 WL 5848999, at *13.  That was a mistake because testimony from SEP holders who have made FRAND commitments to SDOs is powerful evidence of the intent of the parties.  *Crestview Cemetery Ass'n v. Dieden*, 54 Cal. 2d 744, 754 (1960) ("[E]ven if it be assumed that the words standing alone might mean one thing to the members of this court, where the parties have demonstrated by their actions and performance that to them the contract meant something quite different, the meaning and intent of the parties should be enforced."); *Phoenix Tech. Ltd. v. VMware, Inc.*, 2017 WL 1289863, at *3 (N.D. Cal. Jan. 6, 2017).

SSOs' IPR policies is a necessary step in determining issues surrounding the FRAND commitment. Each of the IPR policies of the SSOs at issue has provisions covering the disclosure obligation. *See* Docs. 16-19 (TIA IPR Policy § 3.1.2; ATIS IPR Policy § 10.4.1; ETSI IPR Policy, cl. 4.1, 4.2, 15.7).

Under all three IPR policies, SEP owners have an obligation to make good faith efforts to timely disclose their IPR, i.e., patents and relevant patent applications, to SSOs. This obligation specifically applies when a SEP owner is participating in the development of a standard.[55] *See Core Wireless Licensing S.A.R.L. v. Apple Inc.*, 899 F.3d 1356, 1368 (Fed. Cir. 2018). Under California law, every contract imposes a duty of good faith and fair dealing in its performance. *Carma Developers*, 826 P.2d 726 (Cal. 1992). There is a parallel obligation under French law. *See* Apple and the CMs' Rule 44.1 Brief. Thus, Qualcomm has a good faith obligation to disclose its relevant IPR to TIA, ATIS, and ETSI.

Whether a SEP owner is acting in a manner consistent with its good faith obligation must be examined on a case-by-case, or disclosure-by-disclosure, basis and may be more meaningfully analyzed by considering what is "prohibited." *See Dr. Greens, Inc. v. Stephens*, 2012 WL 12846976, at *9 (S.D. Cal. Mar. 21, 2012) ("Exactly what constitutes bad faith remains to be determined on a case by case basis."). A French judge would similarly analyze a SEP owner's disclosure conduct. *See* Apple and the CMs' Rule 44.1 Brief.

Generally, SEP owners participating in a standard "should disclose intellectual property rights that they know are relevant to potential standards while the standard is being discussed and before the standard is adopted." *Apple, Inc. v. Motorola Mobility,*

---

[55] *In re Crystal Props., Ltd.*, 268 F.3d 743, 748 (9th Cir. 2001) (Courts "must interpret the contract in a manner that gives full meaning and effect to all of the contract's provisions."); *Avidity Partners, LLC v. State of Cal.*, 165 Cal. Rptr. 3d 299, 320 (Cal. App. 4th 2013) ("[T]he scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract.").

*Inc.*, 886 F. Supp. 2d 1061, 1068 (W.D. Wis. 2012). In the case of ETSI, "the policy clearly requires members to make efforts to disclose intellectual property rights before a standard is adopted." *Id.* at 1086. Thus, disclosure must be made no later than the date the standard was adopted. *Core Wireless*, 899 F.3d at 1368 (applying theory of unenforceability for implied waiver). Because the IPR policies of TIA and ATIS are similar to ETSI's, their disclosure obligations may be similarly interpreted.

### ii.   Qualcomm's Position

Although Apple and the CMs now argue that Qualcomm breached its obligation to SDOs to timely declare its IPRs, for the reasons stated in Qualcomm's motion *in limine* to exclude evidence concerning the timing of certain SEP disclosures, any reference to the issue of when Qualcomm disclosed any of its intellectual property rights ("IPRs") to ATIS and TIA should be stricken from this case.

As to the substance of the disclosure practices, Apple and the CMs have misstated the law. While the provisions in the IPR Policies of TIA, ATIS and ETSI concerning the disclosure of IPRs differ, none of them create a blanket rule requiring a SEP holder to disclose all of its SEPs prior to the adoption of a standard. The ATIS and TIA policies do not impose a binding contractual obligation to disclose IPRs at all, while under the ETSI policy, which is governed by French law, members shall use "reasonable endeavours" to disclose IPRs. This clause merely requires a reasonable attempt to disclose IPR.

