# Exhibit G

1
2
3
4
5
6
7
8
9
10
11
12
13

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

14

| | |
|---|---|
| IN RE: QUALCOMM LITIGATION | No. 3:17-cv-0108-GPC-MDD |

**EXHIBIT G:  QUALCOMM INCORPORATED'S PROPOSED JURY INSTRUCTIONS WITH OBJECTIONS**

Judge:      Hon. Gonzalo P. Curiel
Courtroom: 2D
Date:        March 28, 2019
Time:        1:30 p.m.

15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **QUALCOMM'S PROPOSED JURY INSTRUCTIONS**

Pursuant to the Court's December 19, 2018 Order, Federal Rule of Civil Procedure 51 and Local Rule 51.1, Qualcomm, Inc. ("Qualcomm") submits these Proposed Jury Instructions.

Qualcomm's Proposed Jury Instructions do not include instructions regarding claims and defenses to be decided by the Court or defenses that were not asserted in the Final Pretrial Conference Order, which are:  Apple Counts III (Violation of Cal. Civ. Code § 1671(b)), IV (Declaratory Relief:  BCPA, bullets 2, 3 and 6), LX (Declaratory Relief:  STA Assignment Agreement), LXI (Declaratory Relief:  SULAs) and LXIII (Violations of the California UCL); and CM Counts IV (Violations of the California UCL), VII (Promissory Estoppel), and XII (Declaration of Unenforceability re:  SULAs); Qualcomm defenses (against Apple) 1 (to the extent it alleges failure to state a claim), 3-4, 6, 13-15, 17, 23-25, 28-30 and 36; Qualcomm defenses (against the CMs) 1 (to the extent it alleges failure to state a claim), 3-4, 6, 20, 24-26 and 31; Apple defenses 1 (to the extent it alleges failure to state a claim), 3-4, 6-10, 12, 16-17, 23-25, 28-30, 32-35 and 37-39; and CM defenses 1 (to the extent it alleges failure to state a claim), 2, 3 (to the extent it challenges subject matter jurisdiction), 6-8, 9 (except as to the question of whether Qualcomm violated its FRAND commitments, the Sherman Act or the Cartwright Act), 10-11, 12 (except with regard to Qualcomm's compliance with FRAND), 14, 16-22, 29 (as to laches) and 31-36.  In addition, Qualcomm's Proposed Jury Instructions do not include instructions regarding defenses that were not asserted in the pleadings.

# **TABLE OF CONTENTS**

## **PRELIMINARY INSTRUCTIONS**

Claims and Defenses................................................................................2

## **PATENT**

Patents—General—Introduction ............................................................7

Patents—General—Invalidity ............................................................. 12

Patents—General—Exhaustion ........................................................... 15

## **BREACH OF CONTRACT**

Breach of Contract—The Parties' Contract Claims ...............................21

Contract Formation —Essential Factual Elements ...............................23

Breach of Contract—Essential Factual Elements ................................25

Disputed Term (BCPA) ......................................................................27

Meaning of Words Defined By Contract (All Contracts) ......................29

Meaning of Ordinary Words (All Contracts) ......................................32

Meaning of Technical Words (All Contracts) .....................................34

Construction of Contract as a Whole (All Contracts) ..........................36

Construction of Contract By Conduct (All Contracts)..........................38

Occurrence of Agreed Condition Precedent (BCPA).............................40

ETSI FRAND Commitment ................................................................42

Breach of Implied Covenant of Good Faith—Essential Factual Elements

   (BCPA, FRAND and SULAs) ..........................................................44

Introduction to Contract Damages......................................................46

Breach of Contract—Obligation to Pay Money Only ...........................48

Causation ..........................................................................................49

Contract Damages—Jurors Not To Consider Attorney Fees and Court Costs .......51

# TORTIOUS INTERFERENCE

Tortious Interference—Essential Elements ............................................................ 53

Tortious Interference—Introduction to Tort Damages ......................................... 55

Tortious Interference—Punitive Damages ............................................................ 57

# UNJUST ENRICHMENT

Affirmative Defense—Mistake (BCPA) ................................................................ 63

Unjust Enrichment—Essential Factual Elements ................................................. 66

# WAIVER

Waiver Claim (FRAND) ........................................................................................ 70

# NEGLIGENT MISREPRESENTATION

Negligent Misrepresentation ................................................................................. 72

Negligent Misrepresentation—Introduction to Tort Damages ............................. 74

# ANTITRUST LAW

Patents—General—Relation to Antitrust Laws .................................................... 76

Freedom To Set Prices ......................................................................................... 78

# SECTION 1 OF THE SHERMAN ACT AND SECTIONS 16720 AND 16727 OF THE CARTWRIGHT ACT

Section 1 of the Sherman Act and Sections 16720 and 16727 of the
    Cartwright Act—General ................................................................................. 80

Section 1 of the Sherman Act and Sections 16720 and 16727 of the
    Cartwright Act—General—Rule of Reason—Overview ................................. 82

Section 1 of the Sherman Act and Sections 16720 and 16727 of the
    Cartwright Act—General—Rule of Reason—Proof of Competitive Harm ....... 84

Section 1 of the Sherman Act and Sections 16720 and 16727 of the
Cartwright Act—General—Rule of Reason—Evidence of Competitive
Benefits ................................................................................................ 87

Section 1 of the Sherman Act and Sections 16720 and 16727 of the
Cartwright Act—General—Rule of Reason—Balancing the Competitive
Effects ................................................................................................. 88

Section 1 of the Sherman Act and Sections 16720 and 16727 of the
Cartwright Act—Contract—Definition, Existence, and Evidence .................... 89

Section 1 of the Sherman Act and Sections 16720 and 16727 of the
Cartwright Act—Tying Arrangements ................................................. 94

Section 1 of the Sherman Act and Sections 16720 and 16727 of the
Cartwright Act—Rationale For Prohibition of Tying Arrangements ................. 96

Section 1 of the Sherman Act and Sections 16720 and 16727 of the
Cartwright Act—Unlawful Tying ....................................................... 99

Section 1 of the Sherman Act and Sections 16720 and 16727 of the
Cartwright Act—Tying Under Rule of Reason—Presence of Two
Products or Items ............................................................................ 103

Section 1 of the Sherman Act and Sections 16720 and 16727 of the
Cartwright Act—Proof of Conditioning .............................................. 105

Section 1 of the Sherman Act and Sections 16720 and 16727 of the
Cartwright Act—Existence of Market Power With Respect to the Tying
Product ........................................................................................... 108

Section 1 of the Sherman Act and Sections 16720 and 16727 of the
Cartwright Act—Foreclosure of a Substantial Volume of Commerce with
Respect to the Tied Product ............................................................... 112

Section 1 of the Sherman Act and Sections 16720 and 16727 of the
Cartwright Act—Business Justification Defense ............................................. 115

Section 1 of the Sherman Act and Sections 16720 and 16727 of the
Cartwright Act—Exclusivity Terms.................................................................. 117

## <u>SECTION 2 OF THE SHERMAN ACT</u>

Section 2 of the Sherman Act—Monopolization —General—Elements.............. 120

Section 2 of the Sherman Act—Monopolization—Monopoly Power Defined .... 125

Section 2 of the Sherman Act—Monopolization—Relevant Market—
General ............................................................................................................. 128

Section 2 of the Sherman Act—Monopolization—Relevant Product Market...... 130

Section 2 of the Sherman Act—Monopolization—Relevant Product
Market—Supply Substitutability ...................................................................... 133

Section 2 of the Sherman Act—Monopolization—Existence of Monopoly
Power—Indirect Proof ...................................................................................... 136

Section 2 of the Sherman Act—Monopolization—Existence of Monopoly
Power—Direct Proof ......................................................................................... 139

Section 2 of the Sherman Act—Monopolization—Willful Acquisition or
Maintenance of Monopoly Power...................................................................... 143

Section 2 of the Sherman Act—Unilateral Refusal To Deal with a
Competitor ........................................................................................................ 147

Section 2 of the Sherman Act—Sham Litigation ................................................ 151

## <u>ANTITRUST LAW CAUSATION AND DAMAGES</u>

Clayton Act Section 4 and the Cartwright Act Requirements—Injury and
Causation........................................................................................................... 155

Clayton Act Section 4 Requirements—Introduction—Business or Property ....... 160

Antitrust Damages—Introduction and Purpose ................................................ 162

Antitrust Damages—Basis for Calculating Damages ........................................ 165

Antitrust Claims—Causation and Disaggregation ............................................ 168

Causation and Damages—Damages for Tying Arrangements ............................ 171

Causation and Damages—Multiple Plaintiffs .................................................. 174

Causation and Damages—Plaintiffs' Participation ........................................... 175

Damages on Multiple Legal Theories .............................................................. 178

## **<u>AFFIRMATIVE DEFENSES</u>**

Affirmative Defenses Are Not Evidence ........................................................... 180

Affirmative Defense—Waiver ........................................................................ 181

Affirmative Defense—Unjust Enrichment ....................................................... 185

Affirmative Defense—Statute of Limitations ................................................... 188

Affirmative Defense—Ratification, Agreement, Acquiescence or Consent ........ 192

Affirmative Defense—Failure To Mitigate (Breach of Contract and Tortious

    Interference) ............................................................................................. 195

Affirmative Defense—Antitrust Mitigation ..................................................... 197

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **PRELIMINARY INSTRUCTIONS**

**QUALCOMM'S REQUESTED PRELIMINARY INSTRUCTION NO. 1**

**CLAIMS AND DEFENSES**

To help you follow the evidence, I will give you a brief summary of the positions of the parties:

Apple asserts the following claims against Qualcomm:

1.　　that Qualcomm breached a contract called the Business Cooperation and Patent Agreement (or "BCPA");

2.　　that Qualcomm breached the covenant of good faith and fair dealing implied in the BCPA; and

3.　　that Qualcomm engaged in anticompetitive behavior prohibited by Federal competition law.

Apple has the burden of proving these claims.

Qualcomm denies Apple's claims and also asserts the following claims against Apple:

1.　　that Apple tortiously interfered with Qualcomm's Subscriber Unit License Agreements (or "SULAs") with the Contract Manufacturers (or "CMs").

2.　　that Apple breached the BCPA;

3.　　that Apple breached the covenant of good faith and fair dealing implied in the BCPA;

4.　　that Apple is liable to Qualcomm under the doctrine of unjust enrichment for the money paid pursuant to the BCPA; and

5.　　that Apple breached a contract known as the February 28, 2013 Statement of Work Agreement (or "2013 SOW").

Qualcomm has the burden of proof on these claims.

Qualcomm also contends:

1.     that Qualcomm satisfied with respect to Apple its commitment to the European Telecommunications Standards Institute ("ETSI") that it would be prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory ("FRAND") terms and conditions with respect to Apple.

2.     that Qualcomm's SULAs with the CMs do not violate its ETSI FRAND commitment; and

3.     that Qualcomm's SULAs with the CMs do not violate Federal competition law.

Apple has the burden of disproving these claims.

Apple denies Qualcomm's claims.

Qualcomm also asserts the following claims against the CMs:

1.     that each CM breached its SULA with Qualcomm; and

2.     that each CM breached its Master Software Agreement (or "CM MSA") with Qualcomm.

Qualcomm has the burden of proving these claims.

The CMs deny Qualcomm's claims and also contend:

1.     that Qualcomm breached its SULA with each CM;

2.     that Qualcomm breached the covenant of good faith and fair dealing implied in its SULA with each CM;

3.     that Qualcomm breached its ETSI FRAND commitment with respect to the CMs;

4.     that Qualcomm breached the covenant of good faith and fair dealing implied in connection with its ETSI FRAND commitment;

5.      that Qualcomm waived its right to collect royalties from the CMs;

6.      that Qualcomm is liable to the CMs for negligent misrepresentation; and

7.      that Qualcomm engaged in anticompetitive behavior prohibited by Federal and California competition law.

The CMs have the burden of proof on these claims.

Qualcomm denies the CMs' claims.

Each party also asserts various affirmative defenses to these claims, which I will instruct you on later.



*Compare* Ninth Circuit Model Civil Jury Instructions (2017 Edition, Updated Sept. 2018) 1.5

Given  _____

Denied  _____

Withdrawn  _____

Modified  _____

## APPLE AND CMS' OBJECTIONS

Apple and the CMs object to this instruction on the grounds that it omits the issues on which Apple and the CMs seek an advisory jury, as reflected in Apple and the CMs' proposed parallel instruction.  Apple objects to Qualcomm's instruction that Apple has the burden of proof on Qualcomm's FRAND-related claims as misleading and likely to confuse the jury.  Qualcomm identifies no support for its position that the burden shifts to Apple by Qualcomm's assertion of the claim alone.  While the parties agree that the FRAND commitment may be

treated as a contract term, the specific Counts relate to claims made by Qualcomm, but Apple is not a party to that contract.  Qualcomm has entered into contracts with various SSOs and by doing so has committed to licensing certain patents according to the FRAND commitment.  "It is a fundamental rule that the burden of proof in its primary sense rests upon the party who, as determined by the pleadings, asserts the affirmative of an issue and it remains there until the termination of the action." *Pac. Portland Cement Co. v. Food Mach. & Chem. Corp.*, 178 F.2d 541, 547 (9th Cir. 1949).  Qualcomm has affirmatively asserted in its Counterclaims II and IV that it has satisfied its contractual obligations to ETSI.  Thus, at a minimum, Qualcomm has the burden to first make out a *prima facie* case that it has satisfied its FRAND commitment.

1

2

3

4

5

6                                    **<u>PATENTS</u>**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 2
## PATENTS—GENERAL—INTRODUCTION

This is not a patent case.  There are no claims in this case by any party under the patent laws.  This is a licensing contract dispute.  You have heard about patents because the contract dispute relates to licensing the rights to use patents.  To give you some background about patents that may help you in your deliberations, I will briefly give you some general information about patents and will explain the patent concepts of infringement, invalidity and exhaustion.  But you are not being asked to decide those patent law issues.

The basic policy of the patent laws is to encourage inventors to reveal new, useful, and nonobvious technology to the public, in exchange for the grant by the U.S. government of a patent on their inventions.

To receive a patent, an inventor pays a fee and submits an application to the U.S.  Patent and Trademark Office (Patent Office).  The Patent Office reviews the application and, if it finds that the application adequately describes a new, useful and nonobvious invention, it grants, or "issues," a patent to the inventor.  The inventor may keep the patent or assign it to some other person or entity.  The owner of the patent is called the patentee.  The patent provides the patentee the right, for a specified number of years, to exclude others from making, using, offering for sale, selling or importing the patented invention throughout the United States without the permission of the owner of the patent.  This potential economic reward gives people an incentive to invest time, money, and effort in research and development.

Every inventor who applies for a patent must provide details of his or her invention to the Patent Office.  When the Patent Office issues a patent, a

description of the invention is included in a publicly filed document that describes the innovation, as well as claims that precisely define what the patent covers. This public filing allows anyone to find out what was invented and how it works. Thus, other researchers can learn from a patent owner's work and can make other inventions of their own.

An inventor who receives a patent may sell, or "assign," his or her patent to someone else. Frequently, employees working for a corporation agree to assign any patents they receive to their employer. The buyer of a patent acquires all of the rights that the original patent holder had.

A patent gives the patentee, for 20 years, the right to exclude anyone else from making, using, offering for sale, or selling throughout the United States or importing the invention into the United States the patented invention. Using a patented invention within the 20-year period without the patent owner's permission is called "patent infringement" or "infringing the patent". The patentee may enforce the right to exclude by bringing a lawsuit to stop the alleged infringement, to recover damages for the alleged infringement, or both.

A patent owner may give someone else permission to make, use, offer for sale, sell or import the patented invention. This is called licensing the patent, and the permission usually is formally set out in a patent license agreement. In the context of a license, the patent owner may be referred to as the "licensor", and the firm or person receiving permission to use the patent is called the "licensee" or "license holder". A licensor may license the patent individually or as part of a portfolio of patents.

Sometimes, two entities or persons both own separate patents, and give each other permission to use the other's patented inventions. Such arrangements are

1   known as "cross licenses."

2         Inventors may also file for patents in foreign countries.  A patent granted by

3   a foreign country is regarded as entirely separate and independent from any U.S.

4   patents and is governed by the laws of the issuing country.  Although patent laws

5   vary in many respects across countries, there are certain features that are common

6   to all countries.  Some common features are that the patented invention must be

7   new and that the patent holder has the right to exclude others from using the

8   patented invention for the duration of the patent.  The patent holder may enforce

9   the right to exclude by bringing a lawsuit in the country that granted the patent.

10

11

12   *Compare* ABA Model Jury Instructions in Civil Antitrust Cases at 175

13   (2016 Edition); 2 Baxter, World Patent Law & Practice § 1.01 (2018); 7 Pat. L.

14   Fundamentals §§ 21:3-21:4 (2d ed.)

15   Given  _____

16   Denied  _____

17   Withdrawn  _____

18   Modified _____

19

20

21

22

23

24

25

26

27   **EXHIBIT G:  QUALCOMM'S**         -9-         **CASE NO. 3:17-CV-0108-GPC-MDD**
**PROPOSED JURY INSTRUCTIONS**

28   **WITH OBJECTIONS**

## APPLE AND CMS' OBJECTIONS

Apple and the CMs object to Qualcomm's instruction as misleading and outside the scope of the claims.  Apple and the CMs have crafted instructions that not only educate the jury about patents generally, but also include basic descriptions of general patent issues that are relevant here, such as infringement, invalidity, and unenforceability.  Apple and the CMs also include instructions relating to standard essential patents (SEPs) and standard setting organizations (SSOs), which are relevant to the issues in this case, including FRAND-related claims and defenses.  Apple and the CMs' proposed instructions on patent issues originate in model instructions from sources very familiar with patent law—the United States District Court for the Northern District of California and the American Intellectual Property Law Association (AIPLA).  In patent infringement cases, parties regularly rely on model instructions from these sources because they are accessible to juries and well-grounded in patent law.

In contrast, Qualcomm's instructions are lengthy, complex, and introduce concepts that are irrelevant to the claims and defenses here.  For example, Qualcomm's instruction purports to instruct the jury about patent assignment, but there are no allegations here related to patent ownership.  Qualcomm's instruction also includes inappropriate argument because it offers a one-sided, misleading characterization of this case:  "[T]his is not a patent case. . . . This is a licensing contract dispute."  A key issue in this case is Qualcomm's failure to comply with its FRAND commitments for *standard essential patents*.  As such, the instruction that this case "is not a patent case" will confuse and mislead the jury as the case is most certainly about patents and patent issues.  Apple and the CMs object to the

entire first paragraph of Qualcomm's instruction, except for the fifth sentence ("To give you some general background . . . .").

Finally, Qualcomm has inserted, without model or case law support, a final paragraph related to obtaining patents in foreign countries.  The only issue of foreign law noticed in this case relates to the ETSI IPR Policy, pursuant to which Qualcomm has agreed to license its SEPs on FRAND terms.  *See* ECF No. 496.  Any attempt by Qualcomm to introduce foreign law issues in its jury instructions without proper notice under Rule 44.1 should be rejected on that basis alone.  An instruction that raises issues of ***foreign*** patent law in a case where none exists will confuse the jury.  Furthermore, Qualcomm presents an incomplete, self-serving description of the "features that are common to all countries" because Qualcomm notably omits "patent exhaustion."

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 3
## PATENTS—GENERAL—INVALIDITY

You have heard the term "patent invalidity" during this trial.  Patent invalidity is not a claim; it is a defense to a claim of infringement of a U.S. patent. There is no claim for patent infringement in this case, and therefore no defense of patent invalidity is at issue in this case either.

A patent is presumed to be valid.  In other words, it is presumed to have been properly granted by the PTO.  But that presumption of validity can be overcome in a patent infringement case if the alleged infringer proves by clear and convincing that the patent is invalid.

Even if a patent is proved to be invalid, that is not determinative of a party's contract rights.  A patent holder's right to receive royalties under a patent license is a contract right.

*See* 2018 AIPLA Model Patent Jury Instructions at 2-6; *Verance Corp. v. Digimarc Corp.*, No. 10–831, 2011 WL 2182119, at *6-7 (D. Del. Jun. 2, 2011) (rejecting a patent licensee's argument that "a finding of invalidity would render the License Agreement void and unenforceable", because where "the License Agreement is not contingent on the validity of the patent", "a declaration of invalidity or non-infringement would not obviate [the licensee's] royalty obligation under its terms as a matter of federal patent law").

Given  _____

Denied  _____

Withdrawn  _____

Modified _____

## **APPLE AND CMS' OBJECTIONS**

Apple and the CMs object to Qualcomm's instruction in its entirety as incorrect and incomplete.

First, Qualcomm improperly characterizes patent invalidity as only "a defense to a claim of infringement of a U.S. patent" and asserts that the concept is not relevant in this case because Qualcomm is not asserting patent infringement. Qualcomm ignores that several claims and defenses implicate Qualcomm's failure to comply with its FRAND commitments for SEPs, as well as Qualcomm's position that specific SEPs and NEPs are useful in establishing value for its portfolio. As to SEPs, Qualcomm's FRAND commitments require Qualcomm to charge fair, reasonable, and non-discriminatory royalties. And for NEPs, Qualcomm must prove the patent merits before it can use a patent to show value. The measure of patent royalties is governed by substantive patent law, which makes clear that patent owners are not entitled to royalties for patents that are not infringed or that are invalid, exhausted, unenforceable, or expired. *See, e.g.*, *Kimble v. Marvel Entm't, LLC*, 135 S. Ct. 2401, 2405 (2015) ("[A] patent holder cannot charge royalties for the use of his invention after its patent term has expired."); *see MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 135 (2007). Qualcomm's assertions that "[e]ven if a patent is proved to be invalid, that is not determinative of a party's contract rights" and "[a] patent holder's right to receive royalties under a patent license is a contract right" is misleading. For example, Apple and the CMs seek declarations that the patent license agreements between Qualcomm and the CMs (the SULAs) are unenforceable as against public policy because, *inter alia*, Qualcomm has violated its FRAND commitment. Because

patent invalidity is relevant to FRAND, Qualcomm's proposed instruction incorrectly tells the jury that they cannot find the SULAs unenforceable because they require payments for invalid patents.  Qualcomm's assertion that "[a] patent holder's right to receive royalties under a patent license is a contract right" does not belong in an instruction relating to patent invalidity.  If anywhere, it belongs in connection with the breach of contract collection of instructions.

Qualcomm's instruction is also incomplete.  Qualcomm's instruction merely tells the jury about a presumption of invalidity without explaining any principle under which the jury should evaluate invalidity, such as anticipation and obviousness.  *See* Apple and CMs' Proposed Instruction No. 59: Invalidity.  As a result, the instruction incorrectly skews the jury against finding that Qualcomm's patents are invalid.

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 4

## PATENTS—GENERAL—EXHAUSTION

You have heard the term "patent exhaustion" during this trial.  Patent exhaustion is not a claim; it is a defense to a claim of infringement of a U.S. patent. There is no claim for patent infringement in this case, and therefore no defense of patent exhaustion is at issue in this case either.

To prove the defense of patent exhaustion with respect to a particular article in a patent infringement case (which, again, this is not), a party would have to prove by a preponderance of the evidence:

1. That the patent holder authorized the sale of a particular article;

2. That the article embodies the essential or inventive features of the allegedly infringed patent;

3. That the only reasonable and intended use of the article is to practice the invention claimed by the allegedly infringed patent; and

4. That, if a product incorporating the article infringes the patent, it is solely because the article, on its own, substantially embodies the patent.

A defendant in a patent infringement case would have to prove each of these elements in order to prevail on the defense of patent exhaustion.

Even if a patent is proved to be exhausted, that is not determinative of a party's contract rights.  A patent holder's right to receive royalties under a patent license is a contract right.

*See* ECF 737 at 11 ("Under *Lexmark*, Qualcomm's patent rights are not determinative of Qualcomm's contract rights."); *Impression Products, Inc. v. Lexmark International, Inc.*, 137 S. Ct. 1523, 1533 (2017) (following an exhaustive sale, "whatever rights Lexmark retained are a matter of the contracts "); *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617, 637 n.7 (2008) ("We note that the authorized nature of the sale to Quanta does not necessarily limit LGE's other contract rights.  LGE's complaint does not include a breach-of-contract claim, and we express no opinion on whether contract damages might be available even though exhaustion operates to eliminate patent damages."); *Keeler v. Standard Folding Bed Co.*, 157 U.S. 659, 661 (1895) ("Where the patentee has not parted, by assignment, with any of his original rights, but chooses himself to make and vend a patented article of manufacture, it is obvious that a purchaser can use the article in any part of the United States, and, unless restrained by contract with the patentee, can sell or dispose of the same."); *ExcelStor Tech., Inc. v. Papst Licensing GMBH & Co. KG*, 541 F.3d 1373, 1377 (Fed. Cir. 2008) ("Patent exhaustion prohibits patentees from enforcing patent rights in certain circumstances, but it does not forbid multiple licenses on a single product or even multiple royalties.").

Given  _____

Denied  _____

Withdrawn  _____

Modified  _____

## **APPLE AND CMS' OBJECTIONS**

Apple and the CMs object to Qualcomm's instruction in its entirety as incorrect and incomplete.

First, Qualcomm improperly characterizes patent exhaustion as a defense to patent infringement only, and asserts that the concept is not relevant in this case because Qualcomm is not asserting patent infringement.  Qualcomm ignores that several claims and defenses rely on the patent exhaustion doctrine, including the CMs' Count I (Violation of Sherman Act § 2), CMs' Count V (Breach of Contract – FRAND Commitments), CMs' Count VIII (Declaration that Qualcomm did not comply with FRAND commitments), Apple's Affirmative Defense to Count II (Declaration that SULAs Do Not Violate FRAND), and Apple's Affirmative Defense to Count IV (Declaratory Judgment that Qualcomm satisfied FRAND commitments to ETSI with respect to Apple).  *See also* 10-26-2018 Hr'g Tr. at 33:16-19 (Mr. Chesler, on behalf of Qualcomm: "***Exhaustion will absolutely, undoubtedly, be part of this trial***.  We understand that because it has been, from day one, part of Apple's argument, this double-dipping argument . . . ."  (emphasis added)); *id.* at 7:21-24 (Mr. Chesler stating "I could see, for example, a situation where the issue of exhaustion might relate to the license agreement claims . . . or with respect to the FRAND claims.").  Therefore, the jury must be instructed on the issue of patent exhaustion and should not be told that its relevance is limited to only patent infringement actions.

