Evan R. Chesler (N.Y. Bar No. 1475722; *pro hac vice*)
echesler@cravath.com
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

David A. Nelson (Ill. Bar No. 6209623; *pro hac vice*)
davenelson@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN, LLP
500 West Madison St., Suite 2450
Chicago, Illinois 60661
Telephone: (312) 705-7400
Facsimile: (312) 705-7401

Karen P. Hewitt (SBN 145309)
kphewitt@jonesday.com
Randall E. Kay (SBN 149369)
rekay@jonesday.com
JONES DAY
4655 Executive Drive, Suite 1500
San Diego, California 92121
Telephone: (858) 314-1200
Facsimile: (844) 345-3178

*[Additional counsel identified on signature page]*

Attorneys for
QUALCOMM INCORPORATED

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| IN RE: QUALCOMM LITIGATION | No. 17-cv-0108-GPC-MDD |
|---|---|
| | **QUALCOMM INCORPORATED'S OPPOSITION TO APPLE'S AND THE CMS' MOTION FOR DETERMINATION OF FRENCH LAW PURSUANT TO FED. R. CIV. P. 44.1** |

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

I.    APPLE MISCHARACTERIZES QUALCOMM'S MOTION. ........................ 1

II.   IT IS APPLE THAT TRIES TO MISUSE RULE 44.1. .................................. 2

III.  APPLE'S "PRINCIPLES OF FRENCH LAW" ARE MISLEADING
      AND WRONG. ............................................................................................. 4

      1.    Interpretation of Contracts:  Consistency with U.S. Law. ....................... 4

      2.    Interpretation of Contracts:  Parties' Intent .............................................. 5

      3.    Interpretation of Contracts:  Burden of Proof. ......................................... 8

APPLE'S DETERMINATIONS AND ................................................................. 9

QUALCOMM'S COUNTER-DETERMINATIONS. ........................................... 9

IV.   APPLE'S DETERMINATION NO. 1. ........................................................... 9

V.    APPLE'S DETERMINATIONS NOS. 2 AND 3. ........................................... 9

      1.    Qualcomm Counter-Determination No. 1 .............................................. 11

      2.    Qualcomm Counter-Determination No. 2 .............................................. 15

      3.    Qualcomm Counter-Determination No. 3 .............................................. 18

VI.   APPLE'S DETERMINATION NO. 4. ......................................................... 20

      1.    Qualcomm's Counter-Determination No. 4 ........................................... 20

      2.    Qualcomm's Counter-Determination No. 5 ........................................... 25

CONCLUSION ................................................................................................. 26

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Animal Science Products, Inc. v. Hebei Welcome Pharmaceutical Co.*,
   138 S. Ct. 1865 (2018) ................................................................5

*Apple Inc. v. Qualcomm Inc.*, No. 3:17-cv-108-GPC-MDD, 2017 WL
   3966944 (S.D. Cal. Sep. 7, 2017) ..........................................26

*Apple, Inc. v. Motorola Mobility, Inc.*, 886 F. Supp. 2d 1061 (W.D. Wis.
   2012) ........................................................................................17

Cass. civ. 1, 21 décembre 2006, no. 0520031 ..................................9

Cass. civ. 1, 28 mars 1977, no. 75-13782 .........................................8

Cass. civ., 15 avril 1872, DP 1872, 1, 176 ......................................6

Cass. civ. 2, 18 octobre 2017, No. 14-18118 ...................................9

Cass. civ. 3, 14 février 1996, no. 94-12268 ......................................8

Cass. com., 7 janvier 1975, no. 72-14681 ........................................7

*Clarkson Co. v. Rockwell Int'l Corp.,* 441 F. Supp. 792 (N.D. Cal. 1977)....................4

*Core Wireless Licensing S.A.R.L. v. Apple Inc.*, 899 F.3d 1356 (Fed. Cir.
   2018) ........................................................................................18

*Huawei Techs. Co. v. T-Mobile US, Inc.*, No. 2:16-CV-00052-JRG-RSP,
   2017 WL 3954108 (E.D. Tex. Aug. 29, 2017), *adopted by*, 2017 WL
   3927177 (E.D. Tex. Sept. 6, 2017) ..................................16, 20

*In re USGen New England, Inc.*, No. 03-30465, 2007 WL 2363353
   (Bankr. D. Md. Aug. 16, 2007) ...............................................3

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82 (2d
   Cir. 1998) .................................................................................3

*TCL Commc'n Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*,
   No. SACV 14-341 JVS(DFMx), 2018 WL 4488286 (C.D. Cal. Sept.
   14, 2018) .................................................................................24

*Weiss v. La Suisse*, 313 F. Supp. 2d 241 (S.D.N.Y. 2004) .............3

**Statutes & Rules**

Fed. R. Civ. P. 26(a)(2)....................................................................4

Fed. R. Civ. P. 44.1......................................................................passim

NEW CIVIL CODE Art. 1166.............................................................12

New Civil Code Art. 1192 ...................................................................... 6

New Civil Code Art. 2274 ...................................................................... 8

Old Civil Code Arts. 1135, 1159-60 ................................................... 12

Old Civil Code Art. 1156 ...................................................................... 7

Old Civil Code Art. 1353 ...................................................................... 9

**Other Authorities**

Alain Benabent, Droit des obligations (LGDJ, lextenso éditions, 16th ed., 2017) ............................................................................... 7, 12

C. Demolombe, Traite des contrats (1869) .......................................... 7

François Chenede, Le nouveau droit des obligations et des contrats (2017) ................................................................................. 12

François Terre et al., Les obligations (11th ed. 2013) .......................... 6

Pascale Deumier, Introduction Generale au Droit (4th ed. 2017) ................... 12

Philippe-Henri Dutheil, Droit des associations et fondations (1st ed. 2016) ...................................................................................... 7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# INTRODUCTION

Apple's[1] Rule 44.1 Motion (the "Motion") mischaracterizes Qualcomm's opening brief; states an intent to offer expert testimony that is at odds with its own motions *in limine*; offers a misleading and inappropriate exposé on French law that it never connects to the determinations it is seeking; and fails to adequately specify the determinations sought. On the substance of the determinations Apple actually seeks, Apple is wrong.

Accordingly, rather than simply oppose Apple's determinations, which do not advance the issues in dispute in this case, where appropriate, Qualcomm proposes specific *counter-determinations* that reflect the correct interpretation of French law as it relates to those disputed issues. Issuing an order in favor of Qualcomm's counter-determinations will help facilitate the crafting of appropriate jury instructions with respect to the claims at issue in this case that pertain to French law.

## I. APPLE MISCHARACTERIZES QUALCOMM'S MOTION.

Apple accuses Qualcomm of arguing there "can be no antitrust conduct because its agreements are FRAND as matter of French law". (Motion at 1-2.) Apple also asserts that Qualcomm is requesting the Court improperly to make findings regarding Qualcomm's FRAND obligation that it insists must be decided "based on the evidence presented at trial". (*Id.* at 1.) That is simply not true and a puzzling assertion to make at a time when Apple had not yet seen Qualcomm's brief.

Qualcomm's proposed determinations simply ask the Court to resolve legal issues related to Apple's claims so that it can properly instruct the jury. For example, it is a legal issue whether Qualcomm's ETSI FRAND obligation is discharged by executing a license agreement. (*See* Qualcomm's Opening Mem., Determination #1.) The legal impact of signing a license agreement is not a factual issue for the jury to

---

[1] This brief refers to Apple and the Contract Manufacturers together as "Apple" unless there is a need to differentiate.

