UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: QUALCOMM LITIGATION | Case No.: 3:17-cv-108-GPC-MDD<br><br>**ORDER ON APPLE'S MOTION FOR SUMMARY JUDGMENT ON BCPA COUNTERCLAIMS (COUNTERCLAIMS VI, VII, VIII, IX)**<br><br><br>**[ECF No. 602]** |

In 2013, Apple and Qualcomm entered into a Business Cooperation and Patent Agreement ("BCPA") that required Qualcomm to make sizable quarterly payments to Apple so long as Apple did not initiate or induce certain types of litigation or investigations. In its Second Amended Counterclaim ("SACC"), Qualcomm has asserted claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and a declaratory judgment, all based on the BCPA. Before the Court is Apple's Motion for Summary Judgment on these BCPA based Counterclaims. ECF No. 602. The parties submitted supplemental briefings. ECF No. 758, 759, 773. A hearing was held on the motion on January 25, 2019. ECF No. 782.

Based upon the pleadings, papers filed on the motion and arguments of counsel, the Court GRANTS Apple's motions for partial summary judgment on each of these claims.

## I. BACKGROUND

On February 28, 2013, the parties executed a Business Cooperation and Patent Agreement effective January 1, 2013 through December 31, 2016. BCPA, ECF No. 609-5 at 7. Section 7 of the BCPA provides that Qualcomm will make quarterly payments to Apple during the term of the agreement. *Id.* at 6. Section 7 also states that Qualcomm's obligations will apply only " █████ " as Apple does not " ████████████████ ████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████ " *Id.* at 7. The BCPA explains, ███████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ████████ to initiate any ████████ *Id.* And for " ██████████████████ ███████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████ " *Id.* The BCPA defines " ████████ " as ████████████████████████████████ ██████████████████████████████████ ██████████████████████████████████ ████████████████████████████████ ██████████████████████ *Id.* at 12.

Meanwhile, Section 4 of the BCPA states that "██████████████ ████████████████████████████████████████████ ████████████████████████████████ ██████████████████████████████ ████████████" *Id.* at 2.

Unbeknownst to Qualcomm, in ████████████████████ ████████████████████████████████████ █████████████████████████████████████. Qualcomm Supp. Opp. Ex. 48, ECF No. 769. Apple did not ██████████████████████ ██████████████████████████████████████, and the BCPA is silent as to any duty to disclose such pre-BCPA contacts.

In September 2016, Qualcomm stopped making BCPA quarterly payments to Apple. Apple FAC, ECF No. 83 at 64.

A.    Procedural History

1.    Qualcomm's Second Amended Counterclaims

Count VI of Qualcomm's Second Amended Counterclaims ("SACC") advances a claim for breach of the BCPA. SACC, ECF No. 469 at 158. Qualcomm claims that Apple breached both Section 7 and Section 4 of the BCPA. *Id.* at 159-60. As to Section 7, Qualcomm alleges that Apple induced Samsung to suggest to the KFTC ("Korean Fair Trade Commission") that it should broaden its investigation into Qualcomm, made untrue statements to the KFTC and other government agencies about Qualcomm, and urged the KFTC to impose extraterritorial, worldwide remedies against Qualcomm. *Id.* at 160. With respect to Section 4, Qualcomm claims that Apple induced the Contract Manufacturers ("CMs") to reduce royalty payments to Qualcomm, interfered with audit procedures, and directed the CMs to misstate the selling price of the devices they sell to Apple. *Id.* at 161.

Count VII of the SACC is a claim for breach of the implied covenant of good faith and fair dealing. *Id.* at 161. Qualcomm alleges that by inducing governmental agencies

3:17-cv-108-GPC-MDD

to attack Qualcomm's business, Apple has evaded the clear intent of Section 7 and has denied Qualcomm the benefit of its bargain. *Id.* at 162.

Qualcomm raises an unjust enrichment claim in Count VIII, only in the alternative to its breach of contract claims. *Id.* at 163. Qualcomm takes the position that "if there was no meeting of the minds on the meaning of Section 7," then no contract was formed, the BCPA is unenforceable, Apple received and unjustly retained the benefit of substantial payments from Qualcomm, and Qualcomm is entitled to restitution of the value of all unjustly retained payments. *Id.*

Count IX seeks a declaration that Qualcomm is released from any obligation to make further payments under the BCPA, including those for the second, third, and fourth quarters of 2016. *Id.* at 164.

2. Apple's MSJ

Apple moves for partial summary adjudication on Qualcomm's claim that Apple breached Section 7 of the BCPA. Apple Mem., ECF No. 609 at 4. Apple argues that its responses to agency inquiries cannot constitute "active inducement" and are protected by Section 7's safe harbor. *Id.* at 7-8. As to Qualcomm's claim that Apple breached the BCPA by making false statements to authorities, Apple asserts that the BCPA does not permit Qualcomm to regulate the content of Apple's responses to agency requests. *Id.* Next, Apple asserts there is no evidence to support the claim that it attempted to expand investigations of Qualcomm by government authorities. *Id.* As an alternative argument regarding the Section 7 claims, Apple argues that Qualcomm's interpretation of the BCPA would violate public policy and thus Section 7 should be void. *Id.* at 11-12.

Apple does not move for summary judgment on the merits of the Section 4 breach of contract claim, but instead, moves for a partial summary judgment that Qualcomm cannot recover the BCPA payments as damages for that claim. *Id.* at 15.

Next, Apple moves for partial summary judgment on Qualcomm's claims for breach of the implied covenant of good faith and fair dealing, arguing that Apple's interactions with government authorities were expressly allowed by the BCPA. *Id.* at 12-

13. Apple asks the Court to dismiss Qualcomm's unjust enrichment claim. *Id.* at 13. Apple contends that unjust enrichment is not a stand-alone cause of action in California, and, moreover, Qualcomm's argument that there was no meeting of the minds lacks merit in the face of the BCPA's clear and unambiguous language. *Id.* Finally, Apple moves for summary judgment on Qualcomm's declaratory relief claim. Apple asserts that it did not breach the BCPA during the BCPA's term, and its obligations to refrain from filing a lawsuit under Section 7 did not survive termination of the BCPA.

## II. DISCUSSION

A.  Legal Standard

   1.  Summary Judgment

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 327 (1986). Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material when it affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element of his or her claim on which that party will bear the burden of proof at trial. *Id.* at 322-23. If the moving party fails to bear the initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159-60 (1970).

Once the moving party has satisfied this burden, the nonmoving party cannot rest on the mere allegations or denials of his pleading but must "go beyond the pleadings and

by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. If the non-moving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. *Id.* at 325. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court must view all inferences from the evidence in favor of the nonmoving party. *Id.*; *Fontana v. Haskin*, 262 F.3d 871, 876 (9th Cir. 2001) (stating that the court must "view[ ] the evidence in the light most favorable to the nonmoving party."). The Court does not engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the trier of fact. *Anderson*, 477 U.S. at 255.

## 2. Contract Interpretation

Under California law, interpretation of a written instrument is solely a judicial function unless interpretation turns on the credibility of extrinsic evidence. *De Guere v. Universal City Studios*, 56 Cal. 4th 482, 501 (1997). "The mutual intention of the parties at the time the contract is formed governs interpretation." *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 647 (2003) (citing Cal. Civ. Code § 1636. "Such intent is to be inferred, if possible, solely from the written provisions of the contract." *Id.* (citing Cal. Civ. Code § 1639). Contract provisions are interpreted in their "ordinary and popular sense . . . unless used by the parties in a technical sense, or unless a special meaning is given to them by usage." Cal. Civ. Code § 1644. If contractual language is clear and explicit, it governs. *Id.* § 1638. But if the meaning is uncertain, the general rules of interpretation are to be applied. Cal. Civ. Code § 1637; *Pacific Indem. Co. v. California Elec. Works, Ltd.* 29 Cal. App. 2d 260, 272 (1938).

Whether language in a contract is ambiguous is a question of law to be determined by the court. *Producers Dairy Delivery Co. v. Sentry Ins. Co.*, 41 Cal. 3d 903, 904 (1986). Interpretation of an unambiguous contract is also a question of law. *Abifadel v.*

*Cigna Ins. Co.*, 8 Cal. App. 4th 145, 159 (1992) ("The interpretation of a contract is a question of law when the contract terms are unambiguous."). Civil Code Section 1649 provides as follows: "If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it."

B.    <u>Qualcomm's Claims that Apple Breached Section 7 of the BCPA</u>

Count VI of Qualcomm's SACC includes the claim that Apple breached Section 7 of the BCPA. SACC, ECF No. 469 ¶ 359. Apple moves for partial summary judgment on this claim. In its SACC, Qualcomm advances three theories to support this claim: 1) Apple induced government investigations prior to the BCPA and then responded to inquiries made as part of the investigation Apple had itself induced; 2) Apple made false and misleading statements to government authorities; and 3) Apple attempted to expand investigations of Qualcomm.

