# ATTACHMENT 2A

# PUBLIC VERSION

Juanita R. Brooks (SBN 75934) brooks@fr.com
Seth M. Sproul (SBN 217711) sproul@fr.com
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, CA 92130
Telephone: (619) 678-5070 / Facsimile: (619) 678-5099

Ruffin B. Cordell (D.C. Bar #445801; Admitted *Pro hac vice*) cordell@fr.com
Lauren A. Degnan (D.C. Bar #452421; Admitted *Pro hac vice*) degnan@fr.com
FISH & RICHARDSON P.C.
1000 Maine Avenue, S.W., Suite 1000
Washington, D.C. 20024
Telephone: (202) 783-5070 / Facsimile: (202) 783-2331

William A. Isaacson (D.C. Bar #414788; Admitted *Pro hac vice*) wisaacson@bsfllp.com
Karen L. Dunn (D.C. Bar #1002520; Admitted *Pro hac vice*) kdunn@bsfllp.com
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, N.W.
Washington, D.C. 20005
Telephone: (202) 237-2727 / Facsimile: (202) 237-6131

*Attorneys for Plaintiff and Counterclaim-Defendant Apple Inc.*

*(Counsel for the CMs and Additional Counsel listed below Signature Line)*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE:<br><br>QUALCOMM LITIGATION | Case No. 3:17-CV-00108-GPC-MDD<br>[Consolidated with Case No. 3:17-CV-01010-GPC-MDD]<br><br>**APPLE INC. AND THE CONTRACT MANUFACTURERS' TRIAL BRIEF**<br><br>**[█REDACTED VERSION]**<br><br>**Trial Date:** April 15, 2019<br>**Time:** 9:00 a.m.<br>**Judge:** Judge Gonzalo P. Curiel<br>**Courtroom:** 2D |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

I.      Qualcomm's Illegal Business Model ................................................... 4

        A.      Qualcomm Violated Section 2 of the Sherman Act .............................. 4

                1.      Qualcomm Has Monopoly Power ................................................. 4

                2.      Qualcomm's Conduct Is Exclusionary ........................................ 5

        B.      Qualcomm Violated Section 1 of the Sherman Act and the Cartwright

                Act ............................................................................................... 6

        C.      Qualcomm's Patents Are Exhausted by Its Chipset Sales ..................... 8

        D.      Qualcomm's FRAND Commitment ..................................................... 10

II.     Qualcomm's SULAs ............................................................................... 15

        A.      Qualcomm's SULAs Are Unenforceable ............................................ 15

III.    BCPA Issues ........................................................................................... 17

IV.     Qualcomm's Tortious Interference Claim Against Apple ............................. 18

V.      Qualcomm's Carrier Aggregation SOW Claim Against Apple ..................... 19

CONCLUSION ............................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Apple, Inc. v. Motorola Mobility, Inc.*,
 886 F. Supp. 2d 1061 (W.D. Wis. 2012)........................................................11, 12

Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,
 472 U.S. 585 (1985)...........................................................................................4

*Continental Wall Paper Co. v. Voight & Sons Co.*,
 212 U.S. 227 (1909)..........................................................................................16

*Core Wireless Licensing S.A.R.L. v. Apple Inc.*,
 899 F.3d 1356 (Fed. Cir. 2018) ........................................................................12

*Datagate, Inc. v. Hewlett–Packard Co.*,
 60 F.3d 1421 (9th Cir. 1995) ..............................................................................8

*Ericsson, Inc. v. D-Link Sys., Inc.*,
 773 F.3d 1201 (Fed. Cir. 2014) ........................................................................14

*Fed. Trade Comm'n v. Qualcomm Inc.*,
 No. 17-CV-00220-LHK, 2018 WL 5848999 (N.D. Cal. Nov. 6, 2018) .............12

*Impression Prods., Inc. v. Lexmark Int'l, Inc.*,
 137 S. Ct. 1523 (2017)......................................................................................10

*JVC Kenwood Corp. v. Nero, Inc.*,
 797 F.3d 1039 (Fed. Cir. 2015) ..........................................................................9

*Kaiser Steel Corp. v. Mullins*,
 455 U.S. 72 (1982)............................................................................................16

*Microsoft Corp. v. Motorola, Inc.*,
 2013 WL 2111217 (W.D. Wash. Apr. 25, 2013) ..............................................13

*Microsoft Corp. v. Motorola, Inc.*,
 795 F.3d 1024 (9th Cir. 2015) ..........................................................................12

*Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc.*,
 268 F. Supp. 3d 1071 (C.D. Cal. 2017) ..............................................................8

*Quanta Computer, Inc. v. LG Elecs., Inc.*,
 553 U.S. 617 (2008).......................................................................................8, 9

*Realtek Semiconductor Corp. v. LSI Corp.*,
 946 F. Supp. 2d 998 (N.D. Cal. 2013)..............................................................13

*United States v. Univis Lens Co.*,
 316 U.S. 241 (1942)............................................................................................9

**Statutes**

15 U.S.C. § 1 ................................................................................................4, 6

Cal. Bus. & Prof. Code § 16720 ...................................................................4

Cal. Bus. & Prof. Code § 17200 ...................................................................4

Apple Inc.; FIH Mobile Ltd. and Hon Hai Precision Industry Co., Ltd., (together, "Foxconn"), Pegatron Corporation, Wistron Corporation, and Compal Electronics, Inc. (collectively, "the CMs") submit this trial brief regarding the upcoming trial of their claims against Qualcomm Incorporated ("Qualcomm"), as well as Qualcomm's claims against them, and each party's defenses.

