# ATTACHMENT 2B

# PUBLIC VERSION

Evan R. Chesler (N.Y. Bar No. 1475722) (*pro hac vice*)
echesler@cravath.com
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

David A. Nelson (Ill. Bar No. 6209623) (*pro hac vice*)
davenelson@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN, LLP
500 West Madison St., Suite 2450
Chicago, Illinois 60661
Telephone: (312) 705-7400
Facsimile: (312) 705-7401

Karen P. Hewitt (SBN 145309)
kphewitt@jonesday.com
JONES DAY
4655 Executive Drive, Suite 1500
San Diego, California 92121
Telephone: (858) 314-1200
Facsimile: (858) 345-3178

[*Additional counsel identified on signature page*]

*Attorneys for Defendant and Counterclaim-Plaintiff*
QUALCOMM INCORPORATED

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| IN RE: QUALCOMM LITIGATION | No. 3:17-CV-0108-GPC-MDD |
|---|---|
| | **QUALCOMM INCORPORATED'S TRIAL BRIEF** |
| | Judge: Hon. Gonzalo P. Curiel |
| | Courtroom: 2D |
| | **Trial Date: April 15, 2019** |
| | ▮▮▮▮▮▮▮▮▮▮ |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................ii

INTRODUCTION .............................................................................................1

FACTUAL BACKGROUND .............................................................................2

    A.    Qualcomm's Inventions Enable the Modern Smartphone. ............................2

    B.    Qualcomm Developed and Sells Industry-Leading Cell Phone
        Applications Processors, Modems and Related Chips. ..................................3

    C.    The CMs Entered into SULAs on Terms That Have Been Widely
        Accepted by the Cellular Industry for Decades. ............................................4

        1.    Qualcomm's Licensing Business and Practices ...................................4

        2.    The CMs' SULAs ..................................................................................6

    D.    The Apple-Qualcomm Business Relationship .................................................7

DISCUSSION .....................................................................................................9

I.     The CMs Breached Their SULAs at Apple's Instigation.......................................9

II.    Apple's and the CMs' Excuses for Breaching the SULAs Fail. ...........................10

    A.    The SULAs Are Consistent with FRAND. .....................................................11

        1.    The SULAs Are Immune from the CMs' FRAND Challenges..........11

        2.    The SULAs Satisfy Qualcomm's FRAND Commitment...................11

    B.    Qualcomm Has Not Violated the Antitrust Laws. ........................................12

        1.    Legal Standards...................................................................................12

        2.    The SULAs and Qualcomm's Licensing Practices Are Lawful
            Under Competition Law. ....................................................................14

    C.    Apple's and the CMs' Exhaustion Theories Fail. ........................................17

III.   Qualcomm Discharged Its FRAND Commitment as to Apple. .............................18

IV.   Additional Claims. ...............................................................................................19

    A.    Apple and the CMs Are Liable for Underpaid Royalties Prior to 2017. .......19

    B.    Apple Breached the 2013 SOW Agreement with Qualcomm. .....................20

CONCLUSION ....................................................................................................20

**Page(s)**

**Cases**

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp.*,
    592 F.3d 991 (9th Cir. 2010) ...................................................................................................17

*Blank v. Kirwan*,
    39 Cal. 3d 311 (1985) ...........................................................................................................10

*City of Vernon v. S. Cal. Edison Co.*,
    955 F.2d 1361 (9th Cir. 1992) ..........................................................................................13, 17

*Cost Mgmt. Servs., Inc. v. Wash. Nat'l Gas Co.*,
    99 F.3d 937 (9th Cir. 1996) ..................................................................................................13

*Feitelson v. Google, Inc.*,
    80 F. Supp. 3d 1019 (N.D. Cal. 2015) ...................................................................................17

*Fernandez v. K-M Indus. Holding Co.*,
    646 F. Supp. 2d 1150 (N.D. Cal. 2009) .................................................................................18

*HTC Corp. v. Telefonaktiebolaget LM Ericsson*,
    No. 6:18-CV-00243-JRG, 2019 WL 126980 (E.D. Tex. Jan. 7, 2019) .............................12

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) ..........................................................................................13, 14

*Impression Prods., Inc. v. Lexmark Int'l, Inc.*,
    137 S. Ct. 1523 (2017) ......................................................................................................17, 18

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. 4th 1134 (2003) ........................................................................................................10

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
    694 F.3d 51 (Fed. Cir. 2012) ................................................................................................11

*Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc.*,
    89 Cal. App. 4th 1042 (2001) ...............................................................................................18

*MetroNet Servs. Corp. v. Qwest Corp.*,
    383 F.3d 1124 (9th Cir. 2004) ..............................................................................................16

*NYNEX Corp. v. Discon, Inc.*,
    525 U.S. 128 (1998)...............................................................................................................14

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018) ..........................................................................................................13

*Pool Water Prods. v. Olin Corp.*,
    258 F.3d 1024 (9th Cir. 2001) ........................................................................13

*Rooz v. Kimmel*,
    55 Cal. App. 4th 573 (1997) ........................................................................18

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) ........................................................................13

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ........................................................................13

*Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ........................................................................16

**Statutes & Rules**

Cal. Civ. Code § 3294 ........................................................................10

Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.* ........................................................................10

Sherman Act § 1, 15 U.S.C. § 1 ........................................................................13

Sherman Act § 2, 15 U.S.C. §2 ........................................................................12, 13

Although this case involves a large number of claims and counterclaims, at its heart it is about Apple and its contract manufacturers' refusal to pay what they owe for their continued use of Qualcomm's IP.  The Qualcomm IP licensed to the contract manufacturers forms the core of modern cellular technology without which the iPhone could not exist.  That IP also covers a wide array of technologies in modern smartphones, including audio, video, streaming, multimedia, Wi-Fi, Bluetooth, digital photography, user interface, battery life, and much more.  These technologies have enabled Apple to grow into one of the world's most successful companies while the wider cellular industry has also flourished.

