1                    UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3                                    .
    IN RE:                           . Docket
4   QUALCOMM LITIGATION              . No. 17cv0108-GPC-MDD
                                     .
5                                    .
                                     . April 15, 2019
6                                    . 9:00 a.m.
    . . . . . . . . . . . . . . . . . San Diego, California
7
                 TRANSCRIPT OF JURY TRIAL, VOLUME 1
8             BEFORE THE HONORABLE GONZALO P. CURIEL,
              UNITED STATES DISTRICT JUDGE, AND A JURY
9
                     A-P-P-E-A-R-A-N-C-E-S
10

11  For Apple Inc.:        Fish & Richardson
                           12390 El Camino Real
12                         San Diego, California 92130
                           By:  JUANITA R. BROOKS, ESQ.
13                              LAUREN A. DEGNAN, ESQ.
                                BENJAMIN C. ELACQUA, ESQ.
14                              RUFFIN B. CORDELL, ESQ.
                           – and –
15                         Boies Schiller Flexner LLP
                           1401 New York Avenue NW
16                         Washington, DC 20005
                           By:  KAREN L. DUNN, ESQ.
17                              WILLIAM A. ISAACSON, ESQ.
                                MELISSA B. FELDER ZAPPALA, ESQ.
18                              STEVEN HOLTZMAN, ESQ.

19

20  For Compal Electronics Inc., FIH Mobile Ltd., Hon Hai Precision
    Industry Co., Ltd., Pegatron Corporation, and Wistron
21  Corporation:           Gibson, Dunn & Crutcher, LLP
                           333 South Grand Avenue
22                         Los Angeles, California 90071
                           By:  JASON C. LO, ESQ.
23                              RICHARD J. DOREN, ESQ.

24

25  ///

```
1                    A-P-P-E-A-R-A-N-C-E-S (CONTINUED)

2    For Qualcomm Incorporated:
                              Jones Day
3                             4655 Executive Drive, Suite 1500
                              San Diego, California 92121
4                             By:  KAREN P. HEWITT, ESQ.
                              - and -
5                             Cravath, Swaine & Moore LLP
                              Worldwide Plaza, 825 Eighth Avenue
6                             New York, New York 10019
                              By:  EVAN CHESLER, ESQ.
7                                  VANESSA A. LAVELY, ESQ.
                                   NATHAN E. DENNING, ESQ.
8                                  RICHARD J. STARK, ESQ.
                                   J. WESLEY EARNHARDT, ESQ.
9                                  ANTHONY L. RYAN, ESQ.
                              - and -
10                            Quinn Emanuel
                              865 South Figueroa Street, 10th Floor
11                            Los Angeles, California 90071
                              By:  STEPHEN A. SWEDLOW, ESQ.
12

13

14

15

16

17

18

19

20

21

22   Court Reporter:         Chari L. Bowery, RPR, CRR
                             USDC Clerk's Office
23                           333 West Broadway, Suite 420
                             San Diego, California 92101
24                           chari_bowery@casd.uscourts.gov

25   Reported by Stenotype, Transcribed by Computer
```

1          SAN DIEGO, CALIFORNIA; APRIL 15, 2019; 9:00 A.M.

2                              -o0o-

3          (The following proceedings were held in open court out of

4     the presence of the jury:)

5               THE COURT:  Good morning.

6               ALL:  Good morning, Your Honor.

7               THE CLERK:  Calling Item Number 1 on the calendar,

8     Case Number 17-cv-108, Apple Inc. v. Qualcomm Inc. on for jury

9     trial, day one.

10              THE COURT:  Appearances, please.

11              MS. BROOKS:  Good morning, Your Honor.  Sitting at

12    counsel table on behalf of Apple is Karen Dunn, Noreen Krall,

13    Ruffin Cordell, and Bill Isaacson.

14              MR. DOREN:  Good morning, Your Honor.  On behalf of

15    the contract manufacturers, Richard Doren and Jason Lo.

16              THE COURT:  Good morning.

17              MS. HEWITT:  Good morning, Your Honor.  On behalf of

18    Qualcomm, Karen Hewitt from Jones Day.  At counsel table, Evan

19    Chesler, Anthony Ryan, Wes Earnhardt, Vanessa Lavely, Steve

20    Swedlow; and, on behalf of the company, John Scott.

21              THE COURT:  Good morning.  We are ready to send over

22    our jury in a couple of moments; but, before we do that,

23    there's a couple of housekeeping matters I'd like to address.

24         First of all, with respect to the *Daubert* motions that

25    were filed, the Court had issued a tentative as to those

1    motions.  We will issue our final with respect to those this

2    evening as well as Qualcomm's motion in limine Number 3.

3         There had been previously made a request to impanel an

4    advisory jury under Rule 39(c)(1).  The Court had previously

5    denied that request.  Upon further review, the Court is

6    prepared to make a slight modification with respect to that.

7         At the last court hearing, the Court observed that, first

8    and foremost, this case presents antitrust and anticompetitive

9    conduct claims.  Apple and the CMs have Sherman Act Section 2

10   claims.  Apple's Section 2 claims are in equity, and the CMs

11   are at law.

12        Given the overlap of elements 1 through 3 of Apple's

13   Section 2 claim with that of the CMs' claim, the Court is

14   prepared to impanel our jury panel on the legal claims for also

15   the dual purpose of providing an advisory opinion solely on the

16   Sherman Act Section 2 claim.

17        The Court finds that the jury would not need to perform

18   any further or additional analysis as to the Section 2 claim.

19   Impaneling the panel will avoid issues or problems if the jury

20   finds in favor of Qualcomm on the Sherman Act claims and then

21   Qualcomm seeks to have that decision held against Apple.

22        Finally, it will help avoid confusion or speculation as to

23   why Apple is involved in litigating the Sherman Act claims

24   where it otherwise has no legal claims under Section 2 of the

25   Sherman Act.  The Court does not at this time intend to impanel

1    the jury to provide an advisory opinion on Qualcomm's request

2    for a declaration that the SULAs do not violate the Sherman Act

3    and Apple's antitrust illegality defense, nor is the Court

4    prepared to use the jury on the question of whether the SULAs

5    have a legal purpose.

6          Accordingly, the statement of the claims and defenses, a

7    preliminary instruction that we give, will identify the Sherman

8    Act Section 2 claim as being one that the jury will decide even

9    as it relates to Apple.

10         We will select a nine-person jury for this case.  And

11   whereas in a civil case the parties are entitled to three

12   peremptories, I am prepared to give each side five peremptory

13   challenges.  We will be bringing over a group of -- I believe

14   it's 45?

15               THE CLERK:  35.

16               THE COURT:  -- 35 jurors who have been time-screened.

17   In the event that we lose, by way of excused for cause, a

18   sufficient number so that the parties would not be able to

19   exercise their five peremptory challenges, then we'll bring

20   over additional jurors who are otherwise available who have

21   been time-screened.

22         The Court did send out 100-and-some or maybe even 200

23   questionnaires to prospective jurors, and they responded.  A

24   number were not available for a trial the length of ours, so

25   they were excused.

1        The Court also excused jurors who expressed opinions about

2   the parties which were in favor or against one side or the

3   other.   The Court did this to reduce the consumption of time

4   and avoid beginning with jurors who would, as a starting point,

5   require rehabilitation and would require precious time to make

6   further inquiry about their impartiality.

7        I understand the questionnaire responses for our

8   prospective jurors have been provided to counsel.   At this

9   time, let me inquire whether there are any issues that exist

10  with respect to these jurors that we should take up at this

11  time before the jurors are sent over.

12        MS. BROOKS:   Your Honor, there were a few jurors --

13  there were a few jurors that said they had read or heard

14  something about the case.   They were a little bit vague.

15  Rather than have them potentially contaminate the rest of the

16  venire, for those jurors, if they make it in the 35, we would

17  ask the Court to take them sidebar to inquire further about

18  exactly what they had read or heard.

19        THE COURT:   All right.   Does Qualcomm agree with

20  that?

21        MR. CHESLER:   Yes, Your Honor, we do.

22     I have two other matters.

23        THE COURT:   Yes.

24        MR. CHESLER:   One of the jurors apparently owns about

25  $100,000 worth of Apple stock.

```
 1              THE COURT:  And they made it through the --

 2              MR. CHESLER:  Apparently, yes.

 3              THE COURT:  Which juror is that?

 4              MR. CHESLER:  Number 25 in the list that we received

 5   this morning, Your Honor.  The juror says "owns about 500

 6   shares of Apple stock selling for about $200 a share."

 7              THE COURT:  Well, I'll be prepared to excuse that

 8   juror.  I don't think it is worthwhile to take our time to try

 9   to determine whether or not they could be fair given that

10   stake.

11              MR. CHESLER:  Thank you, Your Honor.  Appreciate

12   that.

13          One other thing?

14              THE COURT:  Yes.

15              MR. CHESLER:  Your Honor made the comment about

16   excluding people who have opinions about the parties or strong

17   opinions about the parties.  There was one juror, Number 14,

18   who said she, quote, loves Apple.  Obviously, a lot of people

19   use Apple products, and that is not an issue.  But this one

20   juror's comment stood out on that issue.

21          The answer to Question 17, Your Honor, for that juror.

22              MS. BROOKS:  Your Honor, I apologize.  I'm not sure

23   we have the same list.  I'm not tracking the numbers.

24              MR. CHESLER:  We received a list from the Court this

25   morning of the first 35 jurors.
```

1           THE COURT:  You just got it, Ms. Brooks?

2           MS. BROOKS:  Apparently, my co-counsel --

3           THE CLERK:  There should be one on each table.  So

4    yours might be under your binder at the very bottom maybe.

5           THE COURT:  It's hiding.

6           THE CLERK:  But I did place one on each table.

7       I'll print another one.

8           THE COURT:  It says "love Apple Inc. and their

9    products."

10      At this point, we have enough jurors.  I'm prepared to

11   excuse that juror.  I don't think we need to go into this

12   rehabilitation.  "Okay.  You may love them, but can you be

13   fair?"  I don't think we need to start with that.

14          MR. CHESLER:  Thank you, Your Honor.

15          THE COURT:  We will have those two jurors excused.  I

16   will ask my clerk to have substitutes put in their place, and

17   I'm not sure how long that will take.

18      Do you have any idea?

19          THE CLERK:  I can send a message now.

20          THE COURT:  So we'll send a message to have those two

21   replaced.

22      I'm not sure if we talked about attorney voir dire.  I am

23   prepared to provide it.  And did we speak in terms of how long

24   each side would get?

25          MR. CHESLER:  We didn't, Your Honor.  I think you

1    said something like "briefly" or some verbiage.

2             THE COURT:  What is your request?

3             MS. BROOKS:  Your Honor, we would request at least 30

4    minutes.  It's 35 people.  And that would be just for Apple.

5    The contract manufacturers have sort of a different juror

6    profile they're concerned about.

7             THE COURT:  Okay.

8             MR. DOREN:  Agreed, Your Honor.

9             THE COURT:  So would you be looking then each, then,

10   30 minutes?

11            MR. CHESLER:  Well, Your Honor, apparently, if they

12   have different juror profiles, I would like something close to

13   what the other side has.  We've been trying to -- in terms of

14   strikes and all other issues, we've been symmetrical here.

15            THE COURT:  We have been.

16            MR. CHESLER:  I don't know that I'd need an hour,

17   Your Honor.  That seems like an awfully long time.  But I would

18   like to have something approximating what both counsel use.

19            THE COURT:  All right.  I'll give the CMs and Apple

20   30 minutes, and then I'll give you 45 minutes.

21            MR. CHESLER:  Thank you, Your Honor.  Appreciate

22   that.

23            MR. DOREN:  And, Your Honor, may I raise two other

24   issues?

25            THE COURT:  Sure.

1          MR. DOREN:  First of all, in terms of the jurors,

2     Mr. Eric Lee -- what number is Mr. Lee? -- who is Number 13 on

3     Your Honor's list, in his questionnaire, response Number 17,

4     they ask, "Do you have any strong opinions about Apple Inc.?"

5          And he said, "Apple makes products in China instead of the

6     U.S. to avoid taxes."  And I would say that's a little bit more

7     specific than loving a particular brand.  And we would ask,

8     Your Honor, that this juror be excused as well.

9          THE COURT:  All right.  The question was "Do you have

10    any strong opinions about Apple Inc.?"  And the juror said

11    "Yes," and then an explanation that said "Apple makes products

12    in China instead of the U.S. to avoid taxes."

13         I think that reflects some sort of -- if not bias, a

14    strong opinion about Apple that we don't need to confront as a

15    starting point.  So I will also excuse Juror Number 13.

16         MR. DOREN:  Yes, Your Honor.

17         THE COURT:  Yes.

18         MR. DOREN:  Thank you.

19         And then, Your Honor, the other issue is, on the strikes,

20    as Your Honor knows, each party is entitled to three.  We're

21    not suggesting that we get one or three for each of our four

22    clients, but --

23         THE COURT:  Actually, I was looking in terms of five

24    and five.

25         MR. DOREN:  Understood, Your Honor.  And that's what

1    I wanted to address.

2           THE COURT:  Yes.

3           MR. DOREN:  I think, Your Honor, that puts the CMs

4    potentially at the disadvantage of one, because even if you

5    gave the CMs as a group the three to any one party, that would

6    at least get us to six between Apple and the CMs as a group.

7        And we do, in fact, Your Honor, have different issues and

8    different concerns about jurors.  And we do feel we are

9    entitled -- again, as a group -- to be able to have at least

10   three strikes of our own.

11          THE COURT:  All right.  So I will give, then, Apple

12   three, CMs three, and Qualcomm five.

13          MR. DOREN:  Thank you, Your Honor.

14          MR. CHESLER:  Your Honor, I would ask, if they're

15   going to be able to strike six, that we have an equal number.

16   I don't want to go into all the detail of why, although they

17   may have preferences for different jurors, they are aligned.

18   We've talked about that in prior conferences at some length.

19   And it is certainly the case that if the jurors are thinking on

20   the basis of the evidence --

21          THE COURT:  All right.  Let me do this:  Given that,

22   at this point with respect to Apple -- well, we still have the

23   BCPA claims from Apple and those are legal claims?

24          MS. DUNN:  Yes, Your Honor.

25          MR. CORDELL:  Yes.

```
1              THE COURT:  All right.  I'll give you six.

2         So then we have excused Juror Number 13, Juror Number 25,

3    and then the other one is 14.

4         Any other preliminary matters before we have the jury sent

5    over?

6              MR. CHESLER:  Are we going to -- I just want to be

7    sure we have the process.  Are we going to get substitute names

8    before the jury comes in for the several that you've excused?

9              THE COURT:  Yes.  Yes.

10        Anything else?

11        (Pause.)

12             THE COURT:  Just so you know logistically what will

13   happen is that the three jurors that are being excused will not

14   be in fact replaced in the seat that they were in; they will be

15   added.  So in your sheet, they will be added as 36, 37, and 38.

16   All right?

17        So, with that, we will have the jury sent over, and we

18   will be ready to begin with the jury selection process at that

19   time.

20             MR. CHESLER:  I'm sorry, Your Honor, just to make

21   sure I've got it.  So the juror who was previously 15 will now

22   become 13.  Is that --

23             THE COURT:  No, no, no.  So we excused 13, 14, and

24   25.  Those now are blank.  You can wipe them out.

25             MR. CHESLER:  Thank you, Your Honor.
```

1          THE COURT:  And the three new ones will be placed in

2     the empty boxes 36, 37, and 38.

3          MR. CHESLER:  Got it.  Thank you very much.

4        (Recess taken from 9:18 a.m. to 9:30 a.m.)

5          THE COURT:  Ms. Brooks, I understand there's a juror

6     that we may have an issue with.

7          MS. BROOKS:  Yes, Your Honor.  I apologize.  There

8     were so many questionnaires, I just missed this one.  If I

9     could have one moment, I can give you the number of this juror.

10       Number 21.

11        It turns out, Your Honor, that this juror has very strong

12    opinions about Apple, all of them negative, and also strong

13    opinions about Qualcomm, "Yes.  Large company and very

14    innovative."

15         THE COURT:  I see why we could have missed this.

16    This person's penmanship isn't very good.

17         MS. BROOKS:  That's unfortunately what my problem

18    was, but the Apple is something about "pushing apps, don't want

19    or, whereas Qualcomm" -- at least my handwriting expert tells

20    me it says "large company and very innovative."

21         THE COURT:  Read to me what you think it says,

22    Number 17.  Is that what you're --

23         MS. BROOKS:  Yes.  Question 18 about Qualcomm, "Do

24    you have any strong opinions about Qualcomm Inc.?"

25        "Yes."  It's either "large" or "loud company, and very

1    innovative," whereas Question 17 about Apple --

2              THE COURT:  "Pretty large and successful."

3              MS. BROOKS:  "Pretty large, successful, Apple phone

4    for the last 20 years, sometimes pushed apps, et cetera, I

5    don't want or need."

6              MR. CHESLER:  Your Honor, may I?

7              THE COURT:  Sure.  Why not?

8              MR. CHESLER:  I don't think I own a single product

9    that I haven't at some point thought did something I wasn't

10   thrilled about.  That doesn't seem to me to rise to the level

11   of the jurors we have discussed before.

12             THE COURT:  All right.  Well, I let -- I excused two

13   of these prospective jurors at the suggestion of Qualcomm; I'll

14   excuse this juror as well.  It's close.  Hopefully, you don't

15   have anyone else.

16             MR. DOREN:  I do have one more, Your Honor.

17             THE COURT:  Which one is it?

18             MR. DOREN:  May I speak from here?

19             THE COURT:  Yes.

20             MR. DOREN:  It is the new juror, Number 36,

21   Mr. Shoepke.  He answered Number 17 regarding Apple, "I think

22   they make great products.  That being said, I don't agree with

23   the way they outsource labor and don't give to charity.  Cables

24   break fast."

25        Number 19, regarding strong opinions about the various

```
 1   contract manufacturers, he says, "Foxconn fell through with
 2   workers in Wisconsin, tons of jobs promised, and nothing."
 3            THE COURT:  He will be excused.
 4            MR. DOREN:  Thank you, Your Honor.
 5            THE COURT:  All right.  So we'll replace 36.  And
 6   what was the --
 7            MR. CHESLER:  21.
 8            THE CLERK:  21.
 9            MS. BROOKS:  21, Your Honor.
10            THE COURT:  And I'll, at this point, entertain only
11   requests with respect to new prospective jurors.
12        During the jury voir dire, at the point in time where we
13   will identify the attorneys for the jury to determine whether
14   or not they know the attorneys, I'll turn it over to counsel,
15   and then you can identify.  Because I believe there may be an
16   attorney or two that may not be present with your counsel table
17   that may be appearing and participating; is that correct?
18            MR. CORDELL:  That's right, Your Honor.
19            THE COURT:  All right.  So I'll turn to you all to
20   identify the attorneys in this case at that time.
21        And then, with respect to witnesses, is -- the witness
22   list that was provided most recently with the trial brief, is
23   that current?  Is that up to date?  Do I need to identify all
24   100 or so possible witnesses?
25            MR. CORDELL:  It's largely up to date, Your Honor;
```

```
 1   however, there are many of those that are may-calls.  So I

 2   acknowledge that it presents a problem.

 3          THE COURT:  We'll just -- I just wanted to know if

 4   that had been further --

 5          MR. EARNHARDT:  There are a couple that moved from a

 6   may-call to a will-call.

 7          THE COURT:  That doesn't help reduce it.  I'll just

 8   go through the 100.

 9      We'll start up as soon as we get our additional jurors

10   identified and you have had a chance to review their

11   questionnaires, and then we can proceed.

12      (Recess taken from 9:37 a.m. 10:20 a.m.)

13      (Oath administered by the clerk.)

14      (The following proceedings were held in open court in the

15   presence of the jury:)

16          THE COURT:  Good morning.

17          ALL:  Good morning.

18          THE COURT:  Oh, you can do better than that.  Good

19   morning.

20          ALL:  Good morning.

21          THE COURT:  Thank you for being here.  My name is

22   Gonzalo Curiel, and I want to thank you for coming out to

23   participate in the jury selection process.  We understand that

24   we are taking you away from your day-to-day responsibilities

25   and obligations.
```

1    But we have a trial here.  And it is in the case of In Re:

2  Qualcomm Litigation, which is made up of two separate cases;

3  that is, Apple Inc. v. Qualcomm Inc., and Qualcomm Inc. v.

4  Compal Electronics Inc., Foxconn Mobile Ltd., Pegatron

5  Corporation, and Wistron Corporation.  And you've been selected

6  as possible jurors to hear this case.

7    As a starting point, I recognize that what we are asking

8  you to do, which is to participate in a four- to five-week

9  trial, is a big ask and -- especially since jury duty isn't

10  held in the highest of esteem by most people.

11    In fact, that low esteem saw its way into a commercial

12  that played during the Super Bowl.  You may have seen it.  It

13  was kind of the escalator to hell.  And it begins with a

14  couple, and they're getting ready to go car shopping.  And they

15  take the elevator.  And the elevator operator says, "Where are

16  you going?"

17    He says, "Car shopping."

18    He says, "Oh, you're going way down."

19    So as they're proceeding down this tortuous path to lower

20  and lower and more difficult and ugly experiences, they pass

21  root canals, and then they get to jury duty.

22    And so, in your case, not only do you have jury duty, but

23  you have it on tax day, so April 15.  So it's like a double

24  whammy.

25    So we appreciate you being here and recognize that, when

```
 1    people express these negative views of jury duty, they -- if
 2    not miss the point, they fail to recognize how profound it is
 3    that we even have jury service.  This is the exception; it is
 4    not the rule around the world.
 5        And when you think about what you bring to this process --
 6    that is, that you are the judges of the facts and you are
 7    participating in something very consequential -- and you look
 8    at the other branches of government and realize that this
 9    happens only here in the judicial branch.
10        You certainly vote for your legislator.  They go and enact
11    laws.  But you don't get to be a legislator for the day.  You
12    elect your mayor, your governor, your president.  You don't get
13    to sit in the governor's office and make decisions.
14        But here in the judicial branch, people from the community
15    are actually called upon to make challenging, consequential
16    determinations, determinations with respect to the credibility
17    of witnesses, determining what the facts are, and applying the
18    facts to the law.
19        So, hopefully, we can begin with an understanding that,
20    while what you are being called to do is service and it does
21    take you away from your everyday affairs, that it is so
22    meaningful and it is so consequential.
23        Now, our legal system depends upon an impartial jury to
24    decide cases that are brought to trial.  And what we are here
25    to do is to find fair jurors; that is, a juror who can judge
```

```
 1   without bias and is fair and objective, a juror who is willing

 2   to decide the case based on the evidence and the applicable

 3   law.

 4       A fair and impartial juror must be able to disregard and

 5   set aside all prejudices, sympathy, ideas, and notions or

 6   beliefs about the law, the type of case they are asked to try,

 7   and the parties.

 8       And you notice that I said "has to set aside."  Because we

 9   are not looking for people that don't have opinions, that don't

10   have beliefs, and perhaps even some form of a bias.  But what

11   we need to know is, at this time, do you have such a bias that

12   is so strong that you will be unable to set it aside, that you

13   are not in a position to identify its parameters and to set it

14   aside and judge this case based on the facts and the law as I

15   give it to you.

16       So the purpose of this voir dire process is to determine

17   whether or not any prospective juror should be excused for

18   cause and to enable the attorneys for the parties to develop

19   sufficient information so that they can meaningfully exercise

20   what is called peremptory challenges.

21       Those are challenges that the law affords each side and

22   for which there does not have to be cause and, in that way,

23   provides a confidence in the ultimate determination and a

24   confidence in the fact finders that will be presiding over this

25   case or will be deciding the issues in this case.
```

1    So to expedite this jury selection process, we previously

2  had sent out questionnaires, and you all have provided

3  responses.  And, at this time, as I understand it, you have

4  been time-screened.  And I will get to that in a minute.

5    But those responses have been provided to counsel in this

6  case.  They've had an opportunity to review your responses and

7  now are in a position to follow up with questions that they

8  will pose after I am done posing questions to all of you at one

9  time.

10    We are doing something in this case that we normally don't

11  do; that is, we are identifying each of you by number versus by

12  name.  And, normally, when people are identified by number,

13  they kind of go, "That's impersonal.  Is that all I am, a

14  number?"

15    But, in this case, we are doing it to provide you with an

16  additional measure of privacy so that people are not able to

17  identify your role on this jury or your participation on this

18  panel and then, somehow or another, reach out and let you know

19  how they see the case or let you know what they believe about

20  your responses.  So that's why we are doing that, not because

21  we don't recognize each one of you as an individual and unique

22  person who deserves respect.

23    Now, the questions that we will be asking are not intended

24  to embarrass you, and I don't believe that there will be many

25  questions that may call for a response that would be

1    embarrassing.

2         But, having said that, if there is any question that I ask

3    which, in your view, would raise something that you believe is

4    private or embarrassing and you want to provide your answer in

5    a form that's not public, let me know.  We will call you to the

6    side and have, hopefully, a limited number of attorneys and not

7    all of the attorneys, but we will have some of the attorneys at

8    sidebar and -- so that you can provide that information to us

9    in private.

10        In the trial of this case, the parties are entitled to

11   have a fair, unbiased, and unprejudiced jury.  If there is any

12   reason why any of you might be biased or prejudiced in any way,

13   you must disclose such reason when you are asked to do so.  And

14   it is your duty to make this disclosure.

15        Now, going back to the length of the trial, we did send

16   out questionnaires asking to see if you would be available to

17   serve on a trial of significant length.  The trial will take

18   around 15 days to complete.  It may take longer.  I am planning

19   it so that it won't, but the 15 days will include today, jury

20   selection; opening statements that will be provided or given

21   tomorrow; the introduction of testimony and evidence; closing

22   arguments; and jury instruction.

23        It does not include jury deliberations.  The jury will be

24   in charge of how long jury deliberations last.

25        Our trial schedule will be April 15 through the 18th,

1   which is Monday through Thursday.  And then, thereafter, it

2   will be Monday through Wednesday.  So it will be April 22

3   through 24, April 29 through May 2, May 6 through 8, and

4   May 13.  And, hopefully, at that point, we'll be about done,

5   but up through perhaps the 15th.

6          Once deliberations begin, then there will be no

7   limitation.  So the jury can deliberate five days a week.  We

8   won't limit your deliberations to three days a week.

9          So let me now tell you a little bit about the case.  The

10  parties have agreed on the following statement of the case to

11  be read to you, and it describes the case as follows:  This

12  case involves Apple, Qualcomm, and a group of companies that I

13  will refer to as the contract manufacturers, or the CMs --

14  Pegatron, Compal, Wistron, and Foxconn -- which is made up of

15  Hon Hai and its subsidiary FIH.

16         Apple designs, manufactures, and markets mobile

17  communication and media devices including iPhones, iPads, and

18  personal computers as well as related software, accessories,

19  and content.  The CMs manufacture iPhones and/or iPads for

20  Apple, as well as cell phones, tablets, and other electronics,

21  electronic products for other companies.

22         Qualcomm develops technologies, obtains patents on those

23  technologies, and licenses its patents to companies that make

24  cellular devices such as cell phones and tablets.  Qualcomm

25  also has subsidiaries that design, market, and sell cellular

 1   baseband chipsets which are components of cellular phones,

 2   tablets, and watches.  The parties have very different views of

 3   what the evidence will show, which you will hear directly from

 4   them.

 5       Generally, Apple and the CMs have claims that Qualcomm

 6   violated the federal antitrust laws and California competition

 7   law and also breached certain contracts.  Qualcomm denies those

 8   claims.  Qualcomm has claims that Apple and the CMs breached

 9   certain contracts, including that the CMs breached the license

10   agreements with Qualcomm, and a claim that Apple caused the CMs

11   to breach those license agreements.  Apple and the CMs deny

12   those claims.

13       After you hear all the evidence, you will be asked to

14   decide a variety of issues related to these claims.

15       Has any juror heard of or have any knowledge of the facts

16   of events in this case?

17       We have one hand, and two hands, three hands.  Let me do

18   this:  Let me begin with the jurors in the box, and I will ask

19   you to raise your number so that I can identify you for the

20   record by your juror number.  And, sir, I expect you probably

21   will be Juror Number 5; is that right?

22       With respect to what you have read, seen, or heard in the

23   media or internet regarding this incident, are you

24   knowledgeable about the claims and this lawsuit?

25           PANELMEMBER:  Only through reading the newspaper.

```
 1              THE COURT:  With respect to what degree of knowledge

 2    you have developed, have you developed significant information

 3    about this action or just in passing of certain information

 4    that there exists this lawsuit?

 5              PANELMEMBER:  I have not formed any opinion

 6    whatsoever, just reading the newspaper about the case.

 7              THE COURT:  Do you have an estimate how many articles

 8    you've read?

 9              PANELMEMBER:  One.

10              THE COURT:  One.  And when was that?

11              PANELMEMBER:  I believe it was three days ago.

12              THE COURT:  All right.  And after you read the

13    article, you didn't develop an opinion one way or another?

14              PANELMEMBER:  No, I didn't form any opinion

15    whatsoever.

16              THE COURT:  The reason I ask that question is because

17    it is so critically important that this case is decided based

18    on the evidence that's introduced in this case -- and I said

19    "introduced," not offered -- but introduced in this case and as

20    applied with the law that I will give to you.  And so, to the

21    extent that you read something about this case, at this point,

22    you don't believe that it has in any way affected your view of

23    the respective positions of the parties?

24              PANELMEMBER:  I don't even think I could recall that

25    information.
```

```
 1              THE COURT:  All right.  Very good.

 2         Is there anyone else in the jury box?

 3         Sir, what number are you?

 4              PANELMEMBER:  Juror Number 8.

 5              THE COURT:  All right.  Juror Number 8, how many

 6    articles or stories have you read or seen about this case?

 7              PANELMEMBER:  One.

 8              THE COURT:  When was that?

 9              PANELMEMBER:  Probably about Saturday.  It was the

10    weekend edition of the Wall Street Journal.

11              THE COURT:  And with respect to the information that

12    you reviewed, did it lead to any opinions one way or another?

13              PANELMEMBER:  Not at all.

14              THE COURT:  And if at some point during these

15    proceedings it occurs to you or you remember something that was

16    written about this case, and you realize that, after reviewing

17    that, it may influence how you see this case, will you let me

18    know?

19              PANELMEMBER:  I will.

20              THE COURT:  Thank you, sir.

21         Anyone else in the jury box?  No other hands.

22              THE CLERK:  One more, judge.

23              THE COURT:  I am sorry.

24         Juror Number 1.  Yes, ma'am.

25              PANELMEMBER:  I didn't read the articles, but there
```

1   were two articles in the newspaper.  One, the first article

2   that I saw was after I got the packet of questions from you,

3   and I knew -- I had an idea of what the case is about, so I

4   didn't read it.  And then there was an article in yesterday's

5   paper that I didn't read.

6           THE COURT:  Excellent.  You did a great job.  And I

7   will ask you to model your behavior according to that of Juror

8   Number 1, and I guess you are Number 1 for a reason.  Because

9   that's what you need to do.  You need to avoid reading any

10  accounts regarding this case so that you can decide it based on

11  the evidence admitted in this case, not on articles that are

12  written by others.

13      Anyone else in the box?

14      Is there someone else in the jury box?

15      All right.  So then the next juror was, I think, in

16  the audience.

17      What number are you, sir?

18          PANELMEMBER:  17.

19          THE COURT:  17.  All right.  Tell me about your

20  experience.  Have you read something?  Have you seen a story?

21          PANELMEMBER:  It hasn't been reading articles.

22  Actually, where I work, I have a couple of friends at work that

23  have worked at Qualcomm, have worked at Apple, some other

24  friends that have transitioned from where I work to Qualcomm

25  and Apple.  And before I got the questionnaire, I figured out

1   what this court case was going to be about, we had talked about

2   the ongoing issues in the industry between these various

3   companies.

