<pre>
 1                  UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3                                    .
      IN RE:                         . Docket
 4    QUALCOMM LITIGATION            . No. 17cv0108-GPC-MDD
                                     .
 5                                   .
                                     . April 16, 2019
 6                                   . 8:50 a.m.
      . . . . . . . . . . . . . . . . San Diego, California
 7
                  TRANSCRIPT OF JURY TRIAL, VOLUME 2
 8            BEFORE THE HONORABLE GONZALO P. CURIEL,
             UNITED STATES DISTRICT JUDGE, AND A JURY
 9
                      A-P-P-E-A-R-A-N-C-E-S
10

11    For Apple Inc.:        Fish & Richardson
                             12390 El Camino Real
12                           San Diego, California 92130
                             By:  JUANITA R. BROOKS, ESQ.
13                                LAUREN A. DEGNAN, ESQ.
                                  BENJAMIN C. ELACQUA, ESQ.
14                                RUFFIN B. CORDELL, ESQ.
                             – and –
15                           Boies Schiller Flexner LLP
                             1401 New York Avenue NW
16                           Washington, DC 20005
                             By:  KAREN L. DUNN, ESQ.
17                                WILLIAM A. ISAACSON, ESQ.
                                  MELISSA B. FELDER ZAPPALA, ESQ.
18                                STEVEN HOLTZMAN, ESQ.

19

20    For Compal Electronics Inc., FIH Mobile Ltd., Hon Hai Precision
      Industry Co., Ltd., Pegatron Corporation, and Wistron
21    Corporation:          Gibson, Dunn & Crutcher, LLP
                            333 South Grand Avenue
22                          Los Angeles, California 90071
                            By:  JASON C. LO, ESQ.
23                               RICHARD J. DOREN, ESQ.

24

25    ///
</pre>

```
1                   A-P-P-E-A-R-A-N-C-E-S (CONTINUED)

2    For Qualcomm Incorporated:
                              Jones Day
3                             4655 Executive Drive, Suite 1500
                              San Diego, California 92121
4                             By:  KAREN P. HEWITT, ESQ.
                              – and –
5                             Cravath, Swaine & Moore LLP
                              Worldwide Plaza, 825 Eighth Avenue
6                             New York, New York 10019
                              By:  EVAN CHESLER, ESQ.
7                                  VANESSA A. LAVELY, ESQ.
                                   NATHAN E. DENNING, ESQ.
8                                  RICHARD J. STARK, ESQ.
                                   J. WESLEY EARNHARDT, ESQ.
9                                  ANTHONY L. RYAN, ESQ.
                              – and –
10                            Quinn Emanuel
                              865 South Figueroa Street, 10th Floor
11                            Los Angeles, California 90071
                              By:  STEPHEN A. SWEDLOW, ESQ.
12

13

14

15

16

17

18

19

20

21

22   Court Reporter:          Chari L. Bowery, RPR, CRR
                              USDC Clerk's Office
23                            333 West Broadway, Suite 420
                              San Diego, California 92101
24                            chari_bowery@casd.uscourts.gov

25   Reported by Stenotype, Transcribed by Computer
```

```
 1              SAN DIEGO, CALIFORNIA; APRIL 16, 2019; 8:50 A.M.

 2                               -o0o-

 3        (The following proceedings were held in open court out of

 4   the presence of the jury:)

 5              THE COURT:  Good morning.

 6              ALL:  Good morning, Your Honor.

 7              THE COURT:  Let the record reflect we are outside the

 8   presence of the jury.  And there's a couple of matters I want

 9   to address before we bring in the jury.

10        And, first of all, I have had the opportunity to look

11   closer at the question regarding the hotspots and the media

12   requests for live tweeting or live texting from the courtroom.

13   And, at this point, based upon my review of the Northern

14   District of California General Order Number 58, I am prepared

15   to modify my earlier ruling or my practice that has been

16   approved.  I am prepared to allow the media to rely upon

17   hotspots and live tweet or live text during these proceedings.

18        The other prohibitions regarding video, audio, all the

19   other ones still apply.  So that will be the first thing that

20   we take up.

21        Second, I have made the modifications to the preliminary

22   instruction.  I am not sure if that's been provided to you yet.

23   Has it?  No.  It then will be in a couple of moments.  Thank

24   you for the information regarding the SULA breach of covenant.

25        So at this point, even though it's labeled "draft," these
```

1    will be the preliminary instructions that I provide the jury

2    when we begin.

3         And then, third of all, I am not sure if we had hammered

4    down a time frame for the opening statements.

5         Is there a request as to the length?

6              MR. CORDELL:  Your Honor, for Apple's part, we would

7    be shooting at something around an hour, maybe an hour and

8    five, hour and eight.

9              THE COURT:  That's what I was thinking would be

10   reasonable.  Does everyone agree with that?

11             MR. CHESLER:  Yes, Your Honor.

12             THE COURT:  You are asking for an hour as well?

13             MR. DOREN:  30 minutes, Your Honor.

14             THE COURT:  So an hour, 30, hour and 15.

15             MR. CHESLER:  Thank you, Your Honor.

16             MR. DENNING:  Your Honor, may I briefly raise one

17   issue with the preliminary instructions?

18             THE COURT:  Yes.

19             MR. DENNING:  The parties discussed this morning, on

20   page 3.

21             THE COURT:  The third page of the instruction.  Yes.

22             MR. DENNING:  Yes, Your Honor.  On lines 23 through

23   about 26 --

24             THE COURT:  Let me see.  This is from the one I

25   provided yesterday or the one that was just handed out?

 1               MR. DENNING:  Just now, Your Honor.

 2               THE COURT:  So page 3, line 23.

 3               MR. DENNING:  23.  Starts "That Qualcomm waived the

 4    right to receive compensation for its standard-essential

 5    patents other than under FRAND terms."  The CMs have withdrawn

 6    that claim.

 7               THE COURT:  All right.  Is that fair?

 8               MR. LO:  That's correct.  We have agreed that it is

 9    an affirmative defense and not a claim itself.

10               THE COURT:  All right.  So then I will remove that.

11               MR. DENNING:  That would be our request, Your Honor.

12               MR. LO:  And we are okay with that, Your Honor.

13               THE COURT:  So, then, based upon that unopposed

14    request, I will remove that.

15               MR. DENNING:  Thank you, Your Honor.

16               THE COURT:  Anything else on that?

17               MR. LO:  No, Your Honor.

18               THE COURT:  And so then the first witness that will

19    be called by Apple, after the openings, will be --

20               MS. DUNN:  Mr. Blevins.

21               THE COURT:  And he will be live?

22               MS. DUNN:  Correct.

23               THE COURT:  And the next witness is video by

24    Mr. Blumberg?

25               MS. DUNN:  Correct.

1          THE COURT:  And on that one, there are a very large

2    number of objections.  And I am prepared to provide my rulings

3    with respect to those objections.  But before we do that --

4          MS. HEWITT:  Your Honor, may I address that very

5    point?

6          THE COURT:  Yes.

7          MS. HEWITT:  The parties overnight worked on trying

8    to streamline the process with regard to the video testimony,

9    and we made a submission very early this morning.  It's a short

10   submission, but we had some progress there that will be

11   helpful, so we'll know about the video testimony for this

12   afternoon.  Could I just, briefly in two minutes with

13   Mr. Isaacson, perhaps address that so that we could have some

14   clarity about the video edits that would be needed so that can

15   go smoothly this afternoon?

16         THE COURT:  Certainly.

17         MS. HEWITT:  The filing is ECF-1169.

18         THE COURT:  Let me see if we are all on the same

19   page.  ECF-1169.

20         MS. HEWITT:  We can do this very briefly, Your Honor.

21         THE COURT:  Yes.  That's Qualcomm's response in

22   further support.

23         MS. HEWITT:  It is.  There are three witnesses that

24   Apple and the CMs have designated:  Ira Blumberg, who is a

25   Lenovo lawyer; Kevin Constantine, who is an Intel employee; and

1    Todd Madderom from Motorola.  The good news first, Your Honor,

2    Qualcomm is withdrawing all objections with regard to Madderom.

3            THE COURT:  That's good because they were all

4    overruled.

5            MS. HEWITT:  So that testimony will be able to come

6    in without any objection.  And we also made progress with

7    regard to stipulation with Apple with regard to the redacted

8    exhibits for Blumberg.  There's information in there that needs

9    to be consistent with Your Honor's ruling on motion in limine

10   Number 10, and so counsel has indicated that they are willing

11   to agree to our proposed redactions.

12       So there are three exhibits that would be redacted.  They

13   are appended to -- they were lodged with the Court as

14   Exhibit 2, 3, and 4 to our motion.  And the Bates stamp numbers

15   are PTX002520.

16           THE COURT:  I am sorry.  0025?

17           MS. HEWITT:  Yes.  PTX002520.  The next one is

18   PTX002645.  And PTX0026 -- pardon me -- 2776.

19       So we understand the parties are agreeing about redactions

20   with those documents.  But there are two outstanding documents

21   about which we could not agree, and the main concern there has

22   to do with hearsay and admissibility of the information.

23           MR. ISAACSON:  Constantine?

24           MS. HEWITT:  I was talking about Constantine.

25           MR. ISAACSON:  Right.  With Constantine, it is a very

1    short video.  We will play it last.  We are continuing to meet

2    and confer on that.  I am thinking we agree on some redactions

3    to those to deal with the problem that's being addressed.

4              MS. HEWITT:  But the main issue, just briefly, Your

5    Honor, on Blumberg is Blumberg is a lawyer for Lenovo.  And in

6    his deposition testimony that's being offered, he offers expert

7    opinions that are impermissible.  He is a lay witness; he is

8    not an expert that has been designated.  And he also offers

9    hearsay.  So we, in our short filing with the Court, indicated

10   those portions of the record that should be removed from the

11   video and not played to the jury for those reasons.

12             THE COURT:  All right.  And I have reviewed that memo

13   that was filed last night.  I reviewed it this morning after I

14   had conducted my review of Mr. Blumberg's testimony.  I have

15   already planned to sustain a number of objections based upon

16   legal conclusions and hearsay, perhaps not all of the ones that

17   have been raised by Qualcomm but certainly a number of them.

18        It sounds to me that, given the time frame that we have in

19   mind, an hour, 30 minutes, an hour and 15 for openings, that

20   will likely take us to the noon hour, and we can perhaps talk a

21   little bit more about some of this then so that we can start

22   precisely at 9:00.  All right?

23             MS. HEWITT:  Thank you, Your Honor.

24             MR. ISAACSON:  Yes, Your Honor.

25             THE COURT:  And so anything else before then we bring

1 in the jury?

2        MS. BROOKS:  Yes, Your Honor.  Could we have just a

3 one-minute sidebar?

4        THE COURT:  Sure.

5        MS. BROOKS:  Thank you.

6    (The following proceedings were heard at sidebar:)









20      (The following proceedings were held in open court:)

21           MR. DENNING:  Your Honor, I apologize.  Very briefly

22  on the instructions we received this morning --

23           THE COURT:  Yes.

24           MR. DENNING:  -- on page 4.  This is still in the

25  statement of claims.

1          THE COURT:  Page 4.  Yes.

2          MR. DENNING:  As you get to the end of the CMs'

3   claims against Qualcomm, around lines 4 and 5, we request that

4   the Court state that Qualcomm denies these claims to make it

5   parallel with the prior page.

6          THE COURT:  All right.  I will.

7          MR. DENNING:  Qualcomm denies the claims that you

8   will have just previously set forth.  Thank you.

9          THE COURT:  I will put that Qualcomm denies these

10  claims and CMs have the burden of proof on these claims.

11         MR. DENNING:  Thank you, Your Honor.

12     (Brief discussion off the record.)

13     (The following proceedings were held in open court in the

14  presence of the jury:)

15         THE COURT:  Please be seated, and good morning.  It's

16  wonderful to see you, and we are ready to have opening

17  statements right after preliminary instructions.  So let me

18  provide those, and then we will go right into the opening

19  statements.

20     Members of the jury, you are now the jury in this case.

21  It is my duty to instruct you on the law.  These instructions

22  are preliminary instructions to help you understand the

23  principles that apply to civil trials and to help you

24  understand the evidence as you listen to it.

25         You will be allowed to keep this set of instructions to

1    refer to throughout the trial.  These instructions are not to

2    be taken home and must remain in the jury room when you leave

3    in the evenings.  At the end of the trial, these instructions

4    will be collected and I will give you the final set of

5    instructions.  It is the final set of instructions that will

6    govern your deliberations.

7        It is your duty to find the facts from all the evidence in

8    the case.  To those facts, you will apply the law as I give it

9    to you.  You must follow the law as I give it to you, whether

10   you agree with it or not, and you must not be influenced by any

11   personal likes or dislikes, opinions, prejudices, or sympathy.

12   That means that you must decide the case solely on the evidence

13   before you.  You will recall that you took an oath to do so.

14       Please do not read into these instructions or anything I

15   may say or do that I have an opinion regarding the evidence or

16   what your verdict should be.

17       To help you follow the evidence, I will give you a brief

18   summary of the positions of the parties.  Apple asserts the

19   following claims against Qualcomm.  Apple has the burden of

20   proving these claims:  That Qualcomm breached the contract

21   known as the business cooperation and patent agreement; that

22   Qualcomm breached the implied covenant of good faith and fair

23   dealing in the BCPA; that Qualcomm as engaged in

24   anticompetitive behavior prohibited by Section 2 of the Sherman

25   Act.

1        Qualcomm denies these claims and asserts the following

2    claims against Apple:  That Apple tortiously interfered with

3    Qualcomm's license agreements with the CMs; that Apple breached

4    the BCPA; that Apple breached a contract known as the

5    February 28th, 2013, statement of work agreement, herein

6    referred to as 2013SOW.

7        Qualcomm has the burden of proving these claims.

8        Qualcomm also asserts the following claims against the

9    CMs:

10        Qualcomm has the burden of proving these claims:  That

11    Foxconn, Pegatron, Wistron, and Compal each breached its

12    respective license agreements with Qualcomm, that is, the

13    Foxconn SULA, the Pegatron SULA, the Wistron SULA, and Compal

14    SULA; that Foxconn, Pegatron, Wistron, and Compal each breached

15    its master software agreement with Qualcomm, the Foxconn MSA,

16    Pegatron MSA, the Wriston MSA, and the Compal MSA.

17        The CMs deny Qualcomm's claims and assert the following

18    claims against Qualcomm:  That Qualcomm has engaged in

19    anticompetitive behavior prohibited by Section 2 of the Sherman

20    Act; that Qualcomm has engaged in anticompetitive behavior

21    prohibited by Section 1 of the Sherman Act; that Qualcomm

22    violated California's Cartwright Act, which is found at

23    California Business and Professions Code Section 16700, et seq.

24        That Qualcomm has breached its FRAND -- that is, fair,

25    reasonable, and nondiscriminatory -- commitments; that Qualcomm

1    has breached the implied covenants of good faith and fair

2    dealing based on Qualcomm's violation of its FRAND commitments

3    to standard-setting organizations; that Qualcomm has breached

4    the implied covenant of good faith and fair dealing based on

5    Qualcomm's violation of its license agreements with the CMs;

6    that Qualcomm is liable for negligent misrepresentation,

7    including to standard-setting organizations; that Qualcomm

8    breached its license agreements with the CMs.

9         Qualcomm denies these claims, and the CMs have the burden

10   of proving these claims.

11        The CMs also seek a finding that Qualcomm violated its

12   FRAND commitments.  Meanwhile, Qualcomm seeks findings, first,

13   that Qualcomm satisfied and discharged, with respect to Apple,

14   its commitment to the European Telecommunications Standard

15   Institute -- that's ETSI; that it would be prepared to grant

16   irrevocable licenses on FRAND terms and the conditions with

17   respect to Apple.

18        Next, that Qualcomm's SULAs with the CMs do not violate

19   its ETSI FRAND commitment.  And last, that Qualcomm's license

20   agreements with the CMs are lawful and do not violate Section 2

21   of the Sherman Act.  Each party also asserts various

22   affirmative defenses to these claims which I will instruct you

23   on later.

24        When a party has a burden of proving any claim or

25   affirmative defense by a preponderance of the evidence, it

1    means you must be persuaded by the evidence that the claim or

2    affirmative defense is more probably true than not true.  You

3    should base your decision on all of the evidence, regardless of

4    which party presented it.

5         When a party has the burden of proving any claim or

6    defense by clear and convincing evidence, it means that the

7    party must present evidence that leaves you with a firm belief

8    or conviction that it is highly probable that the factual

9    contentions of the claim or defense are true.  This is a higher

10   standard of proof than proof by a preponderance of the

11   evidence, but it does not require proof beyond a reasonable

12   doubt.

13        You should decide the case as to each party separately.

14   Unless otherwise stated, the instructions apply to all parties.

15        The evidence you are to consider in deciding what the

16   case -- what the facts are consists of, one, the sworn

17   testimony of any witness; two, exhibits that are admitted into

18   evidence; three, any facts to which the lawyers have agreed;

19   and, four, any facts that I may instruct you to accept as true.

20        In reaching your verdict, you may consider only the

21   evidence.  Certain things are not evidence and you may not

22   consider them in deciding what the facts are.  I will list them

23   for you.

24        First, arguments and statements by lawyers are not

25   evidence.  The lawyers are not witnesses.  What they may say in

1    their opening statements, closing arguments, and at other times

2    is intended to help you interpret the evidence, but it is not

3    evidence.  If the facts as you remember them differ from the

4    way the lawyers have stated them, your memory of them controls.

5         Two, questions and objections by lawyers are not evidence.

6    Attorneys have a duty to their clients to object when they

7    believe a question is improper under the rules of evidence.

8    You should not be influenced by the objection or by the Court's

9    ruling on it.

10        Three, testimony that is excluded or stricken or that you

11   are instructed to disregard is not evidence and must not be

12   considered.  In addition, some evidence may be received only

13   for a limited purpose.  When I instruct you to consider certain

14   evidence only for a limited purpose, you must do so.  And you

15   may not consider the evidence for any other purpose.

16        Four, anything you may see or hear when the Court is not

17   in session is not evidence.  You are to decide the case solely

18   on the evidence received at the trial.

19        Evidence may be direct or circumstantial.  Direct evidence

20   is direct proof of a fact, such as testimony by a witness about

21   what that witness personally saw or heard or did.

22   Circumstantial evidence is proof of one or more facts from

23   which you could find another fact.  You should consider both

24   kinds of evidence.  The law makes no distinction between the

25   weight to be given to either direct or circumstantial evidence.

1    It is for you to decide how much weight to give to any

2    evidence.

3        There are rules of evidence that control what can be

4    received into evidence.  When a lawyer asks a question or

5    offers an exhibit into evidence and a lawyer on the other side

6    thinks that it is not permitted by the rules of evidence, that

7    lawyer may object.  If I overrule the objection, the question

8    may be answered or the exhibit received.  If I sustain the

9    objection, the question cannot be answered and the exhibit

10   cannot be received.

11       Whenever I sustain an objection to a question, you must

12   ignore the question and must not guess what the answer might

13   have been.

14       Sometimes I may order that evidence be stricken from the

15   record and that you disregard or ignore that evidence.  That

16   means, when you are deciding the case, you must not consider

17   the stricken evidence for any purpose.  In deciding the facts

18   in this case, you may have to decide which testimony to believe

19   and which testimony not to believe.  You may believe everything

20   a witness says or part of it or none of it.

21       In considering the testimony of any witness, you may take

22   into account the opportunity and ability of the witness to see

23   or hear or know the things testified to; the witness's memory;

24   the witness's manner while testifying; the witness's interest

25   in the outcome of the case, if any; the witness's bias or

1    prejudice, if any; whether other evidence contradicted the

2    witness's testimony; the reasonableness of the witness's

3    testimony in light of the evidence; and, any other factors that

4    bear on believability.

5         Sometimes a witness may say something that is not

6    consistent with something else he or she said.  Sometimes

7    different witnesses will give different versions of what

8    happened.  People often forget things or make mistakes in what

9    they remember.  Also, two people may see the same event but

10   remember it differently.

11        You may consider these differences, but do not decide that

12   testimony is untrue just because it differs from other

13   testimony.  However, if you decide that a witness has

14   deliberately testified untruthfully about something important,

15   you may choose not to believe anything that witness said.  On

16   the other hand, if you think the witness testified untruthfully

17   about some things but told the truth about others, you may

18   accept the part you think is true and ignore the rest.