The plain language of the TIA IPR Policy demonstrates that it imposes no obligation to disclose IPRs. Section 3.1.2 states, "TIA's Policy is to ***encourage, but not require***, the voluntary disclosure (preferably early) of" potentially essential IPRs. The use of the phrase "encourage, but not require" leaves no question that the Policy does not require disclosure of IPRs. (emphasis added) The word "encourage" means something different than an obligation to "require." *Associated/ACC Int'l, Ltd. v. Dupont Flooring Sys. Franchise Co.*, 2002 WL 32332751, at *3 (D. Del. Mar. 28, 2002), *aff'd*, 89 F. App'x 758 (3d Cir. 2004).

1    The same is true for the ATIS Policy. Section 10.4.1 of that Policy reads:

2    "disclosure of the patented invention ***should be encouraged*** at the earliest possible time

3    in the development of the standard". (emphasis added)  The use of the term "encouraged"

4    demonstrates the absence of a binding obligation. *Associated*, 2002 WL 32332751, at *3.

5    Moreover, the use of "should" reinforces that disclosure is not obligatory.  When

6    provisions "are stated in permissive (i.e., 'should'), as opposed to mandatory (i.e., 'shall')

7    terms . . . it would be anomalous to conclude [that they] impose a mandatory duty".

8    *Kirola v. City & Cty. of San Francisco*, 74 F. Supp. 3d 1187, 1265 (N.D. Cal. 2014), *aff'd*

9    *in part*, *rev'd in part*, 860 F.3d 1164 (9th Cir. 2017).

10    Finally, the ETSI IPR Policy is a French contract that must be interpreted

11    according to French law.  The parties have agreed to brief the disclosure obligation in the

12    ETSI IPR Policy in their Rule 44.1 briefs; Qualcomm only summarizes its argument here.

13    The obligation in Clause 4.1 to use "reasonable endeavours" to inform ETSI of essential

14    IPRs in a timely fashion and to "on a bona fide basis, draw the attention of ETSI" to

15    potentially essential IPR when submitting technical proposals is, under French law, an

16    "obligation of means".  In an obligation of means, "███████████████████████████████

17    ███████████████████████████████████████ (Ex. 40 at ¶ 4.A.)

18    Therefore, even if a disclosure is, in fact, *untimely*, that alone does not constitute a breach

19    of Clause 4.1; it must also be shown that there was a failure to exercise diligence.  (*Id.* at

20    4.) ████████████████████████. (Ex. 36 ¶ 54 .)  With regard to the timing of the

21    ETSI disclosure, while Apple now claims that "disclosure must be made no later than the

22    date the standard was adopted"█████████████████████████████████████

23    ████████████████████████████████████████████████████████████

24    ████████████████████████████████████████████████████████████

25    █████████████████████████████████████████

26

27

28

## VIII.  Essentiality

### i.  Apple and the CMs' Position

Qualcomm has identified a number of patents which it has declared essential to ETSI and contends are essential to ETSI standards.  However, Apple and the CMs contend that ETSI's IPR Policy defines "essential" such that patents directed to an optional portion of the standard do not meet that definition.  Clause 15 of the ETSI IPR Policy includes definitions for certain words used throughout the policy, including a definition for the term "essential."  *See* Doc. 19 (ETSI IPR Policy, cl. 15.6).  The Court will need to determine whether this term is clear and unambiguous, requiring no interpretation.  *See* Apple and the CMs' Rule 44.1 Brief.

### ii.  Qualcomm's Position

Because the interpretation of the ETSI IPR Policy is a matter of French law, Qualcomm's support for its position that patents relating to an optional part of the relevant ETSI standard *are* essential under the plain language of the ETSI IPR Policy will be set forth in full in its opposition Rule 44.1 briefing.

Dated:  February 15, 2019

Respectfully submitted,

By:    */s/ Evan R. Chesler*

Evan R. Chesler (pro hac vice)
(N.Y. Bar No. 1475722)
echesler@cravath.com
Keith R. Hummel (pro hac vice)
(N.Y. Bar No. 2430668)
khummel@cravath.com
Richard J. Stark (pro hac vice)
(N.Y. Bar No. 2472603)
rstark@cravath.com
Antony L. Ryan (pro hac vice)
(N.Y. Bar No. 2784817)
aryan@cravath.com
Gary A. Bornstein (pro hac vice)
(N.Y. Bar No. 2916815)
gbornstein@cravath.com
J. Wesley Earnhardt (pro hac vice)
(N.Y. Bar No. 4331609)
wearnhardt@cravath.com
Yonatan Even (pro hac vice)
(N.Y. Bar No. 4339651)
yeven@cravath.com
Vanessa A. Lavely (pro hac vice)
(N.Y. Bar No. 4867412)
vlavely@cravath.com
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