Second, Qualcomm misstates the elements of patent exhaustion.  The test does not include the phrase: "***if a product incorporating the article infringes the patent, it is solely because the article, on its own,*** substantially embodies the patent" (emphases added).  The focus of the inquiry is not the sale of an allegedly infringing product but rather whether a particular sale is authorized and whether the sold item is a "patented article" or an article that "substantially embodies" a patent claim.  *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 625 (2008)

1   ("The longstanding doctrine of patent exhaustion provides that the ***initial***

2   ***authorized sale of a patented item*** terminates all patent rights to that item."

3   (emphasis added)); *JVC Kenwood Corp. v. Nero, Inc.*, 797 F.3d 1039, 1046 (Fed.

4   Cir. 2015) ("Exhaustion is triggered only by a sale authorized by the patent holder,

5   whereby if the thing that is sold 'substantially embodies' patented subject matter

6   owned by the entity that authorized the sale, then the patent is exhausted as to the

7   thing sold." (internal citations omitted)); *Keurig, Inc. v. Sturm Foods, Inc.*, 732

8   F.3d 1370, 1373 (Fed. Cir. 2013). "[T]he traditional bar on patent restrictions

9   following the sale of an item applies when the item sufficiently embodies the

10  patents—even if it does not completely practice the patent—such that its only and

11  intended use is to be finished under the term of the patent." *Quanta*, 553 U.S. at

12  628, 637. There is no requirement that the "article, ***on its own***, substantially

13  embod[y] a patent." A product "substantially embodies" a patent "if (1) the only

14  reasonable and intended use of the article is to practice the allegedly exhausted

15  patent; and (2) the article embodies the essential or inventive features of the

16  allegedly exhausted patent." *JVC Kenwood Corp.*, 797 F.3d at 1046.

17       Third, Qualcomm's assertions that "[e]ven if a patent is exhausted with

18  respect to a particular product, that is not determinative of a party's contract rights"

19  and "[a] patent holder's right to receive royalties under a patent license is a

20  contract right," are misleading. Apple and the CMs bring claims that the contracts

21  at issue—the SULAs—are unenforceable, *inter alia*, because they violate public

22  policy, including that embodied in the long-standing doctrine of patent exhaustion.

23  *See, e.g.*, Apple's Count LXI (Declaration of Rights Under Qualcomm's

24  Agreements with Apple's CMs). Apple and the CMs assert defenses based on this

25  same principle. *E.g.*, Apple's Affirmative Defense to Qualcomm's Count II

26

27  **EXHIBIT G: QUALCOMM'S**          **-18-**          **CASE NO. 3:17-CV-0108-GPC-MDD**
    **PROPOSED JURY INSTRUCTIONS**

28  **WITH OBJECTIONS**

(Declaration that SULAs Do Not Violate FRAND); Apple's Affirmative Defense to Qualcomm's Count III (Declaration that SULAs Do Not Violate Competition Law).  Qualcomm's proposed instruction attempts to foreclose these claims and defenses entirely and would leave the jury with the wrong impression that the jury cannot rely on the patent exhaustion doctrine to find that the SULAs are unenforceable.  Therefore, these two sentences have no place in the patent exhaustion instruction.  If anywhere, the last sentence belongs in connection with the breach of contract collection of instructions.

Finally, Qualcomm's instruction is incomplete.  For example, it does not explain (1) that patent exhaustion occurs automatically even if the sale is made pursuant to an express restriction or is made outside of the United States, (2) how to determine what is essential or inventive about a patent claim, or (3) the relevance of alternative uses to the patent exhaustion inquiry.  Accordingly, Apple and the CMs' instruction accurately sets forth the relevant principles of patent exhaustion and should be adopted.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **BREACH OF CONTRACT**

1     **QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 5**

2     **BREACH OF CONTRACT—THE PARTIES' CONTRACT CLAIMS**

3     Qualcomm, Apple and the CMs bring various contract claims.

4     Qualcomm claims that the CMs breached their Subscriber Unit License

5 Agreements ("SULAs") and Master Software Agreements ("CM MSAs").

6     Qualcomm claims that Apple breached the Business Cooperation and Patent

7 Agreement ("BCPA"), and the February 28, 2013 Statement of Work Agreement

8 ("2013 SOW").

9     Apple claims that Qualcomm breached the BCPA.

10     The CMs claim that Qualcomm violated its contractual ETSI FRAND

11 commitment and that Qualcomm breached the SULAs.

12     Qualcomm, Apple and the CMs each deny the allegations against them.

13

14

15 Final Pretrial Conference Order § III

16 Given  _____

17 Denied  _____

18 Withdrawn  _____

19 Modified _____

20     **APPLE AND CMS' OBJECTIONS**

21     Apple and the CMs object to Qualcomm's description of the contract claims

22 at issue.  Qualcomm's descriptions are overbroad in light of the limited nature of

23 Qualcomm's claims.  First, Qualcomm generally states that it contends that Apple

24 breached the BCPA, which is apparently intended to encompass claims that Apple

25 breached the express terms of the BCPA and the implied covenant of good faith

26

27     **EXHIBIT G:  QUALCOMM'S**      -21-      **CASE No. 3:17-CV-0108-GPC-MDD**

    **PROPOSED JURY INSTRUCTIONS**

28     **WITH OBJECTIONS**

and fair dealing. However, Qualcomm's counterclaims clearly limit Qualcomm's implied covenant claim to *only* issues related to Section 7 of the BCPA, *See* Qualcomm's Second Amended Answer and Counterclaims (ECF No. 469), at ¶¶ 367, 369 (alleging breach of implied covenant with respect to Section 7 only), ¶¶ 362-371 (omitting any allegation of implied breach with respect to provisions other than section 7).  And it is improper for Qualcomm—on the eve of trial—to contend otherwise. Qualcomm cannot, at this late stage, broaden the scope of its breach-of-contract claims.  *See, e.g.*, *Beck v. Metro. Prop. & Cas. Ins. Co.*, No. 3:13-CV-00879-AC, 2016 WL 4978411, at *1 (D. Or. Sept. 16, 2016), *aff'd* 727 F. Appx. 687, 689 (9th Cir. 2018) (defendant's "decision to advance for the first time on the eve of trial a completely new and significant legal theory, and to do so through [an] awkward procedural mechanism" was inappropriate).

Likewise, Qualcomm does not claim that Apple breached the implied covenant in the 2013 Statement of Work.  But because Qualcomm does not separate out the claims for express breach and breach of the implied covenant, and because Qualcomm includes instructions on the elements of breach of contract and breach of the implied covenant, the jury may be confused into thinking that Qualcomm is bringing claims of breach of the implied covenant in connection with 2013 SOW. Similarly, Qualcomm does not bring claims of breach of the implied covenant against the CMs, but the structure of Qualcomm's instructions might confuse the jury into thinking the jury must consider whether the CMs violated the implied covenant.

Moreover, Qualcomm lists its claims first. But as plaintiff, Apple's claims should come first. The CMs' claims should also go before Qualcomm's claims as Apple and the CMs are trying their case together.

**QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 6**

**CONTRACT FORMATION — ESSENTIAL FACTUAL ELEMENTS**

To prove that the parties entered into a contract, all of the following must be proved for that contract by a preponderance of the evidence:

1.   That the contract terms were clear enough that the parties could understand what each was required to do;

2.   That the parties agreed to give each other something of value (a promise to do something or not to do something may have value); and

3.   That the parties agreed to the terms of the contract.

When you examine whether the parties agreed to the terms of the contract, ask yourself if, under the circumstances, a reasonable person would conclude, from the words and conduct of each party, that there was an agreement.  You may not consider the parties' hidden intentions.

If any of the above has not been proven, then a contract was not created.

*Compare* Judicial Council of California Civil Jury Instructions (2019 Edition) No. 302

Given  _____

Denied  _____

Withdrawn  _____

Modified  _____

# APPLE AND CMS' OBJECTIONS

Apple and the CMs object to the placement of this instruction as confusing. Apple and the CMs have included a similar, modified, instruction as part of the instruction on Qualcomm's unjust enrichment claim.  The only dispute over contract formation is in connection with Qualcomm's unjust enrichment claim—Qualcomm contends that the BCPA was not legally formed, and therefore Qualcomm is entitled to recover for unjust enrichment.  The notes to this instruction in CACI state that "This instruction should only be given if the existence of a contract is contested." (CACI 302). Accordingly, the jury should be instructed on this issue only in connection with the unjust enrichment claim. Moreover, as formulated, the instruction may confuse the jury as to what Qualcomm must prove to find that the BCPA was not a contract.  As Qualcomm has the burden on the unjust enrichment claim, it is Qualcomm that must prove that the BCPA was not a contract.  Apple's instruction includes modifications that make this point clear.

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 7
## BREACH OF CONTRACT—ESSENTIAL FACTUAL ELEMENTS

To recover damages for breach of contract, the party asserting the breach of contract claim (which I will refer to as the "Claimant") must prove all of the following by a preponderance of the evidence:

1. That the Claimant and the other party to the contract (which I will refer to as the "Counterparty") entered into a contract;

2. That the Claimant did all, or substantially all, of the significant things that the contract required it to do; or that the Claimant was excused from having to do those things;

3. That the Counterparty failed to do something that the contract required it to do;

4. That the Claimant was harmed; and

5. That the Counterparty's breach of contract was a substantial factor in causing the Claimant's harm.

[Placeholder for issues of contract interpretation, if any, as determined by the Court.]

1    *Compare* Judicial Council of California Civil Jury Instructions (2019 Edition)

2    No. 303

3    Given  _____

4    Denied  _____

5    Withdrawn  _____

6    Modified  _____

7                    **APPLE AND CMS' OBJECTIONS**

8           The parties have proposed similar instructions. However, Apple and the

9    CMs maintain it is more appropriate to instruct the jury on the Court's contractual

10   interpretation as part of the earlier instruction describing the various contracts in

11   this case.

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 8

## DISPUTED TERM (BCPA)

Apple and Qualcomm dispute the meaning of Section 7 of the BCPA.

In deciding what the words of a contract mean, you must decide what the parties intended at the time the contract was created. You may consider the usual and ordinary meaning of the language used in the contract as well as the circumstances surrounding the making of the contract.

*Compare* Judicial Council of California Civil Jury Instructions (2019 Edition) No. 314

Given  _____

Denied  _____

Withdrawn  _____

Modified  _____

### APPLE AND CMS' OBJECTIONS

Apple objects to this instruction as misleadingly informing the jury that it is required to interpret the terms of the BCPA. The Court is to interpret the BCPA, and instruct the jury as to the meaning of the BCPA. The parties have briefed the question of the interpretation of the BCPA, for resolution by the Court (ECF Nos. 602; 632), and it is for the Court to resolve these issues. Under California law, '[i]t is solely a judicial function to interpret a written contract unless the interpretation turns upon the credibility of extrinsic evidence.'" *PSM Holding Corp. v. Nat. Farm Fin. Corp.*, 339 F. App'x 693 (9th Cir. 2009) (quoting *Hess v. Ford Motor Co.*, 41 P.3d 46, 53 (Cal. 2002)).

1           Moreover, this instruction is essentially superfluous of the "placeholder" for

2    contract interpretation issues already located elsewhere in the jury instructions.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27    **EXHIBIT G:  QUALCOMM'S**    -28-    **CASE NO. 3:17-CV-0108-GPC-MDD**
      **PROPOSED JURY INSTRUCTIONS**
28    **WITH OBJECTIONS**

1   <u>**QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 9**</u>

2   <u>**MEANING OF WORDS DEFINED BY CONTRACT (ALL CONTRACTS)**</u>

3   If the parties defined a word or a term in a contract, you should follow the

4   definition provided in the contract.

5

6

7   *See Brinderson-Newberg Joint Venture v. Pac. Erectors, Inc.*, 971 F.2d 272, 278-

8   79 (9th Cir. 1992); *In re Tobacco Cases I,* 186 Cal. App. 4th 42, 47-48 (Cal. Ct.

9   App. 2010).

10   Given  _____

11   Denied  _____

12   Withdrawn  _____

13   Modified  _____

14   <u>**APPLE AND CMS' OBJECTIONS**</u>

15   Apple and the CMs object to this proposed instruction on the grounds that it

16   has no place in the jury instructions, as issues of contract interpretation are for the

17   Judge to decide. Under California law, '[i]t is solely a judicial function to interpret

18   a written contract unless the interpretation turns upon the credibility of extrinsic

19   evidence.'" *PSM Holding Corp. v. Nat. Farm Fin. Corp.*, 339 F. App'x 693 (9th

20   Cir. 2009) (quoting *Hess v. Ford Motor Co.*, 41 P.3d 46, 53 (Cal. 2002)). Because

21   there is no indication that the contracts at require jury interpretation, these

22   instructions are superfluous. Reading these instructions to the jury as a matter of

23   course risks sowing confusion by encouraging the jury to interpret the relevant

24   contracts, thereby creating a risk of conflicting interpretations as between the judge

25   and jury.  It is for the Court to instruct the jury as to what the various contracts

26

mean, and all parties have included placeholders in their instructions whereby the Court will instruct the jury as to the meaning of the disputed terms at issue after resolving the contract interpretation disputes that were submitted to the Court. (ECF No. 881).  Although Apple and the CMs have included parallel instructions in its proposed jury instructions, Apple and the CMs have indicated that these instructions should not be read to the jury unless the Court intends for the jury to interpret the various contracts at issue.

This instruction is also redundant as it merely repackages the concepts set forth in CACI No. 314, which is included elsewhere in Qualcomm's proposed instructions (Apple also included CACI No. 314 in its proposed instructions as an instruction to be read to the jury to extent the Court intends for the jury to interpret the contracts at issue). To the extent Qualcomm intends for this instruction to be read to the jury regardless of whether the jury is to engage in contract interpretation, this instruction will confuse the jury into thinking it is required to interpret the terms of the contracts at issue.  Moreover, this instruction is unsupported by Qualcomm's authority. Qualcomm relies on *In re Tobacco Cases I*, 186 Cal. App. 4th 42, 47-48 (Cal. Ct. App. 2010), wherein the court analyzes a definitional provision in a contract. But the court never expressly states that the "defined words or terms in a contract" must be interpreted "in accordance with the parties' definitions."  Instead the court relies on basic interpretational canons— e.g., that contract interpretation is focused on the parties' intent and that the intent of a written contract should be derived "from the language of the writing alone"— to conclude that the definitional provision is unambiguous and affirms the trial court on this ground.  Qualcomm's other authority, *Brinderson-Newberg Joint*

1    *Venture v. Pac. Erectors, Inc.*, 971 F.2d 272, 278-79 (9th Cir. 1992), similarly fails

2    to lock in the rule Qualcomm wants to instruct the jury on regarding defined terms.

3        Apple and the CMs reserve the right to further object to, or propose

4    modifications to, these instructions after the Court's resolution of the contract

5    interpretation disputes.

1
2

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 10
## MEANING OF ORDINARY WORDS (ALL CONTRACTS)

3
4
5

You should assume that the parties intended the words in a contract to have their usual and ordinary meaning unless you decide that the parties intended the words to have a special meaning.

6

7

8    *Compare* Judicial Council of California Civil Jury Instructions (2019 Edition)
9    No. 315
10   Given _____
11   Denied _____
12   Withdrawn _____
13   Modified _____

14

## APPLE AND CMS' OBJECTIONS

15   Apple and the CMs object to Qualcomm's proposed instructions 10-13 as
16   confusing and likely to mislead the jury. CACI makes clear that these instructions
17   are to be read *only* if the jury is to engage in contract interpretation. Under
18   California law, '[i]t is solely a judicial function to interpret a written contract
19   unless the interpretation turns upon the credibility of extrinsic evidence.'" *PSM*
20   *Holding Corp. v. Nat. Farm Fin. Corp.*, 339 F. App'x 693 (9th Cir. 2009) (quoting
21   *Hess v. Ford Motor Co.*, 41 P.3d 46, 53 (Cal. 2002)). Because there is no
22   indication that the contracts at require jury interpretation, these instructions are
23   superfluous. Reading these instructions to the jury as a matter of course risks
24   sowing confusion by encouraging the jury to interpret the relevant contracts,
25   thereby creating a risk of conflicting interpretations as between the judge and jury.

26

27   **EXHIBIT G: QUALCOMM'S**          -32-          **CASE NO. 3:17-CV-0108-GPC-MDD**
     **PROPOSED JURY INSTRUCTIONS**
28   **WITH OBJECTIONS**

It is for the Court to instruct the jury as to what the various contract mean, and all parties have included placeholders in their instructions whereby the Court will instruct the jury as to the meaning of the disputed terms at issue after resolving the contract interpretation disputes that were submitted to the Court. (ECF No. 881). Although Apple and the CMs have included parallel instructions in its proposed jury instructions, Apple and the CMs have indicated that these instructions should not be read to the jury unless the Court intends for the jury to interpret the various contracts at issue. Apple and the CMs reserve the right to further object to, or propose modifications to, these instructions after the Court's resolution of the contract interpretation disputes.

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 11
## MEANING OF TECHNICAL WORDS (ALL CONTRACTS)

You should assume that the parties intended technical words used in a contract to have the meaning that is usually given to them by people who work in that technical field, unless you decide that the parties clearly used the words in a different sense.

*Compare* Judicial Council of California Civil Jury Instructions (2019 Edition) No. 316

Given  _____

Denied  _____

Withdrawn  _____

Modified  _____

## APPLE AND CMS' OBJECTIONS

Apple and the CMs object to Qualcomm's proposed instructions 10-13 as confusing and likely to mislead the jury.  CACI makes clear that these instructions are to be read *only* if the jury is to engage in contract interpretation. Under California law, '[i]t is solely a judicial function to interpret a written contract unless the interpretation turns upon the credibility of extrinsic evidence.'"  *PSM Holding Corp. v. Nat. Farm Fin. Corp.*, 339 F. App'x 693 (9th Cir. 2009) (quoting *Hess v. Ford Motor Co.*, 41 P.3d 46, 53 (Cal. 2002)). Because there is no indication that the contracts at require jury interpretation, these instructions are superfluous. Reading these instructions to the jury as a matter of course risks sowing confusion by encouraging the jury to interpret the relevant contracts,

thereby creating a risk of conflicting interpretations as between the judge and jury. It is for the Court to instruct the jury as to what the various contract mean, and all parties have included placeholders in their instructions whereby the Court will instruct the jury as to the meaning of the disputed terms at issue after resolving the contract interpretation disputes that were submitted to the Court. (ECF No. 881). Although Apple and the CMs have included parallel instructions in its proposed jury instructions, Apple and the CMs have indicated that these instructions should not be read to the jury unless the Court intends for the jury to interpret the various contracts at issue. Apple and the CMs reserve the right to further object to, or propose modifications to, these instructions after the Court's resolution of the contract interpretation disputes.

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 12
## CONSTRUCTION OF CONTRACT AS A WHOLE (ALL CONTRACTS)

In deciding what the words of a contract meant to the parties, you should consider the whole contract, not just isolated parts.  You should use each part to help you interpret the others, so that all the parts make sense when taken together.

*Compare* Judicial Council of California Civil Jury Instructions (2019 Edition) No. 317

Given _____

Denied _____

Withdrawn _____

Modified _____

## APPLE AND CMS' OBJECTIONS

Apple and the CMs object to Qualcomm's proposed instructions 10-13 as confusing and likely to mislead the jury.  CACI makes clear that these instructions are to be read *only* if the jury is to engage in contract interpretation. Under California law, '[i]t is solely a judicial function to interpret a written contract unless the interpretation turns upon the credibility of extrinsic evidence.'" *PSM Holding Corp. v. Nat. Farm Fin. Corp.*, 339 F. App'x 693 (9th Cir. 2009) (quoting *Hess v. Ford Motor Co.*, 41 P.3d 46, 53 (Cal. 2002)). Because there is no indication that the contracts at require jury interpretation, these instructions are superfluous. Reading these instructions to the jury as a matter of course risks sowing confusion by encouraging the jury to interpret the relevant contracts, thereby creating a risk of conflicting interpretations as between the judge and jury.

It is for the Court to instruct the jury as to what the various contract mean, and all parties have included placeholders in their instructions whereby the Court will instruct the jury as to the meaning of the disputed terms at issue after resolving the contract interpretation disputes that were submitted to the Court. (ECF No. 881). Although Apple and the CMs have included parallel instructions in its proposed jury instructions, Apple and the CMs have indicated that these instructions should not be read to the jury unless the Court intends for the jury to interpret the various contracts at issue. Apple and the CMs reserve the right to further object to, or propose modifications to, these instructions after the Court's resolution of the contract interpretation disputes.

1
2

**QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 13**
**CONSTRUCTION OF CONTRACT BY CONDUCT (ALL CONTRACTS)**

3   In deciding what the words in a contract meant to the parties, you may

4   consider how the parties acted after the contract was created but before any

5   disagreement between the parties arose.

6

7

8   *Compare* Judicial Council of California Civil Jury Instructions (2019 Edition)

9   No. 318

10   Given _____

11   Denied _____

12   Withdrawn _____

13   Modified _____

14   **APPLE AND CMS' OBJECTIONS**

15   Apple and the CMs object to Qualcomm's proposed instructions 10-13 as

16   confusing and likely to mislead the jury.  CACI makes clear that these instructions

17   are to be read *only* if the jury is to engage in contract interpretation. Under

18   California law, '[i]t is solely a judicial function to interpret a written contract

19   unless the interpretation turns upon the credibility of extrinsic evidence.'" *PSM*

20   *Holding Corp. v. Nat. Farm Fin. Corp.*, 339 F. App'x 693 (9th Cir. 2009) (quoting

21   *Hess v. Ford Motor Co.*, 41 P.3d 46, 53 (Cal. 2002)). Because there is no

22   indication that the contracts at require jury interpretation, these instructions are

23   superfluous. Reading these instructions to the jury as a matter of course risks

24   sowing confusion by encouraging the jury to interpret the relevant contracts,

25   thereby creating a risk of conflicting interpretations as between the judge and jury.

26

27
28

It is for the Court to instruct the jury as to what the various contract mean, and all parties have included placeholders in their instructions whereby the Court will instruct the jury as to the meaning of the disputed terms at issue after resolving the contract interpretation disputes that were submitted to the Court. (ECF No. 881). Although Apple and the CMs have included parallel instructions in its proposed jury instructions, Apple and the CMs have indicated that these instructions should not be read to the jury unless the Court intends for the jury to interpret the various contracts at issue. Apple and the CMs reserve the right to further object to, or propose modifications to, these instructions after the Court's resolution of the contract interpretation disputes.

### QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 14

### OCCURRENCE OF AGREED CONDITION PRECEDENT (BCPA)

If you find that Qualcomm's obligation to make payments under the BCPA was conditioned on Apple's performance of a condition precedent, you must determine whether Apple performed that condition precedent.  If Apple does not prove that it performed the condition precedent, then Qualcomm was not required to make payments.

[Placeholder for issues of contract interpretation, if any, as determined by the Court.]

*Compare* Judicial Council of California Civil Jury Instructions (2019 Edition) No. 322

Given  _____

Denied  _____

Withdrawn  _____

Modified _____

### APPLE AND CMS' OBJECTIONS

Apple and the CMs object to this instruction as misleading and inaccurate. In proposing this instruction, Qualcomm appears to construe the second paragraph of Section 7 of the BCPA—which provides that Qualcomm's Section 7 obligations to make certain BCPA Payments to Apple continues only so long as Apple does not engage in conduct that induces litigation against Qualcomm—as a condition precedent.  But for reasons explained more fully in Apple's submission as part of the parties' joint brief on contract interpretation (ECF No. 881), the second

paragraph of Section 7 is a condition *subsequent*, i.e., a condition of breach, not a condition precedent. *See* Cal. Civ. Code § 1438; Restatement (Second) of Contracts § 230 (1981); *Title Guar. & Sur. Co. v. Nichols*, 224 U.S. 346, 351 (1912) ("The coming into effect of a contract may be made to depend upon the happening or performance of a condition.  But a condition subsequent presupposes a contract in effect which may be defeated by the happening or performance of a condition.").

Specifically, Qualcomm's Section 7 payment obligation arose at the moment the BCPA became effective.  At most, Apple's subsequent conduct could only relieve Qualcomm of this existing and ongoing obligation. This supports the conclusion that Section 7's second paragraph operates as a condition subsequent. *See* 1 Witkin, Summary of Cal. Law (10th Ed. 2005) Contracts, § 776 ("A condition is a fact, the happening or nonhappening of which creates (condition precedent) or extinguishes (condition subsequent) a duty on the part of the promisor. . . . [I]f the promisor makes a conditional promise, he or she is bound to perform only if the condition precedent occurs, or is relieved from the duty if the condition subsequent occurs.").

Because Qualcomm's Section 7 obligation is not subject to a condition precedent, and because Qualcomm has not identified any other contract that is, such conditions are irrelevant to this case. Accordingly, there is no basis for giving this standalone instruction to the jury.

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 15
## ETSI FRAND COMMITMENT

[Placeholder for instructions on ETSI FRAND commitment following the Court's determination of French law.]

[Ruling on Qualcomm's Motion for Determination of French Law Pursuant to Fed. R. Civ. P. 44.1 at [●]]

Given  _____

Denied  _____

Withdrawn  _____

Modified  _____

## APPLE AND CMS' OBJECTIONS

Apple and the CMs object to Qualcomm's placeholder instruction on the ETSI FRAND Commitment.  Qualcomm's placeholder instruction ignores the established framework for assessing the FRAND commitment.  Apple and the CMs have proposed instructions that capture this framework.  For example, Apple and the CMs have proposed an instruction based on a model instruction from the United States District Court for the Northern District of California about the "commitment to license on reasonable and nondiscriminatory terms."  *See* N.D. Cal. Model Patent Jury Instructions (Rev. Aug. 2017, Updated Dec. 2018) at 53. This model instruction applies to the FRAND commitment with any SSO.

Qualcomm's instruction is also misleading because Qualcomm has FRAND commitments with three SSOs relevant to the claims and defenses in this case: the European Telecommunications Standards Institute (ETSI), the

Telecommunications Industry Association (TIA), and the Alliance for Telecommunications Industry Solutions (ATIS).  TIA and ATIS are not subject to French law, and their FRAND commitments are similarly not subject to French law.

Apple reserves the right to further object to any instruction Qualcomm proposes following the Court's determination of contract and Rule 44.1 determinations.