1   decide.  Nor does Qualcomm seek resolution of any antitrust claims through its Rule

2   44.1 motion.  Some of the determinations may be relevant to Apple's antitrust claims,

3   but none would be resolved by any of the Court's 44.1 rulings.

4        Qualcomm will not address that issue further in this brief, but instead will

5   address any remaining arguments concerning its opening brief in reply to Apple's

6   opposition.

7   **II.     IT IS APPLE THAT TRIES TO MISUSE RULE 44.1.**

8        Apple claims that its French law experts, Professors Libchaber and Stoffel-

9   Munck, "will present their non-legal opinions to the jury" and that the Court will need

10  to consider "Live Testimony".  (Motion at 2, 10.)  Those assertions suggest at least

11  two attempts to misuse Rule 44.1.  Contrary to Apple's suggestions, the jury should

12  not receive any testimony from Professors Libchaber or Stoffel-Munck in any form,

13  and, because the record already is sufficiently developed to allow the Court to make

14  its Rule 44.1 determinations, additional live testimony is unnecessary.

15       *First*, Professors Libchaber and Stoffel-Munck should not testify at trial.  As

16  Apple argued in its Motion *in Limine* No. 13 (ECF No. 856) "[t]estimony to an

17  ultimate issue of law is inadmissible" and "testimony on the duties and obligations of

18  licensors and licensees pursuant to SSO IPR policies . . . is improper". (ECF No. 856

19  at 1.)  Professors Stoffel-Munck and Libchaber are qualified solely as Professors of

20  French law; they have both expressly disclaimed any opinions about the workings of

21  ETSI, IP licensing or the cellular industry.[2]  As such they have no relevant non-legal

22  opinions to offer and should not testify to the jury.  Their opinions are solely for the

23  Court in connection with the Court's Rule 44.1 determinations on French law.  (*See*

24  Qualcomm's Opp. to Apple's Motion *in Limine* No. 13 (ECF No. 929).)  This issue

25

26       [2] Libchaber Dep. (Ex. 1) 21:17-25; 23:6-11 23:18-21, 24:9-13; Stoffel-Munck

27  Dep. (Ex. 2) 20:22-23, 21:11-21.  All Exhibits referenced in this memorandum are
    attached to the declaration of Nathan E. Denning, filed herewith.

28

was already addressed in Qualcomm's *Daubert* Motion No. 6 (ECF No. 823), which seeks to preclude Professor Libchaber from offering opinions to the jury that require technical analysis he does not possess.

*Second*, Apple refers to "Live Testimony" by Professors Libchaber and Stoffel-Munck. To the extent Apple is referring to live testimony for the Court on issues of French law, however, the current record is more than sufficient. The parties submitted five expert reports containing 128 pages of substantive content on the meaning of French law as it pertains to this case. The parties subsequently took four depositions of three different French law experts for a total of 18 hours on the record. Courts regularly make Rule 44.1 determinations without holding a separate evidentiary hearing. *See In re USGen New England, Inc.*, No. 03-30465, 2007 WL 2363353, at *18 (Bankr. D. Md. Aug. 16, 2007) ("expert testimony to determine foreign law . . . need not be live and may be made via declarations or affidavit"); *Weiss v. La Suisse*, 313 F. Supp. 2d 241, 244 (S.D.N.Y. 2004) ("Unless the law requires me to hear live testimony on these matters—and I do not believe it does—plaintiffs cannot complain that they have not had a Rule 44.1 hearing. They did have a hearing—just not one involving live witnesses."); *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 92 (2d Cir. 1998) (noting that in Rule 44.1 determinations, "it is not the credibility of the experts that is at issue, it is the persuasive force of the opinions they expressed").

Apple has pointed to no gap in the extensive record, nor any questions that have gone unanswered. Instead, Apple's suggestion that there must be additional live testimony appears to be mere gamesmanship. As Apple well knows, Qualcomm's French law expert, Professor Fauvarque-Cosson, is no longer available to offer live testimony because she was appointed to the Conseil d'État, the French supreme court for administrative law, and was denied permission from that court to testify further in this matter. (*See* Qualcomm's Opposition to Apple's Motion *in Limine* No. 13 (ECF

No. 929) at 3-4 n.3.)  Qualcomm elected to take Professor Fauvarque-Cosson's trial deposition to ensure the record regarding her opinions was complete.  To the extent Apple intends to surprise Qualcomm with some opinion that is not contained in the previous written submissions and extensive testimony, that would obviously be improper under Rule 26 and this Court's scheduling orders.  Fed. R. Civ. P. 26(a)(2); ECF 508, 604 (Scheduling Orders).  In short, Apple provides no basis for live testimony on Rule 44.1 issues.[3]

## III.    APPLE'S "PRINCIPLES OF FRENCH LAW" ARE MISLEADING AND WRONG.

The substance of Apple's Motion begins with a long exposé on French law, much of which is never connected to any determination Apple is seeking.  The section is argumentative and misleading; less a treatise on French law and more Apple's views on what it wishes French law were.  But because most of Apple's discussion is unconnected to any determination, Qualcomm will address here only those portions that appear to be relevant to Apple's proposed determinations.  Qualcomm's failure to rebut a specific "principle" should not be construed as agreement with it; Qualcomm's position on issues of French law relevant to its proposed determinations is set forth in its opening brief.  (ECF 876.)

### 1.  Interpretation of Contracts:  Consistency with U.S. Law.

Apple claims that "interpretations [of French law] cannot be inconsistent with U.S. law".  (Motion at 4.)  That is incorrect.  It is basic, black-letter law that foreign law will be applied even if it is inconsistent with U.S. law, so long as it is not contrary to a fundamental public policy.  *Clarkson Co. v. Rockwell Int'l Corp.,* 441 F. Supp. 792, 797 (N.D. Cal. 1977).  Were Apple right that U.S. law always controls if there is any inconsistency, there would be no need for conflicts of law analysis and there

[3] Of course, to the extent the Court believes additional information is required, Qualcomm will provide it in whatever format the Court requests.

would be no need for determinations of foreign law under Rule 44.1—U.S. law would always apply.  That is obviously wrong.  Apple's reliance on *Animal Science Products, Inc. v. Hebei Welcome Pharmaceutical Co.* is misplaced.  That case has nothing to do with inconsistency between foreign and United States law.  Rather, the case involved a situation in which a foreign government submitted a statement to the court on the meaning and interpretation of its domestic law.  The Supreme Court held that United States courts are "not bound to accord conclusive effect to [a] foreign government's statements" about the meaning and interpretation of that government's domestic law.  138 S. Ct. 1865, 1869 (2018).[4]

## 2. Interpretation of Contracts:  Parties' Intent.

Apple offers several arguments suggesting a French judge could ignore the meaning and the purpose of the IPR policy as originally drafted in favor of Apple's preferred views of what the contract should mean.  For example, Apple suggests that the sovereign power of French judges permits them to ignore mandatory provisions of the Civil Code concerning the proper interpretation of contracts.  (Motion at 7.)  Apple also suggests that French judges may actually cite the Code but then secretly pursue some different, nebulous "objective[]" interpretation of a contract.  (*Id.*)  Neither position is correct.