Under Section 7, Qualcomm agrees to make quarterly payments to Apple during the term of the agreement "████████" as Apple does not "████████████████ ████████████████████████████████████████████ "████ ████████████" BCPA at 7. "████████ is defined to include any claim that "(█ ████████████████████████████████████████████ ████████████████████ *Id.* at 7. The BCPA explains, ████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████ *Id.* BCPA also states that for "████████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████" *Id.*

1.    <u>Qualcomm's Claim that Apple Induced the FTC Investigation</u>

It is undisputed that the FTC initiated an informal investigation of Qualcomm in September of 2014 during the BCPA term, and as part of this investigation, the FTC asked Apple to provide information about Qualcomm. Qualcomm alleges that Apple actively induced the FTC to "███████████" and that, consequently, the BCPA's safe harbor for responding to inquiries from governmental authorities in connection with an investigation "███████████████████████████████████" does not protect Apple. Qualcomm Supp. Opp., ECF No. 769 at 6. Qualcomm asserts, consequently, it was relieved of its payment obligation from, at the latest, the first instance of Apple's active inducement after the effective date of the BCPA, i.e. November 2014. *Id.*

Qualcomm alleges that in August 2012, Apple suggested to the FTC ██████ that they should investigate Qualcomm's licensing practices. QSOF, ECF No. 640-1 ¶ 67. There is no dispute that on August 9, 2012, Apple met with the FTC ██████ "to educate" ██████ "on the scope and value of a cellular standard" within iPhones. *Id.* Apple's goal was to "have the FTC ██████ influence the industry in the way it computes royalties for standard essential patents." *Id.* Apple stated at the meeting "that royalty payment should not be based on the sale price of the device." *Id.* Moreover, Apple stated that "some chipset suppliers (e.g. Qualcomm) seek royalties even when purchasing the supplier's chipset." *Id.* ¶ 68.

According to a Form 10-K filed by Qualcomm, on September 17, 2014, the FTC had notified Qualcomm that the agency was conducting an investigation of Qualcomm relating to Section 5 of the Federal Trade Commission Act. Apple Mot. Ex. Z, ECF No. 602-31 at 86. The FTC notified Qualcomm that it was investigating conduct under antitrust and unfair competition laws related to standard essential patents, pricing, and contract practices with respect to baseband processors and related products. *Id.*

On October 27, 2014, the FTC emailed Apple "as part of [its] non-public investigation to determine whether" Qualcomm has engaged in unfair methods of competition "through licensing practices related to cellular chipset patents, including

potential breach of any FRAND commitments." Apple Mot. Ex. F, ECF No. 602-11. The FTC asked Apple to discuss "███████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████" *Id.* On November 6, 2014, the FTC emailed Apple, reaffirming that the FTC is conducting an investigation to determine whether Qualcomm is violating the FTCA "██████████████████████████████████████████████████ ██████████████████████████████." Apple Mot. Ex. G, ECF No. 609-11 at 3. The FTC asked Apple to submit any request, proposal, or agreement with Qualcomm "████████████████████████████████████████████████████████████████" *Id.* at 5. Apple responded to the FTC's requests on November 18, 2014. Apple Mot. Ex. H. Apple asserted that Qualcomm charges for its chipsets and its patents, including those patents allegedly embodied in its chipset. *Id.* at 79. Apple also asserted that Qualcomm ██████████████████████████████████████████████████████ ████████, and that Qualcomm seeks to avoid its FRAND commitments by mixing SEPs and non-SEPs. *Id.* at 82.

In a complaint filed in the Northern District of California on January 17, 2017, the FTC sought injunctive relief, claimed that Qualcomm has unlawfully maintained a monopoly in baseband processors, alleged that Qualcomm has a "no license-no chips policy," and that Qualcomm had violated its FRAND commitments. Qualcomm Opp. Ex. 22 ("Qualcomm Opp"), ECF No. 632-24 at 317. The FTC referenced some of Qualcomm's negotiations and agreements with Apple. *Id.* at 339-42.

　　　　　　　a.　　Whether pre-BCPA term inducement removes the safe harbor

Under Section 7 of the BCPA, Qualcomm is obligated to make quarterly payments to Apple during the term of the agreement "██████" as Apple does not "████████ ████████████████████████████████████████████████████████ ████████████████████████" BCPA, ECF No. 609-5 at 7. Under these terms, the BCPA provides a safe harbor for Apple's responses to an official inquiry by stating

that "███████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████. *Id.*

At its core, a safe harbor protects described behavior as compliant with specific laws, regulations or contractual provisions.[1] It allows an individual or entity to engage in the described behavior with protection from claims alleging a violation or breach of the specified provisions. Meanwhile, behavior outside of the safe harbor is neither protected or necessarily noncompliant. *Id.* Here, Section 7 of the BCPA protects Apple's responses to inquiries arising from "████████████████████████████████
████████████████████████████." BCPA at 7. It provides a safe harbor by allowing Apple to respond to inquiries without fear that the response to investigators will be found to be active inducement of a third party to initiate litigation. The parties agree that Apple's conduct, by itself, before the BCPA term does not constitute active inducement as to violate Section 7. That is, Qualcomm does not contend that Apple breached the BCPA by inducing the FTC investigation outside of the BCPA term. Instead, Qualcomm argues that Apple is not entitled to the safe harbor for its responses during the term of the BCPA because it had previously induced the FTC to investigate Qualcomm. To arrive at this conclusion, Qualcomm posits that Section 7 does not draw a distinction between investigations that were induced prior to or during the BCPA term. Qualcomm Opp., ECF No. 640 at 9.

Apple asserts that because its first interaction with the FTC during the BCPA term occurred after the FTC had already opened its investigation, Apple did not actively induce the investigation and its responses fall within Section 7's safe harbor. Apple

_____

[1] Susan C. Morse, Safe Harbors, Sure Shipwrecks, 49 U.C. Davis L. Rev. 1385, 1391–92 (2016) (A safe harbor guarantees compliance for described behavior, without foreclosing the possibility that activities outside the safe harbor are also compliant. Sure shipwrecks provide that activity within the sure shipwreck is definitely noncompliant, while activity outside the space described by the sure shipwreck may or may not be compliant. Thus the activity described by the sure shipwreck is subject to a rule, while activities outside the sure shipwreck remain subject to a standard.

Mem. at 6-8. Qualcomm counters that Section 7's "███████" draws no distinction between investigations that were induced during the term of the BCPA versus those that were induced before the term. Qualcomm Opp. at 9. Qualcomm thus argues that since Apple induced the FTC investigation in 2012, Apple's responses are outside the safe harbor, even though the alleged inducement occurred prior to the BCPA term. The Court agrees.

Section 7 does not limit "████████████" to inducement during the term of the agreement. It only requires that the inducement occur prior to the specified responses. A safe harbor conveys a benefit to a party and setting conditions to realize it, even one based upon pre-BCPA conduct, is not unreasonable. The failure to satisfy the conditions of the safe harbor removes the protection but does not establish liability. Accordingly, the Court concludes that active inducement of an investigation prior to the term disqualifies Apple from taking advantage of the safe harbor.

               **b.**    <u>Did Apple's 2012 meetings induce the FTC's investigation?</u>

Even if the BCPA does not distinguish between inducement prior to or during the BCPA term, Apple asserts that Qualcomm has failed to raise a genuine dispute that Apple's 2012 meeting with the FTC induced its investigation. Apple Reply, ECF No. 679 at 1. Specifically, Apple contends that Qualcomm has not cited evidence that Apple's 2012 meeting with the FTC induced the investigation that started more than two years later. Apple Reply at 1 (citing SOF, ECF No. 609-1 ¶ 34). It is undisputed that Apple's meeting with the FTC occurred in August 2012, but the FTC did not notify Qualcomm of the investigation until September 17, 2014.

Apple is correct that Qualcomm does not show any direct evidence that Apple's meeting that induced the FTC to investigate Qualcomm. Qualcomm has not pointed to any communications, statements, or filings by the FTC that demonstrate its reliance on Apple's meeting to initiate its investigation into Qualcomm.

However, drawing all inferences from the evidence in favor of Qualcomm, the trier of fact could reasonably infer that Apple induced the investigation based upon the

information disclosed by Apple in 2012 and the scope of the FTC investigation. In the meeting, Apple ██████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████. Apple's specific goal was to have the FTC influence the way the industry computes royalties for SEPs. In other words, Apple intended for the FTC to investigate Qualcomm's licensing practices, and the FTC did in fact do that. The FTC's investigation was to determine whether Qualcomm violated the FTC Act through its licensing practices related to cellular chipset patents, which was the topic Apple raised to the FTC. Moreover, the FTC asked Apple to ████████████████████████████ ████████████████████████████████. A trier of fact could find that the scope of this investigation was correlated to Apple's 2012 proffer to the FTC.