## INTRODUCTION

This trial is about Qualcomm's illegal and self-proclaimed "unique" business model that stifles competition, burdens innovation, and extorts customers and licensees. After Apple initiated this case, consumers, investors, and other technology companies have come forward to challenge Qualcomm's business model. Those challenges have been launched against the backdrop of continuing investigations in the United States, Europe and Asia. But even as consensus mounts against its illegal business practices, Qualcomm seeks to expand them. Qualcomm's anticompetitive scheme also includes imposing gag clauses, like Section 7 of the BCPA, to prevent law enforcement authorities from taking on Qualcomm's business model. Qualcomm used the BCPA to obstruct justice and to withhold $1 billion in payments due to Apple under the BCPA in retaliation for Apple's cooperation with antitrust authorities. Qualcomm then demanded that Apple change its testimony to those authorities.

Qualcomm has had a dominant position in CDMA and premium LTE cellular modem chipsets, and shows that it will continue that position in 5G chipsets. Qualcomm's monopoly chip power, together with a unique refusal to sell chips to unlicensed parties, allowed Qualcomm to achieve unreasonable and exclusionary royalties for its patents or to block competitors' sale of chips altogether. The higher royalties have acted as a tax on competitor chips—with the monopolist Qualcomm as the tax collector. To add to this, Qualcomm refuses to license its chipset competitors exhaustively, despite having promised to do so. Qualcomm's exclusionary conduct has increased chip prices, caused supra-competitive margins, increased barriers to

entry and hastened competitors' exit, restricted choice for customers and opportunities for competitors, and reduced the profits available for R&D by competitors.

Qualcomm's component business supplies Apple and the CMs with a single connectivity element for cellular devices such as iPhones and iPads—the cellular modem chipset.[1]  This chipset enables iPhones and iPads to connect to cellular networks.  Unlike other component manufacturers, Qualcomm requires customers ***also*** to purchase a patent license before they can purchase chipsets from Qualcomm, under what Qualcomm calls its "no license, no chips" policy.  Qualcomm's licensing arm then demands a 5% royalty on the Net Selling Price of each cellular device manufactured—an amount far greater than the price of the modem chipset itself.  Qualcomm customers must pay that royalty even on devices that do not contain a Qualcomm chipset.

Through this scheme, Qualcomm taxes innovations made by others.  Twenty-five years ago, when the cellular industry was just starting, the only value of a cellular device was its connection to a cellular network.  But today iPhones and iPads have evolved into handheld computers with a revolutionary touchscreen interface, virtual keyboard, facial recognition security, state of the art cameras, and crystal clear "Retina" displays.  Qualcomm had nothing to do with the creation of those features, yet Qualcomm wants to be paid as if those (and future) breakthroughs belong to it.  Qualcomm insists in this Court that it should be entitled to rely on the same business model it applied over a decade ago to the flip phone, but while that model may have been defensible when a phone was just a phone, today it amounts to a scheme of extortion that allows Qualcomm unfairly to maintain and entrench its existing monopoly.

---

[1] "Device" is a term used to refer to finished consumer products such as cell phones and tablets, rather than individual chips or chipsets which are commonly referred to as "components."

Qualcomm artificially segments its chipset and licensing businesses in an attempt to circumvent the well-established doctrine of patent exhaustion, so that it can double-dip—charge customers for patent royalties **and** a purchase price for a modem chipset. Moreover, by charging royalties on the **entire** sales price of products, Qualcomm profits from highly-valuable innovations that lead to the success of these products and for which Qualcomm deserves no credit. Apple and the CMs' antitrust claims against Qualcomm are an attempt to put a stop to Qualcomm's unfair and monopolistic practices.

Qualcomm will stop at nothing to protect its business model. Numerous investigations have been launched by government agencies in the United States (including the recently-tried lawsuit initiated by the FTC), Europe, and Asia. Those agencies requested information from Apple because its products contain Qualcomm's chips, and Apple responded truthfully and in good faith. Qualcomm punished Apple for its cooperation with government agencies by withholding nearly $1 billion in royalty rebates owed to Apple under the Business Cooperation and Patent Agreement (BCPA) between the two companies. Further, after Apple filed suit to stop Qualcomm's practices, Qualcomm sued the CMs, claiming that they had breached their patent license agreements—known as SULAs—with Qualcomm.

Qualcomm's claims seek massive amounts of money based on bad-faith interpretations of SULA provisions. For example, Qualcomm seeks to recover 5% royalties ████████████████████████████████ ████████  The CMs filed their own antitrust claims against Qualcomm as direct purchasers of Qualcomm chipsets and SULA licensees. The CMs seek to have the anticompetitive, above-FRAND contracts imposed by Qualcomm deemed void, and to recover the billions of dollars of above-FRAND, antitrust damages they have incurred as a result of Qualcomm's anticompetitive scheme.

Qualcomm's counterclaims against Apple further exemplify Qualcomm's abuse of its monopoly power. Qualcomm claims that Apple tortiously interfered

with Qualcomm's agreements with the CMs by directing the CMs not to pay royalties, even though the royalties Qualcomm demands violate its FRAND commitments, and exceed Qualcomm's rights under the CMs' SULAs. Qualcomm also demands almost ███████ in alleged carrier aggregation payments where it is undisputed that the features *were not used*. Qualcomm admits that its claim is based on certain Apple products allegedly being ████████████████████ ████████████████████████████" based on two brief mentions of carrier aggregation made during launch events—even though most carrier networks did not even support carrier aggregation at the time. Qualcomm thus demands "money for nothing" for features that simply were not used.

Below, Apple and the CMs outline their claims and defenses within the key themes that the parties will address at trial.