Virtually every significant cellular device manufacturer has recognized the value of Qualcomm's technology and entered into a license agreement with Qualcomm, including Apple's contract manufacturers ("CMs"), which signed their Subscriber Unit License Agreements ("SULAs") with Qualcomm many years ago.  The CMs' SULAs are worldwide portfolio licenses covering not only Qualcomm's cellular standard-essential patent ("SEP") portfolio, but also tens of thousands of its non-standard-essential patents ("NEPs") and non-cellular SEPs for technologies like video and audio playback and recording, among others.  Rather than let the CMs continue to pay Qualcomm a fair royalty, as they contracted to do—and did for the better part of two decades—Apple took deliberate steps to interfere with the CMs' compliance with their SULAs, causing them to breach those agreements by failing to pay billions of dollars in royalties owed from the beginning of 2017 to today.  Apple did this for the express purpose of inflicting financial harm on Qualcomm and coercing Qualcomm to accept unfair compensation for its IP.

The evidence at trial will establish that the CMs' SULAs are reasonable, enforceable agreements, covering tens of thousands of patents not covered by Qualcomm's commitments to license its cellular SEPs on fair, reasonable, and non-discriminatory ("FRAND") terms.  And, to the extent its FRAND commitments do apply, Qualcomm has fulfilled them; Qualcomm's royalty rates have been accepted by hundreds

of licensees, and its licensing practices have been standard in the cellular industry since its inception. The evidence also will establish that Qualcomm's business practices are not anticompetitive, and that Apple and the CMs have suffered no injury cognizable under the antitrust laws. Qualcomm is entitled to declaratory relief that the SULAs are enforceable and that Apple and the CMs have no excuse for their failure to provide *any* compensation to Qualcomm for using its IP for the past two years. Finally, the evidence at trial will establish that Apple caused the CMs to underpay royalties owed under the SULAs even before they completely stopped paying royalties in 2017, and that Apple also breached various direct agreements with Qualcomm.[1]

## FACTUAL BACKGROUND

### A.    Qualcomm's Inventions Enable the Modern Smartphone.

Since Qualcomm's founding 30 years ago, Qualcomm's innovations have been key to the cellular industry's development. At that time, when Qualcomm was a fledgling technology startup in an industry dominated by a handful of large, established companies, Qualcomm invented code division multiple access technology ("CDMA") for commercial use. CDMA was better at allocating scarce bandwidth than the solution that the industry (and governments) supported at the time. Despite resistance from entrenched players, and facing substantial risk of failure, Qualcomm proved CDMA's superiority, ushering in a revolution in cellular communications.

Qualcomm did not stop there. CDMA became the backbone of 3G. Qualcomm also recognized that data transmission and mobile internet access would be critical to the future of cellular communications. It developed technologies key to today's high-data, bandwidth-intensive applications, many of which were ultimately incorporated into the 4G LTE standard. Today, Qualcomm is leading the way in the development of 5G. Qualcomm has remained at the leading edge of technological innovation by investing

---

[1] This brief sets forth the key claims and evidence for trial. Some claims will be tried to the jury, while other claims will be tried to the Court. Qualcomm will be prepared to address the issue of which claims fall into each bucket, and the logistics of how each set of claims will be tried, at the March 28, 2019 hearing.

billions of dollars each year—a substantial proportion of its revenues—in R&D.

Rather than retaining its inventions as proprietary, Qualcomm's goal has always been to propagate its cellular technologies broadly so that many manufacturers would adopt them, benefitting Qualcomm, the entire industry, and consumers. To further that goal, Qualcomm has participated in standards-development organizations ("SDOs"), which adopted many of Qualcomm's innovations as the foundation of cellular standards. Qualcomm has consistently been recognized as the leader in cellular SEPs. It also has an extensive portfolio of non-cellular SEPs and NEPs. Apple itself has ████████████
████████████████████████████████████████████.[2]

Apple has been one of the chief beneficiaries of Qualcomm's innovations. High-speed cellular enables ubiquitous access to the mobile data on which smartphones, with their data-intensive apps and functions, depend. The evidence will show that Qualcomm's inventions enhance consumer demand for smartphones, and iPhones in particular.

**B.  Qualcomm Developed and Sells Industry-Leading Cell Phone Applications Processors, Modems and Related Chips.**

Qualcomm also is a leading manufacturer of chips that enable cell phones. These chips include: (1) multi-mode modem chips that enable cellular devices' connection to multiple cellular networks, such as CDMA, WCDMA, or LTE networks; and (2) systems-on-a-chip ("SOCs") that, in addition to cellular modem functionality, include an application processor, graphics processor, global positioning (GPS), and other functions integrated into one chip package. The business of developing and selling modem chips has been, and remains, highly competitive. Original equipment manufacturers ("OEMs"), including Apple, have chosen Qualcomm's chips because those chips have been first to market and technologically superior. Qualcomm has also been able to out-compete its rivals with its ability to satisfy OEMs' demanding technical

---

[2] ████████████████████████████████████████████
████████████████████████████████████████████████████

and scheduling needs.  That has been particularly true for Apple, ████████████
██████████████████████████████████████████████████████.

### C. The CMs Entered into SULAs on Terms That Have Been Widely Accepted by the Cellular Industry for Decades.

#### 1. Qualcomm's Licensing Business and Practices

As a startup company in need of cash, Qualcomm in the early 1990s began licensing its CDMA technology in exchange for an up-front fee and running royalty that the licensee would pay if CDMA ever became commercialized.  This approach allowed Qualcomm to monetize the value of its IP while the industry flourished.  Since then, hundreds of licensees have agreed, following arm's-length negotiations, to pay Qualcomm royalties commensurate with its patent portfolio's value.