4           THE COURT:  All right.  Well, that's a lot to unpack.

5       So you have friends who have worked at Qualcomm and some

6   that are even going on to work at Qualcomm; is that right?

7           PANELMEMBER:  Yes.

8           THE COURT:  Now, these friends who work at Qualcomm

9   or are going on to work at Qualcomm, are they close friends of

10  yours?

11          PANELMEMBER:  Not really close friends, but they are

12  acquaintances at work that I have interacted with on pretty

13  much a daily basis.

14          THE COURT:  And do you still encounter them and

15  interact with them on a daily basis?

16          PANELMEMBER:  One in particular, he is actually in

17  the same group I am in.  Basically a very similar role, so I am

18  interacting with him on a daily basis.

19          THE COURT:  So, to the extent that one of the

20  instructions will be that you cannot talk to anyone about this

21  case, do you have any concerns that you will be able to follow

22  that directive?

23          PANELMEMBER:  I have no concerns being able to follow

24  that.

25          THE COURT:  All right.  And you also said that you

1    have perhaps an acquaintance or friend or two also that may be

2    working at Apple or will be working for Apple?

3              PANELMEMBER:  This is someone I worked with.  They

4    left probably about a year -- about a year ago, but I still

5    keep in touch periodically through social media and so forth.

6              THE COURT:  And that's -- brings up another issue,

7    social media.  Given the fact that this case has received some

8    attention and will continue to receive attention, it is

9    critical that the jurors not go onto social media and read the

10   opinions of people on social media.  It's critical that you

11   remove yourself -- and I know that's hard in this day and

12   age -- from these social media outlets.

13       So, let me ask you, Juror Number 17, to the extent that

14   you have a number of acquaintances and you have discussed, it

15   looks like or sounds like, some of the issues that are before

16   the Court, have you developed any opinions about this case

17   based upon those conversations?

18             PANELMEMBER:  I do have opinions that I have

19   developed based on the information I have, but I am well aware

20   that I don't have all the information.  So I am open to have my

21   mind changed by what is presented.

22             THE COURT:  All right.  More to unpack.

23       So you are open to having your mind changed.  So, as we

24   begin today, sounds like you have an opinion; and if you were

25   asked to choose, you, without more, perhaps would choose one

1    side over the other?  Is that accurate?

2              PANELMEMBER:  I would have to understand the details

3    of exactly what the charges are before I make my decision.  But

4    I think I have enough information to make a high-level

5    decision.  Like I said, I don't know the details.

6              THE COURT:  And then, taking a step back, we would

7    need a promise from every juror that you start this trial with

8    an even depth, a view that no one is entitled to your vote.  No

9    one has any standing or -- not standing but has the scales

10   weighed in their favor; that both parties or all parties are on

11   the same level.

12       Would you be able to abide by that directive?

13             PANELMEMBER:  Yes.  I actually am very logical in the

14   way I come to my conclusions, so whatever the facts are, that's

15   what the facts are.

16             THE COURT:  Is there anything about your

17   relationships with your friends or acquaintances that would

18   apply pressure on you, if you were to find one way or the other

19   that you would feel like, Oh, my God, my friends are going to

20   kill me because I decided this way?

21             PANELMEMBER:  No.

22             THE COURT:  All right.  Thank you, sir.

23       Anyone else in the audience who has seen an account

24   regarding this case?

25       And, sir, you are juror number?

```
 1              PANELMEMBER:  22.

 2              THE COURT:  22, yes.  Juror Number 22, what have you

 3    seen?

 4              PANELMEMBER:  I actually just saw headlines somewhere

 5    there was a lawsuit between mainly Qualcomm and Apple, but I

 6    wasn't interested enough to read the details, so actually I

 7    don't know anything.

 8              THE COURT:  All right.  But you did see that

 9    headline, and it hasn't had any effect on you at all?

10              PANELMEMBER:  Correct.

11              THE COURT:  All right.  Thank you, sir.

12         Any other juror who has seen a story regarding this case?

13    No?

14         All right.  At this time, let me identify myself and my

15    staff again -- not again, but identify myself.  Again, my name

16    is Gonzalo Curiel, and I will be assisted during the course of

17    this proceedings by my sterling courtroom clerk, Kimmi Ridgeway

18    and my amazing court reporter, Chari Bowery.

19         Do any of you know any of us?

20         I see no hands.

21         And you will hear that expression on an ongoing basis, "I

22    see no hands," and I am saying that so that the record will

23    reflect that there was no affirmative response to my question.

24         Now, I am going to read the names of witnesses in this

25    case.  So these are witnesses that some will be called, some
```

1   may be called.  So the fact that I read 100 or so names doesn't

2   mean that they will all testify, but to the extent that there's

3   a possibility that they will testify, we need to know whether

4   or not you know them, because if you know them, then we have to

5   further inquire about how you know them.

6      So, these witnesses are as follows: Tony Blevins, Tim

7   Cook, Kim Cooper, Deborah Denney, and Richard Lutton.  Since we

8   have so many witnesses, instead of reading all 100 and then

9   asking if you know any of them, do any of you know these first

10   five witnesses that I have read their names?

11      Do you know of any of these five witnesses?

12      All right.  Sir, you are Juror Number?

13         PANELMEMBER:  I know who Tim Cook is.

14         THE COURT:  Who is Tim Cook?

15         PANELMEMBER:  Well, president, CEO probably too of

16   Apple.

17         THE COURT:  Do you have any opinions or any views on

18   Mr. Cook?

19         PANELMEMBER:  No.

20         THE COURT:  The fact that he may be a witness in this

21   case will not affect your view of the evidence?

22         PANELMEMBER:  No.

23         THE COURT:  Anyone else?

24      All right.  Juror Number?

25         PANELMEMBER:  8.

```
1            THE COURT:  8?

2            PANELMEMBER:  Just the same.

3            THE COURT:  So you have heard the name, and you are

4   aware he is a CEO or president of Apple, but that won't affect

5   your view of the evidence?  All right.  Thank you, sir.

6       The next group, I believe I left off with Richard Lutton;

7   Bob Mansfield; Jeff Risher, R-I-S-H-E-R.  I think it's

8   Matthias, M-A-T-T-H-I-A-S, Sauer, S-A-U-E-R; Aaron Schafer; and

9   Phil Schiller.

10      Anyone know any of those five witnesses?

11      I see no hands.

12      Next, Johnson Sebeni; Bruce Sewell, S-E-W-E-L-L; Boris

13   Teksler, T-E-K-S-L-E-R; B.J. Watrous; and Jayna Whitt.  Any

14   juror know any of those witnesses?  I see no hands.

15      Jeff Williams, Derek Aberle, A-B-E-R-L-E; Baaziz Achour,

16   A-C-H-O-U-R; Cristiano Amon, A-M-O-N; and Marvin Blecker.

17      Any juror know any of these five individuals?

18      I see no hands.

19      Next, Lorenzo Casaccia, C-A-S-A-C-C-I-A; James Cathey,

20   C-A-T-H-E-Y; Liren Chen; Victoria Chen; Deborah Dwight.

21      Any juror know any of these names?

22      I see no hands.

23      Fabian Gonell, Michael Hartogs, Irwin Jacobs, Durga

24   Malladi, and Steven Mollenkopf.

25      Does any juror know these individuals or recognize the
```

1   names?

2            PANELMEMBER:  Irwin Jacobs.  Couldn't live in

3   San Diego and not.

4            THE COURT:  Do you have any opinions or strong

5   opinions about Mr. Jacobs that would affect your judging of his

6   testimony?

7            PANELMEMBER:  No.

8            THE COURT:  Any other juror who is familiar with the

9   name Irwin Jacobs?

10       Sir, you are Juror Number --

11           PANELMEMBER:  24.

12           THE COURT:  24.  And the same question --

13           PANELMEMBER:  I just heard of his name over the

14   years.  I know he started Qualcomm.

15           THE COURT:  Does that fact in any way lead you to

16   conclude that you should or should not believe his testimony?

17           PANELMEMBER:  No.

18           THE COURT:  Thank you.

19       Next, Ryan Pilgram; Eric Reifschneider,

20   R-E-I-F-S-C-H-N-E-I-D-E-R; Alex Rogers; Abbaseh Samimi; Gerald

21   Skiver, S-K-I-V-E-R.

22       Do any of the jurors know any of these five witnesses?

23       I see no hands.

24       James Thompson, David Wise, William Wyatt, Rick Chang, and

25   Lily Chao.

1        Does anyone know any of those few witnesses?

2        I see no hands.

3        Michael Chiang; Calvin Chih, spelled C-H-I-H; Brian Chong;

4   Eric Peng; Joe Lam.

5        I see no hands in response.

6        Jessica Lee; Brenda Liu, L-I-U; Eric Ma; Eric Peng; and

7   David Shen.

8        Does any juror know these five witnesses?

9        I see no hands.

10        Shawn Tien, Renee Wang, Selena Wang, Monica Yang, Denese

11   Yao.

12        Does any juror know any of these five witnesses?

13        I see no hands.

14        Ira Blumberg, Richard Blaylock, Hwi-Jae Cho, Kevin

15   Constantine, Mark Davis.

16        Does anyone know any of these five witnesses?

17        I see no hands.

18        Aichatou Evans, John Grubbs, Arthur Hill, Eushuk Hong, and

19   Asha Keddy.

20        Does anyone know any of these five individuals?

21        I see no hands.

22        Yooseok Kim, Injung Lee, Todd Madderom, Scott McGregor,

23   and Finbarr Moynihan, and he also goes by John Moynihan.

24        Anyone know those five individuals?

25        I see no hands.

```
 1        Christina Petersson; Godavarthi Varadarajan; Dirk Weiler;
 2   Nanfen Yu, also goes by Nancy Yu; and Robert Akl, A-K-L.
 3        Does any juror know any of these five individuals?
 4        I see no hands.
 5        Douglas Bernheim, B-E-R-N-H-E-I-M; Harry Bims; David Choi;
 6   Mark Lanning; Jeffrey Leitzinger?
 7        Anyone juror know these five witnesses?
 8        I see no hands.
 9        Remy Libchaber, Paul Meyer, Friedhelm Rodermund, Fiona
10   Scott Morton, Andrew Sears.
11        Anyone know these five individuals?
12        I see no hands.
13        Timothy Simcoe, Itamar Simonson, Wayne Stark, Robert
14   Stevenson, Matthew Valenti.
15        Does any juror know any of these five individuals?
16        And the answer is no.
17        Jonathan Wells, Roy Welsch, Stephen Wicker, Todd Zickler,
18   and Jeff Andrews.
19        Any juror know any of these five individuals?
20        No affirmative responses.
21        Tasneem Chipty, David Evans, Richard Gitlin, Oliver Hart,
22   Bertram Huber.
23        Does any juror know of any of these potential witnesses?
24        I see no affirmative responses.
25        Nikil Jayant; Christopher Knittel, K-N-I-T-T-E-L; Vijay
```

1   Madisetti; William Michalson; Aviv Nevo.

2       Anyone know any of these five individuals?

3       I see no hands.

4       Kenneth Parulski, P-A-R-U-L-S-K-I; Massoud Pedram; Jeffrey

5   Prince; Jonathan Putnam; Ambreen Salters.

6       Does any juror know any of these witnesses?

7       I see no affirmative responses.

8       Edward Snyder; Daniel Wigdor; and last but not least, Tim

9   Williams.

10      Does any juror know any of these last three possible

11  witnesses?

12      I see no affirmative responses.

13      At this time let me ask lead counsel to introduce and

14  identify the attorneys that will be participating in this

15  trial, and I will begin with the plaintiffs.

16      Ms. Brooks.

17          MS. BROOKS:  Thank you, Your Honor.

18      Good morning, ladies and gentlemen.  My name is Juanita

19  Brooks, and I am with the law firm of Fish & Richardson.  I

20  don't know if you have seen our sign on I-5 just north of

21  Carnell Valley.

22      And along with my colleagues from Fish & Richardson,

23  Ruffin Cordell, Lauren Degnan, and Ben Elacqua.  And also our

24  colleagues from Boies, Schiller & Flexner, Karen Dunn, Bill

25  Isaacson, Mary Dearborn, and Steve Holtzman.  We represent

1    Apple, and we have here at counsel table, Noreen Krall from

2    Apple.

3            THE COURT:  Does any juror know any of the attorneys

4    that have been identified?

5        Let me ask counsel for the CMs to identify themselves and

6    any other attorneys who may be participating in these

7    proceedings.

8            MR. DOREN:  Thank you, Your Honor.

9        Good morning, ladies and gentlemen.  My name is Richard

10   Doren, and I am with the law firm of Gibson, Dunn & Crutcher.

11   My colleague Jason Lo is also with Gibson, Dunn & Crutcher, and

12   we represent the four contract manufacturers:  Pegatron,

13   Wistron, Compal, and Foxconn.  Thank you.

14           THE COURT:  All right.  Thank you.

15       And on behalf of Qualcomm?

16           MR. CHESLER:  Thank you, Your Honor.  Good morning,

17   everyone.  My name is Evan Chesler.  I am from the law firm

18   called Cravath, Swaine & Moore, and I have several people from

19   my law firm with us here today:  Anthony Ryan, Wes Earnhardt,

20   Vanessa Lavely, Rick Stark.  And colleagues from two other

21   firms, Karen Hewitt from Jones Day; Stephen Swedlow from Quinn

22   Emanuel; and from Qualcomm, John Scott.

23           THE COURT:  All right.  Does any juror know any of

24   the attorneys or representatives from Qualcomm that were

25   identified?

1        I see no affirmative responses.

2        So have any of you heard of or been otherwise acquainted

3    with, done business with, been employed by, or had any dealings

4    with any of the witnesses or attorneys just named?

5        No affirmative response.

6        And as I noted earlier, the parties are not required to

7    call each of the witnesses that were named and might decide not

8    to call them.  Do any of you have any belief or feelings

9    towards any of the parties, attorneys, or witnesses that might

10   be regarded as a bias or prejudice for or against any of them?

11       No affirmative response.

12       Do you have any interest, financial or otherwise, in the

13   outcome of this case?

14       No affirmative responses -- I take it back; there is.  Do

15   you have any interest, financial or otherwise, in the outcome

16   of this --

17            PANELMEMBER:  I have Apple stock and Qualcomm stock.

18            THE COURT:  So I don't know how you made it past our

19   review of 20 lawyers and a judge and some more people, but we

20   are here.

21       You are number --

22            PANELMEMBER:  24.

23            THE COURT:  So I guess we missed it.  You did

24   indicate that you had a financial interest such as owning

25   individual stock.  And so how long have you owned Apple stock?

```
1              PANELMEMBER:  Probably five years.

2              THE COURT:  Five years.  And with respect to the

3    amount of stock that you own, the value of the stock, are you

4    comfortable in sharing that in open court?  Do you want to let

5    us know sidebar?

6              PANELMEMBER:  The Apple stock is probably $5,000.

7              THE COURT:  Okay.  And what about Qualcomm stock?  Do

8    you own Qualcomm stock?

9              PANELMEMBER:  Yes.

10             THE COURT:  And how long have you owned that?

11             PANELMEMBER:  About 6500, and I have owned it for

12   about ten years.

13             THE COURT:  So the fact that you own a little bit

14   more Qualcomm stock than you do Apple stock, would that in any

15   way affect your ability to be fair to all parties in this case?

16             PANELMEMBER:  No.

17             THE COURT:  All right.  Thank you, Juror Number 24.

18        Any other jurors who have a financial interest?

19        And I think there's a woman behind you.  Are you Juror

20   Number 34?

21             PANELMEMBER:  Yes.

22             THE COURT:  Yes, Juror Number 34.

23             PANELMEMBER:  Yes, I have stock in both Qualcomm and

24   Apple.

25             THE COURT:  Another one.  As to Apple, how long have
```

1    you owned Apple stock?

2            PANELMEMBER:  I don't know.

3            THE COURT:  You don't know?

4            PANELMEMBER:  My husband handles the stock.

5            THE COURT:  But you know that you own it.  Do you

6    have an idea of the value of the Apple stock?

7            PANELMEMBER:  (Shakes head.)

8            THE COURT:  Do you have an idea of how long you have

9    owned the Qualcomm stock?

10           PANELMEMBER:  No.

11           THE COURT:  So it would be safe to say that, based on

12   the fact you don't know how long you have owned the stock or

13   how much the value is, that the fact that this case involves

14   Apple and Qualcomm would not necessarily influence you one way

15   or another based upon the stock that you own?

16           PANELMEMBER:  That's correct.

17           THE COURT:  Have you ever had any conversations with

18   your husband where he has bemoaned or otherwise complained

19   about the performance of either Apple or Qualcomm stock?

20           PANELMEMBER:  No.

21           THE COURT:  So there's no reason why you couldn't be

22   a fair and impartial juror in this case?

23           PANELMEMBER:  Correct.

24           THE COURT:  Thank you, Juror Number 34.

25       And let me return to Number 24.  I didn't ask you this

1    question:  With respect to gains or losses by either the Apple

2    or Qualcomm stock, is there anything about their performance

3    that would affect your ability to be fair?

4         PANELMEMBER:  No.

5         THE COURT:  Thank you, sir.

6     Any other juror who has an interest, financial or

7    otherwise, in the outcome of this case?

8     I see no other hands.

9     It may appear that one or more of the parties, attorneys,

10   or witnesses come from a particular national, racial, or

11   religious group or have a lifestyle different than your own.

12    Would this in any way affect your judgment or the weight

13   and credibility you would give to their testimony?

14    I see no affirmative responses.

15    Now let me shift over to lawsuits and the law and courts.

16    Have any of you or any member of your family or close

17   friends, to your knowledge, ever filed an action against anyone

18   or presented a claim against anyone, including any of the

19   parties in this case, in any civil case other than a domestic

20   relations case, that is, a family law case, divorce, for

21   example?  Has anyone ever filed an action against anyone on our

22   jury panel?

23    We have a number of hands in the jury box.  And we will

24   begin, I believe it is Juror Number 8.  Is that correct, sir?

25         PANELMEMBER:  Juror 8.

```
 1            THE COURT:  Juror Number 8, what is your experience?
 2            PANELMEMBER:  Currently, we are involved with a
 3    lawsuit against PG&E over the fires up in Northern California.
 4            THE COURT:  Did you previously live up in Northern
 5    California?
 6            PANELMEMBER:  No.  I just owned two properties up
 7    there, and both of them burned in the fires.
 8            THE COURT:  And at this point, that case is still
 9    proceeding forward and has not yet been tried; is that correct?
10            PANELMEMBER:  Correct.
11            THE COURT:  Is there anything about how that case has
12    proceeded or has not proceeded as quickly as you would like
13    that would affect your view of this case?
14            PANELMEMBER:  No.
15            THE COURT:  Have you been satisfied with how that
16    case has moved forward?
17            PANELMEMBER:  Yes.
18            THE COURT:  Any dissatisfaction that you may have
19    about how that case has gone forward wouldn't affect your views
20    in this case; is that right?
21            PANELMEMBER:  No.
22            THE COURT:  And then I am not sure if it was the
23    juror next to you, Number 9.  That was the only civil case; is
24    that correct, Juror Number 8?
25            PANELMEMBER:  Yes.
```

```
 1              THE COURT:  Juror Number 9.
 2              PANELMEMBER:  I played professional baseball for a
 3    few years, and there was a class action for minimum wage rights
 4    filed by minor league players that were either currently
 5    playing or retired.  I don't know if it is still going on.  I
 6    think I actually received something saying they tossed it and
 7    it had to be an individual and couldn't be a class action
 8    thing, but I never followed through.
 9              THE COURT:  When was that lawsuit filed?
10              PANELMEMBER:  Maybe 2015, I'm guessing.
11              THE COURT:  Were you satisfied with the way that case
12    was handled?
13              PANELMEMBER:  I never thought it would amount to
14    anything; I just signed up for it because I got --
15              THE COURT:  So you weren't dissatisfied?
16              PANELMEMBER:  No.
17              THE COURT:  And I take it, then, there's nothing
18    about how that case proceeded that would affect your ability to
19    be fair in this case?
20              PANELMEMBER:  No.
21              THE COURT:  Any other case, sir?
22              PANELMEMBER:  I am an air traffic controller
23    currently here at Lindbergh.  And, because of the government
24    shutdown, the union, NATCA, filed a lawsuit just for the
25    shutdown and the fact that --
```

```
1            THE COURT:  Yeah, the impact, how it impacted you
2   financially?
3            PANELMEMBER:  Yeah.  So that's still going on, part
4   of the class action with that.  I don't know where it is.
5            THE COURT:  So I take it, in neither the MLB class
6   action or this class action, you haven't had any interactions
7   with the attorneys handling the cases?
8            PANELMEMBER:  No, I just -- they sent me something
9   saying you can be a part of this if you want to.  I filled it
10  out.  And I think I received something saying that they were
11  just moving forward.  And if anyone else hadn't signed up, you
12  know, that might want to, to let them know.  But it's still
13  kind of early on.
14           THE COURT:  Okay.  Anything about the way that that
15  case is proceeding that would affect your ability to be fair in
16  this case?
17           PANELMEMBER:  No.
18           THE COURT:  Thank you, sir.  And how do you think the
19  Padres are doing this year?
20           PANELMEMBER:  I am a Diamondbacks fan.  Actually, I
21  just root for the people that I played with.  So --
22           THE COURT:  Would that affect your ability to be fair
23  in this case?
24       Thank you, sir.  I think we have another juror in the box?
25       Yes.  You are Juror Number 11.
```

```
1              PANELMEMBER:   11.

2       I may have jumped the gun on this one, but a personal

3    injury workman's compensation case.

4              THE COURT:  I don't think you did jump the gun.  You

5    filed a PI workmen's compensation case?  When was that?

6              PANELMEMBER:  2013.

7              THE COURT:  Has that been concluded?

8              PANELMEMBER:  Yes.

9              THE COURT:  Were you satisfied how that was handled?

10             PANELMEMBER:  Yes.

11             THE COURT:  Anybody else in the jury box?

12      Yes.  Juror Number 12?

13             PANELMEMBER:  12.  I'm a retired attorney.  I filed

14   numerous lawsuits on behalf of clients, gone through the whole

15   trial process.

16             THE COURT:  So you were representing other people,

17   your clients.  Did you ever file any on behalf of yourself or

18   did anyone represent you in representing your interests?

19             PANELMEMBER:  One incident involving the National

20   City Police Department.

21             THE COURT:  And that situation involving the National

22   City Police Department, did you file a lawsuit against them?

23             PANELMEMBER:  Yes.

24             THE COURT:  And how long ago was that?

25             PANELMEMBER:  It had to be 20 years ago.
```

1          THE COURT:  And were you satisfied with the outcome

2     of that case?

3          PANELMEMBER:  Yes.

4          THE COURT:  And you said you are a retired attorney.

5     And did you specialize in any particular field?

6          PANELMEMBER:  Civil trial work.

7          THE COURT:  Personal injury or plaintiff work?

8     Defense work?  What type of cases did you handle?

9          PANELMEMBER:  They were mostly employment law cases.

10    About 75 percent of them were for the employer; about

11    25 percent were on behalf of the employee.  And most of them,

12    like I said, were employment cases.

13         THE COURT:  All right, sir.  Thank you.

14       Anyone in the back with a response?  I see a couple of

15    jurors.

16       And we begin with Juror Number 17; is that correct, sir?

17         PANELMEMBER:  That is correct.

18         THE COURT:  Yes, sir.

19         PANELMEMBER:  It was a personal injury suit stemming

20    from an accident, a traffic accident, about 24 years ago.

21         THE COURT:  And were you satisfied with the outcome?

22         PANELMEMBER:  Yes, I was.

23         THE COURT:  Nothing about that case would affect your

24    ability to be fair here?

25         PANELMEMBER:  No.

```
 1              THE COURT:  Thank you, sir.

 2        Anyone else?

 3        Yes.  Number 24, yes, sir.

 4              PANELMEMBER:  I am a private fiduciary, so I am in

 5   and out of probate court all the time.

 6              THE COURT:  And how long have you been a private

 7   fiduciary?

 8              PANELMEMBER:  17 years.

 9              THE COURT:  And tell me a little bit -- what role

10   does a private fiduciary play?

11              PANELMEMBER:  Well, I've done conservatorships,

12   guardianships.  And, right now, I'm the trustee on 18 trusts.

13              THE COURT:  How does one become a private fiduciary?

14              PANELMEMBER:  It's a long story.

15              THE COURT:  All right.  Well, let me ask, did you

16   receive any special training to become one?

17              PANELMEMBER:  No.  It was mostly on the job.

18              THE COURT:  Is there anything about that role you

19   play as a private fiduciary that would impact your ability to

20   be fair in this case?

21              PANELMEMBER:  No.

22              THE COURT:  Thank you, sir.

23        Anyone else?

24        Behind him.  That would be Number 33; is that correct?

25              PANELMEMBER:  Yes, that is correct.
```

1           THE COURT:  Yes, sir.

2           PANELMEMBER:  I was the plaintiff in a lawsuit

3  resulting from an automobile accident.

4           THE COURT:  How long ago was that?

5           PANELMEMBER:  About 25 years ago.

6           THE COURT:  Were you satisfied with the outcome of

7  that case?

8           PANELMEMBER:  Yes, I was.

9           THE COURT:  Any other case?

10          PANELMEMBER:  No.

11          THE COURT:  Thank you, sir.

12     Any other juror who has experience of filing a lawsuit?

13     All right.  22.  Yes, sir.

14          PANELMEMBER:  Yes.  I sued somebody over a year ago

15  in court.

16          THE COURT:  About what?

17          PANELMEMBER:  About a scam.

18          THE COURT:  A scam?

19          PANELMEMBER:  A scam, yes.

20          THE COURT:  And someone took money from you that

21  didn't belong to them and used false representations to do it?

22          PANELMEMBER:  Correct.  Somebody borrowed money and

23  didn't return it.

24          THE COURT:  Borrowed money and didn't return it?

25          PANELMEMBER:  A fellow coworker.

```
 1              THE COURT:  Oh.  So how long ago was this?
 2              PANELMEMBER:  This was over a year ago.
 3              THE COURT:  And has that case concluded?
 4              JUROR:  Yes.  The judgment was for me.
 5              THE COURT:  Were you satisfied with the way that that
 6    case was handled, processed, and concluded?
 7              PANELMEMBER:  Yes, I was.
 8              THE COURT:  So there's nothing about that case that
 9    would affect your ability to be fair here?
10              PANELMEMBER:  No.
11              THE COURT:  Thank you, sir.
12         Anyone else?
13         All right.  I think we have exhausted that question.  The
14    next one is similar but from a different vantage point.
15         Has anyone ever filed an action against any of you or
16    presented a claim against any of you or, to your knowledge,
17    against any member of your family or close friends?
18         All right.  We have a couple of hands in the jury box.
19         And the first hand is from Juror Number 11.
20              PANELMEMBER:  Yes.
21              THE COURT:  Yes, sir.
22              PANELMEMBER:  My spouse owns a real estate brokerage
23    company.  And his company has been involved with a few
24    litigation issues in the past.
25              THE COURT:  When you say "a few," two?
```

```
1              PANELMEMBER:  Two, maybe three.

2              THE COURT:  All right.  And when were those two or

3    three cases filed?

4              PANELMEMBER:  Within the last five years.

5              THE COURT:  And have you been named as a codefendant?

6              PANELMEMBER:  No.

7              THE COURT:  Okay.  And with respect to these

8    lawsuits, are they still alive?  Are they still moving forward?

9     Have they concluded?

10             PANELMEMBER:  We don't talk shop at home.

11             THE COURT:  Or don't you know?

12         So you're not sure.  To the extent that you haven't talked

13   shop about those cases, is there anything about them, the fact

14   that they have been filed or that they are moving forward, that

15   would impact your ability to be fair?

16             PANELMEMBER:  No.  No.

17             THE COURT:  So that hasn't created some

18   dissatisfaction in your mind about the legal system?

19             PANELMEMBER:  No.

20             THE COURT:  Thank you, sir.

21         And then Juror Number 12.

22             PANELMEMBER:  Number 12.

23             THE COURT:  Yes, sir.

24             PANELMEMBER:  One malpractice suit against my

25   partners and the firm and myself.
```

```
 1              THE COURT:  And when was that?  Do you recall?

 2              PANELMEMBER:  Probably -- maybe 15 years ago.

 3              THE COURT:  All right.  And I expect that case has

 4    been concluded now; is that right?

 5              PANELMEMBER:  That case is over with.  It was

 6    resolved through mediation.

 7              THE COURT:  Were you satisfied with the way that case

 8    was resolved?

 9              PANELMEMBER:  Yes.

10              THE COURT:  Anything about that case that would

11    affect your ability to be fair in this case?

12              PANELMEMBER:  No.

13              THE COURT:  Thank you, sir.

14         Anyone else?

15         I think we have a hand.  It's Juror 17.  And I am

16    expecting 24 to raise his hand next.  That's coming.

17              PANELMEMBER:  I think it was 1999, my wife and I sold

18    our house.  The lady who bought it basically sued us because

19    she thought a piece of equipment in the -- actually, we put it

20    in the garage -- was part of the sale, which it was not.  So

21    she wanted us to replace that.

22              THE COURT:  All right.  So that was back in 1999.

23    And that case has been concluded at this point?

24              PANELMEMBER:  Yeah.

25              THE COURT:  Were you satisfied with the way that
```

```
 1    matter was concluded?

 2              PANELMEMBER:  Very much so.  It was thrown out.

 3              THE COURT:  Nothing about that case would affect your

 4    ability to be fair?

 5              PANELMEMBER:  Yes.

 6              THE COURT:  Thank you, sir.

 7        Juror Number 24.

 8              PANELMEMBER:  Wrongful death.  It was tossed out of

 9    court.

10              THE COURT:  When was that?

11              PANELMEMBER:  2007.

12              THE COURT:  Were you satisfied with the way that case

13    was processed and handled and was concluded?

14              PANELMEMBER:  Yes.

15              THE COURT:  So there's nothing about that case that

16    would affect your ability to be a fair juror?

17              PANELMEMBER:  No, not at all.

18              THE COURT:  Thank you, sir.

19        Anyone else?

20        I see no other hands.

21        To the extent that it wasn't covered by my earlier

22    questions, have any of you or any member of your family or

23    close friends, to your knowledge, ever been part of a class

24    action against a technology company?

25              PANELMEMBER:  I am raising my hand for 17.
```

1          Well, I have a clarification.

2              THE COURT:  Yes, sir.

3              PANELMEMBER:  There have been a number of class

4      action suits.  Like, I think there was one many years ago about

5      if you bought a CD-ROM drive in your computers, there was a

6      class action suit.  Millions of people were involved.  I mean,

7      there's been a handful of those throughout the years that I've

8      just completely lost track, but --

9              THE COURT:  And, certainly, most of us may have

10     received some kind of a notice in the mail that we are entitled

11     to 15 cents for some class action or whatever.

12             PANELMEMBER:  Yeah.

13             THE COURT:  So let me ask, besides receiving some

14     notice that you may have been a member of a class action, has

15     there been any juror who actually recalls participating in the

16     process, number one, or receiving more than a nominal amount of

17     money, more than a couple of dollars?

18         All right.  We have a juror, Juror Number 2.

19         Yes?

20             PANELMEMBER:  Before I filled out the application, I

21     was fine.  The last two weeks, I've gotten pneumonia.  I have

22     to have a chest X-ray tomorrow.  I just came here to say I'm

23     sorry.  At the time, I was willing and in better health.

24         To sit through this -- I have sciatica right now.  I can't

25     sit here all day and listen to everybody's personal life

1   stories.  I can't do it.  I'm about ready to pass out.

2        THE COURT:  Let me talk to you sidebar.  All right.

3      (The following proceedings were heard at sidebar with

4   Juror Number 2:)

5        THE COURT:  Ma'am, would you come forward.  Hello.

6   So you look like you are in distress.

7        PANELMEMBER:  I have to do breathing treatments.  I

8   didn't think it was going to take this long.  I can't listen to

9   stories from 1999.  I'm sorry.