19        The weight of the evidence as to a fact does not

20   necessarily depend on the number of witnesses who testify about

21   it.  What is important is how believable the witnesses were and

22   how much weight you think their testimony deserves.

23        You will hear testimony from witnesses who will testify to

24   opinions and the reasons for their opinions.  This opinion

25   testimony is allowed because of the education or experience of

1    these witnesses.  Such opinion testimony should be judged like

2    any other testimony.  You may accept it or reject it and give

3    it as much weight as you think it deserves considering the

4    witness's education and experience, the reasons given for the

5    opinion, and all of the other evidence in the case.

6         If you wish, you may take notes to help you remember the

7    evidence.  If you do take notes, please keep them to yourself

8    until you and your fellow jurors go to the jury room to decide

9    the case.  Do not let note-taking distract you.  When you

10   leave, your notes should be left in the courtroom.  No one will

11   read your notes.

12        Whether or not you take notes, you should rely on your own

13   memory of the evidence.  Notes are only to assist your memory.

14   You should not be overly influenced by your notes or those of

15   other jurors.

16        From time to time during the trial, it may become

17   necessary for me to talk with the attorneys out of the hearing

18   of the jury, either by having a conference at the bench, when

19   the jury is present in the courtroom, or by calling a recess.

20   Please understand that while you are waiting, we are working.

21   The purpose of these conferences is not to keep relevant

22   information from you, but to decide how certain evidence is to

23   be treated under the rules of evidence and to avoid confusion

24   and error.  Of course, we will do what we can to keep the

25   number and length of these conferences to a minimum.

1          I may not always grant an attorney's request for a

2   conference.  Do not consider my granting or denying a request

3   for a conference as any indication of my opinion of the case or

4   of what your verdict should be.

5          Trials proceed in the following way:  First, the parties

6   may make an opening statement.  An opening statement is not

7   evidence.  It is simply an outline to help you understand what

8   the party expects the evidence will show.  A party is not

9   required to make an opening statement.

10         Apple and the CMs will then present evidence, and counsel

11  for Qualcomm may cross-examine.  Then Qualcomm may present

12  evidence, and counsel for Apple and the CMs may cross-examine.

13  Finally, the parties may present rebuttal evidence, and the

14  other parties may cross-examine any rebuttal witnesses.

15         After the evidence has been presented, I will instruct you

16  on the law that applies to the case and the attorneys will make

17  closing arguments.  After that, you will go to the jury room to

18  deliberate on your verdict.

19         So, at this time, we will begin with opening statements.

20  And Apple will go first.

21             MR. CORDELL:  Thank you, Your Honor.

22      Good morning.

23             ALL:  Good morning.

24             MR. CORDELL:  My name is Ruffin Cordell, and with my

25  colleagues Karen Dunn, Juanita Brooks, and Bill Isaacson, we

1    are very proud to appear before you on behalf of Apple.

2         And the first thing I would like to do on behalf of Apple

3    is to thank you for your jury service.  We dearly appreciate

4    your time, your sacrifice, and your attention.  We know you had

5    other things to do this week and for the next couple, but we

6    really do appreciate it.  And we understand how important jury

7    service is and how critical it is to our system.  So thank you.

8         Now, despite what His Honor said yesterday, I am not the

9    elevator operator to hell.  I am not going to talk about car

10   sales.  I am not going to talk about root canals, but I am

11   going to take you through the evidence that we expect to hear

12   in this case and try to give you a little bit of a road map to

13   what you are going to hear and the kinds of issues you are

14   going to be asked to decide at the end of the case.

15        And I can't touch everything because there's a mountain of

16   evidence.  That's why we're going to be here for several weeks.

17   But I'll try to hit the highlights.  And, believe me, you will

18   hear more about everything I'm about to tell you.

19        Now, you heard from His Honor this morning that this is an

20   antitrust case.  He used some legal terms.  He called them the

21   Sherman Act or the Cartwright Act, but what that means is that

22   it's an antitrust case.  And what that really entails is one

23   party has monopoly power -- in this case, it's Qualcomm -- and

24   they have monopoly power in very, very specific things, the

25   part that goes into modern cell phones.  It's called a modem

1    processor.  We are going to talk a lot about that.  Sometimes

2    we call it a baseband processor, but it's the same thing.

3        And what this case is about is the fact that Qualcomm has

4    used its monopoly in this part -- it's not illegal to have a

5    monopoly per se, but they used their monopoly -- their market

6    power, we call it -- to set unfair prices and to stifle

7    competition and to dictate terms to some of the biggest, most

8    powerful companies in the world that rational companies would

9    never agree to in a million years.

10       But because they have this market power, because they are

11   monopolists, they can sort of impose their will on their

12   customers.  And that results in a tax, which is fitting given

13   that yesterday was tax day.  But the Qualcomm tax applies to

14   Apple and the contract manufacturers.  It also applies to the

15   entire industry, the telecommunications industry, and to the

16   public at large, and you're going to hear a lot about that.

17       Now, we are going to talk a lot about jargon.  You're

18   going to hear legal jargon.  You're going to hear technical

19   jargon.  And I'll get to that, but I would like to begin with

20   the fact that my mic is not turned on.

21           THE COURT:  That costs extra.

22           MR. CORDELL:  Fortunately, I am very loud, so

23   hopefully that wasn't a problem.  But, yeah, that is better.

24       So I would like to take all the legal jargon, all the

25   technical jargon, and set it aside for just a moment.  Because,

1    to me, ladies and gentlemen, what this case is about is things

2    that we all know are wrong.  We know it's wrong to make a

3    promise that you never intend to keep and then go back on it

4    right away.

5        What you are going to hear is that Qualcomm made promises

6    so the entire industry.  They told the whole industry that

7    we've got this great technology and you all need to use it.

8    And we are going to put it into a standard.  And, that way,

9    everybody uses it.  But, ladies and gentlemen, they never

10   intended to follow through on that promise.

11       And so when the time came, they looked at their direct

12   competitors, the people that they'd talked into this, the ones

13   that were in the group that decided to adopt this technology.

14   And they said, "Sorry.  You don't get to play.  We're not going

15   to give you a license.  We're not going to share our technology

16   with you despite our promise."  And we all know that that's

17   wrong.

18       We know that it's wrong to force people to pay twice for

19   things that they buy.  When we go to the store, we buy

20   something, we pick it up, we take it home, we use it.  But in

21   Qualcomm's world, the evidence will show they don't do that.

22   They make their customers actually pay twice for things.  So

23   that complicates the whole process.  And they use their market

24   power, their monopoly position, to force that.

25       We all know that it's wrong to cut deals that keep people

1    from competing fairly.  We know that it's wrong to pay people,

2    for example, to stay away from the competition.

3         What the evidence will show is that Qualcomm did exactly

4    that.  They created these schemes that had very intricate

5    incentives and penalties, billions of dollars in penalties, to

6    make sure their customers never went anywhere else.

7         And then, finally, ladies and gentlemen, we all know that

8    it's wrong to try to cover up our misdeeds.  And the evidence

9    will show that Qualcomm, as part of their monopoly power, as

10   part of their market power, imposed on their customers gag

11   clauses, contracts that said you will not go and try to get

12   help from the government.  You will not go and tell the

13   government about our broken promises or the fact that we're

14   overcharging.  And I think that the fact that they have

15   insisted on those kinds of gag clauses tells you volumes about

16   Qualcomm's acts in this case.

17        So, ladies and gentlemen, that's why we're here.  The

18   evidence will show that Qualcomm does business like no other in

19   the world and, again, have exacted the kinds of things from

20   these big companies that you just won't believe.

21        But in the summer of 2016, Qualcomm went too far, because

22   Apple was asked questions by the government and Apple answered

23   questions.  And that enraged Qualcomm.  Apple also had the

24   audacity to buy products from another company.  And that

25   enraged Qualcomm.

1        And the parties tried to work it out.  There was some

2    discussions over a few months; but, ultimately, in January of

3    2017, we felt like we had to bring this case to get your help

4    to try to correct Qualcomm's illegal practices.

5        With that, let me jump in and see if I can take you

6    through the parties and tell you a little bit about them.

7        Now, you know about Apple.  At least most people have

8    heard of them these days.  Back in the 1970s, when Steve Jobs

9    and Steve Wozniak were just starting out, nobody knew who they

10   were.  They were just a couple of garage inventors.  And this

11   was a -- no kidding -- garage.  And they had a -- no kidding --

12   table.  The first Apple I computer was made out of wood.  They

13   actually wired the parts onto a plank of wood.  Steve Jobs sold

14   his van to buy parts so they could sell a few of these things.

15       And so they were the absolute prototypical garage

16   inventors.  But Steve Jobs had a vision.  He had a vision

17   that -- computers in the 1970s were reserved for military and

18   government and big universities.  And he thought every single

19   one of us should have a computer in our homes for ourselves and

20   our family.  And he made that dream a reality.

21       And the innovation track of Apple has been unparalleled.

22   We went to the Apple II and the Macintosh and the iMac and the

23   MacBook Pro.  The computers just kept coming and coming, to the

24   point where, in fact, Mr. Jobs's dream has been realized.

25   People often have computers in their homes.

1      But that innovation didn't stop there.  We had the iPod in

2   2001 that changed the way we listen to music.  We threw away

3   the CDs and the cassette tapes -- that's what I had -- and

4   suddenly you had 1,000 songs in your pocket.  And iTunes gave

5   you a new way to buy music that nobody had ever heard of

6   before.

7      But the world really changed, ladies and gentlemen, in

8   2007, when Steve Jobs stood on a stage and introduced the

9   iPhone.  And people thought he was crazy.  You know, he took a

10  phone and he combined it with a computer.  Who needs that?  The

11  press thought it was going to be a complete failure.

12     But what we know, of course, is that it wasn't a failure.

13  In fact, it was an overwhelming success and really changed the

14  way we communicate.  So now we do carry a computer around in

15  our pocket.  And we do most of the work, you know, in daily

16  life right from the phone.  Fundamentally changed the way we

17  live.

18     And the iPhone and Mr. Jobs's contributions have been

19  recognized the world over.  What I've got on the side of the

20  slide here is actually a display at the U.S. Patent Office, the

21  U.S. Patent Office itself.  Nobody paid for this; the U.S.

22  Patent Office did this, created a memorial to Mr. Jobs and to

23  his design and innovation.

24     There have been many, many awards that Apple has won for

25  the iPhone.  And, in particular, Apple has been awarded

1  thousands and thousands of patents covering their innovations

2  in the iPhone.  We're not going to talk about Apple's patents

3  in this case.  We are not going to accuse Qualcomm of using the

4  patents or infringing the patents in any way, but I wanted you

5  to know they were there because it's important recognition of

6  the innovations Apple has made as opposed to the innovations

7  that Qualcomm is trying to take credit for.

8      What is it that makes the iPhone the iPhone?  Well, there

9  are hundreds and hundreds of features in the iPhone.  You

10 have -- you have the ability to make movies and play games and

11 listen to music and read books and navigate using your compass

12 and your GPS, hundreds and hundreds of features that Apple

13 spends thousands and thousands, even millions, of man-hours

14 putting in the phone.

15     There are a couple of things, though, that this case will

16 be about.

17     So the first is this modem processor on the upper

18 right-hand part of the diagram.  That's the part that Qualcomm

19 makes.  And I'll come back to that in a few minutes, but it's

20 the part that allows you to communicate with your network --

21 AT&T, Verizon, whoever it is.

22     But there are other ways that the phone communicates,

23 right?  So there's this Wi-Fi chip.  And that Wi-Fi chip gives

24 you another way to communicate with the outside world.  So you

25 can send e-mail over Wi-Fi.  You can do FaceTime over Wi-Fi.

 1   And those two pathways are two alternate communication

 2   modalities.  So remember those two chips for just a moment, the

 3   modem processor and the Wi-Fi, and I'll come back to that in a

 4   few minutes.

 5        You're going to hear from some Apple witnesses, some very

 6   key Apple witnesses.  Mr. Tim Cook, the CEO of Apple, is going

 7   to appear before you, take the stand, and tell you about the

 8   history of the iPhone.  He's going to tell you about the

 9   relationship with Qualcomm and the problems they have with

10   Qualcomm.

11        Mr. Jeff Williams is the chief operating officer.  And he

12   was very key in some of the discussions with Qualcomm as Apple

13   was trying to get parts to make its phone.

14        Mr. Tony Blevins is the vice president of procurement.  He

15   was right on the front line of dealing with Qualcomm and trying

16   to get what Apple needed in order to make the phone.

17        Now I have somehow turned off my slides.

18        Mr. Lee?

19             JUROR:  We can see it.

20             MR. CORDELL:  Okay.  Just this one.  I'll resort to

21   the basics.  Was it something I said?  I apologize, ladies and

22   gentlemen.  I really am an engineer.

23        So now let's move to Qualcomm.  Let's talk a little bit

24   about who they are.  Now, Mr. Chesler from the Cravath firm is

25   going to get up in a few minutes.  And he's going to describe

1  Qualcomm.  So I am not going to spend a lot of time on that,

2  but I'll tell you just a couple of things.

3      So Qualcomm has organized itself as the mother ship.  We

4  have Qualcomm.  Then it's got a couple of divisions that are

5  down below it:  QCT and QTL.  They go by these initials.

6  Qualcomm CDMA Technologies is QCT, and Qualcomm Technology

7  Licensing is QTL.  The reason why I have to tell you about

8  those is that they kind of operate in two different spheres.

9      So QCT sells customers chips.  Just like everybody else in

10  the world, you pay your money and you get your chips, you get

11  to use them.

12      QTL is the guy who sort of stands up and says, "Wait a

13  minute.  You can't do that yet.  You can't buy any chips

14  because first you got to deal with me, because I'm going to

15  sell you a patent license.  I want to take some extra money

16  from you for every single chip you buy from Qualcomm."

17      And, ladies and gentlemen, the evidence is going to show

18  that nobody else in the world does business that way.  Nobody

19  else says, "Here, I'm going to give you a product and I'm going

20  to charge you on top of that separately."  Because the law says

21  that's not the way you're supposed to do things.  When you sell

22  something, you're supposed to take it.  And whatever rights you

23  need, they're supposed to come with the product.  And we're

24  going to talk a lot about that in this case.

25      We have the contract manufacturers.  And Mr. Doren is

```
 1   going to get up after me.  And he's going to tell you a lot
 2   about them.  So, again, I won't spend much time on that.  But
 3   just know that the contract manufacturers are very capable
 4   companies who assemble products.  They assemble products on
 5   very, very tight margins.  They don't create a lot of cost.
 6   And that helps us all because we get cheaper products that way.
 7       The contract manufacturers are also kind of on the front
 8   lines.  They're the ones that have to get parts.  We have to
 9   make phones.  You know, we've got to move the production line
10   along.  And if we don't have this one part -- Qualcomm sells
11   their modem processors for about 20 bucks.  If I don't have
12   that one part, I can't make the phone.  The whole phone, you
13   know, hundreds or even thousands of dollars of phone just goes
14   away if I don't have that one part.
15       So they are on the front lines.  They're the ones that
16   have to deal with them.  They are the ones that often actually
17   asks for the money directly.  They then get it from Apple.
18   It's kind of a strange process.  But that's the way it works.
19   They are the ones that actually have to deal with Qualcomm.
20       All right.  Now let's talk a little bit about what a
21   monopoly is.  So I had a vision of what a monopoly is, but it
22   turns out, legally, that could be a little different.
23       So the analogy I like to use is a gas station.  I'm one of
24   those guys that will drive around town for half an hour looking
25   for the cheapest gas there is.  And one of the things I know is
```

1    that, if I go to a corner that has four gas stations on it,

2    chances are I'm going to get the cheapest price because they're

3    competing with one another.

4         But it's not just price, ladies and gentlemen.  Those gas

5    stations start to look for other ways to innovate, to give

6    their customers newer and better things.  So they compete with

7    each other.  So one might say, "I'm going to give out free

8    air," and that might pull in a few customers.  One might say,

9    "I'm going to give out free coffee" or "I am going to have a

10   deli or something attached to my station, so that way I can

11   pull in some more people."

12        And the result of that competition is that we all benefit.

13   We get new and better things.  But imagine the town that has

14   only one gas station.  All of a sudden, the prices go way up

15   because the gas -- that's the only station in town or at least

16   it has a dominant market position.  It doesn't have to be the

17   only one; it can be the only one nearby.  So if it has a

18   dominant market position, it can dictate prices.

19        And you're going to hear from some of the economists in

20   this case -- and I'll introduce them to you in a few minutes --

21   about what a dominant market position is and what that does to

22   people and allows them to manipulate prices.  And they don't

23   have to worry about competition anymore.  It's one of the ways

24   you know somebody has a dominant market position.

25        But of course we are not talking about gas in this case;

1    we are talking about chips.  And it's this modem processor that

2    Qualcomm makes, modem or baseband processor.  Again, it's about

3    a $20 part.

4        So, you know, what is that?  What does it do?

5        So don't confuse it with the main processor, which is this

6    A11 processor you see on the left-hand side of the diagram.

7    That's the processor that runs your apps and makes the phone

8    work and does all the things that you need a phone to do.

9        The modem processor has a very specific job.  Its job is

10   to communicate with the network.  So it does the radio link,

11   if -- if you want to call it that; that's what it is -- between

12   your phone and AT&T or Verizon.  It has to package up the

13   signals.  It has to send them off.  And it has to take them

14   when it comes back and unpackage them and give them to the

15   phone.  It's sort of the go-between.

16       I like to think of it as -- do you remember the old

17   M*A*S*H show, Radar O'Reilly?  He would crank up the phone and

18   talk to Sparky.  That's what the modem processor does.  Now,

19   it's a sophisticated part.  It's not quite as simple as Radar

20   O'Reilly.  And the reality is it's an important part.  We're

21   not saying that -- you can't have a phone without a modem

22   processor.  They've been around forever.  The very earliest

23   cell phones we all had had a modem processor in it because you

24   had to talk to the network.  That's its job.  But it's not the

25   only part.  It about a $20 part.

1        And keep in mind that you always have a second pathway to

2   the network or to information through your Wi-Fi connection.

3   And that's going to be an issue as we move forward.

4        But when we talk about the modem processor, we have to

5   talk about some technology.  We have to talk about the fact

6   that the modem processor uses certain protocols to speak and

7   hear from the network.  And so we are going to spend some time

8   in this case talking about standards, telecommunications

9   standards.

10       Now, what is a standard?  The example that I like to use

11  is the electrical power system.  So, normally, when you plug in

12  a display into the power, it works every single time.  You can

13  buy a toaster, you can buy a blender, you can by anything you

14  want to.  And you can take it home, and you plug it in, and

15  it's going to work just fine.  Why?

16       Because, long ago, we all agreed that the U.S. power

17  system was going to be 110 volts AC, and everybody was going to

18  be happy with that.  So the manufacturers can make products and

19  the power company can make power, and they all match up just

20  perfectly.

21       The telecommunications business lives and dies by these

22  standards.  So you can't have a cell phone that's going to do

23  all of the different things that it has to do -- communicate

24  over long distances in crowds and stadiums, all the difficult

25  things that you have to do with a cell phone -- if you don't

1    have those protocols and you haven't worked this all out on the

2    front end.  And we're going to talk about a couple of key

3    standards, protocols, in this case.

4         So what I have got on the slide now shows cell phones from

5    about 10 or 12 years ago.  So, back then, if you remember, when

6    you bought a phone, you bought it from your cell provider.  You

7    bought it from AT&T or you bought it from Verizon.  And there

8    was a very important reason why.

9         And the reason why was that those phones and those

10   networks operated on a single particular protocol.  So you can

11   see at the top, Verizon used something called CDMA, which was

12   code division multiple access.  But CDMA is what it's called.

13        And because the network spoke CDMA, the phone had to speak

14   CDMA.  You can think of these protocols like languages.  CDMA

15   is French, GSM might be German, and LTE -- which is the newest

16   of the protocols or 4G -- might be English.  And both ends of

17   the system have to speak the same language or you can't

18   communicate.

19        So, at the top, we see Verizon used CDMA.  At the bottom,

20   we see AT&T and T-Mobile used GSM.  And we're going to have

21   experts come in and talk about these, and they'll explain it in

22   great detail.  But that's really the nub of it.