David A. Nelson (pro hac vice)
(Ill. Bar No. 6209623)
davenelson@quinnemanuel.com
Stephen Swedlow (pro hac vice)
(Ill. Bar No. 6234550)
stephenswedlow@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
500 West Madison St., Suite 2450
Chicago, Illinois 60661
Telephone:  (312) 705-7400
Facsimile:  (312) 705-7401

Alexander Rudis (pro hac vice)
(N.Y. Bar No. 4232591)
alexanderrudis@quinnemanuel.com

1  QUINN EMANUEL URQUHART &
   SULLIVAN, LLP
2  51 Madison Ave., 22nd Floor
   New York, New York 10010
3  Telephone: (212) 849-7000
   Facsimile: (212) 849-7100

4  Sean S. Pak (SBN 219032)
   seanpak@quinnemanuel.com
5  QUINN EMANUEL URQUHART &
   SULLIVAN, LLP
6  50 California St., 22nd Floor
   San Francisco, California 94111
7  Telephone: (415) 875-6600
   Facsimile: (415) 875-6700
8
   Karen P. Hewitt (SBN 145309)
9  kphewitt@jonesday.com
   4655 Executive Drive, Suite 1500
10 JONES DAY
   San Diego, California 92121
11 Telephone:  (858) 314-1200
   Facsimile:  (858) 345-3178
12
   Attorneys for Defendant and
13 Counterclaim-Plaintiff Qualcomm
   Incorporated
14

15 By: _William A. Isaacson_

16 Juanita R. Brooks, SBN 75934,
   brooks@fr.com
17 Seth M. Sproul, SBN 217711,
   sproul@fr.com
18 FISH & RICHARDSON P.C.
   12390 El Camino Real
19 San Diego, CA 92130
   Phone: 858-678-5070 / Fax: 858-678-5099
20
   Ruffin B. Cordell, DC Bar No. 445801,
21 _pro hac vice_, cordell@fr.com
   Lauren A. Degnan, DC Bar No. 45421,
22 _pro hac vice_, degnan@fr.com
   FISH & RICHARDSON P.C.
23 1000 Maine Avenue, S.W., Suite 1000
   Washington, DC 20024
24 Phone: 202-783-5070 / Fax: 202-783-2331

25 William A. Isaacson, DC Bar No. 414788,
   _pro hac vice_, wisaacson@bsfllp.com
26 Karen L. Dunn, DC Bar No. 1002520,
   _pro hac vice_, kdunn@bsfllp.com
27 BOIES SCHILLER FLEXNER LLP
28

1401 New York Avenue, N.W.
Washington, DC 20005
Phone: 202-237-2727 / Fax: 202-237-6131

*Attorneys for Plaintiff and Counterclaim
Defendant Apple Inc.*

By:  *Jason C. Lo*

Theodore R. Boutrous, Jr., SBN 132099,
tboutrous@gibsondunn.com
Richard J. Doren, SBN 124666
rdoren@gibsondunn.com
Daniel G. Swanson, SBN 116556,
dswanson@gibsondunn.com
Michele L. Maryott, SBN 191993
mmaryott@gibsondunn.com
Jason C. Lo, SBN 219030,
jlo@gibsondunn.com
Jennifer J. Rho, SBN 254312,
jrho@gibsondunn.com
Melissa Phan, SBN 266880,
mphan@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Tel: (213) 229-7000; Fax: (213) 229-7520

Cynthia Richman, DC Bar No. 492089,
*pro hac vice*
crichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Tel: (202) 955-8500; Fax: (202) 467-0539

*Attorneys for Defendants,
Counterclaimants, and Third-Party
Plaintiffs Compal Electronics, Inc., FIH
Mobile Ltd., Hon Hai Precision Industry
Co., Ltd., Pegatron Corporation, and
Wistron Corporation*

Hugh F. Bassanger, *pro hac vice*
hugh.bangasser@klgates.com
Christopher M. Wyant, *pro hac vice*
chris.wyant@klgates.com
J. Timothy Hobbs, *pro hac vice*
tim.hobbs@klgates.com
K&L GATES LLP
925 Fourth Avenue, Suite 2900
Seattle, Washington 98104
Tel: (206) 623-7580; Fax: (206) 370-6371

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Caitlin C. Blanche, SBN 254109,
caitlin.blanche@klgates.com
K&L GATES LLP
1 Park Plaza Twelfth Floor
Irvine, CA 92614
Tel: (949) 253-0900; Fax (949) 253-0902

*Attorneys for Defendant, Counterclaimant,
and Third-Party Plaintiff Wistron
Corporation*