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 16
## BREACH OF IMPLIED COVENANT OF GOOD FAITH—ESSENTIAL
## FACTUAL ELEMENTS (BCPA, FRAND AND SULAS)

In every contract or agreement there is an implied promise of good faith and fair dealing.  This means that each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract; however, the implied promise of good faith and fair dealing cannot create obligations that are inconsistent with the terms of the contract.  To establish a breach of the implied covenant of good faith and fair dealing, the Claimant must prove all of the following by a preponderance of the evidence:

1.      That the Claimant and the Counterparty entered into a contract;

2.      That the Claimant did all, or substantially all, of the significant things that the contract required it to do, or that it was excused from having to do those things;

3.      That all conditions required for the Counterparty's performance had occurred or were excused;

4.      That the Counterparty unfairly interfered with the Claimant's right to receive the benefits of the contract; and

5.      That the Claimant was harmed by the Counterparty's conduct.

*Compare* Judicial Council of California Civil Jury Instructions (2019 Edition) No. 325

Given _____

Denied _____

1  Withdrawn _____

2  Modified _____

3  ## **APPLE AND CMS' OBJECTIONS**

4       Apple and the CMs object to Qualcomm's proposed instruction on the

5  implied covenant of good faith and fair dealing.  Qualcomm's proposed instruction

6  is improper for similar reasons as Qualcomm's proposed instruction on "conditions

7  precedent."  Qualcomm's instruction is modeled on CACI No. 325 and seeks to

8  include an optional element regarding conditions for performance. *See* CACI No.

9  325 (describing optional third element for conditions of performance).  However,

10  as the notes to CACI No. 325 make clear, this optional element is to be included

11  only where a condition precedent exists. *See* CACI No. 325 (adopting by reference

12  discussion of condition precedent element in CACI No. 303).  There are no

13  conditions precedent involved in this litigation.  Including this element risks

14  unnecessarily confusing the jury.  Apple and the CMs also object to this instruction

15  in tandem with Qualcomm's Instruction on "Contract Interpretation-Defined

16  Terms" because it unfairly implies that Qualcomm is claiming breach of the

17  implied covenant in all of its contracts, when its complaint is not so broad.

18

19

20

21

22

23

24

25

26

27  **EXHIBIT G:  QUALCOMM'S**          -45-          **CASE NO. 3:17-CV-0108-GPC-MDD**
   **PROPOSED JURY INSTRUCTIONS**

28  **WITH OBJECTIONS**

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 17
## INTRODUCTION TO CONTRACT DAMAGES

If you decide that Qualcomm, Apple or the CMs have proved any claims for breach of contract or breach of the implied covenant of good faith and fair dealing, you also must decide how much money will reasonably compensate that Claimant for the harm caused by the breach. This compensation is called "damages." The purpose of such damages is to put the Claimant in as good a position as it would have been if the Counterparty had performed as promised.

To recover damages for any harm, a Claimant must prove by a preponderance of the evidence that when the contract was made, both parties knew or could reasonably have foreseen that the harm was likely to occur in the ordinary course of events as a result of the breach of the contract.

The Claimant also must prove the amount of its damages according to the following instructions. It does not have to prove the exact amount of damages. You must not speculate or guess in awarding damages.

Qualcomm claims damages in the form of unpaid royalties from the CMs for breach of the SULAs and the CM MSAs. Apple and Qualcomm seek damages from each other for breach of the BCPA. Qualcomm also claims damages from Apple for breach of the 2013 SOW, in addition to the [●] Apple admits it owes Qualcomm under the 2013 SOW.

*Compare* Judicial Council of California Civil Jury Instructions (2019 Edition) Nos. 350; 3934

Given  _____

1   Denied  _____

2   Withdrawn  _____

3   Modified _____

4                    **APPLE AND CMS' OBJECTIONS**

5          Apple and the CMs object to Qualcomm's proposed instruction on contract

6   damages.  Qualcomm's closing instruction on contract damages seeks to inform

7   the jury that Apple admits it owes Qualcomm [●] in connection with the 2013

8   Statement of Work. This fact, if presented to a jury, will be unduly prejudicial to

9   Apple as it implies that Apple is already liable for breach of contract. The jury can

10  be informed of the [●] figure in other ways, such as through witness testimony.

11  Moreover, Apple's position is that this time, this instruction should not include any

12  narrative statement as to the categories of damages claimed by the parties because

13  it is overbroad and inaccurate. For example, Qualcomm contends that it seeks

14  "unpaid royalties" from the CMs. But some of the damages sought do not

15  constitute royalties, they constitute (improper) attempts to recover late payments

16  and other forms of damages.  Accordingly, for the sake of accuracy and

17  minimizing confusing, there should be no narrative explanation. Alternatively,

18  should such a narrative statement be appropriate, it can be added to the instructions

19  at a later date.

20

21

22

23

24

25

26

# **QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 18**

# **BREACH OF CONTRACT—OBLIGATION TO PAY MONEY ONLY**

To recover damages for the breach of a contract to pay money, the Claimant must prove the amount due under the contract by a preponderance of the evidence.

*Compare* Judicial Council of California Civil Jury Instructions (2019 Edition) No. 355

Given  _____

Denied  _____

Withdrawn  _____

Modified _____

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 19
## CAUSATION

A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm.  It must be more than a remote or trivial factor.  It does not have to be the only cause of the harm.

*Compare* Judicial Council of California Civil Jury Instructions (2019 Edition) No. 430; *U.S. Ecology, Inc. v. State*, 129 Cal. App. 4th 887, 909 (2005)

Given _____

Denied _____

Withdrawn _____

Modified _____

## APPLE AND CMS' OBJECTIONS

Apple and the CMs object to Qualcomm's proposed "substantial factor" instruction.  Both parties propose to give an instruction modeled on CACI No. 430, which explains the substantial factor causation standard relevant to the parties' contract claims. In part, CACI No. 430 proposes that the following optional statement be included in the instruction: "Conduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct." Qualcomm proposes to omit this optional statement, while Apple and the CMs propose to include it.  This optional statement clarifies that only "culpable acts or omissions" (as opposed to trivial, nonculpable acts) are properly considered "substantial factors." *Id.*  Omitting this statement thus risks confusing the jury.

Without this statement, the jury may interpret the "substantial factor" test more broadly than intended.

## **QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 20**

## **CONTRACT DAMAGES—JURORS NOT TO CONSIDER ATTORNEY**

## **FEES AND COURT COSTS**

You must not include as part of any award attorney fees or expenses that the parties incurred in bringing or defending this lawsuit.  This instruction applies to all of the claims in this case.

*Compare* Judicial Council of California Civil Jury Instructions (2019 Edition) No. 3964

Given  _____

Denied  _____

Withdrawn  _____

Modified _____

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **<u>TORTIOUS INTERFERENCE</u>**

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 21

## TORTIOUS INTERFERENCE—ESSENTIAL ELEMENTS

To establish a claim for tortious interference, Qualcomm must prove all of the following by a preponderance of the evidence:

1.    That there were SULAs between Qualcomm and each of the CMs;

2.    That Apple knew of the SULAs;

3.    That Apple's conduct prevented the CMs' performance or made the CMs' performance more expensive or more difficult;

4.    That Apple intended to disrupt the performance of the SULAs or knew that disruption of performance was certain or substantially certain to occur;

5.    That Qualcomm was harmed; and

6.    That Apple's conduct was a substantial factor in causing Qualcomm's harm.

*Compare* Judicial Council of California Civil Jury Instructions (2019 Edition) No. 2201

Given _____

Denied _____

Withdrawn _____

Modified _____

## APPLE AND CMS' OBJECTIONS

Apple objects to Qualcomm's proposed instruction on tortious interference with contract.  Both parties include a proposed instruction for Qualcomm's tortious

interference claim modeled on CACI No. 2201, which sets forth the elements Qualcomm must prove to prevail on its claim. Apple modified these instructions to make clear that Qualcomm alleges Apple interfered with four discrete contracts (i.e., Qualcomm's Subscriber Unit License Agreement (SULAs) with each of the four CMs). Qualcomm cannot establish that Apple interfered with *all four* SULAs absent evidence that Apple intended to disrupt *each of these four agreements* (or knew disruption was probable). Qualcomm itself made this point at the summary judgment stage, when it opposed Apple's statute of limitations argument by asserting (incorrectly) that Apple had failed to provide evidence as to each of the four SULAs.  ECF 626 at 5 (challenging Apple's evidence as to Wistron and Compal).  These modifications are necessary to provide clarity to the jury as to the appropriate standard. Qualcomm has failed to include this specificity in its proposed instructions, which could confuse the jury into thinking it is sufficient to award all damages requested if Qualcomm proves that Apple interfered with even one SULA.

**QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 22**

**TORTIOUS INTERFERENCE—INTRODUCTION TO TORT DAMAGES**

If you decide that Qualcomm has proved its tortious interference claim against Apple, you also must decide how much money will reasonably compensate the injured party for its harm.  This compensation is called "damages."

The amount of damages must include an award for the harm that was caused by the wrongful conduct, even if the particular harm could not have been anticipated.

Qualcomm does not have to prove the exact amount of damages that will provide reasonable compensation for the harm.  However, you must not speculate or guess in awarding damages.

In addition to compensatory damages, Qualcomm seeks punitive damages from Apple, which I will now instruct you about.



*Compare* Judicial Council of California Civil Jury Instructions (2019 Edition) No. 3900

Given  _____

Denied  _____

Withdrawn  _____

Modified _____

**APPLE AND CMS' OBJECTIONS**

Apple objects to this proposed instruction.  The proposed instruction omits the statement that Apple has included in its parallel instruction that damages can be awarded only if the jury finds that Apple has not proved its affirmative defenses. It

may confuse the jury into thinking that it can award damages even if Apple has proved its affirmative defenses.

There is also no need to reference the fact that Qualcomm also seeks punitive damages from Apple.  This could mislead the jury into thinking that the punitive damages inquiry overlaps with the tort damages inquiry.  The punitive damages inquiry is separate, and should be kept separate.

## **QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 23**
## **TORTIOUS INTERFERENCE—PUNITIVE DAMAGES**

If you decide that Apple tortiously interfered with the CMs' SULAs and caused Qualcomm harm, you must decide whether that conduct justifies an award of punitive damages. The purposes of punitive damages are to punish a wrongdoer for the conduct that harmed the injured party and to discourage similar conduct in the future.

You may award punitive damages only if Qualcomm proves that Apple engaged in tortious interference with malice, oppression, or fraud. To do this, Qualcomm must prove one of the following by clear and convincing evidence:

1. That the conduct constituting malice, oppression, or fraud was committed by one or more officers, directors, or managing agents of Apple, who acted on behalf of Apple; or

2. That the conduct constituting malice, oppression, or fraud was authorized by one or more officers, directors, or managing agents of Apple; or

3. That one or more officers, directors, or managing agents of Apple knew of the conduct constituting malice, oppression, or fraud and adopted or approved that conduct after it occurred.

"Malice" means actions with intent to cause injury or conduct that was despicable and was done with a willful and knowing disregard of the rights or safety of another. A person acts with knowing disregard when he or she is aware of the probable dangerous consequences of his or her conduct and deliberately fails to avoid those consequences.

1    "Oppression" means conduct that was despicable and subjected Qualcomm

2  to cruel and unjust hardship in knowing disregard of its rights.

3    "Despicable conduct" is conduct that is so vile, base, or contemptible that it

4  would be looked down on and despised by reasonable people.

5    "Fraud" means the intentional misrepresentation or concealment of a

6  material fact with the intent to harm Qualcomm.

7    An employee is a "managing agent" if he or she exercises substantial

8  independent authority and judgment in his or her corporate decision-making such

9  that his or her decisions ultimately determine corporate policy

10   There is no fixed formula for determining the amount of punitive damages,

11  and you are not required to award any punitive damages. If you decide to award

12  punitive damages, you should consider all of the following factors in determining

13  the amount:

14   (a)   How reprehensible was Apple's conduct?  In deciding how

15   reprehensible Apple's conduct was, you may consider, among other factors:

16   1.   Whether Qualcomm was financially weak or vulnerable and Apple

17     knew Qualcomm was financially weak or vulnerable and took

18     advantage of it;

19   2.   Whether Apple's conduct involved a pattern or practice; and

20   3.   Whether Apple acted with trickery or deceit.

21   (b)   Is there a reasonable relationship between the amount of punitive

22   damages and Qualcomm's harm or between the amount of punitive damages

23   and potential harm to Qualcomm that Apple knew was likely to occur

24   because of its conduct?

25

26

27

28

(c)     In view of Apple's financial condition, what amount is necessary to punish it and discourage future wrongful conduct? You may not increase the punitive award above an amount that is otherwise appropriate merely because Apple has substantial financial resources.

Punitive damages may not be used to punish Apple for the impact of its alleged misconduct on persons other than Qualcomm.

Punitive damages may only be awarded to Qualcomm for Qualcomm's tortious interference claim against Apple.  For all other claims in this case, including the contract claims and the antitrust claims, you must not include in your award any damages to punish or make an example of the parties.  Such damages would be punitive damages, and they cannot be a part of your verdict, unless they are awarded to Qualcomm for Qualcomm's tortious interference claim against Apple.

*Compare* Judicial Council of California Civil Jury Instructions (2019 Edition) Nos. 3924, 3945

Given  _____

Denied  _____

Withdrawn  _____

Modified _____

## APPLE AND CMS' OBJECTIONS

Apple objects to Qualcomm's proposed instruction on punitive damages. Qualcomm has included only one instruction on punitive damages, which combines the questions of (1) whether Apple is liable for punitive damages and (2)

the amount of punitive damages.  Apple objects to instructing the jury on issues related to the amount of punitive damages prior to any determination of whether Apple is liable for such damages.  The jury's determination of whether punitive damages is appropriate requires consideration of Apple's financial condition, and for the reasons set forth in Apple's Motion in Limine, *see* Apple Inc.'s Motion In Limine No. 5 to Exclude Evidence of Apple's Wealth, Financial Resources, and Profit Information (ECF No. 861), it would be highly prejudicial to permit the jury to hear this evidence prior to deciding liability.  *See Doe v. Rose*, 2016 WL 9150617, at *1 (C.D. Cal. July 27, 2016); *see also* Cal. Civ. Code § 3295(d) ("The court shall, on application of any defendant, preclude the admission of evidence of that defendant s profits or financial condition until after the trier of fact returns a verdict for plaintiff awarding actual damages and finds that a defendant is guilty of malice, oppression, or fraud in accordance with Section 3294.").

Apple's proposed punitive damages instruction avoids this potential prejudice by mirroring California's two-part model instructions for trials bifurcated on the issue of punitive damages. *See* CACI Nos. 3946, 3942 (providing first phase and second phase instructions). The Court has "broad discretion to try the liability phase first." *M2 Software, Inc., v. Madacy Entm't*, 421 F.3d 1073, 1088 (9th Cir. 2005). Bifurcating trial with respect to the issue of punitive damages would prevent the evidence of Apple's wealth from unfairly prejudicing or influencing the jury's determination of liability.

Moreover, Apple objects to Qualcomm's effort to eliminate the following language from the model punitive damages instruction: "whether the conduct caused physical harm" and "whether [Apple] disregarded the health or safety of others." CACI No. 3942 does not list these factors as optional; to the contrary, the

model instruction states that the jury "should consider ***all of the following factors*** in determining the amount" of punitive damages to be awarded. *Id.* (emphasis added).  Both CACI No. 3942 and California case law largely mirror the U.S. Supreme Court's articulation of the factors to be considered in a punitive damages award. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003) (listing Qualcomm's omitted factors as the first two factors for consideration); *Walker v. Farmers Ins. Exchange*, 63 Cal. Rptr. 3d 507, 512 (Cal. Ct. App. 2007) (stating trial court's analysis complied with "the listing of factors indicating reprehensibility" in *State Farm*).  Under *State Farm*, all factors must be considered. 538 U.S. at 419 (listing factors in the conjunctive and noting that "the absence of all of them renders any award suspect"). Qualcomm's exclusion of these mandatory factors in its proposed instruction, therefore, would prejudice Apple.  Accordingly, Apple objects to Qualcomm's deviation from the model as legally incorrect and incomplete and respectfully refers the Court to Apple and the CMs' Proposed Instruction Nos. 107 & 108 for the proper formulation.

1
2
3
4
5
6                      **<u>UNJUST ENRICHMENT</u>**
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

27    **EXHIBIT G: QUALCOMM'S**           **-62-**           **CASE NO. 3:17-CV-0108-GPC-MDD**
       **PROPOSED JURY INSTRUCTIONS**
28    **WITH OBJECTIONS**

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 24
## AFFIRMATIVE DEFENSE—MISTAKE (BCPA)

As an alternative to its claim for breach of the BCPA, Qualcomm claims that there was no contract because both Qualcomm and Apple were mistaken about their obligations under the BCPA.  To succeed, Qualcomm must prove both of the following by a preponderance of the evidence:

1.     That both parties were mistaken about their obligations under Section 7 of the BCPA; and

2.     That Qualcomm would not have agreed to enter into the BCPA if it had known about the mistake.

If you decide that Qualcomm has proved both of the above, then the BCPA was not legally formed.

*Compare* Judicial Council of California Civil Jury Instructions (2019 Edition) No. 331

Given  _____

Denied  _____

Withdrawn  _____

Modified _____

## APPLE AND CMS' OBJECTIONS

Apple and CMs disagree that Qualcomm can maintain a claim for unjust enrichment for the reasons stated in Apple's summary judgment briefing.  (ECF No. 602)  Therefore, the proposed instructions on "mistake" and unjust enrichment are improper.  Should the court find it appropriate to instruct the jury

on mistake, Apple and the CMs object to Qualcomm's formulation of the proposed instruction.

First, Apple disagrees with Qualcomm's use of the "mistake" instruction prior to instructing the jury on the elements of unjust enrichment. Apple proposes that the Court should instead instruct the jury on the elements of contract formation, as in Apple's proposed instructions.  As Apple pointed out in its reply in support of its Motion for Summary Judgment on the BCPA, Qualcomm has never claimed in this case that the BCPA can be avoided due to mistake or fraud. *See* Apple's Reply In Support of Its Motion for Summary Judgment on BCPA Counterclaims, at 5 (Oct. 12, 2018) (ECF No. 664).  Qualcomm cannot now, on the eve of trial, contend that the BCPA can be avoided due to mistake or fraud.

Rather, Qualcomm must prove instead that the BCPA was not a contract. Qualcomm acknowledges in its unjust enrichment instruction that Qualcomm would be entitled to recover for unjust enrichment only "[i]f . . . the BCPA was not legally formed . . . ." That is because  "[t]he elements for a claim of unjust enrichment are receipt of a benefit and unjust retention of the benefit at the expense of another." *Prakashpalan v. Engstrom, Lipscomb & Lack*, 167 Cal. Rptr. 3d 832, 855 (Cal. Ct. App. 2014) (cited in *Allstate Life Ins. Co. v. Attisha*, 2016 WL 3199028, at *2 (S.D. Cal. June 9, 2016)). And retention of a benefit pursuant to a valid contract is not unjust. *Hameed v. IHOP Franchising LLC*, 520 F. App'x 520, 522 (9th Cir. 2013) (stating that under California law, the existence of a valid contract precludes an unjust enrichment claim on the same subject (citing *Klein v. Chevron U.S.A., Inc.*, 137 Cal. Rptr. 3d 293, 330 (Ca. Ct. App. 2012)).   The most straightforward way for the jury to determine whether the BCPA is "legally formed" and therefore a valid contract is to instruct them on contract formation, so

1  that the jury can ascertain whether there was a valid contract formed between the

2  parties.

3        Second, Apple and the CMs object that the "mistake" identified by

4  Qualcomm lacks specificity and is ultimately an allegation that the parties disagree

5  about the meaning of a contract provision, not a "mistake of fact."  Rather than

6  providing a detailed description of an alleged mistake of fact, Qualcomm's

7  proposed instruction states that the mistake is "about [the parties'] obligations

8  under Section 7 of the BCPA."  Qualcomm Instruction No. 25.  This is highly

9  overbroad, lacks any specificity, and, ultimately, is an alleged mistake of *opinion*

10 or *belief* about the interpretation of the provision, not fact.  *See, e.g.*, *Great*

11 *Northern Ry. Co. v. Fowler*, 136 F. 118, 122-23 (9th Cir. 1905) ("mistakes of

12 belief . . . form no basis for the avoidance of [] contracts").  Qualcomm cannot now

13 claim that the parties' dispute over the meaning of the provision amounts to a

14 "mistake of fact" that would allow Qualcomm to void the contract.

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 25
## UNJUST ENRICHMENT—ESSENTIAL FACTUAL ELEMENTS

If you find that the BCPA was not legally formed due to the parties' mutual mistake about their obligations under Section 7 of the BCPA, you must decide whether Qualcomm is entitled to recover from Apple for unjust enrichment.  To recover from Apple for unjust enrichment, Qualcomm must prove by a preponderance of the evidence that:

1.     Apple's receipt of payments under the BCPA constituted a benefit Apple received from Qualcomm; and

2.     Apple's retention of the benefit at the expense of Qualcomm would be unjust.

*In re Nat'l W. Life Ins. Deferred Annuities Litig.*, 268 F.R.D. 652, 668 (S.D. Cal. 2010)

Given  _____

Denied  _____

Withdrawn  _____

Modified  _____

## APPLE AND CMS' OBJECTIONS

Apple and CMs disagree that Qualcomm can maintain a claim for unjust enrichment for the reasons stated in Apple's summary judgment briefing.  (ECF No. 602).  Therefore, the proposed instruction on unjust enrichment is completely improper.  Should the court find it appropriate to instruct the jury on unjust enrichment, Apple and the CMs object to Qualcomm's formulation of the proposed

1   instruction.

2       Qualcomm has included jury instructions on unjust enrichment on the

3   grounds that unjust enrichment claims are jury triable as of right. But unjust

4   enrichment is an equitable claim that is for the Court, not the jury. (Apple and the

5   CMs maintain that an advisory jury is appropriate and unjust enrichment claims

6   should be presented to an advisory jury—Qualcomm's position is that only claims

7   with a jury right should be tried to a jury).  The Ninth Circuit has held that the

8   "cause of action for 'unjust enrichment'" is "synonymous with 'restitution.'"

9   *Astiana v. Hain Celestial Group, Inc.*, 783 F.3d 753, 762 (9th Cir. 2015); *see also*

10  *Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 570

11  (1999); *Shum v. Intel Corp.*, 630 F. Supp. 2d 1063, 1078 (N.D. Cal. 2009) ("There

12  is little doubt that unjust enrichment is an equitable claim."). Restitution is an

13  equitable issue for the Court to decide. *Grayson v. 7-Eleven, Inc.*, No. [], 2013 WL

14  1187010 09-CV-GPC (WMC), at *6 (S.D. Cal. 2013) (describing the "equitable

15  remedy of restitution when an unjust enrichment has occurred"). Apple has

16  included a draft instruction on unjust enrichment, but on the grounds that this is an

17  appropriate issue for resolution by an advisory jury.

18      Qualcomm's unjust enrichment instruction is also prejudicial because it fails

19  to provide sufficient explanation as to what it means for a party to be "unjustly

20  enriched." In its instructions, Apple includes the following language to make clear

21  that simply receiving a benefit is insufficient to constitute unjust enrichment:  "The

22  fact that Apple received a benefit is not enough.  Rather, where a company has

23  received a benefit from another, it is liable to pay only if the circumstances of its

24  receipt or retention are such that, as between the two companies, it is unjust for it

25  to retain that benefit."  *See* Apple & CMs' Proposed Instruction No. 100.  The

26

1   elements of unjust enrichment should be more neutral, and not reference the

2   specific benefit Qualcomm contends are at issue here—BCPA payments.

1
2
3
4
5
6                            **<u>WAIVER</u>**
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 26

## WAIVER CLAIM (FRAND)

To establish waiver, the CMs must prove by clear and convincing evidence that Qualcomm freely and knowingly gave up rights to obtain compensation, other than on FRAND terms, for the patents it had declared to ETSI as potentially essential to a cellular standard.

A waiver may be oral or written or may arise from conduct that shows that the other party gave up that right.

*Compare* Judicial Council of California Civil Jury Instructions (2019 Edition) No. 336

Given  _____

Denied  _____

Withdrawn  _____

Modified _____

## APPLE AND CMS' OBJECTIONS

The CMs object to Qualcomm's proposed instruction on the CMs' waiver claim because it only lists one of the SSOs to whom Qualcomm has promised to license on FRAND terms.  The CMs respectfully submit that, should Qualcomm's instruction be adopted, it should generally apply to Qualcomm's FRAND commitment to any SSO.

1

2

3

4

5

6 # **NEGLIGENT MISREPRESENTATION**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 27**

## **NEGLIGENT MISREPRESENTATION**

To establish a claim for negligent misrepresentation, the CMs must prove all of the following by a preponderance of the evidence:

1.      That Qualcomm represented to ETSI that a fact was true;

2.      That Qualcomm's representation was not true;

3.      That Qualcomm had no reasonable grounds for believing the representation was true when Qualcomm made it;

4.      That Qualcomm intended that the CMs rely on this representation;

5.      That the CMs reasonably relied on Qualcomm's representation;

6.      That the CMs were harmed; and

7.      That the CMs' reliance on Qualcomm's representation was a substantial factor in causing their harm.

*Compare* Judicial Council of California Civil Jury Instructions (2019 Edition) No. 1903

Given _____

Denied _____

Withdrawn _____

Modified _____

### **APPLE AND CMS' OBJECTIONS**

The CMs object to Qualcomm's proposed instruction on the CMs' negligent misrepresentation claim because it only lists one of the SSOs to whom Qualcomm has promised to license on FRAND terms.  The CMs respectfully submit that,

1    should Qualcomm's instruction be adopted, it should generally apply to

2    Qualcomm's FRAND commitment to any SSO, including at least ETSI, ATIS, and

3    TIA.

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 28

## NEGLIGENT MISREPRESENTATION—INTRODUCTION TO TORT

## DAMAGES

If you decide that the CMs have proved their negligent misrepresentation claim against Qualcomm, you also must decide how much money will reasonably compensate the injured parties for their harm. This compensation is called "damages."

The amount of damages must include an award for the harm that was caused by the wrongful conduct, even if the particular harm could not have been anticipated.

The injured parties do not have to prove the exact amount of damages that will provide reasonable compensation for the harm. However, you must not speculate or guess in awarding damages.

*Compare* Judicial Council of California Civil Jury Instructions (2019 Edition) No. 3900

Given _____

Denied _____

Withdrawn _____

Modified _____

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **ANTITRUST LAW**

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 29
## PATENTS—GENERAL—RELATION TO ANTITRUST LAWS

The basic purpose of the patent and antitrust laws is to promote innovation and industry.  In general, the antitrust laws seek to promote innovation and industry by maintaining competitive markets.  The antitrust laws prohibit anticompetitive conduct to obtain or preserve monopoly power, restraints on trade that unduly interfere with the competitive process, and mergers and acquisitions that may substantially lessen competition.  The patent laws seek to promote innovation and industry by providing an economic incentive for people and firms to invest in scientific research and product development.  These investments can lead to new and better products and better ways of making things.  In this way, a patent holder's exercise of its right to exclude others from using the patented invention for the duration of the patent can be reconciled with antitrust policy.