*First*, Apple, in an apparent attempt to diminish the importance under French law that should be accorded to evidence concerning the *drafting* of a contract—a category of evidence submitted only by Qualcomm, and which supports Qualcomm's interpretation of the ETSI IPR Policy—incorrectly characterizes the sovereign power of French lower court judges, unduly expanding the principle of sovereign power to suggest that lower court judges can ignore mandatory provisions of the French Civil

---

[4] The Ministry of Commerce of the People's Republic of China had submitted an *amicus* brief taking a position, which was in direct conflict with its position in a WTO matter, on an issue of Chinese law.  138 S. Ct. at 1870.  There is no submission by a foreign government in connection with the present Rule 44.1 motions.

1    Code.  (*Id.*)  For example, Apple argues that French judges can simply ignore Article

2    1156, which requires judges to interpret contracts based on "the common intention of

3    the contracting parties".  (Old Civil Code (Ex. 3.))  Apple's expert goes as far as

4    stating that a French judge can "do[] what he wants.  He has a sovereign power."

5    (Motion at 7 (quoting Libchaber Dep. 88:6-21).)

6          However, the sovereign power of a French judge is not about mandatory rules

7    of interpretation the judge can purportedly ignore; it is about the limits of appellate

8    review.  The Cour de Cassation, the French supreme court for private and criminal

9    law, will not overturn a lower court decision that incorrectly interprets a contract

10   unless there has been a "distortion" of a clear and unambiguous term.  FRANÇOIS

11   TERRÉ *ET AL.*, LES OBLIGATIONS § 457-59 (11th ed. 2013) (Ex. 4).[5]  That the Cour de

12   Cassation does not overturn lower court decisions that incorrectly interpret contracts

13   does not mean that French judges are free to ignore mandatory rules of interpretation

14   set out in the Civil Code.[6]  Apple's position on this point is not only unsupported by

15   _____

16   [5] The principle of "distortion" is reflected in Article 1192 of the New Civil Code:
     "Clear and unambiguous terms are not subject to interpretation as doing so risks their
17   distortion."  (Ex. 5.)  This principle was established in an 1872 judgment of the Cour
     de Cassation, which held that when the terms of a contract a clear an unambiguous,
18   judges are not permitted to distort the obligations resulting from them.  Cass. Civ., 15
     avril 1872, DP 1872, 1, 176 (Ex. 6).
19

20   [6] Thus, French lower court judges are obligated to follow Article 1156.  Indeed,
     during his deposition, Apple's French law expert repeatedly claimed that Article 1156
21   was not mandatory insofar as judges do not need to apply it, (Libchaber Dep. (Ex. 1)
     81:17-18, 88:6, 89:9, 90:25-91:5, 92:3-11, 95:24-96:4, 115:12-16), but later admitted
22   that a "famous" and "reliable" textbook by a "famous author" which is an "authority
     on French contract law", (Libchaber Dep. (Ex. 1) 115:21-116:11), states that Article
23   1156 is a "true rule" and *is* "mandatory". (Libchaber Dep. (Ex. 1) 117:24-119:3.)
24   Apple's French law expert also admitted that a work by "an important publisher"
     stated that a judge must apply Article 1156 in interpreting the bylaws of an
25   association, (Libchaber Dep. 123:10-125:15), which, Apple's expert concedes, is how
     the ETSI IPR Policy is characterized in French law, (Libchaber Rebuttal Report (Ex.
26   7) ¶ 6).
27

28

any authority; it is affirmatively contradicted by recognized authorities in French contract law.  *See* ALAIN BÉNABENT, DROIT DES OBLIGATIONS § 287 (LGDJ, lextenso éditions, 16th ed., 2017) (Ex. 8) ; PHILIPPE-HENRI DUTHEIL, DROIT DES ASSOCIATIONS ET FONDATIONS (1st ed. 2016) § 2.65 (Ex. 9); CHARLES DEMOLOMBE, TRAITÉ DES CONTRATS (1869) § 3 (Ex. 10) (seeking the common intention of the parties is "the very goal of interpretation, rather than one of its methods"); Cass. com., 7 janvier 1975, no. 72-14681 (Ex. 11) (overturning lower court decision for failure to investigate the mutual intentions of the contracting parties).

*Second*, Apple claims that "it is common to see decisions that cite to the French Civil Code as the basis for their interpretation, but actually interpret the contract objectively based on the present-day needs of the contract", citing no authority other than the testimony of their French law expert, Professor Libchaber, for this statement. (Motion at 7.)  Apple argues this "objective interpretation" should be applied instead of seeking the common intention of the contracting parties, as dictated by Article 1156.  But in support of his argument, Professor Libchaber pointed to cases *citing* OLD CIVIL CODE Article 1156.  (Libchaber Dep. (Ex. 1) 80:4-25.)  He also admitted that the only source cited in his report for this proposition did not actually state that the objective method should be applied.  (Libchaber Dep. 104:10-25.)  And his own prior writings stated exactly the opposite:

- "The goal of contract interpretation under French law is to determine the common intent of the parties at the time of the contract."  (Expert Report of Rémy Libchaber ¶ 21 (February 8, 2017), *Intellectual Ventures I LLC v. AT&T et al.*, 1:15-cv-00800-LPS (Ex. 12) ("*Intellectual Ventures* Report").)
- "the main rule of interpretation is that of Article 1156: the search for the common intent of the parties is the main criterion for interpretation."  (Report of Remy Libchaber Regarding Interpretation of Contracts in French Law at 4

(September 13, 2013), *Apple Inc. v. Samsung Elecs. Co.*, No. 12-CV-00630-LHK (Ex. 13) ("*Samsung* Report").)

In these prior reports, Professor Libchaber also suggests that testimony from the drafters of the ETSI IPR Policy would be relevant to interpret the Policy.  In his *Samsung* Report, he states:  "A French judge may rely on declarations by individuals who may have a helpful opinion regarding the dispute.  In order for a declaration to be probative of the will of the parties, however, the declarant must have been present during the drafting of the contract." (at 6.)  In his *Intellectual Ventures* Report, he states:  "The Court may use any means to determine the intentions of contracting parties.  The Cour de cassation expressed very well this liberty: 'testimonial proof may be used to interpret an obscure or ambiguous contract.'" (¶ 22 (citations omitted).)  These Libchaber positions are correct.  In contrast, Libchaber's (obviously incorrect) position in this case is:  "I disagree with the conclusion that a French judge would attempt to ascertain the intention of the drafters (let alone rely on one particular drafter) of the ETSI IPR Policy to determine the meaning of any ambiguous terms, rather than conducting an objective analysis." (Libchaber Rebuttal Report (Ex. 7) ¶ 13.)

### 3. <u>Interpretation of Contracts:  Burden of Proof.</u>

Finally, while Apple spends more than five pages discussing every other aspect of French law, it leaves out a key one—the burden of proof.  The parties agree that in French law, the burden of proving a breach of Clause 4.1 is on the party claiming breach.  (Fauvarque-Cosson Rebuttal Report (Ex. 14) at 1, 6; Libchaber Opening Report (Ex. 15) ¶ 16.)  The parties also agree that "the party alleging a lack of good faith must prove it".  (Fauvarque-Cosson Rebuttal Report at 6; *see also* OLD CIVIL CODE Art. 2274; Libchaber Opening Report ¶ 61.)  French case law confirms that a party claiming breach of contractual obligation must prove that breach.  (*See* Cass. civ. 1, 28 mars 1977, no. 75-13.782 (Ex. 16); Cass. civ. 3, 14 février 1996, no. 94-

12268 (Ex. 17).)