Apple makes much of the fact that the FTC did not notify Qualcomm of the investigation until two years after the Apple meeting. True, it would be easier to infer Apple induced the investigation had the investigation began immediately after the Apple meeting. But on the other hand, it was not unreasonable for the FTC to take time to perform its due diligence before launching an investigation into a company as large as Qualcomm, especially given the highly technical patent licensing issues with multi-billion dollar implications. After the meeting, Apple ████████████████████████ ████████████████████████ Qualcomm Supp. Opp. Ex. 48 at 27, ECF No. 769. ██████ ██████████████████████████████

The Court finds that Qualcomm has created a genuine dispute of material fact that Apple's 2012 actions induced the FTC informal investigation and therefore Apple's responses to the FTC are not entitled to the safe harbor.

c.   Did Apple's responses to the FTC "██████.

By removing the safe harbor, Section 7 does not automatically convert unprotected responses into acts of inducement. The safe harbor clarifies what is *not* active inducement. On the other hand, nothing in the BCPA states any response outside of the

12

safe harbor automatically constitutes "███████████." By its prior inducement, Apple is only denied the protection of the safe harbor. Or as stated by one commentator, just because an entity cannot rely on the safe harbor does not mean that its conduct has led to a sure shipwreck, i.e. foreclosed the possibility that the activities outside the safe harbor are also compliant with rules or contracts.[2] Ultimately, Qualcomm is still required to demonstrate that Apple "█████████████████████████████████."[3]

Assuming that Apple is outside of the safe harbor, Qualcomm must still create a genuine issue that Apple's responses during the BCPA term actively induced the initiation of Litigation, for that is what Section 7 forbids. Qualcomm asserts that Apple caused the FTC to initiate its informal investigation on September 17, 2014 and the formal investigation on March 20, 2015, and resolved to "█████████████████ ███████████████" QSOF ¶¶ 32, 94, 101. The Court will take up these arguments in turn.

By October 27, 2014, the FTC had initiated a "████████████████ ████████████" Qualcomm had engaged in unfair methods of competition "████ ████████████████████████████████████████████████ ████████████████ Apple Mot. Ex. F, ECF No. 602-11. The FTC specifically asked Apple to discuss "███████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████." *Id.* The above shows that when the FTC sought information from Apple

_____

[2] Susan C. Morse, Safe Harbors, Sure Shipwrecks, 49 U.C. Davis L. Rev. 1385, 1391–92 (2016)

[3] *Cf.*, Emily Cauble, Safe Harbors in Tax Law, 47 Conn. L. Rev. 1385, 1391–92 (2015) (if a taxpayer operates outside the boundaries of a safe harbor, he will not automatically forfeit the tax treatment accorded to taxpayers falling within the safe harbor. Rather, an underlying standard will determine the tax consequences imposed upon taxpayers who function beyond the limits of a safe harbor, and, under this standard, some taxpayers will receive the same treatment provided to taxpayers within the safe harbor while some will not.)

during the BCPA term, the FTC informal investigation was already open. Logically, Apple's responses to an existing investigation could not have actively induced the initiation of that investigation.

Further, Qualcomm has failed to provide evidence in support of a claim that based upon Apple's responses the FTC expanded the investigation to add and include FRAND and Exhaustion issues. Following a successful █████████████████████ ████████████████████████████, Qualcomm has offered clawed back documents to support their argument that Apple initiated or expanded ████ by its contacts with the FTC during the term of the BCPA. However, the █████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████. *See*, "███████████████████" (Qualcomm Supp. Opp. Ex. 50, ECF No. 769); ████████████████████████████ (Qualcomm Supp. Opp. Ex. 52); ████████████████ (Qualcomm Supp. Opp. Ex. 53); Plan of Record, (Qualcomm Supp. Opp. Ex. 56); ██████████████████████████, (Qualcomm Supp. Opp. Ex. 58). These materials may reveal ██████████████████ ██████████████████████████████████ but they do not constitute initiation of ████████ as ██████████ defined in the BCPA. The thought process of Apple does not constitute actions directed at the regulatory agencies.

Qualcomm has failed to create a triable issue that Apple's responses to the 2014 requests for information by the FTC induced the informal investigation. Apple is entitled to summary adjudication on the breach of contract claim as to initiation of the 2014 FTC informal investigation.

Qualcomm also asserts that Apple "continued to encourage the FTC's investigation" through its responses. Qualcomm Opp. at 5. Qualcomm states that Apple's efforts caused the FTC to initiate the 2015 FTC formal investigation and that Apple continued to push the FTC in 2016 until the FTC filed a lawsuit in *FTC v. Qualcomm Inc.*, No. 17-cv-0220-LHK-NMC, on January 17, 2017. To the extent that

Qualcomm is arguing that Apple's 2014-16 responses breached the BCPA by "initiating" later stages of the FTC investigation, the Court finds that public policy prohibits enforcement of a BCPA provision that would punish Apple for responding to the FTC requests for information. This finding is further developed below in Section B(3).

2. Qualcomm's Claim that Apple Breached the BCPA by Making False Statements to Authorities

In its second theory in support of its claim for breach of Section 7, Qualcomm contends that Apple breached the BCPA by making false and misleading statements about Qualcomm to regulators throughout the world. SACC ¶ 359(d). Apple responds that the BCPA does not permit Qualcomm to regulate the content of Apple's responses to agency requests. Apple Mem. at 9.

Qualcomm submits that "[f]alse statements hinder, rather than facilitate, government investigations and, therefore, cannot be characterized as ' █████████ to government inquiries." Qualcomm Opp. at 11. Qualcomm also asserts that Apple's only plausible motivation for its false statements was to induce further investigation of Qualcomm. *Id.* Finally, Qualcomm argues that allowing Apple to make false statements under the guise of the safe harbor would defeat the BCPA's purpose of obtaining litigation peace. *Id.* Apple maintains that absent ' ████████████ " of an agency investigation during the term of the BCPA, Apple was free to respond to agency inquiries however it liked. Apple Reply at 4.

To begin, the Court must construe the safe harbor term " ████████████ ████ " by investigative agencies. BCPA at 7. Interpreting this phrase requires an appreciation of the purpose of the safe harbor provision in this case. By including a safe harbor in the BCPA, the parties clearly recognized that Section 7 could not impose significant penalties against Apple for responding to government requests for information. The BCPA provides that " ██████████████████████ " fall within the safe harbor provision. BCPA at 7. Section 7 does not define " ████████████

15

1   ███████ ".  BCPA at 7.  However, common sense dictates that the safe harbor cannot
2   be transformed from a shield to a sword.

3          Support for this unremarkable proposition can be found in cases involving the First
4   Amendment's Petition Clause which provides parties "breathing space required for
5   effective exercise of the [petitioning] rights it protects." *Rock Rivers Commc'ns Inc. v.*
6   *Univ. Music Grp., Inc.* 745 F.3d 343, 351 (9th Cir. 2014) (*Noerr-Pennington*[4] immunity
7   afforded to pre-litigation correspondence).  Meanwhile, in this case, the safe harbor
8   operates, in many ways like the Petition Clause, by providing "breathing space"
9   necessary for the effective exercise of protected contractual rights, i.e. the right to provide
10  responses to government inquiries.

11         However, it is instructive here that the Petition Clause does not operate without
12  limits.  Excepted from protection are "sham" lawsuits which are both "objectively
13  baseless" and "an attempt to interfere *directly* with the business relationships of a
14  competitor."  *Prof. Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc*. 508 U.S.
15  49, 60-61 (1993).  In defining "objectively baseless", the U.S. Supreme Court has
16  obtained guidance by referring to the Second Restatement of Torts definition of probable
17  cause which requires one to "reasonably believe[] in the existence of the facts upon
18  which the claim is based."  *Id.* at 62-63 (citing Restatement (Second) of Torts § 675).

19         Applying a "reasonable belief" standard into the facts of this case makes sense to
20  avoid turning a safe harbor into an absolute immunity which would immunize
21  demonstrably false statements.  Using the standard here, "████████████████ " would
22  necessarily require Apple to reasonably believe in the existence of the facts that are
23  provided in its responses.  Ultimately, statements that are objectively false do not
24  factually respond to a question.  If there is evidence that Apple's response was

[4] *Eastern Railroad Pres. Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) and *United Mine Workers v. Pennington*, 381 U.S. 657 (1965)

3:17-cv-108-GPC-MDD

"objectively baseless" then the next step is to determine whether the untrue statement relates to areas covered by Section 7, i.e. FRAND and Exhaustion.