## I. Qualcomm's Illegal Business Model

Apple and the CMs contend that Qualcomm has violated the Sherman Act 15 U.S.C. § 1 *et seq.* as well as California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200. The CMs further contend that Qualcomm has violated California's Cartwright Act, Cal. Bus. & Prof. Code § 16720 *et seq.* Qualcomm seeks a declaration that its SULAs do not violate the Sherman Act or the UCL.

### A. Qualcomm Violated Section 2 of the Sherman Act

Section 2 of the Sherman Act prohibits monopolization, which consists of the acquisition or maintenance of monopoly power in a relevant market through exclusionary conduct. Conduct may be condemned as exclusionary when it "(1) tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n.32 (1985).

#### 1. Qualcomm Has Monopoly Power

The evidence at trial will show that Qualcomm had, at all relevant times, monopoly power in markets for CDMA and premium LTE chipsets. Qualcomm's

1 own documents show that Qualcomm's share of the premium LTE market exceeded

2 ██████████████████████████████████████████████████████

3 ██████████████████████████████████████████████████████

4 ████████████████████████████ Qualcomm's monopoly power will

5 be shown directly, through Qualcomm's ability to control prices and exclude

6 competition, and indirectly, through proof of durably high market shares and

7 substantial barriers to entry. Although Qualcomm will claim that its monopoly

8 power has ended, the relevant time period at which monopoly power must be

9 assessed is as of the time of the conduct alleged to be exclusionary; and in any event,

10 Qualcomm's monopoly power continues and will be perpetuated into the future with

11 the arrival of next generation 5G chipsets.

### 2. Qualcomm's Conduct Is Exclusionary

13 Qualcomm engaged in an illegal scheme that shut out competition in the

14 markets for CDMA chipsets and premium LTE chipsets. The scheme has four inter-

15 related, self-reinforcing components in which Qualcomm: (1) imposes a no license,

16 no chips policy; (2) refuses to license its standard-essential patents ("SEPs") to

17 competitors in violation of its FRAND commitments; (3) enters into exclusivity

18 agreements with device manufacturers to block competitors; and (4) obstructs justice

19 and imposes gag clauses in its agreements to block legal challenges or law

20 enforcement. Together, Qualcomm's conduct raises rivals' costs, and diminishes

21 their ability and incentive to invest and innovate, thereby eliminating a constraint on

22 Qualcomm's exercise of monopoly power.

23 There is no dispute that Qualcomm requires device manufacturers (*e.g.*, cell

24 phone and tablet manufacturers) to execute a patent license (*e.g.*, the CMs' SULAs)

25 as a condition of purchasing commercial quantities of baseband chipsets. The

26 evidence will show that this policy enables Qualcomm to force licenses that are well

27 above FRAND and reflect Qualcomm's chipset market power rather than the value of

28 its SEPs. The supra-FRAND royalties imposed by Qualcomm exclude competitors

by levying a "tax" on device manufacturers' purchases of baseband chipsets. When device manufacturers, such as Apple, seek to be relieved from these usurious royalties, Qualcomm then conditions "royalty relief" on the device manufacturers' acquiescence to exclusivity and other anticompetitive terms that benefit Qualcomm's chipset business and further exclude competing chipset manufacturers. *E.g.*, JTX5; PTX130; PTX1094; PTX1949. This, in turn, reinforces Qualcomm's chipset market power and enhances its ability to extract above-FRAND royalties. Tellingly, Qualcomm explored dividing its business, however such a division would have broken the entire licensing model. *E.g.*, PTX2385 (Project Phoenix).

This vicious cycle of self-reinforcing anticompetitive conduct is further exacerbated by Qualcomm's refusal to license its SEPs to its competitors, as it promised to do through its FRAND commitments. But Qualcomm knows that its ability to force supra-FRAND royalties depends on licensing at the device (phone or tablet) level rather than at the chipset level, and that licensing its chipset competitors would eviscerate that aspect of its licensing program. Qualcomm's licensing executives previously represented as much to agents of the United States government, in a taped transcript that will be played for the jury. PTX11057. Qualcomm licenses at the device level because "that is where the real money is."

Qualcomm's business model is unique and has no legitimate business justification. No other component supplier insists on a separate patent license as a condition for selling patented components. Tellingly, Qualcomm itself sells components exhaustively in markets like WiFi chipsets where it lacks substantial market power. Qualcomm's unique business model has no function other than to exclude competition and evade U.S. patent law's doctrine of exhaustion.

## B. Qualcomm Violated Section 1 of the Sherman Act and the Cartwright Act

Qualcomm has also violated Section 1 of the Sherman Act and Sections 16720, 16726, and 16727 of the Cartwright Act, which prohibit unreasonable restraints of

trade.[2]  Qualcomm's SULAs are unreasonable restraints of trade because they result from the exercise of Qualcomm's chipset market power and levy a non-FRAND tax on Qualcomm's rivals, thereby harming competition in the markets for CDMA and premium LTE chipsets.

Qualcomm has also exploited its market—indeed, monopoly—power over CDMA and premium LTE modem chips by refusing to sell chips to any cell phone or tablet manufacturer that does not take a license to Qualcomm's SEPs.  This conditioning is foundational to Qualcomm's "no license, no chips" scheme, which anticompetitively raises costs to cellular device manufacturers such as the CMs.