When Qualcomm identifies its patents to ETSI or other SDOs as potentially essential to practicing a given standard, Qualcomm provides a commitment to the SDO to make available licenses to those SEPs on FRAND terms.  The IP rights policy of ETSI ("ETSI IPR Policy"), the leading cellular SDO, does not define specific terms, rates, or licensing practices as consistent or inconsistent with FRAND.  ETSI seeks to ensure both that standardized technology is made broadly available to implementers such as Apple and that innovators such as Qualcomm receive adequate and fair compensation for their inventions.  Good-faith licensing negotiations are the way the industry strikes this balance.  As to NEPs, Qualcomm has made no commitment to an SDO to license those patents, and thus they are not subject to the FRAND commitment.  Many of Qualcomm's licensees have taken licenses to NEPs and SEPs, recognizing the freedom to operate such a license provides.

Qualcomm has signed over three hundred license agreements.  Although the terms vary, Qualcomm's SULAs generally provide for an up-front payment, a broad cross-license, and running royalties calculated at 5% of the handset's "net selling price" or "NSP".  Qualcomm caps the royalty payable on products above certain selling prices.  Many agreements include a license to Qualcomm's cellular SEPs, non-cellular SEPs, and NEPs, although Qualcomm has negotiated and offered cellular SEP-only licenses

████████████████████████████████████████████ at a royalty rate of 3.25% of the handset's NSP.

Like other major holders of cellular IP since the industry's beginning, Qualcomm has licensed its patents exhaustively only at the handset level, rather than at multiple levels in the phone-production chain. This "device-level licensing" structure both comports with the industry's longstanding understanding of the ETSI IPR Policy, is more efficient for both licensors and licensees, and promotes competition in the modem chip markets. Rather than offer exhaustive licenses to competing modem chipmakers, Qualcomm has never asserted its SEPs against them (except defensively). Thus, other chipmakers, including Intel, MediaTek, and others, have been free to make and sell modem chips, do so in increasing volumes, and they pay no royalties to Qualcomm.

Qualcomm has never priced its IP into the price of its chips. Rather, it charges a separate royalty in its SULAs. Anyone who makes a cellular handset without a Qualcomm license would infringe Qualcomm's IP, whether they bought Qualcomm's chips or not. Hence, Qualcomm does not assist in the infringement of its own IP by selling chips to non-licensed entities. Instead, Qualcomm will sell chips only to licensed entities.

The premise of Apple's case is that this policy allows Qualcomm to coerce OEMs into paying "supra-FRAND" royalties and to "double-dip". The evidence will show, however, that over 100 OEMs have taken licenses on Qualcomm's typical terms—████████████████████████████████████████████—at times when Qualcomm either did not sell modem chips to those OEMs, or indisputably lacked the monopoly power in the modem chip markets that Apple claims allows Qualcomm to coerce unfair royalties. In addition, any plausible methodology for valuing Qualcomm's patent portfolio demonstrates that Qualcomm charges royalties that are fair and reasonable. The strongest evidence that Qualcomm's royalties are FRAND is the market's acceptance of Qualcomm's royalty terms, which have remained largely consistent over time despite the dramatic growth of its patent portfolio and incredible proliferation of the subject

technology.  The evidence will show the massive value to consumers that modern cellular technology has created, and that Qualcomm's royalties represent a modest fraction of that value.[3]  And notably, before bringing this litigation, █████████████████████ ████████████████████████████████.

## 2. The CMs' SULAs

Apple has never been a direct licensee of Qualcomm.  When it entered the handset market in 2007 with the first iPhone, Apple chose to rely on the CMs' SULAs.  Each of the four CMs in this case entered into license agreements with Qualcomm between 2000 and 2010.  Compal, Foxconn, and Wistron negotiated and signed their SULAs years before they began making cellular devices for Apple; in the case of Compal and Foxconn, years before the iPhone even existed.  The CMs are large, sophisticated companies, and the SULAs were the subject of lengthy arms-length negotiations.

Under the CMs' SULAs, the CMs took licenses to Qualcomm's patent portfolio, including cellular SEPs and certain non-cellular SEPs and NEPs.  In exchange, the CMs each agreed that they would ███████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████.[4]  Each SULA also provides that Qualcomm may audit the respective CM's books and records to ensure that the royalties that CM has reported and paid are accurate.  The royalty terms are agnostic as to which company's chip is incorporated into the phone.  As such, Qualcomm's royalties do not result in increased costs to an OEM using a rival's modem chips rather than Qualcomm's.

---

[3] In addition, Qualcomm will present evidence of economic modeling showing that its rates are consistent with the industry average rates for cellular SEPs.

[4] Notably, under the CMs' SULAs, the CMs pay royalties to Qualcomm at a rate of ██ of the "transfer price" at which the CMs sell devices to Apple.  So, unlike many licensees, Apple enjoys the benefit of paying Qualcomm's royalties on its devices based on the wholesale, rather than retail, price.  Whatever the transfer price, moreover, as █████████ve, Qualcomm caps the royalty; the current cap is $20 for mobile phones and ██ █████████.

In addition, the SULA terms were not coerced by a supposed need for Qualcomm's modem chips. Compal, for example, did not even purchase Qualcomm chips until two years after it signed its SULA; ████████████████████████ ████████ ████████. Over the years, several of the CMs and Qualcomm have amended the SULAs multiple times; for example, to add new cellular standards to the scope of the licenses, extend the scope of the non-cellular SEPs and NEPs licensed, or add a new corporate entity as a sublicensee.

Until 2017, the CMs paid the royalties owed under the SULAs, with Apple advancing to the CMs the amounts the CMs paid to Qualcomm. During this time, the CMs' royalties remained the same, whether or not Apple was purchasing Qualcomm's chips at the time. Even after the CMs—at Apple's instigation—stopped paying Qualcomm's royalties for Apple products, they have continued to pay Qualcomm the royalties owed under the SULAs for the non-Apple products they assemble.