10        THE COURT:  We appreciate your patience to this

11   point.  And so, at this point, you indicated that you had

12   suffered from pneumonia.

13        PANELMEMBER:  They think I still have pneumonia.  I

14   have my breathing and bronchitis.

15        THE COURT:  You should not be here.

16        PANELMEMBER:  I didn't think it was going to take

17   this long.  Before, I was so willing, but I can't --

18        THE COURT:  Is there any disagreement with excusing

19   Juror Number 2?

20        ALL:  No, Your Honor.

21        THE COURT:  You should have let us know immediately.

22        PANELMEMBER:  Well, I didn't think I was going to

23   listen --

24        THE COURT:  No, but --

25        PANELMEMBER:  This is just too much.  Sorry.

```
1            THE COURT:  Given your condition, you shouldn't be
2  among other folks.
3            PANELMEMBER:  I tried.
4            THE COURT:  All right.  Thank you.  You are excused.
5       (The following proceedings were held in open court:)
6            THE COURT:  This is as good a time as any to ask the
7  question:  Are there any jurors who at this time are suffering
8  from any maladies, any physical condition that would make it
9  difficult if not impossible to serve as a juror in this case?
10           PANELMEMBER:  I made an error when I circled --
11           THE COURT:  You did?
12           PANELMEMBER:  I am a full-time college student.  And
13 my major is criminal justice, so of course I want to uphold the
14 law.  But my courses this semester aren't finished.  And I
15 thought they were going to be finished on time for this trial;
16 but, with that said, I am not able to be a juror.
17           THE COURT:  Okay.  And then, let me see.  There was
18 another hand or two that was raised.
19      Yes.  You are Juror Number 18, I believe?
20           PANELMEMBER:  Yes.
21           THE COURT:  Yes.  What is your circumstance?
22           PANELMEMBER:  I'm not sure if it would be relevant,
23 but I'm going on vacation in five weeks.
24           THE COURT:  When?
25           PANELMEMBER:  In five weeks.
```

```
 1              THE COURT:  So around May 12?

 2              PANELMEMBER:  The 22nd, I'm leaving.

 3              THE COURT:  So, at this point, we will likely be done

 4   by May 14 or 15.  The jury would then begin their deliberations

 5   and be in deliberations on the 16th, 17th, 20th, 21st.  But you

 6   have scheduled a trip on the 22nd; is that correct?

 7              PANELMEMBER:  Yes.

 8              THE COURT:  All right.

 9       Any other juror who raised their hand?  And you are Juror

10   Number 31?  Yes, sir.

11              PANELMEMBER:  (Inaudible.)

12              THE COURT:  I'm sorry.  Is that microphone on?

13              PANELMEMBER:  I feel I am in high pressure for my --

14   I have diabetes, blood pressure.  Last week, I don't sleep too

15   well.

16              THE COURT:  So you are the taking medication; is that

17   right?

18              PANELMEMBER:  Yes.

19              THE COURT:  And it affects your sleep?

20              PANELMEMBER:  Maybe for this case.

21              THE COURT:  When you say "maybe for this case," that,

22   if you were a juror, you expect that this medication that you

23   take might affect your ability to take in everything and

24   process?

25              PANELMEMBER:  No, I believe for this client --
```

1           THE COURT:  "For this client" in terms of one of the

2  parties, Apple or Qualcomm?

3           PANELMEMBER:  Yeah, no.  No.  When I talking in front

4  of the people.

5           MR. CORDELL:  He wants a sidebar.

6           THE COURT:  Thank you.  Let's do that.

7       (The following proceedings were heard at sidebar with

8  Juror 31:)

9           THE COURT:  Yes.  And you are Juror Number 31,

10  correct?

11           PANELMEMBER:  Yes.

12           THE COURT:  So you wanted to share something with us

13  at sidebar?

14           PANELMEMBER:  The other thing is I don't understand

15  too much English.

16           THE COURT:  And you don't speak --

17           PANELMEMBER:  When I speak too much English, I feel

18  more pressure.  When they select me for juror, I check, I

19  feeling good, the questionnaire.

20           THE COURT:  So because of your, if not limited --

21           PANELMEMBER:  And I --

22           THE COURT:  Your limited understanding of English,

23  you may have a problem being a juror?

24           PANELMEMBER:  Yes, and I affect the case.  When I

25  don't understand all of it, my decision is maybe wrong.

```
1          THE COURT:  So you have reason to believe that you
2   wouldn't be able to understand all of the evidence, right?
3          PANELMEMBER:  Mm-hmm.
4          THE COURT:  Thank you, sir.  You can return to your
5   seat, and I will talk to the attorneys.
6       (Juror Number 31 left the sidebar.)
7          THE COURT:  It seems to me, given his limited
8   understanding of English, he wouldn't be able to perform the
9   duties of juror.  Do you all agree?
10         ALL:  Yes, Your Honor.
11         THE COURT:  At the appropriate time, I will excuse
12   him for cause.
13      But while I have you here, as to Ms. Buluran, she might be
14   able to go all the way through deliberations, but do you have
15   any views whether we should excuse her at this time?
16         MS. HEWITT:  The trip is May 22, she said.
17         THE COURT:  That would be a week of deliberations.
18         MS. BROOKS:  Your Honor, if we are still here then, I
19   think there's going to be a lot of people in trouble.  I think
20   we are going to get this to the jury in plenty of time.
21         THE COURT:  So I won't excuse her for cause.
22         MR. CHESLER:  We should be done.
23         THE COURT:  Keeping in mind jury deliberations, and
24   they sometimes go a day, two days, four or five days.  So I
25   won't excuse her.
```

1        And then we do have Number 15, who is the college student.

2   And I am not sure why he thought he would be able to join us.

3   It doesn't sound like he will be -- given his school, that he

4   will be distracted.

5             MR. CHESLER:  We should let him go.

6             MS. BROOKS:  No objection, Your Honor.

7             THE COURT:  At the appropriate time, we will excuse

8   him for cause.

9        Anything else at this point?

10            MR. CHESLER:  No, Your Honor.  Thank you, Your Honor.

11       (The following proceedings were held in open court:)

12            THE COURT:  All right.  Continuing.  Are there any

13  other jurors who need to bring some issue to our attention

14  regarding their jury service?

15            PANELMEMBER:  I would like to talk to you in private.

16            THE COURT:  All right.  Come on up.  And you are

17  Juror Number 29; is that correct?

18            PANELMEMBER:  Yes.

19       (The following proceedings were heard at sidebar with

20  Juror 29:)

21            THE COURT:  Yes, ma'am.

22            PANELMEMBER:  As I responded to my application,

23  English is my second language.  So there's some -- a lot of

24  technical words that I don't feel comfortable being here at

25  this time.

```
 1          THE COURT:  Let me ask, how long have you lived in
 2   the United States?
 3          PANELMEMBER:  20 years.  But the words I don't
 4   understand is the legal words, but -- the rest, I can
 5   understand.
 6          THE COURT:  So English is your second language?
 7          PANELMEMBER:  Yes.
 8          THE COURT:  And you generally speak English or
 9   Spanish day to day?
10          PANELMEMBER:  Both.
11          THE COURT:  Both.  But, at this point, given your
12   knowledge or understanding or use of English, you think you
13   would have some serious problems understanding technical terms?
14          PANELMEMBER:  Yeah, technical.  Yes.
15          THE COURT:  Anybody have any questions?
16          MS. BROOKS:  No, thank you.
17          THE COURT:  Thank you.
18          MR. CHESLER:  Thank you very much.
19          THE COURT:  Any thoughts?
20          MR. CHESLER:  There's going to be a lot of technical
21   jargon in this case, Your Honor, as you know.
22          THE COURT:  All right.  That was 27.
23          MS. HEWITT:  Number 29.
24          THE COURT:  I'm sorry.  29.
25          MR. CHESLER:  29.
```

```
 1              THE COURT:  We will excuse her.

 2         (The following proceedings were held in open court:)

 3              THE COURT:  Any other jurors with anything you'd like

 4    to present to us regarding jury service?

 5         Yes.  Juror Number 3; is that right?

 6              PANELMEMBER:  Yes.  Correct.  So I'm willing to be

 7    here until May 17, like the letter stated.  Unfortunately, I do

 8    have a work conference that I have to go up to North County

 9    starting on May 20th.

10              THE COURT:  All right.  So a work conference starting

11    May 20th.  All right.

12         So we would need to be in a position to be done by the

13    13th or 14th, and then for the jury to be able to conduct their

14    deliberations, and then you'd be able to attend your meeting on

15    the 20th.

16         Is this meeting limited to the 20th, or is it a conference

17    that begins on the 20th and goes forward?

18              PANELMEMBER:  No, it's a conference.  It's three days

19    starting on the 20th.

20              THE COURT:  Is it out of town?

21              PANELMEMBER:  Yes.  It's up in North County.

22              THE COURT:  North County.  All right.  Thank you for

23    that information.

24         Anyone else?  Juror Number 11.

25              PANELMEMBER:  Yes.  I have a flight scheduled for the
```

1   18th.

2              THE COURT:  You have a flight?

3              PANELMEMBER:  Scheduled for the 18th of May.

4              THE COURT:  All right.  Anyone else?

5      You are Juror Number 40?

6              PANELMEMBER:  40.  I'm going through a divorce right

7   now, and I have a court date on the 3rd.  I stated that in my

8   questionnaire.

9              THE COURT:  May 3rd?

10             PANELMEMBER:  Yes.

11             THE COURT:  All right.  And, just so you know, we

12  will never be in session -- that is, in trial -- on Fridays.

13  On Fridays, I have a number of criminal cases that I handle and

14  process.  So, as they say, we'll be dark on Fridays.

15         And after this week, we actually will not be in trial, as

16  far as evidence is concerned, on Thursdays.  So we will only be

17  in trial Monday, Tuesday, and Wednesday after this week until

18  we get to the end.  And then, at the end, once the jury

19  deliberations begins, then, yes, there will be work on

20  Thursdays and Fridays.

21         But May 3, we will not be in session, so you will be free

22  to go to work, be free to -- and this goes for all the jurors.

23  To the extent that we are not in session, you can go about your

24  business, what you would normally be doing on that Thursday or

25  Friday.  All right?

1          PANELMEMBER:  All right.

2          THE COURT:  Anyone else?

3     I see no other hands.

4     And it's hard to believe, but we had been talking about

5     lawsuits when we ended up kind of taking a little bit of a

6     detour, but let me return to that.  And there are some

7     additional questions that I have regarding lawsuits.

8          Have you or anyone close to you ever been an expert or a

9     consultant in a legal case of any kind?

10         All right.  Juror Number 12, you have been an expert or

11    consultant; is that right, sir?

12    Juror Number 12?

13         PANELMEMBER:  That's correct.

14         THE COURT:  What role have you served?  Expert or

15    consultant.

16         PANELMEMBER:  Both an expert on drugs and drug use in

17    criminal cases.  I have been a consultant on labor and

18    employment issues and also a consultant with regard to criminal

19    law and criminal procedure.  My wife is an expert, testified

20    numerous times in nursing home cases.

21         THE COURT:  So let me first begin by following up as

22    to your role as an expert or consultant.  Do you have an

23    estimate of how many times you have performed the role of an

24    expert?

25         PANELMEMBER:  At least a dozen times.

```
 1              THE COURT:  Did any of those cases go on trial?

 2              PANELMEMBER:  They were all at trial.

 3              THE COURT:  They were all at trial.

 4         Are there other cases that you were called as an expert

 5    that did not go to trial?

 6              PANELMEMBER:  Yes.

 7              THE COURT:  How many of those?

 8              PANELMEMBER:  Dozens of those.  I can't count.

 9              THE COURT:  So in this case, there will be a

10    considerable number of experts who will testify.  Does the fact

11    that you played or you performed the functions of an expert

12    witness in your earlier career, would that in any way affect

13    how you judge the testimony of the experts in this case?

14              PANELMEMBER:  No.

15              THE COURT:  So then would your past experience in any

16    way affect your decision-making in this case?

17              PANELMEMBER:  No.

18              THE COURT:  Thank you, sir.

19         And then I think to your left, Juror Number 11.  Yes, sir.

20              PANELMEMBER:  Yes.  I have had to testify in the

21    scope of my work as a parole agent in parole revocation

22    proceedings and also sexually violent predator hearings.

23              THE COURT:  So I take it, then, you are or were a

24    parole agent?

25              PANELMEMBER:  I am currently a parole agent.
```

```
 1              THE COURT:  So, in that capacity, you have been

 2    called to testify not only as a percipient witness but as an

 3    expert witness; is that right?

 4              PANELMEMBER:  Yes.

 5              THE COURT:  So the fact that you have performed this

 6    role of an expert witness, would that affect your view of the

 7    witnesses that are called who have expert testimony?

 8              PANELMEMBER:  No.

 9              THE COURT:  All right.  Thank you, sir.

10       Anyone else in the jury box?

11       Yes.  We have Juror Number 5.  Yes, sir.

12              PANELMEMBER:  I have been called to testify

13    regarding -- in six different situations.

14              THE COURT:  When you say "situations," are these

15    trials?

16              PANELMEMBER:  Four were hearings and two were trials.

17              THE COURT:  What was the subject matter of your

18    testimony?

19              PANELMEMBER:  I am a clinical psychologist, and I

20    specialize in working with children who are terminally ill, and

21    they were regarding the welfare of those children.  And they

22    were my clients, by the way.

23              THE COURT:  All right.  So there were six proceedings

24    where you ended up testifying as an expert?

25              PANELMEMBER:  Yes.
```

1         THE COURT:  So partly as an expert and partly because

2    you had percipient testimony to give about the clients that you

3    were treating?

4         PANELMEMBER:  Correct.

5         THE COURT:  Okay.  And how long ago was that?

6         PANELMEMBER:  One as long as 20 years ago.  The other

7    one as soon as seven years ago.

8         THE COURT:  And is there anything about your

9    experience as a witness, as an expert witness, that would

10   affect your consideration of the testimony of experts in this

11   case?

12        PANELMEMBER:  No.

13        THE COURT:  Is there anything about your experience

14   that would affect your ability to be fair and impartial in this

15   case?

16        PANELMEMBER:  No.

17        THE COURT:  Thank you, sir.

18     Anyone else in the jury box?

19     I see no other hands.

20     Juror Number 17?

21        PANELMEMBER:  No.

22        THE COURT:  We do have Juror Number 20; is that

23   right?

24        PANELMEMBER:  Right.

25        THE COURT:  Yes, what is your experience?

1          PANELMEMBER:  I just was called as a consultant to

2     give a deposition in an environmental case.

3          THE COURT:  Consultant when you gave a deposition in

4     what type of case?

5          PANELMEMBER:  Environmental case.

6          THE COURT:  Environmental case.

7     How long ago was that?

8          PANELMEMBER:  Last year.

9          THE COURT:  And how was that experience?

10         PANELMEMBER:  It was fine.

11         THE COURT:  Are you saying that honestly?

12         PANELMEMBER:  No, it was fine.

13         THE COURT:  Okay.  As a result of that experience,

14    would that affect how you judge another expert that is

15    testifying?

16         PANELMEMBER:  No.

17         THE COURT:  And it wouldn't impact your ability to be

18    fair in this case?

19         PANELMEMBER:  No.

20         THE COURT:  Thank you, Juror Number 20.

21    Anyone else who has been an expert or consultant?

22    All right.  I see no other hands.

23    Based on what you have heard so far, do you believe for

24    any reason that the Court system is not the proper way to deal

25    with a lawsuit like this one?

1        I see no hands.

2        Let me ask, are there any of you who have trouble

3   understanding English, that you feel could create a difficulty

4   for you if you were a juror in this case, other than anyone

5   else who may have already told us of that fact?

6        I see no other hands.

7        No, sir, I think we received your response regarding that.

8   So I think we are good.  I think we are good, sir.

9        Do any of you know or recognize any of the other potential

10  jurors from before you came here today?  That is, were you

11  acquaintances or friends with any of the fellow jurors that are

12  on your panel today?

13       We have a hand, and that is Number 34.

14            PANELMEMBER:   34.

15            THE COURT:  Who do you know?

16            PANELMEMBER:  Juror Number 1 and I were coworkers.

17            THE COURT:  You know, it is amazing how many times I

18  have received an affirmative response in terms of do you know

19  someone else on this jury panel.  What is the chances of that?

20  Not too great.

21       But, anyway, you know Juror Number 1, who is our model

22  juror, as you know.  And so you worked with Juror Number 1?

23            PANELMEMBER:  Yes.

24            THE COURT:  So how long have you known each other?

25            PANELMEMBER:  Well, our working situation was

1   probably about 20 years ago for about 5 years.

2           THE COURT:  So you hadn't seen each other in a while,

3   or do you still keep in touch?

4           PANELMEMBER:  This is the first time I have seen her

5   in years.

6           THE COURT:  You haven't seen her in years.

7           PANELMEMBER:  Yes.

8           THE COURT:  But you worked together about 20 years

9   ago?

10          PANELMEMBER:  Yes.

11          THE COURT:  Where?

12          PANELMEMBER:  At Scripps Home Health.

13          THE COURT:  At Scripps?

14          PANELMEMBER:  Yes.

15          THE COURT:  Given how delightful Juror Number 1 is, I

16  expect you warmed up to her and became friends with her; is

17  that right?

18          PANELMEMBER:  Yes.

19          THE COURT:  The question is, if you were on the same

20  jury, would you be inclined to do whatever Juror Number 1 was

21  prepared to do or would you be prepared to see it the way you

22  see it and call it the way you see it?

23          PANELMEMBER:  I think I would call it on my own.

24          THE COURT:  And let me ask Juror Number 1, what about

25  you?  Since you and Juror Number 34 were coworkers, colleagues,

```
1    and friends, would you be able to exercise your own judgment in

2    arriving at a determination in this case?  If she was of the

3    view that, "No, I am going this way," would you be prepared to

4    go the other way if that's what the facts and law required?

5              PANELMEMBER:  I would follow my own.

6              THE COURT:  All right.  Very good.  Thank you.

7         Anyone else?

8         I see no other hands.

9         If you are selected as a juror, do any of you believe that

10   you might have any difficulty listening to the views of other

11   jurors and taking those views into account in reaching your

12   decision even if they differ dramatically from your own views?

13        I see no hands.  Although, I kind of expect that, if you

14   were that juror, you might not admit it.  So as long as I can

15   get your commitment that you will be willing and able to work

16   cooperatively with your fellow jurors in order to reach a

17   verdict.  Will you work cooperatively?  Which isn't to say that

18   you have to arrive at the exact same conclusion, but will you

19   at least cooperate?  Yes?

20             ALL:  Yes.

21             THE COURT:  Thank you.

22        Now we will move into the tech world.  Who here is very

23   familiar with how cellular or Wi-Fi technology works,

24   specifically the technical details related to cellular or

25   Wi-Fi?
```

1        And, of course, Juror Number 17.

2        And I guess it is no surprise because you have indicated

3   that you know or have acquaintances and friends who work at

4   Qualcomm.

5              PANELMEMBER:  Correct.

6              THE COURT:  And some who may end up working for

7   Apple.  And so how is it that you know about Wi-Fi and cellular

8   technology?

9              PANELMEMBER:  I have been working in computer

10  technology for almost 30 years.  I am currently a IT solutions

11  architect for infrastructure for SoCalGas and SDGE.  So I work

12  with these technologies, whether it's Wi-Fi -- I am currently

13  help implementing a private LTE network.

14             THE COURT:  A private LTE network.

15             PANELMEMBER:  Yes.  It is not for public use; it is

16  for our OT systems, part of our falling conductor program.

17             THE COURT:  So your situation always raises a

18  question.  Normally, we invite jurors to bring to bear as

19  jurors their common sense, their tools that they have used to

20  navigate through life in terms of determining whether or not

21  someone is telling the truth or not.

22       But when you get to this area, technology, and where

23  someone may have a wealth of experience in a certain field,

24  then the question becomes, I guess, twofold:  One, whether or

25  not in your decision-making you are going to rely upon

1    information or knowledge that you developed along your career,

2    which would not be permitted because that would not have been

3    evidence that was tested and introduced here in open court;

4    and, second of all, concern that a juror such as that may

5    overly influence the other non-tech jurors.

6         So on the first question, given your wealth of knowledge,

7    do you believe you would be able to confine yourself in your

8    decision-making to that evidence that bears on the legal issues

9    in this case?

10             PANELMEMBER:  Yes, I can.  The only caveat is, if my

11   experience shows or indicates to me that the information is not

12   correct or is not factual, that would actually negatively color

13   my opinion of that information.  That's -- I can't avoid that.

14             THE COURT:  Right.  All right.  And then on the

15   second front, keeping in mind that fellow jurors may turn to

16   you for the answers to technical questions, would you be

17   prepared, as a starting point, to allow the other jurors to

18   weigh in and to present their positions and to kind of begin

19   the process of decision-making without you taking the lead and

20   pretty much guiding the rest of the jurors?

21             PANELMEMBER:  I could definitely do that.

22             THE COURT:  All right.  Thank you, sir.

23        Anyone else who has information?  And right behind Juror

24   Number 17 is Juror Number 27; is that correct, sir?

25             PANELMEMBER:  Juror Number 27, yes.

```
 1              THE COURT:  What is your experience?

 2              PANELMEMBER:  Judge, I currently right now am working

 3    for one of the largest distributors of tactical equipment to

 4    the federal government.  But my previous job, I was science and

 5    technology advisor for naval special warfare command and was

 6    involved in quite a few different -- I say cellular technology

 7    development efforts, one of them being in particular with

 8    Qualcomm.

 9              THE COURT:  Did any of it relate to the 5G or 4G

10    technology?

11              PANELMEMBER:  4G.

12              THE COURT:  Do you have a working knowledge of 4G

13    technology?

14              PANELMEMBER:  Yes.  And I'm also currently -- in the

15    current capacity I have right now, I am currently working with

16    the Department of the Interior with the Office of Wildland Fire

17    for bringing forward new communication technologies into their

18    applications in the 4G and Wi-Fi kind of arenas.

19              THE COURT:  And so you worked hand in hand with

20    Qualcomm; is that right?

21              PANELMEMBER:  Yes.  I was directly responsible for

22    the development effort.

23              THE COURT:  All right.  And when was this?

24              PANELMEMBER:  This was in 2010, 2011.

25              THE COURT:  For how long did you work alongside
```

1  Qualcomm?

2         PANELMEMBER:  About two and a half years.

3         THE COURT:  Would that have been from 2010 to 2012,

4  2013?

5         PANELMEMBER:  Correct.

6         THE COURT:  Did you actually work on Qualcomm

7  properties or you worked with their employees out in the field?

8         PANELMEMBER:  Worked with their employees.

9         THE COURT:  Approximately how many people from

10 Qualcomm did you work with?

11        PANELMEMBER:  About -- I want to say two or three

12 employees from Qualcomm and a couple of their consultants and

13 CMs.

14        THE COURT:  And so as to those two or three employees

15 of Qualcomm, do you still touch base with them?  Are you

16 friends with any of them?

17        PANELMEMBER:  No, I have not touched base with any of

18 them.

19        THE COURT:  Does the fact that you worked with

20 employees of Qualcomm, would that affect your view of the case

21 in terms of the evidence that's offered by Qualcomm?  Or as a

22 starting point -- I think we had talked about this -- that one

23 of our jurors has read enough about the case that they have an

24 opinion of sorts and so that they begin with that opinion.

25      Do you begin this process with an opinion or preference

1    for one side or the other?

2          PANELMEMBER:  I don't believe I have an opinion of

3    it.  I do know that the effort was -- was a failure, if you

4    want to call it that, but I don't believe that is an opinion

5    that I would carry over into this.

6          THE COURT:  So, if anything, it sounds like, because

7    of the end result in your work, that there would be a negative

8    view of Qualcomm.

9       Do you have a negative view of Qualcomm?

10          PANELMEMBER:  I don't believe so.

11          THE COURT:  Do you have a positive opinion of

12   Qualcomm?

13          PANELMEMBER:  Yes, I believe so.

14          THE COURT:  And is it sufficiently a positive view

15   that it would weigh in your ultimate decision-making?

16          PANELMEMBER:  I don't believe so.

17          THE COURT:  Are you sure?

18          PANELMEMBER:  Yes, sir.

19          THE COURT:  Okay.

20       Any other jurors with experience in Wi-Fi or cellular?  No

21   others?

22       All right.  Do any of you -- let me see.  Let me go back

23   to this other list.

24       By a show of hands, who here is very familiar with

25   companies that sell cellular or Wi-Fi products, excluding the

1    jurors who have already shared with us they are familiar with

2    how cellular and Wi-Fi technology works?

3         Anyone else who is very familiar with companies that sell

4    cellular or Wi-Fi products?

5         I see no hands.

6         Have you or someone close to you ever worked for any of

7    the following companies:  Apple, Qualcomm, Pegatron, Wistron,

8    Foxconn, Hon Hai, Compal Electronics, or Intel?

9         And we have juror --

10             PANELMEMBER:  Juror Number 40.

11             THE COURT:  Juror Number 40, yes.

12             PANELMEMBER:  When I was a very young child, my dad

13   worked for Qualcomm.

14             THE COURT:  Do you recall, how long did he work

15   there?

16             PANELMEMBER:  I would only be guessing, but I would

17   say maybe five years.

18             THE COURT:  And how long ago would that have been,

19   without dating yourself?

20             PANELMEMBER:  Divulging my age?  I was probably about

21   10 years old, so 35 years ago.

22             THE COURT:  I never would have guessed.

23        All right, so about 35 years ago your dad worked there

24   about five years?

25             PANELMEMBER:  I think so.

1          THE COURT:  He doesn't work there now?

2          PANELMEMBER:  No.

3          THE COURT:  Does he work in technology now?

4          PANELMEMBER:  He is currently retired.

5          THE COURT:  After he left Qualcomm, did he go work

6     with another technology company?

7          PANELMEMBER:  Yes, many.

8          THE COURT:  When did he retire from the technology

9     business?

10         PANELMEMBER:  I think he retired about four years

11    ago.

12         THE COURT:  And his last employer in the field of

13    technology was who?

14         PANELMEMBER:  I couldn't even tell you.  Maybe

15    Skyworks.  He's worked for Skyworks.

16         THE COURT:  Is there anything about his prior

17    employment with Qualcomm that would kind of place a thumb on

18    the scales so you would be more likely to decide in favor of

19    Qualcomm or see the world through the eyes of Qualcomm?

20         PANELMEMBER:  No.

21         THE COURT:  Thank you.

22      Anyone else?

23      Yes.  In the first row in the audience we have a hand.

24    You are Juror Number 19?  Yes.

25         PANELMEMBER:  I have a nephew that is currently

1    working in Qualcomm right now, along with his wife.

2         THE COURT:  You have a nephew that works at Qualcomm

3    and his son?

4         PANELMEMBER:  Wife.

5         THE COURT:  Wife.  I'm sorry.  A nephew and his wife.

6    How long have your nephew and his wife been at Qualcomm?

7         PANELMEMBER:  Approximately 10 or 15 years.

8         THE COURT:  And how close are you with your nephew

9    and his wife?

10        PANELMEMBER:  We only see each other like when there

11   is a party.

12        THE COURT:  Lot of parties?  So you see them once or

13   twice a year?

14        PANELMEMBER:  More than that.

15        THE COURT:  More than that.

16     Do you ever talk about his work at Qualcomm?

17        PANELMEMBER:  No.

18        THE COURT:  Is there anything about the fact that

19   your nephew and his wife work at Qualcomm that would affect you

20   in deciding this case?

21        PANELMEMBER:  No.

22        THE COURT:  No?  All right.  Thank you.

23     Anyone else.

24     We have Juror Number 16.  Is that right?

25        PANELMEMBER:  16.

1          THE COURT:  Yes, sir.

2          PANELMEMBER:  David Turnbull.  I know David Turnbull,

3     and he works for Apple, and his wife used to work for Apple

4     too, Linda Turnbull.

5          THE COURT:  Was he one of the witnesses that I --

6          PANELMEMBER:  No.

7          THE COURT:  But you know someone by the name?

8          PANELMEMBER:  Linda is my cousin.

9          THE COURT:  I guess --

10         PANELMEMBER:  That would be my cousin's husband works

11    at Apple, but we don't see anybody, only on rare occasions when

12    we go to Michigan for a wedding or something like that.  In the

13    '90s we saw each other more but not anymore.

14         THE COURT:  So the fact that your cousin's husband

15    works at Apple, would that in any way impact or affect your

16    view of the evidence?

17         PANELMEMBER:  No, it shouldn't.  It won't.

18         THE COURT:  It won't.  All right.  Thank you, sir.

19       Then Juror Number 20?

20         PANELMEMBER:  My sister-in-law works at Qualcomm.

21         THE COURT:  For how long?

22         PANELMEMBER:  Three or four years at least.

23         THE COURT:  Do you ever talk with your sister-in-law

24    about her work?

25         PANELMEMBER:  Not too much.

```
1              THE COURT:  You try to avoid it?

2              PANELMEMBER:  Yeah, don't talk about work.

3              THE COURT:  Is there anything about the fact that

4    your sister-in-law works with Qualcomm that would impact your

5    ability to be fair in this case?

6              PANELMEMBER:  No.

7              THE COURT:  Thank you.

8         Anyone else?

9         I see no other hands.

10        Has any prospective juror had a negative experience with

11   Apple or its products?

12        I see no hands.

13        Has any prospective juror had a negative experience with

14   Qualcomm or its products?

15        I see no hands.

16        And my apologies to the CMs, but I am going to ask this

17   globally.  Has any juror had a negative experience with either

18   Pegatron, Wistron, Foxconn, or Hon Hai, or Compal?

19        I see no affirmative responses.

20        There will be testimony from a number of companies in this

21   case.  Let me ask whether or not you've had a negative

22   experience with any of these companies.  They are Intel,

23   Broadcom, Huawei -- I think I said it right, H-U-A-W-E-I --

24   Lenovo, Sony Mobile, Motorola, Blackberry, Ericsson, Samsung,

25   ZTE, LGE, MediaTek, Nokia, Boston Consulting Group.
```

1          Anyone ever had a negative experience with any of those

2     companies?

3          I see no hands.

4          Let me ask the jury, prospective jurors, have you ever

5     been employed by a company that works with foreign companies to

6     manufacture any type of product or provide any service?  One

7     hand and that is Juror Number 16.  Yes, sir.

8               PANELMEMBER:  We contract out chemistry, so it's

9     mainly in China.

10              THE COURT:  You contract out chemistry?

11              PANELMEMBER:  Chemistry.

12              THE COURT:  What does that mean, "contract out

13    chemistry"?

14              PANELMEMBER:  Small molecules, drug components.  It

15    would be like Wushi Pharmaceuticals.  That is our main

16    contractor, I believe.

17              THE COURT:  Take a step back.  What role were you

18    playing when you had this experience where there was this

19    contracting out of chemistry to China?

20              PANELMEMBER:  I requested a compound; they made the

21    compound.

22              THE COURT:  Which role do you hold?  How are you

23    employed?

24              PANELMEMBER:  Vertex Pharmaceuticals.

25              THE COURT:  So you work at pharmaceuticals, and so on

1    occasion, then, you will send out particles for testing?

2              PANELMEMBER:  Request a compound that we have used

3    before, and then if they can't make it in mass quantities, they

4    will subcontract it out to Wushi Pharmaceuticals is one that I

5    believe that I've used.  I haven't been in contact with them.

6    That's where I received my compounds from.

7              THE COURT:  And how long have you been making these

8    requests for services from this Chinese company?

9              PANELMEMBER:  I have been there since 2000, and I

10   think they started working with Wushi in 2010.

11             THE COURT:  Is there anything about your experience

12   with these Chinese companies that would impact your view of the

13   evidence here, would impact your ability to be fair in this

14   case?

15             PANELMEMBER:  No.  Because everything is purified.

16   You have a reading.  You know exactly what you are getting.

17             THE COURT:  Thank you, sir.

18        Anyone else?  You are Juror Number 33.  Yes, sir.

19             PANELMEMBER:  The company I currently work for, we

20   import products from China, Taiwan, India, Germany, Spain, and

21   Great Britain.

22             THE COURT:  What is your position?

23             PANELMEMBER:  I am a manager.  I am the operations

24   manager.