23        But of course standards move forward and we go through

24   different generations.  You've heard of 2G, 3G, 4G.  People are

25   talking about 5.  And as things move forward, the phone

```
 1   companies and the cell phone makers, they all try to keep up,

 2   right?  So Verizon improves its equipment.  And the phone

 3   people improve theirs.  And we move into different standards.

 4        But here's the problem:  Sometimes, even though your phone

 5   is LTE-capable -- you see those little initials at the edge of

 6   your phone, meaning it's connected in LTE, sometimes you can't

 7   do LTE because there are buildings in the way or a crowd.

 8   There are lots of different reasons.

 9        So the phone company will say, well, I'm going to go back

10   to my old technology.  I'm going to go back to CDMA or GSM.  So

11   your phone has to be able to do both if you want to sell it

12   today.  And that's a problem.  Because it turns out there's

13   only one company that can do both.

14        So one of the ways that economists look at a company and

15   say, you know, you probably have market power.  Not saying

16   you're abusing it yet, but we know you have market power based

17   on your market share.  Anything over 50 percent sort of fits in

18   that rubric.

19        And you are going to see that Qualcomm had market power

20   and had market shares that were far in excess of 50 percent.

21   This is 2017 numbers, which have come down a little bit, but

22   you'll see numbers from prior years as high as 90 percent.

23        But, importantly, ladies and gentlemen, there was only one

24   company in 2017 that could provide both CDMA and LTE.  And

25   remember that backward compatibility.  If you wanted to sell to
```

1  anybody in the Verizon network, they had 100 percent of that

2  market.

3      Another way that the economists decide whether or not you

4  have market power is they look out there and they see who it is

5  that's making products using your parts.  So we did that.  And

6  we looked at all of the sort of premium smartphones that are

7  out there.  And the premium smartphones, to a phone, every

8  single one of them uses a Qualcomm chip.

9      And I should say something just quickly about this.  I say

10  "premium," and that's important.  Because there are lots of

11  other phones on the market.  And there are manufacturers that

12  make sort of lower-tier phones and lower-tier chips.  But for

13  the premium level, Qualcomm has absolute market power.  Every

14  single model you can name has a Qualcomm chip in it.

15      Now, Apple made a few phones in 2017 with an Intel chip.

16  Remember, that's kind of how we got -- in 2016, when they made

17  that decision, that's kind of how we got to where we are.  And

18  we will talk a bit about that.  But it is beyond question that

19  Qualcomm has market power in this premium tier for smartphones.

20      Now, you are going to hear from some expert witnesses in

21  this case.  And I'll show you a couple here.  This is

22  Dr. Douglas Bernheim and Dr. Fiona Scott Morton.  Dr. Bernheim

23  is from Stanford; Dr. Scott Morton is from Yale.  And both of

24  them have spent years and years studying high-technology

25  industries.  And both agree that Qualcomm has absolute market

1    power in this area.  Both of them agree that Qualcomm has used

2    that market power and abused it to control prices and to stifle

3    competition.  And both of them agree that it's caused us all

4    damages.  It's damaged Apple.  It's damaged the CMs.  It's

5    damaged all of us.

6        And they studied mountains and mountains of evidence --

7    documents, the agreements, the business relationships,

8    witnesses' testimony, depositions, on and on and on.  And

9    they'll be here to explain all of it to you.  And remember that

10   one of the big points we're going to make is that Qualcomm's

11   actions create this tax, this tax that applies to all of us.

12   And they will explain that in great detail.

13       So I could stop right here.  I know maybe some of you are

14   hoping I do.  But I won't.  The reality is that having market

15   power and abusing that market power and having an affect are

16   really what we're going to have to prove in order to show a

17   violation of the antitrust laws, the Sherman and Cartwright Act

18   claims that His Honor talked about.

19       But I want to do more, ladies and gentlemen, because I

20   want to show you how Qualcomm achieved and maintained this

21   monopoly.  And the law says you don't have to show that.  It

22   doesn't matter how you got to be a monopolist; it's using that

23   monopoly power to abuse, set prices, and stifle competition

24   that counts.

25       But the evidence is going to show that Qualcomm used four

1   very important anticompetitive acts to both create and maintain

2   its monopoly.  And they worked together in kind of a scheme.

3   And these are the four acts.

4       One is that they refused to license competitors.  They

5   broke their promises to share their technology with the

6   industry.  They have a "no license, no chips" policy that we're

7   going to talk a lot about that makes customers pay twice for a

8   particular technology.

9       They entered into exclusivity assignments that try to tie

10  up the customer base so that nobody else can sell.

11      And, finally, ladies and gentlemen, they used these gag

12  clauses to make sure that none of the customers go trying to

13  get the government involved, none of the customers go and talk

14  to the government and try to get them to investigate Qualcomm's

15  anticompetitive practices.

16      So let me -- let me take you through each of those

17  quickly.  It actually won't be quick, but I'll do -- so the no

18  license to competitors, we have to start back at the standards

19  bodies.

20      So at the top of Slide 23, what I have are the three sort

21  of prevalent standards bodies these days.  And you heard Your

22  Honor mention some of this this morning:  ETSI, which is the

23  European telecommunication standards body; TIA and ATIS are

24  American standards bodies, the telecommunication industry

25  association.  ATIS is actually The Alliance for

1    Telecommunications Industry Standards.  That's what they do,

2    they create standards.

3        So where do these standards come from, things like CDMA

4    and LTE?  Well, it's a process that takes a lot of yelling and

5    screaming, but what they do is that representatives of the

6    companies that want to make products in this industry all get

7    together, kind of like the jury will when you go to deliberate.

8        You sit around a table.  And the engineer from Ericsson

9    says, "I've got a great idea.  This is the way CDMA should

10   operate or LTE should operate.  We should have this particular

11   frequency.  We should use these parts.  And that works best."

12   And he'll have all kinds of reasons.

13       And then maybe the Nokia engineer says, "Wait.  No, I've

14   got a better idea."  And she lays out her idea and talks about

15   why it saves money or it's faster or whatever.

16       And then the Qualcomm engineer comes in and says, "No,

17   I've got a really good idea," and shares it with the group.

18   And you can see the submissions on the right-hand side of the

19   slide.  They actually write these things up.  They're detailed

20   technical specifications.

21       And so what happens is it's like being in a jury.  You get

22   together and you argue about it, but then you have to come to

23   an agreement, because, remember, the parts have to talk to each

24   other.  The phones have to talk to the Verizon equipment

25   and vice versa.  And if you don't come to an agreement, nobody

1   can make these things.  So there has to be an agreement.

2       But here's the catch:  The standards bodies know that if I

3   let Ericsson's idea in or Qualcomm's idea in, they might have

4   patents on this idea.  In fact, they might have thousands of

5   patents on it.  But they're kind of hiding behind their back.

6       And then, after the standards body says, "Okay.  We're

7   going to go with your idea, Qualcomm.  We're going to do it and

8   take your advice.  We think you've got the best approach,"

9   Qualcomm comes back a little later and says, "Hey, guys,

10  surprise.  I've got all these patents, so I am going to pick

11  and choose which one of you is going to be able to make these

12  products" or "I'm going to tell you how much you're going to

13  pay for them because I've got these patents."

14      So the standards bodies got wise to this long ago.  And

15  they require, before any company can put one of these

16  submissions in and try to talk the whole world into doing

17  things their way -- and they want to do that because then their

18  products have a leg up, right?  I mean, Qualcomm has already

19  made products in this technology, so they want the whole world

20  to do it.  That gives them a huge commercial advantage.

21      But the standards bodies say, "Wait a minute.  We're not

22  going to let you do that.  We're not going to let you hold

23  people up.  We're going to make you make a very, very serious

24  promise before we will take anything from you."  And it's

25  called the FRAND commitment.

1     So, on Slide 24, I've got an excerpt of one of the ETSI

2  commitments.  And it requires --

3     Blow it up so we can all read it.

4     "When an essential IPR relating to a particular standard

5  or technical specification is brought to the attention of ETSI,

6  the director general shall immediately request the owner to

7  give, within three months, an irrevocable undertaking in

8  writing that it is prepared to grant" -- IPR policy --

9  "irrevocable licenses" -- and here's the key language, ladies

10 and gentlemen -- "on fair, reasonable, and nondiscriminatory

11 ('FRAND') terms and conditions."

12    Now, let me take that apart a little bit.

13    It's not just any promise; it's a promise on fair,

14 reasonable, and nondiscriminatory terms.  The fair and

15 reasonable part of it says you can't hold people up.  You can't

16 come in here and ask for a bunch of money, because then the

17 product won't be profitable.  So you're going to have to be

18 reasonable about the prices that you demand if you want to have

19 a patent license for this particular technology.  Many

20 companies don't even insist on one at all when they have a

21 FRAND commitment.

22    The other part of it is that it has to be

23 nondiscriminatory.  I can't pick and choose which company is

24 going to play.  I can't say, "Nokia, you can make the product;

25 but, Ericsson, you can't" or "Broadcom, you can make the

1   product; but, Intel, you can't," because that's not fair.

2   Remember, everybody in the room had to agree.  And you can't

3   then pop up later and try to surprise people and deny them

4   access to the technology we've all agreed you have to use.

5       And that's exactly what Qualcomm did.  Qualcomm signed the

6   promises.  So here on Slide 25, I have an excerpt of one of the

7   promise documents that they signed.  And you can see it's

8   signed by Mr. Thomas Rouse, the VP and legal counsel of

9   standards policy and compliance.  You can't really see his

10  signature, but it's there.

11      And it talks about "The declarant hereby irrevocably

12  declares the following:  To grant irrevocable licenses under

13  these IPRs on terms and conditions" that are in accordance with

14  the clause I just showed you.  They signed it hundreds of

15  times.  Because, as I'm sure Mr. Chesler is going to tell you,

16  they have a lot of patents.  And they've been to a lot of

17  standards body meetings.  And so they've signed these over and

18  over and over again.

19      But here's the catch:  Before the ink was even dry,

20  Qualcomm had a plan.  They had a plan even before they went to

21  the standards bodies that they weren't going to license anybody

22  who could compete directly with them.  So they will license

23  users, they will license people who buy the chips and put them

24  in the phones like Apple, because that's where the money is.

25  But they are not going to license the other people in the room

that had to agree to that technology.

They look right at Intel, and they say, "Intel, we know you want to compete with this technology.  We know you want to make a modem processor, but the answer is no."  They look at Broadcom and they say the same thing.  They look at TI and they say the same thing.  And I will show you in a moment what happens to those companies when they are denied this kind of access.

And one thing that's important, ladies and gentlemen, is standards bodies don't enforce these on their own.  They don't even challenge people on the patents they claim are essential to the standard on SEPs.  We are going to talk a lot about that in this case.  They will let the company decide which patents are appropriate to that standard.  What has to happen is we need a judge and jury to enforce these policies, which is a big part of the reason why we are here.  Standards bodies don't do it themselves.

And what the evidence is going to show is that, again, Qualcomm made the promises.  They had to, right?  Their technology could not have made it into the standard if they didn't agree to license them.  But then immediately they will tell you, "Well, you know, we are just -- we just decided Intel and DM and Broadcom and MediaTek and Samsung, they just don't get a license.  They just don't get a license."

And what they might tell is you, "Oh, we have a couple of

1    licenses that we have signed in the past," but, ladies and

2    gentlemen, you have to look at those really carefully, really

3    carefully because those licenses don't say, "Intel, you can

4    make a part" or "MediaTek you can make a part."  What they say

5    is "You can make a part; you just can't sell it to anybody."

6    Well, it's not terribly useful for a company to have a license

7    to make a modem processor if they can't sell it to anybody.

8         Looks like we are back.  Okay.

9         So the term "exhaustive license" will come up over and

10   over again.  What that means is you can sell a part, and it

11   carries with it license rights to go with it.  That's going to

12   be an important part of this case.  What happens to companies

13   when they are blocked out, when they are told no by Qualcomm,

14   when they agreed to, you know, put the technology into the

15   standard, and then they are told no?

16        Well, I will show a presentation, an internal document

17   from Qualcomm.  And I know its complicated, and I apologize,

18   but that's the way we got it from Qualcomm.  This was a market

19   analysis they did a few years ago.  It spans the years 2006 to

20   2014.  And on the top, you can see it says "Winner Take All."

21        And on the side, they have ranks.  There's the leader,

22   which is number one, two, three, four, and five.  And back in

23   2006, TI was in the business.  They were leading modem

24   processor manufacturer.  And -- but, you know, as the standards

25   evolved and more and more of these technologies were required

1    by the standard, well, you know, TI kind of fell down, and

2    Qualcomm becomes the number one supplier.  And you see it in

3    2008, '09, '10, all the way through '14.

4        And as the standards continue to evolve and TI couldn't

5    play because they didn't have the license rights they needed

6    from Qualcomm, they began to fall down further and further and

7    further until finally we see that Qualcomm puts them in the

8    graveyard.  We'll put a little tombstone down there because TI

9    left the business.  And you can see it at the very top of the

10   chart here, it actually says, "TI exits consumer phones, citing

11   large customers increasingly developing their own chips."

12       And then it talks about STE dissolves, citing reductions

13   in purchases from Nokia and Sony, and that Broadcom exits the

14   cellular business as well.  Some of biggest companies in the

15   world, ladies and gentlemen, Freescale, ST-Ericsson, TI,

16   Broadcom, and NVIDIA all had to leave the business.

17       So where does that leave the phone makers?  So those are

18   the guys that make the chips, and they didn't get the license.

19   So they couldn't play.  Where does that leave the phone makers?

20   Well, the phone makers, all these big companies -- Lenovo,

21   Sony, Motorola, Samsung, RIM -- what the evidence will show is

22   that they really didn't have much of a choice anymore, because

23   Qualcomm had the dominant market position, which meant that, if

24   you wanted to make a phone and you needed a modem processor to

25   do that, you had to go to one of these phone makers.

    And you are going to hear the evidence from their own
mouths.  We have documents and witnesses from these companies
that are going to tell you exactly what happened.  All right.
Let me get to my second anticompetitive act, as part of the
overall scheme, which is no license, no chips.

    Now, this one was unusual.  I had never seen it before
this case.  I am a big fried chicken guy; I admit it.  I'm
right upfront.  I like KFC.  I go to KFC, I plunk down my $17,
whatever it is now for a bucket of chicken.  I get my chicken
and I go eat it in peace, unless my wife is there to tell me
that my cholesterol numbers are too high and I shouldn't be
eating the chicken.

    In Qualcomm's world it's completely different.  I go up to
the counter and I plunk down my $17, and the guy behind the
counter says, "Well, I'm sorry.  You have to understand.  This
chicken has Colonel Sanders' secret recipe, 11 herbs and
spices, and we are not going to sell you the chicken.  You
first have to go over here to a different counter, called
'KFL,' Kentucky Fried Licensing, and you've got to go get an
eating fee license.  And unless you can show me your eating fee
license, I am not selling you any chicken."

    So I've got to go over here and I've got to pay the eating
fee license, when he says it's $17, which seems crazy to me.
Why would I pay $17 for the right to eat it and $17 for the
chicken?  But only when I have that license and can show it do

1    I get my chicken.  That's the world Qualcomm lives in.  They

2    don't sell chicken; they sell chips.  But before they will sell

3    anybody a single commercial chip, you've got to go and deal

4    with their licensing people, and you've got to get that eating

5    fee license before they will even sell you a single one.

6         And Qualcomm admits this.  This is not something that's

7    going to be hard for us to prove.  Here is Mr. Steve

8    Mollenkopf, the CEO of Qualcomm.  He is going to admit readily,

9    they have a "no license, no chips" scheme to force companies to

10   agree to license chips.  And they do it for a very particular

11   reason, because they know, if they are selling you the chips,

12   well, that's their leverage.  If they stop selling you their

13   chips, they can tell you to agree to whatever license terms

14   they want, and the sky is the limit.

15        They know you need the chips; they know you can't make

16   phones without them.  So by using this "no license, no chips"

17   approach, they can dictate, they can dictate those terms.  And

18   the evidence is going to show that has two very profound

19   effects.  One, is that "no license, no chips" allows them to

20   double-dip.  They get to get paid twice for the same product.

21   So they get a price for the chip and get a price for the

22   license.  They -- essentially making the customers pay twice.

23        The other thing it does is it allows them to charge

24   royalties, patent royalties that are far in excess of that fair

25   and reasonable level we talked about earlier.  So I will try to

1    take each of these in turn and just preview some of the

2    evidence you are going to see on this.

3        So no license, no chips is -- I am not going to waste a

4    lot of time on this, because I don't think they are going to

5    deny it.  It's in their documents -- this is one of the

6    contracts at the top.  It's in their e-mails.  This is Derek

7    Aberle, who is one of their executives.  They say it over and

8    over and over again.  "We have never shipped commercial

9    quantities of chips to a company without a license.  No

10   license, no chips.  That's the rule at Qualcomm."

11       But importantly, ladies and gentlemen, and I think this

12   one is blank for the gallery, yes?  This is some third party's

13   confidential information in these things.  So we can't show

14   them to the whole world; I can show them to you.

15       The -- importantly, what Qualcomm did is that, even after

16   they started selling chips, when a customer would say, "You

17   know what?  These terms are unfair.  You are asking for too

18   much money.  You are dictating these terms.  You are telling me

19   that I can't talk to the government about these things.  You

20   are telling me all these other agreement covenants," that they

21   are insisting on, every now and then a customer would say,

22   "This is not fair."

23       What did Qualcomm do?  They'd say, "You know what?  You

24   are going to have a really hard time making phones without

25   chips."  They would threaten to cut off supply to intimidate

```
 1    those customers.  You can see it.  Qualcomm has threatened to
 2    force its chip licensees, including MediaTek, to stop selling
 3    mobile phone chips to Lenovo if Lenovo terminates its license.
 4    If you stop paying me the eating fee, you are not going to get
 5    the chips.
 6        But it's not just Lenovo.  You are going to hear executive
 7    after executive and witness after witness to talk about this.
 8    This is Derek Aberle.  He is another Qualcomm executive.  This
 9    one he was threatening ZTE that they better think about making
10    phones before we decide to cut off their license fee, their
11    eating fee.
12        This is LGE.  So some of you may have had LG phones.  They
13    make good phones.  And they were asked point-blank, "Why did
14    you agree to such a bad deal?  Why would any company agree to
15    the kind of agreements and demands that Qualcomm makes?"  And
16    they were very clear.  They tell you point-blank:  When
17    Qualcomm threatened to terminate the supply agreement, LG had
18    no option but to agree to whatever Qualcomm demanded.  No
19    license-no chips is an enormous amount of leverage, but it's an
20    unfair amount of leverage, ladies and gentlemen.
21        If you are the dominant player and you can decide who is
22    going to make phones and who is not by deciding whether or not
23    to sell them chips, you can do all kinds of things that the law
24    says you shouldn't do.
25        You are going to hear from the biggest companies in the
```

1   world:  Sony, Samsung, Lenovo, ZTE, Huawei.  They are all going

2   to tell the same thing, that they are threatened over and over

3   and over again.

4       Let's look at this just organically, if we can, for a

5   little bit.  This is the way it works.  So Qualcomm sells the

6   chip; QCT gets paid for the chip -- and we're not saying

7   there's anything wrong with that.  Qualcomm can charge whatever

8   prices it wants for the chip because there's a market there

9   that kind of limits them.  We think they use their monopoly

10  power a little bit to inflate those prices, but being paid for

11  their product makes sense.

12      What they are not allowed to do is to have this

13  double-dip, this second payment, threaten to cut off your chip

14  supply if you don't agree to this license that you don't need

15  or don't want.  They end up with a double-dip, a double payment

16  for the same product.

17      I mentioned a few minutes ago this Wi-Fi chip.  Remember,

18  that's the one that allows your phone to connect to the

19  network.  In fact, your phone prefers Wi-Fi because then you

20  don't have to pay AT&T or Verizon for data; your phone will

21  default on the Wi-Fi every time.

22      Well, guess what?  Qualcomm makes Wi-Fi chips too, but

23  there's difference.  They don't have that dominant market

24  position.  They don't have the market power in Wi-Fi chips.  So

25  you know what they do?  They have lots of patents on Wi-Fi

1    chips too, and they go to Wi-Fi standards meetings, all the

2    same stuff.  But for the Wi-Fi chips, QTL is not even involved.

3    They just sell the chips the way everybody else in the world

4    does.  So they understand how to do this correctly.