Thus, so long as the patent owner acts only to take advantage of the right to exclude created by his or her patent, he or she does not violate the antitrust laws. If, on the other hand, the patent owner seeks to restrain trade beyond the right to exclude conferred by the patent, his or her conduct may be an antitrust violation.

*Compare ABA* Model Jury Instructions in Civil Antitrust Cases at 179 (2016 Edition)

Given _____

Denied _____

Withdrawn _____

Modified _____

1

**APPLE AND CMS' OBJECTIONS**

2      Apple and the CMs object to this instruction as misleading because it fails to

3  instruct the jury on correct statements of relevant law regarding standard essential

4  patents (SEPs) and the FRAND commitment.  The antitrust claims in this case

5  involve issues related to SEPs, which are patents that are declared standards-

6  essential by the patent owner (in this case Qualcomm) to various standard-setting

7  organizations (SSOs).  By participating in an SSO, Qualcomm has promised to

8  license its SEPs to all willing licensees, including competitors, on FRAND terms.

9  These concepts are entirely absent from this instruction.  Apple and the CMs

10  contend that this instruction should not be given at all.  But if the Court determines

11  that an instruction on patent law's relation to antitrust law should be given, such an

12  instruction could be proper only if amended to add the following language:

> Because patents at issue in this case include patents that Qualcomm has
> declared as essential to certain standards, it is important to understand
> how the patent owner's rights are affected by the patent owner's
> commitments to relevant standard-setting organizations (SSOs).   A
> patent owner's right to exclude others from using the patented invention
> differs between Standard Essential Patents (or SEPs) and non-standard
> essential patents (or NEPs).  A holder of SEPs is obligated to license its
> patents to all willing licensees, including competitors, on fair,
> reasonable, and nondiscriminatory (FRAND) terms.   In this case,
> Qualcomm has promised standard-setting organizations that it would
> make its patent licenses available under FRAND terms.  Please see
> Instruction No. [] (FRAND commitment) for further information.

*See* Apple and CMs' Proposed Jury Instruction Nos. 12, 52.

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 30
## FREEDOM TO SET PRICES

The antitrust laws impose no limit on a company's freedom to set whatever prices it sees fit for its products unless its prices were due to a contract constituting an unreasonable restraint of trade or unless the company engaged in anticompetitive conduct.  I will explain these terms later in these instructions.

*Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 548-49 (9th Cir. 1991); *Lucas v. Citizens Commc'ns Co.*, 409 F. Supp. 2d 1206, 1217 (D. Haw. 2005)

Given  _____

Denied  _____

Withdrawn  _____

Modified _____

## APPLE AND CMS' OBJECTIONS

Apple and the CMs object to this instruction in its entirety because it would not aid the jury's understanding of the relevant law in any way, and it is therefore confusing and has the potential to mislead.  Qualcomm's instruction says, in essence:  "The antitrust laws do not prohibit certain conduct unless that conduct violates the antitrust laws."  This case involves a number of antitrust claims asserted by Apple and the CMs, and this proposed instruction is nothing more than a circular framing device intended to signal to the jury Qualcomm's view that some of Qualcomm's alleged conduct was not unlawful.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# SECTION 1 OF THE SHERMAN ACT AND SECTIONS 16720 AND 16727 OF THE CARTWRIGHT ACT

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 31

## SECTION 1 OF THE SHERMAN ACT AND SECTIONS 16720 AND 16727 OF THE CARTWRIGHT ACT—GENERAL

Section 1 of the Sherman Act and Sections 16720 and 16727 of the Cartwright Act prohibit contracts that unreasonably restrain trade.  To establish a violation of Section 1 of the Sherman Act or Sections 16720 or 16727 of the Cartwright Act, the CMs must prove the following by a preponderance of the evidence:

1.      the existence of a contract between or among at least two separate entities;

2.      that the contract unreasonably restrains trade; and

3.      that the restraint caused the CMs to suffer an injury to their business or property.

*Compare* ABA Model Jury Instructions in Civil Antitrust Cases at 2 (2016 Edition); Judicial Council of California Civil Jury Instructions (2019 Edition) No. 3405

Given _____

Denied _____

Withdrawn _____

Modified _____

## APPLE AND CMS' OBJECTIONS

The CMs agree that establishing a violation under Section 1 of the Sherman Act will establish a violation under Sections 16720, 16726, and 16727 of the

Cartwright Act.  However, the CMs object to the extent that Qualcomm does not also include a separate instruction for finding a per se tying violation under Section 16727 of the Cartwright Act.  While the elements of proof for a per se tying violation under Section 16727 of the Cartwright Act are similar to those required under Sherman Act Section 1, courts are clear that a plaintiff bringing a claim under Section 16727 of the Cartwright Act need not establish that "a substantial amount of sale was affected in the tied product," an element that is otherwise required under Sherman Act Section 1 and Cartwright Act Sections 16720 and 16726 tying claims.  *Morrison v. Viacom, Inc.*, 61 Cal. Rptr. 2d 544, 551 (Cal. Ct. App. 1997) ("Under section 16727, a per se violation is established if *either* element (2) [defendant's 'sufficient economic power in the tying market to coerce the purchase of the tied product'] *or* (3) ['a substantial amount of sale was affected in the tied product'] is established along with elements (1) and (4).") (emphasis added); see also CACI No. 3421 (in setting forth the essential factual elements to prove a Section 16727 violation, describing as *optional* proof that tie restrained competition for a substantial amount of sales in the tied product).

Accordingly, it is possible for the CMs to fail to establish a violation under Section 1 of the Sherman Act, and Sections 16720 and 16726 of the Cartwright Act, and yet succeed in establishing a violation under Section 16727 of the Cartwright Act.  The CMs object to Qualcomm's Section 1 and Cartwright Act instructions on the basis that they fail to instruct the jury on the correct legal standards.

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 32

## SECTION 1 OF THE SHERMAN ACT AND SECTIONS 16720 AND 16727

## OF THE CARTWRIGHT ACT—GENERAL—RULE OF REASON—

## OVERVIEW

Under Section 1 of the Sherman Act and Sections 16720 and 16727 of the Cartwright Act, a restraint of trade is illegal only if it is found to be unreasonable. You must determine, therefore, whether the restraints that the CMs allege here are unreasonable. In making this determination, you must first determine whether the CMs have proven that an alleged restraint has resulted in a substantial harm to competition in a relevant product market. If you find that the CMs have proven that an alleged restraint results in a substantial harm to competition in a relevant product market, then you must consider whether the alleged restraint produces countervailing competitive benefits. If you find that it does, then you must balance the competitive harm against the competitive benefit. An alleged restraint is illegal under Section 1 of the Sherman Act or Sections 16720 or 16727 of the Cartwright Act only if you find that the competitive harm substantially outweighs the competitive benefit.

I will now review each step of the analysis in more detail.

*Compare* ABA Model Jury Instructions in Civil Antitrust Cases at 3 (2016 Edition); Judicial Council of California Civil Jury Instructions (2019 Edition) No. 3411

Given _____

Denied _____

1   Withdrawn _____

2   Modified _____

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

**QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 33**

**SECTION 1 OF THE SHERMAN ACT AND SECTIONS 16720 AND 16727**

**OF THE CARTWRIGHT ACT—GENERAL—RULE OF REASON—**

**PROOF OF COMPETITIVE HARM**

As I mentioned, to prove that an alleged restraint is unreasonable, the CMs first must demonstrate that the alleged restraint has resulted in a substantial harm to competition. Although it may be relevant to the inquiry, harm that occurs merely to the individual business of the CMs is not sufficient, by itself, to demonstrate harm to competition generally. That is, harm to a single competitor or group of competitors does not necessarily mean that there has been harm to competition.

Furthermore, the CMs must show that the harm to competition occurred in an identified market, known as a relevant product market. It is the CMs' burden to prove the existence of a relevant market.

If you find that the CMs have proven the existence of a relevant market, then you must determine whether the CMs also have proven that the alleged restraint has a substantial harmful effect on competition in that market. A harmful effect on competition, or competitive harm, refers to a reduction in competition that results in the loss of some of the benefits of competition, such as lower prices, increased output, or higher product quality. If the alleged conduct has not resulted in higher prices, decreased output, lower quality, or the loss of some other competitive benefit, then there has been no competitive harm, and you should find that the alleged conduct was not unreasonable.

In determining whether an alleged restraint has produced competitive harm, you may look at the following factors:

- the effect of the alleged restraint on prices, output, product quality, and service;
- the purpose and nature of the alleged restraint;
- the nature and structure of the relevant market;
- the number of competitors in the relevant market and the level of competition among them, both before and after the alleged restraint was imposed; and
- whether the defendant possesses market power.

The last factor mentioned, market power, has been defined as an ability to profitably raise prices, for a sustained period of time, above those that would be charged in a competitive market. A firm that possesses market power generally can charge higher prices for the same goods or services than a firm in the same market that does not possess market power. The ability to charge higher prices for better products or services, however, is not market power. An important factor in determining whether Qualcomm possesses market power is Qualcomm's market share, that is, its percentage of the products or services sold in the relevant market by all competitors. If Qualcomm does not possess a substantial market share, it is less likely that Qualcomm possesses market power. If Qualcomm does not possess market power, it is less likely that the alleged restraint has resulted in a substantial harmful effect on competition in the market.

*Compare* ABA Model Jury Instructions in Civil Antitrust Cases at 5-6 (2016 Edition); Judicial Council of California Civil Jury Instructions (2019 Edition) Nos. 3411-13

1  Given  _____

2  Denied  _____

3  Withdrawn  _____

4  Modified  _____

5  ## APPLE AND CMS' OBJECTIONS

6       Apple and the CMs further object to Qualcomm's alteration of the ABA

7  model jury instruction to change "challenged restraint" to "alleged restraint."  This

8  instruction states a basic theoretical principle of antitrust law, and there is no

9  reason to deviate from the model instruction, which is accurate.  The word

10  "challenged" is accurate, neutral language, and the Court should reject

11  Qualcomm's needless variation on the wording of the model instruction.

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 34

## SECTION 1 OF THE SHERMAN ACT AND SECTIONS 16720 AND 16727

## OF THE CARTWRIGHT ACT—GENERAL—RULE OF REASON—

## EVIDENCE OF COMPETITIVE BENEFITS

If you find that the CMs have proven that an alleged restraint resulted in substantial harm to competition in a relevant market, then you next must determine whether the alleged restraint also benefits competition in other ways. If you find that the alleged restraint does result in competitive benefits, then you also must consider whether the alleged restraint was reasonably necessary to achieve the benefits. If the CMs prove that the same benefits could have been readily achieved by other, reasonably available alternative means that create substantially less harm to competition, then they cannot be used to justify the alleged restraint.

*Compare* ABA Model Jury Instructions in Civil Antitrust Cases at 8 (2016 Edition); Judicial Council of California Civil Jury Instructions (2019 Edition) No. 3411

Given _____

Denied _____

Withdrawn _____

Modified _____

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 35
## SECTION 1 OF THE SHERMAN ACT AND SECTIONS 16720 AND 16727 OF THE CARTWRIGHT ACT—GENERAL—RULE OF REASON— BALANCING THE COMPETITIVE EFFECTS

If you find that an alleged restraint was reasonably necessary to achieve competitive benefits, then you must balance those competitive benefits against the competitive harm resulting from the same alleged restraint.

If the competitive harm substantially outweighs the competitive benefits, then the alleged restraint is unreasonable.  If the competitive harm does not substantially outweigh the competitive benefits, then the alleged restraint is not unreasonable.  In conducting this analysis, you must consider the benefits and harm to competition and consumers, not just to a single competitor or group of competitors.  The CMs bear the burden of proving by a preponderance of the evidence that the anticompetitive effect of the conduct substantially outweighs its benefits.

*Compare* ABA Model Jury Instructions in Civil Antitrust Cases at 9 (2016 Edition); *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1484 (9th Cir. 1986)

Given  _____

Denied  _____

Withdrawn  _____

Modified  _____

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 36
## SECTION 1 OF THE SHERMAN ACT AND SECTIONS 16720 AND 16727
## OF THE CARTWRIGHT ACT—CONTRACT—DEFINITION,
## EXISTENCE, AND EVIDENCE

To show a contract to restrain trade, the CMs must prove both of the following elements by a preponderance of the evidence:

1.    that an alleged contract to restrain trade existed; and

2.    that Qualcomm knowingly became party to a contract to restrain trade.  To act knowingly means to participate deliberately, and not because of mistake or accident or other innocent reason.

The basis of a contract to unreasonably restrain trade is an agreement or understanding between two or more persons that unreasonably restricts competitive conditions.  Every contract may literally restrain trade in some way, but that does not mean that every contract is illegal under Section 1 of the Sherman Act or the Cartwright Act.  Instead, the question is whether the contract unreasonably restrains trade.  To determine whether a contract unreasonably restrains trade, you may consider the nature of the contract and whether the surrounding circumstances give rise to the inference that the contract was intended to restrain trade and enhance prices.  The key consideration is the impact on competitive conditions.

Direct evidence of an agreement may not be available, and therefore a contract to unreasonably restrain trade also may be shown through circumstantial evidence.  You may infer the existence of a contract to unreasonably restrain trade from the circumstances, including what you find the alleged party actually did and the words they used.  Mere similarity of conduct among various persons, however, or the fact that they may have associated with one another and may have met or

assembled together, does not by itself establish the existence of a contract to unreasonably restrain trade.  If they acted similarly but independently of one another, without any agreement among them, then there would not be a contract to unreasonably restrain trade.

In determining whether an agreement or understanding between two or more persons to unreasonably restrain trade has been proved, you must view the evidence as a whole and not piecemeal.

*Compare* ABA Model Jury Instructions in Civil Antitrust Cases at 13 (2016 Edition); Judicial Council of California Civil Jury Instructions (2019 Edition) No. 3406; *Nat'l Soc. of Prof'l Eng'rs v. United States.*, 435 U.S. 679, 687-90 (1978); *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001)

Given _____

Denied  _____

Withdrawn _____

Modified _____

## **APPLE AND CMS' OBJECTIONS**

Qualcomm's proposed instruction misstates the law, applies inapposite case law, and will mislead and confuse the jury about how to find the existence of a "contract" to satisfy Section 1's requirement.  Apple and the CMs' proposed instruction on this element provides the correct standards, borrowed from cases presenting identical claims.  Qualcomm's instruction should be rejected, and the Court should adopt Apple and the CMs' instruction instead.

First, while it is correct that Section 1 only proscribes concerted, rather than unilateral, activity, Qualcomm proposes standards for inferring concerted conduct from cases analyzing conspiracy and collusion.  These instructions are irrelevant and inappropriate under the circumstances of this case, where the CMs allege that Qualcomm's well-documented commercial contracts with the CMs are unreasonable restraints of trade.  Qualcomm has never denied the existence of its contracts with the CMs, and even produced them in discovery.  Qualcomm misconceives the law in attempting to require some "agreement" beyond the commercial contracts being challenged by the CMs.  *See, e.g., Paladin Associates, Inc. v. Montana Power Co*. 328 F.3d 1145, 1153 (9th Cir. 2003) (finding that defendants' commercial assignments were "express 'agreements'" signed by defendants' representatives and thus are "direct evidence of 'concerted activity'").  Indeed, cases dealing with tying claims such as the claims brought by the CMs here, make abundantly clear that the CMs can readily prove this element by reference to their contracts with Qualcomm for the "tied products" (although, of course, they can also prove this element with circumstantial evidence).  *See, e.g., Datagate, Inc. v. Hewlett-Packard Co*. 60 F.3d 1421, 1426–1427 (9th Cir. 1995) ("the 'contract' requirement is satisfied in tie-in cases by the coerced *sales contract* for the tied item") (emphasis original); *Toscano v. PGA Tour, Inc*., 70 F. Supp. 2d 1109, 1115 (E.D. Cal. 1999), *aff'd sub nom. Toscano v. Prof'l Golfers Ass'n*, 258 F.3d 978 (9th Cir. 2001) ("a sales contract alone may give rise to an inference of concerted action under § 1 if the agreement was part of a tying arrangement"); *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc*., 836 F.3d 1171, 1179 (9th Cir. 2016) ("tying conditions need not be spelled out in express contractual terms to fall within the Sherman Act's prohibitions").

1       Given the foregoing, Qualcomm's focus on the standards for inferring

2   agreement are puzzling and likely to confuse the jury.  To the extent this indicates

3   Qualcomm's belief that the tying arrangements alleged in this case do not satisfy

4   Section 1's concerted action requirement because Qualcomm views them as

5   unilaterally imposed conditions on buyers, such an argument has been specifically

6   rejected by courts.  *See Systemcare, Inc. v. Wang Labs. Corp*., 117 F.3d 1137,

7   1142-43 (10th Cir. 1997) (rejecting defendant's argument "that in imposing a tying

8   arrangement, a producer merely acts independently to establish a unilateral term of

9   sale" and holding that "a contract between a buyer and seller satisfies the concerted

10  action element of section 1 of the Sherman Act where the seller coerces a buyer's

11  acquiescence in a tying arrangement imposed by the seller").

12      Second, Qualcomm's proposed instruction improperly conflates the element

13  of "contract" with the notion of "unreasonableness."  This is legally incorrect, as

14  the law does not require any finding of "unreasonableness" in order to find that a

15  "contract" exists to satisfy Section 1's "contract, combination, or conspiracy"

16  requirement.  *See, e.g., Paladin Associates, Inc. v. Montana Power Co*. 328 F.3d

17  1145, 1153 (9th Cir. 2003) (treating "agreement" and "unreasonableness" as

18  separate elements).  In fact, courts have explicitly held otherwise.  In *Paladin*, the

19  Ninth Circuit concluded the district court "reached an erroneous conclusion" when

20  it held that written contracts were not direct evidence of concerted activity for

21  failing to "evidence a specific intent to control prices or destroy competition

22  through predatory or anti-competitive conduct."  *Id*. at 1153.  "Our antitrust law is

23  clear that [plaintiff] need not prove intent to control prices or destroy competition

24  to demonstrate the element of 'an agreement…among two or more entities."  Id. at

25  1153-54.

26

1    None of Qualcomm's cited cases discuss much less resolve this issue in

2  Qualcomm's favor.  See *Nat'l Soc. of Prof'l Eng'rs v. U.S.*, 435 U.S. 679, 687-90

3  (1978) (discussing the rule of reason's operation in Section 1 cases); *Cty. of*

4  *Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) (applying

5  the rule of reason to balance a restraint's anticompetitive harms against

6  procompetitive effects).

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 37

## SECTION 1 OF THE SHERMAN ACT AND SECTIONS 16720 AND 16727 OF THE CARTWRIGHT ACT—TYING ARRANGEMENTS

A tying arrangement is one in which the seller will sell one product (referred to as the tying product) only on the condition that buyers also purchase a different item (referred to as the tied product).

*Compare* ABA Model Jury Instructions in Civil Antitrust Cases at 84 (2016 Edition); Judicial Council of California Civil Jury Instructions (2019 Edition) No. 3420

Given _____

Denied _____

Withdrawn _____

Modified _____

## APPLE AND CMS' OBJECTIONS

Qualcomm needlessly alters the phrase "purchase a different ***product***" used in the ABA's Model Jury Instructions in Civil Antitrust Cases to "purchase a different ***item***." There is no reason to depart from the accurate wording of the model instruction and the instruction should continue to say "purchase a different product." Qualcomm's use of the phrase "different item" presumably is intended to mislead the jury into believing that a tied product must be a physical object or ordinary good. This is not the law. Tying arrangements may involve intangibles and services as either the tying or the tied produce. *See, e.g., Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 24-26 (1984) (anesthesiology services tied

to other facilities and services of hospital); *Fortner Enters. v. United States Steel Corp.*, 394 U.S. 495 (1969) (tying good was favorable credit terms); *Northern Pac. Ry. v. United States*, 356 U.S. 1, 7-8 ((1958) (railway services tied to land); *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43, 47-49 (9th Cir. 1971) (franchise license tied to supplies), cert. denied, 405 U.S. 955 (1972).  Qualcomm's deviation from the model instruction makes little sense, as it uses the phrase "tied product" elsewhere in this very instruction, as well as in its own versions of various other instructions, such as the instruction regarding the rationale for the prohibition on tying arrangements.  The deviation is likely to mislead and confuse the jury, and should be rejected.

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 38 SECTION 1 OF THE SHERMAN ACT AND SECTIONS 16720 AND 16727 OF THE CARTWRIGHT ACT—RATIONALE FOR PROHIBITION OF TYING ARRANGEMENTS

Not all tying arrangements are unlawful.  The essential characteristic of an invalid tying arrangement is a seller's exploitation of its market power over the alleged tying product to force buyers to purchase the alleged tied product that buyers did not want or need at all or might have preferred to purchase elsewhere.

*Compare ABA* Model Jury Instructions in Civil Antitrust Cases at 85 (2016 Edition); *SC Manufactured Homes, Inc. v. Liebert*, 162 Cal. App. 4th 68, 85 (Cal. Ct. App. 2008)

Given _____

Denied _____

Withdrawn _____

Modified _____

## APPLE AND CMS' OBJECTIONS

The CMs object to Qualcomm's instruction on several grounds.

First, Qualcomm needlessly alters the ABA's model jury instruction to add the word "alleged" in front of "tying product."  This instruction merely states a basic tenet of antitrust law to aid the jury's understanding of the law.  It is wholly unnecessary to add the phrase "alleged," which injects a reference to the parties' dispute, in conveying this tenet.  The model instruction uses accurate, neutral

1  language, and the Court should adopt the wording from the model instruction and

2  reject Qualcomm's unwarranted alterations.

3       Second, Qualcomm seeks to instruct the jury that it must consider whether

4  the tied product is one that "buyers did not want *or need at all* or might have

5  preferred to purchase elsewhere." (emphasis added).  Qualcomm's departure from

6  the ABA's model instruction lacks support in the law.  As an initial matter,

7  Qualcomm's edits alters the language from the Supreme Court's opinion on which

8  that instruction is based nearly verbatim.  *See Jefferson Par. Hosp. Dist. No. 2 v.*

9  *Hyde*, 466 U.S. 2, 12 (1984), *abrogated on other grounds by by Illinois Tool Works*

10  *Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006) (a tied product is one that a buyer is

11  forced to purchase and that the buyer "either did not want at all, or might have

12  preferred to purchase elsewhere on different terms").  Further, this alteration is

13  misleading and improperly invites the jury to find that an invalid tying

14  arrangement does not exist if buyers need the tied product, presumably in order to

15  work with the tying product.  That is simply incorrect, and completely at odds with

16  the law.  *See e.g., Jefferson Parish Hospital*, 466 U.S. at 19 n. 30 ("We have often

17  found arrangements involving functionally linked products at least one of which is

18  useless without the other to be prohibited tying devices."); *Thompson v.*

19  *Metropolitan Multi-List, Inc*., 934 F.2d 1566, 1575 (11th Cir. 1991) (rejecting

20  argument against tying arrangement where one product was claimed to be

21  "useless" without the other).

22       Consider how Qualcomm's instruction would apply to a company that sells

23  cameras and film.  If the company refuses to sell consumers a camera unless the

24  consumer also purchases its film cartridges, the consumers may have a tying claim.

25  That is true even if though the consumers "need" film in conjunction with the

26

27  **EXHIBIT G:  QUALCOMM'S**
    **PROPOSED JURY INSTRUCTIONS**
                   **-97-**                  **CASE NO. 3:17-CV-0108-GPC-MDD**

28  **WITH OBJECTIONS**

1   camera.  Qualcomm's instruction would invite the jury to reject the existence of an

2   invalid tying agreement, in contravention of guidance from the Supreme Court.

3   *See Eastman Kodak*, 504 U.S. at 463 ("we would be forced to conclude that there

4   can never be separate markets, for example, for cameras and film, computers and

5   software, or automobiles and tires.  That is an assumption we are unwilling to

6   make.") (citing *Jefferson Parish Hospital*, 466 U.S. at 19 n. 30).  Qualcomm's

7   proposed instruction should be rejected.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 39

## SECTION 1 OF THE SHERMAN ACT AND SECTIONS 16720 AND 16727 OF THE CARTWRIGHT ACT—UNLAWFUL TYING

To prevail on their tying claims, the CMs must prove each of the following elements by a preponderance of the evidence:

1.   The alleged tying products and the alleged tied product are separate and distinct products;

2.   Qualcomm will sell the alleged tying products only on the condition that the buyer also purchase the alleged tied product;

3.   Qualcomm has sufficient market power with respect to the alleged tying products to enable it to restrain competition as to the alleged tied product;

4.   The alleged tying arrangement has foreclosed a substantial volume of commerce as to the alleged tied product;

5.   The alleged tying arrangement has unreasonably restrained trade in that it had a substantial adverse effect on competition as to the alleged tied product; and

6.   The CMs were injured in their business or property because of the tying arrangement.

If you find that the evidence is sufficient to prove all six of these elements, then you should consider Qualcomm's contention that the tying arrangement was justified, which I will instruct you on later.  If you find that the evidence is sufficient to prove all six of these elements, and that the evidence is insufficient to prove Qualcomm's contention that the tying arrangement was justified, then you must find for the CMs and against Qualcomm on the CMs' tying claim.  If you find

1    that the evidence is insufficient to prove any one of these elements, then you must

2    find for Qualcomm and against the CMs on the CMs' tying claim.

3

4

5    *Compare* ABA Jury Instructions in Civil Antitrust Cases at 88 (2016 Edition);

6    Judicial Council of California Civil Jury Instructions (2019 Edition) Nos. 3420-21

7    Given   _____

8    Denied   _____

9    Withdrawn   _____

10    Modified   _____

11    **APPLE AND CMS' OBJECTIONS**

12          Qualcomm's proposed instruction provides the elements for proving a tying

13    claim under the rule of reason.  *See* ABA Jury Instructions in Civil Antitrust Cases

14    at 88 (2016 Edition) (discussing in the Notes the rule of reason standard).