However, Apple's French law expert has claimed, for the first time in a rebuttal report, that a judicial "presumption of contractual breach" may be drawn against Qualcomm, which "implies an inversion in the burden of the proof". (Libchaber Rebuttal Report ¶¶ 126-27.) But in French law presumptions may be drawn "only if they are "serious, precise and consistent", OLD CIVIL CODE Art. 1353, which requires, among other things, that there are no other reasonable explanation for the established facts other than breach. *See* Cass. civ. 1, 21 décembre 2006, no. 05-20031 (Ex. 18); Cass. civ. 2, 18 octobre 2017, No. 14-18118 (Ex. 19) (approving a lower court's decision not to draw a presumption that the administration of a vaccine caused multiple sclerosis in the "absence of scientific consensus as to the etiology of multiple sclerosis"). Apple has made no such argument. Accordingly, a judicial presumption is wholly inappropriate, and the burden of proof is with Apple.

## APPLE'S DETERMINATIONS AND QUALCOMM'S COUNTER-DETERMINATIONS.

Each of Apple's proposed determinations proceeds from a general, vague statement about French law (some of which are unobjectionable) but then includes a number of arguments about specific points that are either misleading or incorrect (and to which Qualcomm objects). Therefore, rather than simply oppose Apple's proposed determinations in whole, Qualcomm has proposed specific counter-determinations, where appropriate.

## IV.    APPLE'S DETERMINATION NO. 1.

The parties have stipulated that agreements must be performed in good faith under French law, which includes the ETSI IPR Policy.

## V.    APPLE'S DETERMINATIONS NOS. 2 AND 3.

Apple's Determinations Nos. 2 and 3 both involve Clause 4 of the ETSI IPR Policy, which governs the disclosure of essential or potentially essential IPR by patent

holders to ETSI.[7]  Specifically, Clauses 4.1 and 4.2 state as follows:

> **Clause 4.1:**  Subject to Clause 4.2 below, each MEMBER shall use its reasonable endeavours, in particular during the development of a STANDARD or TECHNICAL SPECIFICATION where it participates, to inform ETSI of ESSENTIAL IPRs in a timely fashion.  In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted.

> **Clause 4.2:**  The obligations pursuant to Clause 4.1 above do however not imply any obligation on MEMBERS to conduct IPR searches.  (ETSI IPR Policy (Ex. 20).)

Clause 4.1 sets out a general obligation on member patent holders to use their "reasonable endeavours" to inform ETSI about patents that are essential to an ETSI standard in a "timely fashion".  It also states that "in particular" those patent holders participating during the development of a standard must use "reasonable endeavors" to inform ETSI of any patents that are essential to that standard.  For those submitting a technical proposal, they must identify, on a "bona fide basis", any patents that might become essential if the patent holder's proposal is adopted.  The ETSI Guide on IPRs is clear that the purpose of specifically referring to patent holders participating in the development of a standard was to clarify that it would not be reasonable to expect the same level of familiarity from those *not* involved with a standard, rather than to impose a different obligation:

> "The addition of the phrase 'in which it participates' therefore addresses the concern expressed by some ETSI members, and also means that to the extent that a member is not participating in an ETSI standards development committee/working group but becomes aware of certain essential IPRs, a general obligation to inform ETSI of the essential IPRs remains", (ETSI Guide on IPRs (Ex. 21) § 4.6.2.2), but "it is clear that ***it should not be reasonably***

---

[7] Apple's Determination Nos. 2 and 3 are unnecessary because Professor Libchaber's testimony concerning Qualcomm's purportedly untimely disclosures to ETSI should be excluded from evidence because Professor Libchaber is not qualified to offer those opinions.  *See* Qualcomm's Daubert Motion No. 6 (ECF No. 823).)

*expected that an ETSI member should have a duty to take steps to find out about potential IPR it might have relating to ETSI standards development work in areas/committees where that member is not participating in that work* (no more than it should be expected, as we have previously confirmed, that a member carry out patent/IPR searches)", (*id.* § 4.6.3.5, quoting DG COMPETITION, emphasis added.)

In all cases, then, the basic obligation of Clause 4 is to act in good faith. Those participating in the development of a standard should use their knowledge of that standard to make "reasonable endeavors" to determine whether any of their patents might be relevant. Those submitting a technical proposal, who may have a better sense about which of their patents may be implicated if that proposal is adopted, should disclose those patents on a "bona fide basis" or, again, in good faith.

Apple nominally seeks just two determinations regarding Clause 4, but a closer reading of Apple's arguments reveals Apple is raising at least three distinct issues: (1) that a French judge would consider the circumstances of a disclosure when determining whether it was timely, but would not consider industry practice and may not consider the intent of the disclosing party; (2) that patent holders participating in the development of a standard must disclose IPR before that standard is adopted to be timely; and (3) that submitters of technical proposals are held to a heightened good faith requirement. Each is wrong, and Qualcomm addresses each in turn with specific counter-determinations.

**1.  <u>Qualcomm Counter-Determination No. 1:  The Practices of Other ETSI Members and the Disclosing Party's Intent Should Be Considered When Assessing Whether an ETSI Member Has Complied with Clause 4.1 of the ETSI IPR Policy.</u>**

In its Determination No. 2, Apple states that a French law judge would consider the circumstances of an IPR Disclosure to interpret "timely". Qualcomm agrees. But in its argument, Apple excludes several sources of relevant evidence, including the conduct of other industry participants and the intent of the disclosing party. Both are

1   highly relevant, and the Court should determine that they would be considered by a

2   French judge, and therefore, should be considered by the jury here.

3       *First*, Apple claims that "[t]o determine whether a party has breached the

4   disclosure obligation, only the conduct of the IPR owner is considered—no other

5   party's disclosure practice is relevant". (Motion at 11.)  Apple's position is incorrect

6   under French law.  In fact, Apple cites no evidence other than the unsupported

7   statements of its own expert for this proposition, and those statements contradict his

8   previously expressed views.

9       Apple's French law expert agrees that the term "timely", as used in Clause 4.1

10  of the ETSI IPR Policy is "unclear" and a "vague notion".  (Libchaber Opening

11  Report (Ex. 15) ¶ 41; Libchaber Dep. (Ex. 1) 192:5.)  There is no dispute that industry

12  practice can be used to interpret a contract term that is vague or ambiguous.  (*See*

13  Libchaber Rebuttal Report ¶ 27 ("[U]ndoubted practices (understood in proper

14  context), should they be local or professional, can be used to understand how a

15  contract should be interpreted"); Fauvarque-Cosson Opening Report (Ex. 22) at 6-10);

16  FRANÇOIS CHÉNÉDE, LE NOUVEAU DROIT DES OBLIGATIONS ET DES CONTRATS § 24.33

17  (2017) (Ex. 23); PASCALE DEUMIER, INTRODUCTION GÉNÉRALE AU DROIT §§ 428-29

18  (4th ed. 2017) (Ex. 24); BÉNABENT § 293 ; OLD CIVIL CODE Arts. 1135, 1159-60.