Qualcomm advances a theory that a false statement to an agency is a breach of the BCPA solely because it is false, whether or not that statement induced the initiation of ████████ But as discussed above, the relevant inquiry to Section 7 is whether Apple induced the initiation of ██████ Given that a false statement is not a "████████ that only means that the false statement is outside of the protection of the safe harbor; Qualcomm must still provide evidence that the false statement induced the initiation of ████████ for the statement to breach Section 7. To the extent Qualcomm maintains that "Apple's only plausible motivation for its false statements was to induce further investigation of Qualcomm," Qualcomm Opp. at 11, Qualcomm is free to argue that Apple's false or misleading statements induced a third party to initiate litigation against Qualcomm on FRAND and Exhaustion issues, for that is what the BCPA prohibits. Even if Qualcomm were to argue that the allegedly false statements induced the initiation of ████████ as the ████ is defined, Qualcomm has failed to raise a genuine dispute on that issue.

Qualcomm alleges that Apple made false statements to the Directorate-General for Competition ("DG Comp"), such as, that ████████████████████ ██████████████████████████████ ████████████████████████. QSOF ¶¶ 70-74. Qualcomm also alleges, as false statements, that Apple told the ████████████████████ ██████████████████████████, and that Apple asserted that it has yet to add a second chipset supplier because of Qualcomm's exclusionary conduct. QSOF ¶ 75. In addition, Qualcomm alleges that Apple told the ████████████████ ██████████████████████████████ which Qualcomm claims is false. QSOF ¶¶ 72-74, 77-78.

Assuming Apple did not have a reasonable belief that these statements were true, the next step is to determine whether these statements related to an area covered by

Section 7. As Apple points out in its Reply, none of these allegedly false statements relate to FRAND or exhaustion. Section 7 prohibits the initiation of ████████ only if it includes a claim relating to FRAND or exhaustion of patents. While Qualcomm alleges that these statements caused agencies to make erroneous findings, Qualcomm has not pointed to any evidence that the agencies were induced to initiate Litigation involving a claim for FRAND violation or exhaustion, and the purportedly erroneous findings that Qualcomm relies upon do not involve FRAND or exhaustion issues.

Qualcomm also alleges that Apple misled the KFTC when it claimed that Qualcomm never made a good faith offer that defines what patents are covered or ████████████████████████. QSOF ¶¶ 79-82. This statement implicates FRAND. However, there are two problems. First, Qualcomm does not provide evidence that Apple did not "reasonably believe[] in the existence of the facts upon which the claim is based." 508 U.S. 49 at 62-63. Nor has Qualcomm raised a fact issue as to whether this statement induced the KFTC to ████████████ against Qualcomm. The BCPA prevents Apple from "████████████████████████████████." To induce means to "bring on or about, to affect, cause, to influence to an actor or course of conduct, lead by persuasion or reasoning, incite by motives, prevail on." Black's Law Dictionary 775 (6th ed. 1990). Therefore, it appears that the BCPA requires that the action taken by Apple have some sort of effect or causing the third party to actually ████████████. In other words, conduct by Apple (no matter how egregious) that did not lead a third party to ████████████ will not constitute a breach of Section 7. Qualcomm has failed to put forth any evidence that Apple's allegedly false statements induced any action from the KFTC.

Finally, Qualcomm challenges Apple statements to the FTC in December 2016 that Qualcomm charges "excessive", non-FRAND royalties that are "far out of bounds." QSOF ¶ 95. As evidence to show that Apple could not have had a reasonable belief that the statements were true, Qualcomm relies on ████████████████████████████████████████████████████████████████████████████████████

████████████████████████████ The statements relied on were ██████████
█████████████████████████████████████████████████████████████████
█████████████████████████████████ before the Court.

This 2011 opinion does not show that Apple did not have a reasonable belief that the 2016 statements were true. In sum, Qualcomm has failed to a raise a genuine dispute that any of Apple's allegedly false statements breach the BCPA.

### 3. Public Policy

As an alternative argument, Apple Reply at 4 n.2, Apple contends that any interpretation of the BCPA that would prevent Apple from responding to agencies' requests (whether based on subject matter or the alleged truthfulness thereof) would violate public policy. Apple Mem. at 11. The Court partially disagrees with this assertion.

The claim that public policy would permit a party to a contract to lie in a response to government regulators is now moot given that the Court has found that Qualcomm has failed to raise a genuine dispute that any false statements were material and were covered by the BCPA. Meanwhile, there is a remaining question that requires analysis of public policy considerations with respect to Apple's responses from 2014-16 which allegedly initiated "████████ by triggering a formal 2015 FTC investigation and 2017 FTC lawsuit.

Apple's position is that the BCPA violates public policy because it prevents Apple from responding to government inquiries. Qualcomm has alleged that Apple's responses from 2014-16 breach the BCPA by initiating the 2015 formal investigation and the 2017 lawsuit. The Court concludes that interpreting Section 7 in this way would violate public policy.

In *Bovard v. American Horse Enterprises, Inc.*, 201 Cal. App. 3d 832 (1988), the court recognized the need to exercise caution in applying public policy reasons to nullify contractual terms in otherwise enforceable contracts. It observed that "public policy requires and encourages the making of contracts by competent parties upon all valid and

lawful considerations, and courts so recognizing have allowed parties the widest latitude in this regard; and, unless it is entirely plain that a contract is violative of sound public policy, the court will never so declare." *Id.* at 838–839 (citing *Stephens v. S. Pacific Co.*, 109 Cal. 86, 89–90 (1895)).

At the same time, the *Bovard* court quoted from section 178 of the Restatement Second of Contracts recognizing that a contract will be unenforceable on public policy grounds if: " . . . 'the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms.' . . ." *Id.*

"California courts, too, are loathe to enforce contract provisions offensive to public policy." *Potvin v. Metropolitan Life Ins. Co.*, 22 Cal. 4th 1060 (2004). "A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms." *Cariveau v. Halferty*, 83 Cal. App. 4th 125, 131 (2000). "The term 'legislation' is used here in the broadest sense to include any fixed text enacted by a body with authority to promulgate rules, including not only statutes, but constitutions and local ordinances, as well as administrative regulations issued pursuant to them." *Id.* (citing Restatement (Second) Contracts, § 178, cmt. a).

In *Cariveau v. Halferty*, the court found a confidentiality clause in a settlement agreement was unenforceable on public policy grounds. Marion Hixon was a registered agent under the rules of the National Association of Securities Dealers ("NASD"). *Id.* at 129. Plaintiff Loralynn Halferty invested funds with Equitable Life Assurance Society through Hixon. *Id.* Later, Hixon improperly invested Halferty's money in two real estate limited partnerships and a corporation which Hixon managed. *Id.* Halferty later learned that the investments were inappropriate and that Hixon possibly violated securities dealers' ethical standards. Halferty sought to recover the invested funds. *Id.* Hixon told Halferty that the only way she would get her money back was to sign a Forbearance Agreement which provided for repayment of Halftery's investments and stated, in part:

The terms and conditions of this Forbearance Agreement and Mutual Release and each and all of the underlying events resulting in the negotiation of this Agreement shall remain private and confidential in all respects and shall not be disclosed by any party hereto, ... for any reason whatsoever, to any public or private person or entity, or to any administrative, law enforcement or regulatory agency.

*Id.*

The agreement also provided that the confidentiality clause would be waived if a party is subpoenaed or under court order to disclose the subject matter of the agreement if the party was not "either personally or by acting through another person or entity, responsible for the initiation of the inquiry which resulted in the subpoena or court order." *Id.* at 136 n.4.

The trial court concluded that the confidentiality clause was void and unenforceable as a violation of the public policies expressed in the NASD rules and the Securities Exchange Act ("SEA"). *Id.* Hixon[5] appealed, arguing that contracts settling disputes are generally enforceable and that public policy favors the settlement of disputes. *Id.* The appellate court affirmed finding that the agreement "violates the NASD rules as well as the prohibition of the Securities Exchange Act of 1934 of contracts that involve the continuance of a violation of the Act." *Id.* at 138. Hixon "was under an affirmative duty pursuant to the NASD rules and policy, to disclose her outside dealings to her employer and was subject to a policy that disapproved of actions preventing customers from discussing misconduct with an agent's employer and the NASD." *Id.* at 136. The court thus found that a confidentiality agreement that restricted a customer of a NASD member "from reporting improper conduct to the NASD serves to perpetuate the improper conduct and is condemned by NASD policies." *Id.* at 136. "The Forbearance Agreement required suppression of information that Hixon was required to

---

[5] Hixon was shot to death during the litigation and the trustee of her estate subsisted Hixon as plaintiff, for ease I will just refer to the trustee as Hixon.

report to her employer and the NASD," and "also allowed Hixon to continue to violate the rules regarding outside sales, facilitated her periodic false reports to her employer, and frustrated the NASD's self-regulation policies." *Id.* at 135.