The law prohibits a seller from using its market power in the tying product to coerce buyers to purchase the tied product, if the arrangement affects a substantial volume of commerce in the tied market, even where the products are "functionally linked."  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 462, 112 S. Ct. 2072, 2079, 119 L. Ed. 2d 265 (1992).  Here, documents and testimony from Qualcomm and its employees unequivocally confirm that Qualcomm will not sell its modem chips to any OEM or contract manufacturer unless that buyer has previously taken a license to Qualcomm's cellular SEPs.  Qualcomm's Executive VP and President of Qualcomm's licensing division (QTL), Alex Rogers, testified that "it's Qualcomm's policy not to sell chips to unlicensed OEMs."[3]  Senior Vice President of Qualcomm's Licensing Strategy and Legal Counsel, Fabian Gonell, testified to Qualcomm's policy of "components for use in cellular products being sold only to people that have taken a license to at least the cellular essential patents."[4]  Qualcomm has also conceded in an interrogatory response that "Qualcomm does not sell

---

[2] Tying under Sherman Act Section 1 and Cartwright Act Sections 16720 and 16726 is similar; however, proving an illegal tying arrangement requires fewer elements under Cartwright Act Section 16727.  *Suburban Mobile Homes, Inc. v. Amfac Communities, Inc.*, 101 Cal. App. 3d 532, 540, 161 Cal. Rptr. 811 (Ct. App. 1980).
[3] 2/22/2018 Dep. Tr. of A. Rogers, at 210:2-06.
[4] 3/5/2018 Dep. Tr. of F. Gonell, at 59:21-60:03.

Baseband Processor Chipsets to unlicensed cellular device manufacturers."[5]  Chip supply is tied not only to the CMs' initial agreement to above-FRAND licenses, but also to their continued compliance with those above-FRAND licenses, as Qualcomm's "no license, no chips" policy is embodied in the CMs' Component Supply Agreements with Qualcomm.[6]  The CMs' Component Supply Agreements make the tying condition clear by providing that chip supply could be cut off if the above-FRAND license terms are breached.  When coupled with market power in the tying product, "an express refusal to sell the tying product without the tied product obviously constitutes coercion."  *Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc*., 268 F. Supp. 3d 1071, 1085 (C.D. Cal. 2017) (*citing Datagate, Inc. v. Hewlett–Packard Co*., 60 F.3d 1421, 1426 (9th Cir. 1995)).

### C.     Qualcomm's Patents Are Exhausted by Its Chipset Sales

Apple and the CMs challenge Qualcomm's illegal business practices aimed at extracting billions of dollars in undue royalties for a license to its patents, including those embodied in the modem chipsets that it sells to the CMs.  "The longstanding doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates all patent rights to that item."  *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 625 (2008).  Here, the patented products are Qualcomm's modem chipsets that substantially embody Qualcomm SEPs.

The evidence will show that Qualcomm authorizes the sale of its modem chipsets to the CMs for incorporation into Apple products (and products for other

---

[5] Qualcomm Incorporated's Objections and Supplemental Responses to Apple Inc.'s Special Interrogatory Nos. 9 and 13.

[6] When asked "How does Qualcomm communicate its policy of not selling chips to unlicensed OEMs to OEMs," Steve Mollenkopf (Qualcomm's CEO) testified that it "is well known in the industry" and further stated that "if you look at our supply agreements, they are very clear that we have this policy."  3/21/2018 Dep. Tr. of S. Mollenkopf, at 62:20-24.

CM customers),[7] and that those modem chipsets substantially embody Qualcomm

SEPs.[8] If Qualcomm's patents are not practiced, e.g., because they are not actually

standard-essential, then Qualcomm has no basis to demand royalties for

them. However, if those patents are actually essential to a standard implemented in

commercial products, then the evidence will show that the majority of them are

substantially embodied in Qualcomm's modem chipsets and, therefore,

exhausted. Apple and the CMs' expert, Dr. Matthew Valenti, analyzed a randomly

selected, statistically significant sample of the patents Qualcomm identified to Apple

as its best SEPs.[9] Dr. Valenti will testify that, if practiced, **44%** of the sampled

patents would have all claims substantially embodied in the Qualcomm chipset; **22%**

would have all claims substantially embodied in network infrastructure equipment

---

[7] Although Qualcomm has attempted to evade the exhaustion doctrine by structuring the sale of chipsets, provision of certain software needed to implement those chipset, and rights to practice patents embodied in those products in a shell game across multiple entities and separate agreements, the evidence will show that Qualcomm Inc. (the patent owner) tightly controls, via contract, who may buy the chipsets, the software used therewith, and the guaranteed supply of such chipsets for Apple products. *See* JTX3; JTX4; JTX9; JTX11; JTX18; JTX25; JTX30; JTX34; JTX41; JTX52; JTX57; JTX62; JTX63; JTX68; JTX76; JTX147.

[8] Patent exhaustion applies to both patented articles/items and articles that substantially embody a patent claim. *Quanta*, 553 U.S. at 628 ("[T]he traditional bar on patent restrictions following the sale of an item applies when the item sufficiently embodies the patents—even if it does not completely practice the patent—such that its only and intended use is to be finished under the term of the patent."); *id.* at 637 ("[M]aking a product that substantially embodies a patent is, for exhaustion purposes, no different from making the patented article itself."); *see also United States v. Univis Lens Co.*, 316 U.S. 241, 250-51 (1942). A product "substantially embodies" a patent "if (1) the only reasonable and intended use of the article is to practice the allegedly exhausted patent; and (2) the article embodies the essential or inventive features of the allegedly exhausted patent." *JVC Kenwood Corp. v. Nero, Inc.*, 797 F.3d 1039, 1046 (Fed. Cir. 2015); *see also Quanta*, 553 U.S. at 631; *Univis Lens*, 316 U.S. at 249.

[9] Qualcomm declared the patents "essential" to certain cellular standards. If true, then the Qualcomm chipsets that implement these standards would necessarily practice the SEPs and, therefore, be exhausted.