### D.    The Apple-Qualcomm Business Relationship

Unlike most other OEMs, which use SOCs, Apple uses "thin modems"— standalone baseband processors that do not include application processors, graphics processors, or other functionalities. Until 2011, Apple sourced thin modems solely from Infineon (which was acquired by Intel). Between 2007 and 2013, Qualcomm and Apple entered into a series of agreements relating to business cooperation and, starting in 2011, to chips. The evidence will show that these agreements were freely and heavily negotiated, with Apple holding a large amount of leverage over Qualcomm; that Apple, despite its claims today, was not coerced; that the agreements did not result in foreclosure of any rival chipmaker; and that Apple received substantial value—billions of dollars from Qualcomm—from these agreements.

*Marketing Incentive Agreement (2007) ("MIA")*:  Under the MIA, Qualcomm paid over ████████ in marketing funds to Apple in exchange for Apple's announcing that it would use WCDMA, rather than an inferior standard known as WiMax, for its 3G iPhones, among other consideration.

*Transition Agreement (2011) ("TA")*:  Apple first used Qualcomm modems in 2011.  Apple demanded that Qualcomm pay the purported cost of Apple's switching from Infineon/Intel to Qualcomm.  Under the Transition Agreement, Qualcomm paid over ████ to incentivize Apple to purchase its chips.  But, while Apple demanded large up-front payments from Qualcomm, and Qualcomm was required to make large investments to customize thin modems for Apple, Apple refused to provide a volume commitment.  Thus, Qualcomm faced the risk that those very substantial, Apple-specific, up-front investments might be lost, in whole or in part, if Apple did not in fact source most of its modem requirements from Qualcomm.  To protect against that risk, Qualcomm negotiated a clawback provision giving it the right to recover some of its up-front investments if Apple did not purchase nearly all of its modem chips from Qualcomm.  Unbeknownst to Qualcomm at the time, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

*Amended Transition Agreement (2013) ("ATA")*:  In 2012, Apple threatened to move its thin modem purchases elsewhere unless Qualcomm paid it additional financial incentives.  In the Amended Transition Agreement, Qualcomm agreed to make additional incentive payments to Apple, again conditioned on Apple's purchasing all or nearly all of its modem chips from Qualcomm.  Like the TA, the ATA did *not require* Apple to source its chips exclusively from Qualcomm, and ultimately Apple did not:  In 2016, while the ATA was still in effect, Apple began using inferior Intel modems for some of its iPhones.  Before that point, Apple repeatedly ████████████████████████████████████████████████████████████████████████████████.  Today, Apple sources *all* modem chips for new-model iPhones and iPads from Intel.

*Business Cooperation and Patent Agreement (2013) ("BCPA")*:  The parties have discussed the BCPA extensively in prior briefing.  In that agreement, Qualcomm agreed to make further incentive payments to Apple in exchange for specifically defined business cooperation and certain rights to Apple's patents.

Contrary to Apple's claims, the incentive payments under these contracts were not royalty rebates. Rather, under the agreements Qualcomm paid Apple money in exchange for valuable consideration. Apple witnesses have acknowledged that each contract provided Qualcomm with separate value, unrelated to royalties, such as marketing assistance, non-assertion of Apple's patents against Qualcomm, and greater assurance that Qualcomm would recoup its investments in supplying Apple.

## DISCUSSION

## I. The CMs Breached Their SULAs at Apple's Instigation.

*CMs' Breaches.* The CMs' breaches of their SULAs are clear and essentially undisputed.[5] As consideration for licensing Qualcomm's patent portfolio (including SEPs and NEPs), the CMs agreed to pay quarterly royalties on all licensed products they sold. The CMs did that for many years. The CMs continue, even today, to pay Qualcomm the royalties they owe under the SULAs on *non-Apple* devices. However, starting with royalties owed on sales to Apple in the first quarter of 2017, the CMs have stopped paying any royalties to Qualcomm on Apple products. Qualcomm has been damaged in at least the amount of these unpaid royalties, which total billions of dollars.

*Apple's Interference.* The CMs' breach of their SULAs was not the CMs' idea; it was the intended result of deliberate acts by Apple.[6] Despite operating under the CMs' SULAs for nearly a decade without challenging the terms of those agreements, in 2017 Apple decided it would no longer pay the CMs *any* royalties which they, in turn, owed to Qualcomm on Apple devices. Apple's ███████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████. The evidence will also show that due to Apple's interference, the CMs have withheld billions of dollars in royalty payments, causing Qualcomm substantial harm—which was precisely what Apple

---

[5] *See* Counts I, III, V & VII, QC CM Compl. (Final Pretrial Conference Order ("PTO") 72-105.) Qualcomm also seeks a declaratory judgment that each CM has unjustifiably breached its obligations under its SULA and that Qualcomm has not. Count IX, QC CM Compl. (PTO 109-114.)

[6] Count I, QC Countercls. (PTO 32-38.)

intended. Apple knew that its failure to pay the CMs would disrupt the CMs' performance because the CMs' policy and practice was to pay Qualcomm ████ ████████████████████████████. Apple also knew that ████████████ ████████████████████████████████████████████████ ████████. Apple's knowledge that its actions would result in the disruption of the CMs' contracts is sufficient for liability. *See, e.g.*, *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153-57 (2003). But the evidence is overwhelming that Apple *intended* to disrupt the CMs' performance, and acted maliciously in doing so.[7] The CMs ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████. And Apple took the initiative to fully indemnify each of the CMs from claims arising from breaches of their SULAs—████████████████ ████████████████████████ ████████████████. Apple documents reveal that all of this was part of its goal of ████████████████████████ to get Qualcomm to give in to Apple's demands.