25             THE COURT:  For?

1              PANELMEMBER:  It is a small company called American

2    General Tools.

3              THE COURT:  A tool company?

4              PANELMEMBER:  It is a tool company, import power

5    tools, equipment, accessories.

6              THE COURT:  Anything about your work importing from

7    these foreign countries that would affect your ability to be

8    fair in this case?

9              PANELMEMBER:  No.

10             THE COURT:  Thank you, sir.

11        Anyone else?

12             PANELMEMBER:  If I understand the question, I worked

13   for United Healthcare and we have subsidiaries in other

14   countries.

15             THE COURT:  So these subsidiaries, do they

16   manufacture any type of product?

17             PANELMEMBER:  They have -- they are -- especially in

18   pharmaceuticals that they were in charge of.

19             THE COURT:  So they do perform some manufacturing as

20   far as the pharmaceuticals?

21             THE DEFENDANT:  I do not know.

22             THE COURT:  They do not.

23             PANELMEMBER:  I do not know for sure.  That's why I

24   am a little bit --

25             THE COURT:  Hesitant.  But anything about that which

 1   would impact your ability to be fair in this case?

 2            PANELMEMBER:  No.  I never had to participate beyond

 3   the domain of the United States.

 4            THE COURT:  Thank you.

 5        To the best of your knowledge, have you or your employer

 6   ever been accused of breaking an important contract or business

 7   agreement with another party?

 8        I see no hands.

 9        To the best of your knowledge, have you or your employer

10   ever been accused of not paying a royalty or licensing fee to

11   another party?

12        I see no hands.

13        Some of the parties in this case are claiming financial

14   loss and damages due to anticompetitive behavior or breach of

15   contract.  Do any of you have any hesitation in awarding

16   monetary damages, assuming the requesting party has carried its

17   burden?

18        Does anybody have a problem with awarding damages if

19   warranted?

20        I see no hands.

21        I'm sorry.  We do have a hand.  Juror Number 16, yes, sir.

22            PANELMEMBER:  Will there be a formula to determine

23   what the damages would be?

24            THE COURT:  Let me ask, if there were one, would you

25   be able to abide by it?

1          PANELMEMBER:  Yes.

2          THE COURT:  And if there wasn't one?

3          PANELMEMBER:  You can't just make up a number.

4          THE COURT:  So you would be instructed by the Court

5    with respect to the issue of damages and how you are to compute

6    them and what you are to take into account but keeping in mind

7    that the ultimate determination after following the law would

8    be on the jury.

9       Is there anything about that process of determining

10   damages which would make it difficult or impossible for you to

11   serve as a juror?

12         PANELMEMBER:  No.  I just didn't want it to be like a

13   Monsanto case where you round up.

14         THE COURT:  And so let me ask, with respect to that

15   case, did you disagree ultimately with the final outcome?

16         PANELMEMBER:  I wasn't a juror on the case.  I don't

17   know what the facts were.  All I know was that the sum was

18   quite a bit for what happened.

19         THE COURT:  Is there anything about that outcome that

20   would affect your ability to be fair in this case?

21         PANELMEMBER:  No, because I will be looking at the

22   facts in this case to see what's going on.  I mean, that

23   outcome could have been justified too.  I don't know the facts.

24   I just know it was a large sum.

25         THE COURT:  Yeah.  And keeping in mind that there are

1    things such as that that may affect somebody in such a way

2    where they would allow that to influence them, how they see the

3    case before them, and that would be -- certainly that would be

4    wrong.

5         And, but you are, from what I can tell, prepared to judge

6    this case, among other things, as to damages based on the

7    evidence that you hear, the evidence that is admitted and then

8    following the instructions of the Court; is that right?

9              PANELMEMBER:  Correct.  The facts.

10             THE COURT:  Thank you, sir.

11        Anyone else?

12        I see no other hands.

13        If you are selected as a juror, you will act as a judge of

14   the facts.  However, I remain the judge of the law.  It is

15   important that I have your assurance that you will, without

16   reservation, follow my instructions and rulings on the law and

17   will apply that law to this case.

18        Is there anyone that has a problem with that?

19        And let me get a little bit more granular about that.  The

20   jury will play the role of judges of the facts.  And you're

21   wondering, well, what am I doing here?

22        I'm the judge of the law.  And, in that role, I identify

23   the applicable law and provide it to you, number one.

24        And then, number two, as a judge of the law, I determine

25   what evidence is admissible, what evidence should be presented

```
1    to you.
2         And you can imagine that there's a lot of evidence that
3    would potentially be offered.  And so I have to make the
4    determinations, like yes, yes, yes, no.  Or no, no, no, yes.  I
5    have to make that call.
6         And what I'm doing, it sometimes plays out here in open
7    court.  There is a question, there's an objection, I rule on
8    it, overruled, sustained.
9         But then sometimes there are areas of inquiry that are
10   potentially so prejudicial, unduly prejudicial, or confusing
11   that the lawyers and myself meet outside of your presence.  And
12   that kind of lets me segue into what -- perhaps why the
13   elevator to hell stops at jury service on its way down to car
14   dealers.
15        And that's because -- and I know this because here's my
16   jury badge.  Jurors complain about waiting around, just sitting
17   around not knowing what is going on.  And -- if not resenting
18   it, kind of like "Really?  That's why you called me out here,
19   so I could sit around in the hallway for an hour?"
20        I will do everything in my power to avoid that.  I can't
21   guarantee that I will be able to execute on that, but here's
22   what I can tell you:  I will meet with the lawyers before you
23   get here.  I will meet with the lawyers after you leave.  And I
24   will do that in order to reduce the inconvenience to you
25   because I respect and honor the fact that you are here.  And I
```

```
 1   don't take your appearance here for granted.
 2        So I need to do everything that I can in my power to make
 3   it so that we make the best use of your time.  So that's what I
 4   promise we will do.
 5        But, having said that, there will be issues that come up.
 6   And, especially, you can imagine, in a case where there's a lot
 7   of claims, there's a lot of issues that are before the Court,
 8   that I am going to want to meet with the attorneys outside of
 9   your presence.
10        I will do everything in my power to minimize the
11   inconvenience to you; but, on occasion, that may happen.  But
12   while we're in conference outside your presence, that's what we
13   are doing.  We are wrestling with issues at law that me, the
14   judge of the law, has to rule on.
15        So, believe it or not, we are almost done with this
16   portion of the jury selection process.  And I apologize for
17   going over the noon hour, but it's just that we were so close
18   to concluding this, that I didn't want to send you to lunch and
19   then have you hear me some more when you get back.
20        What's going to happen is, when you get back, the lawyers
21   will be talking to you and they'll be following up with
22   questions about things that they've read in your questionnaires
23   or from responses that you've made here in open court.
24        At this point, given the agreement of counsel, though, I
25   am prepared to excuse a couple of jurors.  One will be Juror
```

1   Number 31.  And I'll ask counsel to make sure that I have this

2   right.

3        Juror Number 31, we will be excusing you.  We will ask you

4   to return to the jury room.

5        And there's no disagreement, correct?

6             MR. CORDELL:  Correct, Your Honor.

7             THE COURT:  And also Juror Number 29, we will be

8   excusing.  And I will ask you to return to the jury room to see

9   if they need any additional jurors in any other case that may

10  be going forward today.

11       Also Juror Number 15, I will be excusing you with the

12  agreement of counsel.

13       And let me see.  I think that's what I had.

14       So, then, those three jurors will be excused.  You will

15  not have to return after the lunch hour.  All right?

16       And then, as to the rest of you, I will be giving you an

17  hour lunch.  So we'll resume at about 1:00 -- let's make it

18  1:30.  Because, at this time, I am going to read an instruction

19  that's kind of long.  And that will probably take three or four

20  minutes by itself.

21       Do not communicate with anyone in any way and do not let

22  anyone else communicate with you in any way about the merits of

23  the case or anything to do with it.  This includes discussing

24  the case in person, in writing, by phone, or electronic means

25  via e-mail, text messaging, or any internet chat room, blog,

1    website, or application including, but not limited to,

2    Facebook, YouTube, Twitter, Instagram, LinkedIn, Snapchat, or

3    any other forms of social media.

4        This applies to communicating with your fellow jurors

5    until I give you the case for deliberation and it applies to

6    communicating with everyone else, including your family

7    members, your employer, your former colleagues from work, the

8    media, or the press.

9        And we need to have you abide by this in order to try to,

10   as much as possible, have you in a place where you decide the

11   case on the evidence that's admitted here and the law that I

12   give to you, and that you are not influenced or affected by the

13   opinions of others that they may share on an elevator, that

14   they may share by social media, that they may share in a story

15   or an account in the newspapers or on TV.

16       We do expect that there will be a fair amount of coverage

17   of this case.  And, as a result, then, you need to be like

18   Juror Number 1, our model juror.  And once you see that there's

19   a story about this case, you need to shut it off or turn it

20   down or go to another source of information.

21       So we will resume at 1:30.  And, throughout these

22   proceedings, I will remind you of the admonition that you not

23   speak about this with anyone, including your family, friends,

24   coworkers, not perform any form of research regarding this

25   case, the issues it presents.

1          And these rules protect each party's right to have the

2   case decided only on the evidence that has been presented here

3   in court.  Witnesses here in court take an oath to tell the

4   truth, and the accuracy of their testimony is tested through

5   the trial process.

6          If you do any research or investigation outside the

7   courtroom or gain any information through improper

8   communications, then your verdict may be influenced by

9   inaccurate, incomplete, or misleading information that has not

10  been tested by the trial process.

11         A juror who violates the admonishment restrictions that I

12  have given you jeopardizes the fairness of these proceedings,

13  and a mistrial could result that would require the entire trial

14  process to start over.

15         If any juror is exposed to any outside information, please

16  notify the Court immediately.

17         So, with that, that brings us to our lunch hour.  We will

18  see you at 1:30.

19         And just remember this:  We can't start back up unless we

20  have every one of you here.  So it's not like if we have

21  everyone except one or two, we can start back.  No.  We need

22  every one of you back.

23         So also keeping in mind that, on days like this, there can

24  be a line outside, people trying to get back into the

25  courthouse, keep that in mind and try to get here a couple

1   minutes early.

2       While we will start at 1:30, I would like you to be

3   outside at 1:25 or 1:20.  So, that way, when I ask my clerk to

4   go out, she'll come out and say they're all here and we will be

5   able to start exactly at 1:30.  Have a great lunch.

6       (The following proceedings were held in open court out of

7   the presence of the jury:)

8           THE COURT:  Please be seated.

9       So let me take a look where we are.  We lost three

10  additional -- three or four -- four, with Juror Number 2 being

11  the first.  Jurors, we started with 35, and we're down to 31.

12  The challenges I have given you amount to 11 --

13          MR. CORDELL:  12.

14          THE COURT:  12.  So then -- all right.  We still

15  should be fine unless we have your attorney-conducted voir dire

16  result in additional excuses for cause.

17      Is there anything that we need to address at this moment?

18          MR. DOREN:  No, Your Honor.

19          MR. CORDELL:  Not from us.

20          MS. BROOKS:  No, Your Honor.

21          MS. HEWITT:  No, Your Honor.

22          THE COURT:  So I will ask you as well to be back here

23  early, because the last thing we want to do is not to have all

24  of our attorneys present and for me to look like a liar when I

25  say we are going to start at exactly 1:30.

1      So have a good lunch.  We will see you at 1:30.

2            ALL:  Thank you, Your Honor.

3      (Recess taken from 12:25 p.m. to 1:28 p.m.)

4      (The following proceedings were held in open court out of

5  the presence of the jury:)

6            THE COURT:  Good afternoon.

7            ALL:  Good afternoon, Your Honor.

8            THE COURT:  Thank you for being early.  We will check

9  on our jury and see if they're out there.

10     Just so counsel will know, after we're done selecting the

11  jury, I am going to hand out a proposed preliminary instruction

12  relating to claims and defenses.  It is in the shape that I am

13  going to issue it, but there is a question on a couple of the

14  claims relating to declarations that I want to talk with you

15  about.  But we'll tackle that after we have our jury and we

16  send them home for the day.

17     (Brief discussion off the record.)

18            THE COURT:  And I know we have one or more members of

19  the media here.  And I know that there was some confusion and

20  perhaps conflicting instructions on the use of electronics.

21            THE CLERK:  We are missing one, Judge.  So I am just

22  checking the restrooms.  We are missing one.

23            THE COURT:  All right.

24     We will take that up at the end of the day as well.  So we

25  will hopefully address this so there is not any lack of

clarity.

(The following proceedings were held in open court in the presence of the jury:)

THE COURT: Please be seated.

Let me double-check with my clerk.

THE CLERK: We have everyone, Judge.

THE COURT: Very good. Good afternoon.

ALL: Good afternoon.

THE COURT: Hope you had a wonderful lunch. I understand that you all performed an experiment this afternoon to see whether or not it was true whether or not we would be able to start without each and every one of you. And you now have seen it is true. So we'll keep that in mind as we proceed that we need all prospective jurors or, actually, all the jurors before we can proceed.

I mentioned before we broke that, at this time, I'm going to turn it over to the attorneys. And, as you know, there is three sets of attorneys, and they represent different interests in these proceedings. We have Apple's attorneys, the CMs' attorneys, and the Qualcomm.

We are going to proceed first with the attorneys for the plaintiffs, Apple, keeping in mind that Qualcomm is also a plaintiff. I mentioned at the very beginning that there's two cases. This is referred to In Re: Qualcomm Litigation, but there are two cases that we've joined together.

```
 1        And, normally, the plaintiff goes first, and that's

 2   because the plaintiff has the burden of proof.  Here, in some

 3   ways, we have two plaintiffs and maybe even three if you count

 4   a counterclaimant.

 5        But, in order to avoid any confusion, at this point, we

 6   will proceed with Apple going first, then the CMs, and then

 7   Qualcomm, at the same time recognizing that Qualcomm is also a

 8   plaintiff in their case.

 9        So, with that, who speaks on behalf of Apple?

10            MS. BROOKS:  I do, Your Honor.  Thank you.

11        Good afternoon, ladies and gentlemen of the jury.

12            ALL:  Good afternoon.

13            MS. BROOKS:  I introduced myself before.  My name is

14   Juanita Brooks.  And, along with my colleagues, we will be

15   representing Apple throughout this proceeding.

16        We each have 30 minutes to talk to you.  And there's a lot

17   of you, so, unfortunately, I won't be able to talk to all of

18   you.  What I really want to do is ask you some questions based

19   on some of your answers to the questionnaire that we didn't

20   quite get to flesh out when His Honor was questioning you.

21        So I'm going to start with Juror Number 4.

22        And I apologize in advance.  I am going to try really hard

23   not to use your names, but I am an Air Force brat.  And my dad

24   told me that you always use the last name, never even the first

25   name, let alone a number.  So I hope I don't slip up.  Boy, is
```

1   this going to be hard.

2       Mr. 4, how's that?  Mr. 4, you mentioned that, on your

3   questionnaire, as far as what smartphone you have, you listed

4   both an iPhone and a Samsung.  Can you tell me a little bit

5   more about that.  Which one do you use and how often?

6           PANELMEMBER:  Originally, I started with a Samsung

7   and lost it.  And then, in order to replace it, I bought an

8   iPhone.  And I have been with it ever since.

9           MS. BROOKS:  And how long has that been?

10          PANELMEMBER:  Since the iPhone 4.  So it's been a few

11  years.  Yeah, four or five years or so.

12          MS. BROOKS:  All right.  Well, thank you for your

13  business.  Thank you.  If you could pass the mic to Juror

14  Number 5.

15      That's it.  I'll call everybody sir and ma'am.  That will

16  work for me.

17      Sir, you mentioned that you had read about the case in a

18  newspaper.  You said you read one article about three days ago.

19  Can you tell me -- without telling me what you read, can you

20  tell me what newspaper it was?

21          PANELMEMBER:  The local San Diego Union.

22          MS. BROOKS:  The Union?  Okay.  And do you have a

23  pretty distinct recollection of what you read?

24          PANELMEMBER:  As I stated, I honestly cannot recall.

25  I wouldn't want to have a test on this because I wouldn't do

1    very well.  I do not recall the content of the article,

2    frankly.

3              MS. BROOKS:  Okay.  So let me ask you this:  If you

4    end up on this jury and, during the course of the trial, it

5    comes back to you what you read, will you be able to put that

6    aside, whatever it is you read, and just base any decision you

7    make on the evidence you're going to hear in this courtroom?

8              PANELMEMBER:  Absolutely.

9              MS. BROOKS:  All right.  Thank you.

10        Now, let me ask you about your smartphone.  You said you

11   do have one; but, on your questionnaire, you didn't list what

12   kind or how often you use it.  Can you tell me a little bit

13   about that.

14             PANELMEMBER:  Very similar to Number 4.  I still have

15   a smartphone, but I don't use it.  And I have the iPhone now.

16   That's my active phone.

17             MS. BROOKS:  And which model iPhone do you have?

18             PANELMEMBER:  6.

19             MS. BROOKS:  The 6.  And how often would you say you

20   use it?

21             PANELMEMBER:  Often.

22             MS. BROOKS:  Okay.  Do you use it just for phone

23   calls or for other things too?

24             PANELMEMBER:  Oh, no, for other things too:

25   texting -- oh, gosh -- games, like Words with Friends, and

1    things like that.

2              MS. BROOKS:  And do you use the Wi-Fi feature?

3              PANELMEMBER:  Yes.

4              MS. BROOKS:  Would you say you use the Wi-Fi feature

5    quite a bit or a little bit?

6              PANELMEMBER:  I would say sometimes.

7              MS. BROOKS:  All right.  Thank you very much.  If you

8    could pass the microphone to Juror Number 6.

9         Hello.  On your questionnaire, ma'am, under Question 31

10   for hardship, you checked off "Yes" because this is --

11             PANELMEMBER:  I was just saying for a high holiday,

12   it's a holy month -- or week.  So I was doing Passover and

13   Easter and Palm Sunday.  So I was saying for Friday, but it

14   sounds like Friday is a dark day.  So that's the only reason I

15   put down.

16             MS. BROOKS:  Okay.  Great.  So it wouldn't be a

17   problem for you if we -- as His Honor said, we will not be in

18   session on Friday.  So that will work out for you?

19             PANELMEMBER:  Correct.

20             MS. BROOKS:  Okay.  Great.  You also checked off that

21   you -- Question 17 is whether you had a strong opinion about

22   Apple.  And you said yes.  And you put down the reason why.

23        So -- and, you know, I agree.  And I think you're going to

24   learn during this trial why that is actually.  With that in

25   mind --

```
 1              THE COURT:  Ms. Brooks, try to focus on questions and
 2    not editorials.
 3              MS. BROOKS:  Yes, Your Honor.  Sorry.
 4         With that in mind, with your answer to Question 17, would
 5    that cause Apple to start a little bit behind in this case?
 6              PANELMEMBER:  No, because, again, this is all
 7    factual.  And I don't know exactly what this case -- other than
 8    what the judge said at the beginning, what this is about.  So
 9    this -- having that answer has nothing to do with this case.
10              MS. BROOKS:  Okay.  Great.  Thank you very much.  If
11    you could pass, then, to Juror Number 7.
12         Hello, sir.
13              PANELMEMBER:  Hi.
14              MS. BROOKS:  As far as your use of Apple products,
15    you checked off no, never.  And I was wondering if there was
16    any particular reason why you never used an Apple product or it
17    just turns out that you just have never done so.
18              PANELMEMBER:  I don't think of a reason why, just
19    because the way it turned out.  There's another choice or
20    choices, so I never chose Apple.
21              MS. BROOKS:  Do you have a smartphone?
22              PANELMEMBER:  I do.
23              MS. BROOKS:  What sort of smartphone do you have?
24              PANELMEMBER:  A Samsung.
25              MS. BROOKS:  So some people are just avid Samsung
```

1    Droid users and truly don't like Apple; and, others, it's just

2    whatever is convenient.  Where would you put yourself on that?

3              PANELMEMBER:  I think it's just convenient.  When you

4    start with certain ones, it sort of becomes a habit.  I just

5    never thought about changing.  So I guess I was satisfied with

6    what I had.  So I didn't think it was necessary to change.

7              MS. BROOKS:  Okay.  Great.  And nothing about that, I

8    assume, would cause you to have Apple start a little bit behind

9    for you in this case?

10             PANELMEMBER:  No, not at all.

11             MS. BROOKS:  Great.  Thank you very much, sir.

12        I am going to come and get the microphone and give it to

13   Juror Number 10.

14        Thank you, sir.  Can you tell me a little bit about -- you

15   have your prior occupation as investment counselor.  Can you

16   tell me a little bit more about that?

17             PANELMEMBER:  I managed money for wealthy individuals

18   and was a trustee, a professional trustee, for 35 years.

19             MS. BROOKS:  Are you retired now, or are you still an

20   investment counselor?

21             PANELMEMBER:  I retired three and a half years ago.

22             MS. BROOKS:  How are you liking it?

23             PANELMEMBER:  You know, it is not as easy as I

24   thought it would be.

25             MS. BROOKS:  So you kind of miss being in the action?

```
 1            PANELMEMBER:  I sort of need deadlines to be very

 2    effective.

 3            MS. BROOKS:  And in your investment counseling in the

 4    past, would you actually counsel clients as to what companies

 5    they should invest in, for example?

 6            PANELMEMBER:  No.  I had a power of attorney, so I

 7    didn't counsel; I just invested.

 8            MS. BROOKS:  Okay.  And did you ever have occasion to

 9    invest the client's money that you have the power of attorney

10    for in either Apple or Qualcomm, for example?

11            PANELMEMBER:  Both at various times.

12            MS. BROOKS:  Was there anything about that experience

13    that would cause you to favor one side or the other?

14            PANELMEMBER:  No.

15            MS. BROOKS:  Okay.  Thank you very much.  If you

16    could pass the microphone to the gentleman next to you.

17        We have another Samsung user.  Any particular reason why a

18    Samsung Galaxy over an iPhone?

19            PANELMEMBER:  No.  Just convenience.

20            MS. BROOKS:  Okay.  And nothing about that would

21    cause you to have Apple start a little bit behind in this case

22    over Qualcomm, for example?

23            PANELMEMBER:  No.

24            MS. BROOKS:  You also mentioned, to Question 29, that

25    you had heard of the case.  You said that you believed so, but
```

```
 1   you couldn't recall any details on the basis of the lawsuit.
 2   Do you remember where you had heard or read about it?
 3              PANELMEMBER:  No.
 4         MS. BROOKS:  Okay.  Not even that?  All right.
 5   Great.
 6         Same question I asked the other gentleman, though.  If,
 7   during the course of this trial, you all of a sudden remember
 8   what it is that you read or what it is that you heard, would
 9   you be able to put that aside and, whatever decision you make,
10   base it solely on the evidence you hear in court?
11              PANELMEMBER:  Yes.
12         MS. BROOKS:  Okay.  Great.  Thank you very much.  If
13   you could pass, then, the microphone.
14         I think we're going to go to this row over here now.
15   Thank you.
16         It's your turn, Juror Number 16.  I noticed that you
17   nodded when I mentioned that we, Fish & Richardson's sign is
18   off I-5?
19              PANELMEMBER:  I have seen it.
20         MS. BROOKS:  I want to make sure that you know it's
21   not there anymore, but it's only because the building is under
22   construction.  And we haven't gone out of business.
23              PANELMEMBER:  That's fine.
24         MS. BROOKS:  Okay.  Good.  Just wanted to make sure
25   in case you drive by there tonight and go, "Wait a minute.
```

1    It's gone."  We are still there.

2        I want to talk to you a little bit about what you answered

3    to Question 16, which is, if I read your answer correctly, that

4    you have designed -- the question was about have you designed

5    or invented or created something.  And you wrote down four

6    patents?

7                PANELMEMBER:  Yes.

8                MS. BROOKS:  Okay.  Tell me a little bit about that.

9                PANELMEMBER:  Two of them were from Sytemix.  It's a

10   biotech company, stem cell company, in the Bay Area.  And the

11   other two were from Beckman Coulter.

12               MS. BROOKS:  I'm sorry.  I didn't mean to interrupt.

13   Go ahead.

14               PANELMEMBER:  The first one was for -- it was really

15   simple, stupid, but it was just a mirror for a laser deflecting

16   to a glass, BK glass, that didn't use any -- like a signal of

17   the laser.  So we closed up a chamber for a -- so that was one.

18       And the other patent was, I think, for the same thing.

19   I'm not sure, but they just had a different iteration of it, a

20   newer version.

21       And then, for the other patent, was at Beckman Coulter.

22   And it was for a cell-washing system using a hull fiber.  And

23   then those are my diagrams on the front of the patent.  And

24   that was it.  They made an instrument out of it.  They marketed

25   it, and they sold it I don't know for how many years.  But I

```
 1    can't remember the exact name of the instrument because it's
 2    been so long.
 3         These were back in the '90s.
 4              MS. BROOKS:  So did you have direct interaction with
 5    the patent and trademark office while --
 6              PANELMEMBER:  Just the patent attorneys when they
 7    came in and we had to verify all the documents, all the
 8    pictures, and make sure everything was correct as far as part
 9    numbers and how everything was used.
10              MS. BROOKS:  And you were listed as an inventor,
11    then, on each of those patents?
12              PANELMEMBER:  Yes.
13              MS. BROOKS:  And how long ago was that?
14              PANELMEMBER:  I think the one for Sytemix was in '95,
15    and the other one was '99 for Beckman Coulter.
16              MS. BROOKS:  Anything since then?
17              PANELMEMBER:  I don't know.  They quit recognizing
18    people on patents anymore.  So nothing since then.
19              MS. BROOKS:  Thank you.  If you could pass the
20    microphone to Juror Number 17.
21         I've got to just come right out and ask you, sir.  On your
22    questionnaire, when you were asked if you had any opinions, you
23    have, "I do have some opinions, but I haven't formed any
24    conclusions."
25         So I have to ask, what are your opinions?
```

```
 1              PANELMEMBER:  How much time do we have?

 2         MS. BROOKS:  I have 30 minutes.

 3              PANELMEMBER:  I have been an Apple user both --

 4    pretty much since they started producing Intel desktops.  I've

 5    been an iPhone user since the 3G model.  I have liked their

 6    products, but I don't really like some of the directions that

 7    they are going for some of the power users.  So that's a slight

 8    negative; but, overall, I understand the reasoning from market

 9    share of why they're doing it.

10        I don't know how much more you want me to elaborate on

11    this.  I mean, because I originally chose the iPhone because it

12    fit into my ecosystem.  I have stuck with it because of that.

13    I don't really have any dislike so much for the Samsung or any

14    of the Qualcomm or the non-iPhone devices.

15              MS. BROOKS:  Okay.  But -- so it sounds like there's

16    both pluses in your experience with Apple, or your opinions

17    about Apple, but there's also some negatives in your opinions

18    about Apple.

19              PANELMEMBER:  Correct.

20              MS. BROOKS:  With all of that in mind, because only

21    you can tell us, are we going to start out on an even playing

22    field here, or are we going to start out a little bit behind?

23    Or, frankly, are we have going to start out a little bit ahead?

24              PANELMEMBER:  I would say you are pretty much on an

25    even playing field because I have similar thoughts on the other
```

```
 1   side too.

 2            MS. BROOKS:  Okay.  I appreciate that, then.  Thank

 3   you very much.

 4            PANELMEMBER:  You're welcome.

 5            MS. BROOKS:  If you could hand the microphone to

 6   Juror 18.

 7       So you mentioned that you have a vacation starting

 8   May 22nd.

 9            PANELMEMBER:  Yes.

10            MS. BROOKS:  And if, in fact, we get this case to you

11   in a timely fashion, that should be around May 13 or 14 at the

12   latest.  So I just want to make sure that, if you ended up on

13   the jury, you wouldn't be worried the whole time that you might

14   be running into your vacation.  Do you think that might cause

15   you some issues?

16            PANELMEMBER:  I had would be fine as long as –– I

17   would be happy to serve my duty as long as it would be done

18   before my –– when I leave.

19            MS. BROOKS:  Okay.  Thank you very much.  I think

20   we've got a comfortable window there, so it should be okay.

21   Thank you.

22       If you could hand the microphone to Juror 19.

23       Ma'am, on your questionnaire, on Question 31, when you

24   were asked if you had any hardship, you checked off yes, and

25   you listed some medical conditions.  I wondered if you would
```

1    want to go to sidebar and talk to the Court about that.

2            PANELMEMBER:  Yes.

3            MS. BROOKS:  Your Honor, would that be permissible?

4            THE COURT:  Yes, of course.

5        (The following proceedings were heard at sidebar with

6    Juror 19:)

7            THE COURT:  Hello.  How are you?

8            THE WITNESS:  Good.

9            THE COURT:  Do you want to follow up at sidebar?

10           MS. BROOKS:  You checked "hardship" because you are a

11   diabetic patient, heart problems, and blood pressure,

12   palpitations, and taking medication for high cholesterol?

13           PANELMEMBER:  Right.

14           MS. BROOKS:  Do you think that your health would be

15   adversely, negatively affected if you sat on this case?

16           PANELMEMBER:  It could be, because my palpitations

17   sometimes comes without any warning.

18           MS. BROOKS:  Okay.

19           THE COURT:  So when the palpitations come, what do

20   you have to do?

21           PANELMEMBER:  I have to take medication.

22           THE COURT:  And then do you have to go somewhere and

23   lay down?