5        And this is not trivial, ladies and gentlemen.  The amount

6    of money we are talking about here is not just a drop in the

7    bucket.  So for Apple alone, from the years 2010 to 2016, Apple

8    paid Qualcomm $16.1 billion, big number.  $16.1 billion for the

9    chips.  That was to buy the chips.  But the eating fee license

10   that they had to pay for before they could get any of those

11   chips was $7.23 billion.

12       And there's another little aspect that you will come to

13   understand when Mr. Doren gets up here.  The contracts under

14   which Apple is paying these moneys, this 23 or $24 billion,

15   they wouldn't even show to Apple because the contracts are with

16   the contract manufacturers.  So Apple would just get a bill for

17   these amounts of money and was having to double pay for these

18   chips over and over and over again to a very extensive way.

19       We are going to show you documents that let you know that

20   even Qualcomm knows this is wrong, that it's wrong to

21   double-dip.  When you sell a chip, whatever intellectual

22   property is supposed to have gone with it should go into the

23   chip as well.

24       This is a neat document.  A few years ago Qualcomm got

25   contacted by the IRS -- and fitting because yesterday was tax

1    day -- and they had a conversation with the IRS where the IRS

2    official asked them lots of questions about their business

3    model.  And they had executives -- this is one, Mr. Eric

4    Reifschneider, who is going to appear before you and testify.

5    He is no longer with Qualcomm, but he is going to come.  And

6    they asked him lots of questions about the Qualcomm business

7    model.  And you are going to see this document over and over

8    again as we move through the case.

9         And one of the things they have asked him about was patent

10   exhaustion.  Now, what is that?  That's the no double-dip.

11   That says that, when you buy a product and it's got the 11

12   herbs -- with the secret recipe in it, that you get the license

13   you need with the product.  Again, that's the way the whole

14   world works.  When you go buy a television at Best Buy, they

15   don't say, "No, wait, you need to pay a license fee too."  You

16   just get the TV, and the patent rights come along with it.

17        And he recognizes that patent exhaustion is judicially

18   adopted doctrine based on public policy concerns.  And he says,

19   "The idea is you shouldn't be able to sell your product and

20   capture the price of the product and then also turn around and

21   sue your customer for patent infringement and say you have to

22   pay me more."  You can't double-dip.  You don't get the eating

23   fee license.  When you sell the product, the product is sold,

24   and that's the way the world works.

25        You are going to see this in the other documents.  This is

from an internal strategic plan of Qualcomm from 2012, and it
talks about sales risking a finding of patent exhaustion.  We
don't want our customers to actually try to expose this patent
exhaustion thing because that would take away our double-dip;
it would take away our eating fee license.  If we cease supply
of chips to current customers, they may assert antitrust
claims.

     Ladies and gentlemen, they knew what they were doing was
wrong and that we would be filing this case eventually.  And
they even say "Develop a plan of communication that maximizes
our ability to defend against these claims while ceasing supply
when necessary."  Try to avoid exhaustion and antitrust claims,
but we still need to be able to threaten our customers by
ceasing supply.  Ladies and gentlemen, that is an abuse of
market power.

     Let me get to my second point about the sordid effects of
the no license, no chips, and it has to do with this consent of
FRAND royalties.  And you are going to hear a lot about that in
this case.  So the reality is Qualcomm doesn't just charge --
when I go to KFC, they want their eating fee license, even if I
get the chicken from Popeyes, because they say they have
patents to cover the standard and they ought to get some money
for that.  So they charge it.

     Make no mistake, they first charge it on their own
products.  And remember the exhaustion principle we just went

1   through?  They are not supposed to do that.  But in any case,

2   ladies and gentlemen, what they do, when they go to charge, is

3   they charge way, way, way too much.  They tell the CMs that you

4   have got to take it or leave it with these contracts.  If you

5   want chips, you have got to sign up, and we are going to set

6   those royalty rates at astronomical levels.  Astronomical

7   levels.

8       They also then say, "You know what?  We don't care how

9   many patents we have.  If they expire, if they go away, if they

10  are valid, who cares?  You are going to pay the same amount."

11  Remember, our standards body, it requires that a license be

12  fair and reasonable.  Those are the ETSI rules.  They agreed to

13  this.  They have signed up for it.  It's got to be fair and

14  reasonable.  Every single time.

15      The way that people look at this, in the business, is they

16  say, "You know, it's a little bit like real estate market.  You

17  go into a neighborhood.  You look at a house.  How much does it

18  rent for?  How much does that one rent for?"  And you kind of

19  compare them, or sell for, and you do comparables and you

20  figure out kind of what it ought to be.

21      And in this case, we look at the number of

22  standard-essential patents, or SEPs, that parties have.  So we

23  looked at the biggest companies in the world, Ericsson

24  InterDigital, LG, Huawei, Nokia.  Ericsson and Nokia basically

25  invented the cell phone.  They started the whole business.  So

1    they have some very important patents, very important

2    standards, essential patents.  But if you add up their patent

3    holdings -- and this is for the 4G standard, the LTE standard.

4    So if you add up all their patents, they have about twice as

5    many as Qualcomm.

6        So if you think about it, if they have twice the number of

7    patents -- and this is not perfect, because you don't just

8    count them, but it's a metric.  It's one way you can do it.  If

9    they have twice as many patents, they should be charging twice

10   as much as Qualcomm, right?  You know, if it's 10,000 patents

11   versus 5,000 patents, it's reasonable to assume that they would

12   be charging twice as much.  Let's look at what the facts will

13   show.  It's just the opposite.

14       So if you take Ericsson, Huawei, InterDigital, LG, Nokia

15   and you add them all together, you add what Apple pays each of

16   those, and Apple pays each of those as little as 30 or 40 cents

17   a unit to a little over a dollar, dollar 30 a unit, something

18   like that.  But if you add them all up, most of them are at 60

19   cents, 65 cents, 70 cents a unit.  You add them all up, and you

20   get $3.34 for twice as many standard-essential patents as what

21   Qualcomm has.  And what does Qualcomm demand?  $13.  Does that

22   make any sense?  Is that fair and reasonable?

23       We are going to have a couple of experts, Mr. Paul Meyer

24   and Mr. Timothy Simcoe, come in and explain all of this in

25   great detail.

1        Now, Mr. Chesler is going to get up here and is going to

2    say, "Wait a minute.  Sometimes Apple has asked for lots of

3    money for its patents."  And he is going to show you documents

4    and he's going to point to lots and lots of things.

5        Keep in mind, ladies and gentlemen, something very

6    important.  These are standard-essential patents.  These are

7    very, very particular kinds of patents.  And you also have to

8    be very suspicious of those kinds of documents sometimes

9    because sometimes what people ask for is one thing and what

10   they get is something completely different.  This is what they

11   get.  These are agreements.  These are actual royalties that

12   are being paid to these big companies, and this is what

13   Qualcomm is demanding right now.

14       And one of the issues we are going to ask you to decide is

15   whether this demand, this $13 demand is fair and reasonable

16   under the FRAND standard, because His Honor said that was one

17   of the issues you will be confronted with in this case.  And

18   just looking at this, I hope you will agree that the answer is

19   no.

20       But there's more.  So it turns out that Qualcomm isn't

21   satisfied with just taking money for its own technology, right?

22   It is not satisfied with just taking money for the modem

23   processor.  It wants royalties on the whole thing.  It doesn't

24   care that it had nothing to do with FaceTime or nothing to do

25   with photos or MovieShop or any of the other features that you

get on an iPhone.  It wants 5 percent of the whole thing.  And to be fair, they cap it, 5 percent up to $400, so they at least try to do that.

But the reality is they didn't contribute to any of these technologies, and yet they want 5 percent of the entire phone.  And those technologies are profound, ladies and gentlemen -- camera, touch ID, multi-touch, the design aspects of it, FaceTime, Face ID, the App Store -- they want 5 percent of the whole thing.  Is that fair and reasonable?  Why would anybody in the world agree to that?  You know the answer:  because you need the chips.

So, sure, you will pay on technologies they had nothing to do with, because you need the chips.  Now, why does Qualcomm do that?  Why won't they simply stick to their own technology?  Why do they feel like they have to go out and go after the whole phone?  Well, the answer is pretty simple too.  Modem processor sells for about 20 bucks.  So you take a percentage of that, it's going to be less than a dollar, maybe a dollar if you are lucky.  You go after the entire phone and that's where the money is.  And we know that, again, from Mr. Reifschneider in his IRS interview, "We collect a royalty on the cell phone that's based on the price of the cell phone, and that's a lot higher than the price of the chip."  He is going for the money.

In the same interview, Mr. Fabian Gonell, another Qualcomm executive said, "The handset is humongously more lucrative."

 1   Humongously more lucrative.  They are going for what the money

 2   is -- where the money is.

 3        The last thing I will say about this is that Qualcomm

 4   charges for patents nobody needs.  Nobody needs.  We know that

 5   in a couple of different key ways.  Here, we have an internal

 6   Qualcomm document, and they admit that "the price we charge

 7   doesn't matter how many patents we have."  You -- "it can be

 8   10,000; it can be one.  We are going to charge you the same

 9   price."  Why is that, ladies and gentlemen?  The reason why

10   that is is because they don't set the price based on the

11   technology you use or infringe or any real involvement for the

12   patents.  They do it because of their market power.  They do it

13   because they can.  They can deprive you of chips, and they can

14   force you to do it.

15        And we are going to present some very detailed analysis of

16   their patent portfolio.  Qualcomm's going to bring in -- we are

17   not sure how many -- they just told us they are going to bring

18   in a bunch of witnesses, a bunch of experts who are going to

19   say, "Our patents are great."  They are going to kind of wave

20   them around.  But we did a real detailed analysis, and what

21   we -- our expert Dr. Matthew Valenti will testify about is that

22   90 percent of the Qualcomm patent portfolio consists of either

23   patents that apply to Verizon on the network equipment side and

24   Apple doesn't have anything to do with that, or they are

25   exhausted, they come with the chip, you can't double-dip,

1   right?

2       The whole exhaustion principle, if we are buying a chip

3   from Qualcomm, that's the price you get.  You don't get to come

4   back later and ask for a second license fee.  Then there's a

5   third bucket here, patents that nobody uses, nobody could use.

6   This is one of my favorites.  It's a patent on a shirt and

7   pants that have wires running through them.  I am not really

8   sure what the purpose of this was, but Qualcomm went to the

9   standards bodies and said, "This is an essential patent."  So

10  they are charging money for this.  Ladies and gentlemen, it is

11  just not fair, and it is just not reasonable.

12          THE COURT:  Mr. Cordell, just so you know, you have

13  five minutes left.

14          MR. CORDELL:  Thank you, Your Honor.

15      So the -- I do want to say one more thing about patents

16  because you are going to hear a lot from Qualcomm about it, but

17  patents have a very specific legal function and that is to

18  protect an invention.  That invention is defined by the patent

19  in its claims.  Not in its drawings, not in the text on the

20  front of the patent.  It is in the patent claims.  And they are

21  supposed to come in here and prove to you that Apple's

22  technology infringes those patents, that we are actually using

23  the claim of patents; that's infringement.  That's all that

24  counts legally.  How many of those are they going to show you?

25  The answer is zero.

1    We actually put patents into this case, and they took them

2    out.  They took them out.  We have been frustrated for years

3    because they would never tell us what we infringe.  So we came

4    in here, and we put the patents in, and they took them out.

5    They've got to explain to you why they did that and how they

6    can still hope to hold us up over their patents when they won't

7    confront the basic issues.

8        Let me get to my last two, because I am running very short

9    on time.  Exclusivity.  What happened here, ladies and

10   gentlemen, is in 2011, Apple needed a CDMA chip.  Remember,

11   that's part of it.  You got to have it in order to communicate.

12   Qualcomm had Apple agree to a set of incentive penalty

13   arrangements back then to reduce the royalty a little bit.  And

14   if Apple bought a single chip from a single competitor, these

15   were the penalties:  a billion, 780 million, 2.7 billion, on

16   and on and on.

17       So you can imagine that, in fact, Apple didn't buy a lot

18   of chips from other people because these are the penalties it

19   kept.  They did it for a very specific reason.  They knew Intel

20   was knocking on the door; they knew Intel wanted to make this

21   chip.  Here we have an e-mail from Mr. Mollenkopf, the CEO, who

22   talks about the fact that they didn't want to leave the door

23   open for Intel.  They wanted to slam that door.

24       And you will hear it from Intel's witness, Ms. Aichatou

25   Evans, who is going to testify about how she was really

1    frustrated.  She was in charge of their chip business at the

2    time, and they had spent billions and billions on this and

3    couldn't get into the door, and she couldn't understand why.

4    The answer is it's those incentive and penalties that Qualcomm

5    put into the contract.

6         And if there is any doubt in your mind about the profound

7    effect of these penalties, let's play a little deal or no deal.

8    This is an internal Qualcomm document where in May of 2013, as

9    Intel was getting into the market, they compared their revenues

10   with the penalties in place, which turns out to be 22 billion,

11   to the revenues if there was no deal, which is 9.8.  Penalties

12   brought them 22.4 billion; no penalties, 9.8.

13        All right.  One last part of the anticompetitive scheme,

14   and it's this:  Remember, they got these clauses that required

15   them not to -- required the customers not to buy from anybody

16   else.  Remember that they breached their promise to the

17   standards bodies.  Qualcomm has got some problems.  What do

18   they do?  They put into the BCPA an express agreement, covenant

19   saying, "Apple, you will not go to a government agency and ask

20   them to investigate Qualcomm."  And they put it into writing.

21   They say that "You will not initiate litigation against a

22   Qualcomm party or actively induce any third party to initiate

23   where such litigation includes a claim that Qualcomm has failed

24   to offer a license on FRAND."

25        So the two big things that they're doing, they don't want

1    the government looking at.  And they tell us, black and white,

2    for the avoidance of doubt, suggesting or inducing a third

3    party to suggest to a governmental authority that it instigate

4    an investigation regarding a Qualcomm party's licensing

5    practices violates the agreement.

6         And, ladies and gentlemen, what happened was, in the

7    summer or spring of 2016, Apple got inquiries.  And Apple's a

8    good company; Apple has to respond to government inquiries.

9    And when they got those inquiries, they responded truthfully

10   and honestly, and Qualcomm went ballistic and said, "You

11   agreed.  You agreed that you wouldn't go to a government agency

12   and get them to investigate us, instigate an investigation."

13   And Apple said, "We didn't do that.  We just responded to their

14   questions."

15        But when Apple responded to those inquiries, they began

16   withholding moneys that they owed under this BCPA that you

17   heard about this morning, and ultimately that resulted in this

18   case.  And then finally we have this from Mr. Alex Rogers who

19   you'll also hear from, another Qualcomm executive.

20        And in December of 2016, after they had withheld all this

21   money, Mr. Rogers wrote to one of the executives at Apple and

22   said, "You know, we hope we can resolve this amicably.  And if

23   you'll just change your testimony, if you'll just change your

24   statements, maybe we can work out that billion dollars."

25        Well, ladies and gentlemen, again, that's just plain

1    wrong.  It's just plain wrong.

2        So, at the end of this, we're going to ask that you

3    actually award damages in the amount -- and we'll come back to

4    this -- you don't have to worry about it now -- but it's --

5    $964 billion is what Qualcomm should have paid under the BCPA

6    but breached the agreement and said they weren't going to pay

7    because Apple responded to those government inquiries.

8        So, with that, we thank you for your time.  And I'll make

9    my wrap-up very short.

10       We have our four anticompetitive acts that cooperate to

11   create the scheme.  Keep in mind, when Mr. Doren gets up here,

12   he's going to talk about a bunch of contracts.  And you're

13   going to hear from Mr. Chesler too.

14       But keep in mind that those contracts are based on this

15   illegal scheme.  They're based on their broken promises to the

16   standards bodies.  They're based on their "no license, no

17   chips" leverage that they used to force terms.  They're based

18   on the exclusivity, locking out the competition.

19       And then, again, good companies don't do gag clauses.

20   They're not afraid of government intrusion.  They make good

21   products, and the customers keep coming back.  And that should

22   be all you need.  You don't need the market power.  You don't

23   need to abuse the marketplace.

24       With that, I thank you for your time and attention.  And I

25   look forward to putting on the rest of the case.

1                THE COURT:  Mr. Doren?

2                MR. DOREN:  Thank you, Your Honor.

3         Good morning, ladies and gentlemen.

4         As you will recall, my name is Rich Doren.  And I

5    represent the contract manufacturers:  Foxconn, Pegatron,

6    Wistron, and Compal.

7         And you've heard of them referred to as contract

8    manufacturers or, for short, CMs.  It's a lot of syllables.

9    And, really, the name, the title says it all.  These companies

10   contract with other companies, like Apple, to manufacture the

11   products that those companies design.  So they contract to

12   manufacture those products.  Therefore, my clients are the

13   folks that actually make the iPhone, make the iPad, make the

14   Apple Watch.

15        Now, they're very proud of the work that they do for

16   Apple, but Apple is just one of many clients that each of these

17   companies have.  And each of these companies, historically --

18   just like you've heard from Apple and I'm certain you will hear

19   from Qualcomm -- have each had their own path to success over

20   the years.

21        Now, I see several of us are old enough to remember having

22   to actually get up and walk across the room to change a

23   television channel.  And, back in 1974, that was actually how

24   Foxconn got started.  They made the knobs that one needs to

25   change a channel or that one needed to change a channel.

1      Since then, each of these companies has grown and evolved

2   and become more sophisticated.  And they now make hundreds and

3   thousands of different consumer electronic products that are

4   found in homes throughout the United States and throughout the

5   rest of the world.

6      Now, Mr. Cordell just told you about kind of this broad,

7   overarching overview of Qualcomm's conduct and of how that

8   conduct was -- how early successes was used to create market

9   power, how later steps were taken to secure it and kind of

10  fortify it, and how, ultimately, it has been abused to both

11  stifle competition and to funnel billions of dollars into the

12  bank accounts of Qualcomm that it would not otherwise have

13  received.

14     What I would like to do with our time is talk about the

15  evidence from the perspective of the contract manufacturers.

16  As Mr. Cordell said, we have contracts that they've never even

17  seen.  And recall that it's my clients, it's the four contract

18  manufacturers, that are the direct purchasers of these chips

19  from Qualcomm.

20     They are the ones that pay Qualcomm the royalties, that

21  pay Qualcomm for the chips.  Of course that's built into

22  purchase prices.  And in the case of Apple, you'll hear about

23  other avenues by which those are paid.  Because, as you've

24  seen, they come into the billions of dollars.

25     But the law is that, as the direct purchaser, it is these

1    companies that have the right -- and I think you will conclude

2    by the end of this trial, the obligation -- to seek the

3    recovery of those moneys from Qualcomm.

4         It is these four companies that tried to negotiate better

5    terms with Qualcomm but did not receive them.  And it's these

6    four companies that have had to work under the terms of the

7    contracts with Qualcomm through which the excessive royalties

8    were charged.

9         Now, Foxconn, Pegatron, Wistron, and Compal compete

10   aggressively with each other outside of this courtroom.

11   Contract manufacturing is a business that requires that you

12   prove your excellence every day if you're going to be in the

13   game.  There has to be excellent products generated on time,

14   every time.  And you have to be able to prove your ability to

15   maintain that quality over time.

16        Now, to be selected by a company like Apple to make their

17   products, especially a company with the reputation and the

18   brand equity, if you will, of an Apple, you have to pass a lot

19   of tests.  They'll send experts out to my clients' facilities.

20   They'll meet with their engineers.  They'll meet with their

21   executives.  They'll basically scrub every element of their

22   operations to make sure that they can carry the weight that

23   comes with building products for a company like Apple.

24        And once you pass those tests, if you pass those tests,

25   then Apple provides very specific product specifications,

1    component requirements, what goes in those specifications, and

2    then manufacturing assumptions.  What are you making?  How long

3    are you going to be making it?  How many do we hope you make?

4        And they tell my clients on the front end, "Now tell us

5    what you're going to charge."  And so my folks take those

6    assumptions and take that information, and they calculate a

7    price per unit.  And because it's such a competitive

8    environment, they cut their margins as thin as they can and

9    then hope they make enough, thin margins off of enough units,

10   that they add up into a meaningful profit.

11       But there is no guarantee.  If the product isn't

12   successful, if for any reason the volume drops below those

13   projections, projected profits can turn into actual losses.

14       Now, part of the being a contract manufacturer is the

15   ability to get the components required within those products.