15    However, the CMs are alleging a per se tying violation.  Tying has long been

16    recognized as a per se violation, and cases are legion that apply the per se standard

17    when evaluating tying claims.  *Jefferson Parrish*, 466 U.S. 2, 9 (1984) ("certain

18    tying arrangements pose an unacceptable risk of stifling competition and therefore

19    are unreasonable 'per se'"); *Northern Pacific Railway v. United States*, 356 U.S. 1,

20    6 (1958) ("[a]mong the practices which the courts have heretofore deemed to be

21    unlawful in and of themselves are…tying arrangements); *Eastman Kodak Co. v.*

22    *Image Technical Services, Inc*., 504 U.S. 451, 461 (1992) (tying arrangement

23    analyzed under per se analysis set forth in *Northern Pacific Railway v. United*

24    *States*, 356 U.S. 1, 6 (1958)); *Siegel v. Chicken Delight, Inc*., 448 F.2d 43, 46 (9th

25    Cir. 1971) (tying arrangement analyzed as "unlawful per se under Section 1 of the

26

Sherman Act"); *see also United States Steel Corp. v. Fortner Enters.*, 394 U.S. 495, 503 (1969) (observing that tying arrangements "generally serve no legitimate business purpose that cannot be achieved in some less restrictive way"). Qualcomm may disagree, as a matter of policy or economics, with established precedent, but it cannot on that basis instruct the jury to disregard the law.

CMs also object to Qualcomm's attempt to use the ABA model instruction for tying violations under Sherman Act Section 1 to instruct the jury on what constitutes a violation of Section 16727 of the Cartwright Act. As noted before in Apple and the CMs' objection to Qualcomm's proposed Instruction No. 31, the law is clear that a plaintiff bringing a claim under Section 16727 of the Cartwright Act need not establish that "a substantial amount of sale was affected in the tied product." *Morrison v. Viacom, Inc.*, 61 Cal. Rptr. 2d 544, 551 (Cal. Ct. App. 1997) ("Under section 16727, a per se violation is established if *either* element (2) [defendant's 'sufficient economic power in the tying market to coerce the purchase of the tied product'] *or* (3) ['a substantial amount of sale was affected in the tied product'] is established along with elements (1) and (4).") (emphasis added); see also CACI No. 3421 (in setting forth the essential factual elements to prove a Section 16727 violation, describing as optional proof that tie restrained competition for a substantial amount of sales in the tied product). This eliminates the need for plaintiffs bringing tying claims under Cartwright Act Section 16727 to prove an element that is otherwise required when proving a tying claim under Sherman Act Section 1 or Cartwright Act Sections 16720 and 16726. Specifically, element #4 in Qualcomm's proposed instruction ("foreclose[ure of] a substantial volume of commerce as to the alleged tied product") is an optional, not a required element under Section 16727. Accordingly, Apple and the CMs object to the

extent that Qualcomm does not also include an additional, separate instruction for finding a per se tying violation under Section 16727 of the Cartwright Act. Accordingly, Apple and the CMs object to the extent that Qualcomm does not also include an additional, separate instruction for finding a per se tying violation under Section 16727 of the Cartwright Act.

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 40
## SECTION 1 OF THE SHERMAN ACT AND SECTIONS 16720 AND 16727 OF THE CARTWRIGHT ACT—TYING UNDER RULE OF REASON— PRESENCE OF TWO PRODUCTS OR ITEMS

To determine whether the alleged tying products and the alleged tied product are separate and distinct products, you should consider whether there would be demand for each of them if they were offered separately. If enough customers would want to purchase the alleged tying products alone and obtain the alleged tied product alone to induce sellers generally to provide the alleged tying products alone and the alleged tied product alone, then the alleged tying products and the alleged tied product are separate products. If there is very little demand for one of the products by itself, that is, without the other product, then the alleged tying products and the alleged tied product are not two separate products for the purposes of the tying claim, even if they are sometimes sold separately.

Products may be separate products even if one of them is useless without the other. The relevant issue is whether there is sufficient demand from customers to induce sellers to provide them separately, even if the customer needs to obtain both products from one or more suppliers.

*Compare ABA* Model Jury Instructions in Civil Antitrust Cases at 90 (2016 Edition); Judicial Council of California Civil Jury Instructions (2019 Edition) No. 3422

Given _____

Denied _____

Withdrawn _____

Modified _____

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 41

## SECTION 1 OF THE SHERMAN ACT AND SECTIONS 16720 AND 16727 OF THE CARTWRIGHT ACT—PROOF OF CONDITIONING

You may find that a tying arrangement exists between the alleged tying products and the alleged tied product if Qualcomm either refused to sell the alleged tying products unless purchasers also agreed to buy the alleged tied product or effectively coerced purchasers into buying the alleged tied product in addition to the alleged tying products.  To prove coercion, the CMs must prove by a preponderance of the evidence that Qualcomm exploited its control over the alleged tying products to force the buyer into the purchase of the alleged tied product, which the buyer did not want or need at all, and that any appearance of choice was illusory.  Mere sales pressure or persuasion is not coercion.  Mere ownership of patents is not coercion.

*Compare ABA* Model Jury Instructions in Civil Antitrust Cases at 93 (2016 Edition); *Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*, 532 F.3d 963, 972 (9th Cir. 2008); *Lloyd Design Corp. v. Mercedes Benz of N. Am., Inc.*, 78 Cal. Rptr. 2d 185, 187 (Cal. Ct. App. 1998)

Given  _____

Denied  _____

Withdrawn  _____

Modified _____

**APPLE AND CMS' OBJECTIONS**

First, Qualcomm's proposed instruction is incomplete and, as a result, likely to mislead and confuse the jury.  The CMs' instruction cures this defect, and should be given instead.  The law recognizes that, in tying cases, a clear form of coercion exists when a seller with market power refuses to deal with buyers under certain conditions.  *Packaging Systems, Inc. v. PRC-Desoto Int'l, Inc.*, 268 F. Supp. 3d 1071, 1085 (C.D. Cal. 2017) ("[A]n express refusal to sell the tying product without the tied product obviously constitutes coercion.").  As one court put it, "ordinarily if the purchaser must purchase the tied product in order to get the tying product and the seller has market power in the tying product coercion may be presumed."  *Mozart Co. v. Mercedes-Benz of North America, Inc.*, 593 F. Supp. 1506, 1513 (N.D. Cal. 1984).  Thus, the jury should be instructed that express refusals to sell may constitute coercion in the tying context, when a seller has market power in the tying product.  Absent such an instruction, the jury may be confused and misled into believing that something amounting to threats or force may be required.  But that is not the law.

Second, Qualcomm again seeks to instruct the jury that it must consider whether the tied product is one that "buyers did not want ***or need at all*** or might have preferred to purchase elsewhere." (emphasis added).  Qualcomm's departure from the ABA's model instruction lacks support in the law.  As an initial matter, Qualcomm's edits alters the language from the Supreme Court's opinion on which that instruction is based nearly verbatim.  See *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984), *abrogated on other grounds by by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006) (a tied product is one that a buyer is forced to purchase and that the buyer "either did not want at all, or might have

preferred to purchase elsewhere on different terms").  Further, this alteration is misleading and improperly invites the jury to find that an invalid tying arrangement does not exist if buyers need the tied product, presumably in order to work with the tying product.  That is simply incorrect, and completely at odds with the law.  *See e.g., Jefferson Parish Hosp.*, 466 U.S. at 19 n. 30 ("We have often found arrangements involving functionally linked products at least one of which is useless without the other to be prohibited tying devices."); *Thompson v. Metropolitan Multi-List, Inc.*, 934 F.2d 1566, 1575 (11th Cir. 1991) (rejecting argument against tying arrangement where one product was claimed to be "useless" without the other).  Qualcomm's proposed alteration to the model instruction should be rejected.

**QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 42**

**SECTION 1 OF THE SHERMAN ACT AND SECTIONS 16720 AND 16727**

**OF THE CARTWRIGHT ACT—EXISTENCE OF MARKET POWER**

**WITH RESPECT TO THE TYING PRODUCT**

You may find that Qualcomm has market power with respect to the alleged tying products if, by reason of some advantage, Qualcomm has the power to raise its prices for the alleged tying products without losing an appreciable amount of its business or otherwise to force a purchaser of the alleged tying products to do something that the purchaser would not do in a more competitive market.

Allegations of unlawful tying that assert a patent or patented product is the tying product are evaluated in the same way as other alleged tying arrangements. With respect to the third element of a tying claim, market power with respect to the alleged tying products, the mere fact that the tying products are patented does not support a presumption that Qualcomm has market power with respect to the alleged tying products. The potential for market power in the tying product markets is to be assessed in the same manner as in other tying claims.

The CMs may prove power over price with respect to the alleged tying products by establishing that the price of the tied package is higher than the price charged in competitive markets.

In the alternative, you may determine whether Qualcomm has market power with respect to the alleged tying products by considering whether Qualcomm has a high share of the market for the alleged tying products such that purchasers do not have alternative sources of the alleged tying products or a reasonably interchangeable substitute readily available. If Qualcomm's market share of the market for any alleged tying product is below 30 percent, Qualcomm does not have

market power in the market for that alleged tying product.  But if Qualcomm's market share of the market for any alleged tying product is above 30 percent, you may consider that in determining whether Qualcomm has market power in the market for that alleged tying product.

Whether a high market share is an indicator of Qualcomm's power to raise prices without loss of appreciable business is a function of numerous market conditions, including the uniqueness of the product, the ability of existing competitors to expand production, and the ease with which new competitors can enter the market and make a price increase unprofitable.  If you find that purchasers of the alleged tying products do not have readily available alternative sources of supply and are forced as a practical matter to buy the alleged tying products from Qualcomm, you may find that Qualcomm has market power.  You may also consider in your market power determination the presence of any unique features or costs associated with the alleged tying products that effectively prevent others from offering a comparable product.

*Compare* ABA Model Jury Instructions in Civil Antitrust Cases at 94-96, 221 (2016 Edition); Judicial Council of California Civil Jury Instructions (2019 Edition) No. 3423; *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001)

Given  _____

Denied  _____

Withdrawn _____

Modified _____

## APPLE AND CMS' OBJECTIONS

First, Qualcomm's proposed instruction is incomplete and, as a result, likely to mislead and confuse the jury. The CMs' instruction cures this defect, and should be given instead. The law recognizes that, in tying cases, a clear form of coercion exists when a seller with market power refuses to deal with buyers under certain conditions. *Packaging Systems, Inc. v. PRC-Desoto International, Inc.*, 268 F. Supp. 3d 1071, 1085 (C.D. Cal. 2017) ("[A]n express refusal to sell the tying product without the tied product obviously constitutes coercion."). As one court put it, "ordinarily if the purchaser must purchase the tied product in order to get the tying product and the seller has market power in the tying product coercion may be presumed." *Mozart Co. v. Mercedes-Benz of North America, Inc.* (N.D. Cal. 1984) 593 F. Supp. 1506, 1513. Thus, the jury should be instructed that express refusals to sell may constitute coercion in the tying context, when a seller has market power in the tying product. Absent such an instruction, the jury may be confused and misled into believing that something amounting to threats or force may be required. But that is not the law.

Second, Qualcomm again seeks to instruct the jury that it must consider whether the tied product is one that "buyers did not want ***or need at all*** or might have preferred to purchase elsewhere." (emphasis added). Qualcomm's departure from the ABA's model instruction lacks support in the law. As an initial matter, Qualcomm's edits alters the language from the Supreme Court's opinion on which that instruction is based nearly verbatim. See *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984), *abrogated on other grounds by by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006) (a tied product is one that a buyer is forced to purchase and that the buyer "either did not want at all, or might have

preferred to purchase elsewhere on different terms"). Further, this alteration is misleading and improperly invites the jury to find that an invalid tying arrangement does not exist if buyers need the tied product, presumably in order to work with the tying product. That is simply incorrect, and completely at odds with the law. *See e.g., Jefferson Parish Hospital*, 466 U.S. at 19 n. 30 ("We have often found arrangements involving functionally linked products at least one of which is useless without the other to be prohibited tying devices."); *Thompson v. Metropolitan Multi-List, Inc*., 934 F.2d 1566, 1575 (11th Cir. 1991) (rejecting argument against tying arrangement where one product was claimed to be "useless" without the other). Qualcomm's proposed alteration to the model instruction should be rejected.

**QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 43**

**SECTION 1 OF THE SHERMAN ACT AND SECTIONS 16720 AND 16727 OF THE CARTWRIGHT ACT—FORECLOSURE OF A SUBSTANTIAL VOLUME OF COMMERCE WITH RESPECT TO THE TIED PRODUCT**

If you determine that the alleged tying products and the alleged tied product are separate products that have been tied to one another and that Qualcomm has market power for the alleged tying products then you must determine whether the CMs have proven that Qualcomm has foreclosed a substantial amount of commerce with respect to competing products in the market for the alleged tied product.

In determining whether Qualcomm has foreclosed a substantial amount of commerce with respect to the alleged tied product, you should first consider the total dollar amount of Qualcomm's sales of the alleged tied product achieved by the tying arrangement in absolute terms.

If the dollar amount of Qualcomm's sales of the alleged tied product was substantial, you should next consider whether there has been a substantial adverse effect on competition with respect to competing products in the market for the alleged tied product due to the tying arrangement.  If there was not a substantial adverse effect on competition with respect to competing products in the market for the alleged tied product due to the tying arrangement, then you must find in favor of Qualcomm on the tying claim.

There is no substantial foreclosure if only a small percentage of sales of competing products in the market for the alleged tied product were affected by the tying arrangement.  There also is no substantial foreclosure if you find that

purchasers would not have bought the alleged tied product at all in the absence of the tying arrangement.

*Compare* ABA Model Jury Instructions in Civil Antitrust Cases at 97 (2016 Edition); *Morrison v. Viacom, Inc.*, 78 Cal. Rptr. 2d 133, 137 (Cal. Ct. App. 1998)

Given _____

Denied _____

Withdrawn _____

Modified _____

## APPLE AND CMS' OBJECTIONS

First, the CMs object to this instruction to the extent it overlaps with Apple and the CMs' proposed Instruction No. 23. Instruction No. 23 already instructs the jury that it needs to find that "the alleged tying arrangement foreclosed a 'substantial volume of commerce.'" Instruction No. 23, which is based on pattern instructions accepted by the Ninth Circuit, already instructs the jury that, "[i]n deciding this question, you must look to the total dollar volume of sales by Qualcomm to the CMs of the products, if any, that you find to have been tied to the tying products." Qualcomm's proposed instruction merely repeats this unnecessarily: "In determining whether Qualcomm has foreclosed a substantial amount of commerce with respect to the alleged tied product, you should first consider the total dollar amount of Qualcomm's sales of the alleged tied product achieved by the tying arrangement in absolute terms."

Second, the CMs object to this instruction to the extent that it directs the jury to consider whether there has been a "substantial adverse effect on competition with respect to competing products in the market for the alleged tied product due to the tying arrangement."  A showing of actual adverse effect on competition is not necessary to establish a per se tying claim, which the CMs have alleged.  Indeed, the per se framework is designed to shortcut the need for any extended analysis of competitive conditions in the affected market. *Northern Pacific Railway v. United States*, 356 U.S. 1, 3 (1958) (asserting that principle of per se unreasonableness "avoids the necessity for an incredibly complicated and prolonged economic investigation…to determine at large whether a particular restraint has been unreasonable").  Qualcomm's proposed instruction injects an additional hurdle for the CMs' claim which is not supported by the law, by requiring an element that is required in rule of reason cases, and not in per se cases.  *See, e.g., Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1200 (9th Cir. 2012) (holding that "a plaintiff bringing a rule of reason tying case…must allege an 'actual adverse effect on competition' caused by the tying arrangement") (citations omitted).

**QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 44**

**SECTION 1 OF THE SHERMAN ACT AND SECTIONS 16720 AND 16727 OF THE CARTWRIGHT ACT—BUSINESS JUSTIFICATION DEFENSE**

If you find that the CMs have proven all of the elements of a tying claim, then you should consider whether Qualcomm has proven, by a preponderance of the evidence, a business justification for the tying arrangement.  Qualcomm has the burden of proof on this issue.

In determining whether the tying arrangement is justified, you must decide whether it serves a legitimate business purpose of Qualcomm.  In making this determination, you should consider whether the justification Qualcomm offers is the real reason that it imposed the tying arrangement.

You must also consider whether Qualcomm's claimed objective could reasonably have been realized through less restrictive means.  Even if some type of constraint is necessary to promote a legitimate business interest, Qualcomm must not adopt a constraint that is more restrictive than reasonably necessary to achieve that interest.

In determining whether Qualcomm's objective could reasonably have been achieved through other means, you may assess such factors as whether other means to achieve Qualcomm's objective were more or less expensive and more or less effective than the means chosen by Qualcomm.

If you find that Qualcomm could reasonably have achieved its legitimate business purpose by less restrictive means, then you may find that there was no business justification and find for the CMs on the tying claim.  If you find that the tying arrangement serves a legitimate business purpose of Qualcomm, and that

1   there are not less restrictive means reasonably available to achieve that purpose,

2   then you must find for Qualcomm and against the CMs on the tying claim.

3

4

5   *Compare* ABA Model Jury Instructions in Civil Antitrust Cases at 99

6   (2016 Edition); *In re Cipro Cases I & II*, 348 P.3d 845, 870-71 (Cal. 2015);

7   *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1483 (9th Cir. 1986)

8   Given  _____

9   Denied  _____

10  Withdrawn  _____

11  Modified  _____

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27  **EXHIBIT G:  QUALCOMM'S**                    -116-                    **CASE NO. 3:17-CV-0108-GPC-MDD**
    **PROPOSED JURY INSTRUCTIONS**
28  **WITH OBJECTIONS**

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 45

## SECTION 1 OF THE SHERMAN ACT AND SECTIONS 16720 AND 16727 OF THE CARTWRIGHT ACT—EXCLUSIVITY TERMS

An exclusive dealing agreement is not, in and of itself, a violation of Section 1 of the Sherman Act or Sections 16720 or 16727 of the Cartwright Act because an exclusive dealing agreement may have procompetitive effects.  An exclusive dealing agreement does not violate Section 1 of the Sherman Act or Sections 16720 or 16727 of the Cartwright Act unless it constitutes an unreasonable restraint of trade.  Thus, you must decide whether the anticompetitive effect of any alleged exclusive dealing agreement substantially outweighed the beneficial effect on competition and whether any alleged exclusive dealing agreement caused the CMs to suffer injury to their business or property.

*Compare ABA* Model Jury Instructions in Civil Antitrust Cases at 3, 71-72 (2016 Edition); *Theme Promotions, Inc. v. News Am. Marketing FSI*, 546 F.3d 991, 1000-01 (9th Cir. 2008)

Given  _____

Denied  _____

Withdrawn  _____

Modified _____

## APPLE AND CMS' OBJECTIONS

The CMs object to this instruction in its entirety.  Qualcomm's instruction regarding how exclusive dealing arrangements may violate Sherman Act Section 1 or the Cartwright Act is irrelevant and has no application in this case.  The CMs

1   are not alleging a discrete violation of Section 1 or the Cartwright Act based on

2   Qualcomm's exclusivity agreements with Apple.  Rather, the CMs allege that

3   Qualcomm's exclusivity agreements with Apple support the CMs' Section 2

4   monopolization claim.  Thus, Qualcomm's proposed instruction does not apply to

5   any actual claim that the jury will be asked to decide.  There is no basis for

6   providing the jury with a superfluous and irrelevant instruction; doing so will only

7   serve to confuse the jury about the claims they will need to decide.

1
2
3
4
5
6
# **SECTION 2 OF THE SHERMAN ACT**
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2
3

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 46

## SECTION 2 OF THE SHERMAN ACT—MONOPOLIZATION — GENERAL—ELEMENTS

4   To prevail on their claims under Section 2 of the Sherman Act, Apple and

5   the CMs must prove each of the following elements by a preponderance of the

6   evidence:

7   1.   the alleged market is a valid antitrust market;

8   2.   Qualcomm possessed monopoly power in the alleged antitrust market;

9   3.   Qualcomm willfully acquired or maintained monopoly power in the

10   alleged antitrust market by engaging in anticompetitive conduct; and

11   4.   Apple and the CMs were injured in their business or property because

12   of Qualcomm's anticompetitive conduct.

13   If you find that Apple and the CMs have failed to prove any of these

14   elements, then you must find for Qualcomm and against Apple and the CMs on the

15   Sherman Act Section 2 claims.  If you find that Apple and the CMs have proved

16   each of these elements by a preponderance of the evidence, then you must find for

17   Apple and the CMs against Qualcomm on the Sherman Act Section 2 claims.

18
19
20
21
22
23
24
25
26

27
28

1  *Compare ABA* Model Jury Instructions in Civil Antitrust Cases at 102

2  (2016 Edition)

3  Given  _____

4  Denied  _____

5  Withdrawn  _____

6  Modified  _____

7  ## APPLE AND CMS' OBJECTIONS

8        Apple and the CMs object to this instruction because it improperly describes

9  monopoly power as being "the power to control prices, restrict output, *and* exclude

10  competition," while Ninth Circuit and Supreme Court case law make clear that

11  monopoly power is "the power to control prices *or* exclude competition."  *See*

12  *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir.

13  1997) ("Monopoly power is 'the power to control prices *or* exclude competition.'"

14  (emphasis added) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 571

15  (1966)); *see also* Apple and CMs' Proposed Jury Instruction No.13.  Apple and the

16  CMs object to this and any other instruction that misstates the law by describing

17  these aspects of monopoly power in the conjunctive rather than the disjunctive.

18        Apple and the CMs object to this instruction—and every other antitrust

19  instruction—as not making clear the relevant time period at which the jury must

20  assess whether Qualcomm had monopoly power.   For example, Qualcomm states

21  in this instruction that the jury must find that Qualcomm "possessed monopoly

22  power in the alleged antitrust market," whereas Apple and the CMs state that the

23  jury must find that Qualcomm "possesses or at relevant times possessed monopoly

24  power."  *See* Apple and the CMs' Proposed Jury Instruction No. 11.  This

25  modification makes clear to the jury that it must look to the relevant time periods

26

1  to determine whether Qualcomm had monopoly power.  This kind of precision is
2  necessary because, in other instructions, Qualcomm uses the present tense
3  "possesses."  *See* Qualcomm's Proposed Jury Instruction No. 33 (Rule of
4  Reason—Proof of Competitive Harm).  Qualcomm's use of the present tense in its
5  antitrust instructions is legally incorrect.  *See, e.g.*, *L.A. Land Co. v. Brunswick*
6  *Corp.*, 6 F.3d 1422, 1425, 1429 n.7 (9th Cir. 1993) ("The jury could have inferred
7  from the evidence presented, however, that Brunswick was a desirable supplier *at*
8  *the relevant time*.") (emphasis added); *see also Oahu Gas Service, Inc., v. Pacific*
9  *Resources, Inc.*, 838 F.2d 360 (9th Cir. 1988) (affirming a finding of monopoly
10  power measured during the "relevant period" of alleged exclusionary conduct,
11  despite the fact that a significant number of competitors entered the market
12  between the time period of exclusionary conduct and the time of trial, by which
13  time the competitive environment had changed due to the new entrants); *Microbix*
14  *Biosystems, Inc. v. Biowhittaker, Inc.*, 172 F. Supp. 2d 680, 695 (D. Md. 2000)
15  (dismissing as "without merit" defendant's argument that it could not have
16  monopoly power because it had a zero percent market share at the time of
17  summary judgment) ("[Defendant's] monopoly power is determined as of the time
18  the alleged monopolization occurred.").

19       Apple also objects to Qualcomm's statement that Apple must prove that it
20  "[was] injured."  Apple seeks injunctive relief under Section 16 of the Clayton Act,
21  not damages under Section 4 of the Clayton Act.  Injunctive relief is available
22  under Section 16 of the Clayton Act "even though the plaintiff has not yet suffered
23  actual injury; [it] need only demonstrate a significant threat of injury from an
24  impending violation of the antitrust laws or from a contemporary violation likely to
25  occur."  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130 (1969);

1    *see also Datagate, Inc. v. Hewlett-Packard Co.*, 941 F.2d 864 (9th Cir. 1991).  As

2    reflected in Apple's proposed instructions, Apple makes clear that the jury needs to

3    find that Apple faced a significant threat of injury, as opposed to actual injury.

4    Accordingly, Apple objects to any proposed jury instructions that state that Apple

5    must prove actual injury, as opposed to a "significant threat" of injury.

6            Moreover, Qualcomm has completely omitted any instruction to the jury

7    regarding the form of injury that Apple must prove.  Qualcomm has included a

8    separate instruction detailing what the CMs must prove in order to demonstrate

9    injury, but has not included any similar instruction with respect to Apple.  In

10   contrast, Apple has included an instruction making clear that Apple must

11   demonstrate "significant threat of injury" under Section 16 of the Clayton Act—

12   and explaining what this means—that is Instruction 38 in Apple and the CMs'

13   instructions.  Apple objects to Qualcomm's complete lack of instructions to the

14   jury on the question of Apple's injury.  The complete lack of instruction on this

15   point may mislead and confuse the jury with respect to Apple's claims.  The jury

16   may also be confused into thinking that Apple must prove actual injury, as opposed

17   to significant threat of injury.

18           Apple and the CMs also object to Qualcomm's references to a singular

19   "antitrust market."  Apple and the CMs allege multiple antitrust markets (the

20   CDMA and premium LTE markets), and therefore it would be inappropriate for the

21   jury instructions to refer to a singular "alleged antitrust market."  Apple and the

22   CMs object to all of Qualcomm's instructions that refer to a singular market on this

23   basis.

24           Apple and the CMs also object to Qualcomm's use of the term "valid"

25   antitrust market in the first element of this instruction, as compared to Apple and

26

1  the CMs' use of "relevant" antitrust market. The ABA Model Instructions

2  repeatedly use the term "relevant" markets; therefore, for the sake of consistency

3  and to minimize juror confusion, this instruction's first element should be modified

4  accordingly. This modification would be consistent with Ninth Circuit case law.

5  *See, e.g.*, *Malaney v. UAL Corp.*, 434 F. App'x 620, 621 (9th Cir. 2011) (referring

6  to "relevant antitrust market"); *E.W. French & Sons, Inc. v. Gen. Portland, Inc.*, 62

7  F.3d 1424 (9th Cir. 1995) ("relevant market").

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 47

## SECTION 2 OF THE SHERMAN ACT—MONOPOLIZATION— MONOPOLY POWER DEFINED

To prove their claims under Section 2 of the Sherman Act, Apple and the CMs must prove by a preponderance of the evidence that Qualcomm has monopoly power in a relevant antitrust market.  Monopoly power is the power to control prices, restrict output, and exclude competition in a relevant antitrust market.  More precisely, a firm is a monopolist if it can profitably raise prices substantially above the competitive level for a significant period of time.  However, possession of monopoly power, in and of itself, is not unlawful.

I will provide further instructions about how you may determine whether Apple and the CMs have met their burden of proving monopoly power in a relevant market.