19  Moreover, the French Civil Code states "[w]here the quality of the act of performance

20  is not determined or capable of being determined under the contract, the debtor must

21  offer an act of performance of a quality which conforms to the legitimate expectations

22  of the parties taking into account its nature, usual practices and the amount of what is

23  agreed in return".  (NEW CIVIL CODE Art. 1166).  Accordingly, the practices of other

24  ETSI members are relevant to interpret the word "timely" in Clause 4.1 of the ETSI

25  IPR Policy.

26      Although Professor Libchaber argues here that "what the standard practice of

27  SEP holders was with respect to the timeliness of their disclosures" is "unpertinent",

28

(Libchaber Dep. 194:20-24), he previously argued the exact opposite in *Apple Inc. v. Samsung Elecs. Co.*, No. 12-CV-01846-LHK, stating that "in the case of a criticism of the practice of a member in the disclosure of his patents:  it suffices, in this respect, to ask ourselves whether he has respected the customs generally followed by the other members . . . . [I]t will sometimes be easier to determine if a disclosure is late with regard to the conducts of the other members rather than by reference to an original ideal".  *Samsung* Report at 15-16.  He was correct then; he and Apple are wrong now.[8]

Apple points to no legal authority supporting its assertion that a French judge would ignore industry practice when interpreting an undefined term.  And the only court to address the issue, of which Qualcomm is aware, expressly reviewed and included such evidence in its finding.  *See Apple v. Samsung*, Tōkyō Chihō Saibansho [Tokyo Dist. Ct.] May 16, 2014, No. 2013 (Ne) 10043 (Ex. 25) at 128 (Japan) (permitting infringement claim despite alleged breach of Clause 4.1 in part because the two-year delay was not "extremely long when compared with other companies").

*Second*, a French judge would consider (and, therefore, the jury here should consider) the intentions of the disclosing party in assessing whether that party had complied with Clause 4.1 of the ETSI IPR Policy.

The purpose of Clause 4.1 of the ETSI IPR Policy is to prevent "patent ambush,"[9] which involves a party "intentionally not disclosing Essential Intellectual Property Rights (EIPR) during the standardization process, and after the standard has issued, then disclosing such EIPR with the intention to not license on fair, reasonable, and non-discriminatory (FRAND) terms".  (ETSI Guide on Intellectual Property

---

[8] Indeed, when pressed during his deposition, Professor Libchaber even admitted that "a judge may look at the general practice in order to say I believe that if everyone is late, so timely is untimely".  (Libchaber Dep. (Ex. 1) 194:11-13.)

[9] (Fauvarque-Cosson Rebuttal Report at 5; Huber Rebuttal Report (Ex. 26) at 10-11; *see also* Libchaber Opening Report ¶ 49.)

Rights (Ex. 21) § 4.6.3.2.)  The point is not to be a trap for the unwary patent holder, but rather to prevent inequitable conduct.

Therefore, as Apple's French law expert said in another case:  "ETSI focuses on the members' intent rather than an objective measure of timeliness."[10]  *Samsung Report* (Ex. 13) at 14.  The ETSI Guide on IPR, when discussing timely disclosure of IPRs states that "'Intentional Delay' has arisen when it can be demonstrated that an ETSI member has deliberately withheld IPR disclosures significantly beyond what would be expected from normal considerations of 'Timeliness'".  § 2.  The parties' French law experts agree that a court would consider whether there had been an intentional delay in assessing an alleged breach of Clause 4.1 of the ETSI IPR Policy. (Libchaber Opening Report ¶ 52; Fauvarque-Cosson Rebuttal Report (Ex. 14) at 1.) For example, in assessing compliance with the obligation in Clause 4.1, a French judge would likely consider whether the allegedly untimely-disclosed IPR was later the subject of a FRAND commitment.  (Fauvarque-Cosson Rebuttal Report at 8.)  A patent that is the subject of a FRAND declaration is not being withheld from other ETSI members, and the patent holder is not engaging in patent ambush.  *See also Apple v. Samsung*, Tōkyō Chihō Saibansho [Tokyo Dist. Ct.] May 16, 2014, No. 2013 (Ne) 10043 at 128 (Japan) (permitting infringement claim despite alleged breach of Clause 4.1 in part because the late-disclosed IPR was ultimately the subject of a FRAND declaration).

Apple's contrary position appears to be based on the mistaken view of its French law expert that any representative at an ETSI standard-setting meeting has knowledge of *all* the essential IPRs of the company it represents.  (*See* Libchaber

---

[10] Notably, the obligation to use "reasonable endeavours" to timely disclose IPR does not imply "any obligation on MEMBERS to conduct IPR searches".  (ETSI IPR Policy Clause 4.2.)  The absence of an obligation to conduct IPR searches is another factor a French judge would consider to evaluate whether a party used "reasonable endeavours" to timely disclose IPRs.

Opening Report ¶ 63 ("It is [im]possible that a SEP holder ignores the importance of a single IPR . . . if this SEP holder participates in the technical discussions relating to a standard"); *see also* ¶¶ 55.)  This presumption is flatly wrong.  As noted by Professor Fauvarque-Cosson, "patent applications change during prosecution, and standards often change throughout development [. . . A party] is not always able to become aware of the fact that it actually owns potentially essential IPRs, particularly for holders of large patent portfolios and with regard to complicated IPR."  (Fauvarque-Cosson Rebuttal Report (Ex. 14) at 8; *see also* Huber Rebuttal Report (Ex. 26) at 10.).

**2. <u>Qualcomm Counter-Determination No. 2:  An IPR Need Not Be Disclosed to ETSI Before the Standard to Which It is Essential Is Adopted for that Disclosure to Comply with Clause 4.1.</u>**

Apple suggests that the adoption of the relevant standard is the deadline for what constitutes "timely" disclosure.  But the ETSI IPR Policy contains no bright-line rules about when a disclosure must occur in order to be timely, and the Court should determine as much.

The text of Clause 4.1 of ETSI IPR Policy simply requires members "to inform ETSI of ESSENTIAL IPRs in a timely fashion" and imposes no set limit on what constitutes "timely".  Apple admits as much when it notes that "'timely' has no explicit definition" and that it is, instead, a "vague legal notion with imprecise limits". (Motion at 12.)  Any bright-line cut-off would be inconsistent with the notion that Clause 4.1 imposes an obligation of means, that is, one that "does not have to actually succeed".  (Motion at 11.)

As discussed in Qualcomm's opening brief, testimony of the drafters of a contract is relevant to its interpretation.  (ECF No. 876 at 3.)  Dr. Bertram Huber, a drafter of the ETSI IPR Policy, confirms that the Policy's drafters meant to permit disclosure of an IPR after the adoption of the standard to which it is essential, explaining that the drafters never intended to require disclosure of all IPRs prior to the

adoption of a standard.  Dr. Huber writes,

> it was generally understood by the drafters of the ETSI IPR Policy that it would be unrealistic to expect complete or close to complete disclosure of ESSENTIAL IPRs prior to adoption of a standard.  Patent applications change during prosecution, and standards often change throughout development, so uncertainty as to whether all essential IPRs have been disclosed can never be eliminated. The ETSI IPR Policy drafters further recognized that it is practically impossible for the owner of a large portfolio of IPRs to become aware of every potential claim it may own before the final versions of many standards are adopted.

(Huber Rebuttal Report (Ex 26) at 10.)

The parties' French law experts agree that the disclosure of an IPR after the date the standard to which it is essential is adopted may be "timely".  Professor Libchaber argues that "timely" does not "refer[] to a specific point in time . . . such as the freeze date of a technical specification (or standard)".  (Libchaber Opening Report (Ex. 15) ¶ 39; *see also* Fauvarque-Cosson Rebuttal Report at 2.)  Apple's French law expert also admitted that there is no set time after the patented technology is incorporated into the standard at which a disclosure is required.  (Libchaber Dep. 203:11-14. (admitting that disclosure need not "happen within a set period of time of the particular technology being specified in the standard").)