The court noted that maintaining an honest marketplace in securities had been declared a "national public interest" in the SEA. *Id.* at 136. The court concluded that the public policy from securities laws and regulations outweighed the interest in settling disputes without litigation. *Id.*

Here, Apple asserts that it had a legal duty to comply with all subpoenas and investigate demands from the FTC. Apple Mem. at 11. 14 U.S.C. § 49 provides that the FTC "shall have power to require by subpoena the attendance and testimony of witnesses and the production of all such documentary evidence relating to any matter under investigation." FTC investigations are in the matter of public interest. *See* 16 C.F.R. § 2.3 ("The Commission acts only in the public interest and does not initiate an investigation or take other action when the alleged violation of law is merely a matter of private controversy and does not tend adversely to affect the public."). The FTC "encourages cooperation in its investigations" and "expects all parties to engage in meaningful discussions with staff to prevent confusion or misunderstandings regarding the nature and scope of the information and material being sought, in light of the inherent value of genuinely cooperative discovery." 16 C.F.R. § 2.4. The FTC is given subpoena powers and may initiate an enforcement proceeding in connection with the failure or refusal to comply with a subpoena. 16 C.F.R. §§ 2.7, 2.13.

Qualcomm contends that the BCPA prohibitions do not contravene public policy. Qualcomm Opp. at 12. To decide this issue, it is necessary to determine what effect Qualcomm's interpretation of Section 7 would have on public policy. Here, the FTC was investigating Qualcomm's licensing practices to determine whether it violated the Sherman Act and adversely affected consumers. Apple's responses to FTC inquiries led the FTC to conclude that Qualcomm's conduct violated antitrust laws and led it to file a lawsuit against Qualcomm seeking injunctive relief to protect consumers from ongoing

anticompetitive behavior.  Clearly, the violations investigated were serious and are alleged to have adversely affected the public.

Under these circumstances, enforcing the BCPA so as punish Apple for responding to regulatory investigations would deter parties from responding to regulatory investigations and have the effect of concealing ongoing illegal conduct to the detriment of the public and perpetuating improper conduct.

Qualcomm argues that the BCPA should be enforced because public policy favors settlement of potential legal claims.  Qualcomm Opp. at 13.  While the Court exercises caution in applying public policy reasons to nullify contractual terms, settlement agreements are unenforceable where enforcement is outweighed by a public policy against the enforcement of such terms.  *Bovard v. American Horse Enterprise, Inc*. 201 Cal. App. 3d 832, 840 (1988).   In addition, Section 7 does not promote settlement of past claims, rather than create financial incentives in order to avoid future challenges to its licensing practices.

Qualcomm next maintains that Apple gave up the BCPA payments by actively inducing investigations and by making untrue statements, not by responding to government inquiries.  According to Qualcomm, that distinguishes Section 7 from *Cariveau*.  Qualcomm also contends that public policy does not protect making untrue statements to government authorities.  18 U.S.C. § 1001 prohibits knowingly making "any materially false, fictitious, or fraudulent statement or representation" "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States."  Qualcomm asserts that if Apple is responding to a federal government inquiry with a false statement, then such response is not protected by public policy.

The Court agrees that public policy does not support Apple's position that its responses are protected and immune from any form of review even if Apple did not reasonably believe in the existence of the facts reported in its responses.  However, that issue is moot given the Court's prior determination regarding the alleged false statements.

23

For the reasons stated, the Court concludes that public policy bars enforcement of the BCPA with respect to Apple's responses from 2014-16.  As such, the Court grants Apple's motion for partial summary judgment as to the claims that Apple initiated the 2015 FTC formal investigation and 2017 FTC lawsuit.

    4.    <u>Qualcomm's Claim that Apple Attempted to Expand the Scope of Investigations of Qualcomm</u>

Lastly, Qualcomm claims that Apple was not entitled to BCPA payments because it attempted to expand investigations of Qualcomm.  Specifically, Qualcomm points to: 1) Apple's alleged attempt to expand the EU's investigation; 2) Apple's inducement of Samsung to suggest to the KFTC that it should broaden its investigation; and 3) Apple's urging of the KFTC to impose worldwide remedies against Qualcomm.

    a.    <u>The European Union's Investigation of Qualcomm</u>

There is no question that EU's Directorate General for Competition's ("DG Comp") initial investigation did not relate to Qualcomm's licensing practices.  QSOF 28, 86; Qualcomm Opp. Ex. 9 at 1.  It is also undisputed that Apple did not actively induce the initiation of this investigation.  SOF 29.  After the investigation was initiated, Apple received the DG Comp's initial RFI ("Request for Information") on or about August 12, 2014.  SOF 30.  Apple sent its first response on August 15, 2014.  SOF 31.  The response does not mention FRAND, exhaustion or Qualcomm's licensing practices.  *Id.*  The final decision of the European Commission that Qualcomm points to only references the issue of Qualcomm's exclusivity payments.  On January 24, 2018, the European Commission issued a decision concluding that "██████████████████████████████ ████████████████████████████████████ ████████████████████  Qualcomm Opp. Ex. 41, ECF No. 640-43 at 102.

Qualcomm alleges that Apple provided responses to DG Comp queries that improperly induced DG Comp to expand its investigation to include challenges to Qualcomm's licensing practices.  Qualcomm. Opp. at 12.  Qualcomm also alleges that in July 2015, while the EU was investigating certain payments that Qualcomm had made to

Apple under a different agreement, Apple induced Samsung to ask DG Comp to broaden the investigation ████████████████████████████████████. Qualcomm Opp. at 5.

Apple argues that Qualcomm has failed to raise a genuine dispute of material fact that Apple actively induced the DG Comp to initiate Litigation involving FRAND or exhaustion.

As noted above, Section 7 does not define "█████████████████████████████". "Responding" is defined as "to make a reply; answer." *The American Heritage Dictionary of the English Language*, *4th Edition*. In the context of the BCPA, the Court concludes that the reply must be responsive to the query. That is, it must fairly be an answer to the call of the question. Otherwise, under the guise of a response, Apple could improperly initiate an investigation or broaden the scope of an investigation that is underway.

      i.    <u>Whether Apple Induced the EU to Investigate Qualcomm for Possible FRAND Violations</u>

On November 4, 2014, the DG Comp issued an RFI asking Apple: "In your experience, are the intellectual property rights associated with BCs [baseband chipsets] an impediment for switching between different BC suppliers for your company?" RSOF, ECF No. 776 ¶¶ 87, 97; Qualcomm Opp. Ex. 12, ECF No. 640-14 at 187. On January 9, 2015, Apple responded in the affirmative, and explained that in its experience: "████████████████████████████████████████████ ████████████████████████████████████████ ███████" *Id.*

Apple asserted that it paid a net royalty of ██████ per unit to Qualcomm, which is the function of a series of agreements between the two companies that requires Apple to purchase baseband processor chipsets exclusively from Qualcomm. *Id.* Apple alleged that if it were to use another chipset supplier, Apple would have to pay much higher royalties and lose additional funds from Qualcomm. First, Apple explained that BCPA

caps the royalties at ████ ████████████████████████████████

████████████████████ which effectively means that Apple must purchase chipsets

exclusively from Qualcomm. *Id.* Apple believed that if it used another chipset supplier,

Apple would lose the royalty cap and would have to pay over ████ a unit in royalties. *Id.*

Next, Apple stated that it would lose funds paid under its ████████████████ if

Apple used another chipset supplier. Apple alleged that the ████████████ was

achieved by Qualcomm leveraging its SEPs and high royalty demands to force Apple to

agree to exclusivity in exchange for a discount off Qualcomm's royalties. *Id.* Pursuant

to the ████████████, Qualcomm agreed to pay Apple ████ for each iPhone with

a Qualcomm chipset as long as Apple purchases chipsets exclusively from Qualcomm.

*Id.* at 188. Apple concluded that a decision to use a different chipset supplier would

likely increase the cost of Qualcomm's intellectual property to Apple in terms of

royalties. *Id.*

Apple asserts that this document is responsive to an agency request and thus

protected by the BCPA's safe harbor. Apple Reply at 6. Qualcomm contends that Apple

was not merely responding to the RFI but inducing DG Comp to expand its investigation

to include challenges to Qualcomm's licensing practices. Qualcomm Opp. at 12.