---

(which neither Apple nor the CMs sell); and *24%* would have all claims substantially embodied in either the Qualcomm modem chipset or in network infrastructure equipment. Further, Apple and the CMs' technical experts will testify that, of the 93 declared SEPs identified by Qualcomm's technical experts, *more than 95%* would be substantially embodied in the Qualcomm modem chipset, if they are practiced. Regardless, Qualcomm has collected royalties to which it was not entitled because the patents are *either* practiced and exhausted *or* not practiced. As discussed in more detail below, Qualcomm's royalty demands are above FRAND because, *inter alia*, Qualcomm seeks payment for patents that are not essential to a cellular standard, not infringed or practiced by Apple products, invalid, exhausted, and/or unenforceable.

     Qualcomm's decision to sell chipsets in which its patents are substantially embodied—and in turn receive whatever fee it decides is appropriate "for the article and the invention which it embodies"—exhausts its patent rights. *Impression Prods., Inc. v. Lexmark Int'l, Inc.*, 137 S. Ct. 1523, 1537 (2017) (internal quotations omitted). Qualcomm's desire *also* to charge royalties for those same patents is not permitted under the law.[10]

### D. Qualcomm's FRAND Commitment

     Issues of whether Qualcomm has complied with its FRAND commitment to three standard setting organizations (SSOs) involved in the creation and distribution of cellular standards will be central to the resolution of the matters in this case. The FRAND commitment is the contractual obligation between SSOs, including the

---

[10] Indeed, applied to this case, the operative effect of *Lexmark* is to void Qualcomm's sales contracts that purportedly decouple patent rights from chipsets that substantially embody Qualcomm's patents. *See* JTX34 at -4 ("███████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████"); JTX41 at -5 (same); JTX52 at -4 (same); JTX57 at -3 (same).

Telecommunications Industry Association (TIA), the Alliance for Telecommunications Industry Solutions (ATIS), and the European Telecommunications Standards Institute (ETSI),[11] and technical companies such as Qualcomm that seek to influence cellular standards. It is one commitment: the commitment that they are going to tell the SSOs in a timely way about their intellectual property rights (IPRs) and offer FRAND licenses to any party if that technology makes it into the standard.

Apple and the CMs contend that, as part of or as a result of Qualcomm's unlawful monopolization scheme, Qualcomm has violated its FRAND commitment to TIA, ATIS, and ETSI by failing to disclose to SSOs that it owns technology incorporated into the standard and by offering licenses with terms that are not "fair, reasonable, and nondiscriminatory." Qualcomm, in turn, seeks a declaration that it has complied with its FRAND obligations to ETSI. Whether Qualcomm has complied with its FRAND commitment to TIA, ATIS, and ETSI is relevant to a number of the claims and defenses in these consolidated cases. *E.g.*, Apple Claims LXI, LXII, LXIII; CMs Counterclaims I–III, V–IX; Qualcomm Counterclaims II, IV; Apple and CMs' Defense of Violation of SSO IPR Policy.

Qualcomm has an obligation to make good faith efforts to timely disclose its IPR (i.e., patents and relevant patent applications) to TIA, ATIS, and ETSI. Generally, SEP owners participating in a standard "should disclose intellectual property rights that they know are relevant to potential standards while the standard is being discussed and before the standard is adopted." *Apple, Inc. v. Motorola Mobility, Inc.*, 886 F. Supp. 2d 1061, 1068 (W.D. Wis. 2012). There is no requirement for the IPR to "actually be essential to fall under the disclosure obligation, [s]o long as it might become essential." *Core Wireless Licensing S.A.R.L.*

---

[11] ATIS and ETSI are organizational partners for the United States and Europe, respectively, of the Partnership Project known as 3GPP.

*v. Apple Inc.*, 899 F.3d 1356, 1366 (Fed. Cir. 2018) (internal quotation marks omitted) (brackets in original). In the case of ETSI, "the policy clearly requires members to make efforts to disclose intellectual property rights *before* a standard is adopted." *Apple*, 886 F. Supp. 2d at 1086; *see also Core Wireless*, 899 F.3d at 1368. The evidence will show that Qualcomm's disclosure practices are untimely: that Qualcomm pursued technical changes to cellular standards without telling SSOs about relevant IPR before the standard was adopted. *E.g.,* PTX11272; PTX3191.

Qualcomm's licenses, license offers, and licensing practices will be thoroughly discussed at trial in the context of FRAND; but several practices and issues are of particular note. *First*, it is discriminatory to distinguish between potential recipients of a patent owner's FRAND offer, and it is unfair and unreasonable to refuse to license to modem chipset manufacturers when the patented technology is implemented in that component. A FRAND offer must be made to any party who requests a SEP license, including modem chipset manufacturers. *Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1031 (9th Cir. 2015) (A "SEP holder cannot refuse a license to a manufacturer who commits to paying the RAND rate."). Judge Koh recently determined that it was inconsistent with Qualcomm's FRAND obligations to U.S. SSOs TIA and ATIS for Qualcomm to refuse to license to modem chipset competitors, such as Intel. *Fed. Trade Comm'n v. Qualcomm Inc.*, No. 17-CV-00220-LHK, 2018 WL 5848999, at *15 (N.D. Cal. Nov. 6, 2018); *id.* at *10 ("Ninth Circuit precedent establishes that Qualcomm's FRAND commitments include an obligation to license to all comers, including competing modem chip suppliers."). The evidence will show that Qualcomm's practice of refusing to license to chipset manufacturers is unfair and unreasonable. Apple and the CMs will show, including through Dr. Valenti, that Qualcomm owns SEPs that are implemented at the modem chipset and that Qualcomm has received licenses to its chips. *E.g.*, PTX269; 4/5/2018 Tiedemann Dep. at 228:6-229:4; PTX3587; JTX117; JTX119; JTX126. The evidence will show that Qualcomm's licensing practices are aimed solely at

extracting the maximum amount of royalties. *E.g.*, PTX11057.