## II. Apple's and the CMs' Excuses for Breaching the SULAs Fail.

In an attempt to excuse their breaches and Apple's tortious interference, Apple and the CMs assert three broad categories of claims, each challenging the enforceability of the SULAs on public policy grounds. *First*, Apple and the CMs assert a set of claims premised on the assertion that the SULAs fail to comply with Qualcomm's FRAND commitments.[8] *Second*, Apple and the CMs assert claims under the Sherman Act that the SULAs and Qualcomm's licensing practices generally are anticompetitive.[9] *Third*, Apple asserts that the SULAs are unenforceable because they allegedly require the CMs (and

---

[7] Qualcomm is entitled to punitive damages in relation to Apple's tortious interference, because Apple acted with "oppression, fraud, or malice". Cal. Civ. Code § 3294.

[8] Count LXI, Apple Claims (PTO 20-25); Counts V-XII, CM Countercls. (PTO 130-156).

[9] Count LXII, Apple Claims (PTO 25-28); Counts I-II, CM Countercls. (PTO 115-122). The CMs also allege that Qualcomm's conduct violated the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, Count III, CM Countercls. (PTO 122-126), which is coextensive with the Sherman Act, *Blank v. Kirwan*, 39 Cal. 3d 311, 320 (1985).

therefore Apple) to pay royalties on exhausted patents.[10]  For each of these claims, Apple must prove that the interest in the contracts' enforcement is "*clearly* outweighed in the circumstances by a public policy against the enforcement of such terms".  (ECF 1027 at 20 (quotation omitted) (emphasis added).)  Qualcomm seeks declaratory judgments that the SULAs do not violate either its FRAND commitments or competition laws.[11]

### A.    The SULAs Are Consistent with FRAND.

#### 1.    The SULAs Are Immune from the CMs' FRAND Challenges.

Apple's and the CMs' FRAND-related claims fail at the outset for three reasons. *First*, as explained in its Rule 44.1 motion briefing, Qualcomm discharged its FRAND commitments as to the CMs when it offered a license to its SEPs and the CMs accepted the terms of that license.  An existing licensee has no *post hoc* cause of action to invalidate its license on the basis that it violated (or violates) FRAND.  (*See* ECF 876-01 at 6-9.)  *Second*, as discussed in Qualcomm's brief on disputed contract provisions, the SULAs contain integration clauses that bar the CMs from invoking Qualcomm's FRAND commitments as a basis to invalidate them.  (*See* ECF 881 at 21-25.)  *Third*, the CMs' SULAs cover tens of thousands of patents not covered by any FRAND commitment.

#### 2.    The SULAs Satisfy Qualcomm's FRAND Commitment.

Even if the CMs and Apple could today challenge as unfair and unreasonable agreements that the CMs signed years ago and performed for over a decade, their claims fail on the merits.  The evidence will show that Qualcomm's FRAND commitment does not require that parties to licenses adopt particular commercial terms, or that royalties stay under the artificial caps or be calculated according to the artificial methods put forward by Apple's experts.  Rather, the best evidence of the fairness and reasonableness of Qualcomm's royalties is the market's broad acceptance of those terms.  *See, e.g.*, *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012).

████████████████████████████████

---

[10] *See* Count LXI, Apple Claims. (PTO 20-25.)  Apple's and the CMs' claims under the California UCL appear to rely on each of these three defenses.  Count LXIII, Apple Claims (PTO 28-31); Count IV, CM Countercls. (PTO 126-129).

[11] *See* Counts II, III, QC Countercls. (PTO 38-45.)



. For example, ████████████
████████████████████████████
████████████████████████████████
███████████████████████████████████

████████████████████████. Even before then, Apple had chosen to use the CMs' SULAs since it entered the handset market. During its first several years, Apple did not use *any* Qualcomm chips. Thus, even under Apple's theory of alleged chip power, Qualcomm lacked the ability to coerce Apple to accept the royalties paid by the CMs. But Apple did not bring a FRAND challenge during those 10-plus years, █████ ████████████████████████████████ ███████████████████████.[12]

The licensing practices that Apple and the CMs challenge are consistent with standard licensing practices in the cellular industry, which the industry had good reasons for adopting. For example, the SULAs' use of the NSP of the device as the royalty base is consistent with the common understanding of the ETSI IPR Policy. Using NSP as the royalty base was the prevailing practice of the industry at the time the policy was adopted, and has been ever since. *See HTC Corp. v. Telefonaktiebolaget LM Ericsson*, No. 6:18-CV-00243-JRG, 2019 WL 126980, at *5 (E.D. Tex. Jan. 7, 2019). This makes good sense because the value provided by Qualcomm's technology is realized at the handset level—for example, faster data speeds make the entire handset more valuable. Thus, using NSP ensures that Qualcomm is fairly compensated for the value its technology contributes to the licensed product.

**B.    Qualcomm Has Not Violated the Antitrust Laws.**

1.    Legal Standards.

To prevail on their claims under the Sherman Act § 2, Apple and the CMs must prove that Qualcomm (1) possesses or possessed at the relevant time monopoly power in

---

[12] As discussed above, the CMs' SULAs include licenses to NEPs that enable valuable technologies throughout handsets. These NEPs are not subject to Qualcomm's FRAND commitments.

the relevant market, (2) willfully acquired or maintained that power, and (3) that Qualcomm's conduct caused them antitrust injury. *See Cost Mgmt. Servs., Inc. v. Wash. Nat'l Gas Co.*, 99 F.3d 937, 949 (9th Cir. 1996). "'Willful acquisition' or 'maintenance of monopoly power' involves 'exclusionary conduct,' not power gained 'from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1208 (9th Cir. 1997) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)). Apple and the CMs must prove that the challenged conduct has "an anticompetitive effect", meaning "harm [to] the competitive process" rather than merely "harm to one or more competitors". *United States v. Microsoft Corp.*, 253 F.3d 34, 50 (D.C. Cir. 2001) (quotation omitted). "When a legitimate business justification supports a monopolist's exclusionary conduct, that conduct does not violate § 2 of the Sherman Act." *Image Tech. Servs.*, 125 F.3d at 1212.