24           PANELMEMBER:  Well, because sometimes, when it comes,

25   I feel like I am going to faint.

```
 1              THE COURT:  Does it happen in a situation like here,
 2     where you are just seated somewhere and then all of a sudden it
 3     comes over you, or are you generally active when something like
 4     that happens?
 5              PANELMEMBER:  Nothing.  It just comes.
 6              THE COURT:  It just comes whenever it wants to come?
 7              PANELMEMBER:  Even at work, because I am a nurse.
 8     When it comes, they have to wheel me down to the emergency
 9     room.
10              THE COURT:  And how long does it take to adjust and
11     be able to overcome this situation?
12              PANELMEMBER:  Maybe 10, 15 minutes, but my heart goes
13     up to like 250.
14              THE COURT:  Do you need to go see a doctor right
15     away?
16              PANELMEMBER:  Yes.  Yes.
17              THE COURT:  So if it happened here, would you require
18     an ambulance, or would you be able to have somebody drive you
19     to the doctor, or how would that work?
20              PANELMEMBER:  I am not sure, because today I didn't
21     bring my medication.  I left it at home.
22              THE COURT:  How often does this happen?  Once a week?
23     Once a month?  Once a year?
24              PANELMEMBER:  Sometimes once a month.  It doesn't,
25     you know --
```

```
1              THE COURT:  When was the last time it happened?

2              PANELMEMBER:  Maybe three months ago.

3              THE COURT:  Anything else?

4              MS. BROOKS:  No, Your Honor.  Thank you very much.

5              MR. CHESLER:  Nothing.

6              THE COURT:  Thank you.

7         (Juror 19 left sidebar conference.)

8              MS. BROOKS:  We ask the Court to excuse this juror.

9    I can share with the Court that my second husband -- not my

10   current husband, second husband -- suffered from heart

11   palpitations.  And it can be very serious.  You have to

12   sometimes go the ER and get shocked back to normal rhythm.

13             THE COURT:  Any objection?

14             MR. DOREN:  No.

15             MR. CHESLER:  No.

16             THE COURT:  We will excuse her.

17        Right now, you are at about 15 minutes or so.  We will

18   excuse her at the end of yours.

19             MS. BROOKS:  Thank you.

20        (The following proceedings were held in open court in the

21   presence of the jury:)

22             MS. BROOKS:  I am going to skip ahead to Juror

23   Number 23.  Here you are.  I'll move around so I am not

24   standing on top of you.

25        You mentioned in your questionnaire that you read the tech
```

```
 1   news daily, like every day?  Not the TechNewsDaily, as in the
 2   newspaper, but the tech news every day.  What kind of tech news
 3   do you read?
 4              PANELMEMBER:  I work in a biotech company, so I just
 5   read about new products that come out in biotech.
 6              MS. BROOKS:  And exactly is your -- I noticed you put
 7   down "student development associate."  Can you elaborate a
 8   little more about what you do for the tech company?
 9              PANELMEMBER:  Yes.  So my company manufactures rapid
10   diagnostics test kits.  So as a development associate, I am,
11   like, an assistant to the scientists.  So we develop products
12   that go out commercially.
13              MS. BROOKS:  Under "smartphone," you mentioned that
14   you use one but didn't list what kind.  What kind of smartphone
15   do you have?
16              PANELMEMBER:  I have an iPhone X.
17              MS. BROOKS:  How long have you had that?
18              PANELMEMBER:  For about two years.
19              MS. BROOKS:  And happy with it?
20              PANELMEMBER:  Yes.
21              MS. BROOKS:  Great.  Last, you mentioned that, under
22   hardship, your company only pays for one week of jury duty.
23              PANELMEMBER:  Yes.  So, apparently, my company only
24   pays for one week of jury duty.  So I would have to do PTO if I
25   do get selected.
```

```
 1              MS. BROOKS:  Is that a big issue for you?

 2              PANELMEMBER:  Right now, I believe so, because I just

 3    got promoted.  So I think that can be a hardship on my part.

 4              MS. BROOKS:  Your Honor, I don't know if you wanted

 5    to approach this at sidebar or if that's sufficient.

 6              THE COURT:  You can continue with your inquiries, and

 7    then we'll address that later.

 8              MS. BROOKS:  Thank you.

 9         Let's move to Juror 24.  So you had all sorts of really

10    interesting information to give us here.  A self-employed

11    private fiduciary, and you described that for us.  Are you an

12    attorney?  Are you like --

13              PANELMEMBER:  No.

14         MS. BROOKS:  So -- and you said it was on-the-job

15    training.  Tell me a little bit more about that.

16              PANELMEMBER:  Well, I was a CFO for a commercial

17    printer.  And then the family started coming into the business,

18    the sons and daughters.  And I didn't approve the way they were

19    going about the printing business, so I left.

20              MS. BROOKS:  Okay.

21              PANELMEMBER:  And one of my friends who was a probate

22    attorney had told me, "Well, I've got some trusts and they need

23    a fiduciary."  So I started dealing with -- I started with one

24    trust.  And, the next thing I knew, I had a whole load of them.

25              MS. BROOKS:  And how long ago was that?
```

```
1              PANELMEMBER:  15 years ago -- or 17 years ago.

2              MS. BROOKS:  And I couldn't tell from your

3    questionnaire.  Are you still active or are you retired now?

4              PANELMEMBER:  Semi-retired, is what I like to call

5    it.

6              MS. BROOKS:  All right.  How is that working out for

7    you?

8              PANELMEMBER:  I'm busy enough where I'm not bored.

9              MS. BROOKS:  There we go.

10        Under what you've heard about the case, you said you had

11   heard a little bit.

12             PANELMEMBER:  Right.

13             MS. BROOKS:  And then you put down what you thought

14   you had heard.  Can you tell me, without sharing with everyone

15   what you heard, where did you hear it?

16             PANELMEMBER:  I heard it on the nightly news, and it

17   was just basically described as patent infringement.  And they

18   didn't describe who was at fault; they just said it was between

19   Apple and Qualcomm.

20             MS. BROOKS:  Do you remember which nightly news you

21   heard this on?

22             PANELMEMBER:  ABC, channel 10.

23             MS. BROOKS:  Anything else that you can recall, again

24   without sharing what --

25             PANELMEMBER:  They gave a dollar amount that it was
```

1    going to be $7 billion at stake.

2            MS. BROOKS:  Is there anything about that that you

3    think is going to affect -- it's hard to erase something that

4    is in one's head, even if what you hear in Court turns out not

5    to be at all like what you read.  How is that going to work for

6    you that that's kind of in there?

7            PANELMEMBER:  I think I can be impartial on it,

8    because, I mean, I look at what the stocks are doing.  They are

9    pretty close to being even, and I am not going to jeopardize

10   my -- I am trying to think of the word -- my integrity just for

11   a couple of hundred dollars.

12           MS. BROOKS:  So you mentioned stock and them being

13   pretty even.  So let's talk about that for a minute.

14           PANELMEMBER:  Okay.

15           MS. BROOKS:  If, during the course of this case, you

16   come to the conclusion that, if you rendered a verdict in favor

17   of Apple, it could adversely affect your Qualcomm stock or, the

18   reverse, you render a verdict in favor of Qualcomm, it could

19   adversely affect your Apple stock, how is that going to affect

20   you sitting as a juror?

21           PANELMEMBER:  Well, I don't -- I mean, either way I

22   am going to do it, somebody is going to have a consequence.  So

23   I think, you know, it's got to be what is fair to the parties,

24   not to just me.  You know.

25           MS. BROOKS:  Okay.  So you would be able to put aside

1    and not have a nagging little voice in your head saying, Oh, if

2    you go this way, you are going to lose this much; and if you go

3    that way, you're going to lose that much.

4              PANELMEMBER:  And, you know, I guess I could run out

5    right after the verdict and sell whatever stock.

6              MS. BROOKS:  As long as you don't do it before the

7    verdict.

8              PANELMEMBER:  Not a good idea.

9              MS. BROOKS:  Thank you very much.

10        I am going to go over here to Juror 26.  I guess I will

11   stay over here.

12        So, ma'am, under question 17, you said you have a strong

13   opinion about Apple.

14             PANELMEMBER:  Yeah.

15             MS. BROOKS:  And what you said sounds like it is not

16   a very favorable opinion.

17             PANELMEMBER:  That's true.  But I also believe that

18   what I wrote in there is a systematic problem across technology

19   in general.

20             MS. BROOKS:  Okay.  Since you say it is a systematic

21   problem across all technology, can you share with me a little

22   bit more what you mean by that?

23             PANELMEMBER:  Do you want me to describe the problem?

24             MS. BROOKS:  Sure.  Sure.

25             PANELMEMBER:  Phones crashing kind of simultaneously

1    when contracts come due, things like that, just bugs -- kind of

2    feel like sometimes bugs are put out there into technology just

3    to force an upgrade.

4            MS. BROOKS:  Okay.  And do you think all smartphone

5    manufacturers do that?

6            PANELMEMBER:  I think that it is not isolated to one

7    company; I think it is a systematic problem across technology.

8            MS. BROOKS:  Have you ever done anything about it?

9    Have you ever complained to a company or written in?

10           PANELMEMBER:  No.  No.

11           MS. BROOKS:  But has it been something you have

12   experienced quite a bit?

13           PANELMEMBER:  I would say yes.  I have five phones on

14   my contract, and it's happened on multiple occasions through

15   the last ten years.

16           MS. BROOKS:  Are they all Apple phones?

17           PANELMEMBER:  Yes, but it hasn't been bad enough for

18   me to choose to switch.

19           MS. BROOKS:  With that in mind, since Qualcomm

20   doesn't make phones, do you think that your experience with

21   iPhones would cause you to have Apple start a little bit behind

22   in this case?

23           PANELMEMBER:  No.  As I said before, I really feel

24   like it is across the board.  I just think it is a system that

25   needs to be worked out.

```
 1              MS. BROOKS:  Okay.  Thank you very much.

 2        If we could hand the mic over to Juror 28.

 3        Hi, sir.

 4              PANELMEMBER:  Hello.

 5              MS. BROOKS:  You checked off "yes" under hardship due

 6     to medical reasons.  I wondered if you wanted to go and talk to

 7     the Court about that at sidebar?

 8              PANELMEMBER:  No, I am just diabetic, that's it.

 9              MS. BROOKS:  Is there anything about the way you have

10     to manage your diabetes that would cause you to have issues

11     with sitting as a juror in this lengthy a trial?

12              PANELMEMBER:  I don't think so.  I mean, I have,

13     like, all my stuff with me.  So, I mean, I shouldn't have any

14     issues with that, staying here.  I have snacks and whatnot.

15     So...

16              MS. BROOKS:  Okay.  Great.  So you would be able to

17     manage it?

18              PANELMEMBER:  It's fine.

19              MS. BROOKS:  Great.  We don't want to risk anybody's

20     health here for the trial.

21              PANELMEMBER:  Yes.

22              MS. BROOKS:  Thank you.  If you could hand the mic

23     over to Juror Number 30.

24        Can you tell me, you have the LG smartphone?

25              PANELMEMBER:  Yeah.
```

```
 1              MS. BROOKS:  What kind of phone is that?  I know LG,

 2    but I am just wondering, like is there a particular model?

 3              PANELMEMBER:  Yeah, I don't know the name of it.  I

 4    don't use my phone that much.

 5              MS. BROOKS:  Is there any reason you picked LG over,

 6    for example, an iPhone or Samsung Droid?

 7              PANELMEMBER:  Just convenience.

 8              MS. BROOKS:  Just convenience.

 9         You mentioned something in your questionnaire about having

10    been -- let me make sure I am getting this right.  Question 16,

11    you were asked whether you had ever been a witness, and you

12    checked off yes, but I am not sure you mentioned that when the

13    Court questioned you.  So if you are comfortable with it, could

14    you tell me a little bit more about that.

15              PANELMEMBER:  I don't remember checking that, I

16    guess.

17              MS. BROOKS:  The question was have you or someone

18    close to you ever -- and D was "been a witness," and you had

19    checked off yes.

20              PANELMEMBER:  No, that's no.

21              MS. BROOKS:  Great.  Then we cleared up why there was

22    no further elaboration on that.  Thank you.

23         If you could hand the microphone over to Juror 32.

24              PANELMEMBER:  Hello.

25              MS. BROOKS:  Hello.  You talked about that you had
```

1    heard of the case, that you had seen a news report.  Can you

2    tell me, without sharing too much about what you had heard,

3    where you heard it and how extensive it was?

4              PANELMEMBER:  I think it was a radio news blog that

5    was several months ago, actually, so -- and it was just

6    something about there being some litigation between Qualcomm.

7    And it was not a lot of detail.  It was just kind of a quick

8    radio blog that went out.

9              MS. BROOKS:  And nothing since then?

10             PANELMEMBER:  No, I haven't heard anything since

11   then.

12             MS. BROOKS:  If, for any reason -- the same questions

13   I asked some of the jurors -- during the course of this trial,

14   you remember more about what you heard and it is not consistent

15   from what you learn in the courtroom from the evidence, will

16   you be able to let the evidence control?

17             PANELMEMBER:  Sure.  No problem.

18             MS. BROOKS:  I see that you have a degree in computer

19   science.

20             PANELMEMBER:  Yes.

21             MS. BROOKS:  Tell me a little bit more about that if

22   you could.

23             PANELMEMBER:  I have been in the computer industry

24   for probably 30-plus years, 35 years, something like that.  As

25   a matter of fact, back when you had to have a modem to hook up,

1    made a little noise with your phone to be able to get on the

2    internet.  So, yeah, and I am currently in the industry.

3              MS. BROOKS:  In this case, there's going to be a lot

4    of testimony regarding technology.

5              PANELMEMBER:  Sure.

6              MS. BROOKS:  If your experience differs from what you

7    hear from experts on the witness stand, will you be able to set

8    that aside and listen to the expert testimony?

9              PANELMEMBER:  Sure, I can -- I would do that.  I

10   would listen to everything before I made any decisions.

11             MS. BROOKS:  Great.  Thank you.  And I am not sure if

12   I am almost out of time or not, so I will keep going until I am

13   told I have to sit down.  If you could hand it to Juror

14   Number 33.

15             PANELMEMBER:  Hello.

16             MS. BROOKS:  Hello.

17             THE COURT:  And your 30 minutes are up.  I will let

18   you ask that.

19             MS. BROOKS:  I will never know the answer to this.

20             THE COURT:  Go ahead.  You can pose the last

21   question.

22             MS. BROOKS:  Oh, I can.

23             THE COURT:  Go ahead.

24             MS. BROOKS:  If you could tell me a little bit about

25   your MBA -- you have a master's in business administration --

1    and tell me what your experience is with that.

2          PANELMEMBER:  I worked at Costco Wholesale for ten

3    years in management at the warehouse level.  Currently, I work

4    for a privately held company as a senior manager, mostly in

5    operations, although I previously was a line manager in

6    determining product lines to bring in and develop.  I still do

7    some of that.  I consult with the ownership.  Beyond that, I

8    have worked briefly as a consultant, but it was mostly in

9    retail environments.

10         MS. BROOKS:  Okay.  Great.  Thank you so much.

11      Thank you, Your Honor.

12         THE COURT:  Of course.  And now Mr. Doren.

13         MR. DOREN:  Thank you, Your Honor.

14         MS. BROOKS:  Your Honor, I think I have to pass the

15   microphone off to Mr. Doren, so if I could have a moment.

16         THE COURT:  I won't count that time against you.

17         MR. DOREN:  Good afternoon.

18         ALL:  Good afternoon.

19         MR. DOREN:  One thing that I wanted to talk about a

20   bit as we talk about just kind of everybody's relative takes

21   and starting points.  And Qualcomm is a San Diego company, kind

22   of born and raised.  And Apple is a California company, and our

23   clients are Taiwan companies.  So they are coming from a long

24   ways to participate in this trial.

25      And just in terms of kind of the starting point, how that

1    scale is for you, before you start putting evidence on it, does

2    anyone think that that puts my clients, the Taiwanese contract

3    manufacturers, a little bit behind at the beginning of this

4    lawsuit?  Everybody is willing to put them in and to view them

5    in the same position as any other party in this courtroom?  Is

6    that what I am gathering?

7         Now, also, our clients are hired by Apple to manufacture

8    their products, and some of that manufacturing, in fact quite a

9    bit of it, takes place in Mainland China.  And you hear a lot

10   about that in the news and all, and does anybody have any

11   strong opinions about those sorts of arrangements?

12        You've heard some folks here today talk about their

13   companies using offshore manufacturing and laboratory

14   facilities.  Does anybody have any strong opinions about that?

15   Is anybody against that?

16        And also, for my clients, as with a few of the jurors, few

17   of the folks we have seen here today, English is a business

18   language and it is a second language for our clients.  And a

19   few of them may seek the assistance of an interpreter, be it

20   with all of their testimony or with some of it, given the

21   importance of what they are going to say.

22        Is anybody going to give their testimony any less weight

23   as a result of the fact that they are providing it through an

24   interpreter?  And is anybody going to be at all concerned about

25   whether the interpreter or whether they are kind of hiding

```
 1    behind this third person?  You will still, again, recognize
 2    this as their testimony?
 3         Thank you.  Thank you.
 4         Juror Number 1?
 5              PANELMEMBER:  Yes.
 6              MR. DOREN:  You may well be the only person in this
 7    room not to own a smartphone.
 8              PANELMEMBER:  I probably am.
 9              MR. DOREN:  And do you have a cell phone of any sort?
10              PANELMEMBER:  I have a flip phone, an old phone.
11              MR. DOREN:  I know, that's what my mother used.
12         And how long have you had that?
13              PANELMEMBER:  Oh, my goodness.  Probably over ten
14    years.
15              MR. DOREN:  And is it fair to say that, when it comes
16    down to the qualities of -- oh, I am sorry.  I apologize.
17              PANELMEMBER:  That's okay.
18              MR. DOREN:  Thank you.
19         Is it fair to say that, when it comes down to the
20    comparative qualities of Apple versus Samsung or various
21    generations of Qualcomm chips, that you can be completely
22    neutral and objective?
23              PANELMEMBER:  Yes.
24              MR. DOREN:  I thought it might.  Thank you.
25         And if I could just ask you, Juror Number 3, you said in
```

1    your questionnaire that you felt -- and you can correct me if I

2    got it wrong -- but you felt that awards were too high in a lot

3    of different trials.  And I think you heard discussion over

4    here a little bit ago about this is a case where literally

5    billions of dollars are involved.  If the evidence supports a

6    claim for billions of dollars, would you be willing to award

7    it?

8                PANELMEMBER:  Of course.

9           MR. DOREN:  Thank you.

10       Is that on?

11               PANELMEMBER:  No.

12          MR. DOREN:  Thank you very much.  If you would just

13   hand that next to you.  Juror Number 4, you were on a jury just

14   recently, just a year or two ago; is that right?

15               PANELMEMBER:  Two years ago.

16          MR. DOREN:  As I understand it, that jury did not

17   reach a verdict?

18               PANELMEMBER:  Correct.

19          MR. DOREN:  Without disclosing any of the specifics

20   of the case or the names of the parties or anything else, what

21   was your take on the dynamic there?

22               PANELMEMBER:  Well, actually it was settled out of

23   court.

24          MR. DOREN:  Okay.  Okay.  Did you begin

25   deliberations?

```
 1              PANELMEMBER:  No.  No.  It was actually before we
 2    even came into the courtroom.
 3              MR. DOREN:  Great.  Thank you.  I appreciate the
 4    clarification.  No offense, Juror Number 5.  I am just going
 5    over to Juror Number 6.
 6         Could you please tell me a little bit more about your
 7    work.  I understand you work as an accountant?
 8              PANELMEMBER:  Yes.
 9              MR. DOREN:  In the 22nd District Agricultural
10    Association?
11              PANELMEMBER:  Also known as Del Mar Fairgrounds.
12              MR. DOREN:  Thank you very much.  That cuts to it.
13    Thank you.  I appreciate that.
14         Sir, Juror Number 7, you are retired now?
15              PANELMEMBER:  Yes, I am.
16              MR. DOREN:  And your job was an employment
17    representative or employee representative?
18              PANELMEMBER:  In California, that was my last
19    position.
20              MR. DOREN:  Can you tell us a little bit more about
21    that?
22              PANELMEMBER:  It was a call center.  People would
23    call and file new claims for unemployment, or we would do that
24    for them on the computer.  Or they would have some issues, they
25    weren't getting their benefits properly.  Or we would try to
```

1    problem solve and figure out what was going on and help them.

2    Customer service.

3           MR. DOREN:  Was this for state employees or was it

4    state unemployment benefits generally?

5           PANELMEMBER:  Everybody in California would call.

6           MR. DOREN:  Got it.  Thank you.  Thank you very much.

7       Juror Number 9, similar question.

8           PANELMEMBER:  I was thinking more about the coffee

9    spilled, sued McDonald's for millions.  When it comes to

10   technology and information, stuff like that, I haven't paid

11   attention to what lawsuit sums are, and I am open to whatever

12   the facts have.

13          MR. DOREN:  So we heard a comment earlier about, like

14   Monsanto trial and, again, without judging that one, since none

15   of us were there, kind of the notion of a big number over kind

16   of an uncertain event.

17          PANELMEMBER:  When it comes to this kind of stuff, I

18   am open to everything.  I was thinking more of just "I stubbed

19   my toe, and I am going to sue somebody."

20          MR. DOREN:  Yes.  I appreciate that.

21          PANELMEMBER:  I am open to however the -- the facts

22   lay out and whatever the information is.

23          MR. DOREN:  Is this going to be exciting enough for

24   you rather than air traffic control?

25          PANELMEMBER:  I am used to it.  Cleared for takeoff.

```
 1              MR. DOREN:  What was the training for that?

 2              PANELMEMBER:  Anyone can apply with a college degree

 3     or three years' work experience.  And then I passed through

 4     background checks and whatever other random things and then got

 5     sent to Oklahoma for three months' training.  At the end, it

 6     was two tries, pass or fail.

 7              MR. DOREN:  Hopefully, you passed on the first.

 8              PANELMEMBER:  Half our group failed.  And I passed,

 9     obviously, and got sent to San Diego and then took eight months

10     to train on the job.  And I have been doing it for four years.

11              MR. DOREN:  Cool.  All here in San Diego?

12              THE WITNESS:  Yeah, up in Lindbergh the whole time.

13              MR. DOREN:  Have you and Juror Number 8 talked as

14     he's flown into town?

15              PANELMEMBER:  We probably have definitely talked.

16              PANELMEMBER:  You are clear to land.

17              PANELMEMBER:  Exactly.

18              MR. DOREN:  And then you also train exotic animals.

19              PANELMEMBER:  No.  My wife is at a college in

20     Moorepark, north of Los Angeles, Ventura County.  So I usually

21     commute up there to see her, and she is up there for another

22     year.

23              MR. DOREN:  And Juror Number 8, your wife is a

24     veterinarian?

25              PANELMEMBER:  Correct.
```

1          MR. DOREN:  Whoa.  All right.  Thank you very much.

2     I only have limited time, so I am going to swing around.

3          Juror Number 16.  You were the gentleman, as I recall, who

4     brought up the Monsanto verdict.

5          PANELMEMBER:  Yes, sir.

6          MR. DOREN:  And similar question we were having over

7     here, if you were offered concrete evidence of damages, would

8     you be willing to award those damages if you found the evidence

9     convincing?

10         PANELMEMBER:  Yes, but I need the formula.  I just

11    got to come up with a number.

12         MR. DOREN:  When you say "the formula," what do you

13    mean?

14         PANELMEMBER:  Well, just you can determine, like -- I

15    don't know what the case was about.  I mean, like, let's say

16    how much units were -- you are talking about and, like, how

17    much per unit, and we go by there and how much they want for

18    it.  Compensation, attorney fees, all this other stuff -- I

19    don't know.  I just need to know -- you need a direction on

20    where to go.  You just can't make up a number and then do

21    punitive damages for something else and punish somebody for

22    anything.  There's a number.  There's a way to determine that

23    number.

24         MR. DOREN:  And you have served on juries before?

25         PANELMEMBER:  Just one.

1          MR. DOREN:  You were the foreperson?

2          PANELMEMBER:  Yes, sir.

3          MR. DOREN:  How did you like that experience?

4          PANELMEMBER:  I didn't like it at all.

5          MR. DOREN:  How long did you deliberate in that case?

6          PANELMEMBER:  It was only a day.

7          MR. DOREN:  Okay.  All right.  Thank you very much.

8      Juror Number 17, should have just had him pass it over.

9  You mentioned one thing that I just wanted to follow up on a

10  bit, and you said that you would be open to the evidence?

11          PANELMEMBER:  Right.

12          MR. DOREN:  And I think everybody in the room

13  appreciates that.  But you also commented that, if you knew

14  something that you heard up here was inaccurate or contrary to

15  what you believed to be accurate, that you would bring that to

16  bear in the -- in your deliberations as a juror.

17      Is that a fair characterization of what I heard?

18          PANELMEMBER:  That is a fair characterization.

19          MR. DOREN:  So if you are with your fellow jurors in

20  the deliberation room, and they are talking about testimony

21  from the stand or evidence or you are looking at documents

22  together, and you find something in that document or testimony

23  that you don't agree with and that you believe to be incorrect,

24  even if there wasn't testimony of it here, you would raise that

25  in the jury room?

```
 1              PANELMEMBER:  I would be -- feel obligated to point

 2    out the mistake or the error, yes.

 3              MR. DOREN:  Thank you very much, sir.

 4         Juror 18, you are a medical coder?

 5              PANELMEMBER:  Yes.

 6              MR. DOREN:  Who do you work for?  Individual doctors?

 7              PANELMEMBER:  No, I work for Scripps.

 8              MR. DOREN:  Do you work at home or do you work --

 9              PANELMEMBER:  I work from home.

10              MR. DOREN:  How long have you been doing that?

11              PANELMEMBER:  Almost 15 years.

12              MR. DOREN:  Is that an online billing system that you

13    use?

14              PANELMEMBER:  Yes.  We currently just changed to

15    electronic.

16              MR. DOREN:  Okay.  Yeah, I've spent a lot of time

17    looking at medical bills over the years.

18         Juror Number 20.  I notice that you negotiate contracts in

19    your job.

20              PANELMEMBER:  Yeah.

21              MR. DOREN:  Can you tell us what sorts of contracts

22    and kind of what's involved in that process?

23              PANELMEMBER:  Professional services-type contracts

24    for environmental consulting, and then usually we are looking

25    for -- I am not in the contracts department, but we are looking
```

1    for terms and conditions that will protect ourselves in our

2    contract with a client.

3              MR. DOREN:  Okay.  So these were basically

4    environmental consulting engagements.  And are you a

5    substantive environmental consultant?  In other words, you do

6    consulting as well?

7              PANELMEMBER:  Yes, I do.

8              MR. DOREN:  That's what I gather.

9              PANELMEMBER:  I am not a contract person.

10             MR. DOREN:  You are the consultant, not the contract

11   person.  But in entering into engagements, you will do some

12   negotiating?

13             PANELMEMBER:  Right.

14             MR. DOREN:  And you also mentioned that your husband

15   has a degree in computing or computers?

16             PANELMEMBER:  I think that is my brother.

17             MR. DOREN:  Okay.  I'm sorry.  I either read it wrong

18   or wrote it down wrong.

19        What does he do?

20             PANELMEMBER:  He is in the Navy.

21             MR. DOREN:  Okay.  Does he use it there?

22             PANELMEMBER:  Somewhat.  He is kind of a project

23   manager.

24             MR. DOREN:  Is he on a ship or land-based?

25             PANELMEMBER:  Not anymore.  Land-based.

```
 1              MR. DOREN:  Okay.  And you also mentioned that your
 2   sister-in-law works at Qualcomm?
 3              PANELMEMBER:  Yes.
 4              MR. DOREN:  And she has been there for three or four
 5   years?
 6              PANELMEMBER:  Yes.
 7              MR. DOREN:  Is that your brother's wife?
 8              PANELMEMBER:  My husband's sister.
 9              MR. DOREN:  Got it.
10        What does she do there?
11              PANELMEMBER:  She is a recruiter.
12              MR. DOREN:  For employment?
13              PANELMEMBER:  Yes.
14              MR. DOREN:  What kind of positions does she recruit
15   for?
16              PANELMEMBER:  I guess whatever they need.
17              MR. DOREN:  Fair enough.
18        So she is basically in the HR department?
19              PANELMEMBER:  I think so.
20              MR. DOREN:  She is a recruiter.  I got it.  Thank you
21   very much.  Thank you.
22        Juror Number 22, please.
23        Hi.  You are an engineer?
24              PANELMEMBER:  Correct.
25              MR. DOREN:  And you work for the Department of
```

1    Defense.

2         PANELMEMBER:  Yes.

3         MR. DOREN:  Can you tell us what kind of engineering

4    you do there?

5         PANELMEMBER:  Right now I am in electrology,

6    calibration.

7         MR. DOREN:  What are you calibrating?

8         PANELMEMBER:  Microwave equipment.

9         MR. DOREN:  Does that have any relationship to

10   cellular technology, wireless technology?

11        PANELMEMBER:  No.

12        MS. BROOKS:  And what microwave -- microwaves in the

13   context of what sort of use or equipment?

14        PANELMEMBER:  Such as radiation probe that monitors

15   radiations level, little equipment.

16        MR. DOREN:  Got it.  Got it.  Thank you.  Thank you

17   very much.

18        Juror Number 33.  Thank you.  Thanks so much.  I notice

19   that you have been a foreperson of two juries and you served on

20   three.  Do I have that right?

21        PANELMEMBER:  Served on five.

22        MR. DOREN:  Served on five.  And how many of those

23   have reached verdicts?

24        PANELMEMBER:  Four.

25        MR. DOREN:  And how many of those were you the

1    foreperson on?

2         PANELMEMBER:  Two.

3         MR. DOREN:  And did those each reach verdicts?

4         PANELMEMBER:  Yes.

5         MR. DOREN:  And we have that you had a number, and

6    then a no verdict for each, but I couldn't quite decipher how

7    the numbers split.  From your perspective, I mean, you've had a

8    lot of jury service, and I realize the difference is everybody

9    ended up agreeing versus people were disagreeing between where

10   there was a verdict and where there wasn't; but, as you

11   evaluated the processes, what did you see as a deliberation

12   that led to a successful result, a verdict, versus the one that

13   did not?

14        PANELMEMBER:  What was presented in Court, that

15   really determined it, the strength of the two arguments.

16        MR. DOREN:  So if I'm understanding, in the four,

17   there was a case that convinced everyone, and, in the fifth,

18   there was a split of opinions?

19        PANELMEMBER:  Let me clarify.  Four of them were

20   civil.  The fifth that was indeterminate was a criminal case.

21        MR. DOREN:  Okay.  That's interesting.  And did the

22   different burden of proof there play into it?

23        PANELMEMBER:  Yes, that was it, the burden of proof.

24        MR. DOREN:  Do you remember what the different burden

25   of proofs are?

```
 1                PANELMEMBER:  Absolutely.

 2                MR. DOREN:  Can you describe them for me?

 3                PANELMEMBER:  Preponderance of the evidence is civil,

 4   and beyond a reasonable doubt is criminal.  And the prosecution

 5   in the one case didn't prove their case.

 6                MR. DOREN:  And what did you understand the

 7   distinction between those two burdens to be?

 8        Sorry.  It's not a test.  So in the civil context, it

 9   was --

10                PANELMEMBER:  In the civil context, it was, like,

11   they just kept presenting -- kind of cornered the evidence

12   around the defendant.

13                MR. DOREN:  I got you.

14                PANELMEMBER:  In the criminal, it was like -- they

15   explained, if you had any doubt as to guilt, then you can't say

16   they're guilty.  If they haven't proven it to you, if you have

17   any doubt at all, you can't vote for guilty.

18                MR. DOREN:  Thank you.  I appreciate it.

19        Your Honor, it's already been a long day, so I'll end

20   there.

21                THE COURT:  All right.  And you waive your additional

22   remaining time?

23                MR. DOREN:  Yes, Your Honor.

24                THE COURT:  We will turn to Mr. Chesler.

25                MR. CHESLER:  Thank you, Your Honor.
```

1      Good afternoon, everyone.  I would issue a greeting to

2   Jurors Number 1 to 40.  I'm Lawyer 341.

3      I would like to start with Juror Number 1, our ideal

4   juror.  I think from your -- I think from your questionnaire it

5   says you have an MBA degree.

6          PANELMEMBER:  Yes.

7          MR. CHESLER:  That's an interesting combination.  You

8   were a nurse, and you have an MBA.  How did that happen?  Why

9   did you get an MBA?

10         PANELMEMBER:  We were in Japan, and Pepperdine was

11  offering an MBA degree.  And I was accepted into the program,

12  so that's the reason I have an MBA.

13         MR. CHESLER:  Did you focus on any particular area of

14  business?

15         PANELMEMBER:  Management.

16         MR. CHESLER:  In your nursing career, you said you

17  were at Scripps.

18         PANELMEMBER:  Yes, nurse educator in home care.

19         MR. CHESLER:  Did you supervise others in that job?

20         PANELMEMBER:  I didn't supervise; I taught and

21  trained nurses and staff and validated their skills.

22         MR. CHESLER:  I see.  These are nurses who treated

23  people in their homes?

24         PANELMEMBER:  Yes.

25         MR. CHESLER:  I see.  Thank you.  You indicated, when

1    the judge was asking you questions earlier, that you had seen

2    an article or two about the case but didn't read them.

3            PANELMEMBER:  There were two articles in the

4    newspaper that -- and I didn't read it, no.  I didn't read

5    them.

6            MR. CHESLER:  Did you make a conscious choice not to

7    read it because you knew you were a possible juror?

8            PANELMEMBER:  Yes.  I've served on a lot of juries,

9    and the packet of information that I received from this court,

10   the questions, was saying not to look up stuff and all of that.

11   So I didn't read it.

12           MR. CHESLER:  Okay.  How many juries have you served

13   on?

14           PANELMEMBER:  On, if I remember correctly, about six.

15           MR. CHESLER:  Did they all come to a verdict?

16           PANELMEMBER:  Yes.

17           MR. CHESLER:  Civil?  Criminal?

18           PANELMEMBER:  Criminal -- mostly criminal, and I

19   think one was civil.

20           MR. CHESLER:  When was the last time you were on a

21   jury?