16   And if you don't get the products, if you can't prove that you

17   can provide a regular, reliable, steady supply of what goes in

18   these things, then you're not getting the work.  Nobody can

19   take the risk in hiring you if you can't make sure you can get

20   these things built.  And as Mr. Cordell said, when it comes to

21   a high-end smartphone, that means Qualcomm chips as one of

22   those parts.

23       Now, purchasing components from any other company than

24   Qualcomm, purchasing chips from any company other than

25   Qualcomm, is a pretty simple process.  You submit a purchase

1   order, and you get your chips.  You pay the bill, and you own

2   those chips.  You own the physical chip itself; you own the

3   technology in it.

4        And just like most things you own, you can do what you

5   want with it.  You can put it in any product you want.  And you

6   can send it on down the line.  You've heard about fried

7   chicken; I think of it as a bottle of Coke.  You walk into a

8   store; you buy your Coke.  You get the bottle, you get the

9   carbonated water, you get the caramel coloring, and you get

10  Coca-Cola's most closely guarded secret, the intellectual

11  property on which that company is based.  You get the flavor.

12  It's yours.  You can do whatever you want with it, one price.

13       Doing business with Qualcomm, though, is different.  If

14  you want Qualcomm's chips, you don't just submit a purchase

15  order.  Qualcomm makes its customers sign three different

16  contracts.  And, by the way, my clients are the Qualcomm

17  customers here.  They're purchasing the chips.

18       It requires them to sign three different contracts and to

19  pay Qualcomm in three different ways.  You heard about

20  double-dipping as perceived by Apple.  Well, from where my

21  clients are standing, there's a lot more than a double-dip

22  going on.

23       Now, the terms of these contracts are take it or leave it.

24  There is no negotiation.  If you need Qualcomm chips, you

25  accept Qualcomm's terms.

```
 1        And these are the three contracts.  They are interrelated.

 2   And you are going to hear witnesses in this trial describe it

 3   in a way from which we believe you will conclude this is

 4   essentially a Bermuda Triangle where competition disappears.

 5        The first thing you have is a component supply agreement.

 6   The second is a software agreement.  And then up here is kind

 7   of the mother of all contracts, the subscriber unit license

 8   agreement.  You've heard it referred to already as the SULA.

 9   You are going to hear "SULA" every day of this trial.

10        Now, Mr. Cordell mentioned this, but I want to make sure

11   you heard it.  This is what you need to enter into, this little

12   Bermuda Triangle, if you want the modem processors.  If you

13   want other products that Qualcomm makes, like Wi-Fi chips,

14   where they don't have market power, you do it like anybody

15   else.  You call up, you place your order, you get the chips,

16   and you pay the bill.  And you go on and use them any way you

17   want.

18        But if you want modem processors, you've got to come into

19   the triangle.  So let's look at each part of it.  The first is

20   the component supply agreement.

21        Now, with most companies, a document like this sets out

22   the nuts and bolts of the transaction.  How do you submit the

23   purchase order?  By what means will the chips be delivered?

24   Who has the risk and has to ensure them while they're in

25   transit?
```

```
 1        And Qualcomm's component supply agreement has all those
 2   points, but it has something else in it as well.  And it's down
 3   here deep in the document -- a little bit dense, wouldn't you
 4   say? -- this paragraph called "Intellectual Property" in a
 5   component supply agreement, the nuts-and-bolts document.
 6        So let's dig into that a little bit.  And you can see
 7   there in the first sentence.  It says "The sale of products to
 8   the buyer" -- now, let's be clear; that's the sale of chips to
 9   the contract manufacturers -- "does not convey to the contract
10   manufacturer any intellectual property rights in the chips."
11        Look a little bit further down.  "The buyer" -- the
12   contract manufacturers -- "may not use or sell any chips
13   without a separate license from Qualcomm under all applicable
14   patents."
15        So let's step back and talk about it in plain terms.  This
16   is the document that talks about the nuts and bolts of the
17   transaction.  And a fundamental foundational point for the
18   transaction is, if you get a chip, what you have is a tiny
19   little piece of silicon.
20        You don't have any of the intellectual property in it.
21   You don't have anything that makes it go.  You don't have any
22   of the reasons that you bought that chip.  You get none of the
23   giddyup; all you get is a little piece of plastic, something so
24   small you can't even use it as a paperweight.
25        You remember Mr. Cordell saying "no license, no chips."
```

1    Well, here in one of the three contracts -- you're going to see

2    it again -- is the plain explanation, the plain directive, "you

3    need a license to get our chips."

4         And, by the way, while this talks about you don't get the

5    intellectual property without the license, the reality of it is

6    you can't buy the chip until you sign all three of these

7    contracts.  There will be no risks taken that that chip gets

8    used without all three contracts being signed.

9         Now, the second contract is called the software agreement.

10   You may see it in some documents as the master software

11   agreement.  And, while other chipmakers will have software

12   agreements because chips generally require software in order to

13   kind of enable it, to start them up; but, as a general

14   proposition, software provided by most chipmakers is free.  And

15   the only reason you have a license, or this software agreement,

16   is because it is their intellectual property within the

17   software.  And so they want to have this separate

18   acknowledgment of that.

19        Well, again, the Qualcomm software agreement is a little

20   bit different in two fundamental ways.  First, there is an

21   up-front payment.  You pay for this software.  And, in some

22   cases, you'll see that you pay millions of dollars for this

23   software.  And, in every case, you pay more for this software,

24   an additional amount for this software, with any new generation

25   of chip.

1    The second way it differs is found within the contract

2  itself, again a paragraph entitled "Intellectual Property"

3  within the software agreement.  Well, again, that makes sense

4  because software has intellectual property in it, but then you

5  take a look at what it says.

6    "The licensee may not use or sublicense the software

7  without a separate license from Qualcomm under all applicable

8  patents."  What it's saying is you don't get the intellectual

9  property and the software under this software agreement; you

10 get the floppy disk, not to date myself.  And you need to enter

11 into a separate license if you want to actually stick that

12 thing in your computer.

13    Then you go down further and you see that "the

14 licensees" -- and, again, that's the contract manufacturer --

15 "its use and sale of any product incorporated in a Qualcomm

16 ASIC" -- that's a chip -- "using any product incorporated in a

17 chip shall be solely in accordance with the terms of this

18 agreement and the license agreement."

19    So, again, what's that doing in the software agreement?

20 It's just making sure that no contract goes through that

21 doesn't say you've got to have -- you've got to have the

22 license agreement before you can use anything we're selling you

23 related to a modem chip.

24    And that takes us to the keystone, the engine room, of

25 this pyramid, of this triangle.  And that's the subscriber unit

 1   license agreement.  That's the mother of all contracts.

 2        Remember "no license, no chips."  This is the license you

 3   have to sign to get the chips.  And there will be no evidence

 4   that any other chipmaker makes their customers sign a license,

 5   a patent license, before they can purchase that chipmaker's

 6   chips.  It is unique to Qualcomm.

 7        Now, there's no negotiation on the financial terms of this

 8   document.  You're going to hear Monica Yang of Pegatron and

 9   Brian Chong of Wistron talking about their negotiation of this

10   document as they tried to get improved terms, as they tried to

11   get specific information.  And it was denied each and every

12   time.  And they were required to take the terms offered, some

13   might say dictated.

14        So let's look at a few of those terms.  And, as we do,

15   keep in mind what Mr. Cordell told you about FRAND obligations.

16   And you can ask yourself today, and you can ask yourself during

17   the trial, whether what you find in this contract is consistent

18   with those FRAND obligations.

19        The first thing is an up-front payment, an up-front

20   payment of multimillions of dollars.  Now, this isn't a

21   prepayment.  It's not a deposit on future purchases.  This is a

22   tribute.  This is the price of admission.  If you want to do

23   business with Qualcomm, if you want to purchase their chips,

24   the first thing you do is hand them millions of dollars for the

25   right to do so.  Then you get on with paying for what you get

1    the right to buy.

2        Now, you will hear testimony in this case that, as a

3    matter of business economics, as a matter of business planning,

4    once you plunk down millions of dollars for the right to do

5    business with a company, you want to spread those dollars

6    across as many chips as you can.  So you're spreading that

7    across as many products as you can.  You're driving down how

8    much that goes across your whole -- all your product line.  So

9    this alone starts closing off any incentive to use any other

10   product that might be out there.

11       Secondly, you've got royalty rates.  And you heard a

12   little bit about this.  But this SULA is the document where the

13   royalty rates are contained.  And what you'll see here is the

14   royalty rates range from 5 percent to 6.5 percent, depending on

15   volume, the volume of the number of chips you purchase and the

16   number of devices you make.

17       But it never goes below 5 percent.  And you will hear

18   testimony from contract manufacturers, who went from zero in a

19   volume to tens of millions of units in volume, calling Qualcomm

20   and asking to renegotiate.  And the message back was if you

21   don't like it, terminate, because you can't make it without us.

22       But the rate itself -- and, by the way, you will hear no

23   evidence of a royalty rate anywhere near this by any other

24   component manufacturer.  But it's not the rate itself that's

25   the impressive part of this provision.  And you heard this from

1    Mr. Cordell.  But here's the contract language.  It's up here.

2    "The percentage set forth below" -- the royalty rates -- "will

3    be charged against the net selling price of each subscriber

4    unit."

5         So what's a subscriber unit?  It's the final product.

6    It's the product that they stick the chip into.  And whether

7    that chip goes into a $100 product or a $400 product, Qualcomm

8    will take a 5 percent commission on that.  It has no relation

9    to the value of the chip.  It has solely to do with the value

10   of the subscriber unit.  As Mr. Cordell described, there's a

11   whole lot of things in those units in those phones -- let's

12   call them phones -- and other devices that you don't -- that

13   have nothing to do with Qualcomm.

14        So net selling price seems simple enough.  It is the price

15   you sell it to your customer for.  Seems that one at least

16   should be easy.  But the evidence will show, when doing

17   business with Qualcomm, it's not so easy.

18        For example, when a customer -- when one of our customers

19   hires a contract manufacturer to, for example, make a phone or

20   a device for them, they may help them defray some of the costs

21   of a new, large piece of equipment they may need to purchase or

22   to retool the assembly line, something like that.  They will

23   contribute toward that cost.  It's not on a per-unit basis;

24   it's just let's get this thing up and running so we can all

25   start making devices.

```
1          Well, Qualcomm wants 5 percent of that amount.  Basically,
2    any money coming in from the customer, they want their cut of.
3    It's got nothing to do with the chip.  That's got nothing to do
4    with their intellectual property.
5          And then the other thing -- another thing that Qualcomm
6    says should be included in this royalty basis is their own
7    royalty.  You pay us 5 percent on the selling price of the
8    phone, well, heck, that's part of the selling price.  Give us
9    5 percent on that.
10         And what we're all going to learn together over the course
11   of this trial is whether they're going to ask for 5 percent on
12   the 5 percent on the 5 percent.  We're still not clear on that.
13         Now, another element of the SULA you should have in
14   mind -- and this is a little bit of legal gobbledygook, but
15   "Royalties shall be payable on subscriber units sold by the
16   contract manufacturer" -- basically without regard -- "from
17   whomsoever it's purchased by licensee."  Point being, if you've
18   got somebody else's chipset in your phone, we at Qualcomm don't
19   care; we want our 5 percent.  And they get it.
20         Why, then, would you use someone else's chip?  It's like
21   going into a store to buy a bottle of Pepsi and having to pay
22   Coke 5 percent.  Coke makes money; Pepsi gets more expensive.
23   More Coke gets sold, more money to improve their products and
24   do their R&D off of somebody else's product while that company
25   tips into a death spiral because they're selling less and less
```

1    because you're imposing a tax to improve your bottom line.

2    They want their commission, their royalty, whether it's their

3    chip or not.

4        Now, we've heard a little bit about these intellectual

5    property licenses in terms of patents outside of the chipset.

6    And I suspect that what you're going to hear from Qualcomm is

7    that's what this is really all about.  It's, "My God, that

8    phone is just replete with patented technology that we

9    developed."

10        Well, they certainly want a lot for that, the 5 percent on

11    the entire unit, whether it includes their chip or not.  But

12    what do they want in regard to my client's technology?  You

13    see, my clients are sophisticated companies.  Admittedly,

14    they're not Apple or Qualcomm.  But some of them have hundreds,

15    if not thousands, of patents.  And this is what the SULA

16    requires of them.  They must give Qualcomm a personal,

17    nontransferable, worldwide, nonexclusive, fully paid, and

18    royalty-free license.  You pay us 5 percent on everything and

19    give us complete rights to your patents.

20        Well, like I said, that must mean that you are getting

21    something truly impressive for all of that.  And you will hear

22    that some of my clients have asked, "Wow, what do we get?  Can

23    you send us a list of patents?  Can you send us the top 100?"

24    And the answer has always been, "No.  Go look it up yourself.

25    Go to the website of the standards-setting organization and

1    look it up yourself and make your own assessment."

2        No list provided, no information provided, no data points

3    on how many of these patents have expired, no data points on

4    how many of these patents were used in different specific

5    products.  You've heard about wired pants, for goodness' sake.

6    And when some of my clients have asked to negotiate a narrower

7    license in order -- or in return for a lower rate, that was

8    refused.  They were simply told, "Trust us.  It's really good

9    stuff."

10       Now, you will hear from Dr. Jeffrey Leitzinger.  He is a

11   Ph.D. economist.  And Dr. Leitzinger has evaluated the injuries

12   that Qualcomm's anticompetitive conduct, that this Bermuda

13   Triangle of contracts, along with everything else, has caused

14   to the contract manufacturers.  He's basically calculated the

15   difference between what they paid and what they would have paid

16   had the market been free of these anticompetitive forces and

17   had Qualcomm complied with its FRAND obligations.

18       And Dr. Leitzinger will tell you that the amount that was

19   paid that was due to this anticompetitive conduct alone was 7

20   to $9 billion out of the $31 billion that my clients paid to

21   Qualcomm for chips and royalties over the relevant period.

22            THE COURT:  Mr. Doren, you have five minutes.

23            MR. DOREN:  Thank you, Your Honor.

24       And let me be clear on that too.  It's not just the

25   royalty that's being paid; you're paying for the chip too, as

1   we've said.  You've got to buy the chip, and then you got to

2   buy the intellectual property in the chip.

3       So 7 to $9 billion, how did this scheme go on so long?

4   Why didn't the contract manufacturers step up sooner?  And the

5   reality of it is they didn't dare.  They are literally between

6   a rock and a hard place.  You've got the needs of all your

7   customers, and you've got the demands of Qualcomm.  And it's a

8   delicate and difficult balance, but if you don't maintain it,

9   you will not survive.  And so they stayed quiet, as they were

10  required to under the confidential contracts in place with

11  Qualcomm.

12      But that changed in 2017 when Apple sued Qualcomm.  Apple

13  came to the contract manufacturers and told them that they were

14  going to stop paying the contract manufacturers the royalty

15  portions for the Apple products.  Well, as a result of that, my

16  folks couldn't pay Qualcomm those royalties.  And so Apple

17  said, "Look, if they come at you on that, we'll help you.

18      Qualcomm then comes to us and says, "You know what?  This

19  is a fight between us and Apple."  This is their head of

20  licensing.  They actually took -- took a suite at the Westin in

21  Taipei and had my clients over one at a time to assure them

22  that this was a fight between Apple and Qualcomm, and we're

23  going to keep everything exactly as it was; we just want to

24  keep business as usual.

25      And so that's where we were until May of 2017, when

1    Qualcomm sued my clients for $8 billion in unpaid royalties.

2    And Apple, good to its word, agreed that it would indemnify my

3    clients for any unpaid royalties they were held accountable

4    for, that they would pay for their lawyers to protect

5    themselves from this lawsuit.

6         But remember that my clients have a lot of customers.  And

7    my clients have a lot of business concerns.  And after years of

8    being under the yolk of these contracts, it was able to come

9    before you and say that there are no royalties due because

10   these contracts are unenforceable.

11        And this case is my client's chance -- perhaps their only

12   chance -- to ask for a fair deal with Qualcomm and to ask the

13   harm that it caused be undone.

14        You will meet with witnesses from all four contract

15   manufacturers who have flown here from Taiwan to testify.  You

16   will see lawyers and executives coming into this courtroom from

17   each company most every day.  And they are coming here because

18   this is their chance to get a fair deal.  And when we talk

19   again after you've heard all of the evidence, I'm going to ask

20   you for that fair deal, and I am going to ask that you take

21   from Qualcomm what it took through its anticompetitive scheme.

22        Thank you for your time.

23             THE COURT:  Mr. Chesler?

24             MR. CHESLER:  Thank you, Your Honor.

25        Introduce myself again.  I'm Evan Chesler, and I represent

1   Qualcomm, along with my colleagues who I introduced you to

2   yesterday as well.

3       So I don't think it will surprise you to hear me say that

4   Qualcomm has a very different view of the evidence from what

5   you just heard the last hour and a half.  I hope it doesn't

6   surprise you.

7       We agree on one thing.  I've got a mom who is 100 years

8   old.  She's got a lot of wisdom, a lot of things I've tried to

9   take through life.  And one of the things she told me a long

10  time ago is a promise made is a debt unpaid.  And we actually

11  agree with them about that because that's what this case, at

12  bottom, is about.  It's about promises.  It's about debts that

13  haven't been paid.  And that's why we're here.

14      The contract manufacturers paid royalties for the use of

15  Qualcomm's technology every quarter, every three months, for

16  almost 20 years.  Some of them signed later contracts.  The

17  earliest one was about 20 years ago.

18      Compal signed their contract back in 2000, and they

19  started paying royalties shortly after that.  Foxconn signed in

20  2005.  Wistron signed in 2007.  Pegatron signed in 2010.

21      All of them signed contracts called SULAs.  You've heard

22  that expression before, subscriber unit license agreements.

23  And every time they pay us for the use of our technology, Apple

24  paid them because they were using that technology to build

25  phones for Apple.  And Apple bought the phones from them.  And

1    Apple paid them the royalties that they paid us.

2         By the way, they don't make phones only for Apple.  They

3    make phones for other companies, same royalties, same deal.

4    They want to use our technology, fine.  They can make phones

5    for anybody they want.  They can make them for Apple; they can

6    make them for others.

7         After all that time, almost 20 years, in April of 2017,

8    all four of the contract manufacturers stopped paying anything

9    for our technology.  And, in fact, they have not paid us a dime

10   in the two years since then, literally, billions of dollars.

11        Qualcomm's stock has plummeted.  People have been laid

12   off.  Research and development projects to develop new

13   technologies have been canceled.  It's billions of dollars.  It

14   was, at the end of last year, over 8, the interest building on

15   it.  Since we don't have the use of the money, it's gone even

16   higher since then.  You'll hear testimony about that.

17        Now, they talked about an agreement called a BCPA

18   agreement.  They said that they didn't breach it; we withheld

19   some money.  I want to talk for a minute about some pieces of

20   facts.  There are going to be a lot of facts I tell you about

21   in the next hour and 12 minutes or so that they didn't talk

22   about.  And I know I am between you and lunch, and the judge

23   can make me stop on time, and I want to stop on time for you

24   guys.

25        But they didn't tell you about something that happened

1    before this dispute over the BCPA, which took place in 2016.

2    It has to do with something called "carrier aggregation."

3    Simply put, let me explain what it is.  Think about going down

4    a highway, your car and a highway, it's got one lane.  There

5    are a lot of cars behind you.  The highway will only allow for

6    as many cars as can fit on that one lane.

7        Every one of those cars is a message, a message sent over

8    yours phones.  The highway is the airways, is the spectrum, as

9    it's called, over which the signals that you send on the phone

10   go back and forth.

11       Carrier aggregation was something that allowed you to have

12   multiple lanes at the same time, so a lot more cars, a lot more

13   messages, a lot more voice communications and documents and

14   movies and pictures of your kids and grandkids could all be

15   going back and forth over the internet, and over the cellular

16   networks at the same time.

17       And we made an agreement.  Promises made are debts unpaid.

18   We made an agreement with Apple that we provide this carrier

19   aggregation capability to them, which would enormously increase

20   the speed of data going on the networks; and they would pay for

21   it.

22       Well, they didn't.  As with almost everything else that's

23   happened between Qualcomm and Apple, we ended in a disagreement

24   because Apple didn't do what it promised.  And we said, "You

25   owe us $800 million for all these phones that you've got that

1    you're selling to people on networks who have carrier

2    aggregation so that movies are coming through like that, and

3    you are making money, and more iPhones are being sold.  We gave

4    you that technology for a price.  You made a promise."