*Compare ABA* Model Jury Instructions in Civil Antitrust Cases at 104 (2016 Edition)

Given  _____

Denied  _____

Withdrawn  _____

Modified _____

**APPLE AND CMS' OBJECTIONS**

Apple and the CMs object to this instruction because it improperly describes monopoly power as being "the power to control prices, restrict output, *and* exclude competition," while Ninth Circuit and Supreme Court case law make clear that monopoly power is "the power to control prices *or* exclude competition." *See Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997) ("Monopoly power is 'the power to control prices *or* exclude competition.'") (emphasis added) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966));

Apple and the CMs object to this instruction as not making clear the relevant time period at which the jury must assess whether Qualcomm had monopoly power.   For example, Qualcomm states in this instruction that the jury must find that "Qualcomm has monopoly power in a relevant antitrust market," whereas Apple and the CMs state, in their proposed instructions, that the jury must find that Qualcomm "possesses or at relevant times possessed monopoly power."  Apple and the CMs' modification makes clear to the jury that it must look to the relevant time periods to determine whether Qualcomm had monopoly power.  Qualcomm's use of the present tense in its antitrust instructions is legally incorrect.  *See, e.g.*, *L.A. Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1425, 1429 n.7 (9th Cir. 1993) ("The jury could have inferred from the evidence presented, however, that Brunswick was a desirable supplier *at the relevant time*.") (emphasis added); *see also Oahu Gas Service, Inc., v. Pacific Resources, Inc.*, 838 F.2d 360 (9th Cir. 1988) (affirming a finding of monopoly power measured during the "relevant period" of alleged exclusionary conduct, despite the fact that a significant number of competitors entered the market between the time period of exclusionary conduct

1  and the time of trial, by which time the competitive environment had changed due

2  to the new entrants); *Microbix Biosystems, Inc. v. Biowhittaker, Inc.*, 172 F. Supp.

3  2d 680, 695 (D. Md. 2000) (dismissing as "without merit" defendant's argument

4  that it could not have monopoly power because it had a zero percent market share

5  at the time of summary judgment) ("[Defendant's] monopoly power is determined

6  as of the time the alleged monopolization occurred.").

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 48
## SECTION 2 OF THE SHERMAN ACT—MONOPOLIZATION—
## RELEVANT MARKET—GENERAL

Apple and the CMs must prove by a preponderance of the evidence that Qualcomm had monopoly power in a relevant market.  Defining the relevant market is essential because you are required to make a judgment about whether Qualcomm has monopoly power in a properly defined economic market.  To make this judgment, you must be able to determine what, if any, economic forces restrain Qualcomm's freedom to set prices in the relevant product markets alleged by Apple and the CMs.  The fact that a product is protected by a patent does not alone create monopoly power in the alleged product market.

The most likely and most important restraining force will be actual and potential competition from other firms and their products.  This includes all firms and products that act or likely could act as restraints on Qualcomm's power to set prices as it pleases because customers could switch to them if Qualcomm sets its own prices too high.  All the firms and products that exert such restraining force are within what is called the relevant market.

In determining whether Apple and the CMs have met their burden to prove the relevant market by a preponderance of the evidence, you must consider whether they have proven a relevant product market.

*Compare ABA* Model Jury Instructions in Civil Antitrust Cases at 106 (2016 Edition); *Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 42-43 (2006)

1  Given  _____

2  Denied  _____

3  Withdrawn  _____

4  Modified  _____

5  **APPLE AND CMS' OBJECTIONS**

6  Apple and the CMs object to this instruction because Qualcomm's addition

7  of the sentence stating "[t]he fact that a product is protected by a patent does not

8  alone create monopoly power in the alleged market" misrepresents the scope of

9  patent law in the context of SEPs and the FRAND commitment.  This language

10  does not appear in the ABA model instruction, and the additional language—

11  similar to the other additional language regarding patents, discussed *supra*—is

12  likely to mislead the jury about the types of patents at issue in this case.

13  Apple and the CMs also object to this instruction on the grounds that it does

14  not inform the jury of the relevant markets at issue.  It is appropriate to inform the

15  jury that there are two relevant markets, and to identify them for the jury—the

16  CDMA chipset market, and the premium LTE chipset market.

17  Apple and the CMs additionally object to the inclusion of this sentence: "the

18  views of Apple, the CMs and Qualcomm regarding who their respective

19  competitors are" as a factor for the jury to consider in evaluating whether various

20  products are reasonably interchangeable. Apple and the CMs' competitors are not

21  particularly relevant to their claims.  Accordingly, Apple and the CMs have

22  proposed the following alternate language for their instructions: "the views of

23  Apple, the CMs, and Qualcomm regarding who Qualcomm's competitors are,"

24  which is more accurate, as the inquiry relates to Qualcomm's competitors.

**QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 49**

**SECTION 2 OF THE SHERMAN ACT—MONOPOLIZATION—**

**RELEVANT PRODUCT MARKET**

The basic idea of a relevant product market is that the products within it are reasonable substitutes for each other from the buyer's point of view; that is, the products compete with each other.  In other words, the relevant product market includes the products that a consumer believes are reasonably interchangeable or reasonable substitutes for each other.  This is a practical test with reference to the actual behavior of buyers and marketing efforts of sellers.  Products need not be identical or precisely interchangeable as long as they are reasonable substitutes.  Thus, for example, if consumers seeking to cover leftover food for storage considered certain types of flexible wrapping material—such as aluminum foil, cellophane, or even plastic containers—to be reasonable alternatives, then all those products may be in the same relevant product market.

To determine whether products are reasonable substitutes for each other, you must consider whether a small but significant and non-transitory increase in the price of one product would result in enough customers switching from that product to another product such that the price increase would not be profitable.  In other words, will customers accept the price increase or will so many switch to alternative products that the price increase will be withdrawn?  Generally speaking, a small but significant and non-transitory increase in price is approximately a 5 percent increase in price not due to cost factors.  If you find that customers would switch and that the price increase would not be profitable, then you must conclude that the products are in the product market.  If, on the other hand, you find that

customers would not switch, then you must conclude that the products are not in the product market.

In evaluating whether various products are reasonably interchangeable or reasonable substitutes for each other under the price increase test I have just given you, you may also consider:

- consumers' views on whether the products are interchangeable;
- the relationship between the price of one product and sales of another;
- the presence or absence of specialized vendors;
- the perceptions of either the industry or the public as to whether the products are in separate markets;
- the views of Apple, the CMs and Qualcomm regarding who their respective competitors are; and
- the existence or absence of different customer groups or distribution channels.

In this case, Apple and the CMs contend that the relevant product markets are: (1) a market for "CDMA chipsets" and (2) a market for "premium LTE chipsets." By contrast, Qualcomm contends that Apple and the CMs have failed to allege a proper relevant product market. If you find that Apple and the CMs have proven a relevant product market, then you should continue to evaluate the remainder of Apple and the CMs' claims under Section 2 of the Sherman Act. However, if you find that Apple and the CMs have failed to prove such a market, then you must find in Qualcomm's favor on Apple and the CMs' claims under Section 2 of the Sherman Act.

*Compare ABA* Model Jury Instructions in Civil Antitrust Cases at 108

(2016 Edition)

Given _____

Denied _____

Withdrawn _____

Modified _____

## **QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 50**

## **SECTION 2 OF THE SHERMAN ACT—MONOPOLIZATION—**

## **RELEVANT PRODUCT MARKET—SUPPLY SUBSTITUTABILITY**

In deciding whether Apple and the CMs have proven a relevant product market, you may also consider what the law refers to as "the cross-elasticity of supply" or, in other words, the extent to which the producers of one product would be willing to shift their resources, such as intellectual property, manufacturing facilities, or personnel to producing another product in response to an increase in the price of the other product. Such producers, to the extent that they exist, can increase supply and, therefore, drive prices back to competitive levels, defeating any effort by a would-be monopolist to charge significantly higher prices.

Take two shoe manufacturers, for example. The first manufacturer produces shoes for women, while the second manufacturer produces shoes for men. Generally speaking, men's and women's shoes are not reasonably interchangeable and, therefore, might be thought of as being in a separate product markets. However, it is possible that the men's shoe manufacturer could quickly shift its resources to start producing women's shoes if the women's shoe manufacturer raised its prices significantly and vice versa. Although women would not buy men's shoes, nor would men buy women's shoes, the ability of each manufacturer to alter its production could prevent the other manufacturer from raising prices significantly. Thus, in this example, men's and women's shoes would be included in the same market.

If, in determining the products in the relevant product market you find that there are manufacturers that have the ability to alter their production to manufacture products that can reasonably be substituted for Qualcomm's chips—

even though they do not presently compete with Qualcomm—you may consider whether the existence of these potential alternative suppliers can influence the prices that Qualcomm charges for its product and, if so, that amount of the product that these suppliers are likely to produce.  However, if you find that there are no others who would switch production to products that would compete with Qualcomm's, you may define the market solely on your evaluation of whether the existing allegedly competing products are reasonable substitutes for each other.

*Compare ABA* Model Jury Instructions in Civil Antitrust Cases at 112 (2016 Edition)

Given  _____

Denied  _____

Withdrawn  _____

Modified  _____

## **APPLE AND CMS' OBJECTIONS**

Apple and CMs object to Qualcomm's proposed instruction in its entirety because it incorrectly suggests to the jury that the jury should consider "supply substitutability" in defining the relevant antitrust market. "As the Supreme Court has instructed, '[t]he outer boundaries of a product market are determined by the reasonable *interchangeability of use* or the cross-elasticity of demand between the product itself and substitutes for it.'" *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008) (quoting *Brown Shoe v. United States*, 370 U.S. 294, 325 (1962)). In other words, the focus of the inquiry is on the demand side— "the extent to which consumers will change their consumption of one product in

1   response to a price change in another . . . ."  *Eastman Kodak Co. v. Image Tech.*

2   *Servs., Inc.*, 504 U.S. 451, 469 (1992) (internal citations omitted)).

3           "The determination of what constitutes the relevant product market hinges,

4   therefore, on a determination of those products to which consumers will turn, given

5   reasonable variations in price," *Lucas Auto. Eng., Inc. v. Bridgestone/Firestone,*

6   *Inc.*, 275 F.3d 762, 767 (9th Cir. 2001)—not on whether suppliers try to capitalize

7   on a price increase by a competitor. Qualcomm's "Supply Substitutability"

8   instruction flips this principle on its head by implying that the jury should assess

9   supply substitutability rather than focusing on the cross-elasticity of demand. As

10  written, this instruction risks confusing the jury by giving the impression that the

11  thrust of the relevant-market inquiry is on the supply side rather than on the

12  demand side, where it properly belongs.

13  If the Court finds that an instruction as to supply substitutability is proper, Apple

14  and CMs contend that the appropriate section to include such an instruction is the

15  section of jury instructions regarding indirect proof of monopoly power—

16  specifically, on barriers to entry.  Qualcomm has omitted the portion of the indirect

17  proof instruction focused on barriers to entry, and improperly attempts to raise that

18  issue in the instructions about the relevant market. *See* Qualcomm's Proposed

19  Instruction No. 51.  To the extent supply substitutability should be included in the

20  instructions at all, the Court should instruct the jury on supply substitutability in

21  conjunction with instructions about various ways the jury might find indirect

22  evidence of monopoly power.

23

24

25

26

27

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 51
## SECTION 2 OF THE SHERMAN ACT—MONOPOLIZATION—
## EXISTENCE OF MONOPOLY POWER—INDIRECT PROOF

If you find that Apple and the CMs have proven a relevant market, then you should determine whether Qualcomm has monopoly power in that market.  As I instructed you earlier, monopoly power is the power to control prices and exclude competition in a relevant antitrust market.  [Placeholder for description of Apple and the CMs' evidence, if any, on monopoly power.]  If Apple and the CMs' evidence establishes that Qualcomm has the power to control prices and exclude competition in the relevant antitrust market, then you may conclude that Qualcomm has monopoly power in the market.

[Placeholder for explanation of how the jury may consider Apple and the CMs' evidence, if any, on monopoly power, as provided by the ABA Model Jury Instructions in Civil Antitrust Cases.]

If you find that Qualcomm has monopoly power in the relevant market, then you must consider the remaining elements of these claims.  If you find that Qualcomm does not have monopoly power, then you must find for Qualcomm and against Apple and the CMs on these claims.

*Compare ABA* Model Jury Instructions in Civil Antitrust Cases at 115 (2016 Edition)

Given  _____

Denied  _____

Withdrawn  _____

1   Modified _____

2   ## **APPLE AND CMS' OBJECTIONS**

3          Apple and the CMs seek to prove their claims through both direct and

4   indirect proof. Antitrust violations are regularly proven using a combination of

5   direct and indirect proof, and the factors discussed in the indirect proof instruction

6   are regularly considered. *See, e.g.*, *United States v. Microsoft Corp.*, 253 F.3d 34,

7   56-57 (D.C. Cir. 2001) (discussing both indirect proof, including evidence of

8   market structure and barriers to entry, as well as direct proof, including evidence of

9   defendant's restriction of output). Qualcomm, however, has deleted the indirect

10  proof instruction almost in its entirety—including only placeholders— and

11  attempts to have the jury focus only on elements of direct proof.  It is not clear

12  what Qualcomm means by "[Placeholder for explanation of how the jury may

13  consider Apple and the CMs' evidence, if any, on monopoly power, as provided by

14  the ABA Model Jury Instructions in Civil Antitrust Cases]" considering that the

15  ABA Model Jury Instructions include model instructions that Apple and the CMs

16  have included in their own instructions. Qualcomm's effort to limit the jury's

17  consideration of indirect proof misrepresents the law and would result in a one-

18  sided, and incorrect, presentation of the forms of proof the jury should consider.

19         Moreover, this instruction includes an incorrect formulation of monopoly

20  power: "monopoly power is the power to control prices and exclude competition in

21  a relevant antitrust market." As Apple and the CMs noted in an earlier objection, to

22  accurately reflect the law, this should instead read: "monopoly power is the power

23  to control prices **or** exclude competition in a relevant antitrust market." *Image*

24  *Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997)

25  ("Monopoly power is 'the power to control prices *or* exclude competition.'").

26

1    Apple and the CMs therefore respectfully request that the Court adopt its

2 version of the indirect proof instruction.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 52
## SECTION 2 OF THE SHERMAN ACT—MONOPOLIZATION—
## EXISTENCE OF MONOPOLY POWER—DIRECT PROOF

If you find that Apple and the CMs have proven a relevant market, then you should determine whether Qualcomm has monopoly power in that market.  As I instructed you earlier, monopoly power is the power to control prices and exclude competition in a relevant antitrust market.  More precisely, a firm is a monopolist if it can profitably raise or maintain prices substantially above the competitive level for a significant period of time.

Apple and the CMs have the burden of proving that Qualcomm has the ability to raise or maintain the prices that it charges for goods in the relevant market above competitive levels.  Apple and the CMs must prove that Qualcomm has the power to do so by itself—that is, without the assistance of, and despite competition from, any existing or potential competitors.

Apple and the CMs must also prove that Qualcomm has the power to maintain prices above a competitive level for a significant period of time.  If Qualcomm attempted to maintain prices above competitive levels, but would lose so much business to other competitors that the price increase would become unprofitable and would have to be withdrawn, then Qualcomm does not have monopoly power.

Similarly, Apple and the CMs must prove that Qualcomm has the ability to exclude competition.  For example, if Qualcomm attempted to maintain prices above competitive levels, but new competitors could enter the relevant market or existing competitors could expand their sales and take so much business that the price increase would become unprofitable and would have to be withdrawn, then

Qualcomm does not have monopoly power.  The ability to earn high profit margins or a high rate of return does not necessarily mean that Qualcomm has monopoly power.  Other factors may enable a company without monopoly power to sell at higher prices or earn higher profit margins than its competitors, such as superior products or services, low costs, or superior advertising or marketing.  However, an ability to sell at higher prices or earn higher profit margins than other companies for similar goods or services over a long period of time may be evidence of monopoly power.  By contrast, evidence that Qualcomm would lose a substantial amount of sales if it raised prices substantially, or that Qualcomm's profit margins were low compared to its competitors, or that Qualcomm's margins go up and down or are steadily decreasing, might be evidence that Qualcomm does not have monopoly power.

If you find that Qualcomm has monopoly power in the relevant market, then you must consider the remaining elements of these claims.  If you find that Qualcomm does not have monopoly power, then you must find for Qualcomm and against Apple and the CMs on these claims.

*Compare ABA* Model Jury Instructions in Civil Antitrust Cases at 121 (2016 Edition)

Given   _____

Denied   _____

Withdrawn   _____

Modified _____

# APPLE AND CMS' OBJECTIONS

Apple and CMs object to this instruction.  This instruction incorrectly conveys the notion that "monopoly power is the power to control prices and exclude competition in a relevant antitrust market." As Apple and the CMs noted in an earlier objection, this should instead read "monopoly power is the power to control prices **or** exclude competition in a relevant antitrust market." Likewise, this instruction states that "Apple and the CMs have the burden of proving that Qualcomm has the ability to raise or maintain the prices," **and** that "Similarly, Apple and the CMs must prove that Qualcomm has the ability to exclude competition."  Apple and the CMs need only prove one of these two options, and Apple and the CMs have included language in their proposed instructions that makes this clear. *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997) ("Monopoly power is 'the power to control prices *or* exclude competition.'" (emphasis added)).

Apple and the CMs also object to this proposed instruction on the ground that it commits the "Cellophane fallacy," which is an error of logic that "[t]he existence of significant substitution in the event of *further* price increases or even at the *current* price does not tell us whether the defendant *already* exercises significant market power."  *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1121 (N.D. Cal. 2004) (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 471 (1992)).  Qualcomm's proposed instruction states that "evidence that Qualcomm would lose a substantial amount of sales if it raised prices substantially" might be evidence that Qualcomm does not have monopoly power.  However, this instruction fails to consider the fact that Qualcomm's prices may already be pricing as a monopolist.  Apple and CM's proposed instruction attempts

---

1    to correct this potential error by stating that "evidence that Qualcomm would lose a

2    substantial amount of sales if it raised prices substantially above the competitive

3    level" might be evidence that Qualcomm did not have monopoly power.  *See*

4    Apple and the CMs' Proposed Jury Instruction No. 17.

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 53

## SECTION 2 OF THE SHERMAN ACT—MONOPOLIZATION—WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY POWER

The next element Apple and the CMs must prove is that Qualcomm willfully acquired or maintained monopoly power through anticompetitive acts or practices. Anticompetitive acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market. Harm to competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition. Some examples of harm to competition include increased prices, decreased production levels, and reduced quality.

Mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws. The acquisition or maintenance of monopoly power by supplying better products or services, possessing superior business skills, or because of luck, is not unlawful.

A monopolist may compete aggressively without violating the antitrust laws, and a monopolist may charge monopoly prices without violating the antitrust laws. A monopolist's conduct only becomes unlawful where it involves anticompetitive acts.

The difference between anticompetitive conduct and conduct that has a legitimate business purpose can be difficult to determine. This is because all companies have a desire to increase their profits and increase their market share. These goals are an essential part of a competitive marketplace, and the antitrust

laws do not make these goals—or the achievement of these goals—unlawful, as long as a company does not use anticompetitive means to achieve these goals.

In determining whether Qualcomm's conduct was anticompetitive or whether it was legitimate business conduct, you should determine whether the conduct is consistent with competition on the merits, whether the conduct provides benefits to consumers, and whether the conduct would make business sense apart from any effect it has on excluding competition or harming competitors.

For example, suppose there are five firms that make printers for home computers and that these printers comprised a relevant product market. Suppose also that Firm A developed a more efficient manufacturing process that allowed it to sell profitably at a lower price than its competitors. If Firm A grew its market share and achieved monopoly power by selling profitably at a lower price, it would not be unlawful for Firm A to achieve monopoly power in this way. Developing more efficient processes and developing the ability to sell profitably at lower prices is competition on the merits and benefits consumers, and it therefore is not anticompetitive conduct even if it has a negative effect on competitors.

Similarly, in the same example, suppose Firm B developed and patented a revolutionary new printer and consumers so preferred Firm B's printer that Firm B achieved monopoly power. It would not be unlawful for Firm B to achieve monopoly power in this way. Firm B "built a better mousetrap," which is competition on the merits and benefits consumers, and it therefore is not anticompetitive conduct.

By contrast, in the same example, suppose not only that Firm C makes printers, but also that Firm C is the world's only manufacturer of computers and that there are barriers to entry in the computer market such that no other firm will

be able to enter that market.  Suppose also that Firm C altered its computers in such a way that only Firm C's printers would work with its computers, and that the alteration does not improve the design of Firm C's computers or provide any benefits to competition or consumers.  The only effect of the alteration is to exclude competing printer makers from the marketplace.  It would be unlawful for Firm C to achieve monopoly power in the printer market in this way.

As these examples show, the acts or practices that result in the acquisition or maintenance of monopoly power must represent something more than the conduct of business that is part of the normal competitive process or commercial success. They must represent conduct that has made it very difficult or impossible for competitors to compete and that was taken for no legitimate business reason. You may not find that a company willfully acquired or maintained monopoly power through anticompetitive means if it has acquired or maintained that power solely through the exercise of superior foresight and skill; or because of natural advantages such as unique geographic access to raw materials or markets; or because of economic or technological efficiency, including efficiency resulting from scientific research; or by obtaining a lawful patent or patents; or because changes in cost or consumer preference have driven out all but one supplier; or because the market is so limited that it is impossible to efficiently produce the product except by a plant large enough to supply the whole demand.

If you find that Apple and the CMs have proven by a preponderance of the evidence that Qualcomm willfully acquired or maintained monopoly power through anticompetitive acts, then you must consider whether Apple and the CMs have proved the remaining elements of these claims.  If, however, you find that

1   Apple and the CMs did not prove this element by a preponderance of the evidence,

2   then you must find for Qualcomm against Apple and the CMs on these claims.

3

4

5   *Compare ABA* Model Jury Instructions in Civil Antitrust Cases at 123

6   (2016 Edition)

7   Given   _____

8   Denied   _____

9   Withdrawn   _____

10  Modified _____

11                    <u>**APPLE AND CMS' OBJECTIONS**</u>

12          Apple and the CMs object to the inclusion of the "five firms" example as

13  confusing, irrelevant, prejudicial, and likely to mislead the jury.  The convoluted

14  scenarios described in this instruction are not relevant to the facts of this case,

15  making the examples far more likely to confuse jurors than to aid in their

16  understanding of the underlying legal issues in this case.  The examples offered

17  show only one way a firm might engage in anticompetitive conduct while

18  possessing monopoly power, creating a possible perception that the conduct

19  described in the example is the *only* way a monopolist might engage in unlawful

20  conduct.  If the "five firms" example were used, the jury could be confused and

21  substantially misled about the parameters of what it may consider when assessing

22  whether a company had monopoly power.

23

24

25

26

27  **EXHIBIT G:  QUALCOMM'S**                    -146-                    **CASE NO. 3:17-CV-0108-GPC-MDD**
    **PROPOSED JURY INSTRUCTIONS**

28  **WITH OBJECTIONS**

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 54

## SECTION 2 OF THE SHERMAN ACT—UNILATERAL REFUSAL TO DEAL WITH A COMPETITOR

Under Section 2 of the Sherman Act, ordinarily, a company may deal or refuse to deal with whomever it pleases, as long as it acts independently.  Even a company with monopoly power in a relevant market has no general duty to cooperate with its business rivals and ordinarily may refuse to deal with them.

Considering all of the facts and circumstances, you must decide whether any refusal to deal was motivated solely by an anticompetitive intent.  A refusal to deal with a competitor constitutes anticompetitive conduct only where the refusal is contrary to the short-run best interest of Qualcomm, and where it makes sense for Qualcomm only because it harms competitors and helps Qualcomm achieve or maintain monopoly power in the long run.

A refusal to deal that is based in part on legitimate business reasons does not violate the antitrust laws, even if it is also motivated by the desire to harm competitors or does in fact harm competitors.  In general, the desire to maintain monopoly power or to block entry of competitors is not a legitimate business purpose.  A legitimate business purpose is one that benefits the actor regardless of any harmful effect on competitors, such as a purpose to promote efficiency or quality, offer a better product or service, or increase short-run profits.  In other words, if the refusal to deal results in or is expected to result in short-run or long-run benefits to Qualcomm—such as more profits, reduction of costs, a higher market share, or avoiding the loss of customers—then it is not anticompetitive and you must find for Qualcomm on this element.  On the other hand, if the refusal to deal hurts Qualcomm in the short-run, and is undertaken only because Qualcomm

expects it to harm competitors and enhance its monopoly power in the long run, then you must find for Apple and the CMs on this element.

In the patent context, a patent holder's unilateral refusal to license a patent is ordinarily not properly viewed as exclusionary conduct. A patent holder's desire to exclude others from use of its patented technology without more is a presumptively valid business justification.

*Compare ABA* Model Jury Instructions in Civil Antitrust Cases at 129, 219 (2016 Edition)

Given  _____

Denied  _____

Withdrawn  _____

Modified  _____

## **APPLE AND CMS' OBJECTIONS**

Apple and the CMs object to this instruction as inapplicable to any claims involved in this case and therefore highly likely to confuse and mislead the jury.

Qualcomm's liability under Section 2 of the Sherman Act does not stand or fall on whether it unlawfully refuses to license competitors, conduct which Apple and CMs allege is a part of Qualcomm's overall anticompetitive scheme. Rather, the anticompetitive conduct alleged must be viewed in the aggregate. *See Free Freehand Corp. v. Adobe Sys.*, 852 F. Supp. 2d 1171 (N.D. Cal. 2012) (Koh, J.) ("Thus, the Court analyzes the alleged anticompetitive practices below to determine whether, in the aggregate, they tend to reduce competition and maintain Adobe's monopoly power."); *Anaheim v. So. Cal. Edison Co.*, 955 F.2d 1373 (9th

Cir. 1992) ("In so doing, we agree that it would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect. At the same time, if all we are shown is a number of perfectly legal acts, it becomes much more difficult to find overall wrongdoing. Similarly, a finding of some slight wrongdoing in certain areas need not by itself add up to a violation. We are not dealing with a mathematical equation. We are dealing with what has been called the 'synergistic effect' of the mixture of the elements."). Apple and the CMs object to this instruction as misleading in that it encourages the jury to view Qualcomm's refusal to license competitors in isolation rather than as a piece of a broader anticompetitive scheme.

Furthermore, the last paragraph that Qualcomm added to the Instruction regarding a patent owner's conduct is misleading and prejudicial because it does not acknowledge that the antitrust claims in this case involve SEPs and does not account for the FRAND commitment Qualcomm undertook by participating in SSOs.  The desire of a SEP owner with a FRAND commitment to exclude others from use of its patented technology is ***not*** a presumptively valid business justification.  This instruction should not be given for the same reason that the Court should decline to provide Qualcomm's proposed introduction to the intersection of patent laws and antitrust laws.  In the event that the Court thinks such an instruction is proper, Apple and CMs request that the following language be appended to the end of the instruction:

> Although companies are usually allowed to refuse to license a patent, Qualcomm is a party to agreements by standard-setting organizations, which require Qualcomm to license its SEPs on fair, reasonable, and nondiscriminatory terms. The agreements are policies that require Qualcomm to license its SEPs to modem chip suppliers.