A U.S. court has held that disclosure need not occur before adoption of the relevant standard.  In *Huawei Techs. Co. v. T-Mobile US, Inc.*, the court was presented with the argument "that the window for disclosing IPR is closed on the day the standard is adopted (or the technical specification is published), and if IPR is not disclosed by that day, the disclosure obligation has been violated".  No. 2:16-CV-00052-JRG-RSP, 2017 WL 3954108, at *3 (E.D. Tex. Aug. 29, 2017), *adopted by*, 2017 WL 3927177 (E.D. Tex. Sept. 6, 2017).  The court rejected that argument:

> This does not mean there is a bright-line rule requiring a member to disclose IPR that might be essential before a standard is adopted. There may be a circumstance in which, despite a member's reasonable endeavours, IPR that might have been essential to a proposed standard was not disclosed

before the standard was adopted.  The ETSI Guide therefore emphasizes that a member's duty to use 'reasonable endeavours' to disclose IPR that might be essential continues even after the standard is adopted. *See, e.g.*, ESTI [*sic*] Guide on IPRs (November 27, 2008) § 4.6.3.4, Dkt. 257-5.  *Id.*

Apple's position that an IPR must be disclosed prior to the adoption of a standard does not withstand even casual scrutiny.  For example, Professor Libchaber analyzes some Qualcomm patents that were *applied for after* the date that the standard to which they were declared essential was adopted.  (*See*, *e.g.*, Libchaber Rebuttal Report ¶ 120(43).)  It would be absurd to require Qualcomm to declare to ETSI a patent filing *that did not yet exist* and would not be made until later, lest its declaration be deemed "untimely".

This is not to say that a party may conceal from ETSI the essentiality of an IPR that it *knows* is essential to a standard prior to the adoption of that standard.  As discussed, the ETSI IPR Policy does not condone "intentional delay", which involves "deliberately withheld IPR disclosures".  (ETSI Guide on IPRs § 4.6.3.2.)  But the mere disclosure of an IPR after the adoption of a standard does not automatically make that disclosure untimely, absent deliberate concealment.  Indeed, the cases cited by Apple support Qualcomm's position.  *See Apple, Inc. v. Motorola Mobility, Inc.*, 886 F. Supp. 2d 1061, 1068 (W.D. Wis. 2012) ("[M]embers of ETSI should disclose intellectual property rights that they *know* are relevant to potential standards while the standard is being discussed and before the standard is adopted.") (emphasis added); *id.* at 1086 ("[T]he policy clearly requires members to *make efforts* to disclose intellectual property rights *before* a standard is adopted.") (emphasis added) (referring to the obligation of reasonable endeavours, which applies at all times).  Similarly, *Core Wireless* did not establish a bright-line rule, but merely noted that on the specific record of the case, a disclosure four years after the adoption of the standard was not timely.  In that case, Nokia first disclosed a patent as essential in July 2002 despite the

fact that "Nokia's employees" had "acknowledged" it was potentially essential in a report created in 1997, or more than 4 years earlier.  *Core Wireless Licensing S.A.R.L. v. Apple Inc.*, 899 F.3d 1356, 1366 (Fed. Cir. 2018).  The court merely held that in such circumstances, a "reading of the policy, which would define a timely disclosure as one occurring as late as four years after the adoption of the standard, is unsupported *in the record*".  *Id.* at 1368 (emphasis added).

### 3.  Qualcomm Counter-Determination No. 3:  The Obligation in Clause 4.1 To Timely Disclose IPRs Is an Obligation of Means and Is Not "Heightened" for IPR Owners Making Technical Contributions.

Pointing to the last sentence of Clause 4.1, Apple argues that an ETSI member submitting a technical proposal for a standard is held to a "heightened" good faith obligation that (1) is not an obligation of means and; (2) sets the adoption of that technical proposal as the deadline for the disclosure of any patents as potentially essential.  (Motion at 13-14.)  Apple is wrong on both counts.

As an initial matter, Apple's justification for a "heightened standard" is that the first sentence of Clause 4.1 uses the term "reasonable endeavors" and that the final sentence addressing technical proposals uses the phrase "bona fide basis".  But according to Apple's own expert "'Bona fide' is Latin for 'good faith'".  (*Samsung* Report at 13.)  And "good faith" simply requires "'the care of a reasonable person'".  (Fauvarque-Cosson Rebuttal Report at 7-8 (internal citation omitted).)  The use of the phrase "in particular" in the final sentence of Clause 4.1 means that it simply describes a particular case of the general "reasonable endeavours" standard.  Apple provides no basis for drawing a distinction between what in both instances is simply an obligation to act reasonably in the circumstances.  Instead, as explained above, the two clauses merely distinguish between the knowledge of the participants—one that has not made a technical proposal and the other that has.  There is no heightened obligation.

Case No. 17-cv-0108-GPC-MDD
QC's OPP'N TO APPLE'S RULE 44.1 MOTION

To the contrary, regardless of the status of the particular patent holder, Clause 4 imposes an "obligation of means" to timely disclose IPRs.  In an obligation of means, "the promisor must only bring his care and diligence to his mission, but does not have to actually succeed".  (Fauvarque-Cosson Rebuttal Report at 3.)  Therefore, even if an IPR disclosure is, in fact, not made "in a timely fashion", that alone does not constitute a breach of Clause 4.1; it must also be shown that there was a failure to exercise diligence.  (*Id.* at 4.)  Apple's French law expert agrees:  "[a] French judge would just say it is an obligation of means.  Everyone agrees about this."  (Libchaber Dep. 191:4-6.; *see also* Libchaber Opening Report ¶ 54 ("Clause 4 asks for disclosure of SEPs, but a timely disclosure does not appear as a steadfast exigency, rather it is an act of good faith.").)

Apple's argument that the presence of the term "bona fide" means that the obligation of "good faith" is no longer an obligation of means fails.  As the parties stipulated, good faith is required in carrying out all agreements under French law.  But as discussed, good faith merely requires "the care of a reasonable person"; it does not guarantee any particular outcome, including the successful disclosure of all essential IPRs.  (Fauvarque-Cosson Rebuttal Report at 7-8.)  And an obligation of means is the same—no guarantee of any outcome.  (*Id.* at 3.)  That is, it requires a party to act reasonably.  So an obligation of good faith and an obligation of means are entirely consistent.

Finally, Apple argues that reference in the final sentence of Clause 4.1 to IPR that "might be ESSENTIAL if that proposal is adopted" means a patent holder making a technical proposal must identify any related patents *before* adoption of the standard.  But "if that proposal is adopted" defines the universe of essential patents, not the timing of the disclosure.  And for the reasons already described, such a bright line timing rule would be impracticable—relevant patents may not yet have been applied for or may change in the application process, for example.  Apple's argument here is

precisely what was rejected by the *Huawei* court.  There, the court cited the "bona fide" clause, and assumed "Huawei submitted a technical proposal for the LTE standard".  2017 WL 3954108, at *2.  Nevertheless, it held that there is no "bright-line rule requiring a member to disclose IPR that might be essential before a standard is adopted".  *Id.* at *3.  Prior to this case, at least, Apple's expert also agreed:  "The language of Article 4.1 thus focuses on the efforts made by the member and does not set forth a set term or deadline by which the disclosure must be made."  (*Samsung* Report at 13.)