The initial query posed by the EC was wide ranging and asked for Apple to

describe "████████████████████████████████████████████

████████ that would make it difficult to switch chipset suppliers. The Court concludes

that each of Apple's responses described its experience relating to intellectual property

rights associated with Qualcomm baseband chips and the effect of switching chipset

suppliers. Given the purpose of the safe harbor, Qualcomm has failed to prove that these

responses fall outside the safe harbor's protective umbrella.

As a matter of law, the answers were responsive to an RFI and therefore protected

by the safe harbor. Even assuming the response was overbroad, non-responsive and

outside the safe harbor, Qualcomm has, as discussed above, failed to raise a disputed

issue that Apple actively induced the DG Comp to initiate Litigation involving a FRAND or exhaustion claim.

           ii.     <u>Whether Apple induced ███████ to Ask the EU to<br>Broaden Its Investigation of Qualcomm</u>

Qualcomm alleges that on February 19, 2016, an internal ███████ presentation[6] stated under the heading, "███████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████ RSOF 87; Qualcomm Opp. Ex. 14 at '9940, ECF No. 640-16.

Apple asserts that the EC investigation never extended to Qualcomm's licensing practices, "a fact Qualcomm does not dispute." Reply at 6 (citing SOF 28). Apple thus argues that it did not induce the EC to initiate "████████ that included a FRAND or exhaustion claim.

Now, the final sentence of Section 7 does state that "█████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████ This provision merely requires a suggestion to initiate an investigation and does not appear to require that the suggestion have any causal effect or influence on the authority actually beginning an investigation. But even so, Apple also argues that ███████████████████ ████████████████████████████████████████ ██████████████████ Apple Reply at 6. Certainly, there is no direct evidence that ████████████████████████. The question that remains is whether one can draw reasonable inferences from the evidence that based on the ██████████████ and language indicating that ████████ intended to ████████████ a trier of fact could reasonably conclude that ██████████████████████ to the DG Comp. The █████████

_____

[6] Apple objects to this exhibit as inadmissible because it is hearsay and lacks authentication; however, without ruling on the objection, the Court addresses this claim on the merits.

███████████████████████████████████████████████████████████████

███████.”   Yet there is no email, filing or documentation that shows through direct

or circumstantial evidence that █████████████ to the KFTC.

Finally, even if one could reasonably conclude that █████ ██████████,

there is not a triable issue as to whether Apple ██████████████████████████

██████████. There is no evidence to show whether █████ came up with the idea and

asked Apple for help, at which point Apple was not the one inducing, or whether ████

████████ to ██████████████.

In conclusion, Qualcomm has failed to raise a genuine dispute that Apple induced

███████ to ask the DG Comp to broaden its investigation.

The Court concludes that Qualcomm has failed to raise a genuine issue that Apple

actively induced the DG Comp to initiate Litigation against Qualcomm.

b.   <u>Whether Apple induced Samsung to Suggest the KFTC Broaden Its
Investigation</u>

Qualcomm claims that Apple breached Section 7 by inducing Samsung "███████

███████████████████████████████████" SACC ¶¶ 359(d);

216.  Apple contends that there is no evidence creating a triable issue regarding this

allegation.

Qualcomm alleges that ████████████████████████████████

██████████████████. RSOF 53.  Apple counters that there is no evidence

to suggest that ████████████████████████████. ████████

████████████████████████████████████

███████ RSOF 57.

Qualcomm notes that Apple admitted that ███████████████████████

████████████████████████████. RSOF 18.  Qualcomm argues

that this evidence, along with evidence of Apple's strategy to induce and expand

investigations into Qualcomm, permits the jury to infer that ███████ discussed

instigating an expansion of the KFTC's investigation into Qualcomm.

Qualcomm's argument is not persuasive.  Just because ███████████████ ███████████████ it is not reasonable to infer that ████████████████ induce the KFTC to expand its investigation.  Moreover, it ██████████████ ███████████████.  Qualcomm has failed to raise a genuine dispute that Apple induced ██████ to suggest to the KFTC that it expand its investigation of Qualcomm.

       c.    <u>Apple's Request to the KFTC for Worldwide Remedies against Qualcomm</u>

Qualcomm claims that Apple breached Section 7 by "urg[ing] the KFTC to impose extraterritorial, worldwide remedies against Qualcomm."  SACC ¶ 359(d).  The KFTC opened its investigation of Qualcomm no later than March 17, 2015.  SOF 38; Apple Mem. Ex. D, ECF No. 602-31 at F-26.  There appears to be no dispute that Apple did not induce this KFTC investigation.  On March 27, 2015, KFTC sent an RFI to Apple containing at least 15 questions regarding Qualcomm's licensing practices.  SOF 40-41.  The KFTC asked Apple to explain its licensing agreements with Qualcomm, how royalties are calculated under the agreement, and whether the royalty calculation is reasonable.  Apple Mem., Ex. I at 96-98.  Apple sent its first response to the KFTC on May 5, 2015.  SOF 43; Apple Mem. Ex. J, ECF No. 609-13.

Apple asserts that the KFTC requested Apple's opinion on the proper scope of remedies for the Qualcomm investigation on July 17, 2015.  Apple Mem. Ex. K at 134, ECF No. 609-15.  The document that Apple cites in support of this assertion is an email from Sanghoon Shin to Apple regarding a meeting with the KFTC.  Shin states that the KFTC noted that Qualcomm has argued that a corrective order should only have effect with respect to the domestic handset firms, but invited Apple to submit countervailing reasoning, to justify inclusion of Apple and other foreign makers with the domestic makers as objects of a corrective order to Qualcomm.  *Id*.

Previously, on July 14, 2015, Apple submitted to the KFTC a document which concluded: "███████████████████████████████████████ ███████████████████████████████████████████████

3:17-cv-108-GPC-MDD

██████████████████████████████████████████████████████████████████ "

Qualcomm Opp. Ex. 7, ECF No. 640-9 at 156.  Ultimately, the KFTC's January 20, 2017

Order did not impose worldwide remedies.  RSOF 61.

   Apple first argues that its cooperation with the KFTC investigation did not actively

█████████████████ because this investigation was already open.  Apple Mem. at 6-7.

Apple also contends that its submissions to the KFTC were made in response to the

agency's request and thus protected under the safe harbor.  Apple Mem. at 9-10.  Third,

Apple contends that suggesting worldwide remedies is not inducing ████████  Finally,

Apple notes that the KFTC order applies only to manufacturers that are headquartered in

or sell chipsets in Korea, and does not apply worldwide.  Qualcomm contends that Apple

was not "████████ to the KFTC's inquiry and thus does not qualify for the safe harbor.

Qualcomm Opp. at 12.  Qualcomm takes the position that Apple affirmatively argued for

the KFTC to impose worldwide remedies, which was an active inducement under Section

7.  *Id.*

     i. <u>Is Apple's Response to the KFTC covered by the safe harbor?</u>

  The safe harbor covers Apple if it is "████████████████████

██████████████████████████████████████████████ .

BCPA at 7.  The safe harbor protects replies that are responsive to inquiries or requests.

The undisputed facts show that KFTC asked Apple to explain its licensing agreements

with Qualcomm, how royalties are calculated under the agreement, and whether the

royalty calculation is reasonable.  Apple Mem. Ex. I at 96-98.  Apple does not point to

anywhere in this RFI that calls for an opinion as to the scope of remedies against

Qualcomm.  Apple sent a response on May 5, 2015.  SOF 43; Apple Mem. Ex. J, ECF

No. 609-13.

   Then, on July 14, 2015, Apple sent a memo that requested worldwide remedies.

Apple has not shown, or asserted, how this memo was in response to the KFTC's initial

RFI.  Apple alleges that on July 17, 2015, the KFTC requested Apple's opinion on the

proper scope of remedies for Qualcomm.  SOF 43.  But Apple sent its memo on July 14,

2015 and the KFTC did not request Apple's opinion on the scope of remedies until July 17, 2015. It is inconceivable that Apple's memo could be responsive to a KFTC request that had not been sent. Moreover, Apple's request for a larger remedy does not appear relevant to the questions posed in the initial RFI. The Court concludes that Apple is not entitled to the protection of the safe harbor as to this July 14, 2015 submission. That leaves open the question whether Apple "actively ███████████████████████████ ██████████

ii.   Did Apple actively induce the initiation of Litigation?

"███████████ as defined in the BCPA "█████████████████████████ ████████████████████████████████████████████████ ████████████████" BCPA at 12. While the term is to be construed broadly, a remedy is not a procedure to resolve a controversy. Instead, it is the relief available in a lawsuit. A remedy is not an independent proceeding but, instead, arises in the course of an administrative proceeding or lawsuit.