**Second**, it is neither fair nor reasonable to demand cross-licenses without separately compensating the cross-licensor, and it is discriminatory to accord the same value for all cross-licenses. The evidence will show that ███████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████.[12] *E.g.*, PTX2960 at -2; PTX243, PTX258 at -16, JTX100 at -19. Neither is possible. Similarly, Qualcomm demanded identical cross-licenses from each of the CMs that ignored the scope and quantity of their patents, and despite efforts to negotiate the scope of that cross-license. *E.g.*, JTX62; JTX63; JTX68; JTX76; 3/12/2018 Chong Dep. at 230:11-232:22.

**Third**, it is unfair and unreasonable to force licensees into whole-portfolio licenses, and it is discriminatory to force differently situated licensees with different products incorporating different technology to take licenses to the same patents. A potential licensee does not need to take a license (to SEPs or otherwise) to IPR it does not practice. *See Microsoft Corp. v. Motorola, Inc.*, 2013 WL 2111217, at *42, *55 (W.D. Wash. Apr. 25, 2013) ("Indeed, an implementer would see little to no value in licensing a SEP if that patent did not cover a portion of the standard utilized by the implementer."); *Realtek Semiconductor Corp. v. LSI Corp.*, 946 F. Supp. 2d 998, 1007 (N.D. Cal. 2013) ("[A party] can simultaneously pursue a determination of the RAND royalty rate while denying infringement or asserting invalidity, even though those issues may ultimately obviate the need for a license."). Apple and the CMs' technical experts will testify that many of Qualcomm's patents are not valid, not infringed by Apple's products, not essential to a cellular standard, exhausted,

---

[12] There is no evidence that Apple was unwilling to negotiate a license to certain of Qualcomm's SEPs.

and/or unenforceable. This is unsurprising given that SSOs do not review the patents that are declared as "potentially essential."

Whether a "FRAND" offer or license is in fact FRAND can also be evaluated numerically. Patent valuation methodologies, in particular, patent damages principles, such as the long-standing rule of apportionment, are helpful tools for evaluating whether an offer or license is FRAND. *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1232 (Fed. Cir. 2014) ("As with all patents, the royalty rate for SEPs must be apportioned to the value of the patented invention."). The evidence will show that analyzing comparable license agreements, issues of royalty stacking, and issues surrounding the value attributable to the patented technology (*e.g.*, apportionment and smallest salable patent-practicing unit (SSPPU)) are all relevant to evaluate Qualcomm's license offer to Apple and Qualcomm's licenses with the CMs. *See, e.g.*, PTX3026; PTX8340; PTX1301; 3/8/2018 Watrous Dep. 358–59, 384–88, 412, 458–59, 474–75, 498–99, 520–21. Apple and the CMs' experts Paul Meyer and Timothy Simcoe, as well as CM expert Jeff Leitzinger, will testify on many of these analyses and valuations as part of evaluating recent comparable license agreements between Apple, the CMs, and other cellular industry leaders with large SEPs portfolios and as part of applying a "top-down" method (or component royalty stack approach) ████████████████████████████████ as well as how Apple's offer to Qualcomm fits within FRAND royalty ranges for Qualcomm's share of SEPs.

In contrast, Qualcomm will attempt to establish a technical value for its patents that is not grounded in any recognized patent principle. The only way to establish the technical value of any patent is to first define what the claimed invention is, but Qualcomm's technical experts never define the claimed invention for any of the 150 non-SEPs. Notably, these experts never examined the Apple products that supposedly use the claimed invention. Further, Qualcomm's technical experts opine on an additional 93 SEPs that are not used in any valuation analysis by Qualcomm's

1   experts.  These technical experts also fail to show that Apple's products practice the
2   claimed invention in these 93 SEPs.

3       **II.     Qualcomm's SULAs[13]**

4       **A.     Qualcomm's SULAs Are Unenforceable**

5           Qualcomm's SULAs with the CMs play a central role in this case.  Qualcomm
6   leveraged its market power and no license, no chips policy to force the CMs to sign
7   and maintain SULAs ███████████████████████████████████
8   ████████████████████████████████████████████████
9   ████████████████████████████████████████  *See,*
10  *e.g.,* PTX66 at -1 ███████████████████████████████████
11  ████████████████████████████████████████████████
12  ████████████████.  As CM witnesses will testify at trial, Qualcomm withheld
13  chips sought by the CMs until and unless the CMs agreed to first execute one-sided
14  SULAs as well as multiple other agreements.  *E.g.*, 3/12/2018 Dep. Tr. of B. Chong
15  at 184:06–185:07; 3/13/2018 Dep. Tr. of B. Chong at 245:24–246:04.  Further, once
16  signed, Qualcomm refused to renegotiate the terms of the license or otherwise agree
17  to negotiate the terms of a new license covering patents for other cellular standards.
18  *E.g.*, PTX11274.