Under the Sherman Act § 1, the CMs must prove: "(1) an agreement or conspiracy among two or more . . . entities; (2) by which the . . . entities intend to harm or restrain competition; and (3) which actually restrains competition". *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1365 (9th Cir. 1992) (internal quotation marks and citation omitted). Because the CMs challenge vertical agreements, under § 1 the CMs must also prove that Qualcomm possessed market power in the alleged antitrust markets. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 n.7 (2018). Under the rule of reason, the CMs must first prove that the challenged agreements have a "substantial anticompetitive effect". *Id.* at 2284. If the CMs succeed, the burden then shifts to Qualcomm to advance a "procompetitive rationale". *Id.* To overcome such a showing, the CMs must "demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means". *Id.*

For all of their competition law claims, Apple and the CMs must further prove that they suffered an injury of the type the antitrust laws were intended to prevent due to the allegedly anticompetitive aspects of Qualcomm's conduct. *See, e.g.*, *Pool Water Prods.*

*v. Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2001). It is insufficient for Apple and the CMs to prove merely that Qualcomm's conduct resulted in raised prices or costs. *See, e.g.*, *NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128, 136-37 (1998).

2.   The SULAs and Qualcomm's Licensing Practices Are Lawful Under Competition Law.

The evidence will not support Apple's and the CMs' allegations concerning market definition and monopoly power, dooming all of the competition law claims. Apple's "premium LTE" chip market definition is based on flawed assumptions, and Apple's experts fail to consider various factors that contradict its allegations regarding Qualcomm's monopoly power, including, for example, *ex ante* competition among chip suppliers and competitive pressure on Qualcomm from the threat of entry. The antitrust claims also fail for a number of other reasons.

*Qualcomm Acquired and Maintained Its Market Position Lawfully.* Qualcomm's market position with respect to OEMs and rival chipmakers is the result of its "superior product[s]" and "business acumen", not exclusionary conduct. *Image Tech. Servs.*, 125 F.3d at 1208. For years, Qualcomm has been a global leader in cellular technology due to its superior innovations and extensive R&D spend. While other chipmakers ignored CDMA technology, the risks Qualcomm took in proving CDMA's superiority paid off. Apple has recognized that Qualcomm's chips are technologically superior to its competitors' offerings. Qualcomm has consistently been first to market various cutting edge technologies in its chips; for example, Qualcomm developed the first 4G LTE-Advanced multimode chipset that included an important technology known as carrier aggregation. Qualcomm has also been able to meet Apple's and other OEMs' production schedules, ████████████████████████. Contrary to Apple's claims that its agreements with Qualcomm prevented it from turning to other chip suppliers, the evidence will show that, at the time, Apple ████████████████████████████ ████████████████████████████████████████████.

*Qualcomm's License Agreements Were Not Influenced by Its Alleged Monopoly Power.* As explained above, Apple and the CMs allege that Qualcomm used its

monopoly power in CDMA and "premium LTE" chips to extract "supra-FRAND" royalties from licensees, including from the CMs. But the simple facts of Qualcomm's licensing history belie these claims. For example:

- Compal signed its SULA two years before it bought chips from Qualcomm, and four years before Apple and the CMs allege Qualcomm possessed monopoly power. Accordingly, Qualcomm had no way to use its purported monopoly power in any chip market to coerce Compal into accepting its licensing terms.

- ███████████████████████████████████. Apple and the CMs do not allege that Qualcomm had monopoly power in WCDMA chips.

- ████████████████████████████ which were not influenced by alleged monopoly power.

- Apple advanced to the CMs the royalties they owed under the SULAs for Apple products beginning in 2008 (when Apple introduced the iPhone 3G), but Apple did not buy Qualcomm's chips until 2011, so nothing prevented Apple from challenging Qualcomm's royalty rates if it thought they were unreasonable.

Qualcomm's license agreements with other OEMs have the same FRAND characteristics. Qualcomm's early license agreements, some signed *before Qualcomm had a chip business* and before CDMA was standardized, were signed at what became its standard 5% rate. Scores of other OEMs signed onto Qualcomm's standard royalty rates despite not buying Qualcomm's chips until years later, if at all.

*Qualcomm's Licensing Practices Have Not Harmed Competition in the Modem Chip Markets.* There is no evidence that any Qualcomm conduct harmed competition among modem chipmakers. While Apple and the CMs will point to chipmakers that have exited the market in the past, there is no evidence that they did so because of Qualcomm. Rather, those companies exited the market for unrelated reasons, including misguided strategic decisions and an inability to meet customers' needs. The modem chip markets have seen entry and expansion as well as exit, and are dynamically competitive. For example, Qualcomm has recently faced competition in CDMA and LTE chips from Intel and MediaTek, among others, and increasingly from handset manufacturers that develop and supply their own modem chips such as Samsung and Huawei.

*The Challenged Licensing Practices Are Procompetitive and Otherwise Justified.*

Qualcomm's licensing practices are procompetitive and supported by legitimate business justifications. For example, Qualcomm's policy of selling modem chips only to licensed OEMs prevents Qualcomm from enabling the theft of its own IP. It also ensures that Qualcomm will be able to realize a return on its massive and risky investments in R&D, and that non-paying unlicensed OEMs do not gain an unfair advantage over licensed OEMs who pay royalties. Qualcomm's ability and incentive to continue to invest in R&D depends directly on its ability to receive adequate compensation. As another example, device-level licensing avoids the need for SEP-holders to engage in duplicative and costly licensing at multiple levels of the production chain. Qualcomm's patents are practiced throughout a handset, not just on the chip, and many chip-level patents are also implemented in software that does not reside on the chip. Licensing at the device level eliminates the substantial costs of determining where each patent in Qualcomm's portfolio is practiced and which licensee owes the royalty, and component manufacturers are able to use Qualcomm's technology royalty-free.[13]