22           PANELMEMBER:  The last time I was on a jury was about

23   ten years ago.  Well, I was called to a jury, but they came to

24   an agreement, so I didn't have to actually serve.  But it's

25   been a little over ten years since I actually served on a jury.

```
 1              MR. CHESLER:  Thank you very much.  Give this to
 2    Juror Number 3.
 3         You have a degree in criminal justice?
 4              PANELMEMBER:  Yes.
 5              MR. CHESLER:  Have you worked in the criminal justice
 6    area at school?
 7              PANELMEMBER:  Not directly, but I do work with the
 8    County of San Diego.  And I started in the legal side, and I've
 9    stayed there.
10              MR. CHESLER:  What do you do?
11              PANELMEMBER:  I am a child support officer.
12              MR. CHESLER:  Does this have to do with cases where
13    there's an issue about whether child support is being paid or
14    not?
15              THE WITNESS:  Yes, financial.  We deal with money.
16              MR. CHESLER:  Is that San Diego County?
17              PANELMEMBER:  Yes.
18              MR. CHESLER:  How long have you been there?
19              PANELMEMBER:  Almost five years.
20              MR. CHESLER:  I see you have -- I read your
21    background.  You have an iPhone X; is that right?
22              PANELMEMBER:  Yes.
23              MR. CHESLER:  And an iPad?
24              PANELMEMBER:  Yes.
25              MR. CHESLER:  And an Apple Watch?
```

```
1                    PANELMEMBER:  Yes.

2                    MR. CHESLER:  And an AirPod?

3                    PANELMEMBER:  Yes.

4                    MR. CHESLER:  Well.  Don't all stand up and applaud.

5        Thank you very much.  Would you hand that to the gentleman

6   next to you, Juror Number 4.

7        Sir, you worked in the steel industry?

8                    PANELMEMBER:  High-rise construction.

9                    MR. CHESLER:  Were you actually doing construction,

10  building the buildings, or supplying the steel?

11                   PANELMEMBER:  Building the buildings.

12                   MR. CHESLER:  I'm terrified of heights.  Were you one

13  of the guys out there on the girders, way up?

14                   PANELMEMBER:  Yeah, in the business for 35 years.

15                   MR. CHESLER:  Do you get strapped on when you do

16  that?

17                   PANELMEMBER:  Yes, you do have a safety harness.

18                   MR. CHESLER:  Did you build buildings here in

19  San Diego?

20                   PANELMEMBER:  Yes, all my work was in San Diego.

21                   MR. CHESLER:  I went over and saw the library the

22  other day, that domed building, steel frame.  Did you work on

23  that?

24                   PANELMEMBER:  Right.  I never worked on that one;

25  but, yeah, all the high-rises that are here, I had a part of
```

1    some of them.

2             MR. CHESLER:  And you're retired?

3             PANELMEMBER:  Retired, yes.  And now I work part-time

4    for UCSD in research.

5             MR. CHESLER:  You say you work in a laboratory at

6    UCSD?

7             PANELMEMBER:  Yes.

8             MR. CHESLER:  What kind of laboratory is it?

9             PANELMEMBER:  Well, actually, the laboratory is at

10   the VA.  And the school is right next door, sort of like a

11   learning facility for the school.

12            MR. CHESLER:  And what do you do in the lab?

13            PANELMEMBER:  We do hep C, Alzheimer's, fatty liver;

14   mostly with organs, heart, brain.

15            MR. CHESLER:  So research on those diseases?

16            PANELMEMBER:  Yes.  Yes.

17            MR. CHESLER:  Juror Number 5, I believe you said,

18   sir, you are a clinical psychologist; is that right?

19            PANELMEMBER:  Retired, although I do carry one

20   patient -- one to two patients at a time.

21            MR. CHESLER:  When you were practicing, were you in

22   private practice or with some sort of organization?

23            PANELMEMBER:  Private practice.

24            MR. CHESLER:  You had your own practice?

25            PANELMEMBER:  I did.  I had a private practice in

1    Seattle.  And then some down here, but mostly in Seattle for

2    about 27 years.

3             MR. CHESLER:  I think you said --

4             PANELMEMBER:  And then I worked after that -- I

5    retired and then went to work with UnitedHealthcare.

6             MR. CHESLER:  What did you do when you were at

7    UnitedHealthcare?  Same thing?  You treated --

8             PANELMEMBER:  I was a clinical investigator, and I

9    investigated suicides around the United States.

10             MR. CHESLER:  Child suicides?

11             PANELMEMBER:  Attempted and completed suicides.

12             MR. CHESLER:  That's got to be hard work, hard work.

13             PANELMEMBER:  Not as hard as the other.

14             MR. CHESLER:  Really?

15             PANELMEMBER:  Working with children who were

16    terminally ill, that was a little hard.

17             MR. CHESLER:  When you were practicing, I think you

18    said you had participated in some kind of court proceedings

19    with respect to children you were treating?

20             THE WITNESS:  Yeah.  There were occasions when the

21    welfare of the child was a concern by one parent or another or

22    by the medical community and the parents.  And so my

23    responsibility was to try and describe what was going on with

24    the child and the condition that he or she was in.

25             MR. CHESLER:  Were these situations where the parents

 1   perhaps didn't agree with the treatment regimen, that sort of

 2   thing?

 3            PANELMEMBER:  On one of the occasions, yes.

 4            MR. CHESLER:  Would you pass it on your neighbor

 5   there.

 6       I believe you said you were an accountant?

 7            PANELMEMBER:  Yes.

 8            MR. CHESLER:  What sort of work do you do for the

 9   agricultural association?

10            PANELMEMBER:  I do the accounts payable for the

11   association.  I have been working there for about eight years.

12            MR. CHESLER:  Do you use -- I assume they're

13   electronic files?

14            PANELMEMBER:  Yes.

15            MR. CHESLER:  Do you use Apple products?

16            PANELMEMBER:  No.

17            MR. CHESLER:  If you know, what company supplies the

18   products you use, or the accounting system?

19            PANELMEMBER:  We use specifically a software called

20   Microsoft Dynamics, a software accounting system.  And then we

21   have other products we use for other things in the company.

22            MR. CHESLER:  What sort of hardware does it run on?

23   Do you know?

24            PANELMEMBER:  A PC.

25            MR. CHESLER:  Lenovos or --

```
 1              PANELMEMBER:  Dells.

 2              MR. CHESLER:  How long have you been doing that for

 3    the agricultural association?

 4              PANELMEMBER:  Four years in finance and three years

 5    in a different department on the fairgrounds.

 6              MR. CHESLER:  Can you hand it down to your neighbor

 7    there.

 8       Juror Number 7, I believe you said you worked for the

 9    county.  You are retired now or you do customer service with

10    them?

11              PANELMEMBER:  No, that was for the State of

12    California.  I retired from the county, and then I went to work

13    for the State of California and then retired from them.  I had

14    two retirements.

15              MR. CHESLER:  I see.  What did you do with the prior

16    job, before you retired?

17              PANELMEMBER:  For the county, I was there for 24

18    years.  I started as a social worker in child protection and

19    child protective services.

20       And then I went to internal investigations in the human

21    resources.  So we were investigating allegations about

22    employees, malfeasance.

23       And then I went to sort of general human resources work.

24              MR. CHESLER:  I see you have an MS.  Is it in social

25    work?
```

1          PANELMEMBER:  Yes, MSW.

2          MR. CHESLER:  Where did you get that?

3          PANELMEMBER:  San Diego State.

4          MR. CHESLER:  Here in San Diego.  Thank you.  Can you

5   hand it back to the gentleman back here.

6      This is Juror Number 12.

7          PANELMEMBER:  Number 12.

8          MR. CHESLER:  And you are a lawyer?

9          PANELMEMBER:  Yes, retired.

10         MR. CHESLER:  It also indicates you were a detective

11  for a while.

12         PANELMEMBER:  Yes.  I retired from the Chula Vista PD

13  in December.

14         MR. CHESLER:  So you practiced law, and then you

15  became a detective after you stopped practicing law?

16         PANELMEMBER:  Actually, I did both simultaneously for

17  a while, and then --

18         MR. CHESLER:  You didn't defend the people you

19  arrested?

20         PANELMEMBER:  No.

21         MR. CHESLER:  You said that you were -- is it right

22  that you testified as an expert in drug cases?

23         PANELMEMBER:  Yes.  I have a background in

24  anesthesia, so I qualified as an expert in drug cases, cases

25  involving drugs that were in the home where children were

1    present, what the effects of those drugs would be on children.

2        I testified in cases involving people who had been driving

3    under the influence of drugs, narcotics.

4            MR. CHESLER:  What kind of cases were they -- you

5    were talking about the effects on children of drugs in the

6    home.  Were these cases where people had been negligent in

7    keeping the drugs away from children, or what sort of cases

8    were those?

9            PANELMEMBER:  No.  They would be cases where the

10   parents or some other adults in the home would be using drugs,

11   and then the drugs would be left around on tables and

12   accessible to children.

13           MR. CHESLER:  Thank you very much.  Could we hand it

14   over.

15       Juror Number 11, I think you said you had some kind of

16   travel planned?

17           PANELMEMBER:  Yes.

18           MR. CHESLER:  Was that on May 18th?

19           PANELMEMBER:  Yes.

20           MR. CHESLER:  Is that one of those "you can't get the

21   ticket back" refund plans, or what is that?

22           PANELMEMBER:  I would have to double-check on that.

23   I didn't make the arrangements, but it's a family holiday.

24           MR. CHESLER:  Family holiday.  How far away are you

25   going?

```
1              PANELMEMBER:  Yosemite, flying up to Fresno.

2              MR. CHESLER:  And you're a parole agent, sir?

3              PANELMEMBER:  Yes.

4              MR. CHESLER:  For the state?

5              PANELMEMBER:  Yes.

6              MR. CHESLER:  Do you testify in court ever in cases

7    where there are parole violations?

8              PANELMEMBER:  Yes.

9              MR. CHESLER:  Here in San Diego?

10             PANELMEMBER:  Department 1103 in San Diego Superior

11   Court.

12             MR. CHESLER:  How often do you actually testify?

13             PANELMEMBER:  It's been five or six years since I've

14   had a case -- or been required to testify.

15             MR. CHESLER:  When you testified in Court, have you

16   been cross-examined by the lawyers for the people accused of

17   parole violations?

18             PANELMEMBER:  Yes.

19             MR. CHESLER:  How do you feel about being

20   cross-examined?

21             PANELMEMBER:  Part of the job.

22             MR. CHESLER:  Part of the job to cross-examine.

23        Juror Number 10, I apologize if you answered this before,

24   but I am not sure I made a note of it.  Are you still investing

25   money for clients?
```

```
 1                PANELMEMBER:  No.

 2                MR. CHESLER:  You retired from doing that?

 3                PANELMEMBER:  (Nods head.)

 4                MR. CHESLER:  And you said that there were times when

 5      you invested money in Qualcomm and times when you invested

 6      money in Apple?

 7                PANELMEMBER:  Yeah.

 8                MR. CHESLER:  Did you invest in other technology

 9      stocks as well?

10                PANELMEMBER:  Yeah.

11                MR. CHESLER:  How did you go about doing that?  Did

12      you do your own research to decide where to invest your

13      client's money, or did you rely on brokers?  What did you do?

14                PANELMEMBER:  I had a formula that I used, a

15      technical training program.

16                MR. CHESLER:  To sort of index the market in some

17      way?

18                PANELMEMBER:  No, kind of the opposite of index

19      investing.

20                MR. CHESLER:  Darts on a board?

21                PANELMEMBER:  Well, there's an element of random luck

22      for sure in all of those approaches.

23                MR. CHESLER:  And did you have -- it was

24      discretionary investing?  I think you said you had power of

25      attorney, so you made the decisions on where to invest?
```

```
 1              PANELMEMBER:  Yeah.

 2              MR. CHESLER:  You may have answered this, and I

 3    apologize if you have, but did you have any particular

 4    unpleasant experience in investing in either Apple or Qualcomm

 5    stock?

 6              PANELMEMBER:  No.  No, they're both pretty good.

 7              MR. CHESLER:  Pretty good companies.  Thank you.

 8    Could you hand the mic over.  Thank you.

 9        Juror Number 9, what position did you play?

10              PANELMEMBER:  Pitcher.

11              MR. CHESLER:  Pitcher.

12              PANELMEMBER:  Yeah.

13              MR. CHESLER:  For what team?

14              PANELMEMBER:  With the Royals.

15              MR. CHESLER:  That was your ERA?

16              PANELMEMBER:  Not good enough to keep pitching.

17              MR. CHESLER:  When you've got those lights in your

18    hand and he's coming by, you're okay with that?

19              PANELMEMBER:  I sit up in the tower and talk to him.

20    I'm not with the lights.

21              MR. CHESLER:  You're not the guy directing?  Okay.

22    You can just hand it.

23        Sir, are you still a pilot, or are you retired?

24              PANELMEMBER:  No.  I wish I was retired.

25              MR. CHESLER:  Still a pilot?
```

```
 1              PANELMEMBER:  Still a pilot.

 2              MR. CHESLER:  I travel a lot.  I know how you feel.

 3        I just want to check.  You did say that you read an

 4    article, I think you said in The Wall Street Journal, this past

 5    weekend?

 6              PANELMEMBER:  Yeah.  I was on a layover and there was

 7    a Wall Street Journal sitting in the hotel.  And I picked it up

 8    waiting for the van.  And I flipped through it and I saw

 9    something about this, but I don't recall much of anything, no.

10              MR. CHESLER:  Okay.  You were involved with the PG&E

11    fire cases up north.  I think you said you don't live there but

12    you own property there; is that right?

13              PANELMEMBER:  I do, yeah.

14              MR. CHESLER:  Did you lose whatever was on the

15    property, the buildings?

16              PANELMEMBER:  No, it was -- it was all just trees and

17    landscape and all that stuff -- and all my neighbors.  I -- I

18    don't know much about the particulars other than an attorney

19    contacted me and all the people in the community, said you

20    should become a part of this.  So I'm a part of it, but I have

21    no idea what it's going to amount to.  But I know there's a lot

22    of cleanup on the land because the land is torched.

23              MR. CHESLER:  Was the damage from the North Bay fires

24    or the more recent fires this year?

25              PANELMEMBER:  It was the Witch Creek, which was the
```

1    one that was before.

2              MR. CHESLER:  2017?

3              PANELMEMBER:  Yeah.

4              MR. CHESLER:  I'll come over to this row, please.

5         Juror Number 16, you were asked before, and I'll try to be

6    brief.

7              THE COURT:  Mr. Chesler, it's hard for my clerk to

8    hear you.  Maybe we can get you -- do you have a lapel mic?

9         (Brief discussion off the record.)

10             MR. CHESLER:  It wasn't my fault.  The battery is

11   dying.  I've been exonerated.

12             THE COURT:  You may proceed.

13        (Brief discussion off the record.)

14             MR. CHESLER:  Sorry.  Juror 16.

15             PANELMEMBER:  Yes.

16             MR. CHESLER:  I think you said you have several

17   patents.  Are they still in force?

18             PANELMEMBER:  I think they're done, the statute of

19   limitations.  I don't know how they work.

20             MR. CHESLER:  You think they've expired?

21             PANELMEMBER:  Yes.

22             MR. CHESLER:  Did you ever have any disagreements

23   with anyone over the patents, anybody using your inventions

24   without your permission?

25             PANELMEMBER:  They're not my inventions because I

1    worked for the company.

2              MR. CHESLER:  They were assigned to your company?

3              PANELMEMBER:  Yeah.  Well, no, we worked in research

4    and development.  We developed the product, and they market it

5    and sell it.

6              MR. CHESLER:  Did you get any special compensation

7    for their marketing of the things that you patented?

8              PANELMEMBER:  Yeah.  We were supposed to get $5,000 a

9    patent, but -- for each person, but then, because they kept

10   piling people on the name of the patent, so it came up to,

11   like, $10.

12             MR. CHESLER:  Okay.  Could you hand it over to the

13   gentleman next to you, Juror 17.

14       You said something about, sir -- I think I've got the note

15   right.  You said you didn't like the direction Apple was going

16   for power users.  Do I have that right?

17             PANELMEMBER:  Yes.

18             MR. CHESLER:  Can you just give me a moment and

19   explain what you mean by that.

20             PANELMEMBER:  Early on -- this is probably about 10,

21   12 years ago, Apple products were marketed towards high-end

22   professional or consumer markets.

23             MS. BROOKS:  Perhaps this would be better at sidebar,

24   Your Honor, if we are going to get an in-depth discussion.

25             THE COURT:  All right.

1          MR. CHESLER:  Your Honor, to save time, I'll move on.

2          THE COURT:  Okay.

3          MR. CHESLER:  T for time out.

4          PANELMEMBER:  Okay.

5          MR. CHESLER:  When the judge asked about people the

6    jurors know, I think when Irwin Jacobs' name came up, you

7    raised your hand.  Do you actually know Dr. Jacobs or you just

8    know his name?

9          PANELMEMBER:  Actually, I did not raise my hand.

10         MR. CHESLER:  You didn't?  Okay.  My mistake.  I'm

11   sorry.

12     Can you pass the mic over.

13         PANELMEMBER:  Certainly.

14         MR. CHESLER:  And I hope I have this right from your

15   application.  Did you say your entire family uses Apple

16   products?

17         PANELMEMBER:  Yes.

18         MR. CHESLER:  And you believe they're very good

19   products, right?

20         PANELMEMBER:  Yes.

21         MR. CHESLER:  What sort of Apple products does your

22   family use?

23         PANELMEMBER:  We have iPhones and iPads.  And my kids

24   use the iPad and iPhone.

25         MR. CHESLER:  Thank you very much.  Pass it down two,

1    please.  Thank you.

2        Juror 20, correct?

3            PANELMEMBER:  Yes.

4            MR. CHESLER:  Can you describe for us a little bit,

5    what kind of environmental consulting work do you do?

6            PANELMEMBER:  Mostly related to the Clean Water Act.

7    So compliance with NPDS permits and maximum daily loads and

8    sediment quality.  Could be for prejudge values.

9            MR. CHESLER:  Is it all permitting, or do you also

10   deal with situations where there are cleanup issues?

11           PANELMEMBER:  The company as a whole deals with it,

12   but I don't.

13           MR. CHESLER:  You don't?

14       You also mentioned that you were involved in some way with

15   contracts for your company, but you're not in the contracts

16   department; is that right?

17           PANELMEMBER:  Right.

18           MR. CHESLER:  What is your involvement with the

19   contracts?

20           PANELMEMBER:  Usually I will do a preliminary review.

21   And there's the formal person who does an in-depth, but I just

22   look at the issues that would potentially pose a lot of risk

23   for us as the company providing the services.

24           MR. CHESLER:  Are these, for example, clients who are

25   seeking to get permits and you are consulting for them?

```
 1              PANELMEMBER:  Most of our clients are municipal

 2    clients or state agencies.  And we're doing a lot of monitoring

 3    and collection and then special settings research type of work

 4    to help them with issues.

 5              MR. CHESLER:  I see.  Are you involved at all in

 6    negotiating contracts, or are you reviewing drafts of them?

 7              PANELMEMBER:  I usually review the drafts, the actual

 8    language in the contract negotiations.  It might go through me,

 9    but the actual effort is done by someone else, if that makes

10    sense.

11              MR. CHESLER:  That makes sense.  Thank you.  Very

12    helpful.

13        Can you hand the microphone over to the next gentleman.

14        I just want to ask one question, a follow-up about the

15    microwave equipment testing that you did.

16              PANELMEMBER:  Yes.

17              MR. CHESLER:  Is the microwave equipment connected in

18    any way to computer systems, or is it stand-alone?

19              PANELMEMBER:  No.  Stand-alone.

20              MR. CHESLER:  Stand-alone.

21              PANELMEMBER:  Yes.  Just using different equipment

22    like power, power sensors, moving meters, things like that.

23              MR. CHESLER:  What are you measuring with the

24    microwave?

25              PANELMEMBER:  We measure such as radiation probe,
```

1  like we measure the level of radiation for safety, and some of

2  the other one like ...

3           MR. CHESLER:  Are you qualifying the equipment to

4  make sure it's properly calibrated and properly working?

5           PANELMEMBER:  Yes.

6           MR. CHESLER:  Thank you.  Hand the microphone to

7  Juror Number 23.

8       You work for a biotech company?

9           PANELMEMBER:  Yes, that's correct.

10          MR. CHESLER:  Does your company develop products?

11          PANELMEMBER:  Yes, we do.  Especially, we do rapid

12  diagnostic testing.  So we partner up with up a company in

13  Australia to make a machine that makes our test kits.

14          MR. CHESLER:  I see.  So you are not making

15  biotechnology-based drugs; you are making equipment?

16          PANELMEMBER:  Sort of, yes.  It's mostly, they are

17  test kits, so we put them into readers -- or machines that we

18  call it -- and then we develop those tests kits, not

19  necessarily the machine but just the test kits.

20          MR. CHESLER:  Do you know if the test kits are

21  patented?

22          PANELMEMBER:  I believe so.

23          MR. CHESLER:  Do you know whether your company owns

24  the patents on them?

25          THE WITNESS:  My company is Quidel Corporation, so I

1    believe we do own patents for it.

2             MR. CHESLER:  Thank you.

3         Can you -- yes, thank you, Juror Number 24.  Do you, sir,

4    in connection with your private fiduciary duty

5    responsibilities, do you testify in the probate court or have

6    you testified?

7             PANELMEMBER:  Yes, but it's always been on my own

8    cases where I have had a problem.  Most of the time, when I go

9    to court, I am asking the court for directions on how to

10   proceed on something.

11            MR. CHESLER:  Just because it is someone who is under

12   the court's protection?

13            PANELMEMBER:  Yes, because, you know, like a lot of

14   my clients are incapacitated, so I am handling their financial

15   affairs.

16            MR. CHESLER:  I see.

17            PANELMEMBER:  And then there's a money, you know,

18   amount that I am not comfortable with, then I will go and ask

19   the Court to approve whatever I am asking to do.

20            MR. CHESLER:  I see.  So these are not really

21   adversary proceedings; you are getting guidance from the Court

22   on how to carry out your responsibility?

23            PANELMEMBER:  Right.  There was one that was a

24   adversary situation.

25            MR. CHESLER:  One was, you said?

```
 1            PANELMEMBER:  Yes.  And that's where the mom had

 2   been -- well, I had been -- the doctor had recommended that she

 3   get a DNR, do not resuscitate.

 4            MR. CHESLER:  Do not resuscitate.

 5            PANELMEMBER:  And everybody in the family, the

 6   brothers were all for it, but the daughter wasn't.  She had a

 7   stroke; she went to the hospital.  And then she wanted me to

 8   withdraw life support.  We ended up going to court because the

 9   probate code says that the trustee doesn't have the authority

10   to withdraw life support, but the family that had the POA does

11   have the authority; and she kept insisting I do it.

12            MR. CHESLER:  Thank you.  Thank you very much.  You

13   want to hand this to the next juror.

14        Juror 26.

15            PANELMEMBER:  Yes.

16            MR. CHESLER:  I just wanted to go back to the subject

17   that you were talking about before with one of my colleagues.

18        Is it your view that the -- you said that you think this

19   is an industry-wide problem, bugs and crashes of the system,

20   etc.?

21            PANELMEMBER:  Yes, or could just be a longevity of

22   the systems too.  I don't know enough about it to really

23   understand the process here.

24            MR. CHESLER:  Have you had this problem with any

25   products -- you said you have had it with Apple products.  Have
```

1   you had other products that you've had issues with?

2           PANELMEMBER:  I use mostly -- like, I have iPhones at

3   work, iPads for the students.  I am a teacher.  But we also

4   have Chromebooks and have issues with that.  And we are -- Dell

5   and Microsoft on our desktops and laptops, so it was with that

6   too.

7           MR. CHESLER:  I see.  What do you teach?

8           PANELMEMBER:  Elementary.  I am currently teaching

9   kindergarten through third grade reading intervention.

10          MR. CHESLER:  I am sorry.  What is reading

11  intervention?

12          PANELMEMBER:  At-risk students, teaching foundational

13  skills, trying to get them up to grade level, specifically in

14  reading.  If they can't read, they can't graduate.

15          MR. CHESLER:  Understood.

16      Pass it over, please.

17      Juror 28.

18          PANELMEMBER:  He is 27.  Do you want 28?

19          MR. CHESLER:  No, I want 27.  I'm sorry.  The cards

20  stuck together.  I apologize.

21      Sir, you have worked for the United States Navy, correct?

22          PANELMEMBER:  Yes.

23          MR. CHESLER:  And I think you said that you had done

24  a project where there was some Qualcomm folks involved?

25          PANELMEMBER:  Yes.

1              MR. CHESLER:  We don't want any secrets disclosed in

2    here, but can you say anything about it or what the nature of

3    the project was that you did with the Navy with Qualcomm?

4              PANELMEMBER:  Without giving classified information?

5              MR. CHESLER:  Absolutely, please.

6              PANELMEMBER:  But it was a development effort that

7    had to deal with tracking, and some of the particulars that

8    were involved in it was Qualcomm was involved in the chipsets

9    that were being utilized.

10             MR. CHESLER:  Were there other component or device

11   suppliers involved in the program other than Qualcomm?

12             PANELMEMBER:  Yes.

13             MR. CHESLER:  Is that classified information?  If it

14   is, obviously don't want to...

15             PANELMEMBER:  I can't remember exactly what the main

16   company's name was, but they were a CM too on Qualcomm.

17             MR. CHESLER:  A CM, contract manufacturer?

18             PANELMEMBER:  Correct.

19             MR. CHESLER:  Ultimately, you said the program was

20   not a success; is that right?

21             PANELMEMBER:  Yeah.  It was two years and lots of

22   money and ended up failing, not succeeding for what it was

23   intended.

24             MR. CHESLER:  Okay.  Can you hand it over to -- thank

25   you.  Now we are up to 28.

1      Sir, I think you said that you had a, you had Android

2    phones and you most recently bought an iPhone; is that right?

3              PANELMEMBER:  Yes.

4              MR. CHESLER:  Is there some reason why you switched

5    from one to the other?

6              PANELMEMBER:  No.  I am familiar with both, but

7    recently I bought a new iPhone.  But usually I am an Android

8    user.

9              MR. CHESLER:  Do you know which phone manufacturers

10   you had for your Android phones?

11             PANELMEMBER:  All of them.

12             MR. CHESLER:  All of them.

13             PANELMEMBER:  Basically, yeah.

14             MR. CHESLER:  That is a lot of companies.

15             PANELMEMBER:  That's a lot of companies, yeah.

16             MR. CHESLER:  How long have you had the iPhone?

17             PANELMEMBER:  About a year.

18             MR. CHESLER:  Is it a model X?

19             PANELMEMBER:  No, it's like a 6 Plus.

20             MR. CHESLER:  Can you hand it over to that gentleman

21   there.

22       Sir, you had an LG phone and then you switched to an

23   iPhone?

24             PANELMEMBER:  No, I don't have an iPhone.

25             MR. CHESLER:  You don't have an iPhone.  You do have

1    an LG?

2              PANELMEMBER:  Yes.

3              MR. CHESLER:  An Android.

4              PANELMEMBER:  Yes.

5              MR. CHESLER:  How do you like it?

6              PANELMEMBER:  It's all right.

7              MR. CHESLER:  You don't sound too excited.

8              PANELMEMBER:  It's all right.

9              MR. CHESLER:  Do you use it for data as well as for

10   voice?

11             PANELMEMBER:  Yeah.

12             MR. CHESLER:  Do you use it for videos?  Do you ever

13   receive or send videos?

14             PANELMEMBER:  I don't use my phone that often.  I

15   just use it for emergencies.  I just use it to call people.

16             MR. CHESLER:  Could you hand it over to the next...

17       Juror Number 32, correct?  You said you have been involved

18   in the computer industry for about 30 years, correct?

19             PANELMEMBER:  Yes.

20             MR. CHESLER:  Can you just tell us a little bit more.

21   What sort of work you do in the computer industry?

22             PANELMEMBER:  Currently -- well, the last 29 years I

23   have worked for UC San Diego Health in information services,

24   supporting all the hospitals that the UC system supports.  My

25   jobs have changed, but I do have -- my involvement with mobile

1    devices is I am the administrator for the mobile device

2    management systems for VMWare, AirWatch, and Absolute.  And in

3    a clinical environment, we are super security conscious, and we

4    have to have every lock in place for every device that's being

5    used.

6         And there's a big push in the healthcare environment to

7    use iPads at the bedside for the nursing staff and physician

8    staff, and that's the route we are going.  I help manage the

9    systems as well as all the 14,000 computers that we have in our

10   environment.

11            MR. CHESLER:  When you say you manage them, are you

12   in sysops?  Are you in systems operations?

13            PANELMEMBER:  Yeah, systems administrator.  Our team

14   of four, we are at the tier-two level, so we are not field

15   support, but what we do is we build the tools for the field

16   support.  And we also -- we can access and manage the entire

17   environment, all our computer environment basically from our

18   desk anywhere, with different management tools for those work

19   stations and mobile devices.

20            MR. CHESLER:  Do you use servers?

21            PANELMEMBER:  Yes, those are all server-based

22   systems.

23            MR. CHESLER:  Do you know who supplies the servers?

24            PANELMEMBER:  They are all virtual -- virtual

25   environments, so it is kind of -- I think -- I don't manage the

1    servers myself, but it's a mixed environment right now.

2            MR. CHESLER:  So it's server farms someplace?

3            PANELMEMBER:  Yeah, they're a virtual environment

4    setup.

5            MR. CHESLER:  Thank you, sir.  Hand it to the

6    gentleman next to you.

7        You have an MBA as well, sir?

8            PANELMEMBER:  Yes, I do.

9            MR. CHESLER:  Did you specialize in some field of

10   business?

11           THE WITNESS:  Retail sales.  Retail management.

12           MR. CHESLER:  You said that you have been on five

13   juries, four of which came to verdict?

14           PANELMEMBER:  Yes, I did.

15           MR. CHESLER:  Did any of those cases involve

16   technology companies?

17           PANELMEMBER:  No.

18           MR. CHESLER:  Were they all here in San Diego?

19           PANELMEMBER:  Yes, they were.

20           MR. CHESLER:  Federal court?  State court?

21           PANELMEMBER:  State court.

22           MR. CHESLER:  State court.

23       Thank you, sir.

24       I don't want to run out of time.  I have a little bit

25   more.

```
 1          Juror Number 34.  You also worked at Scripps as a nurse,

 2   correct?

 3              PANELMEMBER:  That's correct.

 4              MR. CHESLER:  With Juror Number 1.

 5          Your husband is an electrician; is that right?

 6              PANELMEMBER:  Retired.

 7              MR. CHESLER:  Retired electrician.

 8          Did you -- I am just interested in that you read technical

 9   publications, LegalTech Weekly; is that right?

10              PANELMEMBER:  No.

11              MR. CHESLER:  Okay.  I must have had -- took that

12   wrong.  I feel better now, about you and about myself.

13          What did you do after you left Scripps when you were a

14   nurse?

15              PANELMEMBER:  I have only been retired since August,

16   and I am having the time of my life.

17              MR. CHESLER:  Were you at Scripps until you retired?

18              PANELMEMBER:  Yes.

19              MR. CHESLER:  I thought you had left there at some

20   point, you just weren't working with Juror Number 1?

21              PANELMEMBER:  Yes.

22              MR. CHESLER:  I just have a few more minutes.  Can we

23   hand it back to Juror Number 40 there.  Thank you.

24          Is it correct that you work for Netflix?

25              PANELMEMBER:  Correct.
```

1              MR. CHESLER:  What do you do?

2              PANELMEMBER:  I am their flight attendant on the

3    corporate jet.

4              MR. CHESLER:  Do you have an iPhone?

5              PANELMEMBER:  I do.

6              MR. CHESLER:  And an iPad.

7              PANELMEMBER:  I do.

8              MR. CHESLER:  You have the Macbook.

9              PANELMEMBER:  My children have the Macbook.  I don't

10   use one.