5          They said, "You know what?  We owe you some money."  And

6    as often happens with Apple, even when they say you are right,

7    they don't really say you are right.  They say, "We owe you

8    something, but we don't owe you anything near what you say.  We

9    say we owe you 160 million bucks.  You say it's about

10   800 million.  By the way, now it's a billion.  So here's what

11   we're going to do.  We will pay you the 160 million we owe you

12   but only if you give up on the other 800 million that you say

13   we owe you."

14         Well, folks at Qualcomm didn't become successful by being

15   stupid, and they said, "I don't think so."  And so Apple never

16   paid us a dime.  They admitted they owed us $160 million, and

17   they never paid us a dime because we wouldn't give up the other

18   $800 million.  And that entire disagreement took place long

19   before this dispute over the BCPA agreement in 2016.  So by the

20   time we got to this back-and-forth over the BCPA in 2016, we

21   were out about 800 million bucks.

22         And it is true that we withheld about 900 million under

23   the BCPA in 2016 because of what we believed they did under the

24   contract, the BCPA that they shouldn't be doing.  And I'll come

25   back to that.

1        And you know what they did immediately after that?  They

2   had the contract manufacturers withhold in royalties exactly

3   the same amount of money that we withheld under the BCPA, about

4   $900 million.  So here is the state of play at the end of 2016.

5   We have held back about 900 million of the BCPA.  They held

6   back the exact same amount in royalties, but they've also

7   refused to pay us the 800 million in carrier aggregation, which

8   preceded all of that.  That was the state of play at the end of

9   2016.  And then what happened next is critical, and it's why we

10  are here.

11       On April 1, 2017, all the royalties cut off, not a dime.

12  Now, I am going to talk to you a little bit about how many

13  iPhones they sold since then, how much money Apple has put into

14  its own pocket.  Apple is bigger and has a larger value in

15  stock market than the entire gross domestic product of Turkey.

16  It is the largest technology company in history.  The idea that

17  Qualcomm can bully Apple is absolutely remarkable.  I am going

18  to show you some slides.  It dwarfs us by size.  And they've

19  cut off that money, and that's why we are here.

20       Now, it wasn't by accident, and it wasn't because anything

21  that happened in 2017.  I am going to show you what the

22  documents, in fact, say.

23       I want to show you the first.

24       Put up Chart 2.  Can we do that?

25       This is from the BCPA.  This is Section 4 of the BCPA.

And it says, "Apple shall not knowingly take or continue taking

any action against or make any demand of any Qualcomm

licensee" -- those are the CMs -- "that prevents, restricts, or

discourages such Qualcomm licensee" -- the CMs -- "from which

it purchases Apple devices from complying fully with the terms

of Qualcomm's license."

So simple terms, you, Apple, cannot mess with our

licensees and get them to stop paying us.  You are not allowed.

This contract said, "You promised not to do that."  A promise

made is a debt unpaid.

So what happened?  Well -- before I get to that.  The CMs

have never said that these contracts are invalid.  In fact,

they said quite the reverse.  Let's look at Slide 3.  These are

agreements between Foxconn and Qualcomm.  Foxconn reorganized

their company in 2017, and they created -- wanted subsidiaries

to do business that use our technology, but those subsidiaries

didn't have our license.  So, to cover themselves, right thing

to do, they said, "We want to execute sublicenses that allow

our new subsidiaries to use Qualcomm's technology."  And we

said, "Fine."  And they can use it.

"You, Foxconn, already had a license.  You want these

companies that you own to use our technology?  They can have

the license.  They don't have to pay extra," same thing.  Look

what every single one of these licenses says.  This is after

they cut us off and stopped paying, saying these SULAs are

1   invalid.  Says here, "Whereas Qualcomm and licensee" -- that's

2   Foxconn -- "are parties to a SULA as of October 18, 2005" -- so

3   the SULA at that point was 12 years old -- "which constitutes a

4   valid, binding, and enforceable agreement between Qualcomm and

5   Foxconn."

6        So they stopped paying us and then they asked us to give

7   their subsidiaries licenses to use our technology under the old

8   2005 agreement.  And they say, "That old agreement, that's a

9   perfectly valid, enforceable agreement.  I am not going to pay

10  you.  I am not going to give you new money for all the phones

11  we are selling to Apple that uses your technology, but it's

12  valid."

13       So why did they do this?  Why did they stop paying us?

14  Well, here is what the facts are going to show.

15       In 2016, while that BCPA agreement was in force that said

16  you can't mess with our license agreements, Apple sent two

17  executives to Taipei, Taiwan -- that's where the CMs are

18  headquartered.

19       They went to the Grand Hyatt Hotel, they summoned each of

20  the contract manufacturers to the hotel, and they said this to

21  them -- this is what the evidence is going to show:  "Apple

22  will reimburse you for what you are required to pay to

23  Qualcomm.  But, it is our view that you are required to pay

24  nothing; and, therefore, we won't reimburse you for anything."

25       And guess what the contract manufacturers did?  They

1  stopped paying us.  Because quarter after quarter for 15 years,

2  10 years, 12 years, depending upon how long their agreements

3  existed, every quarter they paid us; every quarter they got a

4  check from Apple.  And now Apple said, "We've decided you don't

5  have any obligation to pay them, so we are not going to pay

6  you."  And like that, contract manufacturers all stopped at the

7  same period of time.

8       And there isn't going to be any dispute about this.  Let's

9  look at Chart 4.  This is from one of the contract

10  manufacturers, written to our client, Qualcomm.  "Our

11  customer" -- that's Apple.  Apple is the CMs' customer -- "has

12  recently formally requested Compal to stop the royalty payment

13  to Qualcomm."  They notified us, they told us, "Please stop

14  paying."

15       And Apple didn't leave anything to chance.  They didn't

16  just say, "Please stop paying."  As counsel just told you, they

17  gave every one of the contract manufacturers an indemnity.

18  Here is what that means:  If you all decide that we are

19  entitled to our money back in this case, Apple is going to pay

20  the contract manufacturers for that.  They said, "We will cover

21  you.  Don't worry.  Stop paying them, and if they beat you in

22  court, we will pay."  But they did more than that.  They did

23  more than that.

24       Let's look at Chart No. 5.  Here is what Apple made every

25  single one of the contract manufacturers agree.  "CM," contract

1    manufacturer, "does not settle any claim or allegation or make

2    any admissions of liability or admissions relevant to the claim

3    or allegation or take" -- this is critical -- "or take any

4    other action that the CM knows or should reasonably know will

5    harm Apple's positions with respect to the claim without

6    Apple's prior written permission."

7        So they took them in a hotel room in Taipei.  They said,

8    "We're not paying you anymore.  We ask that you not pay them.

9    We will cover you if Qualcomm sues and wins.  But in order for

10   us to cover you, you have to play by our rules.  You don't say

11   a word in court that we haven't approved.  You don't settle a

12   case that we haven't approved.  You take no action against our

13   claims unless we say it's okay."  Now, they are sitting at

14   separate tables, and they are telling you they are separate,

15   they've got their separate claims.  Look at the proof.  Doesn't

16   sound separate to me.

17       Why did Apple do this?  It had nothing to do with what

18   happened in 2016.  I am going to show you what the evidence

19   will show about that.  Let's look at Slide 6.  This is document

20   from 2014.  Not 2016 -- sorry, 2016.  June 2016.  Nine months

21   before they stopped paying us.  It is an Apple document from

22   inside their files.  Goal:  Reduce Apple's net royalty to

23   Qualcomm.  The richest technology company in the world decided,

24   despite the fact that we had contracts that had been in place

25   for years and years on which they paid every quarter, "I don't

1    want to pay them anymore, so I am going to create a program --

2    a secret program; I am not going to tell you anything about

3    it -- to reduce the royalties that I pay."

4         Let's look at the next slide.  What was the plan?  First,

5    it said, "Let's reshape FRAND.  We are going to change the

6    rules of what fair, reasonable, and nondiscriminatory means,

7    and the way we are going to do that is we are going to devalue

8    SEPs."  Now, remember, SEPs stands for standard-essential

9    patents.  These are the patents we tell the standards

10   organizations that we believe are essential to practicing the

11   standards so the phones will all work with each other.

12        What was Apple's plan?  We are going to devalue SEPs.  We

13   are going to make them worth less.  And how are they going to

14   do that?  Look at this bullet.  "We're going to build favorable

15   arm's length," quote, "comp licenses" -- "comp" is comparable.

16        I don't know about you, but when I put something in

17   quotes, when I write a document, it means I don't really mean

18   what the word says.  That's why I put it in quotes.

19        Now, they stood up here and they told you today that there

20   were these other companies that license technology to them for

21   which they pay much less than they pay us.  We must be

22   exercising, quote, "monopoly power."  We must be bad guys,

23   because these other guys have technology and they charge a lot

24   less.

25        What Apple did was they created a plan to go up and create

1    evidence.  Let's look at the next chart.  It's not my word.

2    Look at their words.  This is Apple creating evidence.  And

3    then they say down here "We selectively filter this pipeline to

4    identify the most desirable deals, evaluating risk, cost, and

5    use as evidence as a comparable in disputes with others."

6    Guess who the "others" are?  Us.

7         So they went out to these other companies, and they

8    negotiated very cheap deals, within the last couple of years,

9    to create the evidence to come in here and tell you that those

10   guys are the good guys because they are getting less for their

11   patents, and we are charging too much.

12        They did a very good job at creating evidence, exactly

13   what they planned to do before this fight ever started,

14   unbeknownst to us.

15        Let's look at the next one.  This what they said

16   internally they actually thought about these other companies

17   who they just told you have great technology, good as ours, and

18   yet they're charging less.  One of those companies is Nokia.

19   This is from inside Apple in 2009.  Nokia's patent portfolio is

20   significantly weaker than Qualcomm's.

21        You know, Abraham Lincoln once said about his cabinet,

22   "Not all the equals in my cabinet are really equal.  Some are

23   more equal than others."  Some patents are more equal than

24   others.

25        I am going to talk to you in a little bit about Qualcomm's

1   technology.  But you are going to have to take my word for it,

2   ladies and gentlemen, this is Apple's description of Nokia's

3   patent portfolio compared to ours.

4        Let's look at the next one.  One of the other companies on

5   the chart is InterDigital.  How come they are paying so much

6   less to InterDigital than us?  Look at this:  InterDigital

7   makes minimal contributions to the standards.  That's why we're

8   paying them less.  They went out and negotiated these deals.

9   Now they are telling you they are comparables.

10       Now, what did they say about Qualcomm before they came

11  here and gave you the impression that all those people up in

12  La Jolla are sitting around just looking out the window?

13  They're not inventing anything of any quality.  Are we just

14  gouging money out of them?

15       Let's see what they say.  "Compared to others, Qualcomm

16  holds a stronger position.  Compared to other licensors,

17  Qualcomm has more significant holdings in key areas.

18  Qualcomm's patents, SEPs and non-SEPs both, on average, score

19  higher compared to the other largely non-US-based licensors."

20  That's what they said to themselves when they were plotting the

21  scheme; that's not what they told you today.  The reason they

22  pay us more is because what we've created is worth more.

23       And, again, that's not my -- the judge properly told you

24  what I say is not evidence.  But what Apple says is, and that's

25  what Apple said.

1        Now, the plan that they hatched -- let's look at

2   Number 12.  It's entitled "Apple Wanted to 'Hurt Qualcomm

3   Financially.'"  It is right out of their document.  This is

4   from June of 2016.  Hurt Qualcomm financially.  Create leverage

5   by building pressure.

6        So let's look at the next slide.  This is from September

7   of 2014.  This is two and a half years before they cut off the

8   money.  They told you they cut off the money because it's

9   something that happened years later.  This is from September of

10  2014.  They stopped paying us in April of 2017.  This is two

11  and a half years before.

12       What does the internal document say?  Future scenarios.

13  Future scenarios, quote, "CM stops paying royalties to

14  Qualcomm."  Didn't come up when they went out there in 2016

15  with this brand-new idea.  They were plotting it for two years.

16       And a year later, in October 2015 -- let's look at 13A --

17  they are talking to Wistron, one of the CMs.  Okay.  And they

18  say to Wistron in the negotiation of agreement between Apple

19  and Wistron, "Apple wants this provision.  Apple may notify

20  Wistron that Apple will not pay Wistron any amount attributable

21  to mobile technology license fees at any time.  And after the

22  day of such notification, after Apple says 'We are not going to

23  pay,' any mobile technology license fee that Wistron pays are

24  the sole responsibility of Wistron."

25       In other words, "Any time we want" -- this is what they

1    are proposing way back three years ago -- "Any time we want, we

2    can say we are not going to pay anymore.  And if you continue

3    to pay after we say that, you are on your own, buddy.  It's

4    your sole responsibility."

5        And look at what Wistron wrote back.  Look what they said:

6    "Apple needs Wistron's support to stop license fee payment upon

7    receiving notification from Apple.  Wistron will be facing

8    below consequences by any mobile technology licensor" -- mainly

9    Qualcomm -- "if we stop payment upon your notification," quote,

10   "breach the agreement we had with Qualcomm which may result in

11   agreement termination.  If Wistron refuses to pay the royalties

12   due, Qualcomm will enforce the license agreement in court, and

13   we may have to pay all of the royalties due plus interest and

14   legal fees."

15       This is like watching a play that you have already seen.

16   They laid out exactly what they were going to do, and the CMs

17   correctly said, "Wait a minute, buddy.  If you cut off the

18   royalties, we can't afford to pay them.  And if we stop paying

19   them, we have just, quote, 'breached the agreement,' and they

20   are going to sue us."

21       Here we are.

22       And we are going to be liable for the money we didn't pay

23   them, and we may be liable for their attorney's fees, and we

24   may be liable for interest on the money we didn't pay.

25       You are putting us -- as one on their lawyers said

1  earlier, using a different reference -- between a rock and a

2  hard place.  Darn right.  That's where Apple put the CMs,

3  between a rock and a hard place.  And Apple knew this.

4      Let's look at Slide 14.  This is Apple writing in June of

5  2016, nine months before they made CMs stop paying us.  Look at

6  what they said:  "Apple would be at risk for infringement,

7  tortious interference, and full royalties plus any interest and

8  penalties."

9      Apple is a giant.  Sometimes giants get bit by fleas and

10 brush them off because they have a bigger agenda.  The bigger

11 agenda was devalue that portfolio that Qualcomm spent billions

12 to invest in, squeeze them, use our power, make them charge us

13 less.  We don't care; we have agreements.  And if they sue our

14 CMs, we will cover them as long as the CMs play by our rules

15 and don't say anything we tell them they can't say.

16     By the way, they told you at some length -- I am not going

17 to get to the policies that they said violated antitrust laws.

18 They said that, as a result of our policies, other chip

19 companies can't compete with us; they can't make chips.  And

20 they mentioned Intel.  Well, what's the evidence going to show?

21 Let's look at 15.

22     Part of the future scenario plan that they hatched back in

23 2014 was -- look at this -- commercial pressure against

24 Qualcomm, switching to Intel.  Please, ladies and gentlemen,

25 just use the common sense your parents gave you when you listen

1    to this evidence and you go through the trial.

2        If Intel couldn't develop competitive chips to compete

3    against us because we, quote, "denied them access" to our

4    technology -- which is not true, and I will show you the

5    evidence about that in a minute -- then how is it that Apple

6    has a plan to exert commercial pressure against Qualcomm by

7    switching to Intel?  Where did Intel get the chips from?  From

8    God?  They made them using our technology, for which they

9    didn't pay a dime.  Because as I am going to explain to you in

10   a few minutes, we don't charge the other chip manufacturers for

11   the use of our technology.  We charge the guys who put our

12   chips in their phones and charge you a thousand bucks a phone,

13   because the technology makes the whole phone work.

14       So Intel apparently was able to get chips, and guess what

15   happened in 2016?  If you bought an iPhone in 2016, it doesn't

16   have any Qualcomm chips in it.  It has Intel chips in it.  The

17   company that couldn't make chips because we denied them

18   technology, those are the chips that are in the Intel phone, in

19   the Apple phones.  To this day, the new phones that Apple has

20   introduced since then, they are all Intel chips.  They are not

21   ours.  Our chips aren't in there.

22       We still sell them chips for the older Legacy phones, but

23   this company that couldn't develop chips because we did

24   something wrong has been the sole supplier of those modem chips

25   to Apple since 2016, the result of them putting commercial

1    pressure against us to force us, to squeeze us to charge less

2    for the technology that we invented and that Intel is using for

3    free.

4         And that brings us to the lawsuit.  Was that part of the

5    plan was to just cut off the royalties to the CMs, indemnify

6    the CMs, tell the CMs what they could and couldn't say?  Is

7    that all of it?  It wasn't all of it.  This is another internal

8    Apple document.  This is from September of 2004.

9         Let's go to Number 17, please.

10        September 2014, Apple sues Qualcomm.  2014.  Before there

11   was a single dispute about the BCPA, before anybody was

12   withholding money, batting back and forth, it was cut off the

13   royalties, protect the CMs against the lawsuit we know will

14   come from Qualcomm, make them say and do what we want them to

15   do so we can protect ourselves -- they can't settle or say

16   anything unless we say it is okay -- and we sue Qualcomm.

17        Now, why did they wait from September of 2014 until

18   January 2017?  They sued us on Inauguration Day, January 20,

19   2017.  Here is why.

20        Let's look at 17A, Jason.

21        This -- again, this is from several years before, about --

22   I think this is 2014.  "Beneficial to wait to provoke a patent

23   fight until after the end of 2016, when the BCPA and the TA" --

24   TA stands for transition agreement.  It's another agreement

25   between Qualcomm and Apple.  "Beneficial to wait to provoke a

1   fight."  Who provoked this fight?  This is Apple talking to

2   itself.  It is beneficial for Apple to wait to provoke a patent

3   fight with us until after the end of 2016 when the BCPA and the

4   TA expire.  You know why?

5       I come from the Bronx.  The Bronx expression is "Follow

6   the money."  Let's follow the money.  Under the BCPA and the

7   transition agreement, Qualcomm paid Apple, over the course of

8   about four years, over $4 billion for the privilege of doing

9   business with the giant.  Think about that.  We paid them to

10  buy our products, and they say we have a monopoly power.

11      America is a great country, but it is not that great.  You

12  can't invent rules that go backwards.  We paid them to do

13  business with us, $4 billion, and what did they plot back in

14  2014?  Let's provoke the fight after we get all the money.  And

15  guess what happened?  These agreements expired on December 31,

16  2016.

17      And when did they sue us?  January 20, 2017.  In the

18  middle of negotiations between the parties over licenses, we

19  got a complaint, this lawsuit.  And 12 weeks later, the

20  royalties stopped.  April 1, 2017.  It was all planned in

21  advance.  Every bit of it.

22      And they waited.  Okay.

23      Let me go to point two.  A deal is a deal.

24      So I said that each of the SULAs -- each of the CMs signed

25  a SULA.

1          Let's just look at 18, please.

2          There are the dates.  I gave you these dates before.  You

3     see that they span a period of a decade, from '000 to 2010,

4     when they signed their agreements.  They were paying, they were

5     getting our technology, they were making chips, not only for

6     Apple, but for others.  And they all pay exactly the same rate.

7          If you want a license for the entire portfolio that

8     Qualcomm has -- SEPs, standard-essential patents; non- SEPs,

9     called "NEPs"; other very valuable patents, but they are not

10    essential to the standard; you can have the whole ball of wax.

11         By the way, they said, "Patents died but keep charging the

12    same thing."  140,000 patents, you get a license for the whole

13    thing, the whole thing, because we don't want to spend our time

14    fighting with people.  "Well, that one patent is being

15    infringed.  You ought to pay us for that."

16         They have freedom of action.  They can make their phones.

17    They don't have to worry about us.  They've got a license to

18    use all that technology.  5 percent for the whole thing, 3 and

19    a quarter percent if you just want the SEPs and you don't want

20    the NEPs.  They sign those licenses.  They are all 5 percent.

21    They all pay the same thing because we don't discriminate,

22    FRAND, nondiscriminatory.

23         And here is the important point.  They said the reason

24    people take these licenses is because of our chips.  Remember,

25    they said, "We have a monopoly in certain specific kinds of

1    chips," they said.

2         Well, let's look at this next slide.  This is 19.  This is

3    really, I think, very important.  Here is when Compal signed

4    its license.  February 10, 2000.  5 percent for the whole

5    portfolio.  Hasn't changed ever since, even though the

6    portfolio has grown to 140,000 patents, and it was a fraction

7    of that 20 years ago.