1   *Fed. Trade Comm'n v. Qualcomm*, 17-cv-00220-LHK, 2018 WL 5848999, at *15

2   (N.D. Cal. Nov. 6, 2018) ("[A]s a matter of law, the TIA and ATIS IPR policies

3   both require Qualcomm to license its SEPs to modem chip suppliers.").

## **QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 55**
## **SECTION 2 OF THE SHERMAN ACT—SHAM LITIGATION**

The Constitution ensures the right of everybody, whether acting alone or in combination or agreement with others, to petition or appeal to the courts for judicial action, recognizing that when people do so, they will naturally seek judicial action that favors them and also may be unfavorable to others. The law provides that the right to use the courts to seek judicial action is an important right, and that the exercise of that right does not normally violate the antitrust laws.

Qualcomm did not violate the antitrust laws by suing the CMs unless the suit was a sham. To prove that this litigation is a sham, and that the litigation thus can be the basis for their antitrust claims, the CMs must prove two things: (1) that Qualcomm's suit was objectively baseless; and (2) the baseless suit must have been an attempt to harass or interfere directly with the business relationships of one or more competitors through the use of governmental process as opposed to through the outcome of the suit.

A lawsuit is objectively baseless only if no reasonable litigant could realistically expect to win. In other words, if someone in Qualcomm's position could have had a reasonable belief that there was a realistic chance of winning, the suit was not objectively baseless.

If you find that Qualcomm's suit was not objectively baseless, then you do not need to consider whether Qualcomm's lawsuit was an attempt to harass or interfere with the business relationships of one or more competitors. Instead, you must find for Qualcomm and against the CMs on the CMs' charges that Qualcomm violated the Sherman Act by pursuing a lawsuit.

1    If, however, you find that Qualcomm's lawsuit was objectively baseless,

2  then you must determine whether Qualcomm's primary objective in bringing the

3  lawsuit was to hurt competitors of Qualcomm by bringing or continuing the

4  lawsuit regardless of the ultimate outcome of the lawsuit, or whether Qualcomm's

5  primary objective was to obtain the relief sought in the suit.

6    In determining Qualcomm's purpose, you may consider whatever direct

7  evidence of Qualcomm's motivation for bringing the lawsuit is available to you.

8  Of course, you also may consider circumstantial evidence of Qualcomm's true

9  purpose.

10    If you find that no reasonable person could have realistically expected to

11  succeed in a suit such as the one Qualcomm brought or maintained against the

12  CMs, and that Qualcomm's primary purpose in bringing or continuing it was to

13  inflict harm on competitors of Qualcomm caused by the suit itself, as opposed to

14  the relief sought, then you must next consider whether Qualcomm's actions in

15  bringing the suit constitute a violation of Section 2 the Sherman Act, that is,

16  whether the remaining elements of the CMs' claims have been proven.

17

18

19  *Compare ABA* Model Jury Instructions in Civil Antitrust Cases at 345-46

20  (2016 Edition)

21  Given  _____

22  Denied  _____

23  Withdrawn  _____

24  Modified _____

25

26

27  **EXHIBIT G: QUALCOMM'S**          **-152-**          **CASE NO. 3:17-CV-0108-GPC-MDD**
    **PROPOSED JURY INSTRUCTIONS**

28  **WITH OBJECTIONS**

## APPLE AND CMS' OBJECTIONS

Apple and the CMs object to Qualcomm's proposed instruction on sham litigation as irrelevant to the case and therefore likely to mislead the jury.  This instruction is prejudicial because it is inapposite.  None of the claims or defenses in this case involves reference to the *Noerr Pennington* doctrine; nor has any party alleged that the claims brought in this case or any other adjudicative action fall into the "sham" exception to that doctrine.  *See generally Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240 (9th Cir. 1982).  Qualcomm's instruction was written for circumstances in which the jury would need to decide whether a petition in an adjudicative body constitutes a "sham litigation" to overcome the *Noerr Pennington* doctrine.  Because no party claims application of *Noerr Pennington*, and therefore no party is claiming that the claims in this case constitute "sham litigation," including this instruction would be confusing and likely mislead the jury.

1
2
3
4
5
6
## ANTITRUST LAW CAUSATION AND DAMAGES
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 56**

**CLAYTON ACT SECTION 4 AND THE CARTWRIGHT ACT REQUIREMENTS—INJURY AND CAUSATION**

If you find that Qualcomm has violated Sections 1 or 2 of the Sherman Act or Sections 16720 or 16727 of the Cartwright Act, then you must decide if the CMs are entitled to recover damages from Qualcomm.

The CMs are entitled to recover damages for an injury to their business or property if they can establish three elements of injury and causation by a preponderance of the evidence:

1.  The CMs were in fact injured as a result of the alleged violation of Sections 1 or 2 of the Sherman Act or Sections 16720 or 16727 of the Cartwright Act;

2.  The alleged illegal conduct was a material cause of the CMs' injury; and

3.  The CMs' injury is an injury of the type that the antitrust laws were intended to prevent.

The first element is sometimes referred to as "injury in fact" or "fact of damage." For the CMs to establish that they are entitled to recover damages, they must prove that they were injured as a result of Qualcomm's alleged violation of the antitrust laws. Proving the fact of damage does not require the CMs to prove the dollar value of their injury. It requires only that the CMs prove that they were in fact injured by Qualcomm's alleged antitrust violation. If you find that the CMs have established that they were in fact injured, you may then consider the amount of the CMs' damages. It is important to understand, however, that injury and amount of damage are different concepts and that you cannot consider the amount

of damage unless and until you have concluded that the CMs have established that they were in fact injured.

The CMs must also offer evidence that establishes by a preponderance of the evidence that Qualcomm's alleged illegal conduct was a material cause of the CMs' injury.  This means that the CMs must have proved that some damage occurred to them as a result of Qualcomm's alleged antitrust violation, and not some other cause.  The CMs are not required to prove that Qualcomm's alleged antitrust violation was the sole cause of their injury; nor need the CMs eliminate all other possible causes of injury.  It is enough if the CMs have proved that the alleged antitrust violation was a material cause of their injury.

Finally, the CMs must establish that their injury is the type of injury that the antitrust laws were intended to prevent.  This is sometimes referred to as "antitrust injury."  If the CMs' injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then the CMs' injuries are antitrust injuries.  On the other hand, if the CMs' injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers, then the CMs' injuries are not antitrust injuries and the CMs may not recover damages for those injuries under the antitrust laws.

*Compare* ABA Model Jury Instructions in Civil Antitrust Cases at 300-01 (2016 Edition); Judicial Council of California Civil Jury Instructions (2019 Edition) No. 3440; *Kolling v. Dow Jones & Co.*, 137 Cal. App. 3d 709, 723-24 (1982)

1   Given _____

2   Denied _____

3   Withdrawn _____

4   Modified _____

5   ## **APPLE AND CMS' OBJECTIONS**

6       Apple and the CMs object to Qualcomm's instruction as incomplete and

7   therefore likely to confuse or mislead the jury.  Given that direct purchasers (the

8   CMs) and an indirect purchaser (Apple) will be trying their cases against

9   Qualcomm together, Qualcomm's proposed instruction is incomplete because it

10  does not instruct the jury that, when determining whether the CMs have been

11  injured, the jury may not consider whether the CMs recouped all or part of the

12  alleged overcharges by passing on any amounts to Apple or their other customers.

13  Absent such an instruction, there is a real danger that the jury will be confused and,

14  in contravention of the law, fail to find injury by considering evidence that the

15  CMs received payments from Apple or its other customers.  Qualcomm should not

16  be allowed to benefit from the jury's potential confusion.

17      The law is settled that direct purchasers—such as the CMs—are injured

18  when they pay "money wrongfully induced," and their "damages are established

19  by the amount of the overcharge."  *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S.

20  251, 262 n.14 (1972). Thus, under Section 4 of the Clayton Act, "courts will not go

21  beyond the fact of th[e] [overcharge] injury to determine whether the victim of the

22  overcharge has partially recouped its loss in some other way." Id.; see also *S. Pac.*

23  *Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531, 534 (1918) ("The plaintiffs

24  suffered losses [in] the amount of the [overcharge] when they paid [it]. Their claim

25

26

27

28

1   accrued at once in the theory of the law and it does not inquire into later events."

2   (citation omitted)).

3       As such, evidence that the CMs may have recouped all or part of

4   Qualcomm's unlawful overcharges by, among other things, passing on those

5   overcharges to their customers, including Apple, is legally irrelevant to whether

6   they suffered injury.  *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S.

7   481, 494 (1968) (holding that antitrust defendants are prohibited from raising as a

8   defense that direct purchaser plaintiffs passed-on or otherwise recouped all or some

9   of defendants' overcharges by passing-on those overcharges to their customers).

10   See also, e.g., *Meijer, Inc. v. Abbott Labs.*, 251 F.R.D. 431, 433 (N.D. Cal. 2008)

11   ("[W]hen a seller overcharges a buyer . . . , the fact that the buyer raises the price

12   for its own product, thereby passing on the overcharge to its customers and

13   avoiding a loss in profit, has no bearing on the issue of whether the buyer has

14   suffered an injury . . . . [D]amages are appropriate to the extent the buyer was

15   overcharged, and must be measured accordingly."); *In re Apple iPod iTunes*

16   *Antitrust Litig.*, No. C 05-00037, 2011 WL 5864036, at *4 (N.D. Cal. Nov. 22,

17   2011) (in antitrust action, rejecting defendant's pass-on-overcharge defense on

18   motion for class certification); *Braintree Labs, Inc. v. McKesson Corp.*, No. 11-

19   80233, 2011 WL 5025096, at *3 (N.D. Cal. Oct. 20, 2011) ("The Supreme Court

20   has made it clear that in an antitrust suit, a plaintiff's alleged benefit from a

21   defendant's anti-competitive behavior because the plaintiff 'passed on' any

22   overcharge is not relevant to whether the plaintiff suffered a cognizable antitrust

23   injury." (citation omitted)).

24       There is nothing improper about clearly instructing the jury that they may

25   not discount injury or damages to the CMs in light of any recoupment.  Such an

26

instruction is particularly necessary in this case given the nature of the parties' claims, where evidence of the CMs' commercial relationship with and payments from Apple, its customer, will certainly be introduced.

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 57

## CLAYTON ACT SECTION 4 REQUIREMENTS—INTRODUCTION— BUSINESS OR PROPERTY

Apple and the CMs each must establish that the injury it claims to have suffered was an injury to its business or property.  The term "business" includes any commercial interest or venture.  Apple and the CMs have been injured in their business if you find that they have suffered injury to any of their commercial interests or enterprises as a result of the alleged antitrust violation.  The term property includes anything of value Apple and the CMs own, possess, or in which Apple and the CMs have a protectible legal interest.  Apple and the CMs have been injured in their property if you find that anything of value that they own, possess, or have a legal interest in has been damaged as a result of the alleged antitrust violation.  Apple and the CMs have been injured in their property if you find that they have paid an inflated price for goods, services, any legal interest of value, or have lost money as a result of the alleged antitrust violation.

*Compare ABA* Model Jury Instructions in Civil Antitrust Cases at 303 (2016 Edition); Cal. Bus. & Prof. Code § 16750

Given  _____

Denied  _____

Withdrawn  _____

Modified _____

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **APPLE AND CMS' OBJECTIONS**

Apple objects Qualcomm's failure to include the proper standard of injury with respect to Apple. This instruction incorrectly states that "Apple and the CMs must establish that the injury it claims to have suffered was an injury to its business or property." However, as explained *supra*, because Apple seeks an injunction pursuant to Clayton Act Section 16, Apple "need only demonstrate a significant threat of injury" from an impending or contemporary antitrust violation. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130 (1969). Apple therefore objects to Qualcomm's omission of this language from its proposed jury instructions respectfully refers the Court to Apple and the CMs' Proposed Instruction No. 39, which includes the proper respective standards for injury to business or property.

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 58

## ANTITRUST DAMAGES—INTRODUCTION AND PURPOSE

If you find a violation of the antitrust laws and that this violation caused injury to the CMs, then you must determine the amount of damages, if any, the CMs are entitled to recover.  Apple does not seek damages for its antitrust claim.

It is important to understand, however, that injury and amount of damages are different concepts and that you cannot consider the amount of damage unless and until you have concluded that the CMs have established that they were in fact injured.  The fact that I am giving you instructions concerning the issue of the CMs' damages does not mean that I believe the CMs should, or should not, prevail in this case.  If you reach a verdict for Qualcomm on the issue of liability on the CMs' antitrust claims, you should not consider the issue of damages for the CMs, and you may disregard the damages instruction that I am about to give.

The law provides that the CMs should be fairly compensated for all damages to their business or property that were a direct result or likely consequence of the conduct that you have found to be unlawful under Sections 1 and 2 of the Sherman Act and Sections 16720 and 16727 of the Cartwright Act.

Antitrust damages are only compensatory, meaning their purpose is to put an injured plaintiff as near as possible in the position in which it would have been had the alleged antitrust violation not occurred.  The law does not permit you to award damages to punish a wrongdoer—what we sometimes refer to as punitive damages—or to deter particular conduct in the future.  Furthermore, you are not permitted to award to the CMs an amount for attorneys' fees or the costs of maintaining this lawsuit.

1   *Compare ABA* Model Jury Instructions in Civil Antitrust Cases at 300-01, 304

2   (2016 Edition)

3   Given  _____

4   Denied  _____

5   Withdrawn  _____

6   Modified  _____

7   **APPLE AND CMS' OBJECTIONS**

8       The CMs object to Qualcomm's unnecessary and illogical deviation from

9 the ABA model instruction. Qualcomm has copied over this sentence from

10 Qualcomm's "injury and causation" instruction into the second paragraph of this

11 proposed instruction on damages: "It is important to understand, however, that

12 injury and amount of damages are different concepts and that you cannot consider

13 the amount of damage unless and until you have concluded that the CMs have

14 established that they were in fact injured." There is no basis for this deviation

15 from the ABA model instructions, and Qualcomm's alteration should be rejected.

16       First, because the sentence also appears in the "injury and causation"

17 instruction, it is repetitive and superfluous. There is no need to instruct the jury

18 twice on exactly the same point, and doing so will likely confuse the jury into

19 believing that it should place greater emphasis on this concept than any other. That

20 is incorrect.

21       Second, to the extent that Qualcomm is proposing to move the sentence to a

22 damages instruction as opposed to an "injury and causation instruction," Apple and

23 the CMs also object. There is no reason to alter its placement from where the ABA

24 has placed it in its model instructions. *See* ABA Model Instructions at 302. The

25 statement is proper in that context, whereas it is confusing in the context of

26

27   **EXHIBIT G: QUALCOMM'S**     **-163-**     **CASE NO. 3:17-CV-0108-GPC-MDD**
  **PROPOSED JURY INSTRUCTIONS**

28   **WITH OBJECTIONS**

damages (since, as Qualcomm acknowledges, injury and damages are different concepts).  At the point when the jurors would be read this instruction, they will already have been instructed on their need to find injury, and this instruction just confusingly backtracks. This sentence belongs in its proper place in the instruction regarding injury and causation, and the Court should reject Qualcomm's attempt to place undue emphasis on an element that stands on equal footing with other elements.

**QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 59**

**ANTITRUST DAMAGES—BASIS FOR CALCULATING DAMAGES**

You are permitted to make just and reasonable estimates in calculating the CMs' damages.  You are not required to calculate damages with mathematical certainty or precision.  However, the amount of damages must have a reasonable basis in the evidence and must be based on reasonable, non-speculative assumptions and estimates.  Damages may not be based on guesswork or speculation.  The CMs must prove the reasonableness of each of the assumptions upon which the damages calculation is based.

If you find that the CMs have provided a reasonable basis for determining damages, then you may award damages based on a just and reasonable estimate supported by the evidence.

If you find that the CMs have failed to carry their burden of providing a reasonable basis for determining damages, then you may not award damages.

*Compare ABA* Model Jury Instructions in Civil Antitrust Cases at 307 (2016 Edition); Judicial Council of California Civil Jury Instructions (2019 Edition) No. 3440

Given  _____

Denied  _____

Withdrawn  _____

Modified _____

# APPLE AND CMS' OBJECTIONS

It is black-letter law that, when determining whether the extent of the CMs' damages, the jury may not consider whether the CMs recouped all or part of the alleged overcharges by passing on any amounts to Apple or their other customers. The CMs object that Qualcomm's proposed instruction is incomplete and confusing because it does not instruct the jury accordingly.   Absent such an instruction, there is a danger that the jury may be confused and, in contravention with the law, discount its calculations of the CMs' damages by considering evidence that the CMs received payments from Apple or its other customers.  The likelihood of jury confusion is particularly high where evidence of Apple's payments to, or commercial relationship with, the CMs will be presented to the jury.  Qualcomm should not be allowed to benefit from the jury's potential confusion.

The law is settled that direct purchasers—such as the CMs—are injured when they pay "money wrongfully induced," and their "damages are established by the amount of the overcharge."  *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 262 n.14 (1972).  Thus, under Section 4 of the Clayton Act, "courts will not go beyond the fact of th[e] [overcharge] injury to determine whether the victim of the overcharge has partially recouped its loss in some other way." *Id.*; *see also S. Pac. Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531, 534 (1918) ("The plaintiffs suffered losses [in] the amount of the [overcharge] when they paid [it]. Their claim accrued at once in the theory of the law and it does not inquire into later events." (citation omitted)).

As such, evidence that the CMs may have recouped all or part of Qualcomm's unlawful overcharges by, among other things, passing on those

overcharges to their customers, including Apple, is legally irrelevant to whether they suffered injury. *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 494 (1968) (holding that antitrust defendants are prohibited from raising as a defense that direct purchaser plaintiffs passed-on or otherwise recouped all or some of defendants' overcharges by passing-on those overcharges to their customers). *See also, e.g., Meijer, Inc. v. Abbott Labs.*, 251 F.R.D. 431, 433 (N.D. Cal. 2008) ("[W]hen a seller overcharges a buyer . . . , the fact that the buyer raises the price for its own product, thereby passing on the overcharge to its customers and avoiding a loss in profit, has no bearing on the issue of whether the buyer has suffered an injury . . . . [D]amages are appropriate to the extent the buyer was overcharged, and must be measured accordingly."); *In re Apple iPod iTunes Antitrust Litig.*, No. C 05-00037, 2011 WL 5864036, at *4 (N.D. Cal. Nov. 22, 2011) (in antitrust action, rejecting defendant's pass-on-overcharge defense on motion for class certification); *Braintree Labs, Inc. v. McKesson Corp.*, No. 11-80233, 2011 WL 5025096, at *3 (N.D. Cal. Oct. 20, 2011) ("The Supreme Court has made it clear that in an antitrust suit, a plaintiff's alleged benefit from a defendant's anti-competitive behavior because the plaintiff 'passed on' any overcharge is not relevant to whether the plaintiff suffered a cognizable antitrust injury." (citation omitted)).

   The CMs' proposed instruction cures the omission in Qualcomm's proposed instruction and should be accepted instead.

1
2

**QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 60**
**ANTITRUST CLAIMS—CAUSATION AND DISAGGREGATION**

3
4
5
6
7
8
9
10
11

If you find that Qualcomm violated the antitrust laws and that the CMs were injured by that violation, the CMs are entitled to recover for such injury that was the direct result or likely consequence of the unlawful acts you find.  The CMs bear the burden of showing that their injuries were caused by the alleged antitrust violation, as opposed to any other factors.  If you find that the CMs' alleged injuries were caused in part by the alleged antitrust violation and in part by other factors, then you may award damages only for that portion of the CMs' alleged injuries that was caused by the alleged antitrust violation.  The CMs may only recover for damages caused by the alleged antitrust violation.

12
13
14
15
16

The CMs bear the burden of proving damages by a preponderance of the evidence, including apportioning damages between lawful and unlawful causes.  If you find that the CMs were injured by the alleged antitrust violation, and there is a reasonable basis to apportion the CMs' alleged injury between lawful and unlawful causes, then you may award damages.

17
18
19
20
21
22

If you find that the CMs' alleged injuries were caused by factors other than the alleged antitrust violation, then you must return a verdict for Qualcomm.  If you find that there is no reasonable basis to apportion the CMs' alleged injury between lawful and unlawful causes, or that apportionment can only be accomplished through speculation or guesswork, then you may not award any damages at all.

23
24
25

*Compare ABA* Model Jury Instructions in Civil Antitrust Cases at 310-11

26
27
28

1    (2016 Edition); Judicial Council of California Civil Jury Instructions

2    (2019 Edition) No. 3440; *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d

3    1148, 1160 (9th Cir. 2001)

4    Given _____

5    Denied _____

6    Withdrawn _____

7    Modified _____

8    <u>**APPLE AND CMS' OBJECTIONS**</u>

9          The CMs object on the basis that Qualcomm's jury instruction is incomplete

10   and likely to confuse the jury, who may be led to believe that the CMs are required

11   to apportion the CMs' alleged injury among various anticompetitive activities.

12   That is not the law, and the CMs' proposed instruction on this point is clarifying

13   and avoids the potential for confusion among the jurors, given that the CMs allege

14   that Qualcomm engaged in a multi-faceted but interrelated scheme, with each of

15   the parts making possible and reinforcing the effects of the others.  The CMs'

16   proposed addition to this instruction simply clarifies that if the jury finds

17   Qualcomm violated the antitrust laws, and if it finds the CMs were injured, that the

18   jury need not engage in parsing out the CMs' injury among Qualcomm's different

19   anticompetitive acts.  This is consistent with the notes to the model instructions

20   which state that the CMs "need not allocate damages among those acts found to be

21   unlawful."  *Id.* at 314 Notes (citing *LePage's Inc. v. 3M*, 324 F.3d 141, 166 (3d

22   Cir. 2003) and *MCI Commc'ns Corp. v. AT&T*, 708 F.2d 1081, 1163 (7th Cir.

23   1983)).

24         The duty of the jury in complicated antitrust cases is "to look at the whole

25   picture and not merely at the individual figures in it," and thus to give the plaintiffs

26

27   **EXHIBIT G:  QUALCOMM'S**               **-169-**               **CASE NO. 3:17-CV-0108-GPC-MDD**
     **PROPOSED JURY INSTRUCTIONS**
28   **WITH OBJECTIONS**

"the full benefit of their proof without tightly compartmentalizing the various factual components." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.* 370 U.S. 690, 699 (1962) (quotation omitted). Thus, as the Ninth Circuit stated in a case involving multiple theories for a Section 2 violation, "it would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect." *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992). Courts thus do not require allocation of damages to particular anticompetitive acts. *MCI Commc'ns Corp.*, 708 F.2d at 1161. This rule prevents defendants from evading liability due to the complexity of their schemes: "Not requiring strict disaggregation of damages among the various unlawful acts of the defendant serves to prevent a defendant from profiting from his own wrongdoing and makes sense when damages arise from a series of unlawful acts intertwined with one another." *Id.* (citing *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264-65 (1946) ("It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain.")). The CMs' requested instruction follows this reasoning, the Supreme Court's decisions, and the Note to the Model Rule. The additional sentence will prevent confusion among the jurors, and the Court should adopt it.

**QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 61**

**CAUSATION AND DAMAGES—DAMAGES FOR TYING ARRANGEMENTS**

If you determine that there was an unlawful tying arrangement that caused some injury to the CMs, you must next consider the extent of the CMs' damages. The CMs' damages are measured by the difference between the price the CMs actually paid for the tied product and tying products and the sum of the prices at which the tied and tying products could have been obtained on the open market in the absence of the tie.

You may award damages to the CMs only if the amount the CMs actually paid for both the tying and tied products is more than the combined fair market value of both the tying and tied products.  For example, if Qualcomm discounted the price of the tying product, such that the price of the package was equal to or less than the fair market value of the package, the CMs are not entitled to recover damages, even if the price assigned to the tied product was greater than the price at which that product could have been obtained separately.



*Compare ABA* Model Jury Instructions in Civil Antitrust Cases at 313 (2016 Edition); *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001)

Given _____

Denied _____

Withdrawn _____

Modified _____

# APPLE AND CMS' OBJECTIONS

The CMs object on the basis that this instruction is incomplete, since it focuses solely on tying damages. It does not instruct the jury on the measure of damages relating to the CMs' challenge to Qualcomm's conduct as an unreasonable restraint of trade under the rule of reason pursuant to Section 1, nor does it instruct the jury on the measure of damages on the CMs' monopolization claim against Qualcomm under Section 2. The CMs' proposed jury instructions cure these defects, and should be adopted by the Court instead.

The CMs also object on the basis that Qualcomm asserts that damages in a tying case are measured by reference to the "combined fair market value of both the tying and tied products," and that some offset against the overcharge on the tied product must be taken into account when determining damages. Not so. Rather, it is the law in the Ninth Circuit (and elsewhere) that damages are calculated only by reference to the overcharge on the tied product. "Under ordinary circumstances, [plaintiff's] injury and damage, if any, would be the difference between the price they paid for the [tied product] and what they might have been compelled to pay for comparable goods." *Gray v. Shell Oil Co.*, 469 F.2d 742, 751 (9th Cir. 1972); *see also Pogue v. Int'l Indus., Inc.*, 524 F.2d 342, 344-45 (6th Cir. 1975) ("the ordinary measure of damages would be the difference between the price actually paid for the tied product and the price at which the product could have been obtained on the open market"); *Bell v. Cherokee Aviation Corp.*, 660 F.2d 1123, 1133 (6th Cir. 1981) (same); *Northern v. McGraw-Edison Co.*, 542 F.2d 1336, 1347 (8th Cir. 1976) (same) (*citing Siegel v. Chicken Delight, Inc.*, 448 F.2d 43, 52 (9th Cir. 1971); *Carpa, Inc. v. Ward Foods, Inc.*, 536 F.2d 39 (5th Cir. 1976) (same). This flows from the recognition that "[i]n the typical tying arrangement, the victim's injury lies in the higher prices that must be paid for the tied product as

a result of the seller's economic power in the tying product market." *Pogue*, 524 F.2d at 344.