## VI.   APPLE'S DETERMINATION NO. 4.

While Apple asks this Court to make a determination that "the definition of 'essential' provided in Clause 15 of the ETSI IPR Policy is clear and unambiguous", its true contention is that Qualcomm's patents that relate to an optional part of the relevant ETSI standards *cannot* be essential under the ETSI IPR policy.[11]  (Motion at 15-18.)  Aware that its rewrite of the ETSI definition of "essential" narrows patents that would be considered "essential", Apple further attempts to dissociate the FRAND commitment from the definition of "essential".  (*Id.* at 15.)  Apple's positions are wrong as a matter of French law.  Accordingly, Qualcomm proposes two counter-determinations.

1. **Qualcomm's Counter-Determination No. 4:  IPRs Practicing Optional Elements of ETSI Standards Are Essential to Those Standards, Except as They Relate Solely to an Informative Annex.**

Under the ETSI IPR Policy, an IPR (such as a patent) is "ESSENTIAL" if "it is not possible on technical (but not commercial) grounds . . . to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which

---

[11] *See, e.g.*, Wells Opening Report ¶ 318 (Ex. 27); *see also* Stevenson Dep. at 93:2-8 (Ex. 28); Stark Dep. at 267:7-12 (Ex. 29); Lanning Dep. at 57:15-58:18 (Ex. 30); Bims Dep. at 60:13-16 (Ex. 31).

comply with a STANDARD without infringing that IPR".  (ETSI IPR Policy Clause 15.6.)  And "STANDARD" is defined as "any standard adopted by ETSI *including options therein*".  (*Id.* Clause 15.11 (emphasis added).)  It is evident from the plain language that optional elements of a standard are part of that standard and that patents reading on optional elements are, in fact, standard-essential patents.

A brief explanation of the various parts of the ETSI standards and related terms reinforces that conclusion.  ETSI standard documents define the expected behavior of a device when performing various functions, which is necessary to insure interoperability.  (*See* Williams Expert Report (Ex. 32) ¶ 20.)  It may be mandatory for a device to support some functions and optional for a device to support other functions.  But where an optional function is practiced, the standard defines the expected behavior of the device.  As Apple's own technical expert, Robert Akl explained:  "An optional feature of a standard is part of the standard that if you want to implement this feature, you follow what's in the standard".  (Akl Dep. (Ex. 33) at 156:24-157:1.)

The standards themselves are in accord.  First, the ETSI Drafting Rules explain that "Normative [clauses] contain provisions to which it is necessary to conform in order to be able to claim compliance to the ETSI deliverable."  (ETSI Drafting Rules at 194 (Sept. 28, 2018) (Ex. 34)).  Importantly, normative clauses of a standard address both mandatory and optional parts of the standard.  (*Id.* at 185.)  A mandatory or required element of a standard is one that "must be implemented in order for the resulting product to be considered to be compliant" with that standard.  (Rudi Bekkers & Andrew Updegrove, A study of IPR policies and practices of a representative group of Standards Setting Organizations worldwide (2012) (Ex. 35) at 40-41.)  Optional elements do not need to be implemented to be compliant with the mandatory elements of the standard, but an optional element must be implemented as prescribed in order to practice that portion of the standard.  (*See* ETSI, A Guide to Writing World Class

Case No. 17-cv-0108-GPC-MDD
QC's OPP'N TO APPLE'S RULE 44.1 MOTION

Standards (2013) at 24 (Ex. 36).)

The fact that standard "compliance" encompasses optional features is carried throughout the standards.  For example:  TS 26.445, a technical specification for "Enhanced Voice Services (EVS)" code, is part of both the 3G and LTE standards. (*See* Jayant Expert Report (Ex. 37) ¶ 44, App'x A at 1-18.)  It is an optional portion of those standards, however, because it states that devices "should" as opposed to "shall," support the EVS codec.  (TS 26.114 v.12.16.0 (Ex. 38) at § 5.2.1.1.)  But *if* a device performs EVS, it *must* do so in compliance with TS 26.445 to be standard-compliant.  In fact, ETSI specifically defines a set of tests to confirm "a standard compliant implementation of" TS 26.445.  (TS 26.444 V.12.2.0 (Ex. 39) at § 4.1.)

As noted above, the ETSI IPR policy definition of "ESSENTIAL" incorporates the definition of "STANDARD", which clearly includes both mandatory and optional elements in.  Thus, when assessing whether it is possible to comply with the portions of a standard relevant to a patent without infringing that patent, one must include all mandatory and optional portions of the STANDARD.  In more concrete terms, such as in the case of TS 26.445, a device practicing EVS without following TS 26.445 would not be 3G EVS standard-compliant even though it may otherwise comply with other portions of the 3G standards.  Thus, any patent infringed by compliance with the optional feature is a standard-essential patent.

Finally, normative clauses, addressing mandatory or optional portions of the standards, are separate and distinct from informative annexes.  Informative annexes exist to "give additional information intended to assist the understanding or use of the ETSI deliverable and **shall not** contain provisions to which it is necessary to conform in order to be able to claim compliance to the ETSI deliverable."  (ETSI Drafting Rules at 194 (Sept. 28, 2018) (Ex. 34) (emphasis in original).)  Therefore, compliance with the standard *cannot* require that the text of the informative annexes be practiced because those provisions are not "necessary to conform in order to be able to claim

1    compliance". *See id.*

2         Every claim element of each claim of each standard-essential patent analyzed

3    by Qualcomm's experts in this case cites to at least one normative portion of a

4    standard.  (Gitlin Opening Report (Ex. 40) ¶ 10, App'x A at 1-19.)  Qualcomm's

5    experts have, therefore, by definition, demonstrated these patents are standard-

6    essential.  While Apple now argues that "if a patent covers an optional part of the

7    standard, it cannot be a 'standard-essential patent'" (Motion at 16), Apple and its

8    experts have not consistently taken that position.  Apple acknowledged in its First

9    Amended Complaint that the "term essential need not mean the patent is essential for

10   a required implementation of a standard; it might mean the patent is essential to an

11   optional implementation".  (Apple's First Amended Complaint (ECF No. 083) ¶ 35.)

12   Even one of Apple's experts, Robert Akl, agreed that a patent directed to an optional

13   feature can be essential, noting:  "[i]f that section of the standard is for an optional

14   feature, then it is essential to the optional part of the standard, and if that section of the

15   standard is required, then it is essential to the required part of the standard."  (Akl

16   Dep. (Ex. 33) at 170:9-13; *see also id.* at 156:4-7, 170:13-17.)

17        Apple's remaining arguments are unrelated to the definition of "essential"

18   under the ETSI IPR policy.  For example, through its expert Jonathan Wells, Apple

19   contends that there is at least one instance in which "Apple does not use an optional

20   portion of a standard on which Qualcomm alleges it has a patent" and thus the patent

21   is not essential.  (Motion at 17.)  This reasoning misunderstands essentiality under the

22   IPR policy; indeed, it merely identifies a factual circumstance in which an optional

23   portion of a standard was not utilized.  But that does not change the fact that the ETSI

24   IPR Policy specifically includes all portions of the standard, mandatory or optional, in

25   the definition of "STANDARD", and, therefore, any patents that would be infringed

26   in order to practice any portion of the standard are standard-essential.  Apple's

27   interpretation "would lead to the absurd result that whenever an implementer or