Even assuming a remedy constitutes ███████ however, it does not appear that Apple "██████████████████████████████████." Qualcomm has not raised a genuine issue as to whether, by Apple' active inducement, the KFTC actually initiated Litigation. Qualcomm has not shown any evidence that the KFTC began a new investigation, expanded its investigation in some material way, or initiated any other procedure or proceeding, such as a lawsuit or administrative action. And to the extent that Apple requested a worldwide remedy, the KFTC did not issue such remedy. There is simply no evidence that the KFTC initiated anything as a result of Apple's request.

Notably, the last sentence of Section 7 does not apply. ████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████ That clarification is limited to an instigation of an investigation and is not as broad as instigating Litigation. Apple has certainly suggested to a governmental authority that it instigate an expanded remedy, but that is distinct from an

31

investigation. Qualcomm has failed to raise a genuine dispute that Apple breached the BCPA by urging the KFTC to impose worldwide remedies against Qualcomm.

In sum, summary adjudication will be granted in favor of Apple on Qualcomm's claims for breach of Section 7 of the BCPA.

## C.    Breach of the Implied Covenant of Good Faith and Fair Dealing

In Count VII of the Qualcomm's SACC, Qualcomm claims that Apple breached the implied covenant of good faith and fair dealing. SACC at 161. Qualcomm pursues this claim on grounds that Apple primed regulators before signing the BCPA to investigate Qualcomm, and then Apple assisted those regulators in the very investigations Apple induced during the term of the BCPA. *Id.* at 15.

"The covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement actually made." *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th. 317, 349 (2000). Or, to put it another way, the implied covenant imposes upon each party the obligation to do everything that the contract presupposes they will do to accomplish its purpose." *Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.*, 90 Cal. App. 4th 335, 345 (2001) (citation and quotation marks omitted). The duties that are owed under the implied covenant are variable and will depend on the contractual purposes. *Love v. Fire Ins. Exchange*, 221 Cal. App. 3d 1136, 1147 (1990). The implied covenant does not prohibit actions that are expressly authorized by the contract's terms. *Carma Developers, Inc. v. Marathon Development California, Inc.*, 2 Cal. 4th 342, 374 (1992).

As far as the BCPA's purpose, the BCPA's recitals state that "███████████ ████████████████████████████████████████████████████████████████ ███████████████████████████ BCPA at 1. None of the complained of actions by Apple in communicating with regulators affected Qualcomm's ability to obtain "███ ████████████████████". As to "████████████████████", Qualcomm has not

specified what type of cooperation that it was denied. Qualcomm has not shown that Apple engaged in actions that deprived it of the benefits that it sought by this provision.

Throughout this litigation, Qualcomm has asserted that the BCPA sought to keep the peace given Apple's propensity to initiate and engage in costly litigation. However, this claim is contradicted by the express language of Section 7. The BCPA does not impose a peace that prohibits all litigation. It is limited to litigation that raises a claim alleging the failure to offer a license on FRAND terms or a claim that the sale of a Qualcomm component exhausts any of Qualcomm's patents. During the term of the BCPA, Apple did not file suit against Qualcomm, initiate any informal investigation against Qualcomm or broaden any ongoing investigation as to add FRAND or exhaustion issues.

### 1. Pre-BCPA Induction

Qualcomm contends that Apple violated the implied covenant by "having primed regulators (before the signing of the BCPA) to investigate Qualcomm," and then "took repeated actions during the term of the BCPA to deny Qualcomm the peace for which it had bargained, including by further assisting those regulators in the very investigations Apple induced." Qualcomm Opp. at 15.

Recognizing that a pre-BCPA action cannot operate to breach a later formed contract, Qualcomm relies on a theory that this Court has already found is against public policy, that is, Apple may not assist regulators in the very investigation it induced. However, balancing the interest of the consumer with Qualcomm's rights, it would be wrong to assist in concealing and withholding information regarding Qualcomm's licensing practices that were being investigated to be anticompetitive.

In 2012, Apple believed that Qualcomm's royalties were supra FRAND and questioned the legality of Qualcomm's licensing practices. As a result of its view, Apple met with ██████████████████████ in order to describe their concerns regarding Qualcomm's licensing practices. Meanwhile, Apple was negotiating with Qualcomm towards a set of contracts relating to the supply of chipsets used in Apple iPhones and

iPads.  During negotiations, Apple did not volunteer to Qualcomm that it had met with the ████████████████████████ intended to produce an investigation of Qualcomm's licensing practices. Qualcomm has not identified any obligation for Apple to do so.  Nor does it appear that Qualcomm asked Apple if it had made such reports to regulators.  The only hint that prior contacts with investigators was contemplated is found in the safe harbor which strips the protection in cases where Apple responds to inquiries that it initiated.  To the extent that Qualcomm concluded that this provision would operate to impose financial penalties for responding to inquiries of regulators, Qualcomm was wrong because it failed to account for the public interest.

Given the purposes identified in the BCPA and public policy considerations discussed, Qualcomm has failed to demonstrate that it was denied benefits to which it was lawfully entitled and Apple cannot be liable for breach of the implied covenant. Accordingly, the Court grants Apple's motion for partial summary judgment on the implied covenant of good faith and fair dealing cause of action.

D.     Qualcomm's Claim for Unjust Enrichment

In Count VIII, Qualcomm advances a claim for unjust enrichment.  SACC ¶¶ 373-74.  Qualcomm claims, only in the alternative to its BCPA breach of contract claims, that there was no meeting of the minds on the meaning of Section 7 of the BCPA, thus no contract was formed and Qualcomm is entitled to restitution of its payments under the BCPA.  SACC ¶¶ 373-74.

Apple moves for summary judgment on this claim on two grounds.  First, Apple contends that unjust enrichment is not a cause of action under California law and cannot stand alone as an independent claim for relief.  Apple Mem. at 13.  However, "the California Supreme Court has clarified that unjust enrichment is a valid cause of action in California." *Young v. Cree, Inc.*, No. 17-CV-06252-YGR, 2018 WL 1710181, at *8 (N.D. Cal. Apr. 9, 2018) (citing *Hartford Cas. Ins. Co. v. J.R. Mktg., L.L.C.*, 61 Cal. 4th 988, 1000 (2015) (clarifying California law and allowing an independent claim for unjust enrichment)).

Apple next contends that in the face of the BCPA's clear and unambiguous language, Qualcomm's argument that there was no meeting of the minds lacks merit. Apple Mem. at 13. Qualcomm maintains that there is a fact question as to whether the parties had a "███████████████." Qualcomm Mem. at 16. In support of this position, Qualcomm points to deposition testimony of Alex Rogers, Executive Vice President and President of Qualcomm Technology Licensing. RSOF ¶ 65. This deposition was taken on February 22, 2018. Qualcomm's Opp. Ex. 27, ECF No. 640-29. Rogers testified that

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

QC BCPA Ex. 27, ECF No. 758 at 533:11 – 534:7.

Qualcomm contrasts this with a letter sent from Apple's Chief IP Counsel, BJ Watrous, on November 16, 2016, to Qualcomm stating that "████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
█████ RSOF 69; Watrous Letter, Ex. 21 to Qualcomm Opp., ECF No. 640-23 at 1.

Qualcomm thus contends that there was no meeting of the minds as to Section 7 because it believed that Section 7 required Apple's statements to government regulators to be truthful, but Apple believed in no such requirement.

"[T]he failure to reach a meeting of the minds on all material points prevents the formation of a contract even though the parties have orally agreed upon some of the terms, or have taken some action related to the contract." *Bustamante v. Intuit, Inc.*, 141 Cal. App. 4th 199, 215 (2006). "Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings." *Am. Employers Grp., Inc. v. Employment Dev. Dep't*, 154 Cal. App. 4th 836, 847 (2007) (citation omitted). "[I]n determining whether there has been a mutual consent to contract the courts are not interested in the subjective intent of the parties, but only in their objective intent—that is, what would a reasonable man believe from the outward manifestations of consent." *Leo F. Piazza Paving Co. v. Bebek & Brkich*, 141 Cal. App. 2d 226, 230 (1956).

"When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible...." Cal. Civ. Code § 1639. In a case involving a written contract, whether there was a meeting of the minds "must be determined from the written contract itself, and if a reasonable and lawful construction can be given to the contract, then that is where we must conclude the minds of the parties met." *Quantification Settlement Agreement Cases*, 201 Cal. App. 4th 758, 816–17 (2011). "[O]rdinarily one who signs an instrument which on its face is a contract is deemed to assent to all its terms." *Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc.*, 89 Cal. App. 4th 1042, 1049 (2001).

Qualcomm has failed to raise a genuine dispute of material fact regarding a lack of meeting of the minds with respect to Section 7. Qualcomm only points to the parties' subjective interpretations of Section 7. These interpretations were expressed only years after the BCPA was signed. Qualcomm does not point to any evidence that its interpretation was outwardly manifested or expressed during the formation of the BCPA.