19          Apple and the CMs contend that these SULAs—which Qualcomm seeks to
20  enforce through its breach of contract claims against the CMs, including by claiming
21  exorbitant, improper amounts of money based on bad faith interpretations of SULA
22  provisions, ███████████████████—are illegal. First, and as discussed in
23  detail above, a key component of Apple and the CMs' antitrust and FRAND claims is
24  that the SULAs between Qualcomm and the CMs violate the antitrust laws,
25  unreasonably restraining trade and facilitating Qualcomm's monopolization.  The
26  SULAs also violate Qualcomm's FRAND commitments made to SSOs all over the

27  _____

28  [13] Qualcomm claims that the CMs breached their MSAs with Qualcomm.

world, including at least ETSI, TIA, and ATIS. They also violate the doctrine of patent exhaustion, bundling of exhausted and non-exhausted patents, and the doctrine of patent misuse. Accordingly, Apple and the CMs contend that they are unenforceable as against public policy. *Continental Wall Paper Co. v. Voight & Sons Co.*, 212 U.S. 227, 261-62 (1909) (refusing to enforce contracts that embodied and furthered restraint of trade). Moreover, Apple and the CMs contend that the doctrine of antitrust illegality renders the SULAs illegal. *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 83-84 (1982) ("Where the enforcement of private agreements would be violative of . . . policy, it is the obligation of courts to refrain from such exertions of judicial power.").

Second, Qualcomm's claims that the CMs have breached their SULAs (and by extension, their Master Software Agreements ("MSAs")) by not paying royalties owed, and otherwise not complying with audit obligations, are nothing more than arguments that this Court should enforce illegal agreements. The royalties sought by Qualcomm are above-FRAND and inconsistent with the plain language of the SULAs.

Moreover, even if the SULAs were found to be enforceable, Qualcomm has breached the SULAs by violating its implied covenant of good faith and fair dealing in those contracts.[14] Since their execution, Qualcomm has sought to expand the scope of its SULAs beyond their stated terms in its efforts to seek additional monies and information that the CMs did not agree to provide under the SULAs. Under Qualcomm's interpretation of the SULA, ███████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████

---

[14] To the extent that the SULAs and MSAs are found to be enforceable, Qualcomm may not recover twice for the same alleged non-payment of royalties and may not recover any damages for claims that arose outside the statute of limitations period.

(*See* Dkt. 881-9)  Furthermore, [redacted]

### III.    BCPA Issues

The BCPA—in concert with the simultaneously negotiated and executed First Amendment to the Transition Agreement—reduced Apple's effective net royalty burden to $7.50 from 2013 to 2016.  In exchange, Section 7 of the BCPA provided that Qualcomm's rebate obligations would apply "only so long as" Apple did not initiate litigation or actively induce any third party to initiate litigation (including a government investigation) against Qualcomm with a FRAND or exhaustion claim.

During the BCPA's term, five agencies—the Chinese National Development and Reform Commission, European Commission, U.S. Federal Trade Commission, Korea Fair Trade Commission, and Taiwan Fair Trade Commission—initiated antitrust investigations into Qualcomm's illegal and anticompetitive practices.  Each agency made inquiries to Apple, and Apple truthfully responded (as it was required to do).  The Court has determined that Apple's interactions with the agencies during the term did not constitute "active inducement" and thus did not breach the BCPA.  Dkt. 1029.  Apple waited until after the BCPA expired to initiate litigation against Qualcomm.  Apple has thus abided by the BCPA's conditions, and Qualcomm's rebate obligations continued uninterrupted throughout the contract's term.

In 2016, Qualcomm breached the BCPA by withholding nearly $1 billion in rebates in retaliation for Apple's cooperation with law enforcement.  Although Qualcomm cited "legal issues" for its withholding and advanced a number of theories why Apple's responses to agency requests constituted active inducement, the Court has rejected these contentions as a matter of law.  *Id.*[15]  The true purpose of

---

[15] In addition to granting summary judgment for Apple on Qualcomm's breach-

Qualcomm's withholding was to obstruct investigations into its illegal activities and to punish Apple for cooperating with law enforcement agencies. ███████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

Qualcomm's efforts to condition its performance on Apple's agreement to provide favorable testimony violated the express terms of the BCPA, the implied covenant of good faith and fair dealing, public policy, and the antitrust laws. Although the Court has granted summary judgment on Qualcomm's BCPA-related counterclaims (Counterclaims VI, VII, VIII, and IX), Apple's own claims remain issues for the jury to decide (Count I, II, III, and IV), and as described below, Qualcomm's actions in insisting on the BCPA gag clause and retaliating against Apple for cooperating with agencies is part of Apple's monopolization claims.

## IV. Qualcomm's Tortious Interference Claim Against Apple

Qualcomm contends that Apple interfered with Qualcomm's SULAs with the CMs by directing the CMs to withhold and underpay royalties. Dkt. 466 at ¶¶ 264-297. Qualcomm must, but cannot, prove all of the following with respect to each SULA: (1) that there was a SULA between Qualcomm and each of the CMs; (2) that Apple knew of each SULA; (3) that Apple's conduct prevented the CMs' performance of each SULA, or made the CMs' performance of each SULA more expensive or difficult; (4) that Apple intended to disrupt the performance of each SULA or knew that disruption of performance was certain or substantially certain to occur; (5) that Qualcomm was harmed; and (6) that Apple's conduct was a

related counterclaims (Counterclaims VI and IX), the Court rejected Qualcomm's implied covenant and unjust enrichment counterclaims (Counterclaims VII and VIII). Dkt. 1029. The Court also held that Qualcomm could not recover BCPA Payments for any breach of Section 4 of the BCPA. *Id.* Thus, Qualcomm has no theory for trial under which it could recover any BCPA Payments it made to Apple.

substantial factor in causing Qualcomm's harm.  Dkt. 1047-6 at 167.  Below, Apple provides a high level overview of some of its defenses.