*Apple and the CMs Suffered No Antitrust Injury.* Apple and the CMs will be unable to show that they suffered antitrust injury. Qualcomm's royalty rates are reasonable, so Apple and the CMs will be unable to show that they suffered "royalty overcharges" from any unlawful conduct. Even if Qualcomm's rates were found to be above a "FRAND" level, Apple and the CMs will present no credible evidence of the amount of the alleged "tax" portion of Qualcomm's royalties, and so will be unable to show that it was enough to affect competition and, therefore, for Apple or the CMs to suffer harm resulting from alleged harm to the competitive process. Apple and the CMs will also present no evidence that they in fact paid more for Qualcomm's chips because of Qualcomm's allegedly anticompetitive conduct. Moreover, the CMs will not "segregate the [alleged] losses, if any, caused by acts which were not antitrust violations

---

[13] Qualcomm does not have an antitrust duty to deal with rival modem chipmakers; such duties are narrowly circumscribed, and do not arise where, as here, any refusal to deal was based on legitimate business reasons and not solely on anticompetitive intent. *See, e.g., Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004); *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1131-33 (9th Cir. 2004).

from those that were", and will therefore fail to make a showing entitling them to antitrust damages. *City of Vernon*, 955 F.2d at 1372.

*Apple's Agreements with Qualcomm Are Not Unlawful or Anticompetitive.*

Apple's agreements with Qualcomm were not anticompetitive and do not otherwise support Apple's and the CMs' antitrust claims. These agreements were the result of extensive, arm's-length negotiations, and there is no credible evidence that Apple was coerced into entering into them. None of the agreements required that Apple use Qualcomm as its exclusive chip supplier. Apple demonstrated this when it began to dual-source chips for its iPhones in 2016, during the term of the ATA. Apple █████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████. Apple and the CMs will not show that the agreements foreclosed a "substantial share" of the relevant markets, *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp.*, 592 F.3d 991, 996 (9th Cir. 2010), which "has been quantified as foreclosure of 40% to 50%", *Feitelson v. Google, Inc.*, 80 F. Supp. 3d 1019, 1030 (N.D. Cal. 2015). The agreements served legitimate business purposes, including mitigating Qualcomm's risk in supplying Apple; Qualcomm expended substantial dedicated engineering and other resources in order to maintain Apple's business, while Apple refused to commit to purchase a certain volume of Qualcomm's chips. Apple also received substantial value under the agreements, including supply of customized chips and pricing guarantees.

## C. Apple's and the CMs' Exhaustion Theories Fail.

Qualcomm, under the SULAs, does not charge royalties for exhausted patents. The CMs signed their SULAs before any chip sales occurred, and therefore before any patent rights were even arguably exhausted. As Qualcomm previously explained in its summary judgment briefing, patent exhaustion is an affirmative defense to a patent infringement claim; the principle of exhaustion is that after the sale of an article, the patent holder can no longer sue for patent infringement as to the article for any patents substantially embodied in it. *Impression Prods., Inc. v. Lexmark Int'l, Inc.*, 137 S. Ct.

1523, 1531-32 (2017).  Exhaustion does *not* limit a patentee's *contract* rights.  *Id.* at

1533, 1535.  (*See* ECF 629 at 7-14.)  Qualcomm's licenses ensure that prior to the sale of

any chipsets to a customer, Qualcomm has entered into a *contractual* royalty-payment

arrangement with the customer.  This Court has held that Qualcomm's patent rights are

not dispositive of its contract rights (*see* ECF 737 at 10-11), so regardless of chip sales

made after the licenses were agreed to, the CMs' SULAs continue to govern their

payment obligations.  The SULAs provide that ████████████████████████████████

████████████████████████████████████████████████████████████.  Thus

the CMs knew when they entered into the SULAs that they would pay the same royalty

even if some of the licensed patents were practiced by chips purchased from Qualcomm.

Rather than charging for its chips and IP in a single transaction, Qualcomm simply

divides those two exchanges into separate transactions: chip sales and IP licenses.  Both

are contractual, and both are consistent with applicable law.[14]

## III.  Qualcomm Discharged Its FRAND Commitment as to Apple.

Qualcomm seeks a declaratory judgment that (1) it discharged its FRAND

commitment as to Apple by making a complete written offer to Apple for a license to its

cellular SEPs on FRAND terms in 2016, and (2) Apple is an unwilling licensee.[15]  (*See*

ECF 1042.)  Apple and Qualcomm engaged in direct licensing negotiations in 2016, the

latest of several rounds of such negotiations the parties have had beginning in 2005.  In

each instance, Apple chose to continue operating under the CMs' SULAs rather than take

a direct license from Qualcomm.  In the 2016 negotiations, Qualcomm offered Apple a

license to its SEPs on FRAND terms, and it has revised that offer—even after Apple

---

[14] For the same reasons, Apple's claim that § 4.4 of the 2015 STA Assignment
Agreement is unenforceable also fails.  *See* Count LX, Apple Claims. (PTO 18-20.)  In
addition, § 4.4 is an indemnity:  Qualcomm agreed to provide a chip supply commitment
to Apple even if the CMs violated their SULAs.  In return, Apple agreed to indemnify
Qualcomm if a legal decision reduced the royalties the CMs owed under the SULAs.
Indemnities are typically enforced in California and are not held to violate public policy
unless they conflict with express statutory language or involve public safety.  *See, e.g.*,
*Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc.*, 89 Cal. App. 4th
1042, 1057 (2001); *Rooz v. Kimmel*, 55 Cal. App. 4th 573, 588 (1997); *Fernandez v. K-M
Indus. Holding Co.*, 646 F. Supp. 2d 1150, 1155 (N.D. Cal. 2009).