11             MR. CHESLER:  Do you use your iPhone for video as

12   well as other applications?

13             PANELMEMBER:  Yes, I do.

14             MR. CHESLER:  How about the iPad?  Do you use video

15   on the iPad?

16             PANELMEMBER:  Very little do I use my iPad for that

17   purpose.

18             MR. CHESLER:  What sort of application do you use on

19   the iPad?

20             PANELMEMBER:  Mostly just watching movies.

21             MR. CHESLER:  Watching movies?  Netflix?

22             PANELMEMBER:  Netflix.

23             MR. CHESLER:  You said your children use the Macbook;

24   you don't use the Macbook.

25             PANELMEMBER:  Correct.

```
 1              MR. CHESLER:  Have you ever used any smartphone other
 2  than an Apple smartphone?
 3              PANELMEMBER:  No, I have not.
 4              MR. CHESLER:  And how long have you been using it?
 5              PANELMEMBER:  Probably about ten years.
 6              MR. CHESLER:  Thank you.  Can you hand it to the
 7  gentleman there.
 8      Sir, there was some reference to hardship on your form, is
 9  that related to the holidays that are coming up?
10              PANELMEMBER:  It was, and it is not an issue with
11  Fridays not being in session.
12              MR. CHESLER:  In light of what the judge said about
13  the schedule?
14              PANELMEMBER:  Yes.
15              MR. CHESLER:  What do you do at the Coastline Church?
16              PANELMEMBER:  I serve in the day-to-day duties,
17  overseeing payroll, insurances, managing books.
18              MR. CHESLER:  Work in the office?
19              PANELMEMBER:  Right.
20              MR. CHESLER:  Where is that church located?
21              PANELMEMBER:  Oceanside.
22              MR. CHESLER:  Thank you.  Just hand it to the
23  gentleman next to you.
24      You are a horse trainer?
25              PANELMEMBER:  No.  I am a lineman, high-voltage
```

1    lineman.  I build power lines.

2              MR. CHESLER:  People who hang on buildings, and you

3    build power lines?

4         Do you actually put the power lines up?

5              PANELMEMBER:  Yes.

6              MR. CHESLER:  For what company do you do that?

7              PANELMEMBER:  I work for the Imperial Irrigation

8    District out of the Imperial Valley.

9              MR. CHESLER:  How long have you done that?

10             PANELMEMBER:  I have been in the power part for 10

11   years, and I've worked for the company for 17.

12             MR. CHESLER:  Do you use cellular equipment in

13   connection with that job?

14             PANELMEMBER:  No.

15             MR. CHESLER:  Just a couple more questions.  Hand it

16   to the gentleman next to you.

17        Just want to be sure I have got the right -- 37, sir?

18             PANELMEMBER:  37, yes.

19             MR. CHESLER:  You have a Samsung phone, sir?

20             PANELMEMBER:  That's correct.

21             MR. CHESLER:  How long have you been using a Samsung

22   product?

23             PANELMEMBER:  About 12 years, 13 years.

24             MR. CHESLER:  Have you used any Apple iPhones?

25             THE WITNESS:  No, I have not.

1              MR. CHESLER:  I think it says you are a business

2    development manager; is that correct?

3              PANELMEMBER:  That's correct.

4              MR. CHESLER:  Can you describe for us a little bit

5    what that entails.

6              PANELMEMBER:  I work with a team that works on

7    government contracting, so I can work for Department of the

8    Navy and Marine Corps.  So we provide services for weapons

9    systems, communications systems, radar systems, things like

10   that.

11             MR. CHESLER:  What sort of services do you provide?

12             PANELMEMBER:  Engineering services, data analytics,

13   program management, project management.

14             MR. CHESLER:  Do you use computer systems in doing

15   your work?

16             PANELMEMBER:  Yes.

17             MR. CHESLER:  Server-based systems?

18             PANELMEMBER:  Yes.  Cloud-based system, virtual

19   server using VMWare.

20             MR. CHESLER:  Do you use portable devices that are

21   connected to the cloud-based system, either electronically or

22   wireless?

23             PANELMEMBER:  I use a laptop.

24             MR. CHESLER:  Whose laptop do you use, if you know?

25             PANELMEMBER:  I use a company laptop.

```
 1              MR. CHESLER:  Do you know the manufacturer?

 2              PANELMEMBER:  It's a Dell.

 3              MR. CHESLER:  Dell.

 4         One more.  Is it 35?

 5              PANELMEMBER:  Yes.

 6              MR. CHESLER:  You are an assistant manager.  Where

 7    are you assistant manager?

 8              PANELMEMBER:  At a movie theater in Coronado.

 9              MR. CHESLER:  In Coronado?

10              PANELMEMBER:  Uh-huh.

11              MR. CHESLER:  You also are involved -- it says

12    "customer service."

13              PANELMEMBER:  Also Walgreens, a part-time job.

14              MR. CHESLER:  Also in the same town?

15              PANELMEMBER:  Oh, yeah, like a block away.

16              MR. CHESLER:  Okay.

17         Your Honor, I have no further questions at this time.

18              THE COURT:  All right.

19         At this time, I am going to meet with the attorneys at

20    sidebar for a couple of minutes.  We have been in session for a

21    while now.  Feel free to stand up if you wish, try to keep it

22    down to a dull roar.  Otherwise, feel free to stand and

23    stretch.

24         (The following proceedings were heard at sidebar:)

25              THE COURT:  Let me turn to you, excuse for cause.
```

 1    And at this point, let me ask, with respect to two that were, I

 2    think, previously proposed, one we agreed was as to 19.

 3              THE CLERK:  Judge, they have just indicated one of

 4    the jurors might have a hardship.  I need to find out which one

 5    that is.

 6              THE COURT:  All right.  As to 19, we all agree she

 7    can be excused and we will excuse her?

 8              ALL:  Yes.

 9              THE COURT:  As to 23, that was the juror it was

10    developed she only gets one week of jury duty, and it would

11    create a hardship.

12              THE CLERK:  Sorry, Your Honor.  Number 37 --

13              THE COURT:  We can excuse her?

14              MS. BROOKS:  Yes.

15              MR. CHESLER:  She would be out a month without

16    salary.

17              THE CLERK:  Number 37 would like to speak with you

18    sidebar.

19         (Juror 37 joined sidebar conference.)

20              THE COURT:  Yes, sir.  Come over here towards me.  Do

21    you have a hardship?

22              PANELMEMBER:  Yes, I can -- I do.  I discovered two

23    items today during lunchtime.  I am Juror Number 37.

24              THE COURT:  Yes, sir.

25              PANELMEMBER:  One is my employer will only compensate

1   me two days of jury duty, and I only have a week of vacation --

2   and just found out my son is coming in from England from May 11

3   to May 18 -- which I will use during that time he is here.  So

4   that would impact my ability for being able to serve.

5          THE COURT:  Okay.  Thank you for coming out today,

6   participating, and let me talk to the lawyers and we will see

7   what we can do, sir.

8          PANELMEMBER:  Thank you.

9          THE COURT:  Thank you.

10     (Juror 37 left sidebar conference.)

11     Given what we have heard, any objection to excusing Juror

12  Number 37?

13         MS. BROOKS:  No, Your Honor.

14         MR. CHESLER:  No, Your Honor.

15         MR. DOREN:  No, Your Honor.

16         THE COURT:  We have all agreed that Juror Number 19,

17  Juror Number 23, Juror Number 37 should be excused.  Any

18  additional jurors you believe warrant --

19         MS. HEWITT:  I am sorry.  Did you say 27?

20         THE COURT:  37.  That's the gentleman we just spoke

21  to.

22         MR. CHESLER:  He just came in.  And I am sorry, Your

23  Honor.  The other one you said was 23?

24         THE COURT:  19, 23, and 37.

25         MR. CHESLER:  Right.  Ms. Reyes is the one-week

```
 1    excuse?  Great.  Thank you.

 2              THE COURT:  I hope I said that right.  19, 23, and

 3    37.

 4              MR. CHESLER:  Yes.

 5              THE COURT:  Anyone else?

 6              MR. CHESLER:  No.

 7              THE COURT:  From the plaintiffs, Apple?

 8              MS. BROOKS:  Juror Number 27, but I would need to

 9    question him at sidebar.  He is the gentleman that had worked

10    with the Department of Interior, and Mr. Chesler was

11    questioning him and he said he couldn't answer a lot of the

12    questions because of national security.

13              THE COURT:  Okay.  As of this moment, I don't see

14    cause, but we can invite him over to see if he will share with

15    us any additional information that won't require us being

16    killed.

17              MR. DOREN:  Your Honor, Number 17, the gentleman with

18    the deep tech background, he said that, in deliberations, if he

19    disagreed with any of the evidence, he would tell everyone what

20    the truth was.

21              THE COURT:  Yeah.  What is your view and the defense

22    view?

23              MS. BROOKS:  I think he could be extremely

24    prejudicial to any of the parties.  We just don't know.

25              THE COURT:  He may be the man who knows too much.
```

```
 1              MR. CHESLER:  I agree.  Whatever he thinks is going
 2    to be true, and I think that could hurt any of us.
 3              THE COURT:  Right.  So does everyone agree he should
 4    be excused for cause?
 5              MS. BROOKS:  Yes, Your Honor.
 6              MR. DOREN:  Yes, Your Honor.
 7              MR. CHESLER:  Yes, Your Honor.
 8              THE CLERK:  That was 17.
 9              THE COURT:  Yes.  And then we had 37, but anyone else
10    from Apple?
11              MS. BROOKS:  No, Your Honor.
12              THE COURT:  Anyone else from CMs?
13              MR. DOREN:  No, Your Honor.
14              THE COURT:  Anyone else from Qualcomm?
15         Okay.  Let's invite Juror Number 27.
16              MS. BROOKS:  Yes, Your Honor.
17         (Juror 27 joined sidebar conference.)
18              THE COURT:  Hello, sir.  We just have a couple of
19    follow-up questions relating to your work.  I know you talked
20    about your work with Qualcomm from 2010 to 2012 on a program
21    that was ultimately not successful.  There was certain
22    information that you could not share with us or reveal, at
23    least openly.
24              PANELMEMBER:  Right.
25              THE COURT:  And we have a question or two.  I will
```

1    allow it to be posed.

2         MS. BROOKS:  Good afternoon.  There's recently

3    been -- and it's actual public information that the Department

4    of Defense and the Department of Energy have taken a position

5    with the Federal Trade Commission vis-a-vis Qualcomm and

6    litigation and it all relates to work, sounds like, that you

7    have done.

8         PANELMEMBER:  Okay.

9         MS. BROOKS:  I wondered if you were aware of any of

10   that?

11        PANELMEMBER:  I wasn't aware that DOE was involved in

12   it.  There has been some follow-up stuff going on that I am

13   mildly aware of in the Department of Defense side, but not

14   necessarily the DOE side.

15        MS. BROOKS:  Can you tell us about the Department of

16   Defense side of it, what you are aware of?

17        PANELMEMBER:  That there has been some physical --

18   issues of, I guess, some failures in -- I don't know how --

19   just some failures in technology developments that have gone on

20   previously and that had kind of come up with the defense

21   department coming back at -- I don't want to say -- but coming

22   back at Qualcomm, I believe.  It wasn't necessarily things that

23   I did.  It wasn't anything that I was involved in.  I think it

24   was just -- at least what I understand, it was a generalized

25   term, coming back at Qualcomm for some failures that had

1    previously gone on.

2          THE COURT:  When you say -- I think you said "coming

3    back at."  Is that what you said?

4          PANELMEMBER:  Going back after.

5          THE COURT:  What does that mean?

6          PANELMEMBER:  Well, because, like, for my effort it

7    was, like, over $400,000 worth of development that went on and

8    it -- ultimately, the -- the system didn't do what it was

9    supposed to do, and then it was, they were -- I have heard of

10   multiple instances of that happening.

11         THE COURT:  When you say going back at --

12         PANELMEMBER:  Going back to as in --

13         THE COURT:  Does that mean they want their money back

14   they paid, or thinking about filing a lawsuit, or cutting them

15   off as a provider?

16         PANELMEMBER:  Cutting them off as a provider, that's

17   way extreme.  And I am not in that world.  What I say is, like,

18   having bad references put back to them as in not fulfilling

19   what they were supposed --

20         THE COURT:  Given your experience in 2010 and 2012,

21   given what you have learned about what DOD now is doing in

22   response to failures, would that color your views in terms of

23   how you are prepared to judge Qualcomm or Apple?

24         PANELMEMBER:  In all fairness, I would say it would

25   probably have some bias to it, but again --

```
 1              THE COURT:  Would Qualcomm start out kind of in a
 2   ditch when they are trying to get their way out of there?
 3              PANELMEMBER:  In my mind's eye, I think they would.
 4              THE COURT:  I appreciate that.  That's what we need
 5   to have from all our jurors, is candor.
 6              PANELMEMBER:  I don't want to be offensive to
 7   anybody.
 8              THE COURT:  No.  The only problem would be if you
 9   didn't share that with us.
10       Any other questions?
11              MS. BROOKS:  No.  Thank you very much.
12              THE COURT:  Is there an additional request or motion?
13              MR. CHESLER:  Yes, Your Honor.  We ask that Juror
14   Number 27 be excused for cause.
15              MS. BROOKS:  No objection.
16       And I would like Mr. Chesler to thank me for bringing this
17   to his attention.
18              MR. CHESLER:  Yes.  Thank you very much.
19              THE COURT:  Let the record reflect Mr. Chesler is
20   thanking Ms. Brooks.
21       At this point, let me inquire, we have a pilot with
22   American Airlines, Juror Number 8.  I guess he says he can do
23   this, and he would have told us if he couldn't, so I guess his
24   jury duty expands beyond two days.
25       And then, again, I think we have talked about Number 3.
```

1   And I don't know if we talked about 11 much, but they both have

2   flights around the 19th or 20th.  So does everybody agree we

3   should keep them on at this point?

4            MR. CHESLER:  I think it is the 20th and 22nd.

5            THE COURT:  One said the 19th.

6            MS. HEWITT:  He said the 18th.

7            THE COURT:  He originally said the 19th.  And then,

8   later on, I noticed he said the 18th to somebody.

9            MR. CHESLER:  Oh, it's moving.

10           THE COURT:  So, no problems there?

11           MR. CHESLER:  I am concerned about the 18th, I think.

12   20th and 22nd are far enough out, but I am worried that he is

13   in deliberations and it's pressure for him to get an answer.

14           THE COURT:  Anybody disagree?

15           MR. DOREN:  I don't disagree with it.  I think it is

16   in the gray.

17           MS. BROOKS:  I don't disagree if we have enough

18   jurors.

19           MS. DUNN:  I think it is better to be sure than

20   regretful later.

21           THE COURT:  I think we do.  Let me see.  We are up to

22   about 25.  We will end up with nine.

23           MR. CHESLER:  And 12 is 21.

24           THE COURT:  So I guess we should be okay.  Yeah, so

25   we will excuse Juror Number 11.

1    So I think, at this time, I will thank and excuse those

2  jurors.  I will ask you to keep track of who I am excusing to

3  make sure I don't excuse someone I did not intend to.  And then

4  we will go with the peremptory challenges.

5    And then, as you may know, we do the Arizona blind strike

6  method.  So you will not know who the other party is striking

7  before you exercise your allotted number of challenges.

8    After you have completed making your challenges, let Kimmi

9  know.  She will come and take your sheet and give it to me so I

10  can note who our challenges are.  And after we are done with

11  that process, we will meet sidebar here to see if there are

12  *Batson* issues.

13    THE CLERK:  One other thing:  If you are not going to

14  use a challenge, please state that on your challenge sheet.

15    MS. BROOKS:  Will do.

16   (The following proceedings were held in open court in the

17  presence of the jury:)

18    THE COURT:  All right.  I hope you were able to

19  stretch your legs and meet your neighbors.

20    At this time, we are prepared to excuse a number of jurors

21  who declared one form of hardship or another to us.  There was

22  one particular juror -- one particular juror who -- I think she

23  said she had a week and one, two days of jury service.  And

24  these were people that were still prepared to serve as jurors.

25    So we understand the hardship.  So we will be excusing

1    those jurors that did not have payment for more than two or

2    five days.

3        At this point, I am prepared to thank and excuse the

4    following jurors.  I will ask these individuals, after I call

5    your name, to stand in the back right there by the exit, just

6    so that I can assure myself that I have identified the correct

7    individuals that will be excused at this moment.

8        So let me begin with Juror Number 11, next will be Juror

9    Number 17, next will be Juror Number 19, next will be Juror

10   Number 23, next will be Juror Number 27, and then next and last

11   will be Juror Number 37.

12       And let me inquire of all three sets of parties:  Do the

13   parties agree that these are properly the jurors who are

14   excused?

15           MR. CHESLER:  Yes, Your Honor.

16           MS. BROOKS:  Yes, Your Honor.

17           MR. DOREN:  Yes, Your Honor.

18           THE COURT:  So thank you for your time today and for

19   serving your community as prospective jurors.  And, at this

20   time, I am prepared to excuse you.

21       Let me ask my clerk, are we sending them back?

22       (Brief discussion off the record.)

23           THE COURT:  I will send you back to the jury room so

24   that you can report to them that you have concluded your

25   service here.  I can't possibly imagine that your services

```
 1   would be required anymore today, but if you could report back

 2   there, they can note you down as having served and having been

 3   excused.

 4        All right.  Thank you so much.

 5        (Excused jurors left the courtroom.)

 6             THE COURT:  And now, as I stated, we will now have

 7   the attorneys exercise their peremptory challenges.  Those are

 8   challenges for which no cause has to be given.  And it is the

 9   means by which the law allows the parties to have a greater

10   hand in the composition of the jury, have a greater comfort

11   level in the composition of the jury.

12        So this process will probably play out in about 10 -- 10,

13   15 minutes.  What I can tell you is that we're very close to

14   the conclusion of this process.  So I will just ask you to be

15   patient for a couple more minutes.

16        (Pause.)

17             THE COURT:  Mr. Chesler, almost ready?

18             MS. HEWITT:  One moment, Your Honor, just one moment.

19   Your Honor, we're ready.

20             THE COURT:  Thank you.

21        (Pause.)

22             THE COURT:  Let me see counsel sidebar.

23        (The following proceedings were heard at sidebar:)

24             THE COURT:  Have all sides had an opportunity to

25   review the challenges from the others?  Any *Batson* issues?
```

```
 1              MR. CHESLER:  No, Your Honor.

 2              MS. BROOKS:  No, Your Honor.

 3              THE COURT:  And Mr. Lo, no Batson issues?

 4              MR. DOREN:  No, Your Honor.

 5              THE COURT:  All right.  So, then, if I have this

 6    right, this is who I have as our jury:  Juror Number 1, our

 7    model juror, will be Juror Number 1.  Juror Number 2 will be

 8    Number 5.  Is that who you all have?

 9              MS. HEWITT:  We don't have our sheet.

10              MS. DUNN:  We have yours.  If we stand together, we

11    can figure it out.

12              THE COURT:  I have Juror Number 1 as 1.  Juror

13    Number 5 is 2.  Juror Number 6 is 3.  Juror Number 8 as 4.

14              MR. CHESLER:  We -- 7 is out.  Number 8 is 4.

15    Number 9 is 5.

16              THE COURT:  And then, to get to 6, we go all the way

17    to 20.  My 7 is 22.  My 8 is 28.  And my 9 is 33.  Do you want

18    to go back to your tables and make sure that's what you have as

19    well?

20              MS. BROOKS:  If we could, Your Honor.

21         And I had one question.  Your Honor mentioned there would

22    be one alternate.

23              THE COURT:  No, there are no alternatives.  Whoever

24    is left at the end of the jury is going to deliberate.

25              MS. BROOKS:  Thank you very much for the
```

1    clarification.

2         MR. CHESLER:  I think you have it right.  Can we take

3    a minute to make sure?

4         THE COURT:  Yes.  Sure.  Why don't do you that, and

5    we will go about identifying the individuals who will not be

6    jurors, have them stand in the back.  Then I will ask you, "Do

7    you agree that the composition of our jury is one that is

8    proper after the exercise of challenges?"

9       And then you let me know if it is.  And if it turns out

10   that there's a mistake, you can even let me know there may be a

11   problem.  Okay?

12        MR. CHESLER:  Thank you.

13        MS. BROOKS:  Thank you.

14      (The following proceedings were held in open court in the

15   presence of the jury:)

16        THE COURT:  We are almost done.  And there are so

17   many moving parts that I want to triple-check that the nine

18   jurors that I have on my list are the nine jurors that all the

19   parties have on their lists.  So, in a moment, we will be

20   excusing the jurors who will not be serving on our jury.

21        MR. DOREN:  Looks right to us, Your Honor.

22        MR. CHESLER:  Yes, Your Honor.

23        THE COURT:  Kimmi, would you excuse our jurors?

24        THE CLERK:  We would like to thank and excuse Juror

25   Number 3.  If I could have you wait in the back of the room,

1   please.

2       Juror Number 4, we would like to thank and excuse.

3       Juror Number 7, we would also like to thank and excuse.

4       Juror Number 10, we would like to thank and excuse.

5       Juror Number 12, we would like to thank and excuse.

6       Juror Number 16, we would like to thank and excuse.

7       Juror Number 18, we would like to thank and excuse.

8       Juror Number 24, we would like to thank and excuse.

9       Juror Number 26, we would like to thank and excuse.

10      Juror Number 30, we would like to thank and excuse.

11      Juror Number 32, we would like to thank and excuse.

12      Juror Number 34, we would like to thank and excuse.

13      Juror Number 35, we would like to thank and excuse.

14      Juror Number 38, we would like to thank and excuse.

15      Juror Number 39, we would like to thank and excuse.

16      And Juror Number 40, we would like to thank and excuse.

17          THE COURT:  Let me ask counsel, do you all agree that

18  the remaining jurors accurately composes the jury that will try

19  this case?

20          MS. BROOKS:  We do, Your Honor.

21          MR. DOREN:  Yes, Your Honor.

22          MR. CHESLER:  Yes, Your Honor.

23          THE COURT:  With that, let me thank you for being

24  here and going through this process all day.  You've seen that,

25  in order to arrive at a jury of nine, we have to spend hours

1    talking to you, asking you about your background and your

2    knowledge about these types of cases.  And it's all for the

3    goal of arriving at a jury that will be able to assume the

4    great responsibilities in this case.

5         So thank you for being here.  And I will ask you to return

6    to the jury room just to report and then have them let you go

7    about your business.  Thank you.

8         (Excused jurors left the courtroom.)

9              THE COURT:  At this time, Madam Clerk, can we have

10   our jurors placed in their assigned seats.

11             THE CLERK:  Juror Number 1 will be Juror Number 1.

12   Please remain in Seat Number 1.

13        Juror Number 2 is now -- or was Juror Number 5.  If I

14   could have you move to the second seat.  You are now Juror

15   Number 2.

16        Juror Number 6, you are now Juror Number 3.

17        And Juror Number 8, if I could have you move to the front

18   row.  You are now Juror Number 4.

19        Juror Number 9, if I could have you move over one seat.

20   You will be Juror Number 5.

21        Juror Number 20, you will now be Juror Number 6.

22        Juror Number 22, you are now Juror Number 7.

23        Juror Number 28, you are now Juror Number 8.

24        And Juror Number 33, you are now Juror Number 9.

25             THE COURT:  All right.  Madam Clerk, please swear in

1    the jury.

2         THE CLERK:  Can I take a look at Juror Number 4 or

3    Juror Number 5?  We have one juror sitting by themselves.

4         What number are you?

5         THE COURT:  He is Number 7, so he would be in the

6    back row.

7         THE CLERK:  You are in the back row.  1 through 4 in

8    the front row.  And then 5, 6, 7, 8, and 9 in the back row.

9         Ladies and gentlemen of the jury, please rise and raise

10   your right hands.

11        (Oath administered by the clerk.)

12        THE COURT:  All right.  So, at this time, we will be

13   concluding for the day.  And just to give a lead on what we're

14   going to be doing tomorrow, is we will start off with a set of

15   preliminary instructions.  There's about 11 or 12 of them.  And

16   they will inform you about certain legal concepts that you will

17   want to have under your belt as we go through this trial.

18        Then we will proceed with opening statements.  And each

19   party will have the opportunity to present an opening

20   statement.  After that, the evidence will begin, witnesses will

21   be called, exhibits will be offered.

22        So I will ask you to abide by a number of admonitions.

23        First of all, I will be directing counsel to instruct

24   their witnesses not to speak to you, and themselves will be

25   prohibited from speaking with you.  And that's in order to

1    avoid any issues where you're excitedly talking to an attorney

2    about the Padres, and then someone sees you, and then we have a

3    report that a juror was talking to an attorney.  And then I

4    have to call the juror into court and say, "Okay.  You were

5    seen talking to an attorney.  What were you talking about?

6    What did you discuss?"

7        And so to avoid that and to avoid the appearance of

8    impropriety, because, to the extent that you are observed

9    speaking to an attorney or a witness or the media, that will

10   create problems for us.  So counsel has been advised not to

11   speak to you.  They are all wonderful and delightful people.  I

12   think you've already met and heard from a number of them, but

13   that rule is required so that we can avoid problems down the

14   line.

15       With respect to schedule, we will begin, unless otherwise

16   directed, at 9:00 a.m., go until 12:00 p.m.  We'll take a break

17   around 10:30-ish.  We will have a one-hour lunch, resume after

18   lunch at 1:00 p.m., and then proceed to 5:00 p.m.

19       I may adjust that a little bit.  I may change it so it

20   will be 9:00 to 12:30 and then 1:30 to 5:00, just so that the

21   afternoon isn't as long.  Otherwise, it's three hours on one

22   side and then four hours on the other one, and probably at the

23   time that we are least able to stay upright, in the afternoon

24   after lunch.  So we may tweak that, but for right now we'll go

25   with 9:00 to 12:00.

1      Then let me give you the full instruction about the

2  conduct of the jury now that you are in fact the jury.  And

3  because it is so important that you abide by this instruction,

4  avoid any contacts or communications with anyone who wants to

5  talk about this case with you, because it's critical that you

6  learn about this case here in open court and not through some

7  other means.  I will now say a few words about your conduct as

8  jurors.

9      First, keep an open mind throughout the trial and do not

10 decide what the verdict should be until you and your fellow

11 jurors have completed your deliberations at the end of the

12 case.

13     Second, because you must decide this case based only on

14 the evidence received in the case and on my instructions as to

15 the law that applies, you must not be exposed to any other

16 information about the case or to the issues it involves during

17 the course of your jury duty.

18     Thus, until the end of the case or unless I tell you

19 otherwise, do not communicate with anyone in any way and do not

20 let anyone else communicate with you in any way about the

21 merits of the case or anything to do with it.  This includes

22 discussing the case in person, in writing, by phone or

23 electronic means via e-mail, text messaging, or any internet

24 chat room, blog, website, or applications, including, but not

25 limited to, Facebook, YouTube, Twitter, Instagram, LinkedIn,

1    Snapchat, or any other forms of social media.

2        This applies to communicating with your fellow jurors

3    until I give you the case for deliberation.  And it applies to

4    communicating with everyone else, including your family

5    members, your employer, the media or press, and the people

6    involved in the trial, although you may notify your family and

7    your employer that you have been seated as a juror in the case

8    and how long you expect the trial to last.

9        But if you are asked or approached in any way about your

10   jury service or anything about this case, you must respond that

11   you have been ordered not to discuss the matter and report the

12   contact to the Court.

13       Because you will receive all the evidence and legal

14   instruction you properly may consider to return a verdict, do

15   not read, watch, or listen to any news or media accounts or

16   commentary about the case or anything to do with it.

17       Do not do any research, such as consulting dictionaries,

18   searching the internet, or using other reference materials, and

19   do not make any investigation or in any other way try to learn

20   about the case on your own.  Do not visit or view any place

21   discussed in this case, and do not use internet programs or

22   other devices to search for or view any place discussed during

23   the trial.

24       Also do not do any research about the case, the law, or

25   the people involved, including the parties, the witnesses, or

1    the lawyers, until you have been excused as jurors.

2         If you happen to read or hear anything touching on the

3    case in the media, turn away and report it to me as soon as

4    possible.

5         These rules protect each party's right to have this case

6    decided only on evidence that has been presented here in court.

7    Witnesses here in court take an oath to tell the truth, and the

8    accuracy of their testimony is tested through the trial

9    process.  If you do any research or investigation outside the

10   courtroom or gain any information through improper

11   communications, then your verdict may be influenced by

12   inaccurate, incomplete, or misleading information that has not

13   been tested by the trial process.

14        Each of the parties is entitled to a fair trial by an

15   impartial jury.  And if you decide the case based on

16   information not presented in court, you will have denied the

17   parties a fair trial.

18        Remember, you have taken an oath to follow the rules, and

19   it is very important that you follow these rules.  A juror who

20   violates these restrictions jeopardizes the fairness of these

21   proceedings, and a mistrial could result that would require the

22   entire trial process to start over.

23        If any juror is exposed to any outside information, please

24   notify the Court immediately.

25        So that concludes your service for today.  I will ask you

 1   to try to get here early.  And I am not sure how many of you

 2   ever have to commute downtown.  It's much worse than when I

 3   first moved here back in 1989.  So you will want to keep that

 4   in mind, that if you are not used to commuting downtown, give

 5   yourself a couple of extra minutes.

 6        And then, in addition, while you didn't have to enter the

 7   courthouse this morning before 9:00, it does tend to bunch up

 8   out there.  So you want to take that into account.  So, between

 9   the two, you can see that there are possible delays you may

10   encounter.  I will ask you to plan accordingly so that we can

11   start promptly at 9:00 a.m.

12        So have a great evening, and I will see you tomorrow

13   morning.

14        And my clerk has left her business card, I think, on the

15   seat or under the seat.  And it's there for you to take with

16   you so that, if there's anything that happens tomorrow morning

17   before you get here, then you can call us and then we'll know

18   where you are and what's happened.  So please take that card

19   with you.  All right?

20        Have a great evening.

21            THE CLERK:  Just the card, not the notebooks.  You

22   can leave the notebooks under your chairs.

23            JUROR:  We don't go back to the jury lounge?

24            THE COURT:  No.  You're free to go home.

25        (The following proceedings were held in open court out of

1    the presence of the jury:)

2            THE COURT:  Please be seated.

3        So, at this time, I have asked my attorneys, law clerks,

4    to share with you a proposed preliminary Instruction Number 1,

5    claims and defenses.  And it was -- if not challenging, it was

6    somewhat difficult to put this together because the parties'

7    views on the order of the instruction and what is contained

8    appears to be different.

9        I am pretty much convinced that the first page and

10   three-quarters are what I will give with respect to the legal

11   claims.  But there is -- or there are offered instructions that

12   raise a number of equitable forms of relief or request for

13   declarations that are embedded or are found in the respective

14   proposed instructions.

15       I'm not sure that I necessarily would want to have them in

16   the claims and defenses; but, to the extent that they are, I

17   would be prepared to leave them to last.  And, even there, the

18   parties had a different opinion as to what declarations were

19   being sought.  There's a disagreement as to who has the burden

20   of proof on a number of these questions.

21       And so, to the extent that we do leave these requests for

22   declarations in this preliminary instruction, I am not prepared

23   to inform the jury one way or another as to what the -- or who

24   holds the burden of proof.  I have certain ideas in mind about

25   who does.  But, rather than take up a lot of time at this

1    point, I would be punting that for later.

2         So, let me, I guess, identify the salient differences that

3    my preliminary instruction has compared to the ones that the

4    parties have provided.

5         You will see that, as to Apple's claims, the third bullet

6    point does include the claim that Qualcomm engaged in

7    anticompetitive behavior.  And that's based upon my ruling on

8    Rule 39(c)(1), impaneling of the advisory jury.

9         With respect to Qualcomm's claims, you will note that I

10   added the word "tortiously interfered."