8         Here is when they first bought our chips.  2002.  Now,

9    ladies and gentlemen, again, the common sense you got from your

10   folks.  "I took a license because I needed your chips, but I

11   signed the license two years before I ever bought a chip."  I

12   am sorry.  That just doesn't make any sense.

13        And they told you we have monopoly power.  Their

14   allegation is that we have monopoly power over the CDMA chips

15   they talked about beginning in 2004.  So Compal signs a license

16   that they are telling you is a result of our antitrust

17   violations in 2000 because of a supposed need for our chips,

18   which they didn't buy until 2002.  And the chips represent

19   market power, which they say didn't begin until 2004, and yet

20   they signed the license in 2000 at 5 percent, the same

21   percentage they are paying today.

22        And every one of the other CMs represented by these folks

23   is paying exactly the same percentage as Compal was.  So you

24   will conclude whether the evidence in fact shows that the

25   licenses that they're paying -- the SULAs, in other words, they

1    are now not paying us -- were the result of some kind of chip

2    power when they signed them before we even sold them a single

3    chip.

4         Okay.  Skip ahead, save some time.  I said that our

5    portfolio has grown a lot, and I want to talk a little bit

6    about the chronology that relates to that.

7         Apple was actually a latecomer to the phone business.

8    They made it sound in their opening like 2007 was the beginning

9    of the smartphone business.  Then 2007 came, Steve Jobs went

10   out on the stage and said you can have a computer in your hand,

11   and the world as we knew it changed.  I don't know how many of

12   you remember.  I remember.  I had a smartphone before 2007,

13   just wasn't an Apple phone.

14        And, in fact, as I said, they never manufactured a phone.

15   The CMs manufacture the phones.  And Apple doesn't have a

16   patent license from us.  The CMs have the patent license from

17   us.  Here is a critical fact they didn't tell you.  They said

18   they charge 5 percent of the phone.

19        Not so.  I hope you all know the difference between

20   wholesale and retail.  Again, us folks in the Bronx know the

21   difference between wholesale and retail.  They are paying

22   5 percent on wholesale.  Most of the industry is paying

23   5 percent on retail for our technology.  Why is that?  Because

24   our license is with the CMs.  And the CMs build the phone and

25   they sell it to Apple for what they call a "transfer price,"

1   which is just a fancy word for wholesale price.  And we get our

2   royalty based upon the transfer price, the wholesale price.

3       Apple then turns around and sells the phone to you folks,

4   me, and everybody else, and they charge -- now the newest model

5   phone is like 1400 bucks.

6       They can up the price all they want.  We don't get a dime

7   of that.  Our license is based entirely on the wholesale price

8   that the CMs charge Apple.  So that's why, for the last 12

9   years, Apple didn't have a license with us; they didn't need

10  it.  They were selling phones, making billions of dollars, and

11  paying us a royalty based on the wholesale price when their

12  competitors pay it based on the retail price.

13      And as counsel did tell you, not only do we only charge on

14  the wholesale price, we cap it.  Meaning once the wholesale

15  price gets above a certain amount, we don't charge any more.

16  And the current cap right now for our royalty, no matter what

17  Apple charges you for a phone, is $13.  $13.  They charge you

18  $1,000, 1200.  Latest phone is $1,400 for a phone.  What they

19  are not paying us on that phone is $13.

20      Let's go to the third point, Qualcomm's technology is

21  valuable.  Let me tell you a little bit about Qualcomm.  You

22  heard when we were doing the jury selection yesterday, a couple

23  of times, the name Irwin Jacobs.  He is going to testify here.

24  Irwin Jacobs is now 85 years old.  He founded Qualcomm in 1985

25  with some friends.  They talked about Apple starting in a

1   garage.  Here's another thing we agree on:  Great companies

2   start in garages.

3      Qualcomm started in Dr. Jacobs' garage and several friends

4   here in San Diego.  The word "Qualcomm," where it came from, is

5   quality communications.  That's how they came up with the name.

6      Irwin Jacobs is an amazing guy.  He was a tenured

7   professor at MIT.  He gave up a tenured -- tenured job, you

8   know, there are not many people in the world who have tenure.

9   Professors at MIT, that's a pretty good job.  You are there for

10   life.

11      He gave it up; he came out here.  He wanted to work at UC

12   San Diego Engineering School, which was then brand-new.  The

13   State University of California opened schools in Irvine and

14   San Diego.  It was literally a brand-new school.  Nobody knew

15   if it was going to last, if it was going to exist.  And he came

16   out here and took a job teaching there.  And with some

17   colleagues and friends in 1985, he founded Qualcomm.

18      They told you that we make chips and everything we do is

19   somehow loaded in that tiny little chip.  You just heard that a

20   few minutes ago.  Again, we disagree.  The evidence is going to

21   show that the technology that Qualcomm has invented relates to

22   the chip, it relates to the phone in which the chip sits, and

23   it relates to the systems in which those phones communicate.

24      So things like -- I don't know if you all remember this.

25   We've got a range of ages here, and people have different

1  experiences of whether you used a product at one time or

2  another.  I'm old enough to remember when cell phones just

3  started.  I had one that was a brick.  You could kill somebody

4  with it.  It cost about 1,000 bucks.  And I carried it around

5  in a bag.  And if you moved about five feet to the right when

6  you used that phone, the phone call died.  It was an analog

7  phone.  It had a big antenna.  It was a great breakthrough, but

8  it was an early version of the breakthrough.

9      Now think about the way you can seamlessly talk.  You

10  could be in a car going down the highway 60 miles an hour.

11  You're moving from one station to another as you do that, one

12  tower to another.  One tower is giving you up the way a radar

13  tower, when you're flying across the country, the radar tower

14  gives up the plane and then the next tower picks up the plane.

15      Well, cell towers work pretty much the same way.  When you

16  move down the highway, one tower gives up your call, another

17  tower picks it up.  It's seamless.  Now very few calls get

18  dropped.  That's Qualcomm.  That's Qualcomm's technology.  We

19  invented how to make that thing seamless through CDMA.  And

20  I'll tell you a little bit about what Dr. Jacobs did there.

21      What would your iPhone be worth to you if you walked five

22  feet to the right and your phone call died?  What would it be

23  worth to you if you couldn't send a video to your grandkids or

24  your kids across the country?  What would it be worth to you if

25  you couldn't download on your phone the document somebody at

1    work says you need to look at right now?  Download it without

2    waiting around for an hour and a half with a little wheel going

3    around in your face.  That's Qualcomm, not Apple.

4        They're the best packagers, the best marketers in the

5    world, but what makes your smartphone smart is what the people

6    up the road in La Jolla invented.  That's what they're not

7    paying us for.  13 bucks a phone they're not paying us.

8        So Dr. Jacobs had this idea to use CDMA technology.  Let

9    me take a minute to explain this.  The technology at the time

10   that everybody was using was something else.  It was basically

11   called TDMA, time-division multiple access.  So what does that

12   mean?

13       You got five people on the phone at the same time.  And

14   you literally get broken up into tiny little time segments so

15   each of you is only talking alone at a moment.  Now, these are

16   tiny, tiny millisecond times.  So you don't realize that you're

17   getting on and off that quickly, that somebody else is getting

18   on and off.  But it's divided into time.

19       Now, think about the spectrum, the amount of radio waves

20   that we can use for our phones.  It's a set amount.  There's

21   just so much spectrum that's available at any time, like a

22   highway that's only a certain number of lanes.  And it turns

23   out that, if everybody is talking on their phones, whether you

24   divide it up by time -- so you can't talk at the same time that

25   he can talk -- there's only a certain amount of calls that can

1    be handled at one time before you run out of time.

2        And the insight that Dr. Jacobs had, the brilliant insight

3    he had, was that if you divided up all the users not based upon

4    time but based upon giving each one of them a unique code, CDMA

5    code division rather than time division -- so, for example,

6    five people are in a room -- six people, let's make it.

7        Two of them are speaking French to each other.  Two of

8    them are speaking Italian.  Two of them are speaking English.

9    They're all talking at the same time, but only the two French

10   speakers are communicating with each other because they have a

11   code, the French code, that enables them to speak.  And the two

12   that are speaking Italian only speak to each other because

13   they've got the Italian code.  And the two English speakers,

14   English code.  That's CDMA.

15       All those languages are going around in parallel.  They're

16   not starting and stopping when the next person begins to talk.

17   They're all talking at the same time, but they understand

18   exactly which message links with which message.  So they can

19   all travel at the same time, code division instead of time

20   division.  Turns out you can enormously expand the number of

21   messages going into that fixed highway at the same time as

22   compared to TDMA.

23       Now, when he first came up with this, a professor up the

24   road in Stanford said it, quote, "violates the laws of

25   physics."  This is never going to work.  And Dr. Jacobs and his

1    friends literally bought a van.  They put the name "Qualcomm"

2    on it.  They put their technology in the van, and they put

3    people on with phones, and they drove customers around

4    San Diego in the van showing that you could actually use this

5    technology.  It didn't violate the laws of physics; it worked.

6         And then some customers said, well, wait a minute.  What

7    about if you go to a city like New York with a lot of

8    skyscrapers?  The signal is going to get blocked.  So maybe it

9    only works in less dense areas with lower buildings.  So they

10   bought another van, they went to New York, they loaded

11   customers in, they took them around.  And guess what?  They

12   were able to demonstrate it worked.

13        And, over time, with an enormous investment and an

14   enormous amount of creativity and genius, the world slowly

15   moved -- I say "slowly."  In the world of cellular technology

16   it's not lightning speed.  You know, as I said, I had a brick

17   some years ago.  And now look what we've all got.  We've got

18   these little things we carry around in our pockets.

19        The world moved to CDMA because it allowed more cars on

20   that highway at faster speeds as compared to the older

21   technologies.  And it became successful not because Qualcomm is

22   a monopolist but because Dr. Jacobs and his colleagues had a

23   better idea.  That's the way competition works.  That's the way

24   America works.

25        By the way, the deal he made was he had a couple of big

1   companies, PacTel and a few others.  He will tell you he was

2   living paycheck to paycheck.  He was worried that he wouldn't

3   be able to make the payroll of the people working for Qualcomm

4   in the late '80s.  So he got a couple of investors who had

5   confidence in his idea, one of which was PacTel.

6        And they said, "We'll give you some money to keep you

7   going on condition.  And the condition is you've got to sign

8   two major carriers, like AT&T and Motorola, within a short

9   period of time or we're pulling our money out."  And he'll tell

10  you, when he takes the stand, they would have been bankrupt.

11  They would have closed up the shop.  He would just have been

12  teaching at UC San Diego without them because they couldn't

13  keep it open.

14       So he went to AT&T and Motorola and a few others with an

15  idea.  Did he have market power?  Five guys in a garage?  They

16  hadn't made any chips and riding around in a van showing what

17  works and what doesn't work.  A monopolist?  I don't think so.

18       And AT&T and Motorola signed licenses.  And you know what

19  they agreed to pay for this idea?  5 percent.  5 percent of the

20  price of the device that used the technology.  Did he have

21  chips that they needed that he forced them to take that license

22  with?  No, he didn't have chips.  Did he have market power?  He

23  barely had a company.

24       They signed the license at a time when all Irwin Jacobs

25  had was an idea.  And because he got those people to sign those

1    licenses, the PacTels and the others that had given them that

2    seed money to stay alive continued to support him.  And he had

3    a company going.  And it took them five years before they could

4    make a demonstration of a citywide system over in Asia that

5    worked.

6        It took eight years before the first standard that adopted

7    CDMA as a standard for the cell phone industry was adopted in

8    1993, eight years after they formed the company.  All that

9    time, struggling to stay in business, trying to persuade the

10   world not to go with the technology of a time-division-based

11   technology, which is also called GSM, another abbreviation,

12   same thing.

13       Most of world, AT&T, all these other companies, they were

14   GSM companies.  All of Europe was GSM.  He was the small new

15   guy on the block trying to persuade them that this idea he had

16   was actually going to be better.  And, eventually, they were

17   persuaded.  But it took years for them to be persuaded.

18       And now, today, virtually every carrier in the world has a

19   license for Qualcomm's technology.  And although they're

20   telling you that it was based upon some kind of power, it's the

21   same terms as Irwin Jacobs got from AT&T when he was nobody

22   with nothing but an idea, same terms.  Now he's got 140,000

23   patents for the same percentage that he was willing to license

24   a handful of patents back in the late '80s.

25       And all of those people have made billions and billions of

1    dollars.  And we all have been the beneficiaries of the

2    technology involved.  Without Qualcomm, it wouldn't have been

3    there.

4        Qualcomm has spent $50 billion on research and

5    development.  Over 20 percent of its total corporate revenue

6    goes back into research and development.  And, as I said, the

7    portfolio is larger than ever.  And I bet you're reading in the

8    papers about 5G that's coming, a lot of talk about 5G, the

9    "internet of things."

10       It's going to connect your car to the internet so you can

11   drive it without touching the brakes when you park.  It's going

12   to phone in and say your refrigerator is on the blink and you

13   need a new compressor.  This is the future.  All the companies,

14   Verizon and others, are investing billions in the

15   infrastructure to enable 5G to come about.  Who's the leader in

16   5G?  Qualcomm.  Qualcomm has developed the first 5G-capable

17   modem.  It's called the X50.

18       Now, I said I was going to talk a little bit about the

19   value of the technology.  Let's just talk a little bit about

20   SEPs.  These are Qualcomm's standard-essential patents.  At

21   bottom, what Qualcomm enables phones to do is communicate with

22   the rest of the world.  In one sentence, that's when they do.

23       Without Qualcomm's technology, the phones would not

24   connect to the towers and the system simply wouldn't work.

25   It's not just the chip.  They sell chips.  And, as I said, they

1    have a great 5G chip.  But the technology that they're

2    licensing is not technology limited to the chip at all.  I'm

3    going to give you some examples.

4         So, one example is carrier aggregation.  I'm not going to

5    go through that again.  That's the four lanes down the highway

6    instead of one, which enormously increases the data rates.

7         Another is something called MIMO, M-I-M-O.  It stands for

8    multiple input, multiple output.  And what it basically does is

9    it uses multiple antennas for transmitting and receiving

10   cellular signals between a phone and a base station.

11        But they just told you all we're doing is these chips and

12   it has nothing to do with the rest of system.  Here's an

13   example:  We developed and have contributed to this technology

14   of MIMO, which again enables more efficient, higher volume,

15   more smoother communication between the phones and the base

16   station.  That's way outside the chip.  That's out in the air,

17   so to speak, the communicating between the base stations and

18   the telephones.  It's critical to 5G.  Qualcomm is the pioneer

19   in that space.

20        Another example is called source coding of speech.  This

21   is what enables you to travel from place to place with soft

22   landings or soft transitions.  It's one of the features that

23   enables you to do that.  Reception varies in different places.

24   This helps avoid the variation in reception.

25        Now I want to pause for a moment on the famous patent on

1   pants that you heard about twice.  And this, I want to

2   emphasize, is why I came up and said at the beginning we have a

3   different view of the technology -- of the evidence, perhaps.

4   Let me take a minute to explain the pants patent, which they

5   obviously made fun of us.

6        So, one of the things that Qualcomm has developed is

7   enormous improvements in GPS, global positioning technology.

8   You all know what that is, I hope.  Presumably, some of you

9   have it in your car.  It tells you how to get to your kids'

10   house.

11        So Qualcomm didn't invent GPS alone, but it's made

12   enormous advantages to GPS, the efficiency of it and the

13   performance of it.

14        So we declared GPS patents as essential to a standard, to

15   ETSI, the European standards organization.  Now, the way that

16   works is, when you tell a standards organization that a

17   particular patent or set of patents is essential to a standard,

18   they, the standards organization, collect all the patents that

19   are, quote, "in that family," meaning, in the patent office,

20   all the patents that get cited to each other as being related

21   to each other, they sweep them all in and say, okay, that whole

22   family is part of your declaration of a standard-essential

23   patent.

24        And why would they do that?  For the reason that counsel

25   for Apple described earlier, which is they don't want anybody

1    surprised.  You sign up for the standard and say I want to use

2    this, and then all of a sudden you find out there are patents

3    that you need to use in order to practice the standard that you

4    weren't aware of.

5        So ETSI, to protect against that, collects the family of

6    patents.  And they put them together with the ones that you

7    announced as essential.  And guess what?  When they collected

8    all the patent family that related to our GPS patents, one of

9    the patents was to actually install a GPS system in an article

10   of clothing.

11       So we didn't go to ETSI and say we have invented pants and

12   they should pay us for pants.  There was a patent that was a

13   third cousin to our patents that said, by the way, if you're

14   worried where your kids are, we have invented pants that you

15   can put a GPS device in so you can tell where your kids are.

16   And then they come to court and they make fun of us and say,

17   oh, you patented pants.

18       We have a different view of the evidence.

19       Our NEPs are valuable as well as our SEPs.  NEPs are

20   nonessential patents, which means not that they're not

21   important or good, it just means you don't need them to

22   practice the standard.  Let me give you a couple of examples.

23       By the way, we have thousands and thousands of these NEPs,

24   which are included in the licenses that the CMs have for the

25   same 5 percent.  They don't pay extra for these.

1    So let me give you one example, GPS, more accuracy, power

2    consumption.  What it used to be, when you turned your GPS

3    system on, the battery would die almost instantaneously because

4    it drew so much juice.  Well, Qualcomm has invented ways to

5    extend the battery life so the GPS uses less power.  Do you

6    think that's important?  I do.  I think it's important.

7    If I'm on a business trip, as I often am, and I've got

8    a GPS thing in the car and I'm desperately trying to find my

9    way to someplace, I don't want my phone running out.  It

10   extends the battery life.  That's an NEP developed by Qualcomm.

11   Ring/vibrate switch.  You ever been in a meeting with a

12   bunch of people and your phone goes off and everybody looks at

13   you like, oh, you're the one in the room whose phone went off?

14   You can click a little button on the side of most smartphones

15   and change it to vibrate just by clicking the button.  Whose

16   patent is that?  Qualcomm's.  Is it essential to the standard?

17   No.  Is it important?  Is it something that people want to pay

18   for?  Sure.

19   Video magnification.  Do you ever zoom -- while a video is

20   actually running on your phone, do you ever zoom to look

21   closer?  Qualcomm.  CMs can put that on all the Apple phones

22   they want, same price.

23   Simulated momentum.  Did you ever scroll down through a

24   document and then pick your finger up for a minute and the

25   document keeps scrolling faster because you moved faster?  It

1    simulates your body movement over the screen.  If you're

2    getting through a 100-page attachment to a document, you want

3    to get through to page 80 in a hurry, you can start flipping

4    through quickly, extend up, and it will scroll down.  Qualcomm.

5        I could stand here all day.  I'm not going to do it.

6    You'll hear a lot about these thousands and thousands of NEPs,

7    nonessential patents, things that you and I use every day that

8    they put into phones because of technology that we developed

9    for which they are not paying us a dime, not a dime.

10        What did Qualcomm say -- what did Apple say about our

11   patent portfolio?

12        Let's look at Number 21.

13        This is Apple.  This is not Qualcomm; this is Apple.

14        2009, "Qualcomm is widely considered the owner of the

15   strongest patent portfolio for essential and relevant patents

16   for wireless standards."

17        Thank you, Apple.  We appreciate that.

18        That's their commentary on our patents.  The evidence is

19   going to show that they believe our patents are priced at a

20   fair price.  The evidence is going to show that they believe we

21   revolutionized this industry.

22        Here is the CEO of the company, Mr. Cook, making an

23   announcement in 2016.

24        Let's go to 24.

25        They were rolling out LTE -- LTE is the fourth generation.

1  We talked about 5G.  LTE is 4G.  Qualcomm didn't develop it

2  alone, but it made major contributions to the LTE standard,

3  which is a high-speed data transfer standard that you have on

4  your phones.

5      So here's Mr. Cook saying that they're rolling out LTE in

6  India, where they want to sell iPhones.  "LTE rollout with

7  India just really began this year.  And so we'll begin to see

8  some really good networks coming on in India.  That will

9  unleash the power and capability of the iPhone in a way that an

10 older network, a 2.5G or even some 3G networks, would not do."

11     Now, if it unleashes the power of the iPhone, take a

12 minute to yourself.  Does that mean Mr. Cook was saying he's

13 going to sell more iPhones?  Or do you think he was saying this

14 is going to unleash the power of the iPhone and people are

15 going to buy fewer of them?  Who contributed to the LTE

16 standard?  Qualcomm.  And what are they paying us for it?