The "package" measure that Qualcomm endorses, which includes taking into account any offset against the overcharge by the amount that the tying product price might rise in the absence of the tie, is the exception rather than the rule.  It is also an exception that is inapplicable to the present circumstances.  Qualcomm's measure of damages may be appropriate where a seller has charged nothing (or a heavily discounted price) for the tying product, but has exploited the tying product through a substantial overcharge on the tied products.  For example, in *Siegel v. Chicken Delight, Inc*., a franchiser granted franchises rights without collecting any direct franchise fees or royalties, but instead required franchisees to purchase certain tied products at inflated prices.  The Ninth Circuit held that, under those circumstances, the defendant was entitled to an offset for reasonable value of the tying product given that there was no understanding the tying items (i.e. franchise rights) were to be given free of charge.  *Id*. at 52.  This is not the case here, where Qualcomm disavowed any discounting on the tying product to take into account the price of the tied product and indeed as alleged by the CMs, charges a supracompetitive price for the tying products.

## **QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 62**

## **CAUSATION AND DAMAGES—MULTIPLE PLAINTIFFS**

If you award damages, you will be asked what sum of money would fairly and reasonably compensate each CM.  If you find that more than one CM is entitled to recover damages, exercise caution to be sure that each CM is awarded damages only for its own injuries.

*Compare ABA* Model Jury Instructions in Civil Antitrust Cases at 326 (2016 Edition); *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001); Judicial Council of California Civil Jury Instructions (2019 Edition) No. 3933

Given  _____

Denied  _____

Withdrawn  _____

Modified _____

## **QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 63**
## **CAUSATION AND DAMAGES—PLAINTIFFS' PARTICIPATION**

A party who is of equal guilt in an unlawful contract to restrain trade cannot claim that it has been wronged by other parties who assisted or collaborated with it in the contract to restrain trade.  If you find that the CMs were co-initiators of a contract to restrain trade or equally responsible for the acts of a contract to restrain trade, then the CMs are not entitled to recover damages for that period of time in which the CMs remained a party to the contract to restrain trade.

However, the CMs are not prevented from collecting damages for injuries caused by an unlawful contract to restrain trade merely because that the CMs may have participated in the contract to restrain trade, so long as the CMs are not an equal participant in the contract to restrain trade.  If you find that the CMs are an equal participant in the alleged unlawful scheme, the CMs are barred from collecting any damages.  If you find that the CMs are a party to an unlawful contract to restrain trade but not an equal participant, you must consider both the benefits and the losses that the CMs realized as a result of that contract to restrain trade, and you may award damages only for that amount by which the losses exceeded the benefits.

*Compare ABA* Model Jury Instructions in Civil Antitrust Cases at 327 (2016 Edition); *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001)

Given _____

Denied _____

---

1   Withdrawn _____

2   Modified _____

3

## APPLE AND CMS' OBJECTIONS

4        The CMs object to Qualcomm's "equal guilt" instruction in its entirety.  It is

5   inappropriate for this case, and should be entirely excluded.  There is no colorable

6   argument Qualcomm can advance to support a theory that the CMs collaborated

7   with Qualcomm to violate the antitrust laws, or that they were somehow equal

8   partners in Qualcomm's scheme.  But this is what the law requires to find that an

9   "equal guilt" defense applies.  For example, *Columbia Nitrogen Co. v. Royster Co.*,

10   451 F.2d 3, 15-16 (4th Cir. 1971), a case cited in the Notes of the very model

11   instructions referenced by Qualcomm, ruled that "when parties of substantially

12   equal economic strength mutually participate in the formulation and execution of

13   the scheme and bear equal responsibility for the consequent restraint of trade, each

14   is barred from seeking treble damages from the other."  And *in Perma Life*

15   *Mufflers, Inc. v. International Parts Corp*., the Supreme Court rejected the defense

16   where plaintiffs were, as the CMs are here, involuntary participants in "illegal

17   arrangements formulated and carried out by others."  392 U.S. 134, 139 (1968),

18   overruled on other grounds by *Copperweld Corp. v. Indep. Tube Corp*., 467 U.S.

19   752 (1984).  This is true even though plaintiffs sought the agreements

20   "enthusiastically" since plaintiffs accepted the restraints "solely because their

21   acquiescence was necessary to obtain an otherwise attractive business

22   opportunity."  *Id*.  There, as here, the plaintiffs were not "active participants" in the

23   anticompetitive acts, because "the illegal scheme was thrust upon them."  *Id*. at

24   141.

25

26

27

28

The Supreme Court has denied the appropriateness of this defense in almost all cases except where a plaintiff's "truly complete involvement and participation in a monopolistic scheme" might bar its cause of action. *Perma Life*, 392 U.S. at 140 (emphasis added); *see also* ABA Model Jury Instructions in Civil Antitrust Cases at 330 (citing *South-East Coal Co. v. Consolidation Coal Co.*, 434 F.2d 767, 784 (6th Cir. 1970) for the proposition that a plaintiff "cannot recover if he was 'a *co-initiator* of the conspiracy and *equally responsible* therefor'" (emphasis added)).  Qualcomm cannot argue with a straight face that is the case here, where there is no allegation, and indeed there could be none, that the CMs participated equally in the formulation of Qualcomm's commercial or licensing strategy in any way.  This instruction would thus only encourage the jury to reach a verdict contrary to law, and should be denied in its entirety.

1

## <u>QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 64</u>

2

## <u>DAMAGES ON MULTIPLE LEGAL THEORIES</u>

3      Each item of damages may be awarded only once, regardless of the number

4  of legal theories alleged.  The CMs may recover damages for allegedly excessive

5  royalties only once under any of their legal theories.

6

7

8  *Compare* Judicial Council of California Civil Jury Instructions (2019 Edition)

9  No. 3934

10  Given _____

11  Denied  _____

12  Withdrawn _____

13  Modified _____

14

15

16

17

18

19

20

21

22

23

24

25

26

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **<u>AFFIRMATIVE DEFENSES</u>**

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 65
## AFFIRMATIVE DEFENSES ARE NOT EVIDENCE

I will now instruct you about the parties' affirmative defenses.  An "affirmative defense" is a party's assertion of facts and arguments that, if true, would defeat another party's claim.  You must not interpret the fact that a party has asserted an affirmative defense as an admission of guilt or as evidence for any purpose.  You must consider affirmative defenses to claims that you find to have been proved.

For example, Alex claims Bob hit him.  Bob denies it and says that, even if Bob hit Alex, Alex consented.  A jury in that case must first determine whether Bob hit Alex.  If the jury finds that Bob did not hit Alex, then the jury would not consider the affirmative defense of consent.  If the jury finds that Bob hit Alex, then the jury would consider the affirmative defense of consent.

*Affirmative Defense*, *Black's Law Dictionary* (10th ed. 2014)

Given  _____

Denied  _____

Withdrawn  _____

Modified _____

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 66

## AFFIRMATIVE DEFENSE—WAIVER

As I will explain below, Qualcomm, Apple and the CMs each claim that they did not have to perform certain contract obligations because the other party to the contract gave up its right to performance of these obligations.  This defense is called a waiver.

To succeed, the party asserting waiver must prove both of the following by clear and convincing evidence:

1.      That the other party knew the party asserting this defense was required to perform; and

2.      That the other party freely and knowingly gave up its right to have the party asserting this defense perform these obligations.

A waiver may be oral or written or may arise from conduct that shows that the other party gave up that right.

If the party asserting this defense proves that the other party gave up its right to performance of these obligations, then the party asserting this defense was not required to perform these obligations.

Qualcomm claims that Apple gave up its right to have Qualcomm perform under the BCPA.  Qualcomm further claims that the CMs gave up their right to have Qualcomm perform its ETSI FRAND commitment with respect to the CMs and to perform under the SULAs.

Apple claims that Qualcomm gave up its right to have Apple perform under the BCPA and the 2013 SOW and its right to recover against Apple for unjust enrichment and tortious interference.

1      The CMs claim that Qualcomm gave up its right to have them perform under

2  their SULAs and MSAs.

3      You should not consider this defense with respect to any claim by any party

4  unless the claim is identified in this instruction.

5

6

7  *Compare* Judicial Council of California Civil Jury Instructions (2019 Edition)

8  No. 336

9  Given   _____

10  Denied   _____

11  Withdrawn   _____

12  Modified   _____

13  <u>**APPLE AND CMS' OBJECTIONS**</u>

14      Apple and the CMs object to Qualcomm's proposed instruction on waiver.

15  Qualcomm's waiver instruction closely tracks CACI No. 336, but the instruction as

16  written fails to account for the proper scope of the "waiver" defense, which applies

17  more broadly than just to contract claims. Apple and CMs maintain that the jury

18  should be instructed on waiver as a defense to non-breach of contract claims, such

19  as Qualcomm's Count I (tortious interference) and Count VIII (unjust enrichment),

20  as well as the other claims. Under California law, "waiver requires the intentional

21  relinquishment of a known right upon knowledge of the facts." *In re D.J.*, No

22  B257573, 2015 WL 1142954, at *7 (Cal. Ct. App. Mar. 12, 2015).  "Known

23  right[s]" are not limited to those a party might assert under contract law.  *See, e.g.*,

24  *Outboard Marine Corp. v. Sup. Ct.*, 124 Cal. Rptr. 852, 859 (Cal Ct. App. 1975)

25  ("The doctrine of waiver is generally applicable to all the rights and privileged to

26

27  **EXHIBIT G:  QUALCOMM'S**          -182-          **CASE NO. 3:17-CV-0108-GPC-MDD**
   **PROPOSED JURY INSTRUCTIONS**
28  **WITH OBJECTIONS**

which a person is legally entitled, including those conferred by statute . . . ."); *In re GVF Cannery, Inc.*, 202 B.R. 140, 144 (N.D. Cal. 1996) (applying California waiver doctrine to statutory rights). Therefore, Apple and the CMs have proposed an alternative version of this instruction that makes clear that it applies more broadly.

Apple and the CMs also object to this instruction, as well as all other affirmative defense instructions other than Statute of Limitations and Failure to Mitigate, on the grounds that the affirmative defenses associated with each cause of action should not be referenced only at the end of the instructions. Apple and the CMs propose that the affirmative defenses that all parties assert in connection with each cause of action should be identified earlier in the instructions, closer to the recitations of the elements of the instructions.  Otherwise, the jury may not fully understand that it should consider the affirmative defenses in connection with the various causes of action.  Apple and the CMs have proposed this approach in its instructions, and requests that the Court adopt this approach.  Apple and the CMs agree that affirmative defenses that relate to damages, such as Statute of Limitations and Failure to Mitigate, may be included at the end of the instructions.

Apple and the CMs further object to the narrative descriptions of how the parties assert the defense of waiver in connection with their claims. These descriptions are incorrect and misstate the applicability of the waiver defense to Apple and the CMs' claims.  The Court should adopt Apple and the CMs' approach, which is to identify generally the affirmative defenses asserted by the parties in connection with each cause of action, without any narration.To the extent Qualcomm has omitted any defense asserted by Apple or the CMs from its proposed affirmative defense instructions, and the Court adopts Qualcomm's

approach to the proposed instructions, Apple and the CMs reserve the right to request additions or other modifications to these instructions to reflect the defenses they assert

## **QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 67**
## **AFFIRMATIVE DEFENSE—UNJUST ENRICHMENT**

Apple, Qualcomm and the CMs contend that certain claims against them are barred by the doctrine of unjust enrichment.

To establish this defense, the party asserting the defense must prove by a preponderance of the evidence that:

1. Recovery by the party asserting the claim constitutes a benefit the party asserting the claim receives from the party asserting the defense; and

2. The retention of the benefit by the party asserting the claim at the expense of the party asserting the defense would be unjust.

Qualcomm contends that the doctrine of unjust enrichment bars the CMs' claims for violation of the Sherman Act § 2, violation of the Sherman Act § 1, violation of the Cartwright Act, breach of FRAND, breach of the covenant of good faith and fair dealing implied in FRAND, negligent misrepresentation and breach of the SULAs.

Apple contends that the doctrine of unjust enrichment bars Qualcomm's claim for unjust enrichment.

The CMs contend that the doctrine of unjust enrichment bars Qualcomm's claims for breach of the SULAs and breach of the MSAs.

*See In re Nat'l W. Life Ins. Deferred Annuities Litig.*, 268 F.R.D. 652, 668 (S.D. Cal. 2010)

Given _____

1  Denied  _____

2  Withdrawn  _____

3  Modified _____

4  **APPLE AND CMS' OBJECTIONS**

5       Apple and the CMs object to this instruction as a misstatement of law and

6  irrelevant for the jury's consideration.

7       First, Qualcomm has included jury instructions on unjust enrichment on the

8  grounds that unjust enrichment claims are jury triable as of right. But unjust

9  enrichment is an equitable claim that is for the Court, not the jury. (Apple and the

10  CMs maintain that an advisory jury is appropriate and unjust enrichment claims

11  should be presented to an advisory jury—Qualcomm's position is that only claims

12  with a jury right should be tried to a jury).  The Ninth Circuit has held that the

13  "cause of action for 'unjust enrichment'" is "synonymous with 'restitution.'"

14  Astiana v. Hain Celestial Group, Inc., 783 F.3d 753, 762 (9th Cir. 2015); see also

15  Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry, 494 U.S. 558, 570

16  (1999); Shum v. Intel Corp., 630 F. Supp. 2d 1063, 1078 (N.D. Cal. 2009) ("There

17  is little doubt that unjust enrichment is an equitable claim.").

18       Second, unjust enrichment is not properly asserted as an affirmative defense.

19  Okada v. Whitehead, No. 815CV01449JLSKES, 2017 WL 1237969, at *5 (C.D.

20  Cal. Apr. 4, 2017), aff'd, No. 17-56007, 2019 WL 92486 (9th Cir. Jan. 3, 2019)

21  ("Unjust Enrichment: Whitehead raises the affirmative defense of "unjust

22  enrichment," but he provides no authorities holding that unjust enrichment is an

23  affirmative defense under California law. Even if it were, it would fail for the

24  reasons provided in subsection B below.").  Qualcomm's citation, In re Nat'l W.

25  Life Ins. Deferred Annuities Litig., 268 F.R.D. 652, 668 (S.D. Cal. 2010), does not

26

state that unjust enrichment is an affirmative defense. Unjust enrichment is a form of recovery as Apple has noted in previous briefing before this Court, it is not a stand alone cause of action, let alone an affirmative defense.

Moreover, Qualcomm's statement of the defense indicates that it wants to instruct the jury that it could decide not to award damages to a defendant under a legally cognizable theory because it would be unjust. Qualcomm identifies no case that stands for the proposition that a jury can be told that it can refuse to award damages because the damages award would be unjust.

Lastly, Qualcomm's instruction misstates the elements of an unjust enrichment theory of recovery. To the extent the Court determines it is appropriate to instruct the jury on an affirmative defense of unjust enrichment, Apple and the CMs request that the Court instruct the jury using the elements of unjust enrichment set forth in their Instruction No. 100.

# QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 68

# AFFIRMATIVE DEFENSE—STATUTE OF LIMITATIONS

Apple, Qualcomm and the CMs contend that certain claims against them were not filed within the time set by law.  The party asserting this defense must prove the claim was untimely by a preponderance of the evidence.

To succeed on this defense with respect to Apple's claim under Section 2 of the Sherman Act, Qualcomm must prove that some or all of Apple's claimed harm occurred before January 20, 2013.  To succeed on this defense with respect to each of the CMs' claims, Qualcomm must prove that some or all of the CMs' claimed harm occurred before May 17, 2013.

To succeed on this defense with respect to Qualcomm's claim for tortious interference, Apple must prove that some or all of Qualcomm's claimed harm occurred before January 20, 2015.

To succeed on this defense with respect to each of Qualcomm's claims, the CMs must prove that some or all of Qualcomm's claimed harm occurred before May 17, 2013.

The statute of limitations may be a partial defense, allowing recovery for damages that took place after the date set by law but preventing recovery for damages that took place before the date set by law.

If you find that all of Apple's claimed harm from Qualcomm occurred before January 20, 2013, then Apple should not be allowed any recovery.  If you find that some, but not all, of Apple's claimed harm from Qualcomm occurred before January 20, 2013, then Apple should only be allowed to recover for the portion of harm that took place after January 20, 2013.

If you find that all of the CMs' claimed harm from Qualcomm occurred before May 17, 2013, then the CMs should not be allowed any recovery. If you find that some, but not all, of the CMs' claimed harm from Qualcomm occurred before May 17, 2013, then the CMs should only be allowed to recover for the portion of harm that took place after May 17, 2013.

If you find that all of Qualcomm's claimed harm from Apple for tortious interference occurred before January 20, 2015, then Qualcomm should not be allowed any recovery. If you find that some, but not all, of Qualcomm's claimed harm from Apple for tortious interference occurred before January 20, 2015, then Qualcomm should only be allowed to recover for the portion of harm that took place after January 20, 2015.

If you find that all of Qualcomm's claimed harm from the CMs occurred before May 17, 2013, then Qualcomm should not be allowed any recovery. If you find that some, but not all, of Qualcomm's claimed harm from the CMs occurred before May 17, 2013, then Qualcomm should only be allowed to recover for the portion of harm that took place after May 17, 2013.

You should not consider this defense with respect to any claim by any party unless it is identified in this instruction.


*Compare* Judicial Council of California Civil Jury Instructions (2019 Edition) No. 338; Order Granting In Part And Denying In Part Apple's Motion For Partial Summary Judgment On Second Amended Counterclaim For Tortious Interference With Contract As Time-Barred (ECF 729)

Given _____

1  Denied   _____

2  Withdrawn  _____

3  Modified _____

## APPLE AND CMS' OBJECTIONS

Apple and the CMs object to Qualcomm's instruction as incomplete, confusing, and incorrect.

First, Qualcomm's instruction states that Apple must prove that it is not liable for tortious interference that occurred prior to January 20, 2015.  But the Court already ruled that any tortious interference that occurred prior to January 20, 2015, is barred by the statute of limitations.  *See* Order Granting in Part and Denying in Part Apple's Mot. for Summary Judgment at 2, Nov. 08, 2018 (ECF No. 729).  Therefore, the Court should adopt Apple's approach, which is to instruct the jury that the Court has already found that Qualcomm cannot recover for tortious interference that predates January 20, 2015.  Qualcomm's instruction also fails to note that, under the four-year statute of limitations for breach of contract claims, Qualcomm is barred from recovering for any harm, including damages for such harm, that Apple proves occurred prior to January 20, 2013. Second, Qualcomm fails to include the three-year statute of limitations applicable to its unjust enrichment claims. California Code of Civil Procedure § 338(d); *Fed. Deposit Ins. Corp. v. Dintino*, 84 Cal. Rptr. 3d 38, 50-52 (Cal. Ct. App. 2008). Among other things, not including these instructions may cause juror confusion and imply there is no limit on the damages that can be awarded against Apple.

Qualcomm's instruction also is incorrect with respect to the statute of limitations for breach of FRAND commitments. As stated in Apple and the CMs' instruction, a party must bring a claim for breach of FRAND commitment within

1    five years, not four years, of the alleged breach. *See* Apple and the CMs' Proposed

2    Instruction No. 127.  This statute of limitations applies to the CMs' claim that

3    Qualcomm breached its FRAND commitments (CMs' Count V).

4         Apple and the CMs further object to the organization of this instruction. As

5    compared to Apple and the CMs' proposed instructions, Qualcomm's failure to use

6    topical headers to indicate the types of claims (breach of contract, unjust

7    enrichment, tortious interference) to which the statutes of limitations apply, makes

8    this instruction confusing.

## QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 69

## AFFIRMATIVE DEFENSE—RATIFICATION, AGREEMENT, ACQUIESCENCE OR CONSENT

Qualcomm claims that if it did not perform its obligations under the BCPA, Apple ratified this non-performance.  Qualcomm also claims that if it did not perform its obligations under the SULAs and/or satisfy its ETSI FRAND commitment with respect to the CMs, the CMs ratified this non-performance.

Apple claims that if it did not perform its obligations under the BCPA and/or the 2013 SOW, Qualcomm ratified this non-performance.  Apple further claims that if it tortiously interfered with Qualcomm's SULAs with the CMs, Qualcomm ratified this tortious interference.

The CMs claim that if they did not perform under the SULAs and/or the CM MSAs, Qualcomm ratified this non-performance.

To succeed on the defense of ratification, the party claiming ratification must show by a preponderance of the evidence that the other party knew and approved of the breach of the relevant contract.

You should not consider this defense with respect to any claim by any party unless it is identified in this instruction.


*Changzhou AMEC E. Tools & Equip. Co., Ltd. v. E. Tools & Equip., Inc.*, No. EDCV 11-00354 VAP (DTBx), 2012 WL 3106620, at *17 (C.D. Cal. July 30, 2012)

Given _____

Denied _____

1   Withdrawn _____

2   Modified _____

3   **APPLE AND CMS' OBJECTIONS**

4   Apple and the CMs incorporate by reference their objection to the waiver

5   instruction, where Apple and the CMs object to (1) the inclusion of all affirmative

6   defenses at the end of the instructions and (2) the narrative descriptions of the

7   parties' assertions of the affirmative defenses.

8   Moreover, Apple and the CMs object to this instruction on the grounds that

9   ratification, acquiescence, and consent are separate defenses. *See Aikins v. Tosco*

10   *Refining Co.*, 1999 WL 179686, at *4 (N.D. Cal. Mar. 26, 1999) (explaining

11   ratification under California law); *Marsh v. Lott*, 105 P. 968 (Cal. 1909)

12   (discussing acquiescence to breach of contract); *Sanchez v. Sanchez*, 2012 WL

13   6678223, at *5 n.3 (S.D. Cal. 2012) (Curiel, J.) (discussing consent as a defense to

14   intentional torts). Separate defenses warrant separate instructions. Although

15   Qualcomm purports to offer an instruction on "ratification, agreement,

16   acquiescence or consent," its instruction discusses solely ratification. Qualcomm's

17   approach, by omitting instructions on acquiescence and consent, is confusing and

18   risks prejudice to Apple and the CMs. Apple and the CMs ask that the Court adopt

19   Apple's proposed instruction for acquiescence.  Apple and the CMs further ask that

20   the Court adopt Apple's proposed instruction for consent, which is based directly

21   on California law. *See* Cal. Civ. Code § 3515.

22   Additionally, Apple and the CMs object to Qualcomm's instruction on the

23   ground that it does not reflect the appropriate "test for ratification" under

24   California law that is discussed in its authority. *See Changzhou AMEC E. Tools &*

25   *Equip. Co., Ltd. v. E. Tools & Equip., Inc.*, No. EDCV 11-00354 VAP (DTBx),

26

27   **EXHIBIT G:  QUALCOMM'S**                    **-193-**                    **CASE NO. 3:17-CV-0108-GPC-MDD**

28   **PROPOSED JURY INSTRUCTIONS**
     **WITH OBJECTIONS**

1    2012 WL 3106620, at *17 (C.D. Cal. July 30, 2012). Apple and the CMs'

2    instruction better reflects this test. *See* Apple and the CMs' Proposed Instruction

3    No. 117 (citing *Aikins*, 1999 WL 179686, at *4).

**QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 70**

**AFFIRMATIVE DEFENSE—FAILURE TO MITIGATE (BREACH OF CONTRACT AND TORTIOUS INTERFERENCE)**

If Qualcomm breached the BCPA with respect to Apple or if Qualcomm breached the SULAs or its ETSI FRAND commitment with respect to the CMs and the breach caused harm, Apple and the CMs are not entitled to recover damages for harm that Qualcomm proves by a preponderance of the evidence Apple and the CMs could have avoided with reasonable efforts or expenditures.  You should consider the reasonableness of Apple and the CMs' efforts in light of the circumstances facing them at the time, including their ability to make the efforts or expenditures without undue risk or hardship.  If Apple and the CMs made reasonable efforts to avoid harm, then your award should include reasonable amounts that they spent for this purpose.

If Apple tortiously interfered with Qualcomm's SULAs with the CMs and the tortious interference caused harm, Qualcomm is not entitled to recover damages for harm that Apple proves by a preponderance of the evidence Qualcomm could have avoided with reasonable efforts or expenditures.  You should consider the reasonableness of Qualcomm's efforts in light of the circumstances facing it at the time, including its ability to make the efforts or expenditures without undue risk or hardship.  If Qualcomm made reasonable efforts to avoid harm, then your award should include reasonable amounts that it spent for this purpose.

If the CMs breached the SULAs or the CM MSAs and the breach caused harm, Qualcomm is not entitled to recover damages for harm that the CMs prove by a preponderance of the evidence Qualcomm could have avoided with

reasonable efforts or expenditures.  You should consider the reasonableness of Qualcomm's efforts in light of the circumstances facing it at the time, including its ability to make the efforts or expenditures without undue risk or hardship.  If Qualcomm made reasonable efforts to avoid harm, then your award should include reasonable amounts that it spent for this purpose.

You should not consider this defense with respect to any claim by any party unless it is identified in this instruction.

*Compare* Judicial Council of California Civil Jury Instructions (2019 Edition) No. 358

Given   _____

Denied   _____

Withdrawn   _____

Modified _____

### QUALCOMM'S REQUESTED CLOSING INSTRUCTION NO. 71

### AFFIRMATIVE DEFENSE—ANTITRUST MITIGATION

The CMs may not recover damages for any portion of their injuries with respect to the Sherman Act or the Cartwright Act that they could have avoided through the exercise of reasonable care and prudence.  The CMs are not entitled to increase any damages through inaction.  The law requires an injured party to take all reasonable steps it can to avoid further injury and thereby reduce its loss.  If the CMs failed to take reasonable steps available to them, and the failure to take those steps resulted in greater harm to the CMs than they would have suffered had they taken those steps, then the CMs may not recover any damages for that part of the injury they could have avoided.

Qualcomm has the burden of proof on this issue.  Qualcomm must prove by a preponderance of the evidence that the CMs:

1.    acted unreasonably in failing to take specific steps to minimize or limit their losses;

2.    that the failure to take those specific steps resulted in their losses being greater than they would have been had they taken such steps; and

3.    the amount by which the CMs' loss would have been reduced had the CMs taken those steps.

In determining whether the CMs failed to take reasonable measures to limit their damages, you must remember that the law does not require the CMs to take every conceivable step that might reduce their damages.  The evidence must show that the CMs failed to take commercially reasonable measures that were open to them.  Commercially reasonable measures mean those measures that a prudent

businessperson in the CMs' position would likely have adopted, given the circumstances as they appeared at that time.  The CMs should be given wide latitude in deciding how to handle the situation, so long as what the CMs did was not unreasonable in light of the existing circumstances.

You should not consider this defense with respect to any claim by any party unless it is identified in this instruction.

*Compare* ABA Model Jury Instructions in Civil Antitrust Cases at 324 (2016 Edition)

Given  _____

Denied  _____

Withdrawn  _____

Modified _____