28

prospective licensee would intend to apply an optional part of a standard, it could not rely on the FRAND commitment made by the holder of the respective essential IPR." (Huber Rebuttal Report (Ex. 26) at 12.)  As a result, IPR holders could choose not to negotiate with prospective licensees toward reaching a FRAND licensee agreement on optional portions of the standards or ever grant a license to anyone, which could not have been what ETSI intended.  *Id.*

Apple's citation to *TCL Commc'n Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson* does not support its position.  No. SACV 14-341 JVS(DFMx), 2018 WL 4488286, at *15 (C.D. Cal. Sept. 14, 2018).  The question for the *TCL* court was not whether patents practicing *optional portions* of the standard were standard essential, but rather the "only dispute that arose [in that case] concerning ETSI's definition of essential was whether *the informative annex* was part of the 3G standard".  *Id.* (emphasis added).  The court noted the clear distinction between informative and normative annexes with respect to how essentiality should be understood.  *Id.*  On the one hand, "informative annexes 'shall not contain provisions to which it is necessary to conform in order to be able to claim compliance with the ETSI deliverable'".  *Id.* On the other hand, "the definition of normative annex directly above the definition of informative annex . . . states that provisions in the normative annexes are necessary to conform in order to be able to claim compliance with the standard."  *Id.*  The court made no finding that optional elements in and of themselves cannot be essential regardless of whether they were found in normative clauses or informative annexes. Therefore, the portion of the court's holding that it "agrees with TCL that patents for inventions *solely* in the informative annex, while part of a standard, are not standard-essential patents" has no bearing here because, as noted above, for the 92 SEPs at issue in this case, every claim element for each claim cites to at least one "normative" section.  *See id.* (emphasis added); (*see also* Gitlin Opening Report ¶ 10, App'x A).

Moreover, a comprehensive study commissioned by the US National

Academies of Science, Board of Science, Technology, and Economic Policy (STEP) Project on Intellectual Property Management in standard setting processes, found that "[i]n *all* the policies . . . studied, [including ETSI,] the definition of essential IPR is limited to the normative clauses in the standards". (Bekkers & Updegrove (Ex. 35) at 40 (emphasis added).)  The study then explained that:

> Informative elements are protected by the SSO's copyright, but are not relevant from an implementation or patent perspective.  However, in the normative clauses, there may be both mandatory portions (those elements that must be implemented in order for the resulting product to be considered to be compliant) and optional portions.  In fact, it is quite common for a standard to include numerous optional portions, some of which may never be implemented by manufacturers at all, while others may eventually become implemented in nearly every product.  *IPR policies may apply the same licensing obligations to claims that may be infringed by implementation of the optional portions of a standard, or may restrict obligations to the mandatory sections only*. (*Id.* at 40-41, emphasis added.)

As the study recognized, ETSI did not restrict its obligations to mandatory/required portions, but expressly provides that "options therein" will also be essential.  (ETSI IPR Policy Clause 15.11.)

Accordingly, this Court should determine that, as a matter of French law, optional elements of ETSI standards are essential to those standards under the ETSI IPR Policy, except as they relate solely to the informative annex.

### 2. Qualcomm's Counter-Determination No. 5:  Qualcomm's ETSI FRAND Commitment Applies to IPRs Only to the Extent that the IPR(s) Are or Become, and Remain ESSENTIAL

The plain language of the ETSI IPR Policy obligates a patent holder to commit to license a patent on FRAND terms only "***to the extent that the IPR(s) are or become, and remain ESSENTIAL*** to practice that/those STANDARD(S)."  (ETSI IPR Policy Appendix A ("IPR Information Statement and Licensing Declaration") (emphasis added)).  Indeed, a party making an ETSI IPR licensing declaration must only "declare [] . . . [t]o the extent that the IPR(s) disclosed . . . are or become, and

remain ESSENTIAL", that they are "prepared to grant irrevocable licenses under" the terms and conditions of those IPR(s).  (*Id.*; *see*, *e.g.,* Q2014FTC00032671 (Ex. 41).) It thus follows that a patent holder is not obligated to license a patent on FRAND terms if it is not "essential" under the ETSI definition.[12]  Contrary to this plain language, Apple argues that a patent "becomes 'FRAND encumbered'" simply because a patent is "included in an IPR licensing declaration".  (Motion at 15, 17.) The only support Apple cites is this Court's order addressing Qualcomm's request for an anti-suit injunction.  (*Id.* at 15 (citing *Apple Inc. v. Qualcomm Inc.*, No. 3:17-cv-108-GPC-MDD, 2017 WL 3966944, at *1 (S.D. Cal. Sep. 7, 2017)).)  Nothing in that decision relates to the issue, let alone supports Apple's position.  In fact, Apple's position runs contrary to the policies that undergird the ETSI IPR Policy as it would have the effect of narrowing the patents that are subject to a FRAND licensing commitment.

### CONCLUSION

For the foregoing reasons, Qualcomm respectfully requests that the Court determine the issues of French law as set forth above.

---

[12] Notably, when Qualcomm (and other industry participants) make declarations that patents are essential (as in this case), they make good faith efforts to identify these patents as required by ETSI.  That it may be the case that those patents turn out not to be *actually* essential does not negate the good faith efforts utilized in making those identifications.

1

Dated:  March 8, 2019

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

By    /s/ *Evan R. Chesler*
         Evan R. Chesler

**CRAVATH, SWAINE & MOORE LLP**
Evan R. Chesler (*pro hac vice*)
(N.Y. Bar No. 1475722)
echesler@cravath.com
Keith R. Hummel (*pro hac vice*)
(N.Y. Bar No. 2430668)
khummel@cravath.com
Richard J. Stark (*pro hac vice*)
(N.Y. Bar No. 2472603)
rstark@cravath.com
Antony L. Ryan (*pro hac vice*)
(N.Y. Bar No. 2784817)
aryan@cravath.com
Gary A. Bornstein (*pro hac vice*)
(N.Y. Bar No. 2916815)
gbornstein@cravath.com
J. Wesley Earnhardt (*pro hac vice*)
(N.Y. Bar No. 4331609)
wearnhardt@cravath.com
Yonatan Even (*pro hac vice*)
(N.Y. Bar No. 4339651)
yeven@cravath.com
Vanessa A. Lavely (*pro hac vice*)
(N.Y. Bar No. 4867412)
vlavely@cravath.com
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

1

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
David A. Nelson (*pro hac vice*)
(Ill. Bar No. 6209623)
davenelson@quinnemanuel.com
Stephen Swedlow (*pro hac vice*)
(Ill. Bar No. 6234550)
stephenswedlow@quinnemanuel.com
500 West Madison St., Suite 2450
Chicago, Illinois 60661
Telephone:  (312) 705-7400
Facsimile:  (312) 705-7401

Alexander Rudis (*pro hac vice*)
(N.Y. Bar No. 4232591)
alexanderrudis@quinnemanuel.com
51 Madison Ave., 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Sean S. Pak (SBN 219032)
seanpak@quinnemanuel.com
50 California St., 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

**JONES DAY**
Karen P. Hewitt (SBN 145309)
Randall E. Kay (SBN 149369)
rekay@jonesday.com
4655 Executive Drive, Suite 1500
San Diego, California 92121
Telephone:  (858) 314-1200
Facsimile:  (858) 345-3178

***Attorneys for Defendant and Counterclaim-Plaintiff***
**QUALCOMM INCORPORATED**

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28