Notably, this contract has been reduced to writing. The BCPA also contains a merger clause: "█████████████████████████████████

[REDACTED] BCPA at 9.

Qualcomm also fails to overcome the written terms of the contract itself.  The BCPA does not contain any reference to truthfulness or falsity of Apple's responses to communications to government agencies.  However, the Court has interpreted Section 7 as to prohibit "objectively baseless" responses.  In addition, Section 7 only speaks to inducement of Litigation.  As discussed above, based upon the clear language of Section 7, the inquiry is whether Apple actively induced Litigation, irrespective of whether Apple's responses were true or false.

The Court concludes that Qualcomm has failed to raise a genuine issue of disputed fact as to whether the parties had a meeting of the minds, and partial summary judgment is entered in favor of Apple on the unjust enrichment claim.

E.    Qualcomm's Claim for Breach of Section 4 of BCPA

Section 4 of the BCPA provides: [REDACTED]

[REDACTED] BCPA at 2.

Qualcomm claims that Apple breached Section 4 of the BCPA by discouraging the CMs from making royalty payments to Qualcomm under their licensing agreements, by interfering with the audit procedures, and by directing the CMs to misstate the net selling price of the devices they sell to Apple.  SACC ¶ 360.  Qualcomm's expert, Ambreen Salters, was "[REDACTED]." SOF 58.  Salters opined

1    that Qualcomm is ██████████████████████████████████████

2    █████████████████ *Id.*

3       Apple contends that it is entitled to summary judgment that Qualcomm cannot

4    recover the BCPA payments based on a breach of Section 4. Apple Mem. at 15. First,

5    Apple points to California Civil Code § 3300, which provides that measure of damages

6    for a breach of contract "is the amount which will compensate the party aggrieved for all

7    the detriment proximately caused thereby, or which, in the ordinary course of things,

8    would be likely to result therefrom." Apple takes the position that the BCPA Payments

9    are only relevant to Section 7 and have nothing to do with Section 4. Apple notes that

10    Section 7 provides that Qualcomm's payment obligations "████████████████████"

11    ████████████████████████████████████

12       Apple next points to the BCPA's limitation of liability, which provides: "████

13    ████████████████████████████████████████████████████████████████████

14    ████████████████████████████████████████████████████████████████████

15    ██████████████████████████████████████████████." BCPA at

16    16. Because of this limitation, Apple argues that the BCPA only provides for general

17    damages as recoverable. "[G]eneral damages are a natural and necessary consequence of

18    a contract breach, [and] they are often said to be within the contemplation of the parties,

19    meaning that because their occurrence is sufficiently predictable the parties at the time of

20    contracting are 'deemed' to have contemplated them." *Lewis Jorge Constr. Mgmt., Inc.*

21    *v. Pomona Unified Sch. Dist.*, 34 Cal. 4th 960, 968 (2004). Apple argues that the BCPA

22    payments are not in any way related to the breach of Section 4 and do not flow directly

23    and necessarily from Apple's alleged breach of Section 4.

24       Qualcomm first argues that Apple failed to meet its burden to show a lack of

25    genuine dispute as to whether Apple breached Section 4. Qualcomm Opp. at 18.

26    However, Apple has moved for partial summary judgment solely as the damages issue of

27    this claim, and is not required to establish a lack of dispute as to the breach in order to

28    obtain partial summary judgment on the damages issue.

Qualcomm next responds that damages are a factual matter for the jury to decide. Qualcomm Opp. at 18. A court may rule, as a matter of law, that certain types of damages are not general damages. *See Lewis Jorge*, 34 Cal. 4th 960 (holding that plaintiff's lost profits were not general damages). Moreover, "[i]n breach of contract actions, damages cannot be presumed to flow from liability. It is essential to establish a causal connection between the breach and the damages sought." *Crossroads Inv'rs, L.P. v. Fed. Nat'l Mortg. Assn.*, 13 Cal. App. 5th 757, 792 (2017) (citation and quotation marks omitted). While Qualcomm is correct that "[o]rdinarily, the issue of causation [of damages] is a question of fact for the jury, . . . under the principles applicable to directed verdict motions" (which would seem to apply to summary judgment motions), "if there is no substantial evidence to support a verdict in plaintiff's favor if such a verdict were given, and no other reasonable conclusion is legally deducible from the evidence, the trial court is entitled to decide the issue as a matter of law." *Id.* at 32 (citation and quotation marks omitted).

Apple met its initial burden of showing that the BCPA payments as damages did not flow directly from the alleged breach of Section 4. The burden then switched to Qualcomm to make a sufficient showing of a genuine dispute of fact with respect to the proximate causation of damages. Qualcomm does not make any argument on how the BCPA payments are general damages, and thus not excluded by the BCPA's limitation on liability, nor does Qualcomm explain how the BCPA payments are damages proximately caused by the alleged breach of Section 4. Qualcomm's bare assertion that damages are a jury issue is not enough, because California does not presume that contract damages were proximately caused by the breach, and Qualcomm must put forth evidence to establish causation.

Apple's argument is persuasive that the BCPA payments were only consideration for Apple's promise not to initiate or induce Litigation. The Court concludes that Qualcomm has not carried its burden on this issue, and partial summary judgment should

be entered in favor of Apple that Qualcomm cannot receive a refund of the BCPA payments as damages for the Section 4 breach of contract claim.

VI.    Outstanding BCPA Payments

In Count IX, Qualcomm seeks a declaration that it is released from any obligation to make further payments under the BCPA. SACC at 164. Qualcomm raises several different claims in this regard.

First, Qualcomm alleges that its payments under the BCPA "were extinguished when Apple failed to satisfy the necessary conditions for receipt of payment under the Cooperation Agreement." *Id.* ¶ 377. This claim is directly tied to Qualcomm's Section 7 breach claims. Apple contends that if the Court grants summary judgment to Apple on all of Qualcomm's Section 7 claims, then the Court should grant summary judgment on this aspect of Count IX.

Second, Qualcomm alleges that because Qualcomm's payment obligations apply only so long as Apple does not file a lawsuit against Qualcomm based on a FRAND or exhaustion claim, Apple relieved Qualcomm of its obligation to make further payments by filing this lawsuit. *Id.* ¶ 378. Apple did not file a lawsuit against Qualcomm that included a FRAND or exhaustion claim before January 20, 2017. SOF 16. Because Qualcomm has not shown a genuine dispute that Apple filed a lawsuit against Qualcomm during the term of the BCPA, Qualcomm has not shown a genuine dispute that, based on Apple filing a lawsuit, Qualcomm was relieved of its quarterly payment obligations for the second, third, and fourth quarters of 2016.

Third, Qualcomm takes the position that under Section 10.4 of the BCPA, Qualcomm is released from any payment obligations, including payment obligations already accrued, if Apple files a lawsuit for a FRAND violation or exhaustion. *Id.* ¶ 379. Section 10.4 provides:



[REDACTED]

BCPA at 8.

Qualcomm seeks a declaration that it is released from any obligation to make further payments under the BCPA, including those for the second, third, and fourth quarters of 2016. SACC ¶¶ 376, 380.

The BCPA states that [REDACTED]

[REDACTED] BCPA at 1. There is no evidence to suggest that the agreement was terminated prior to December 31, 2016. SOF 2. The Court will presume that the BCPA terminated on December 31, 2016. At that point, because Section 7 did not survive termination of the BCPA, Apple was not bound by any obligations in Section 7, and Qualcomm did not incur any new quarterly payment obligations past December 31, 2016.

Qualcomm's position that Apple's filing of this lawsuit released Qualcomm from its payment obligations already accrued is without merit. Apple did not file a lawsuit during the BCPA. And Apple's filing of the lawsuit after the BCPA does not retroactively relieve Qualcomm of past payment obligations. Section 10.4 is of no help to Qualcomm. Section 7 does not survive termination of the BCPA. The Court enters summary judgment in favor of Apple on this claim.

## CONCLUSION AND ORDER

For the foregoing reasons, the Court will hereby:

- (1) **GRANT** Apple's Motion for Summary Adjudication on Count VI of Qualcomm's SACC on Qualcomm's claim for breach of Section 7 of the BCPA;

- (2) **GRANT** Apple's Motion for Partial Summary Judgment on Count VII of the SACC on the claim for breach of the implied covenant of good faith and fair dealing;

- (3) **GRANT** Apple's Motion for Partial Summary Judgment on the unjust enrichment claim in Count VIII;

- **(4) GRANTS** Apple's Motion for Partial Summary Judgment on Count IX's Request for Declaration That Qualcomm Is Released from Any Obligation To Make Further Payments Under the BCPA.

**IT IS SO ORDERED.**

Dated: March 12, 2019

Hon. Gonzalo P. Curiel
United States District Judge