   ***First***, the SULAs are illegal and unenforceable, as previously discussed. *Supra* at 15.  Apple cannot be found liable for interfering with illegal agreements. ***Second***, Qualcomm was not harmed.  Qualcomm primarily claims two types of damages: ███████████████████████████████████████████.[16] (Dkt. 599-28).[17]  Qualcomm is not entitled to the unpaid royalties because Qualcomm is attempting to collect illegal above-FRAND royalties.  Nor do Qualcomm's SULAs permit Qualcomm to collect ████████████████ for the reasons set forth in Apple and the CMs' contract interpretation brief.  (Dkt. 881-9*).*  ***Third,*** Qualcomm will be unable to prove that Apple intended to cause Qualcomm harm.  ***Fourth*** even if the jury finds that Apple interfered (which it did not), the affirmative defense of justification precludes Qualcomm's claims.  That is, Apple will demonstrate that any nonpayment of royalties was justified because of Qualcomm's anticompetitive actions and above-FRAND royalties.  ***Fifth,*** Apple will demonstrate that it did not have any knowledge of the specific terms of each of the SULAs at issue.  Indeed, Qualcomm kept the SULAs confidential from Apple and prevented the CMs from sharing their SULAs with Apple, despite Apple's repeated requests to review them.

## V.  Qualcomm's Carrier Aggregation SOW Claim Against Apple

   Qualcomm's breach of contract claim against Apple for breach of the 2013 SOW is another example of Qualcomm's overextension.  ███████████████████ ████████████████████████████████████████████████████████████████

---

[16]  There is a third category claimed—██████████████████████████████ ██████████████████████████████████████████████████████████████

   As discussed in Apple's partial motion for summary judgment (Dkt. 599), and Apple and the CMs' contract interpretation brief (Dkt. 881), ███████████████ ███████████████████████████████████████████████████████████████

[REDACTED] JTX8 § 4.2 (2013 SOW). [REDACTED]

[REDACTED] [18] Apple acknowledges that it is obliged to make *some* payments under Section 4.2, and has offered to make those payments, but Qualcomm disagrees about what payments are due.

[REDACTED]

[REDACTED] That claim is based on two statements made by Apple's Phil Schiller (Senior Vice President, Worldwide Marketing) that were made in less than one minute, combined, during two product launch events that were *each* more than an hour long. [REDACTED]

[REDACTED] That demand ignores the plain meaning of the 2013 SOW and common sense.

## CONCLUSION

For all the reasons set forth above, Apple and the CMs anticipate that they will prevail at the trial of their claims.

---

[18] This is consistent with a proposal from Cristiano Amon (then Presi[REDACTED]

Dated: March 25, 2019          Respectfully submitted,

By:    */s/ William A. Isaacson*
          Juanita R. Brooks, SBN 75934, brooks@fr.com
          Seth M. Sproul, SBN 217711, sproul@fr.com
          FISH & RICHARDSON P.C.
          12390 El Camino Real
          San Diego, CA 92130
          Phone: (619) 678-5070; Fax: (619) 678-5099

          Ruffin B. Cordell (D.C. Bar No. 445801;
          *pro hac vice*) cordell@fr.com
          Lauren A. Degnan (D.C. Bar No. 452421;
          *pro hac vice*) degnan@fr.com
          FISH & RICHARDSON P.C.
          1000 Maine Avenue, S.W., Suite 1000
          Washington, D.C. 20024
          Phone: (202) 783-5070; Fax: (202) 783-2331

          William A. Isaacson (D.C. Bar No. 414788;
          *pro hac vice*) wisaacson@bsfllp.com
          Karen L. Dunn (D.C. Bar No. 1002520;
          *pro hac vice*) kdunn@bsfllp.com
          BOIES SCHILLER FLEXNER LLP
          1401 New York Avenue, N.W.
          Washington, D.C. 20005
          Phone: (202) 237-2727; Fax: (202) 237-6131

*Attorneys for Plaintiff and Counterclaim-Defendant Apple Inc.*

By:    */s/ Jason C. Lo*
          Theodore R. Boutrous, Jr., SBN 132099,
          tboutrous@gibsondunn.com
          Richard J. Doren, SBN 124666
          rdoren@gibsondunn.com
          Daniel G. Swanson, SBN 116556,
          dswanson@gibsondunn.com
          Michele L. Maryott, SBN 191993
          mmaryott@gibsondunn.com

Jason C. Lo, SBN 219030,
jlo@gibsondunn.com
Jennifer J. Rho, SBN 254312,
jrho@gibsondunn.com
Melissa Phan, SBN 266880,
mphan@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Tel:  (213) 229-7000; Fax:  (213) 229-7520

Cynthia E. Richman, DC Bar No. 492089,
*pro hac vice*
crichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Tel: (202) 955-8500; Fax: (202) 467-0539

*Attorneys for Defendants, Counterclaimants, and Third-Party Plaintiffs Compal Electronics, Inc., FIH Mobile Ltd., Hon Hai Precision Industry Co., Ltd., Pegatron Corporation, and Wistron Corporation*

Hugh F. Bangasser, *pro hac vice*
hugh.bangasser@klgates.com
Christopher M. Wyant, *pro hac vice*
chris.wyant@klgates.com
J. Timothy Hobbs, *pro hac vice*
tim.hobbs@klgates.com
K&L GATES LLP
925 Fourth Avenue, Suite 2900
Seattle, Washington 98104
Tel: (206) 623-7580; Fax: (206) 370-6371

Caitlin C. Blanche, SBN 254109,
caitlin.blanche@klgates.com
K&L GATES LLP
1 Park Plaza Twelfth Floor
Irvine, CA  92614
Tel: (949) 253-0900; Fax: (949) 253-0902

*Attorneys for Defendant, Counterclaimant, and
Third-Party Plaintiff Wistron Corporation*