[15] Count IV, QC Countercls. (PTO 45-48.)

brought this litigation—in an effort to reach an agreement. Apple, on the other hand, behaved unreasonably during the parties' negotiations in 2016, demonstrating that it never intended to negotiate in good faith toward an agreement. For example, Apple demanded extremely detailed information about *each* of Qualcomm's thousands of SEPs, with full knowledge that negotiating at that level of specificity would be impossible (and that it would therefore be dramatically inconsistent with industry licensing negotiation practice). Apple ultimately made an offer for Qualcomm's cellular SEPs that was so low that it will suggest bad faith to the jury. And then, Apple instituted a royalty embargo by interfering with the CMs' performance of their SULAs. Under these circumstances, Qualcomm's FRAND commitment to Apple has been discharged.[16]

## IV. Additional Claims.

### A. Apple and the CMs Are Liable for Underpaid Royalties Prior to 2017.

For many years, the CMs have understated the true price at which the CMs sold the devices they assembled to Apple. Because the SULAs provide that royalties are calculated based on those prices,[17] the CMs have for years underreported and—before they stopped paying altogether in 2017—underpaid royalties owed to Qualcomm for sales to Apple. Apple and the CMs are liable for these royalties, which amount to hundreds of millions of dollars, as well as the late fees prescribed by the SULAs.

Apple also interfered with the CMs' obligations under their SULAs to allow Qualcomm to audit the CMs' royalty reporting. Qualcomm has been unable to confirm whether the CMs complied with their SULAs in reporting and paying royalties on their sales of Apple devices because the CMs have withheld basic information required by auditors. The CMs withheld that information at Apple's instruction, notwithstanding that the audits are subject to a non-disclosure agreement and that the CMs provide the same

---

[16] *See* ECF 1042 at 13 ("If Apple is found to have forfeited its rights to a FRAND license, then Qualcomm is not obligated to offer Apple a FRAND license to its SEPs."); ECF 141, at 19 n.7 ("[I]f Apple wishes to enforce Qualcomm's commitment to ETSI it must demonstrate that it was a willing licensee and, therefore, a proper third-party beneficiary.").

[17] *See supra* n.4.

information as it relates to sales to other customers.

**B.    Apple Breached the 2013 SOW Agreement with Qualcomm.**

In early 2013, Apple and Qualcomm entered into a Statement of Work for Qualcomm Chipsets ("2013 SOW"), which concerned particular chips Qualcomm sold to Apple.  Apple promised to pay Qualcomm a set amount, called an "Adder", for Apple products that included Qualcomm's MDM9625 chipset (which was included in certain iPhone and iPad models launched in 2014 and 2015) and met any one of four enumerated criteria relating to carrier aggregation technology ("Criteria").[18]  Apple breached the 2013 SOW by withholding hundreds of millions of dollars in Adder payments it owes to Qualcomm under the agreement.[19]  *First*, the "marketing" Criterion states that the marketing of devices as being capable of carrier aggregation triggers Adder payments for those devices, and Apple's own marketing executives repeatedly touted the carrier aggregation capabilities of its iPhones and iPads with MDM9625 at product launch events.  *Second*, Apple owes Qualcomm Adder payments for devices first activated on networks enabled to support carrier aggregation technology.  ███████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████.

# CONCLUSION

The evidence will show that the CMs breached enforceable SULAs at Apple's instigation, causing billions of dollars in damages to Qualcomm.  Apple and the CMs will be unable to prove their claims that the SULAs are inconsistent with Qualcomm's FRAND commitments and competition law or are otherwise unenforceable, and Qualcomm will prevail on its additional claims for damages and for declaratory relief.

---

[18] These Criteria are enumerated in § 4.2(A)-(D) of the 2013 SOW.
[19] Count V, QC Countercls. (PTO 48-50.)

Dated:  March 24, 2019

Respectfully submitted,


By   /s/ *Evan R. Chesler*
    Evan R. Chesler


**CRAVATH, SWAINE & MOORE LLP**
Evan R. Chesler (*pro hac vice*)
(N.Y. Bar No. 1475722)
echesler@cravath.com
Keith R. Hummel (*pro hac vice*)
(N.Y. Bar No. 2430668)
khummel@cravath.com
Richard J. Stark (*pro hac vice*)
(N.Y. Bar No. 2472603)
rstark@cravath.com
Antony L. Ryan (*pro hac vice*)
(N.Y. Bar No. 2784817)
aryan@cravath.com
Gary A. Bornstein (*pro hac vice*)
(N.Y. Bar No. 2916815)
gbornstein@cravath.com
J. Wesley Earnhardt (*pro hac vice*)
(N.Y. Bar No. 4331609)
wearnhardt@cravath.com
Yonatan Even (*pro hac vice*)
(N.Y. Bar No. 4339651)
yeven@cravath.com
Vanessa A. Lavely (*pro hac vice*)
(N.Y. Bar No. 4867412)
vlavely@cravath.com
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
David A. Nelson (*pro hac vice*)
(Ill. Bar No. 6209623)
davenelson@quinnemanuel.com
Stephen Swedlow (*pro hac vice*)
(Ill. Bar No. 6234550)
stephenswedlow@quinnemanuel.com
500 West Madison St., Suite 2450
Chicago, Illinois 60661
Telephone: (312) 705-7400
Facsimile: (312) 705-7401

Alexander Rudis (*pro hac vice*)
(N.Y. Bar No. 4232591)
alexanderrudis@quinnemanuel.com
51 Madison Ave., 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Sean S. Pak (SBN 219032)
seanpak@quinnemanuel.com
50 California St., 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

**JONES DAY**
Karen P. Hewitt (SBN 145309)
kphewitt@jonesday.com
Randall E. Kay (SBN 149369)
rekay@jonesday.com
4655 Executive Drive, Suite 1500
San Diego, California 92121
Telephone: (858) 314-1200
Facsimile: (858) 345-3178

*Attorneys for Defendant and Counterclaim-Plaintiff*
**QUALCOMM INCORPORATED**