11        In Apple's proposed instruction, there were these two

12   additional bullet points for Qualcomm seeks a finding that

13   Qualcomm's license agreements don't violate FRAND.  Qualcomm

14   seeks a finding that Qualcomm can satisfy and discharge its

15   FRAND commitments to ETSI.

16        And so let me inquire with respect to the role that the

17   parties believe that the jury will play as to these two

18   questions.

19             MR. CHESLER:  May Mr. Denning address the Court?

20             THE COURT:  Sure.

21             MR. DENNING:  So, Your Honor, with respect to the --

22   Nathan Denning for Qualcomm.

23        With respect to the two declaratory judgment claims that

24   you identified, we believe that both of those would go to the

25   jury, that they would be decided essentially on a breach of

1   contract standard.

2       I can give a bit more, Your Honor.

3           THE COURT:  Let me see.

4           MR. ISAACSON:  I think you moved it to page 3.

5           THE COURT:  Well, there are the request for

6   declarations that currently are at page 3.  And they don't

7   necessarily match exactly the same.

8       It looks like Apple identifies three declaratory relief

9   claims.  And that is found in Apple's proposed instruction

10  beginning at line 17 and proceeding through line 24, "Qualcomm

11  seeks to find that Qualcomm's license agreements with the CMs

12  do not violate Qualcomm's FRAND commitments to ETSI.  Qualcomm

13  seeks a finding that Qualcomm has satisfied and discharged its

14  FRAND commitment to ETSI with respect to Apple.  And Qualcomm

15  also seeks a finding that Qualcomm's license agreements with

16  the CMs do not violate the Sherman Act."

17      And then, when you move over to Qualcomm's, I'm not sure

18  if it's just a matter of phrasing it differently.  There is the

19  first contention that Qualcomm identifies at line 21 of its

20  revised preliminary instruction, that Qualcomm satisfied and

21  discharged with respect to Apple its commitment to ETSI, that

22  it would be prepared to grant the irrevocable licenses on

23  FRAND, and conditions with respect to Apple.

24      And so, as to that request, does that correspond to

25  Count IV of the counterclaims alleged by Qualcomm?

```
1              MR. DENNING:  That's correct.

2              THE COURT:  So Count IV is seeking a declaration, and

3    that would normally go to the Court, correct?

4              MR. DENNING:  Not in this case, Your Honor.  The

5    underlying claim that gives rise to the declaration is a breach

6    of contract claim.  Under the supreme court's Medtronics case,

7    the declaratory judgment is, in essence, a procedural vehicle

8    for a party that has had a claim threatened against it but the

9    claim has not actually been brought.

10       So in those circumstances where there's a jury right on

11   the underlying claim, you essentially could give that claim to

12   the jury and place the burden where it would be if the claim

13   had actually been brought.  And I think, in this case, Your

14   Honor, the parties agree that this is a jury claim.

15             THE COURT:  All right.

16       And that's correct, Mr. Isaacson?

17             MR. ISAACSON:  It's at least in that category where

18   you said, if we're not sure, we'll send it to the jury.

19             THE COURT:  All right.  So, to the extent that

20   reasonable minds can differ, to avoid issues down the line,

21   that that should be.  Okay.

22             MR. ISAACSON:  I guess -- I'm seeing, I think, the

23   identical language in what you have here, page 3 beginning at

24   line 23 and continuing on to the next page.

25             THE COURT:  Yes.  Yes.  And I think at the beginning
```

 1   I said that.  I've included now these requests for declaratory

 2   relief, and I've bunched them up at the end.

 3           MR. ISAACSON:  Right.

 4           THE COURT:  So -- but even having done that, I just

 5   wanted to make sure that they are properly in here at this

 6   point.

 7       So, then, the parties do agree that, with respect to that

 8   claim set forth at lines 23 through 28, that's properly in

 9   there?

10           MR. DENNING:  I just --

11           THE COURT:  Go ahead.

12           MR. DENNING:  I just note, Your Honor, it looks like,

13   on lines 27 and 28, there's some text that follows the period.

14           THE COURT:  Oh, okay.  So we have a typo in there.

15   So let me look at Qualcomm's.

16       So we will delete everything after "with respect to

17   Apple," period.

18       Then the next declaration relates to Qualcomm's SULAs with

19   the CMs do not violate its ETSI FRAND commitment, and I guess

20   the theory is the same under *Medtronics*?

21           MR. DENNING:  That's correct.  And that's Count II,

22   Your Honor.

23           THE COURT:  All right.

24       And then we have the third, that Qualcomm's license

25   agreements with the CMs do not violate the Sherman Act.

1          MR. DENNING:  Perhaps I misunderstood Your Honor's

2     comments earlier today that you were intending not to give this

3     to the jury.

4          THE COURT:  No, what I was saying is that I have had

5     questions about whether or not they should be in the

6     preliminary instruction.  I had prepared one that has them in

7     the instruction.  But then, based upon our conversations here,

8     I was prepared to delete or remove them if appropriate.  So at

9     this point, I am satisfied that, as to the first two that are

10    included on the Court's proposed preliminary instruction, that

11    they are properly there.

12        Then we have the third one that Qualcomm's license

13    agreements with the CMs do not violate the Sherman Act, and

14    that comes from Apple's proposed instruction.

15         MR. ISAACSON:  Apple and the CMs, yes.

16         THE COURT:  And I am not sure if I saw that in the

17    Qualcomm instruction.  Is that in there as well?

18         MR. DENNING:  It is, Your Honor.  I am just looking

19    for it here.

20         THE COURT:  All right.

21         MR. DENNING:  As I stand here, I don't actually see

22    it.  This claim, of course, is the negation of the claims that

23    have been asserted against us.  But I would have to look

24    further.  I just don't see it here in my materials, Your Honor.

25         THE COURT:  I didn't see it either, so then I wasn't

1    sure whether or not it properly should be placed in that

2    preliminary instruction.

3            MR. ISAACSON:  They clearly -- they are clearly going

4    to be arguing that Qualcomm's license agreements with the CMs

5    do not violate the antitrust laws.

6            THE COURT:  Certainly.  But as, I guess, in defense

7    of the claim versus as a stand-alone.  There is a request for a

8    declaration that Qualcomm's license agreements with the CMs do

9    not violate competition laws.

10           MR. ISAACSON:  That's correct.

11           THE COURT:  And we have here -- no, we haven't.

12           MR. DENNING:  I think, Your Honor, that's the --

13   that's the language we are looking at.

14           THE COURT:  Count III?

15           MR. DENNING:  Yeah, exactly.

16           THE COURT:  Corresponds to that and the theories,

17   again, under Medtronics, that this would be something that's

18   properly presented to the jury for its decision-making?

19           MR. ISAACSON:  We believe it is the safest approach,

20   Your Honor, yes.

21           THE COURT:  So then that corresponds to Count III.

22       With respect to Count III, I know it is identified that

23   the license agreements with the CMs do not violate competition

24   law.  Is it centered on the Sherman Act, or does it also -- and

25   Sherman Act Section 2 or Sherman Act Section 1 and 2?

```
 1              MR. ISAACSON:  For preliminary instructions, telling

 2    them the Sherman Act is --

 3              THE COURT:  Is enough?

 4              MR. ISAACSON:  Actually, it is not terrifically

 5    helpful because they don't know what the Sherman Act is.  So

 6    saying competition laws or antitrust laws, to my mind, is

 7    preferable.  You have already told them there are antitrust

 8    claims in this case.  Opening statements will talk about

 9    antitrust.  But I don't think they necessarily will start to

10    talk about the Sherman Act or...

11              MR. DENNING:  Your Honor, I think the way that the

12    Court has phrased it is fine.  If you look at the count, I

13    think as written it is broader and includes things that are not

14    for the jury including -- I think it relates to the California

15    UCL claim which the Court has previously ruled is not for the

16    jury.  As written, the count is broader.  This would be the

17    correct way to explain it to the jury.

18              THE COURT:  So are you saying that, at the end of the

19    day, the jury would be taking on the questions that relate to a

20    UCL claim as well or just the Sherman Act?

21              MR. DENNING:  No -- that's right, Your Honor.

22              THE COURT:  So maybe if we basically use the same

23    language here that we did at the very beginning, when we were

24    describing Apple's claims, that Qualcomm is engaged in

25    anticompetitive behavior prohibited by Section 2 of the Sherman
```

1    Act, we would have it that Qualcomm's license agreements with

2    the CMs --

3              MR. ISAACSON:  I assume you have to say Section 1 and

4    Section 2 because the CMs have Section 1 claims?

5              THE COURT:  Right.  Right.

6              MR. DENNING:  As I stated, I don't have the count in

7    front of me, Your Honor, but I believe this claim is asserted

8    against Apple, which is not in the actual claim, so I would

9    have to look at the count.

10             THE COURT:  As to Count III?

11             MR. DENNING:  Yeah.

12             THE COURT:  I have the heading as "Declaration that

13   Qualcomm's License Agreements with the CMs Do Not Violate

14   Competition Law."

15       Let me do this:  We will take a closer look at that and

16   then tweak the language on that.

17             MR. DENNING:  I think the only thing I would say

18   there is I think it is clear that the UCL part of that count

19   does not go to the jury.

20             THE COURT:  Right.  I agree.

21       All right.  So then, with respect to the burden of proof

22   on these, I think in my mind it depends.  And I know both sides

23   are taking contrary positions on who bears the burden.  We will

24   take that up, I think, later.  We are not going to spend the

25   next half hour at this point going over that.  I think it will

1    be enough that they are going to be informed that there will be

2    these additional questions that will be presented to them.

3                MR. ISAACSON:  A couple of points about this, Your

4    Honor.

5                THE COURT:  Yes.

6                MR. ISAACSON:  On the first page, where -- with

7    respect to Qualcomm denies these claims and asserts the

8    following claims against Apple.

9                THE COURT:  Yes.

10               MR. ISAACSON:  The second bullet is that Apple

11   breached the BCPA.  I think that's resolved by the summary

12   judgment decision.

13               MR. DENNING:  There remains a claim under Section 4

14   of the BCPA.

15               THE COURT:  That's how I saw it, and I am not sure

16   whether or not we are in a position to conclude that it is no

17   longer in force.  As I understood Apple's motion for summary

18   judgment, they were aiming at Section 7, regarding the safe

19   harbor and the instigation of investigations, and they

20   prevailed on that.  And then there was the Section 4 provision

21   as far as I think interfering or dealing with the CMs in a way

22   that was against the BCPA terms.

23          And then Apple obtained a summary judgment with respect to

24   the issue of damages that the Section 7 damages would not apply

25   on Section 4.  And then it would just leave the question of

1    whether or not there were any other form of damages that were

2    available under Section 4.

3         And keeping in mind that Apple was pretty surgical in

4    terms of what they did, and it seems to me that they must have

5    assumed or accepted the notion that there would be something

6    left on the Section 4 remedy list.

7              MR. ISAACSON:  I don't know that we assumed there

8    would be anything left since the claim as no damages, but I

9    take your point as to what the Court has actually ruled on at

10   this point.

11             THE COURT:  Okay.

12             MR. DENNING:  I think the only thing I would say to

13   that, Your Honor, is the summary judgment motion was expressly

14   not directed at liability; it was directed at one theory of

15   damages and no other theories of damages.

16             THE COURT:  Right.  Right.  That's how I saw it.

17             MR. ISAACSON:  And then just two ministerial points.

18   In the page 3, the fourth and sixth bullets look duplicative.

19   You have breached FRAND commitments, violated FRAND

20   commitments.

21             THE COURT:  All right.  And speaking of duplicative,

22   in Qualcomm's preliminary instruction, at lines 14 and lines

23   18, there's references to two separate theories relating to

24   breach of the covenant of good faith and fair dealing.  One is

25   arising from the SULA, and the other is arising from FRAND.

1        And I don't see what cause of action those correspond to.

2   Certainly, I see it as to the FRAND.  I didn't see it as to

3   Qualcomm breaching the covenant of good faith and fair dealing

4   implied in the SULA.  But this was offered up by Qualcomm.

5        And let me inquire of the CMs, is that in fact a thing?

6   Is that a theory that the CMs are pursuing?

7             MR. LO:  We do have a breach of the covenant of good

8   faith with respect to the SULA claim, Your Honor, yes.

9             THE COURT:  Because I think Apple's instruction did

10  not make reference to the two.

11            MR. LO:  It is our claim.  I don't know if Apple has

12  one.  I will check.  But the CMs do have one.

13            THE COURT:  See, and that's why I was pointing out

14  the other day that this is challenging, because it takes a lot

15  of time to compare the instructions and there are differences,

16  and we have seen here already that some of the differences

17  matter.

18        And so with respect to the breach of covenant, I didn't

19  see that being offered in the preliminary instruction from the

20  CMs and Apple, so perhaps that's something that we should look

21  at a little bit closer.

22        So let me inquire with respect to the CMs' claim as to the

23  breach of the covenant of good faith arising out of the SULAs.

24  Where is that found?

25        I have Count VI being the breach of applied covenant of

1    good faith and fair dealing, FRAND commitments.

2        Is there one that I missed?

3            MR. LO:  Your Honor, I don't have it right now.  Let

4    me figure that out.  I will figure that out.  I am sorry, Your

5    Honor.

6            THE COURT:  Well, let's do this:  Let me let you send

7    us something, an e-mail or something, that identifies the

8    source of this additional theory on the SULAs.

9            MR. LO:  Yes, Your Honor.

10           MR. ISAACSON:  One other scrivener's point, Your

11   Honor.  You define -- at page 3, line 26, you define FRAND,

12   fair, reasonable, and nondiscriminatory, FRAND, and FRAND is

13   used for the first time up at line 8.

14           THE COURT:  Keep out the parenthesis with the

15   additional --

16           MR. ISAACSON:  Yes, define it for the first time.

17           THE COURT:  I have already defined it previously.

18   All right.

19           MR. ISAACSON:  No -- no, you haven't.

20           THE COURT:  I should have identified it earlier, you

21   are saying.

22           MR. ISAACSON:  Yes.  It hasn't been identified.

23           THE COURT:  So then we should do that.  Although, I

24   think I may have been following suit, because looking at

25   Apple's revised, it makes use of the term "FRAND" in line 18

1    without defining that.  But we will clean that up.

2         MR. DENNING:  Thank you, Your Honor.

3         THE COURT:  Anything else?

4         MR. LO:  No, Your Honor.

5         MR. ISAACSON:  No, Your Honor.

6         THE COURT:  So I will ask you to be here a little

7    early tomorrow and maybe we will put the finishing touches on

8    this preliminary instruction.  I do not intend to give any

9    other preliminary instructions that relate to patents or

10   anything techy.  The remaining preliminary instructions will be

11   based on the Ninth Circuit models.

12        MR. LO:  Your Honor, in terms of following up on the

13   Court's question on the covenant, how would you like that

14   provided to you?

15        THE COURT:  Why don't you send something to us and cc

16   counsel for Qualcomm and Apple.  And then we can then have some

17   help in identifying the source of that.

18        MR. LO:  We will do that.  Thank you.

19        THE COURT:  All right.

20        MR. CHESLER:  Your Honor, I know it's late, but we

21   have one other issue that I mentioned at the tail end of the

22   last time we were here, and I guess it is my job to mention it

23   at the tail end each time we are here.  It is the issue about

24   whether there needs to be a live witness to lay the foundation

25   of documents produced out of the files of the parties

1    themselves.  That still isn't resolved, and now we are kind of

2    up against the witnesses showing up.  We would like to --

3            THE COURT:  As I understand it, the parties met and

4    conferred to try and streamline the trial process; that

5    somewhere along the line, Apple decided that it did not want to

6    forgo certain legal requirements or evidentiary requirements;

7    and that would therefore cause or require Qualcomm, and I

8    expect Apple, to do it the hard way.

9         And so to the extent that that is the election by -- not

10   necessarily a stick-in-the-mud, but by one party, then the

11   rules are rules.  So I am prepared to comply with the rules,

12   and, you know, if the parties can have a change of heart to

13   make things more streamlined, that would be fantastic.  But I

14   don't think I have the power to order Apple or CMs or anybody

15   to forgo what is otherwise required for purposes of evolving a

16   evidentiary foundation.

17           MR. CHESLER:  Can we just be heard for two minutes,

18   Your Honor, for Ms. Lavely to address.

19           THE COURT:  I am sorry.

20           MS. LAVELY:  On the same issue.

21           THE COURT:  You raised it first.  Go ahead,

22   Mr. Chesler.

23           MR. CHESLER:  I was just saying Ms. Lavely was going

24   to address it.  Our point, Your Honor, is this:  These are

25   documents that have been produced out of the files of the

```
 1    parties.  We have, as Your Honor knows, a time clock, a lot of
 2    witnesses, and we are trying to get these done within the time
 3    bounds.  We have to get it done within those time bounds.
 4         And these are documents which we are not arguing can be
 5    used without -- can be put into evidence without a witness
 6    being asked about them.  We are talking about having to bring
 7    witnesses in to say, "Yes, this is what the document purports
 8    to be," "Yes, it came from my files or from the files of my
 9    supervisor," when the custodians have been exchanged between
10    the parties, everybody knows which files they've come from, and
11    we are talking about files right out -- documents right out of
12    the files of the parties.
13         We are going to be spending time laying a foundation for
14    documents for which there isn't any question about foundation,
15    and we are prepared to agree that the other side can do the
16    same thing.  We are going to be eating up clock time on things
17    where we desperately need the time to examine on the substance
18    of the issues.
19              THE COURT:  Well --
20              MR. CHESLER:  They are also dictating to us which
21    witnesses -- they're telling us which witnesses are permitted
22    to testify about certain documents.  And, for example, one of
23    them is pointing to our expert, Salters, who is permitted to
24    testify about their document.  So this doesn't seem to be
25    really an exercise to lay a foundation in the old-fashioned
```

1    way, as Your Honor referred to it; it's a way to have witnesses

2    who have to come in and talk about documents, which is going to

3    eat up precious time.

4                THE COURT:  Ms. Brooks?

5                MS. BROOKS:  Your Honor, we have met and conferred ad

6    nauseam on this issue.  And all we are asking Qualcomm to

7    do, even were willing to do buckets --

8                THE COURT:  Sorry.  Willing to do what?

9                MS. BROOKS:  To do buckets of documents, licensing

10   agreements, executed contracts, financial documents, where we

11   could forgo any sponsoring witness.  And so we just keep asking

12   Qualcomm, "Will you just identify which documents" -- we think

13   there's probably just a handful -- "that you want to use with a

14   witness that doesn't fall into one of these buckets and where

15   that witness is not either a recipient of or an author of or

16   has any indication on the document itself that this witness

17   would have any knowledge of it."  And they won't tell us.  It's

18   just that simple.  We could work out --

19               THE COURT:  And you are prepared to tell them?

20               MS. BROOKS:  Absolutely.  We could work this all out

21   if they could tell us what it is they are so --

22               THE COURT:  I guess my fallback is I don't have the

23   power, the authority to order any party to forgo what is

24   otherwise provided for.  Common sense, civility will often lead

25   to stipulations along the lines, as Mr. Chesler is trying to

1    propose.  Sounds like there is a response.

2         But I am not going to get into this fight.  It is not mine

3    to fight.  All I will do is I will follow the law as it relates

4    to the admissibility of evidence, authentication, and

5    foundation.  So at this point, that's my response.

6         (Telephonic interruption.)

7              THE COURT:  That sounds kind of 1980-ish.

8         So with that, we will see you tomorrow morning.

9              MS. BROOKS:  Your Honor, I am really sorry.

10   Mr. Chesler isn't going to get the last word, actually.  With

11   the Court's permission -- I am sorry.  There is the ringing

12   again.  One is a question and one is an issue.  The question,

13   Your Honor, is I assume that the parties are going to invoke

14   the rule, which means fact witnesses will be excluded from the

15   courtroom.

16        May they be here for opening statement?

17             THE COURT:  Fact witnesses?  I would say no.

18             MR. CHESLER:  And we would object.

19             MS. BROOKS:  Fine.  We just wanted that

20   clarification, Your Honor.

21        And then the second issue is that Qualcomm has disclosed

22   that they want to use one or two -- two documents that we

23   believe are the subject of Your Honor's motion in limine

24   regarding the Samsung litigation, and they want to use them in

25   opening statement.  So we would need to address those very

1    briefly this evening with the Court's permission.

2         THE COURT:  Well, with respect to documents used in

3    opening statement, unless the parties have agreed upon the use

4    of any such documents, the parties are prohibited from doing

5    so.  And so, at this time, I haven't heard from any party that

6    they intend to offer something in opening statement that has

7    not otherwise been agreed upon.

8         So, at this time, is there something you would like to

9    ask, Mr. Chesler?

10        MR. CHESLER:  Yes, Your Honor.  These are not

11   documents subject to the in limine motion.  Counsel is

12   referring to a motion that you granted for Apple not to permit

13   us to use certain listed documents in their motion that related

14   to Apple saying what its nonessential patents were worth in

15   other proceedings.  You said that they would confuse the jury,

16   they were mini trials on NEPs, and we were principally focused

17   on SEPs.

18        These two documents have nothing to do with that, Your

19   Honor.  They are admissions by Apple of what Qualcomm's patents

20   are worth, statements that our patents are valuable or our

21   royalties are fair.  They have nothing to do with the in limine

22   argument that Your Honor granted.  In fact, these two documents

23   were not even listed as documents on that motion.

24        THE COURT:  Well, at this point, there's a

25   disagreement as to whether or not these two documents are

1    admissible.  At 4:30 p.m., without any form of briefing, I

2    don't recall the particulars of every one of my motions in

3    limine rulings.  At this point, I suggest that you not use

4    those two proposed exhibits.  And then to the extent that the

5    parties can agree on others, they are free to use those.

6              MR. CHESLER:  Your Honor, these are very important to

7    our case.  May we make a submission overnight and show Your

8    Honor the documents before the openings tomorrow?  We have two

9    documents, and I think Your Honor will see, when we show them

10   to you, they are not the subject of that in limine motion.

11   They are really hampering our ability to lay out our case to

12   the jury.  Because they are disagreeing, it gives them

13   effectively a veto over what we show.

14             THE COURT:  I don't think that that's the case.  To

15   the extent that those documents are admissible, then they are

16   introduced into evidence, then they are available for Qualcomm

17   to use however they wish and reference in closing argument.

18   The only question at this point is if it's so clear that they

19   are admissible for purposes of being relied upon in opening

20   statement.  And at this point, I am in a position where I don't

21   feel comfortable just off the top of my head, based upon verbal

22   representations, of making a ruling along those lines.

23             MR. CHESLER:  All right, Your Honor.  That's why I

24   wanted to make a submission to you, so that it wouldn't be

25   doing it based upon my verbal --

1          THE COURT:  I guess one of my concerns at this point

2     is this is going to be a long trial, and I don't want to set a

3     precedent that, any time you all have a disagreement, that then

4     we are going to by default end up imposing on the Court and

5     submitting these issues that pull the Court away from what

6     otherwise it needs to be doing, focusing on.  So it's opening.

7     I am not going to let you use it at this point.

8          But to the extent there are these types of issues, then I

9     would ask you to identify them earlier rather than later so

10    that then the Court can properly take them into account.

11         All right.  And then I think that's it.

12         Yes.

13         MR. DOREN:  Just one comment, Your Honor, one

14    request, regarding the invocation of the rule.  I just want to

15    make sure that it's understood that party representatives can

16    attend the openings, even if they may end up being testifying

17    witnesses?

18         THE COURT:  So kind of along the lines of the

19    representative that otherwise would be present at trial

20    throughout the case?

21         MR. DOREN:  Yes.  Yes.

22         THE COURT:  Any objection to that?

23         MS. LAVELY:  Your Honor, at least from the people

24    that I have seen in court today, these are the key CM witnesses

25    in the case.  So for the reason we should not have fact

1    witnesses listening to opening, we would ask that, because the

2    jury is not going to know who is here as a representative and

3    who is not, that they be excluded from openings just like every

4    other fact witness.

5              MR. DOREN:  Well, your Honor, if I may respond,

6    there's been no witness in court who was even deposed, other

7    than Ms. Lily Chao right here who is the general counsel of

8    Pegatron.  She may or may not testify at trial, but she is the

9    general counsel of one of our clients, and she should be

10   allowed to attend the trial.

11        As to the other people who are in the courtroom, they were

12   all in-house counsel from the various CMs, and we frankly don't

13   expect any of those people to be testifying.  This isn't an

14   abstract request; it is really oriented specifically to

15   Ms. Chao.  But, certainly, having one witness -- or excuse me,

16   one party representative per client is within the scope of the

17   rule.  It's permitted, it's expected, and, respectfully, Your

18   Honor, we believe it's within our client's rights.

19             MS. LAVELY:  Your Honor, we have no objection to a

20   party representative, of course, but with the witness that they

21   are offering to bring in the case is potentially the only

22   person from Pegatron we would submit that's prejudicial for

23   Qualcomm for that person to hear openings.

24             MR. DOREN:  She is not the only witness.

25             THE COURT:  Why don't you do this:  Why don't each

1    party identify your one representative that you would like to

2    have at counsel table, and then, from there, I will take a look

3    at who that witness is, I guess.

4        I can imagine that there could be some mischief by having

5    a very important, consequential witness identified as the

6    representative in order to develop information that might

7    create an unfair advantage.  But, at this point, why don't you

8    each identify your representative, let me take a look at the

9    rule, and then we will have an answer tomorrow morning.

10            MR. DOREN:  Thank you, Your Honor.

11            MS. LAVELY:  Would you like us to e-mail you or just

12    tell you?

13            THE COURT:  Why don't you e-mail.

14            MS. LAVELY:  Thank you, Your Honor.

15            MR. ISAACSON:  And, Your Honor, while you have been

16    on the bench, the parties have lodged the deposition

17    designations with any remaining -- jointly lodged with any

18    remaining just objections that need to be ruled on for the

19    videos to be played.

20            THE COURT:  So who does Apple or CMs intend to call

21    as their first set of witnesses?

22            MR. ISAACSON:  Tony Blevins will be the first

23    witness.

24            THE COURT:  Blevins?

25            MR. ISAACSON:  Yes.

```
1              THE COURT:  And then?

2              MR. ISAACSON:  Then we have, from --

3         (Counsel confer.)

4              MR. ISAACSON:  Mr. Blumberg by video.  Mr. Grubbs by

5    video.

6              THE COURT:  Blumberg?

7              MR. ISAACSON:  Yes.  Mr. Grubbs by video,

8    Mr. Madderom.

9              THE COURT:  How do you spell that?

10             MR. ISAACSON:  Blumberg is B-L-U-M-B-E-R-G, and

11   Mr. Madderom is two Ds, M-A-D-D-E-R-O-M.

12             THE COURT:  Blevins was the first one?

13             MR. ISAACSON:  Yes.  He will be live.

14             THE COURT:  That's live.  Then the next was Blumberg?

15             MR. ISAACSON:  Blumberg.

16             THE COURT:  And then Grubbs?

17             MR. ISAACSON:  No, I am sorry, Madderom.

18             THE COURT:  And not Grubbs?

19             MR. ISAACSON:  Grubbs is coming up the next day.  And

20   then, if there's time, there will be Constantine at the end of

21   the day.

22             THE COURT:  Constantine?

23             MR. ISAACSON:  Constantine.

24             THE COURT:  Is that video?

25             MR. ISAACSON:  That's video.
```

```
 1            THE COURT:  And Madderom was video.

 2            MR. ISAACSON:  Yes.

 3            THE COURT:  These are witnesses that the Court will

 4   need to review their testimony and objections?

 5            MR. ISAACSON:  Right.  And the parties worked

 6   together to lodge a convenient set of limited objections that

 7   you can, just without any briefing, just you can rule on.

 8            THE COURT:  Say that last part again.

 9            MR. ISAACSON:  There is no briefing; there is just

10   the objection.

11            THE COURT:  Right.  That you provided.  Okay.  Which

12   is another reason why I am not particularly open to additional

13   questions being presented at the end of the day because, as it

14   is, this will be part of my nightly practice.

15       All right.  Anything else?

16            MR. STARK:  No, Your Honor.  Thank you.

17            MAN:  Your Honor, I am a member of the press covering

18   the trial.  You mentioned you would discuss ground rules.

19            THE COURT:  Let me turn to that in a moment.

20       At this point, with respect to counsel, that concludes

21   today's proceedings, and we will see you tomorrow.

22

23

24

25       With respect to the media, I was taking a look at the memo
```

1   that I had prepared and I see perhaps the place where there was

2   some confusion.  Both with respect to the instructions of the

3   media, and the public, the Court indicated all forms, means and

4   manner of taking photographs, tape recordings, videotaping,

5   broadcasting or televising are prohibited in the United States

6   Court houses during the course of or in connection with

7   judicial proceedings, and that rule will be in effect for these

8   proceedings.

9       So that's recited both in the media section and the public

10  section.

11      Because the media had asked for accommodations, we have

12  made available to them the media room, Room 5180 on the fifth

13  floor of this building.  And, after informing the media of

14  such, we separated that information with the information that

15  is in the next paragraph, which says "Power strips will be

16  provided in the media room, but the media will need to provide

17  their own hotspots as Wi-Fi is not provided in the courthouse."

18      And then it continues, "All forms, means, and manner of

19  taking photographs, tape recordings, et cetera."

20      So I'm not sure if, because of the fact that that

21  reference to power strips, hotspots, and Wi-Fi was placed right

22  next to the recording language, that there was some view that

23  there would be permitted the use of hotspots here in court.

24      So, to the extent that there is a question about that, the

25  answer is that no, hotspots won't be allowed to be used here in

1    court.  Certainly, the media is welcome to make notes -- take

2    notes and then proceed to the media room or go in the hallway

3    and then send those notes to their newsroom or live feed,

4    however the media is communicating this information.

5        But those would be my thoughts about that.  I don't know

6    if it addresses 100 percent what issues that developed today.

7    But, sir?

8            MAN:  I just wanted to clarify whether we could take

9    notes electronically.

10           THE COURT:  That's fine.

11           MAN:  As long as our devices are not connected to the

12   internet?

13           THE COURT:  Yeah, that's absolutely fine.

14           MAN:  That was it.

15           WOMAN:  Is that rule also applicable in the overflow

16   room?

17           THE COURT:  It is.

18           WOMAN:  Could you tell the overflow room that,

19   because they are not allowing anybody to take notes

20   electronically.

21           THE COURT:  The rule is the same; the problem is that

22   the monitoring is not the same.  And so whereas here we have

23   blue coats and marshals and people with badges, over there it's

24   clerk's office representatives.  And so they also have their

25   day job.  So they're not always over there.

```
 1         So, evidently, as soon as they slip out, somehow or
 2    another, the hotspots develop.  So the rules are the same.
 3    It's just that, at this point, we perhaps have a little bit of
 4    an enforcement problem over there.
 5              WOMAN:  Yeah, I was just in the overflow this
 6    morning.  And they weren't allowing anybody in the room to use
 7    computers and take notes.  And so I was wondering if we can
 8    clarify that that's all right.
 9              THE COURT:  I think there's clarification in the
10    rules.  And we will seek to communicate that clarification to
11    our staff so that we have a consistent set of rules.  All
12    right?
13         All right.  With that bit of housekeeping, that concludes
14    today's proceedings.
15              ALL:  Thank you, Your Honor.
16         (End of proceedings at 4:45 p.m.)
17                              -o0o-
18
19
20
21
22
23
24
25
```

```
1                       C-E-R-T-I-F-I-C-A-T-I-O-N

2

3          I hereby certify that I am a duly appointed,

4    qualified and acting official Court Reporter for the United

5    States District Court; that the foregoing is a true and correct

6    transcript of the proceedings had in the aforementioned cause;

7    that said transcript is a true and correct transcription of my

8    stenographic notes; and that the format used herein complies

9    with rules and requirements of the United States Judicial

10   Conference.

11              DATED:  April 15, 2019, at San Diego, California.

12

13                         /s/  Chari L. Bowery

14                         _____
                           Chari L. Bowery
                           CSR No. 9944, RPR, CRR
15

16

17

18

19

20

21

22

23

24

25
```