17 Nothing.

18     So the evidence will show that, historically -- I said 13

19 bucks at the cap -- historically, you'll see in the evidence

20 that they've paid us between 11 and $15 depending upon which

21 phone it was and what the wholesale price was from the CMs to

22 Apple.  That's what we're fighting over.

23     Just think about this, ladies and gentlemen:  If you go

24 into an iPhone store, an Apple store, you go to buy a case, the

25 rubber case that has the little Apple logo on it.  The price,

1    depending upon how fancy the case is:  39 bucks to 129 bucks

2    for the case.  Cap on our royalties that they're not paying us?

3    $13.

4         The USB cable so you can plug the phone into a USB device?

5    $29 if you buy it from Apple.  The charging dock, the official

6    iPhone charging dock?  $49.  The AirPods, the little gadgets

7    you put in your ears?  $159.  Our royalty, $13.

8         A few weeks ago, a San Diego jury had a lawsuit between

9    Apple and Qualcomm in which Qualcomm sued Apple for infringing

10   three --

11            MR. CORDELL:  Your Honor, I hate to interrupt.  Can

12   we have a sidebar?

13            THE COURT:  At this time, focus on the evidence that

14   will be admitted at trial, Mr. Chesler.

15            MR. CHESLER:  Okay, Your Honor.

16        What did they say about the quality of our chips?  They

17   talk about the quality of our intellectual property.  Let's

18   talk about the quality of our chips.

19        We have two businesses:  Chips and patent portfolio.  We

20   have a licensing business, and we have a chip business.  We had

21   a licensing business before we ever had a chip business, as I

22   described to you a little while ago.  And now we have both

23   businesses.

24        What has Qualcomm said about the quality of our chips?

25   I'm sorry.  What has Apple said about the quality of our chips?

 1          Let's look at Slide 25.

 2          Johnny Srouji is one of the senior technical people at

 3     Apple.  He is their senior vice president of hardware

 4     technologies.  This is what he wrote in March of 2015.  "We

 5     have been using Qualcomm.  And, engineering-wise, they have

 6     been the best."

 7          He didn't say, "We are stuck with their chips.  They're

 8     really not good.  We'd rather use Intel.  Intel is better.  We

 9     have to use it because they have a monopoly of power.  We're

10     forced to take these licenses."

11          He said, the head of their hardware technologies, "They

12     have been the best."

13          So I want to make four points about their antitrust

14     complaints about our chips quickly.

15          Point Number 1.  I've said this before.  We do not charge

16     any patent royalties to other chip manufacturers.  That's how

17     Intel was able to compete.  That's why MediaTek and these other

18     companies -- you saw in their charts why they have chips that

19     use our technology.  Mr. Cordell said that we, quote, "denied

20     access" to the chip manufacturers.  No.  They have the full use

21     of our chips -- of our technology -- excuse me -- and they pay

22     nothing for it.

23          And the reason for that is not that we are in a charitable

24     business or we're giving things away for nothing; the reason is

25     that our technology gets used at the device level.  That's

1  where the chips interact with the software that interacts with

2  the systems, the base stations.  It's what enables our software

3  to work.

4      So where do we charge for the licenses that use all of

5  that?  We charge at the phone, at the device that uses the

6  technology.  So the chip manufacturer pays nothing.  That

7  lowers their costs.  They can sell their chips to the phone

8  manufacturer, and the phone manufacturer pays for the

9  technology.

10     The second thing I want to point out, as I said, we have

11  high market shares in some of these chip technologies.  We did

12  at certain times.  And here's why:  We invented them.  If you

13  invent something and you're the first, guess what?  You have

14  all the business until somebody copies your invention or comes

15  up with a better invention.

16     So if you take these premium LTE chips that they said we

17  also monopolized, there was a time we had about 90 percent of

18  that.  Because, as counsel told you, we were the first company

19  that had multimode.  You could us the fourth generation with

20  the older generations having the same chip.  That was Qualcomm

21  that came to the market first with that.  So, at that moment,

22  yeah, we had most of the business because we were the only

23  ones.

24     But in the space of about four or five years, our share

25  has gone to below 50 percent of that business because other

1    people have come in with their own versions.  That's the way

2    competition works.  The innovator gets there first and they

3    start out with the business.  Other people come along with

4    their versions.  And your share goes down.  That's exactly

5    what's happened with LTE premium business.

6         There are now these four other companies -- Intel,

7    HiSilicon, MediaTek, and Samsung -- all of whom are making

8    competitive chips, and our share has dropped by more than half.

9         You heard double-dipping.  I made a little tick mark in my

10   notes every time I heard that word, "double-dipping."  I

11   counted six times between the two opening statements.

12        Let me be absolutely clear what the evidence is going to

13   show.  There is no double-dipping.  When you buy a Qualcomm

14   chip, you pay for the chip and only the chip.  When you take

15   the Qualcomm license, you pay for the use of all the

16   technology, not only what's in the chip but what's in the phone

17   and what connects to the base stations.

18        And the scrolling down and the GPS and all the

19   nonessential patents, you're paying for all of that in the

20   license.  Two separate products, two separate chips, two

21   separate prices.

22        The Kentucky Fried Chicken analogy?  It's not that you

23   bought the chicken and you're paying twice for how they breaded

24   the chicken and for the chicken.  You went in and bought the

25   chicken, and you bought potatoes.  And you don't get the

1    potatoes for nothing.  You don't get the chicken for nothing.

2    If you want potatoes and chicken, you pay for each.

3        If you want our technology and you want our chips, since

4    neither one has the price of the other in it, you have to pay

5    separately for it.  If we didn't do that, we would be giving

6    away the technology for nothing.  And if we gave away the

7    technology for nothing, then the money that we've used to

8    reinvest that $50 billion in research and development wouldn't

9    be there.  And we wouldn't be leading the way to 5G, because

10   that's where the R&D money comes from.  It comes from the

11   licensing royalties.

12       They said we cut off chipmakers if they don't take a

13   license.  The evidence will show no one has ever been cut off,

14   ever.

15       And, by the way, since this is a dispute between Qualcomm

16   on the one hand and Apple and the CMs on the other hand, it's

17   not a dispute between us and Intel or MediaTek or Motorola or

18   anybody else.  It's a dispute among the people in this

19   courtroom.  The CMs have licenses from us.  And as you're going

20   to hear in a couple of minutes, while Apple made us agree to a

21   deal in which they said even if the CMs stop paying you for

22   your license royalties, you still have to sell them chips.

23       Now, we didn't know, when they did that, that they were

24   already planning, as I showed you before, to cut us off from

25   the royalties and insist on the chips.  But when they talk

1    about people being cut off from the chips, the CMs are buying

2    our chips literally today.  They still buy chips for Legacy

3    phones, and they haven't paid us a royalty in two years.  And

4    they've never been cut off.

5        And, as I told you, Intel chips have been in the iPhone

6    for the last two, two and a half years.  And we haven't been

7    paid for the last two years, but they're still getting our

8    chips.

9        By the way, the CMs are paying us, right until today,

10   royalties under the same SULAs for the non-Apple phones that

11   they're making.  They told you those contracts are invalid,

12   they're unenforceable.  They're paying us.  When they make a

13   phone for company X instead of Apple, they're still paying us

14   royalties at exactly the same rate for that other phone.

15   They're just not paying us for the Apple phones because Apple

16   cut off the payments to them.

17       How is the industry doing?  Let's look.

18       Your Honor, if I may, how much time do I have?

19           THE COURT:  You have 15 minutes.

20           MR. CHESLER:  Thank you, Your Honor.

21       What the economists are going to tell is, in an industry

22   that's a monopoly, here's what happens in a monopoly according

23   to the evidence:  Prices go up.  Quality goes down.  And

24   output, the amount of products that are being made, goes down.

25   That's what monopolies do.  They restrict the amount of

1    production.  So you have to pay more for what's around.  So

2    prices go up.

3        And they don't care about quality because there's nobody

4    threatening them with better quality.  So the utility gets

5    lousy.  The prices go up.  And the output goes down.

6        Here's what the economists are going to show you is true

7    of the cellular industry.  Chip prices, these different lines

8    are the different lines of technology.  There's GSM down there.

9    There's the time division that I've told you about, TD.

10   There's the 3G technology, which had two different flavors.

11   One was called CDMA 2000; the other was called WCDMA, which was

12   kind of an intermediate technology that started on the basis of

13   GSM and looked more like CDMA.  And then the world went

14   completely to one technology with LTE.

15       Look what's happened to the prices in every single one of

16   those technologies over time.  They didn't go up the way the

17   economists will tell you they go up in a monopolized market.

18   They all come down because of the competition in the

19   marketplace.

20       Let's look at the performance.  This is Number 27.

21       This is downlink and uplink speeds.  This is how people

22   measure performance in the cellular industry.  How fast is that

23   stuff coming across the highway?  Look at the technologies.  As

24   you can see, 4G, maximum downlink speed, that's that kind of

25   purple line on the top.  The others are the older technologies.

1    Look at how it's driving up.  Monopolists don't do that,

2    folks.  Why should they?  If they're the only gas station and

3    everybody is lined up, why should they improve the unleaded

4    quality of the gas?  You have to buy the gas from them whether

5    you like it or not, using their analogy.

6    Look at the increase in performance in 4G technology.

7    How about the total amount of usage?  As I said,

8    economists tell you that, in a monopolized market, output goes

9    down.  Let's see what happened.  This is what are called

10   exabytes.  I had never even heard that word before this case.

11   An exabyte, it turns out, is 1 billion gigabytes.  I can't even

12   get my mind around how much data that is.  It's a lot is the

13   only thing to say.

14   This is the growth in exabytes of data from 2011 to 2016.

15   This is the measure of output, how much data, how much voice,

16   how many bits and bytes are flying around the universe when

17   we're all using our phones and cellular devices.

18   Look at the rate at which output is increasing.  That's

19   the opposite of what the economists are going to tell you

20   happens in a monopolized market.

21   Now let's look at 29, the cost of data.

22   This is the price per gigabyte of data.  In a monopolized

23   market, prices go up because they can squeeze you for prices

24   because they've got the whole market.  In a competitive market,

25   they come down.

1    Look at the price of a gigabyte.  It literally has gone,

2  in seven years, from $47 for a gigabyte of data to $6 for a

3  gigabyte of data.  Now, think to yourself, folks, what other

4  product do you have for which you're not paying more today than

5  you were ten years ago?  From $47 to $6 for a gigabyte of data

6  because competition is pushing ahead.

7    Okay.  Last point, fourth one.  Apple cellular devices

8  have been extraordinarily successful.  And they have made Apple

9  very powerful.

10    Let's look at Slide 30.

11    I told you they sold a lot of iPhones.  Well, look, these

12  are iPhone net sales since their fiscal year 2011.  So let's

13  just focus on these two years, 2017 and 2018, because those are

14  the two years for which they stopped paying us the royalty.  In

15  those two years, when they didn't pay us anything, they sold

16  $300 billion worth of iPhones, $300 billion.

17    Let's look, Jason, at the next one, 31.

18    And they also sold another $20 billion in services and

19  another billion dollars of accessories, part of what they call

20  the ecosystem.  Without an iPhone, you don't need their

21  services and you wouldn't buy their accessories.  So when you

22  add all this up, just for one year, fiscal '17, that's about

23  160 some-odd billion dollars of revenue.

24    Now, we don't charge any royalties on the services, of

25  course.  We don't charge any royalties on the accessories.  We

1   do charge royalties on the phone, which they didn't pay us.

2       Okay.  And, as I've told you, they're supposed to pay us

3   on the wholesale price and not the retail price.

4       Let's skip, Jason, if we can, to 33, please.

5       So here are Apple's iPhone net sales during each fiscal

6   year.  Here are the royalties that they were paying.  They put

7   up numbers.  They have big numbers.  I'd forgotten what the

8   number was, but they're pretty big numbers, billions of dollars

9   they haven't paid us.  And it is.  But I want to see the

10  comparison to what they were earning for what they were selling

11  phones for with our technology in them.

12      So you can see they're fluttering up around 140,

13  160 billion a year in the later years.  Our royalties are down

14  about 6, 5, 4, somewhere in that range, single digits.  And

15  then you get to 2017, and all these net sales on the blue line

16  at the top on the right side of that dotted line are their

17  continuing net sales of the iPhone.  And the royalties go to

18  zero because that's when they stopped paying us.

19      Okay.  So I said that they dwarf us by size and yet we're

20  the bully.

21      Let's look at -- we're going to skip that for time's sake.

22  Suffice it to say -- let's look at 36.

23      So here's Apple's net income against Qualcomm's net

24  income.  This is fiscal year '17, a year or so ago.  Theirs is

25  48 billion; ours is 2.  Their cash is 269 billion versus 39.

1   Their net sales, 229 billion versus 22.  Literally ten times

2   our size.

3       I don't know.  When I was a kid in the schoolyard, anybody

4   who was ten times my size -- and there were a lot that were --

5   they usually had the power in that relationship, not me.

6       So I want to end with one thing that I alluded to a little

7   bit ago.  And that is this thing they called a supply

8   commitment and why they did it.  A supply commitment is exactly

9   what the name suggests.  It's a commitment to supply something.

10  In this case, a commitment from us to supply chips.

11      So we've had, for ten years or so, agreements with Apple's

12  supply commitments.  They say we got to supply chips and, even

13  if we cancel our agreement, you have to continue to supply them

14  for some time after that.  We agreed because they're Apple.

15  And we don't normally give supply commitments to other

16  customers that live on after contracts are terminated.

17      You have a contract.  You say I'll buy your product.  You

18  pay me for it.  The contract ends.  You stop paying; I stop

19  shipping.

20      In this case, they said, even if the contract terminates,

21  it ends, you have to continue to supply us chips.  And they

22  said it's not great, but they said so we have time to get

23  somebody else to supply us chips and we can transition to

24  somebody else.  So we gave them that commitment.

25      And the length of the commitment went on.  It got longer.

1   It started out as 18 months.  And, over the course of signing

2   new contracts, it ultimately got to as long as four years.  So

3   they can cancel the contract and we have to continue to sell

4   them chips under the now-ceased contract for four years.

5       But those contracts have an important provision in them

6   for us.  And that was, yes, we'll continue to sell for four

7   years so long as your -- the purchaser of your chips, the CMs,

8   are paying their royalties to us for the technology in those

9   chips.  And those agreements all said that.

10      And then we got to February 2013, an agreement called the

11  ASTA, the amended and restated strategic terms agreement,

12  pretty important-sounding name.

13      Let's look at Chart 37.

14      This is where they said they were going to stop paying us.

15  Back in 2014, they said they are going to stop paying us.

16      So now let's go to 38.

17      This is where they said let's wait until the end of '16

18  before we provoke a fight because we want the agreements under

19  which they're paying us money to be expired.

20      Now, here is 39.

21      So this is an agreement that we signed along with that

22  ASTA at their insistence.  We had no idea that their planning

23  documents inside were saying "We're going to cut off the

24  royalty arrangement.  We're going to wait until the money stops

25  coming in our direction.  Then we're going to sue."  We didn't

```
1    know any of that until this lawsuit began.

2         But here's what they made us sign.  They said the supply

3    commitment" -- meaning your obligation to continue shipping

4    chips -- "isn't just going to last past the termination

5    agreement; it shall apply irrespective of whether or not the

6    authorized purchaser" -- that's the CM -- "has made or

7    continues to make royalty payments for licensing of Qualcomm's

8    chips."

9              THE COURT:  You have four minutes.

10             MR. CHESLER:  Thank you.

11        Without telling us that they were going to cut us off,

12   they got an agreement that said not only do you have to ship

13   chips after the agreement expires, you have to ship chips even

14   if the CMs stop paying you royalties.  And as soon as our

15   payments to them under the BCPA and the transition agreement

16   stopped, they sued us, they terminated the royalties.  And we

17   are still shipping chips.

18        Ladies and gentlemen, that's why we're here.

19        Thank you.

20             THE COURT:  Let me see counsel sidebar.

21        (The following proceedings were heard at sidebar:)

22        ██████████████    ███████████████████████

23   █████████████    ████████████████████

24        ██████████████    ██████████████████████

25        ██████████████    ████████████████████████████
```



15      (The following proceedings were held in open court:)

16          THE COURT:  Ladies and gentlemen of the jury, let me

17   do this:  I know I've kept you for the last three hours.  Let

18   me have you go into the jury room.  And I'll have you escorted

19   to the jury room.  And you can use the restroom if you need.

20   And then we'll be back out here in a couple of minutes.  And

21   then we'll let you know how we will be proceeding.

22      (The following proceedings were held in open court out of

23   the presence of the jury:)





(The following proceedings were held in open court in the
presence of the jury:)

        THE COURT:  Please be seated.

    Ladies and gentlemen of the jury, in our remarkable legal
system, we encourage parties to resolve their disputes amicably
where they can.  We understand that justice is best served when
the parties are able to be satisfied with the outcome of the

1    case because they have jointly participated in the conclusion

2    and resolution of the case.  And we know if the parties are

3    unable to resolve their differences, our system of justice

4    provides a means, provides a jury trial, as a way to decide

5    legal disputes.

6         Here, after you were selected as jurors, the parties have

7    reached the ideal conclusion; that is, they have settled the

8    case.  This development allows these tech companies to get back

9    to business, and it will permit you to return to your everyday

10   affairs.

11        On behalf of a grateful Court and the parties, thank you

12   for your willingness to serve as jurors in a four- to five-week

13   trial.  Thank you for your service to our system of laws, the

14   rule of law.  You are now free to talk with anyone in the world

15   or not to talk with anyone in the world on your smartphone or

16   other device.

17        But before I excuse you, I would like to personally thank

18   you in my chambers, and I am going to ask my judicial law

19   clerks to escort you into chambers so I can personally thank

20   you.  All right?

21        (Recess taken from 12:18 p.m. to 12:27 p.m.)

22            THE COURT:  This is it.  We are now excusing the

23   jury.  And the most important question that I was asked back in

24   chambers is do we summon them or return them to the jury room

25   or do they get to go home?

```
 1              THE CLERK:  You get to go home.

 2              THE COURT:  You get to go home.

 3         (Applause)

 4              THE COURT:  Thank you again.  You are excused.

 5              THE CLERK:  I don't need your forms.  I can shred

 6    them if you want.

 7         (The following proceedings were held in open court out of

 8    the presence of the jury:)

 9              THE COURT:  This is certainly a rarity.  All parties

10    are smiling, are happy.  Let's pretend we didn't settle this

11    case and let's go over the objections -- or not.

12         So at this time, then, I understand both -- all sides are

13    prepared to have this case dismissed, and you will prepare the

14    paperwork accordingly?

15              MR. CHESLER:  Yes, Your Honor.

16              MR. CORDELL:  Yes, Your Honor.

17              THE COURT:  Is there anything else that we can do at

18    this time?

19              MR. CHESLER:  Not on behalf of Qualcomm, Your Honor.

20              THE COURT:  You are all lovely people, but I am not

21    sure I want to see you all here at the same time to litigate.

22    You are truly outstanding lawyers, and you have outstanding

23    attorneys that are supporting you, I am sure, like I do.  So

24    this has been a very educational process for me, and it's been

25    a very challenging process for all of us.  So, thank you.  And
```

1    then we will await your motions with respect to dismissing the

2    case and then any other steps that we need to take.  Thank you

3    so much.

4              ALL:  Thank you, Your Honor.

5              MR. CHESLER:  And to your entire staff, thank you

6    very much.

7              MR. CORDELL:  Yes.  Excellent.

8        (End of proceedings at 12:30 p.m.)

9                         -o0o-

```
1              C-E-R-T-I-F-I-C-A-T-I-O-N

2

3          I hereby certify that I am a duly appointed,

4   qualified and acting official Court Reporter for the United

5   States District Court; that the foregoing is a true and correct

6   transcript of the proceedings had in the aforementioned cause;

7   that said transcript is a true and correct transcription of my

8   stenographic notes; and that the format used herein complies

9   with rules and requirements of the United States Judicial

10  Conference.

11          DATED:  April 16, 2019, at San Diego, California.

12

13                      /s/  Chari L. Bowery

14                      _____
                        Chari L. Bowery
15                      CSR No. 9944, RPR, CRR

16

17

18

19

20

21

22

23

24

25
```